IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMIE LEE ANDREWS,            :
                                    :
       Plaintiff,          :
                                      :
       v.               :  CIVIL ACTION NO.
                                    :  1:14-CV-3432-WSD-JSA
MAZDA MOTOR CORPORATION, *et* :
*al.*,                               :
                                      :
       Defendants.    :

# **O R D E R**

Plaintiff Jamie Lee Andrews brings the above-captioned action as the surviving spouse and administrator of the estate of Decedent Micah Lee Andrews. In April of 2013, the Decedent died during a crash of his 2005 Mazda3. Plaintiff alleges that the crash was survivable, but for the defective operation of the vehicle restraint system in the Decedent's car, including the air bag, seat belt and seat track. Plaintiff brings several counts of negligence and strict liability against various Mazda Defendants (collectively referred to as "Mazda"), the manufacturer of the vehicle, and against various Autoliv Defendants (collectively referred to as "Autoliv"), the manufacturer of the seat belt.[1] This Order relates to certain discovery disputes that have arisen, as explained below.

---

[1] Certain other Defendants have already been dismissed.

## I.   PROCEDURAL HISTORY

Discovery was set to expire in this case in July 2015. On the eve of the expiration of discovery, the parties filed a Motion for Extension of Time to Complete Discovery [122], principally arguing that discovery had not been completed despite the due diligence of the parties, because of difficulties with retrieving and downloading data from the electronic "black box" associated with the Decedent's vehicle. The Court convened a teleconference about this motion to continue on August 7, 2015 [127], after discovery was originally set to expire. The parties in this call for the first time also indicated that certain disputes existed as to the scope of discovery, including as to whether Plaintiff was entitled to discovery relating to the vehicle restraint systems in other "similar" vehicles other than the Mazda3, as well as in the Mazda3 itself after it had been re-designed in 2010. The Court thereby set a timetable for the submission of letter briefs and set the case down for a hearing on these discovery disputes on August 26, 2015. *See* Minutes [141]; Transcript of August 26, 2015 Hearing [145] (hereinafter "Tr.").

After hearing extensive argument from the parties as to numerous individual disputes at the August 26 hearing, the Court stated a variety of rulings on the record, several of which required additional productions of documents to Plaintiff. Of relevance to this Order, the Court indicated that Plaintiff was entitled to certain

categories of additional documents relating to vehicles other than the Mazda3, but that were built on the same "platform" as the 2004-2009 Mazda3.[2] Otherwise, the Court sustained Defendants' objections to producing documents as to any other vehicles "similar" to the 2004-2009 Mazda3, which term was undefined, vague and ambiguous.

According to Plaintiff, certain Ford and Volvo vehicles were likely also built on the same platform as the Mazda3. The Court ruled that Mazda was not responsible for collecting materials in the possession of non-parties such as Ford and Volvo, but made clear that Mazda was to produce any such materials (if responsive) to the extent those materials were otherwise in its possession.

Because the parties did not appear to be clear on what vehicles were, in fact, produced on the same "platform" as the 2004-2009 Mazda3, the Court further required Mazda to provide an affidavit to Plaintiff identifying these other vehicles, if any. Tr. at 61-62.[3] The Court required that Defendants produce all supplemental documents

---

[2] Plaintiff sought these documents in an effort to discover whether safer alternative designs were implemented in the occupant restraint systems in these vehicles and therefore may have been available to use in the Decedent's vehicle.

[3] Although "platform" was not defined in the Plaintiff's discovery requests, the Court noted that this term was used by Mazda in its own business records. Thus, the Court found that Mazda should at least be able to respond with regard to those vehicles that it considered pursuant to its own business records to be part of the same platform. Tr. at 61-62. Plaintiff further pointed out that the term "platform" is defined in federal regulations, and requested that Defendants respond based on this definition,

to Plaintiff by October 21, 2015 and otherwise extended discovery to December 31, 2015. *Id.* at 129.

