IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMIE LEE ANDREWS, as surviving spouse of Micah Lee Andrews, Deceased, and JAMIE LEE ANDREWS, as Administrator of the Estate of Micah Lee Andrews, Deceased,

        Plaintiff,

v.

AUTOLIV JAPAN, LTD and JOHN DOES 1-5,

        Defendants.

1:14-cv-3432-WSD

## OPINION AND ORDER

This matter is before the Court on Defendant Autoliv Japan, Ltd.'s ("Autoliv") Motion for Summary Judgment [224].

### I. BACKGROUND

    A.   <u>Facts</u>

        1.   <u>Background</u>

This product liability action arises from the April 12, 2013, death of Micah Lee Andrews. Mr. Andrews died when his 2005 Mazda3 veered off Interstate 575 and collided with three trees. Plaintiff Jamie Lee Andrews ("Plaintiff") contends

Autoliv's driver's seatbelt assembly ("Seatbelt Assembly") design should have incorporated one of two alternate designs: (1) a torsion bar with a higher deployment threshold, or (2) a "stop" feature. Plaintiff contends Autoliv's failure to incorporate these designs into the Seatbelt Assembly render the Restraint System[1] defective.

### 2. The Car Accident

On April 12, 2013, Mr. Andrews was involved in a single-car accident while traveling on I-575 in his 2005 Mazda3. (Autoliv's Statement of Undisputed Material Facts [224.2] ("DSUMF") ¶ 1; Pl.'s Resp. [247.1] ¶ 1). William Kemp, a witness to the accident, testified that he was driving in the right lane when he saw Mr. Andrews' vehicle approaching him in his rearview mirror. (DSUMF ¶ 2; Pl.'s Resp. ¶ 2). Mr. Kemp testified that he believes the speed limit was 65 miles per hour on the interstate. (Dep. Of William J. Kemp, II [229] ("Kemp Dep.") at 13:17-18). Because he "generally drive[s] around the speed limit, Mr. Kemp believes that, when he first saw Mr. Andrews' car in his rearview mirror, he was driving around the speed limit. (Id. at 13:15-23). Mr. Kemp testified that he slowed down as Mr. Andrews passed him. (Id. at 65:20-25). He stated that

---

[1]   The supplemental airbag system ("SAS"), drivers side airbag module ("DAB Module"), and the Seatbelt Assembly, in addition to other components, constitute the occupant restraint system ("Restraint System") of the 2005 Mazda3.

Mr. Andrews' car then left the highway onto a steep embankment, and that it appeared that Mr. Andrews' vehicle "left the ground" as it exited the highway. (Id. at 17:10-25).

Mr. Andrews' car struck a cluster of trees. (Pl.'s Statement of Additional Facts [247.1] ("PSAF") ¶ 68; Autoliv's Resp. [259.2] ¶ 68). Two experts, Gregory Stephens and G. Bryant Buchner, opined on the speed at which Mr. Andrews' car was traveling at the time it hit the trees. Mr. Buchner opined the car was traveling around 35 miles per hour, and Mr. Stephens opined that the car was travelling in the low-to-mid 40s. (See DSUMF ¶ 8; PSAF ¶ 77; [224.3] at 26). The driver's side airbag in Mr. Andrews' vehicle did not deploy during the accident. (DSUMF ¶ 9; Pl.'s Resp. ¶ 9). Mr. Andrews' head slammed into the steering wheel, (see PSAF ¶ 73), and he died from injuries he sustained in the collision. (DSUMF ¶ 10; Pl.'s Resp. ¶ 10). Mr. Andrews was wearing his seatbelt properly at the time of the accident. (See PASF ¶¶ 87, 88; Autoliv's Resp. ¶¶ 87, 88).

        3.     Restraint System

The 2005 Mazda3 was part of Mazda's J48C program. (DSUMF ¶ 11; Pl.'s Resp. ¶ 11). The vehicle platform for the J48C program was jointly engineered by Mazda, Ford, and Volvo. (DSUMF ¶ 12; Pl.'s Resp. ¶ 12). The Restraint System comprises multiple parts, including the DAB Module and the Seatbelt Assembly.

