```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF GEORGIA
2                               ATLANTA DIVISION

3    JAMIE LEE ANDREWS, et al.        )
                                      )
4                    Plaintiffs,      )    CIVIL ACTION FILE
                                      )    NO. 1:14-CV-3432-WSD
5    v.                               )
                                      )    ATLANTA, GEORGIA
6    AUTOLIV JAPAN LTD., et al.       )
                                      )
7                    Defendants.      )
     _____)
8

9                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10                  UNITED STATES DISTRICT JUDGE

11                     ATTORNEY'S FEES HEARING
                     Wednesday, July 26, 2017
12

13

14   APPEARANCES OF COUNSEL:

15   For the Plaintiffs:      BUTLER WOOTEN CHEELEY & PEAK LLP
                              (By:  Tedra L. Cannella
16                                  Rory Allen Weeks
                                    Brandon L. Peak)
17
     For Defendant Autoliv:   ALSTON & BIRD LLP
18                            (By:  Jenny Ann Mendelsohn
                                    Douglas G. Scribner)
19

20

21

22           Proceedings recorded by mechanical stenography
               and computer-aided transcript produced by
23                  NICHOLAS A. MARRONE, RMR, CRR
                       1714 U. S. Courthouse
24                    75 Ted Turner Drive, S.W.
                       Atlanta, GA  30303
25                        (404) 215-1486
```

1                        I N D E X

2    *Witness*                                    *Page*

3    *DOUGLAS G. SCRIBNER*

*Direct (By Ms. Mendelsohn)*            *5*
4         *Cross (By Ms. Cannella)*               *16*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   Wednesday Afternoon Session

2                        July 26, 2017

3                          2:30 p.m.

4                         -- -- --

5                  P R O C E E D I N G S

6                         -- -- --

7          (In open court:)

8          THE COURT:  Good afternoon, everybody.  This is the

9   hearing on Autoliv's motion for attorney's fees, which is in

10  Civil Action No. 14-3432.

11         Would counsel announce their appearances, please?

12         MS. CANNELLA:  Your Honor, Tedra Cannella for the

13  plaintiffs.

14         Mr. Butler is out of the state today.

15  Brandon Peak is here with me.  He's a partner at the firm,

16  and he's just here to address anything that comes up that

17  needs to be addressed.

18         And then Rory Weeks is here as well for the

19  plaintiff.

20         Thank you.

21         THE COURT:  So you have got lots of

22  reinforcements.