Mazda provided its affidavit to Plaintiff on October 9, 2015. The affidavit of Osamu Yamashina, Staff Manager, Office of General and Legal Affairs, stated that "[t]he specific platform upon which the 2004-2009 model year Mazda3 was manufactured was uniquely developed for the Mazda3. There are no vehicles, other than the Mazda3, which are built on the platform used to build the Mazda3." Yamashina Aff. at ¶ 9. The Yamashina Affidavit nevertheless acknowledged that "[t]he basic structure of the platform upon which the 2004-2009 Mazda3 was built was jointly engineered by [Mazda], Ford Motor Company and Volvo Cars," and Mr. Yamashina indicated that Mazda "understands" that the platforms upon which the Ford Focus and Volvo S40 were built "on this basic structure." *Id.* at ¶ 6. "However, the body structures and occupant restraint systems included in the Mazda3, Ford Focus and Volvo S40 were uniquely developed by each manufacturer respectively, reflecting the differences in these models' concepts and the independent manufacturers' safety philosophy and production issues." *Id.* Mr. Yamashina stated that "Ford and Volvo did not have any role in the design or manufacture of the occupant restraint system of the 2004-2009 model year Mazda3. Decisions regarding

to which request Mazda did not object. *Id.*

4

the design and manufacture of the occupant restraint system were made solely by [Mazda]." *Id.* at ¶ 8. Further, "[w]hile there might be document(s) indicating certain platform sharing was done between the three vehicles, [Mazda] does not have documents related to the specifics of the Ford Focus or the Volvo S40." *Id.* at ¶ 7.

Based on this information, Defendant Mazda stated to Plaintiff that, while supplemental documentation would be produced on October 21 based on other rulings by the Court, it would "have no additional documents to produce regarding other vehicles on the platform." Mazda Oct. 9, 2015 letter, at 1.

In a discovery teleconference on October 15, 2015, Plaintiff challenged the positions Mazda took in the Yamashina Affidavit, including that no other Mazda vehicles were manufactured on the same platform as the 2004-2009 Mazda3, and that Ford, Volvo and Mazda were uninvolved in the development of each others' occupant restraint systems. At a minimum, Plaintiff argued that this response ignored any mention of internationally-marketed vehicles, including the Mazda3 itself sold under different names overseas (including the "Axela," which according to Plaintiff is the name of the Mazda3 as sold in Japan).

Plaintiff also challenged whether the Yamashina Affidavit, which was from someone in the Mazda legal department as opposed to from a knowledgeable engineer, complied with the Court's direction at the August 26 conference. Further,

even if Mazda lacked documentation relating to the occupant restraint systems of the Ford Focus and Volvo S40, which Plaintiff disputed, Plaintiff argued that she should nevertheless be permitted to obtain whatever responsive documents Autoliv or its subsidiaries might possess.

The Court permitted the parties to submit limited letter briefing and supporting evidence on these questions. The Court has now received all of those submissions. The Court **GRANTS IN PART** and **DENIES IN PART** the Plaintiff's requests to compel, as follows.

## II.   DISCUSSION

### A.   *Legal Standards*

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, a party may obtain discovery regarding any non-privileged matter "that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* This rule is to be broadly construed, but is not an unlimited license for fishing expeditions, and it falls to the courts to impose "ultimate and necessary boundaries." *See Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978) (internal quotations and citations omitted). Discovery may be denied "where, in the

court's judgment, the inquiry lies in a speculative area." *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1326 (Fed. Cir. 1990).

In addition, all discovery is subject to the limitations of Rule 26(b)(2)(C), which states that the court must limit the extent of discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

FED. R. CIV. P. 26(b)(2)(C).

A party moving to compel bears the threshold burden of showing relevance. *See, e.g., Morrison v. Philadelphia Housing Authority*, 203 F.R.D. 195, 196 (E.D. Pa. 2001). Although the right to discovery is broad, "[s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).