(DSUMF ¶ 13; Pl.'s Resp. ¶ 13). Autoliv supplied the DAB Module and Seatbelt Assembly.[2]

The crux of the parties' dispute is whether Autoliv designed the Seatbelt Assembly for the 2005 Mazda3. (See DSUMF ¶ 19; Pl.'s Resp. ¶ 19). Autoliv contends Mazda made decisions regarding the design of the Restraint System, and Plaintiff contends that, while some decisions were made by Mazda, Autoliv manufactured and was heavily involved in the design of the seatbelt. (DSUMF ¶¶ 19, 20; Pl.'s Resp. ¶¶ 19, 20). Plaintiff contends that email communications between Autoliv and Mazda show that Autoliv analyzed computer simulations of the seatbelt's performance in frontal crashes, that Mazda asked Autoliv to look into "countermeasures" to address that the dummy's head was slamming into the steering wheel, and that Autoliv was responsible for analyzing the sled testing that

---

[2] The DAB Module is one component of the airbag system, which also includes the passenger airbag module, the SAS unit, the upfront impact sensor ("UFS"), the wiring harness, a clock-spring assembly, and driver seat track position sensor, the passenger seat weight sensors, buckle sensors, and warning lamps. (DSUMF ¶ 14; Pl.'s Resp. ¶ 14). The Seatbelt Assembly also has numerous parts. (DSUMF ¶ 15; Pl.'s Resp. ¶ 15). Other components in the Restraint System include the vehicle's structure, its seat backs, and the steering wheel. No one component in the Restraint System works in isolation. The airbag system and the Seatbelt Assembly are designed to work together along with all of the other components of the Restraint System, though the seatbelt is meant to provide primary restraint, and the airbag is meant to provide supplemental restraint. (DSUMF ¶ 17; Pl.'s Resp. ¶ 17).

Mazda conducted. (Pl.'s Resp. ¶ 21). The Court describes the evidence in detail below.

    B.    <u>Procedural History</u>

On September 18, 2014, Plaintiff filed this product liability action in the State Court of Fulton County, Georgia.[3] On October 24, 2014, this action was removed to federal court. On March 18, 2015, Plaintiff filed her Second Amended Complaint [90] ("SAC"). The SAC contains the following state-law claims against Autoliv: Strict Product Liability under O.C.G.A. § 51-1-11 based on design defects (Count III); negligence (Count IV); and punitive damages under O.C.G.A. § 51-12-5.1 (Count X).

On March 30, 2016, Autoliv filed its Motion for Summary Judgment. Autoliv argues that, because it was not actively involved in designing the Seatbelt Assembly, it cannot be held liable for the allegedly defective design of the Seatbelt Assembly. On April 25, 2016, Plaintiff filed her opposition to Autoliv's Motion [247]. Plaintiff argues that the load-limiting device in the seatbelt retractor was defectively designed, and that this defective design proximately caused

---

[3] Plaintiff brought claims against Mazda Motor Corporation, Mazda Motor of America, Inc., multiple Autoliv-affiliated entities, Robert Bosch LLC and Robert Bosch North America Corporation. All defendants other than Autoliv and John Does 1-5 have been dismissed from this action.

Mr. Andrews' death. Plaintiff argues that, under Georgia law, both a manufacturer and a designer can be held strictly liable, and that Autoliv is liable under both theories.

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

    B.    Analysis

Under Georgia law, there are three general categories of product defects: (1) manufacturing defects, (2) design defects, and (3) warning defects.

7

Banks v. ICI Americas, Inc., 450 S.E.2d 671, 672 (Ga. 1994). Plaintiff contends Autoliv is liable for the negligent design of certain components in the 2005 Mazda3. Georgia law provides for strict liability against a "manufacturer" of a negligently-designed product. The statute provides:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

O.C.G.A. § 51-1-11. Georgia law also provides that "a product seller is not a manufacturer as provided in Code Section 51-1-11 and is not liable as such." O.C.G.A. § 51-1-11.1(b). A product seller is defined as:

> [A] person who, in the course of a business conducted for the purpose leases or sells and distributes; installs; prepares; blends; packages; labels; markets; or assembles pursuant to a manufacturer's plan, intention, design, specifications, or formulation; or repairs; maintains; or otherwise is involved in placing a product in the stream of commerce. This definition does not include a manufacturer which, because of certain activities, may additionally be included within all or a portion of the definition of a product seller.