23         And there is one more person.

24         MR. PEAK:  This is Ms. Andrews.

25         MS. CANNELLA:  Yes, I'm sorry, Your Honor, most
```

1    importantly, Ms. Andrews.

2            THE COURT:  Ms. Andrews, how are you?

3            MS. CANNELLA:  And then Cathy Huff is here.  She's

4    a paralegal at our firm as well.

5            THE COURT:  Thank you.

6            MR. SCRIBNER:  Good afternoon.

7            THE COURT:  Good afternoon.

8            MR. SCRIBNER:  Jack Scribner on behalf of Autoliv,

9    and Jenny Mendelsohn on behalf of Autoliv as well.

10           THE COURT:  All right.  Good afternoon.

11           This, of course, is on Autoliv's motion for

12   attorney's fees and expenses pursuant to OCGA Section

13   9-11-68.

14           The plaintiff opposes the motion and had filed to

15   request a hearing on it.  That request was granted and

16   scheduled for today.

17           I want you to know that I have read everybody's

18   submissions, including the materials that were given to me,

19   some yesterday, some the day before.  So I have had a chance

20   to review those.

21           But since it is Autoliv's motion, I will let them

22   start.

23           MR. SCRIBNER:  Thank you, Your Honor.

24           Since you have read the briefing on it, we would

25   like to start with the actual testimony and answer any

1   questions you have after that.

2              THE COURT:  That would be fine.

3              MR. SCRIBNER:  Thank you.

4              May I approach, Your Honor?

5              THE COURT:  You may.

6                    --   --   --

7                    DOUGLAS G. SCRIBNER

8     being first duly sworn by the Courtroom Deputy Clerk,

9                 testifies and says as follows:

10                    --   --   --

11                    DIRECT EXAMINATION

12  BY MS. MENDELSOHN:

13  Q.   Can you state your name for the record?

14  A.   Doug Scribner.

15  Q.   Mr. Scribner, can you provide the Court with a summary

16  of your educational background and experience?

17  A.   I attended the University of Toledo, and graduated with

18  a Bachelor's of Business Administration majoring in Finance

19  in 1992.

20     I attended law school at the University of Toledo, and

21  graduated in 1995, and joined the law firm of Alston & Bird

22  in September of 1995.

23     I joined what then was the trial practice group, which

24  ultimately morphed into the litigation and trial practice

25  group, and I have been there ever since.

1   Q.   And what year did you become a partner?

2   A.   2002.

3   Q.   Have you held any positions of leadership at Alston &

4   Bird?

5   A.   From 2009 to 2015, I was the co-chair of the litigation

6   and trial practice group, where I managed 180 lawyers or so

7   in eight offices, all concentrated in litigation.

8        I am currently the co-chair of the manufacturing and

9   industrials team, where we concentrate on representing

10   manufacturers in litigation matters.

11   Q.   What types of cases do you typically handle?

12   A.   Mostly commercial disputes between businesses, mostly

13   manufacturers.  As a younger lawyer I did a ton of product

14   liability cases, and I still do product liability defense, a

15   little less so now.

16   Q.   Do you represent plaintiffs, defendants, or both?

17   A.   Over the past seven years, my practice mix has been

18   about 50/50.  I represent plaintiffs in commercial matters

19   and defendants in commercial matters.  I don't represent

20   plaintiffs in personal injury cases.

21   Q.   Do you have any jury trial experience?

22   A.   I have tried over twenty cases as lead counsel.

23   Q.   As lead counsel, have you tried any products cases?

24   A.   Approximately half have been product related cases that

25   I have tried.

 1    Q.   I want to switch gears a little bit and talk about this
 2    litigation.
 3         What has been your role in this litigation?
 4    A.   I have been the lead trial lawyer from the beginning
 5    until today.
 6    Q.   Is this your first case for Autoliv?
 7    A.   No.  I have represented Autoliv for a decade or so,
 8    primarily defending them in products cases where the
 9    allegations involve alleged defective seatbelts and/or
10    airbags.
11    Q.   And you touched on this a little bit in your answer, but
12    what does Autoliv do?
13    A.   Autoliv is an occupant restraint company that supplies
14    products to auto makers to include in their vehicles.
15    Q.   I'm going to refer you now to what's been previously
16    marked as Exhibit A.
17         I believe you have an exhibit notebook in front of you.
18         MS. MENDELSOHN:  And, Your Honor, you should have
19    one as well.
20         THE COURT:  I do.
21    A.   I am ready.
22    Q.   Do you recognize Exhibit A, Mr. Scribner?
23    A.   I do.
24    Q.   And what is it?
25    A.   This is an offer of settlement letter that I sent to

1    Mr. Butler on May 25, 2016, in this case.

2    Q.    Can you provide the Court with the status of the

3    litigation at the time that you sent that letter?

4    A.    Sure.  As the Court is aware, this is a product

5    liability wrongful death case.

6        Originally the plaintiffs sued 13 defendants that fell

7    into three categories.  One was Mazda, the maker of the 2005

8    Mazda 3 at issue in the case, one was Bosch that provided the

9    electronic equipment for the sensers of the airbag, and one

10   group was the Autoliv defendants.

11       At the time we made this proposal, discovery had been

12   completed, fact witnesses had been deposed, documents had

13   been produced, experts had been deposed.

14       We had filed a motion for summary judgment, and the

15   plaintiffs had responded, and I believe we had filed a

16   reply.  I'm not 100 percent certain about that, but I'm

17   pretty sure the briefing was complete when we made this

18   offer.

19       Importantly from our perspective in terms of why we made

20   the offer when we did, we had learned during the course of

21   discovery that the plaintiffs' expert regarding the airbag

22   which did not deploy during this accident conceded that it

23   was not Autoliv's part that failed.  The plaintiffs' expert

24   said that it was a Mazda-Bosch problem.

25       And then with respect to the seatbelt, we felt

strongly -- and I know that the plaintiffs disagree.  We felt

strongly that the design of that seatbelt was a Mazda design

and not an Autoliv design, and so we felt that our chances

for summary judgment were good.

So we made this proposal at this time knowing that we

would soon be receiving a ruling from Your Honor on summary

judgment.

Q.   How much did you offer to settle the case for in your

letter?

A.   Two hundred thousand dollars, and we offered to

structure any portion of a settlement for the benefit of

Ms. Andrews' minor daughter.

Q.   What did you consider before making this offer,

Mr. Scribner?

A.   Well, we considered the entire case.  We considered the

likelihood of success on summary judgment for us.  We

considered the likelihood that the Eleventh Circuit would

determine that we were entitled to judgment as matter of

law.

We considered the likelihood that the plaintiff would

recover against Autoliv at trial, the likelihood that -- or

strike that -- how much the plaintiff could recover.

And importantly, we also considered how much

responsibility would be allocated toward Autoliv given the

testimony that had been given in the case, and the fact that

1  Mazda and Bosch seemed to be far more culpable, for lack of a

2  better word, in the case.

3      In addition, the decedent himself drove unfortunately

4  off the road in a one-vehicle accident, and so some

5  responsibility could be his as well.

6      And, finally, we considered the cost of litigating going

7  forward and how expensive it would be if we didn't settle the

8  case.

9  Q.  Did you receive a response from plaintiffs to your offer

10 letter?

11 A.  Yes.

12 Q.  I'm going to refer you now to Exhibit B, which I believe

13 is in front of you.  Do you recognize that document?

14 A.  Yes.

15 Q.  Is that the response that you received to your offer

16 letter?

17 A.  Correct.

18 Q.  And how shortly after the offer letter was sent via

19 e-mail did you receive that?

20 A.  We sent our offer of settlement via both certified mail

21 as well as e-mail, because the parties had agreed that they

22 would exchange all correspondence in the case via e-mail.

23      Mr. Butler responded to my offer of settlement a few

24 minutes later -- I believe according to this, three minutes

25 later -- the same day and said, "Be advised there will be no

 1    discussion of settlement with Autoliv unless and until said

 2    letter is withdrawn."

 3    Q.   I think you said earlier on that the parties would

 4    exchange correspondence via e-mail.  Was there any sort of

 5    agreement reached by the parties to do that?

 6    A.   I don't know if I would call it an agreement

 7    necessarily.

 8         I would say early in the case, if you look at Exhibit D

 9    in the materials, one of the lawyers who represented Bosch,

10    I believe, e-mailed Ms. Hobson but didn't copy others on the

11    Butler Wooten team, and Ms. Hobson said, "We insist you copy

12    our entire team on all correspondence regarding this

13    case.  This is our third request.  The list of e-mails is

14    pasted again below."

15         And there is seven or eight folks from both the Ballard

16    & Feagle firm and the Butler Wooten firm listed there.

17         Mr. Butler responded on top of that saying, "Any e-mails

18    that are not copied to all on plaintiffs' team will be deemed

19    nonreceived and there will be no response thereto."

20         So I don't know that there was a formal agreement, but

21    I know that we at that point going forward copied all of the

22    folks that they wanted us to copy on all written

23    communications via e-mail.

24    Q.   Did plaintiffs accept your offer of settlement?

25    A.   No.