Whether and to what extent a plaintiff in a vehicle defect case should receive discovery about performance, testing, design, or other information about other vehicles, allegedly similar to the one driven by the plaintiff, is a fact-specific inquiry with which several courts have wrestled in individual cases. As Judge Duffey has previously stated:

> Although there is "no black letter rule of law regarding discovery of [other] models in products liability cases ... discovery of similar, if not identical, models is generally permitted." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 381 (8th Cir.1992) Courts generally undertake a "fact specific determination of the extent of the similarities and dissimilarities" of claimed similar vehicle models to determine if discovery of a model other than that involved in an accident in litigation should be allowed under Rule 26. *Id.* at 381. "[D]ifferent models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation." *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 441 (S.D.N.Y. 1990). The models must share "pertinent characteristics" as they relate to the accident at issue. *Hofer*, 981 F.2d at 381. What is required is a specific factual showing of substantial similarity. Conclusory statements of alleged similarity are not enough. *See Piacenti v. Gen. Motors Corp.*, 173 F.R.D. 221, 225 (N.D.Ill.1997).

*Gibson v. Ford Motor Co.*, 510 F.Supp.2d 1116, 1120 (N.D.Ga. 2007).

B.     *Discovery Into Non-Mazda3 Vehicles*

As noted above, the Court previously ordered Defendant Mazda to provide affidavit testimony identifying any other vehicles manufactured on the same "platform" as the 2004-2009 Mazda3, and ordered Defendant to produce limited documentation about the occupant restraint systems in those vehicles, if any. The

8

Court also ordered Mazda to produce otherwise responsive documents relating to Ford and Volvo cars, if those documents were otherwise in Mazda's possession. As a result, Defendant has produced the Yamashina Affidavit, which attests that no other vehicles were produced on the same platform as the 2004-2009 Mazda3. The affidavit also provides that while this platform was based on the same "basic structure" as those for the Ford Focus and Volvo C40, the ultimate body structures and systems for these vehicles were uniquely developed by the respective manufacturers.

Plaintiff, in response, challenges Yamashina's characterization of the Mazda3 "platform," and urges the Court based on various documentary submissions to find that several other vehicles (including the Mazda Axela, the Ford Focus, and the Volvo S40) were also in fact manufactured on that same platform and to order additional discovery as a result.[4] The Court addresses the specific issues below.

_____

[4] In directing Mazda to produce this affidavit to clarify its factual position as to the extent of the Mazda3 platform, the Court stated "what I think we need is some sort of testimony, just an affidavit that just explains, you know, this is the platform and these are the cars." Tr. at 61. In further remarks discussing the anticipated affidavit, the Court referred to it as coming from a "knowledgeable engineer." *Id.* Plaintiff now criticizes the Yamashina Affidavit, as it comes from a manager in the Mazda legal department, who is apparently not an engineer. Nevertheless, Mr. Yamashina attests that "I am responsible for address product liability matters involving Mazda vehicles, including [Mazda's] discovery responses," and that "I make this affidavit based upon my personal knowledge, investigation, and a review of [Mazda's] records." Yamashina Aff. at ¶¶ 2-3.

The Court's comments at the hearing clearly suggested that it assumed the affidavit would come from a "knowledgeable engineer." But the Court did not intend

1.      The Axela and Other Non-U.S. Vehicles

Mr. Yamashina attests that "[t]here are no Mazda vehicles, other than the Mazda3, which are built upon the platform used to build the Mazda3." Yamashina Aff. at ¶ 9. Obviously, this sweeping statement omits the Mazda Axela or any other non-U.S. marketed vehicles.

Plaintiff point to Mazda's own documents, which appear to describe the "Axela" and the "Mazda" as, respectively, the "domestic name" and "overseas name" for what is otherwise listed as the same car. Pl. Oct. 16, 2015 letter brief, Ex. 1.[5] Defendant's letter brief, in response, does not appear to either admit or dispute that the Axela is the Japanese analog to the Mazda3. Defendant instead makes two arguments:

First, Defendant argues that it had consistently objected to demands for discovery as to vehicles marketed outside of the United States on grounds of relevance, and "Plaintiff did not raise this objection in any correspondence regarding [Mazda's] discovery responses, which date back to March of this year, nor was

to order, and the language at the hearing did not clearly constitute an order, for Mazda to provide any particular witness. Here, some of Mr. Yamashina's information here may be based on hearsay, but hearsay is generally permitted in this pretrial discovery dispute. Otherwise, Mr. Yamashina establishes that he is competent to testify about the matters stated. Thus, the Court does not reject the Yamashina Affidavit on this threshold ground.