O.C.G.A § 51-1-11.1(a). The Georgia General Assembly enacted Section 51-1-11.1 to "overrule those cases that had created a broad category of entities that had no real role in the creation of products." Alltrade, Inc. v. McDonald, 445

8

S.E.2d 856, 858 (Ga. Ct. App. 1994) (quoting Freeman v. United Cities Propane Gas of Ga., 807 F. Supp. 1533 (M.D. Ga. 1992)).  Based on these statutory provisions, Georgia courts have held that, under Section 51-1-11, "strict liability applies only to those actively involved in the design, specifications, or formulation of a defective final product or of a defective component part which failed during use of a product and caused injury."  Davenport v. Cummins Alabama, Inc., 644 S.E.2d 503, 507 (Ga. Ct. App. 2007); see also Carolina Tobacco Co. v. Baker, 670 S.E.2d 811, 815 (Ga. Ct. App. 2008) (noting that Georgia product liability laws contain complex distinctions between a "manufacturer" subject to strict liability and a "product seller" who is not, and that the concept of "manufacturer" has been refined by case law to mean one who is "actively involved in the design, specifications, or formulation of a defective final product or of a defective component part which failed during use of a product and caused injury." (quoting Davenport, 644 S.E.2d at 507)).

The Georgia Court of Appeals' decision in Davenport is instructive.  In Davenport, the plaintiff suffered injuries when the tree chipper he was operating caught fire.  644 S.E.2d at 504.  The plaintiff asserted product liability claims against, among other entities:  (i) Precision Husky, the designer and assembler of the chipper; and (ii) Cummins Alabama, the company that sold Precision Husky

9

the engine it installed in the chipper. Id. at 505. Cummins Alabama "manufactured" the engine, worked with Precision Husky to determine whether a particular engine would supply the required horsepower, and performed engine installation reviews to ensure the engine was installed properly and to identify issues that might affect the engine's reliability, durability, or performance to avoid damage or premature wear to the engine. Id. at 505-506. Due to the use of a new clutch system, Cummins Alabama instructed Precision Husky to relocate the chipper's hydraulic pumps to the rear of the engine, and Precision Husky did so. Id. at 507. Based on these facts, the Georgia Court of Appeals found that Cummins Alabama did not actively participate in the conception, design, or specification of the chipper, and thus was not strictly liable as a manufacturer. The court noted:

> Cummins Alabama's only input into the design was limited to saying, in essence, that the particular engine would perform adequately in a chipper with the intended hydraulic load only if the hydraulic system was connected to the main drive shaft at the rear of the engine and not to a front or pad-mounted hydraulic drive at the front of the engine.

Id. at 508. The court distinguished its holding from the holding in Buchan v. Lawrence Metal Prods., 607 S.E.2d 153 (Ga. Ct. App. 2004), in which the court

denied summary judgment where there was evidence that a seller chose, purchased, and assembled units of a crowd control system according to its own design.[4]

The allegedly defective component in this case is the Seatbelt Assembly.[5] With respect to this component, the evidence shows that Autoliv supplied a Seatbelt Assembly that met Mazda's detailed specifications. (DSUMF ¶ 67; Pl.'s Resp. ¶ 67; Hirobayashi Decl. ¶ 3; Prentkowski Dep. at 60:13-22; Van Arsdell Dep. at 196:18-197:1). Autoliv provided Mazda with several samples of seatbelt components that included torsion bars with different deployment thresholds, and

---

[4] Plaintiff attempts to distinguish Davenport, arguing that Cummins Alabama was a component supplier that did not manufacture the allegedly defective product. Plaintiff argues that, unlike in Davenport, it is undisputed that Autoliv "manufactured" the Seatbelt Assembly. Plaintiff argues that Georgia law provides that a manufacturer *or* product designer may be held strictly liable, and thus Autoliv may be liable as *either* a manufacturer or designer. Plaintiff misunderstands Georgia law and the definition of "manufacturer" under O.C.G.A. § 51-1-11. As explained above, the Georgia General Assembly enacted Section 51-1-11.1 to provide a specific definition of "product seller" to "overrule those cases that had created a broad category of entities" that qualified as manufacturers. See Alltrade, 445 S.E.2d at 858. Recognizing the complex distinctions between a "manufacturer" subject to strict liability and a "product seller" that is not, the Georgia Court of Appeals in Davenport limited liability under Section 51-1-11 to those entities "actively involved in . . . design, specifications, or formulation . . . ." 644 S.E.2d at 507; see also Carolina Tobacco, 670 S.E.2d at 815. This is the standard that governs liability in design defect cases. See Bailey v. Cottrell, Inc., 721 S.E.2d 571, 573 (Ga. Ct. App. 2011) (citing the Davenport "actively involved" standard as the standard governing liability in design defect cases).