```
 1   Q.   Did you have any further settlement discussions with
 2   plaintiffs' counsel after you received the e-mail previously
 3   marked as Exhibit B?
 4   A.   No.
 5   Q.   What did you take away from plaintiffs' counsel's May
 6   25th, 2016, e-mail?
 7   A.   That it was a rejection of our offer of settlement.
 8   Q.   I'm going to switch gears a little bit now and talk a
 9   little bit about attorneys' fees.
10        If you could look at Exhibit C, which is in front of
11   you, are you familiar with that document?
12   A.   I am.
13   Q.   And what does that represent?
14   A.   Exhibit C are the bills that include the fees for which
15   we seek recovery under O.C.G.A. 9-11-68.  These bills have
16   all been satisfied by Autoliv.
17        And there are some redactions in here for two reasons.
18        The first redactions relate to entries that predated the
19   rejection of the offer of settlement, which means we can't
20   recover those.
21        And there are a smattering of additional redactions
22   that, given the fact that the case is pending in the
23   Eleventh Circuit currently, we just didn't feel comfortable
24   sharing with the other side.
25        But in my experience if you are not willing to share the
```

1  entry with the other side, you can't recover for it, so we

2  are not.

3  Q.   You said based on your experience.  Have you ever

4  testified as an expert witness regarding the reasonableness

5  of attorneys' fees?

6  A.   Several times.

7  Q.   How many times?

8  A.   Less than ten.

9  Q.   But more than one?

10 A.   More than once.  I have testified as to the

11 reasonableness of attorneys' fees at trial twice.

12 Q.   Have you ever testified regarding the reasonableness of

13 another's attorney's fees?

14 A.   Yes.  Other firms in Atlanta have hired me to testify

15 about the reasonableness of their fees in certain litigation

16 matters.

17 Q.   Has any court ever prohibited or precluded you from

18 speaking on the reasonableness of attorneys' fees for lack of

19 expertise or otherwise?

20 A.   No.

21 Q.   Are you generally familiar with the hourly rates

22 charged by attorneys in wrongful death product liability

23 cases?

24 A.   Yes.

25 Q.   How are you aware of those rates?

1    A.    I'm aware of it in lots of ways, but three primary

2    ways.

3         Number one, I negotiate rates with very sophisticated

4    consumers of legal services.  I'm the client attorney for

5    Koch Industries -- K-o-c-h, Koch Industries -- Autoliv,

6    Georgia-Pacific, Mohawk Industries, Sto Corporation,

7    Geographics, and all of these companies negotiate with me on

8    rates.  They tell me what others are charging out there, my

9    competitors.  And so we have to stay competitive, and so

10   that's one way I know.

11        Another way I know is for six years I was the head of

12   the largest practice group in my firm, and so I was

13   constantly dealing with consultants who would help us set our

14   rates.  So I know generally what people are charging in the

15   area for these types of cases.

16        And, finally, just anecdotally, I know a lot of folks in

17   town who do similar work at the other firms that I'm familiar

18   with, and so, yeah, I'm familiar with the rates.

19   Q.    Do you have a position regarding the reasonableness of

20   the fees that Autoliv is seeking in this case?

21   A.    Yes.  My position is that they are reasonable.

22   Q.    What were the rates that you and the attorneys working

23   with you charged in this case?

24   A.    My current hourly rate is $790 an hour.  We froze my

25   rate in this case, and at that time it was $715 an hour.

1    However, we gave them a 15 percent discount, which equates to

2    roughly a little over six hundred dollars an hour for my

3    time.

4        You were frozen at $575 throughout the entirety of the

5    engagement, I believe, and after the 15 percent discount, it

6    ends up being in the high four hundreds.  I believe $488,

7    $489 per hour.

8        I would mention one other thing, and that is we staffed

9    this very leanly.  This entire case, which was complex and

10   had a lot of documents and a lot of witnesses, we handled

11   with two lawyers.

12   Q.   What type of work were you performing from May 2016 to

13   October of 2016 in this case?

14   A.   The bulk of the work resulted from the fact that while

15   our brief -- or strike that -- our motion for summary

16   judgment was pending, we learned that Mazda, the manufacturer

17   of the 2005 Mazda 3, settled with the plaintiffs, and that

18   changed our view in terms of how to try the case.  We had

19   assumed that Mazda would be with us.

20       And so we had to think about how we would take

21   depositions for preservation of evidence and use at trial of

22   experts that the plaintiffs had hired and that sort of

23   thing.

24       So it changed our strategy regarding trial.  That was

25   the bulk of the time.