[5] This appears to be a document describing the market from the domestice Japanese perspective, which is why the Axela is described as the "domestic name" and the Mazda3 as the "overseas name."

[Mazda's] objection/limitation address or challenged by any party at the August hearing. Because [Mazda's] objection was not challenged, [Mazda] believed that the scope of the discovery issue was limited to Mazda vehicles marketed in the United States, and [Mazda] applied this interpretation when investigating the issues and preparing the affidavit." Mazda Oct. 30, 2015 letter brief, at 2.

Second, "[n]ow that Plaintiff has clarified that she seeks production of Axela documents, [Mazda] reiterates its objections to relevance and discoverability." *Id.* at 3. As Mazda argues:

> The Court's August ruling on relevance with respect to the platform did not take into consideration the different issues which are raised when discovery is sought for international vehicles. Documents related to the Axela, a vehicle built to be driving in Japan, would not be discoverable as the subject Mazda3 was not built in Japan and therefore had to meet different regulatory and safety standards than an Axela built to be operated in Japan. The simple fact that the subject Mazda3 may have been manufactured in Japan does not change this analysis, as the subject Mazda3 was built to be driven in the United States.

*Id.*

Plaintiff characterizes Defendant's failure to identify the Axela in the Yamashina Affidavit, and Defendant's explanation that "[Mazda] believed that the scope of the discovery issue was limited to Mazda vehicles marketed in the United States, and [Mazda] applied this interpretation when investigating the issues and preparing the affidavit," as intentional "evasions and misrepresentations." Pl. Nov. 6,

2015 letter brief. Plaintiff points out that Plaintiff's counsel mentioned the Axela and a list of other internationally-marketed versions of the Mazda3 at the August hearing, and that Defendant never raised the objection as to international scope at the hearing itself. Plaintiff characterizes this as a "silent objection," hidden "somewhere in its piles of discovery responses," but not clearly asserted and brought to the Court's attention.[6]

Plaintiff otherwise does not respond on the merits of the relevance objection, that is, as to how a version of a vehicle manufactured to be driven in another country, pursuant to a different set of regulatory and safety standards, necessarily "share 'pertinent characteristics' as they relate to the accident at issue." *Gibson v. Ford Motor Co.*, 510 F.Supp.2d 1116, 1120 (N.D.Ga. 2007).

The Court agrees with Plaintiff, that if Yamashina's assertion that "no other Mazda vehicles" were produced on the Mazda3 platform was limited to U.S.-marketed vehicles only, that limitation should have been stated. Nevertheless, the Court cannot find this to be an entirely "silent" or "hidden" objection, as Mazda expressly objected to any discovery as to non-U.S. vehicles from the inception of discovery in this case.

---

[6] Plaintiff indicates that she is focusing on the Axela because she has proof, in the form of Mazda's own documents, that the Axela is the Japanese analog of the Mazda3. Plaintiff suggests that other analogs of the Mazda3 may have been used in other countries, such as the Mazda3 Speed. Tr. at 16; Pl. Nov. 6. 2015 letter brief, at n.5.

Neither side brought this issue specifically to the Court's attention for consideration during the August hearing or earlier. Both sides, essentially, argue that it was the other's responsibility to do so. The Court is frustrated with this as another instance of delay in these proceedings. This is yet another dispute that the parties were aware of as early as March 2015, yet was not brought to the Court's attention for a ruling on the fundamental issue of the scope of non-Mazda3 discovery until well after discovery was set to expire.