[5] Plaintiff does not appear to contend that the DAB Module contains a design defect. (See [247] at 9-10).

Mazda performed testing and ultimately decided to utilize a load limiting retractor with a torsion bar with a deployment threshold of 2 ± .5 kN. (Prentkowski Dep. at 131:4-132:13; Van Arsdell Dep. at 197:24-198:14; Hirobayashi Decl. ¶ 8; Hinger Dep. at 293:17-294:14). Put another way, as Mazda's expert testified, Mazda "worked together with [Autoliv] to ensure the appropriateness of th[e] [seatbelt] design for the vehicle, and then Mazda ultimately decide[d] that it me[t] their specifications for incorporation into the vehicle." (Hinger Dep. [233] at 218:9-16).

To rebut this evidence, Plaintiff presents the following evidence it contends supports that Autoliv helped design the Seatbelt Assembly:

1) The engineering specification for the Mazda3 seatbelt states that Autoliv "designed," "approved," and "checked the seatbelt specification," (PASF ¶ 129);

2) Autoliv, in its pleadings and discovery responses, states that it "acted reasonably and in good faith in the design, manufacture, and warnings related to its products," and that it "complied with" the scientific, technical, and commercial-feasibility knowledge available when "the product at issue was handled with respect to its design, manufacture, and all warnings, instructions, and labels," (PASF ¶ 130);

3) Autoliv's corporate witness stated that Autoliv and Mazda negotiated the detailed specification for the seatbelt, and as a result, Autoliv "actually create[d] the—the Mazda drawings for the program," (PSAF ¶ 131);

4) On January 16, 2002, Autoliv employee Manabu Touno wrote to Mazda that he had analyzed the computer modeling of the Mazda3's crash performance in an offset deformable barrier test, (PSAF ¶ 132);

12

5) Autoliv was responsible for analyzing the sled testing that Mazda conducted, (PSAF ¶ 135);

6) Autoliv considered changing its designs for the Mazda3 to a "higher load level, implement digressive load limiters or retractor pretensioners instead of R27LL," (PSAF ¶ 138); and

7) Mazda asked Autoliv to look into "countermeasures" to address the fact that the dummy's head was slamming into the steering wheel, (PSAF ¶ 134)."

The evidence Plaintiff presents largely does not support Plaintiff's argument or is taken out of context. As to the first two categories, boilerplate statements regarding Autoliv's "design" of the seatbelt do not support that Autoliv was actively engaged in determining the specifications of the seatbelt at issue in this litigation. With respect to the third category, Plaintiff takes the testimony of Mr. Prentkowski out of context. With the benefit of context, it is clear that Mr. Prentkowski referred to Autoliv's negotiation with Mazda regarding how changes to specification drawings would be recorded. (Prentkowski Dep. [237] at 79:18-81:19) Mr. Prentkowski further testified:

> I specifically asked "Did Mazda ask Autoliv Japan for any input on the system-level design specification?" "Not on the seat"—the Autoliv Japan response was, "Not on the seat belt systems . . . ."

(Id. at 80:21-25). As to the fourth category, that Autoliv analyzed computer modeling of the Mazda3's crash performance does not support that it was actively involved in the design or specification of the Seatbelt Assembly. With respect to

13

the fifth category, the document upon which Plaintiff relies states in full that "Mazda formally informed [Autoliv] that the sled testing would be conducted by Mazda and Autoliv's role was to analyze and evaluate data only." (Autoliv's Resp. ¶ 135). Again, that Autoliv analyzed and evaluated data does not show that Autoliv actively participated in the design of the Seatbelt Assembly. The sixth category misstates the document upon which Plaintiff relies. The document states: "Mazda have [sic] difficulties to achieve their US NCAP targest with the current restraints system. They intend to change to higher load level, implement digressive load limiters or retractor pretensioners instead of R27LL. Timing and costs were submitted[.] Mazda still have not come to a decision." (Autoliv's Resp. ¶ 114). This document supports that Mazda, not Autoliv, designed and set forth the specifications for the Seatbelt Assembly.