```
1    Q.   What are the total fees you are seeking to recover in

2    this case?

3    A.   $29,977 or so.  It's under thirty thousand dollars.

4    It's in our papers.  Sorry.

5              MS. MENDELSOHN:  Your Honor, at this time I would

6    like to tender Exhibits A through D into evidence.

7              THE COURT:  Any objection?

8              MS. CANNELLA:  No, Your Honor.

9              THE COURT:  They are admitted.

10             MS. MENDELSOHN:  That's all the questions I have.

11             THE COURT:  All right.  Plaintiff's turn.

12             THE WITNESS:  May I get some water, Your Honor?

13             THE COURT:  You may.

14             MS. CANNELLA:  May it please the Court.

15                            --  --  --

16                       CROSS-EXAMINATION

17   BY MS. CANNELLA:

18   Q.   Mr. Scribner, I have to admit, I have never had the

19   opportunity to question a lawyer, a fellow member of the

20   bar, on the stand.  So I don't know that it could be

21   pleasant, but my goal is to make it as not unpleasant as

22   possible.

23        First, let me ask you this.  Is there anybody here today

24   from Autoliv?

25   A.   In the courtroom?
```

```
 1    Q.   Yes, sir.

 2    A.   No.

 3    Q.   Do you have the exhibits in front of you?

 4    A.   I do.

 5    Q.   Can you turn to Exhibit B, please?

 6    A.   Your Exhibit B?

 7    Q.   Your Exhibit B.

 8    A.   Yes.

 9    Q.   Can you please tell the Court where the word "rejection"

10    is used in that e-mail?

11    A.   The word "rejection" does not appear in this e-mail.

12    Q.   Okay.  And can you please turn to Exhibit D?  Your

13    Exhibit D.

14    A.   Yes.

15    Q.   This is the e-mail that Autoliv contends created an

16    agreement by which the parties could effect service through

17    electronic means; correct?

18    A.   No.

19    Q.   Okay.  Was there an agreement by which the parties could

20    effect service through electronic means?

21    A.   I don't think there was a formal agreement where we

22    agreed to that, no.

23    Q.   Isn't it true that Federal Rule of Civil Procedure 5

24    requires there be an agreement before electronic service is

25    sufficient under the rule?
```

```
1    A.    Service of pleadings, correct.   Offer of settlement is

2    not a pleading.

3              MS. CANNELLA:  May I approach, Your Honor?

4              THE COURT:  You may.

5              MS. CANNELLA:  I am going to hand you a copy of

6    Rule 5.

7              THE COURT:  Let me ask you, did the plaintiffs

8    serve by e-mail?

9              MS. CANNELLA:  I'm sorry, Your Honor?

10             THE COURT:  Did the plaintiffs serve pleadings and

11   communications by e-mail?

12             MS. CANNELLA:  We served everything through the

13   mail.   We always sent courtesy copies as well.

14             THE COURT:  So you did serve by e-mail?  Were

15   there communications in e-mails that were not pleadings that

16   were communicated by e-mail as opposed to being sent by a

17   letter?

18             MS. CANNELLA:  Certainly we did talk to each other

19   over e-mail, Your Honor, yes.

20             THE COURT:  I mean, did you routinely use e-mail?

21             MS. CANNELLA:  With items that had to be served

22   under the rules?

23             THE COURT:  You know, you are picky about this.

24   I have read this e-mail from Mr. Butler.  It's pretty clear

25   to me what it was.
```

1          I'm just trying to figure, because now you are

2     saying, well, it wasn't really -- it didn't meet the

3     requirements of the rule.  I'm just trying to figure out how

4     the parties litigated and whether or not they waived the

5     requirement.

6          Did you routinely exchange pleadings and

7     communications by e-mail?

8          MS. CANNELLA:  Yes, we did communicate for regular

9     communications via e-mail.

10         For those documents that had to be served under

11    the rules, Autoliv served via U.S. Mail, plaintiff served

12    via U.S. Mail, and plaintiff also sent electronic courtesy

13    copies.

14         I'm not sure, I can't stand here and tell the Court

15    that Autoliv did or did not serve electronic courtesy copies

16    as well, but I do have certificates of service which are also

17    on the Court's system as well --

18         THE COURT:  No, I mean, I understand what's going

19    on here, so continue your interrogation.

20         I have read these e-mails.  I have dealt with

21    lawyers for a long time.  I have dealt with your firm on at

22    least one conference call in this case, and so I understand

23    the tone and the manner in which your firm communicates,

24    especially Mr. Butler.

25         And this, I understand this communication.  I have

1   been doing this for almost forty years, I understand exactly

2   what he was communicating.  And any lawyer would.

3                MS. CANNELLA:  Well, Your Honor --

4                THE COURT:  Continue.

5                MS. CANNELLA:  Okay.

6   BY MS. CANNELLA:

7   Q.   Mr. Scribner, Exhibit D followed a series of incidents

8   where the lawyers in the case on the defense side were not

9   copying paralegals and legal assistants; correct?

10  A.   As long as you are not including me as a lawyer, because

11  we always did.

12  Q.   Oh, okay.  Well, this e-mail itself was not copied to

13  the legal assistants originally; correct?

14  A.   That's what -- your e-mail suggests that, yes, that they

15  were not copying the right people.  The lawyers for Bosch

16  were not.

17  Q.   And you said that Autoliv always copied all legal

18  assistants and paralegals in accordance with that request?

19  A.   I believe after we received this e-mail, Ms. Mendelsohn

20  and I had a conversation and I said make sure that every

21  human being they wanted to be copied on every e-mail is

22  copied, please.

23  Q.   Could you please turn to Exhibit B?

24  A.   Your B or my B?

25  Q.   Your B.

1    A.    Thank you.

2          Yes, I have it.

3    Q.    The letter that was sent with the offer of settlement

4    was attached to Ms. Mendelsohn's e-mail that is in the

5    string; correct?

6    A.    I believe that's correct, yes.

7    Q.    Okay.  And the reply to it, in fact, shows that the

8    people on it did not include the legal assistants; correct?

9    A.    From Mr. Butler?

10   Q.    Yes, sir.

11   A.    There is a Ms. Huff, Ms. Telgenhoff.  I don't know if

12   they are legal assistants or not.

13   Q.    Okay.

14   A.    I think they are.

15   Q.    Okay.  But the original Exhibit D requested that

16   Julie Houston be included as well.

17            THE COURT:  And who is Ms. Houston?  Is she a

18   lawyer?

19            MS. CANNELLA:  She's one of the paralegals,

20   Your Honor.

21            THE COURT:  Did she make an appearance in the

22   case?

23            MS. CANNELLA:  No, sir.

24            THE COURT:  But you insisted that anybody dealing

25   with this had to be e-mailed; otherwise, it would considered

1    as nonreceived?

2         MS. CANNELLA:  Your Honor, we were trying to make

3    sure nothing would fall through the cracks, so we didn't miss

4    something or --

5         THE COURT:  I have never seen any lawyer insist

6    that they would not consider something as being received

7    unless every legal assistant, paralegal and lawyer was

8    copied on a communication.  I have never seen that either

9    when I was in practice, when I was in public service, or on

10   this job.

11        And if you think that's reasonable, then you and

12   I can disagree about how one ought to practice law.

13        MS. CANNELLA:  Your Honor, we certainly agree that

14   we received the letter, the offer of settlement.  We don't

15   contest that at all.

16        THE COURT:  Then let's move on.

17   BY MS. CANNELLA:

18   Q.   Mr. Scribner, I want to talk to you briefly about

19   Autoliv's defense in the case.

20        Would you agree that Autoliv knew there was a

21   possibility it could lose on its motion for summary judgment

22   or in the Eleventh Circuit?

23   A.   Yes.

24   Q.   In fact, you talked to *The Daily Report* about the

25   confusion in the law on this issue?

1    A.    I believe people are confused on the law on this issue.

2    Q.    Pages six through seven of Autoliv's reply brief

3    identifies the factors that Autoliv analyzed when considering

4    the appropriate settlement amount in this case.

5          Would you please turn to pages six and seven?

6    A.    Page six and seven of our brief?

7    Q.    Your reply brief.

8    A.    Give me a moment, please.

9          I'm sorry, what pages again, please?

10   Q.    Six and seven.

11   A.    I am there.

12   Q.    Thank you.

13         The list starts in the first full paragraph on page six

14   and goes into page seven.  Is that representation of the

15   factors Autoliv considered a complete and accurate

16   representation?

17   A.    Well, it says when considering the value of the case, we

18   considered the following things.  And we did, we considered

19   all of those things.

20         If you are asking me are those the only things that we

21   considered, we considered hundreds of things.  We have been

22   litigating hammer and tongs for three years.  We considered

23   the entirety of the record.

24   Q.    Are these the important factors that Autoliv considered?

25   A.    They are important factors that we considered.

1  Q.   Were there other major factors that Autoliv considered?

2  A.   Cost, the litigation expenses that we would incur if we

3  didn't settle, we considered that as well.

4  Q.   So the cost, and then the factors identified in this

5  brief; correct?

6  A.   Yeah, I think so.

7  Q.   Page seven says that Autoliv considered the likely full

8  value of damages in the case.  What did Autoliv believe the

9  likely full value of life damages were?

10 A.   The economic damages according to your expert were a

11 little over two million dollars.  We would cross-examine him

12 at trial; however, it wasn't wildly out of bounds with the

13 economic value here.

14      We considered that, along with the fact that there would

15 be something more than that in the event there was a

16 plaintiffs' verdict.  And so we took that amount, and then we

17 reduced it based upon our likelihood of success at the trial

18 court, at the Eleventh Circuit, perhaps at trial.

19      And in light of the fact that our position was right or

20 wrong, we thought the vast majority of the responsibility for

21 what happened here rested with the decedent himself, Mazda

22 and Bosch.

23 Q.   And what did Autoliv believe the value of Mr. Andrews'

24 life would be?

25 A.   Can you rephrase, please?

1  Q.   What did Autoliv believe the value of Mr. Andrews' life

2  would be as found by the jury?

3  A.   I'm sorry, that last part?

4  Q.   As found by the jury.

5  A.   Oh, I think the range would be somewhere between a

6  factor of the two million.  So it would be more than two

7  million would be my guess.

8  Q.   It could have been three million?

9  A.   It could have been a hundred million.

10      But realistically it was two million in economic

11  damages.  It was going to be something more than that at

12  trial we thought for the whole case if there was a

13  plaintiffs' verdict, if we didn't win directed verdict, if

14  the Eleventh Circuit didn't affirm, and if all of it was

15  placed at the doorstep of Autoliv, which we strongly felt was

16  not going to happen.

17  Q.   One of the things Autoliv considered in determining the

18  amount of the offer was, quote, Mr. Andrews was dealing with

19  marital difficulties, closed quote.  Is that correct?

20  A.   I don't know that it played a massive role in our

21  assessment of the case, but it was out there.  There were

22  marital difficulties.  They were sleeping in different

23  bedrooms, that sort of thing.

24  Q.   Why would Autoliv bring that up in its brief?

25  A.   Why would it bring it up in its brief?

Q.   Yes, sir.

A.   Because it's a factor in terms of figuring out how you value the case.  There are cases where children get burned, there are other cases where a surviving spouse is bringing a claim on behalf of their surviving spouses where they are having marital difficulties.  Those are two very different scenarios.

Q.   Autoliv knew that marital difficulties are not admissible at trial; correct?

A.   Pardon me?

Q.   Autoliv knew that marital difficulties are not admissible at trial; is that right?

A.   Did Autoliv know that marital difficulties were inadmissible at trial?

Q.   Yes, sir.

A.   I think that depends on the case that you tried.

           MS. CANNELLA:  May I approach, Your Honor?

           THE COURT:  You may.

BY MS. CANNELLA:

Q.   I'm going to hand you a case that I have highlighted, *Cornelius v. Macon-Bibb County*, 243 Ga. App. 480.  I have tabbed and highlighted a passage there.

                On cross-examination, Mrs. Crump's daughter

                confirmed that there was a period of about three

                months that Mr. Crump lived with someone else, but

1          by the time Mrs. Crump died, Mr. and Mrs. Crump had

2          reconciled.

3     Did I read that correctly?

4  A.   Where are you reading from, please?

5  Q.   The first highlight.

6  A.          On cross-examination, Mrs. Crump's daughter

7          confirmed that there was a period of about three

8          months that Mr. Crump lived with someone else, but

9          by the time Mrs. Crump died, Mr. and Mrs. Crump had

10         reconciled.

11 Q.   Correct.  And then the second passage says that's

12 highlighted:

13         *Wright* holds that marital problems do not

14         reduce the measure of damages or the damages

15         recoverable.

16     Did I read that correctly?

17 A.   Yes, you did.

18         THE COURT:  I note in that paragraph it started out

19 with the court granting a motion *in limine* for whatever

20 reasons were given about marital difficulties.  The question

21 was whether or not it had been opened on cross-examination.

22 The Court of Appeals said that it had to be.

23         So it started with an order of the court that that

24 not, for whatever was argued at the motion *in limine* stage,

25 that that was not admissible.

1        So the only question here was whether or not there

2   had been direct examination that opened the door, and the

3   court said there wasn't.

4        MS. CANNELLA:  Correct, Your Honor, yes.

5        THE COURT:  It's different than the way that you

6   characterized the case, but I have read it.

7   BY MS. CANNELLA:

8   Q.   Do you agree that plaintiffs' medical expert,

9   Dr. Burton, testified that Mrs. Andrews suffered conscious

10  pain and suffering before his death?

11  A.   That Mr. Andrews did?

12  Q.   Yes, sir.

13  A.   His opinion was that he did, correct.

14  Q.   And did Autoliv hire an expert to contest any of the

15  opinions besides the opinion from the seatbelt expert?

16  A.   We did not hire a testifying expert on the issue of

17  conscious pain and suffering.

18  Q.   Do you have plaintiffs' exhibit notebook?

19  A.   Yes, I do.

20  Q.   Could you turn to Exhibit H?

21  A.   Yes.

22  Q.   Would you stipulate that these bills reflected in the

23  summary are the bills that Autoliv had access to through the

24  depositions?  Or I should say the bills in -- one of them is

25  an estimate and the testimony of the expenses.

1    A.    You have me there.  I don't know.

2    Q.    Okay.

3    A.    Are these fees that plaintiffs' experts charged your law

4    firm?

5    Q.    These are the bills from the depositions in the case.

6    A.    I'm not sure I understand, from the depositions?

7    Q.    Yes.  They are exhibits to the depositions for the

8    experts.

9    A.    Oh, I see, I got it.  This is their time, and they were

10   introduced as exhibits at their deposition.

11   Q.    Correct.

12   A.    I have no reason to dispute it.  I don't know it to be

13   the case.

14            MS. CANNELLA:  That's all I have for

15   Mr. Scribner.  Thank you.

16            THE COURT:  Redirect?

17            MS. MENDELSOHN:  No, Your Honor.

18            THE COURT:  All right.  Thank you for your

19   testimony.  You can return to counsel table.

20            THE WITNESS:  Thank you.

21            THE COURT:  Anything else that the defendants want

22   to present?

23            MS. MENDELSOHN:  If Your Honor would like argument,

24   we would be happy to give some, but --

25            THE COURT:  We will do evidence first.

```
 1              Anything that the plaintiffs would like to present
 2    in the form of evidence or testimony?
 3              MS. CANNELLA:  I'm sorry, Your Honor?
 4              THE COURT:  Is there any evidence or testimony you
 5    would like to present?
 6              MS. CANNELLA:  No, sir.
 7              THE COURT:  Other than what you have presented in
 8    your attachments that I received in your notebook?
 9              MS. CANNELLA:  Correct, Your Honor.  Thank you.
10              THE COURT:  I mean, does anybody have any objection
11    to me considering anything that was presented by either side
12    for use at this hearing?
13              MS. MENDELSOHN:  No, Your Honor.
14              MR. SCRIBNER:  No, Judge.
15              THE COURT:  Even though some of that was not
16    referred to, but I'm happy to consider that, if nobody
17    objects to it?
18              MS. CANNELLA:  I don't think we have an objection
19    to that.  Thank you, Your Honor.
20              MS. MENDELSOHN:  None, Your Honor.
21              THE COURT:  I think everybody has submitted their
22    briefs on this.  The purpose of the hearing was that because
23    under state law the plaintiff in this case was entitled to a
24    hearing in order to contest the reasonableness of the fees,
25    and I've taken the testimony, you had a chance to cross, and
```

1  you have admitted these -- now we have admitted these other

2  exhibits.

3          Which we probably ought to make sure that the

4  record is clear on what those are.  If you don't mind,

5  I think the exhibits are -- didn't you give us -- your

6  plaintiffs' exhibits were at Docket Entry 303, which lists

7  the A through I exhibits that you want me to consider?

8          MS. CANNELLA:  Yes, sir.

9          THE COURT:  So I'm going to admit all of those.

10          And then the plaintiffs' exhibits are only Exhibits

11  A, B, C and D, and those are listed at Docket Entry 301.

12          MS. MENDELSOHN:  I think you said plaintiffs', but

13  those are ours.

14          THE COURT:  I'm sorry, defendant Autoliv's.

15          MS. MENDELSOHN:  Yes, Your Honor.

16          THE COURT:  So that's in the record, the testimony

17  is in the record, your briefs are in the record.  But if

18  there is something that occurred to you as a result of this

19  that you want to add to that, let's do that now, starting

20  with the defendant.

21          MS. MENDELSOHN:  We don't have anything to add,

22  Your Honor, unless there are any questions that you have?

23          THE COURT:  Well, I have read everything so far and

24  I have listened to the testimony.

25          Anything else that the plaintiffs would like to

1    add?

2              MS. CANNELLA:  Your Honor, may I hand up a recent

3    case from the Court of Appeals on the 9-11-68?

4              THE COURT:  Thank you.

5              MS. CANNELLA:  Sure.

6         I would just like to bring this case to the Court's

7    attention.  It addresses an argument about a rejection under

8    9-11-68, and on the place that I flagged the Court of Appeals

9    held that the statute must be strictly construed against the

10   award of attorneys' fees.

11        And it also states on page five of that opinion,

12   which I am sure the Court will read so I won't summarize the

13   entire thing, but it emphasizes that the rejection must be in

14   writing and served upon the offeror, those two requirements

15   in italics.

16        We would ask the Court to apply the statute

17   strictly and to only award fees after the time of the 30-day

18   elapse.

19             THE COURT:  So you are not contesting that the

20   demand was made in writing and that you received it?

21             MS. CANNELLA:  No, sir.

22             THE COURT:  All right.  And you are not contesting

23   that it was rejected?

24             MS. CANNELLA:  Your Honor, we are contesting that,

25   but I can tell from your countenance that you don't agree.

1        THE COURT:  Well, look, you know, when somebody

2   sends an e-mail saying that unless you revoke the letter I'm

3   not going to talk to you about resolving the case, at any

4   time did he come back and say, look, I know you didn't reject

5   it, but we have an obligation to respond to the letter, we

6   reject it, or we are not going to respond?  You were just

7   silent, weren't you?

8        Did you ever at all, other than Mr. Butler's

9   e-mail, ever respond to the letter?

10       MS. CANNELLA:  Your Honor, we didn't respond, and

11  Autoliv didn't respond either.

12       And if Your Honor is curious about that

13  three-minute-after-the-offer e-mail, I can provide some

14  context.

15       In terms of these offers of settlement, for

16  somebody who is in Ms. Andrews' position, a single working

17  mom with a child to care for, an offer of settlement is a

18  huge -- not just a thumb on the scale, it's a threat of

19  bankruptcy.

20       And so in dealing with defendants who don't want to

21  pay fees but certainly could have the ability to pay fees,

22  there is a huge imbalance of power there.

23       So while we are always happy to entertain good

24  faith settlements, when you have that threat against an

25  individual who is facing bankruptcy potentially paying

1   white-shoe law firm fees, you have --

2           THE COURT:  First of all, let's get rid of the

3   rhetoric, let's get rid of all the emotional things.  This is

4   a letter that -- state law provides that you can send these

5   letters.

6           MS. CANNELLA:  Absolutely, Your Honor.

7           THE COURT:  And the letter was sent, and there was

8   a three-minute response by the named partner in your firm.

9           MS. CANNELLA:  Yes, sir.

10          THE COURT:  Rather than a thoughtful response

11  saying let me think about it, let me talk to my client about

12  it, we are not inclined, but we will get back to you, it

13  was -- it said we are not going to talk about this unless you

14  withdraw the letter.

15          So talk about leverage, the leverage was that you

16  are not going to strike any deal with us.  And I'm sure you

17  can say all the things that you said to them you have been

18  saying to me about single mom who has lots of obligations --

19  I don't see how a hundred thousand dollars or two hundred

20  thousand dollars would bankrupt her, but I think I understand

21  kind of what you are trying to get at.

22          And instead, a lawyer sends this quick, curt

23  response three minutes after they get it, and then never does

24  anything.

25          MS. CANNELLA:  Your Honor, we --

1          THE COURT:  I know what e-mails like that mean, and

2     I think any lawyer would know that unless you withdrew it, we

3     are not going to talk.

4          And he followed through on that, because you didn't

5     talk.  You didn't talk, none of all those people that you

6     insisted on e-mails be sent to talked, Mr. Butler didn't

7     talk, Mr. Peak didn't talk, whoever else was on this case,

8     not a word.  Because it was rejected.

9          MS. CANNELLA:  Your Honor, I understand your

10    position.  And it was rejected, you are absolutely right.  It

11    was just thirty days after the letter was sent.

12         THE COURT:  But it was rejected.

13         MS. CANNELLA:  It was rejected by silence, yes,

14    Your Honor.

15         THE COURT:  And your argument is that in

16    calculating attorneys' fees, you have to take into

17    account the terms of the statute, and that the attorneys'

18    fees don't run until a date after Mr. Butler's one-line

19    three-minute-after-the-offer-was-sent rejection.

20         MS. CANNELLA:  Until after the thirty days,

21    correct.

22         THE COURT:  I understand that.

23         MS. CANNELLA:  Yes, sir.

24         THE COURT:  So it's a legal argument that the time

25    for attorneys' fees doesn't begin to run until some period

1    under the statute after the letter was sent.

2              MS. CANNELLA:  Yes, sir.  That's our second

3    argument, that's correct.

4              And -- well, I have lost my train of thought.

5    But -- oh, I wanted to tell the Court that we made an error

6    in the calculation.  Under the summary --

7              THE COURT:  Do you want to just send a follow-up

8    e-mail correcting the calculation?

9              MS. CANNELLA:  Sure.

10             THE COURT:  That would be fine.

11             MS. CANNELLA:  Sure, we can do that.

12             And, Your Honor, we also contend that the offer was

13   not made in good faith, but if the Court does not want to

14   hear argument on that, then we absolutely respect the Court's

15   position on that.

16             Thank you.

17             THE COURT:  Thank you.

18             Anything else?

19             MS. MENDELSOHN:  Just thirty seconds, Your Honor.

20             Having seen this case and the statute needing to be

21   strictly construed, I actually think that works in favor of

22   Autoliv.

23             Because 9-11-68 (a) (8) prescribes the offer letter

24   has to be written and served as required by Code Section

25   9-11-5.  And then going down to 9-11-68 which speaks to the

1   response, it just says writing served.

2          So under the *expressio unius* canon that plaintiffs

3   like to cite and has been cited here, I actually think that

4   would enure to our benefit.

5          MS. CANNELLA:  Your Honor, may I respond to that

6   one argument?

7          Here is the statute.

8          THE COURT:  Thank you.

9          MS. CANNELLA:  The subsection that Ms. Mendelsohn

10  is referring to -- do you know which subsection it was?

11         MS. MENDELSOHN:  (a)(8) and then also (c).

12         MS. CANNELLA:  So under (a)(8), it says that the

13  offer must include a certificate of service and be served by

14  certified mail or statutory overnight delivery as required

15  under 9-11-5.  (a)(8) references 9-11-5 because it is

16  narrowing the categories under that statute that can be used

17  to serve.

18         In contrast, the rejection provision under

19  Subsection (c) does not narrow the category.  So we could

20  have served it via mail, overnight delivery, in hand, or

21  electronic service had there been an agreement among the

22  parties to accept such service, which there was not in this

23  case.

24         Thank you.

25         THE COURT:  All right.  Thank you.

1           Ms. Andrews, I feel sorry that you had to listen to

2    some of the things that we went through today.  I think you

3    have gone through a very difficult time.  I've gone through a

4    similar time in my family.

5           So this is what lawyers do sometimes, and it's not

6    the first time I have had to listen to it, but I think it's

7    the first time in a while where somebody who has gone through

8    the sort of suffering that you have been through would have

9    to listen to this sort of squabbling.

10          I'm going to do what I think is right on behalf of

11   both of the parties.  I'll have a chance to read these

12   cases.

13          But I appreciate your being here, and I'm sorry

14   some of the personal things had to be revisited by you.  In

15   my prayers, ultimately the further you get away from this,

16   the more perspective you can get.

17          I think that that will happen, at least that's been

18   my experience.  And I wish you well as you go through that

19   process, although I know it's not an easy one.

20          MS. ANDREWS:  Thank you.

21          THE COURT:  Anything else?

22          MS. MENDELSOHN:  No, Your Honor.

23          MS. CANNELLA:  No, Your Honor.

24          THE COURT:  We will be in recess.

25              (Proceedings adjourn at 3:10 p.m.)

1                    C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA        :
                                     :
4   NORTHERN DISTRICT OF GEORGIA     :

5

6           I, Nicholas A. Marrone, RMR, CRR, Official Court

7   Reporter of the United States District Court for the Northern

8   District of Georgia, do hereby certify that the foregoing 38

9   pages constitute a true transcript of proceedings had before

10  the said Court, held in the city of Atlanta, Georgia, in the

11  matter therein stated.

12          In testimony whereof, I hereunto set my hand on

13  this, the 27th day of July, 2017.

14

15

16

17                      /s/ Nicholas A. Marrone
                        _____
18                      NICHOLAS A. MARRONE, RMR, CRR
                        Registered Merit Reporter
                        Certified Realtime Reporter
19                      Official Court Reporter
                        Northern District of Georgia

20

21

22

23

24

25