Beyond the finger-pointing, the Court is left with the critical question of whether there is any specific, non-conclusory factual support to justify discovery into non-U.S. vehicles under the legal standards identified above, that is, on the basis that "they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation." *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 441 (S.D.N.Y. 1990). As the proponent of this discovery, Plaintiff argues that "it makes no sense to object to producing documents because they pertain to a car made in Japan," given that the Decedent's Mazda3 *itself was made in Japan*." Pl. Oct. 16, 2015 letter brief, at 2 (emphasis added). Plaintiff also argues that these documents are "instrumental" to Plaintiff's ability to prove her case, because "[s]he *must* prove an alternative, feasible design." *Id.* (emphasis added). Neither of these assertions states any fact-based support for the relevance of the requested discovery, however. Indeed,

Plaintiff offers no reply at all to Defendant's argument that "[d]ocuments related to the Axela, a vehicle built to be driving in Japan, would not be discoverable as the subject Mazda3 was not built in Japan and therefore had to meet different regulatory and safety standards than an Axela built to be operated in Japan." Mazda's Oct. 30, 2015 letter brief, at 2.

The Court therefore finds that Plaintiff has not made a specific, non-conclusory factual showing that the internationally-marketed model at issue "share[s] with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation." *Fine*, 133 F.R.D. at 441; *see also Gibson*, 510 F.Supp.2d at 1120. To be sure, Mazda's own documents appear to describe the Axela as the Japanese analog of the Mazda3. But this does not necessarily mean that the cars are identical–or even substantially comparable in any particular respect–in an industry in which regulatory and other standards affect production and design. In other words, absent some specific explanation otherwise, the Court cannot just assume that a car built exclusively to be driven in Japan, based on Japanese regulatory and other standards standards, would provide an apples-to-apples comparison with regard to the occupant restraint system in the Mazda3, much less shed light on any alternative, feasible design available in the U.S. market. Notably, Plaintiff's reply is silent on this substantive issue.

Thus, while the Axela and Mazda3 may generally be analog vehicles, Plaintiff offers nothing to specifically support the requested discovery. All Plaintiff offers is speculation that this discovery might be helpful in this regard, which is not enough. *See Gibson*, 510 F.Supp.2d at 1120 (denying discovery as to other vehicle models, when the plaintiff offered nothing other than "general, unspecific and conclusory claims" that those models shared relevant accident-causing characteristics so as to be a proper basis of comparison with the vehicle at issue in the suit); *see also Steede v. General Motors, LLC*, No. 2:11-CV-2351-STA-dkv, 2012 WL 6846529, at *7 (W.D. Tenn. Nov. 2, 2012) (request for discovery as to different vehicle models, sought as potential evidence of alternative design, was denied absent "specific, non-conclusory, factual showing" in support); *Barcenas v. Ford Motor Co.*, No. C 03-04644RMWE, 2004 WL 2827249, at *7 (N.D. Calif., Dec. 9, 2004) (plaintiff failed to show through non-conclusory factual assertions that particular tires were sufficiently similar in material respects to the accident-causing tires at issue in the litigation such as to justify discovery); *Piacenti v. General Motors Corp.*, 173 F.R.D. 221, 226 (N.D.Ill. 1997) (plaintiff failed to show that vehicle models were sufficiently similar in relevant respects so as to persuade court to compel production of requested discovery).

2.      Discovery from Mazda as to Ford and Volvo Vehicles

According to the Yamashina Affidavit, "[t]he basic structure of the platform upon which the 2004-2009 Mazda3 was built was jointly engineered by [Mazda], Ford Motor Company and Volvo Cars," and Mazda "understands the Ford Focus and Volvo S40 were built on this basic structure." Yamashina Aff. at ¶ 6. Nevertheless, according to Yamashina, "the body structures and occupant restraint systems" in these three vehicles were "uniquely developed by each manufacturer respectively, reflecting the differences in these models' concepts and the independent manufacturers' safety philosophy and production issues." *Id.* Yamashina thus characterizes the Mazda3 as having been manufactured on a platform unique to it, even if there was some "platform sharing" with Ford and Volvo, and even if the Focus and S40 were built on the same "basic structure."

Plaintiff, among other things, points to press releases stating that "the basic engineering platform used for the Mazda3 will also serve as a basis for the Volvo S40 and for the next version of the Ford Focus in Europe ," testimony given by a Mazda official in another case that "Mazda, Volvo and Ford Europe were involved in the development of the vehicle that would become the base for the Mazda3," and official notices to the Government describing the Volvo S40 and other vehicles as "substantially similar" to the Mazda3. Pl. Oct. 16, 2015 letter brief, Ex. 14-16.

The parties argue about whether or not Ford and Volvo may have been involved in the development of the occupant restraint system of the 2004–2009 Mazda3. The Court sees this dispute as moot, because the Court at the August 26 hearing generally required Mazda to produce documents in its possession (whether originally authored by Mazda, Ford or Volvo) regarding the development of that system and design changes that were made. In other words, if Ford or Volvo contributed to the development of the 2004-2009 occupant restraint system, the Court's rulings at the August hearing sufficiently cover the discoverability of any Ford or Volvo documents currently in Mazda's possession.

It is somewhat less clear whether Mazda has searched for and produced documents that it may have relating to the design of the occupant restraint systems of the Volvo S40 and Ford Focus models built on the same "basic structure" as the 2004-2009 Mazda3. The Court generally ordered Mazda to produce Ford and Volvo documents in its possession that are "otherwise discoverable." Tr. at 56. Mazda's letter brief suggests that, in compliance with this direction, it searched for and failed to locate any documents relating to the occupant restraint systems of the Ford and Volvo sister vehicles. Mazda Oct. 30, 2015 letter brief, at 4. However, it appears that Mazda also continues to take the position that the Volvo S40 and Ford Focus technically do not share the specific platform as the Mazda3–even though they share

17

the same "basic structure"–which appears to mean that Plaintiff believes the occupant restraint systems of those cars are not subject to the Court's August discovery orders.

Plaintiff is entitled to clarity on this question. Thus, the Court orders Defendant Mazda to produce documents in its possession, if any, sufficient to show the design, specifications and performance objectives of any occupant restraint system (or component thereof) of the Volvo S40 and Ford Focus models built on the same "basic structure" as the 2004-2009 Mazda3.[7] If there are no such documents in its possession, Mazda is to specifically inform Plaintiff of that fact. This *appears* to be what Mazda is representing in its letter brief, but the Court perceives some ambiguity, and so requires Mazda to make this clarification. In all other respects, the Court denies the relief requested by Plaintiff.

---

[7] Whether one uses the term "platform" or "basic structure," it appears undisputed that these three vehicles were structurally similar and produced for the same market and under the same regulatory and safety standards. This at least allows a threshold inference that the same or similar occupant restraint design choices could have been used among the three vehicles. Indeed, Yamashina himself suggests that differences in the occupant restraint systems among these vehicles would be attributable, in part, to differences in "safety philosophy" among the manufacturers. Thus, unlike as to the Axela, there is at least some basis to allow a comparison among these vehicles, and, significantly, Mazda does not specifically argue otherwise. Mazda's argument, rather, is that it simply does not possess the requested Ford and Volvo documents.

3.      Discovery from Autoliv as to the Volvo S40 Seatbelt Design

While Mazda appears to represent that it lacks any Ford or Volvo documents regarding the occupant restraint systems of the S40 or Focus, that might not be the case as to Autoliv. Autoliv confirms that one of its subsidiaries manufactured the seatbelt for the Volvo S40, and does not dispute that this subsidiary may still have relevant documents. Plaintiff therefore asserts that, because the Volvo S40 was built on the same "basic structure" as the 2004-2009 Mazda3, Autoliv should be required to produce at least limited documentation, if Autoliv possesses it, sufficient to show the design specifications and performance objections of the S40 Volvo seatbelt.

Autoliv argues that Plaintiff has not made a requisite "showing of similarity" between the seatbelt of the Mazda3 and the seatbelt of the Volvo S40. According to Autoliv, in fact, "all of the major components of the seatbelt assemblies are different; these two seatbelts have different retractors, different buckles, different pretensioners and different load limiters." Autoliv Oct. 30, 2015 letter brief, at 4. Autoliv also argues that the burden of producing these documents outweighs the benefit, because the documents are in the possession of a foreign non-party Autoliv subsidiary. *Id.* at 4-5.

In the October 15, 2015 teleconference, the Court indicated that it would be inclined to rule in Autoliv's favor as to discoverability of the Volvo S40 seatbelt.

19

However, the Court indicated it would allow Plaintiff the opportunity to submit letter briefs on the issue and would reconsider its ruling in light of a fuller record. Now with a proper record, and more opportunity to reflect on the parties' arguments and the applicable law, the Court finds it appropriate to reconsider its view and order limited discovery as to the S40 seatbelt documents.

The "showing of similarity" that Plaintiff must make, after all, is not necessarily between the seatbelt systems of the two models. Indeed, Plaintiff's theory is that the seatbelts are likely to be different, demonstrating that a different and safer system was available for use on the Mazda3. Rather, the "showing of similarity" is between the models themselves, sufficient to at least permit a threshold inference that the same or similar decisions as to seatbelt configuration could have been made in either car. Again, given that the S40 and Mazda3 share the same "basic structure," different design choices as to the occupant restraint system were based in part on different "safety philosophy," and neither Mazda itself nor Autoliv points to any material structural differences to show otherwise, the Court cannot find as a matter of law at this stage in the proceeding that the seatbelt design of the S40 would be an irrelevant comparator.

As to burden, Plaintiff shows that Autoliv's parent company was dismissed from this lawsuit on the specific representation that it would continue to comply with


discovery requests as if it were a party. And Autoliv does not dispute that the documents at issue here are within the custody and control of this former party-defendant. Moreover, Plaintiff clarifies that she only seeks documents sufficient to show the design specifications and performance objectives of the S40 seatbelt. Plaintiff states, and Autoliv does not dispute, that the equivalent production as to the Mazda3 seatbelt totaled only five documents. Thus, the Court finds that there is minimal burden imposed on Autoliv, and this does not outweigh the potential relevance of the material to Plaintiff.

Thus, the Court orders Autoliv to produce documents within its possession, if any, sufficient to show the design specifications and performance objectives of the seat belt system of 2004-2009 Volvo S40 model or models.

## III. CONCLUSION

As explained more specifically above, the Court:

**DENIES** Plaintiff's request for discovery as to internationally-marketed analogs of the Mazda3, such as the Axela; and

**GRANTS**, in part, Plaintiff's request for additional limited discovery from Mazda and Autoliv, as to the 2004-2009 Ford Focus and Volvo S40.

Because of the likelihood, based on Mazda's previous representations, that it lacks any new documents to produce, and because the documents that Autoliv is

ordered to produce (if it has them) are very limited in volume and scope, and because of the December 31, 2015 discovery cut-off date, the Court sees no reason to allow more than **thirty (30) days** from the date of this Order for compliance with these orders. To the extent any Defendant has no documents to produce in response to this Order, that Defendant should inform Plaintiff forthwith and not wait until the end of the thirty-day period.[8]

IT IS SO ORDERED this 12th day of November, 2015.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

_____

[8] The Court is mindful that this new discovery, however minimal in volume, may *somewhat* warrant an extension of the December 31, 2015 discovery cut-off. As soon as the parties know whether new documents will be produced and how many, they may call the Court jointly to discuss any requests for a slightly modified schedule. The Court expects all other discovery not specifically related to what will likely be a small volume of Ford and/or Volvo documents to be proceeding apace, including depositions and expert disclosures. If an extension beyond December 31 is allowed to account for the recent production of new documents, the Court will be eager to issue as short of an extension as possible, and one that is narrowly-tailored to what is specifically necessary to address these new documents.