Finally, the seventh category of evidence relies upon a January 8, 2002, email, from a Mazda employee to an Autoliv employee. The Mazda employee stated he was writing to "send along" Mazda3 forecast modeling data and "countermeasure proposals." ([247.3] at 161). Mazda noted that the modeling tests showed "bottoming of the head . . . on the STG wheel." (Id.). Mazda outlined seven proposed countermeasures, including "Increase power of pretensioner," and "Switch to dual pretensioner." (Id.). Mazda asked Autoliv to

"look into" the countermeasure proposals.  (Id.).  This email does not show that Autoliv was actively involved in the design of the Seatbelt Assembly.  Importantly, Mazda, not Autoliv, provided the countermeasures Autoliv was to "look into," and Plaintiff does not offer any evidence to show that Autoliv's analysis of the countermeasures resulted in Autoliv suggesting or enacting any changes to the Seatbelt Assembly design.

In sum, viewing the evidence in the light most favorable to Plaintiff, Plaintiff offers only bare speculation to support its argument that Autoliv was actively involved in the design of the Seatbelt Assembly.  The evidence supports only that Autoliv's role was limited to choosing the components appropriate for the Mazda3 based on Mazda's specifications, while Mazda made the ultimate decision regarding the types of components to incorporate.  This is the type of involvement the Davenport court found insufficient to create a triable issue with respect to liability under O.C.G.A. § 51-1-11.  Cf. Villegas v. Deere & Co., 135 F. App'x 279, 280-81 (11th Cir. 2005) (evidence that component supplier's engineers designed and produced the final products, provided design drawings, gave final approval of the design plans, and provided specifications for redesigns was sufficient to create triable issue whether supplier was liable for negligent design).

Accordingly, Autoliv's Motion for Summary Judgment is granted on Plaintiff's design defect claim under O.C.G.A. § 51-1-11.

As to Plaintiff's negligence claim, under Georgia law, "the claim of negligent design defect has, in effect, merged into the statutory claim of design defect." Ga. Products Liability Law § 2:1 (4th ed.); see also Perez-Hernandez v. Mitsubishi Motors Corp., No. 1:03-cv-1269-WSD, 2005 WL 6032881, at *2 n.3 (N.D. Ga. 2005) ("'In the subject product-design case, only semantics distinguishes the cause of action for negligence and a cause of action pursuant to O.C.G.A. § 51-1-11.'" (quoting Coast Catamaran Corp. v. Mann, 321 S.E.2d 353, 357 (Ga. Ct. App. 1984), aff'd 326 S.E.2d 436 (Ga. 1985))); Ogletree v. Navistar Int'l Transp. Corp., 522 S.E.2d 467, 469 (Ga. 1999) (design defect and negligence claims "cannot be treated as distinct theories of recovery"). Thus, because Plaintiff's statutory design defect claim fails, her negligence claim also fails. Because the Court finds Autoliv is entitled to summary judgment on Plaintiff's negligence and design defect claims, Plaintiff's claim for punitive damages under O.C.G.A. § 51-12-5.1 also fails. See Morris v. Pugmire Lincoln Mercury, Inc., 641 S.E.2d 222, 241 (Ga. Ct. App. 2007) ("[P]unitive damages under O.C.G.A.

16

§ 51-12-5.1 cannot be awarded where no actual damages are awarded."). Autoliv's Motion for Summary Judgment is granted.[6,7]

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Autoliv Japan, Ltd.'s Motion for Summary Judgment [224] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants John Does 1-5 are **DISMISSED**.

---

[6] In her brief in opposition to Autoliv's Motion, Plaintiff, apparently for the first time, argues that Autoliv failed to warn the public that its seatbelts were dangerously weak. Plaintiff does not include a failure to warn claim in her Second Amended Complaint. Even if Plaintiff included such a claim, the claim would be required to be dismissed. In product liability cases premised on a failure to warn, "Georgia law insists that a plaintiff show that the defendant had a duty to warn, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010) (applying Georgia law). Plaintiff does not present any evidence to show that Autoliv's failure to warn the public of its "dangerously weak" seatbelt caused Mr. Andrews' death.

[7] Plaintiff's Second Amended Complaint also names as defendants John Does 1-5 (the "John Doe Defendants"), and describes them as "additional suppliers of defective components of the defective occupant restraint system, who are currently unknown." (Second Am. Compl. ¶ 26). Fictitious party pleading is not permitted in federal court, unless plaintiff's description of the fictitious defendants is so specific as to be, at the very worst, surplusage. Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010). Plaintiff has not provided any evidence regarding the identities or actions of the John Doe Defendants, and the John Doe Defendants are required to be dismissed from this action.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**SO ORDERED** this 10th day of January, 2017.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE