```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN  DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3
     JAMIE LEE ANDREWS, AS          )
 4   SURVIVING SPOUSE OF MICAH LEE  )
     ANDREWS, DECEASED, AND JAMIE   )
 5   LEE ANDREWS, AS ADMINISTRATOR  )
     OF THE ESTATE OF MICAH LEE     ) NO. 1:14-CV-3432-SCJ
 6   ANDREWS, DECEASED,             ) ATLANTA, GEORGIA
                                    )
 7                   PLAINTIFF,     ) MAY 16, 2019
                                    )
 8           V.                     )
                                    )
 9   AUTOLIV JAPAN, LTD.,           )
                                    )
10                   DEFENDANT.     )
     _____)
11

12                      TRANSCRIPT OF PROCEEDINGS
13               BEFORE THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT JUDGE
14

15
     APPEARANCES OF COUNSEL:
16
             FOR THE PLAINTIFF:        TEDRA L. CANNELLA
17                                     JAMES E. BUTLER, JR.
                                       RORY A. WEEKS
18                                     MICHAEL F. WILLIFORD

19       FOR THE DEFENDANT:            DOUGLAS G. SCRIBNER
                                       WILLIAM J. REPKO, III
20                                     JENNY A. HERGENROTHER

21

22                         DAVID A. RITCHIE
23                      OFFICIAL COURT REPORTER
                        75 TED TURNER DR., S.W.
24                      ATLANTA, GEORGIA 30303
                           (404) 215-1516
25
```

UNITED STATES DISTRICT COURT

```
 1                        INDEX
                                          PAGE
 2   STEVEN E. MEYER

 3        DIRECT BY MS. CANNELLA               6
          CROSS BY MR. SCRIBNER               88
 4        REDIRECT BY MS. CANNELLA           110

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1              (ATLANTA, FULTON COUNTY, GEORGIA, MAY 16, 2019, IN
 2        OPEN COURT)
 3              THE CLERK:  THE COURT CALLS THE MATTER OF JAMIE LEE
 4  ANDREWS V. AUTOLIV JAPAN, LTD., AND OTHERS, CIVIL ACTION NUMBER
 5  1:14-CV-3432.
 6              THE COURT:  GOOD MORNING, MS. CANNELLA, MR. BUTLER
 7  AND MR. WEEKS.  AND WHO ELSE HAVE I MISSED?
 8              MR. BUTLER:  GOOD MORNING.
 9              MS. CANNELLA:  GOOD MORNING, YOUR HONOR.  WE ALSO
10  HAVE MICHAEL WILLIFORD WITH US TODAY.
11              THE COURT:  GOOD MORNING TO YOU ALL AS WELL.
12              MS. CANELLA:  AND MS. CATHY HUFF, WHO IS A PARALEGAL
13  WITH OUR OFFICE.
14              THE COURT:  GOOD MORNING, MS. HUFF.  PROBABLY THE
15  MOST IMPORTANT PERSON THERE.
16              GOOD MORNING, MR. SCRIBNER.
17              MR. SCRIBNER:  GOOD MORNING.
18              THE COURT:  AND FORGIVE ME, MR. HERGENROTHER --
19  MS. HERGENROTHER.
20              MS. HERGENROTHER:  HERGENROTHER.
21              THE COURT:  AND MR. REPKO.
22              MR. REPKO:  GOOD MORNING.
23              MS. HERGENROTHER:  GOOD MORNING.
24              THE COURT:  THIS MORNING, WHAT I WANT TO DO THIS
25  MORNING, I WANT TO START OFF WITH THE MOTION FOR SANCTIONS, AND
```

1   THEN WHEN WE FINISH WITH THE MOTION FOR SANCTIONS, WE WILL DEAL

2   WITH THE MOTIONS ON EXCLUSION ON THE EXPERTS.

3           I HAVE NOT SET A TIME LIMIT ON YOU ALL THIS MORNING.

4   ALL OF YOU ALL ARE EXPERIENCED LAWYERS.  YOU KNOW WHAT YOU NEED

5   TO TELL ME IN THE PERIOD OF TIME YOU NEED TO TELL ME.  HOWEVER,

6   IF SOMEBODY FORGETS THAT, I WILL TELL YOU WHEN I HAVE HEARD

7   ENOUGH, OKAY?

8           MS. CANNELLA:  THANK YOU, YOUR HONOR.

9           AND, YOUR HONOR, WE BROUGHT MR. MEYER FROM

10  CALIFORNIA, WHO IS ONE OF THE EXPERTS AND THE SUBJECT OF ONE OF

11  THE DAUBERT MOTIONS.

12          THE COURT:  OKAY.

13          MS. CANNELLA:  SO IF THE COURT WOULD LIKE ANY

14  GUIDANCE ON ORDER, WE WOULD PROPOSE, AT LEAST, TO PUT MR. MEYER

15  UP SO WE CAN SHUFFLE HIM OFF TO CALIFORNIA AND GET THAT OUT OF

16  THE WAY.  HE IS RELEVANT TO THE MOTION FOR SANCTIONS AND

17  SEVERAL OF THE DAUBERT MOTIONS.

18          THE COURT:  I DON'T HAVE ANY PROBLEM.  DO YOU HAVE

19  ANY PROBLEM WITH THAT?

20          MR. SCRIBNER:  NO PROBLEM, YOUR HONOR.

21          THE COURT:  THEN WE CAN PROCEED THAT WAY.

22          I HAVE READ 85 PERCENT OF EVERYTHING YOU ALL SENT ME.

23  THERE WAS A LOT OF NOTEBOOKS, A LOT OF MOTIONS, A LOT OF

24  DOCKETED THINGS.  I AM PRETTY WELL UP TO DATE, BUT IF ANYBODY

25  WANTS TO MAKE AN OPENING STATEMENT, I WILL HEAR FROM YOU.


                        UNITED STATES DISTRICT COURT

```
 1          MS. CANNELLA:  WE WOULD NOT.  THANK YOU, SIR.
 2          MR. SCRIBNER:  NO, YOUR HONOR.
 3          THE COURT:  THEN YOU MAY PROCEED.
 4          THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE?
 5                        - - -
 6                    STEVEN E. MEYER,
 7 CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, BEING FIRST
 8 DULY SWORN, TESTIFIED AS FOLLOWS:
 9                        - - -
10          THE CLERK:  HAVE A SEAT.  IF YOU COULD PLEASE STATE
11 AND SPELL YOUR NAME FOR THE RECORD.
12          THE WITNESS:  STEVEN WITH A "V" E. MEYER, M-E-Y-E-R.
13          MS. CANNELLA:  YOUR HONOR, WE UNDERSTAND THE COURT
14 HAS THE POWERPOINT IN FRONT OF IT; IS THAT CORRECT?
15          THE COURT:  IT'S RIGHT OVER THERE.
16          MS. CANNELLA:  OKAY.  AND I ALSO HAVE A HARD COPY FOR
17 THE RECORD, PLAINTIFF'S HEARING 1108.
18          THE COURT:  OKAY.  THANK YOU.
19          MS. CANNELLA:  AND WE HAVE PROVIDED A COPY TO DEFENSE
20 COUNSEL ALREADY.
21          MR. SCRIBNER:  YES.  THANK YOU.
22          MS. CANNELLA:  DO YOU HAVE A PREFERENCE ABOUT WHERE I
23 AM?
24          THE COURT:  AS LONG AS THE COURT REPORTER CAN HEAR
25 YOU, YOU CAN MOVE AROUND AS YOU SEE FIT.
```

UNITED STATES DISTRICT COURT

1          MS. CANNELLA:  THANK YOU.

2                    DIRECT EXAMINATION

3  BY MS. CANNELLA:

4  Q.   GOOD MORNING, MR. MEYER.

5  A.   GOOD MORNING.

6  Q.   I WANT TO WALK THROUGH SOME OF YOUR BACKGROUND AND

7  QUALIFICATIONS BEFORE WE GET GOING WITH THE ACTUAL WRECK.

8  A.   OKAY.

9  Q.   YOU ARE A REGISTERED PROFESSIONAL ENGINEER, CORRECT?

10  A.   I AM.  I AM LICENSED IN THE STATE OF CALIFORNIA AS A

11  PROFESSIONAL ENGINEER.

12  Q.   AND WHAT DOES BEING A PROFESSIONAL ENGINEER MEAN?

13  A.   IT MEANS THAT I HAVE A DEGREE IN MECHANICAL ENGINEERING IN

14  MY CASE FROM AN ACCREDITED UNIVERSITY.  I HAVE A MINIMUM

15  REQUIRED NUMBER OF YEARS OF EXPERIENCE.  I HAVE SAT FOR TWO

16  EIGHT-HOUR EXAMS, ONE COVERING ALL ENGINEERING DISCIPLINES, NOT

17  JUST MECHANICAL BUT OTHERS AS WELL, AND THEN AFTER OBTAINING

18  SOME MORE EXPERIENCE, I THEN SAT FOR A SECOND EIGHT-HOUR EXAM

19  IN MY DISCIPLINE SPECIFICALLY, WHICH IS MECHANICAL ENGINEERING.

20  AFTER COMPLETING ALL OF THAT YOU ARE GRANTED THE PROFESSIONAL

21  LICENSE.

22          THE COURT:  CAN YOU SPEAK UP A LITTLE LOUDER?

23          THE WITNESS:  YES.  I'M SORRY.  IN MY MIND, IT'S

24  QUITE LOUD OVER HERE.

25                    - - -


                    UNITED STATES DISTRICT COURT

1  BY MS. CANNELLA:

2  Q.   AND WHEN DID YOU GET YOUR DEGREE IN MECHANICAL

3  ENGINEERING?

4  A.   1986.

5  Q.   AND HAVE YOU ALSO TAKEN GRADUATE-SCHOOL-LEVEL CLASSES IN

6  MECHANICAL ENGINEERING?

7  A.   YES.

8  Q.   AND HOW LONG HAVE YOU BEEN STUDYING AUTOMOBILES AND AUTO

9  SAFETY?

10  A.   ALMOST 30 YEARS.

11  Q.   FOR HOW LONG HAVE YOU WORKED AT SAFETY ANALYSIS AND

12  FORENSIC ENGINEERING?

13  A.   I WENT TO WORK AT WHAT IS NOW KNOWN AS THAT COMPANY IN

14  1991, SO WHATEVER THAT IS, 26, 27.

15  Q.   AND YOU ARE A MEMBER OF SEVERAL PROFESSIONAL ASSOCIATIONS

16  AS WELL?

17  A.   YES.

18  Q.   WHICH ONES?

19  A.   THE AMERICAN SOCIETY OF MECHANICAL ENGINEERS, NATIONAL

20  SOCIETY OF PROFESSIONAL ENGINEERS, NATIONAL ACADEMY OF FORENSIC

21  ENGINEERS, SOCIETY OF AUTOMOTIVE ENGINEERS.  THOSE ARE THE ONES

22  THAT COME TO MIND.

23  Q.   I AM GOING TO HAND YOU A COPY OF YOUR RESUME, WHICH WE

24  HAVE MARKED AS PLAINTIFF'S HEARING EXHIBIT 320.

25          MS. CANNELLA:  IF I MAY APPROACH?


UNITED STATES DISTRICT COURT

1          THE COURT:  OKAY.  JUST GIVE ME WHAT YOU THINK I NEED

2    TO HAVE.  WE'LL FIND A PLACE FOR IT.

3          MS. CANNELLA:  YES, YOUR HONOR.

4    BY MS. CANNELLA:

5    Q.   I COUNT 82 PUBLICATIONS AND INVITED LECTURES ON THE

6    RESUME.  DOES THAT SOUND ABOUT RIGHT?

7    A.   IT DOES.

8    Q.   AND A NUMBER OF THEM RELATE TO SEATBELT RESTRAINT SYSTEMS,

9    CORRECT?

10   A.   YES.

11   Q.   DO A NUMBER OF THEM ALSO RELATE TO BIOMECHANICAL AND

12   OCCUPANT KINEMATICS OPINIONS?

13   A.   YES.  THOSE TWO GO HAND IN HAND MOST TIMES.

14          THE COURT:  THE DEFENDANT HAS NO OBJECTION TO

15   EXHIBIT 1?

16          MR. SCRIBNER:  NO OBJECTION, YOUR HONOR.

17          THE COURT:  ADMITTED WITHOUT OBJECTION.

18   BY MS. CANNELLA:

19   Q.   AND HOW LONG HAVE YOU BEEN STUDYING SEATBELT DESIGNS AND

20   SEATBELT PERFORMANCE SPECIFICALLY?

21   A.   SINCE THE EARLY '90S, SO THE DECADE OF THE '90S AND THE

22   TWO THOUSANDS, SO QUITE A FEW YEARS.

23   Q.   AND HOW MANY INVESTIGATIONS OR CASES DO YOU THINK YOU HAVE

24   LOOKED AT?

25   A.   I STOPPED COUNTING AT ABOUT TWO TO THREE THOUSAND.


                    UNITED STATES DISTRICT COURT

1  Q.   HOW MANY TIMES HAVE YOU TESTIFIED?

2  A.   I DON'T KNOW.  PROBABLY, IF WE INCLUDE DEPOSITIONS, A

3  COUPLE OF HUNDRED, CERTAINLY, MAYBE A LITTLE MORE THAN THAT.

4  Q.   AND HAS ANY COURT EVER EXCLUDED YOUR OPINIONS?

5  A.   NOT ULTIMATELY THAT I AM AWARE OF.

6  Q.   YOU ARE ALSO A LICENSED ATTORNEY, CORRECT?

7  A.   I AM.  I HAVE A LICENSE IN CALIFORNIA.

8  Q.   DO YOU PRACTICE LAW?

9  A.   NO.

10  Q.   HAVE YOU USED YOUR LAW LICENSE AT ANY POINT DURING THIS

11  INVESTIGATION OR GIVING YOUR OPINIONS IN THIS CASE?

12  A.   NO.  I HAVEN'T USED THAT IN DECADES.

13  Q.   OKAY.  I WANT TO TALK ABOUT THE COLLISION ITSELF NOW AND

14  WE CAN USE YOUR POWERPOINT THAT YOU PREPARED FOR THAT.

15          CAN YOU EXPLAIN TO THE COURT HOW THE COLLISION

16  HAPPENED?

17  A.   YES.  MR. ANDREWS WAS DRIVING DOWN A TWO-LANE HIGHWAY,

18  I-575 NORTH IN COBB COUNTY, WHEN HE ATTEMPTED TO AVOID A TURTLE

19  IN THE ROAD, SWERVED TO THE RIGHT, LEFT THE ROAD AND IMPACTED A

20  GROUP OF TREES OFF THE SIDE OF THE ROADWAY.

21  Q.   AND TO BE CLEAR, THESE AREN'T YOUR OPINIONS; THESE ARE

22  OPINIONS YOU ARE RELYING ON FROM ANOTHER EXPERT, CORRECT?

23  A.   YES.  THAT'S DESCRIBED IN THE POLICE REPORT AS WELL AS

24  OTHER EXPERTS, THE RECONSTRUCTIONISTS AND SO FORTH.

25  Q.   CAN YOU TELL US WHAT WE SEE IN THIS SLIDE?

1  A.   THIS IS THE SCENE, SO THE TURTLE THAT WAS UNSUCCESSFULLY

2  AVOIDED.  THE VEHICLE AT ITS REST POSITION IS THE TOP RIGHT.

3  YOU SEE THE TAILLIGHTS THERE LOOKING INTO THE TREE LINE AND

4  THEN YOU SEE THE GROUP OF TREES ON THE BOTTOM RIGHT PHOTOGRAPH.

5  IT WAS EFFECTIVELY A FRONTAL IMPACT FOR MR. ANDREWS' VEHICLE

6  INTO THE TREES.

7  Q.   OKAY.  I AM GOING SKIP FORWARD AND TALK ABOUT YOUR

8  INSPECTION.

9  A.   YES.

10 Q.   CAN YOU TELL US ABOUT THAT INSPECTION, WHAT YOU OBSERVED

11 OF THE CAR?

12 A.   THE VEHICLE IS A 2005 MAZDA3 HATCHBACK.  AGAIN, IT WAS

13 INVOLVED IN A FRONTAL IMPACT, SO I CERTAINLY OBSERVED AND

14 DOCUMENTED FRONTAL IMPACT DAMAGE.  THAT IS CONFINED TO THE

15 FRONT OF THE VEHICLE.  THERE IS NOT WHAT WE WOULD REFER TO AS

16 INTRUSION OF ANY SIGNIFICANCE.  IN OTHER WORDS, THE CRUMPLE

17 ZONE AT THE FRONT OF THE VEHICLE DID WHAT WE WOULD EXPECT IT TO

18 DO AND THAT'S WHERE THE CRUSH WAS OR THE CRUMPLING.

19          WHEN YOU GET BACK INTO THE OCCUPANT COMPARTMENT,

20 THERE IS NOT -- YOU SEE THE DRIVER'S WINDOW IS NOT FRACTURED OR

21 BROKEN.  THE PASSENGER SIDE FRONT WINDOW IS NOT FRACTURED OR

22 BROKEN.  THAT TELLS US THERE IS NOT A LOT OF INTRUSION OF THE

23 STRUCTURE INTO THE VEHICLE.  BUT IT IS A FRONTAL IMPACT.  THAT

24 ALSO GIVES ME SOME INSIGHT AS TO THE SEVERITY OF THE COLLISION.

25          I ALSO NOTE THAT THE -- NOTICE THAT THE VEHICLE IS

1   EQUIVALENT, THE '05 IS THE SAME VEHICLE FROM 2003 TO 2006.

2   THAT COMES TO BE KNOWN AS A J48C PLATFORM.  THAT'S JUST THE

3   DESIGNATION THAT MAZDA GIVES IT INTERNALLY.

4            IT WAS UPDATED IN 2007 AND THE WHOLE RELEVANT RANGE

5   RAN FROM '03 TO '09, BUT THERE WAS SOME CHANGES IN '07.

6   Q.   OKAY.  I WANT TO GO BACK TO SOMETHING YOU MENTIONED TO

7   FOCUS ON IT A LITTLE BIT MORE.

8            YOU SAID THAT THE FRONT OF THE CAR ABSORBED, HAD A

9   LOT OF CRUSH.

10  A.   YES.

11  Q.   AND THAT ABSORBED ALL THE ENERGY FROM THE WRECK; IS THAT

12  RIGHT?

13  A.   YES.  THE FRONT CRUMPLE ZONE IS SOMETIMES WHAT WE CALL IT,

14  BUT THE FRONT CRUMPLE ZONE DID WHAT IT WAS SUPPOSED TO DO AND

15  THAT IS IT IS DESIGNED TO CRUSH AT THE FRONT.  WE WANT TO CRUSH

16  THE VEHICLE IN THE CRUMPLE ZONE BEFORE THE COMPARTMENT.

17           SO THE FRONT BUMPER STRUCTURE, THE FRAME RAILS, THE

18  ENGINE COMPARTMENT ABSORBED AND CRUSHED THAT ENERGY,

19  MAINTAINING, GENERALLY SPEAKING, THE OCCUPANT COMPARTMENT IN

20  ITS CONDITION.

21  Q.   OKAY.  AND SO JUST TO BE CLEAR, THEN, ONCE YOU KEEP THAT

22  OCCUPANT COMPARTMENT SAFE WITHOUT A LOT OF CRASH DAMAGE COMING

23  INTO THE OCCUPANT COMPARTMENT, THAT ALLOWS THE OCCUPANT TO STAY

24  SAFE, CORRECT?

25  A.   THAT'S THE IDEA, YES, ABSOLUTELY.


                    UNITED STATES DISTRICT COURT

1   Q.   OKAY.  I WANT TO LOOK AT THESE PHOTOS OF THE STEERING

2   WHEEL, AND COULD YOU TELL US, WHAT DO WE SEE IN THE STEERING

3   WHEEL PHOTO ON THE RIGHT?

4   A.   THE STEERING WHEEL IS DAMAGED.  IT WAS BENT AND HAD

5   CLEARLY BEEN IMPACTED AND THAT'S WHAT WE SEE ON THE RIGHT.  SO

6   DOES THIS -- SOMETIMES I CAN DRAW ON THESE.  NO?

7            OKAY.  THE PHOTOGRAPH ON THE RIGHT.  YOU SEE THE

8   BUTTONS ON THE STEERING WHEEL TO CONTROL THE RADIO VOLUME AND

9   WHAT HAVE YOU AND YOU SEE --

10            THE COURT:  LET'S MAKE SURE.  YOUR RIGHT?  OKAY.

11   THERE YOU GO.

12            THE WITNESS:  HERE.

13            THE COURT:  ALL RIGHT.  I'M AT THE SAME PLACE.

14            THE WITNESS:  SO THERE'S DEFORMATION THERE OF THE

15   STEERING WHEEL HUB INDICATING SOME CONTACT AND SOME FORCE

16   TRANSFER THERE.

17            THE COURT:  HOLD ON.

18            MS. CANNELLA:  INDICATING --

19            THE COURT:  HOLD ON.

20            MS. CANNELLA:  SORRY.

21            THE CLERK:  IT'S COMING BACK UP.  I TURNED IT ON.

22            MS. CANNELLA:  OH, THANK YOU.  HOW DO I DO THAT?

23   OKAY.  THANK YOU, MS. WRIGHT.

24   BY MS. CANNELLA:

25   Q.   OKAY.  SO THAT DAMAGE INDICATES SOMETHING -- SOMEBODY HIT

UNITED STATES DISTRICT COURT

 1  IT, CORRECT?

 2  A.   CORRECT, YES.  IT'S WHAT WE WERE GOING TO -- ULTIMATELY WE

 3  ARE GOING TO REFER TO THAT OR I AM GOING TO REFER TO THAT AS

 4  OCCUPANT CONTACT.  THAT'S ULTIMATELY OCCUPANT CONTACT EVIDENCE.

 5  Q.   AND THE PATTERN, THAT DOTTED PATTERN THERE ON THE STEERING

 6  WHEEL, YOU CAN SEE IT IN BOTH PHOTOS, THE GRIP THERE WHERE

 7  PEOPLE ARE SUPPOSED TO HOLD THE STEERING WHEEL.  DO YOU SEE

 8  THAT?

 9  A.   I THINK THIS?

10  Q.   YES, SIR.

11  A.   YES.

12  Q.   OKAY.  I AM GOING TO HAND YOU WHAT I HAVE MARKED AS

13  PLAINTIFF'S HEARING EXHIBIT 2.

14          THE COURT:  THANK YOU.

15          THE WITNESS:  I KNOW HOW TO DRAW ON IT NOW, BUT I

16  DON'T KNOW HOW TO ERASE IT.

17  BY MS. CANNELLA:

18  Q.   AND WE PUT IT IN AN ENVELOPE BECAUSE IT IS AN AUTOPSY

19  PHOTO, BUT DID YOU SEE ANYTHING ON THE AUTOPSY PHOTOS THAT

20  MATCHED THIS PATTERN ON THE GRIP?

21  A.   YES.  MR. ANDREWS HAS A SIMILAR PATTERN ON HIS FACE

22  IMPRINT.

23  Q.   AND DOES THAT TELL YOU THAT HIS FACE HIT THE STEERING

24  WHEEL?

25  A.   YES.

UNITED STATES DISTRICT COURT

1  Q.   AND CAN YOU TELL ME WHAT WE SEE IN THE SECOND PICTURE?

2  A.   IN THE SECOND PICTURE, THIS IS A PHOTOGRAPH OF WHAT WE

3  CALL THE D-RING FOR MR. ANDREWS' SEATBELT, SO THAT THE SEATBELT

4  HAS SOME VARIOUS COMPONENTS TO IT.  ONE OF THE THINGS THAT'S

5  IMPORTANT HERE IS THE D-RING AND THE D-RING IS THAT PIECE THAT

6  TYPICALLY HANGS OVER YOUR LEFT SHOULDER IN THE DRIVER'S

7  POSITION?

8           THE COURT:  ONE SECOND.  NO OBJECTION TO EXHIBIT 2?

9           MR. SCRIBNER:  NO OBJECTION, YOUR HONOR.

10          THE COURT:  ADMITTED WITHOUT OBJECTION.

11          MS. CANNELLA:  DID YOU WANT THE GRAY ONE?

12          THE WITNESS:  YEAH, THAT'S FINE.

13          MS. CANNELLA:  MAY I APPROACH AGAIN?

14          THE COURT:  YES.

15          MS. CANNELLA:  IS IT OKAY IF I APPROACH HIM, YOUR

16  HONOR, WITH EXHIBITS AND THINGS LIKE THAT?

17          THE COURT:  YES, YES.

18          MS. CANNELLA:  THANK YOU.

19  BY MS. CANNELLA:

20  Q.   OKAY.  AND I HAVE HANDED YOU THAT JUST SO YOU CAN

21  ILLUSTRATE TO THE COURT THE DIFFERENT PARTS OF THE SEATBELT.

22  CAN YOU GIVE US AN OVERVIEW JUST IN A BASIC WAY?

23  A.   SO THE FEW PARTS THAT WE ARE GOING TO BE TALKING ABOUT IS

24  THE RETRACTOR.  THAT'S THIS PIECE HERE.  THE RETRACTOR IS THE

25  PIECE THAT RETRACTS THE BELT UP INTO ITS STOWED POSITION.  SO

1   WHEN YOU TAKE YOUR SEATBELT -- SO WHEN YOU TAKE YOUR SEATBELT

2   OFF, IT ROLLS UP ONTO THE DOORJAMB THERE, GOES UP BEHIND THE

3   TRIM AND IT'S STOWED AWAY.  WHAT DOES THAT IS THE RETRACTOR.

4   SO THE RETRACTOR LITERALLY RETRACTS THE WEBBING INTO ITS STOWED

5   POSITION.  AND WHEN IT DOES THAT, IT ROLLS UP ON THIS SPOOL AND

6   THAT'S WHERE IT'S STOWED.

7           AT THE TOP OF THE B-PILLAR, WHICH IS THAT STRUCTURE

8   AT THE BACK OF YOUR DOOR FRAME, IS TYPICALLY WHAT'S CALLED THE

9   D-RING, WHICH IS THIS BLACK PIECE, AND THAT'S UP OVER THE

10  DRIVER'S POSITION.  THAT'S GOING TO BE AT YOUR LEFT SHOULDER

11  AND THAT'S WHAT THE PICTURE IS THERE.

12          AND THEN YOU HAVE, THE OTHER THING WE ARE GOING TO

13  TALK ABOUT IS THE TONGUE, OTHERWISE KNOWN AS THE LATCH PLATE,

14  AND THAT'S THE TONGUE THAT INSERTS INTO THE BUCKLE.

15  Q.  THANK YOU.

16          OKAY.  SO WHAT WE ARE LOOKING AT HERE IN THIS PICTURE

17  IS THE D-RING, WHICH IS THE PIECE TO THE LEFT OF THE DRIVER'S

18  HEAD WHERE THE SEATBELT WEBBING IS SLIDING THROUGH?

19  A.  OVER HIS LEFT SHOULDER, BASICALLY, YES.

20  Q.  LEFT SHOULDER, OKAY.  THANK YOU.

21  A.  YES.

22  Q.  AND WHAT DOES THE ABRASIONS THAT YOU SEE HERE TELL YOU?

23  A.  SO WHAT HAPPENS IN AN ACCIDENT, PARTICULARLY A FRONTAL

24  ACCIDENT, IN A FRONTAL COLLISION, IS REALLY WHAT HAPPENS IS THE

25  VEHICLE STOPS UNDERNEATH YOU.  YOU KEEP GOING.


UNITED STATES DISTRICT COURT

1          WE THEN RELY UPON THE SEATBELT TO HOLD US BACK, TO

2    HOLD US IN OUR SEAT AND TO KEEP US FROM FLYING FORWARD INTO THE

3    STEERING WHEEL OR WINDSHIELD OR WHAT HAVE YOU.

4          THE SEATBELT IN THIS RETRACTOR IS A DEVICE THAT

5    SENSES THAT CRASH AND LOCKS UP SO THAT THE SPOOL WON'T TURN.

6    THAT'S THE IDEA.  WHEN IT LOCKS UP, IT DOESN'T SPOOL OUT ANY

7    MORE, IT DOESN'T TURN ANY MORE.  THE BELT THEN -- YOU FLY INTO

8    THE BELT AND THE BELT HOLDS YOU BACK.  THAT'S THE IDEA.

9          WHEN THAT HAPPENS, THERE TYPICALLY IS GOING TO BE A

10   LOT OF FORCE GENERATED BETWEEN THE BELT WEBBING AND THE D-RING,

11   BECAUSE THAT'S AN ANCHOR POINT, SO TO SPEAK, AND ALSO SOME

12   FORCE GENERATED AT THE LATCH PLATE AT YOUR BUCKLE AS YOUR LOWER

13   TORSO TRIES TO GO FORWARD.

14         SO THAT FORCE GENERATES HEAT AND FRICTION AND

15   OFTENTIMES WILL LEAVE EVIDENCE BEHIND, FORENSIC EVIDENCE, ON

16   THE WEBBING AND ON THE D-RING, PERHAPS, AND THE SAME THING ON

17   THE LATCH PLATE.  AND LOOKING AT THOSE COMPONENTS WILL GIVE US

18   SOME INSIGHT AS TO, NUMBER ONE, WAS THE BELT WORN?  BECAUSE IF

19   IT WASN'T, THERE WOULDN'T BE ANY LOADING THERE.  IF THERE IS

20   LOADING OR ABRASIONS OR BURN MARKS AND EVIDENCE LEFT BEHIND

21   THERE, THEN THAT TELLS US THE BELT WAS WORN AND THERE WAS SOME

22   LOAD TRANSFER THERE.

23         AND IN THIS CASE WHAT WE FIND IS, AS THAT PICTURE

24   DEMONSTRATES, ARE QUITE HEAVY BURN MARKS ACROSS THE D-RING FROM

25   THE WEBBING.  SO LITERALLY WHAT HAPPENS IS, AS WE DRAG AND AS

1  THE BELT MOVES OR TRIES TO MOVE ACROSS THAT D-RING, THE HEAT

2  AND FRICTION LITERALLY MELT THE PLASTIC OF THE D-RING AND IT

3  MELTS THAT PLASTIC AND WHAT WE WILL SEE IS IT ACTUALLY MELTS IT

4  ONTO THE WEBBING OF THE BELT AS WELL.

5          SO IN THIS EXAMPLE, THIS WOULD BE BLACK.  WE WOULD

6  SEE PERHAPS SOME BLACK TRANSFER HERE, WHICH IS NOT UNUSUAL, BUT

7  THAT IS A DATAPOINT THAT ALLOWS US TO DETERMINE HOW THE BELT

8  PERFORMED IN THIS ACCIDENT, HOW IT WAS WORN AT THE BEGINNING,

9  WHEN IT LOCKED UP, THINGS OF THAT NATURE, WHETHER OR NOT IT

10 STAYED LOCKED.

11 Q.   AND WAS MICAH ANDREWS' SEATBELT BEING WORN?

12 A.   ABSOLUTELY.

13 Q.   THERE IS NO DISPUTE ABOUT THAT IN THIS CASE, CORRECT?

14 A.   NO DOUBT.

15 Q.   THAT HE WAS WEARING IT CORRECTLY AS WELL?

16 A.   CORRECT.

17 Q.   OKAY.  HOW ABOUT THIS PICTURE, CAN YOU TELL US WHAT YOU

18 DREW FROM THIS PICTURE?

19 A.   SO THIS IS MICAH'S LATCH PLATE AND WE SEE SIMILAR

20 ABRASIONS HERE AND HERE IN THE SLOT FROM THAT BELT, FROM THAT

21 BELT BEING LOADED AGAINST THE LATCH PLATE AND MELTING AND

22 BURNING THAT PLASTIC.

23 Q.   AND SO THE SAME THING IS HAPPENING, IT'S JUST SLIDING

24 THROUGH SO HARD AND SO FAST THAT IT'S ACTUALLY MELTING PLASTIC?

25 A.   CORRECT.


                    UNITED STATES DISTRICT COURT

1  Q.   OKAY.  CAN YOU TELL US WHAT WE SEE IN THIS PICTURE?

2  A.   ONE OF THE THINGS THAT I DID IS LOOKED AT THE WEBBING

3  ITSELF.  SO WHEN YOU LOOK AT THE WEBBING ITSELF, PARTICULARLY

4  IN MICAH'S CASE, THERE IS A LARGE PLASTIC TRANSFER.  MICAH'S

5  D-RING WAS WHITE, REMEMBER, AND THAT TRANSFER GOES FROM ABOUT

6  66 INCHES ALL THE WAY TO 86 OR REALLY ABOUT 66 AND A HALF TO 86

7  AND A HALF.

8          BUT THIS LARGE TRANSFER HERE, THIS WHITE, THAT'S

9  WHITE PLASTIC FROM THE D-RING.  SO THAT IS THAT WHITE PLASTIC

10  FROM THE D-RING THAT'S BEING MELTED ONTO THE WEBBING AND LEFT

11  BEHIND.

12          THE NOTEWORTHY THING HERE IS THAT'S 20 INCHES LONG,

13  WHICH TELLS ME AND TELLS US THAT THE BELT LOCKED UP AND THEN

14  WAS PULLED ACROSS THAT D-RING FOR 20 INCHES.  AND AS IT DID

15  THAT, OBVIOUSLY THE BELT IS GETTING LONGER BY THAT 20 INCHES

16  AND MICAH IS ALLOWED TO GO FORWARD OR MOVE FORWARD AS THAT'S

17  HAPPENING, ULTIMATELY IMPACTING THE STEERING WHEEL.

18  Q.   SO THAT'S ACTUALLY PHYSICAL EVIDENCE OF 20 INCHES OF BELT

19  SPOOL-OUT FOR MR. ANDREWS?

20  A.   CORRECT.  AND THAT HAPPENS AFTER THE BELT LOCKS UP AND

21  THERE'S AN EXPLANATION FOR THAT THAT WE WILL TALK ABOUT IN A

22  MINUTE.

23  Q.   OKAY.  I WANT TO TAKE ONE MOMENT TO TALK ABOUT, TO GO

24  BACKWARDS AND LOOK AT THESE PHOTOS OF THE STEERING WHEEL.

25          THE AIRBAG DID NOT DEPLOY IN THE COLLISION, CORRECT?

UNITED STATES DISTRICT COURT

1  A.   THE AIRBAG DID NOT DEPLOY, NO.

2  Q.   HAVE YOU EVER SEEN A COLLISION BEFORE WHERE AN AIRBAG WAS

3  SUPPOSED TO DEPLOY BUT DIDN'T?

4  A.   YES.

5  Q.   WHAT IS MORE COMPLICATED, AN AIRBAG OR A SEATBELT?  JUST

6  FROM A DESIGN PERSPECTIVE.

7  A.   THE AIRBAG IS MORE COMPLICATED.

8  Q.   AND WHICH ONE RELIES ON A COMPUTER TO WORK?

9  A.   THE AIRBAG.  THE SEATBELTS TYPICALLY ARE MECHANICAL

10 DEVICES.

11 Q.   SO WHICH ONE OF THE TWO REQUIRES ELECTRONICS AND WIRES AND

12 COMPUTER ALGORITHMS IN ORDER TO FUNCTION PROPERLY?

13 A.   THOSE ARE TYPICALLY THE AIRBAG.

14 Q.   AND SOMETIMES AIRBAGS FAIL, CORRECT?

15 A.   OF COURSE.

16 Q.   WHEN I ASKED YOU THAT QUESTION, YOU WERE KIND OF LIKE,

17 YES, OF COURSE I'VE SEEN AIRBAGS FAIL.

18 A.   OF COURSE, YES.

19 Q.   SO SEATBELTS DON'T NEED ANY FANCY TECHNOLOGY TO HOLD YOU

20 BACK IN YOUR SEAT AND -- IS THAT RIGHT?

21 A.   THAT'S CORRECT.  NO, THIS IS A SIMPLE MECHANICAL DEVICE.

22 THERE IS A LITTLE BALL BEARING IN HERE THAT PUSHES THE LOCK BAR

23 UP INTO A SPROCKET.  IT'S THAT SIMPLE.  IT'S ALMOST LIKE

24 STICKING A STICK INTO YOUR BICYCLE SPOKES.  THAT'S KIND OF HOW

25 THIS WORKS.  IT'S VERY BASIC AND VERY SIMPLE AND CONSEQUENTLY

1  VERY RELIABLE.

2  Q.   AND WOULD AUTOLIV, A COMPANY THAT MANUFACTURES BOTH

3  AIRBAGS AND SEATBELTS, BE AWARE THAT SOMETIMES AIRBAGS FAIL?

4  A.   OF COURSE.

5  Q.   OKAY.  YOU ALSO HAVE TESTIFIED BEFORE THAT THE SEATBELT

6  PRETENSIONER DID NOT FIRE.  LET'S SEE IF I CAN FIND THAT PHOTO

7  HERE FOR YOU SO YOU CAN EXPLAIN TO THE COURT WHAT A

8  PRETENSIONER IS, PLEASE.

9  A.   CORRECT.  IN THIS VEHICLE, THERE IS A DEVICE CALLED A

10  PRETENSIONER AND THAT IS INTENDED TO FIRE EARLY WITH THE

11  AIRBAG, TYPICALLY, EARLY MEANING BEFORE WE START TO MOVE.

12  Q.   CAN YOU USE THIS PHOTO TO EXPLAIN WHERE THE PRETENSIONER

13  IS?

14  A.   YEAH.  SO THE PRETENSIONER IN THIS VEHICLE IS IN THE

15  BUCKLE, WHICH IS HERE.  SO THAT BUCKLE IS ATTACHED TO THIS

16  PIECE OF ACCORDION HERE, THAT LITTLE PLASTIC SLEEVE, AND WHAT

17  REALLY HAPPENS IS THERE IS A CABLE IN THERE THAT GOES AROUND A

18  PULLEY AND IT GOES INTO THIS TUBE RIGHT HERE.  AND SO WHAT

19  HAPPENS IS WHEN THE PRETENSIONER FIRES, THAT BUCKLE IS

20  LITERALLY PULLED DOWN TOWARDS THE FLOOR.  AND THE EXPECTATION

21  OF OR THE HOPE IS IS THAT THAT PULLS DOWN TO THE FLOOR EARLY,

22  BEFORE WE START TO MOVE RELATIVE TO THE CRASH, SO THAT IF THERE

23  IS LOOSENESS IN THE BELT, IT SNUGS IT UP BEFORE WE GET THERE.

24  AND THAT'S THE IDEA.

25  Q.   AND HOW MUCH BELT SLACK IS A PRETENSIONER OR WAS MICAH

 1  ANDREWS' PRETENSIONER DESIGNED TO TAKE OUT OF THE SYSTEM?

 2  A.   THE STROKE FOR THIS ONE WOULD HAVE BEEN UP TO ABOUT THREE

 3  INCHES.

 4  Q.   SO WE ARE NOT TALKING ABOUT PULLING IN 20 INCHES OF

 5  SPOOL-OUT?

 6  A.   NO, NO, NO.

 7  Q.   AND A PRETENSIONER, IS THAT DESIGNED IN ORDER, IN ORDER TO

 8  AVOID A SITUATION WHERE SOMEBODY HAS GOT THE SEATBELT A LITTLE

 9  LOOSE WHEN THEY ARE DRIVING AROUND?

10  A.   YES.  AND IT'S DESCRIBED THAT IF YOU ARE WEARING HEAVY

11  COATS OR, YOU KNOW, IF IT'S WINTER AND YOU ARE WEARING A BULKY

12  COAT OR SOMETHING AND THE BELT IS ROUTED OVER YOUR CLOTHING,

13  THEN SOMETIMES THAT CAN CREATE A BIT OF A LOOSENESS THAT THE

14  PRETENSIONER WOULD BE DESIGNED TO BE ABLE TO TAKE OUT.  IT'S

15  NOT GOING TO PULL YOU BACK INTO THE SEAT PER SE.  IT'S NOT

16  GOING TO DO THAT.  BUT IT WILL SNUG IT UP.

17          THE COURT:  WHAT, IF ANY, EFFECT DOES THE SIZE OF THE

18  PERSON PLAY IN THIS?

19          THE WITNESS:  FOR THE PRETENSIONER NOT A WHOLE LOT,

20  BECAUSE THEY ARE NOT -- THEY ARE PURPOSEFULLY NOT THAT STRONG.

21  SO THEY WILL -- AND I HAVE FIRED THEM ON MYSELF.  YOU WILL FEEL

22  IT, BUT WE DON'T WANT IT TO HURT PEOPLE.  SO IT'S NOT GOING TO

23  BE THAT STRONG.

24          SO IF YOU HAD A LOT OF SOFT TISSUE, IF YOU WERE A

25  BIGGER PERSON WITH A LOT OF SOFT TISSUE AROUND THE BELT

```
1   ROUTING, IT MIGHT SNUG UP ON THAT A LITTLE MORE THAN IT WOULD
2   ON A THIN PERSON THAT DIDN'T HAVE A LOT OF THAT SOFT TISSUE.
3           WHAT THE BELT IS REALLY TRYING TO DO IS GRAB ON TO
4   YOUR SKELETAL SYSTEM.  SO AS IT SNUGS DOWN THAT SOFT TISSUE MAY
5   COMPRESS A LITTLE BIT, WHICH IS REALLY WHAT'S GOING TO HAPPEN
6   WITH THE BULKY CLOTHING, FOR EXAMPLE.  IT WILL COMPRESS THAT
7   WINTER COAT.
8           THE COURT:  THANK YOU.
9   BY MS. CANNELLA:
10  Q.   SO IN YOUR OPINION HAD THE PRETENSIONER FIRED, WOULD THERE
11  HAVE BEEN A SIGNIFICANT DIFFERENCE IN THE AMOUNT OF BELT
12  SPOOL-OUT OR IN MR. ANDREWS' FORWARD MOTION IN THIS COLLISION?
13  A.   IT WOULDN'T HAVE AFFECTED THE SPOOL-OUT AT ALL.  IT WOULD
14  HAVE AFFECTED, PERHAPS, TO A SMALL DEGREE THE AMOUNT OF FORWARD
15  EXCURSION.
16  Q.   BUT NOTHING SIGNIFICANT?
17  A.   NO, CERTAINLY NOT WITH RESPECT TO HIS UPPER TORSO.  THAT
18  PRETENSIONER IS ON THE BUCKLE SIDE, WHICH IS GOING TO TIGHTEN
19  BOTH THE LAP BELT AND THE SHOULDER BELT TOGETHER, BECAUSE IT'S
20  PULLING THAT LATCH PLATE DOWN.  SO ENVISION IF YOU PULL THE
21  LATCH PLATE DOWN, YOU ARE GOING TO PULL BOTH, BOTH SEGMENTS OF
22  BELT TIGHTER, WHICH MEANS THAT YOU KIND OF SPLIT THE
23  DIFFERENCE.  SO IF I PULL IT DOWN, I AM NOT GOING TO GET THAT
24  FULL BENEFIT IN ONE OR THE OTHER.  YOU ARE GOING TO SHARE THAT
25  BENEFIT.  BUT THE UPPER TORSO, THAT 20 INCHES IS NOT GOING TO
```

1   BE AFFECTED.

2   Q.   THANK YOU.

3         BEFORE OR SINCE YOU INSPECTED MR. ANDREWS' CAR, HAVE

4   YOU EVER SEEN A SEATBELT WITH 20 INCHES OF SPOOL-OUT OR MORE?

5   A.   ONLY ON ONE OR TWO OCCASIONS THAT I RECALL.

6   Q.   IN YOUR WHOLE CAREER SPANNING 30 YEARS AND THOUSANDS OF

7   INVESTIGATIONS, YOU HAVE ONLY SEEN THIS HAPPEN TWICE, CORRECT?

8   OR A FEW TIMES?  TWO?  ONE, TWO, SOMETHING LIKE THAT?

9   A.   MAYBE THREE.

10  Q.   MAYBE THREE, OKAY.

11  A.   BUT NOT, NOT VERY.  IT'S VERY -- IT'S RARE.

12  Q.   HAVE YOU EVER SEEN 20 INCHES OF SPOOL-OUT IN THE DRIVER'S

13  SEAT OF ANY OTHER CAR?

14  A.   THERE'S ONLY ONE POSSIBILITY THAT COMES TO MIND.  I RECALL

15  ONE OTHER CASE WHERE IT MAY HAVE BEEN CLOSE TO THAT, BUT I

16  DON'T RECALL THE NUMBER.  TWENTY IS PRETTY SIGNIFICANT.

17  Q.   IS IT AN EXTREME OUTLIER IN YOUR EXPERIENCE?

18  A.   YES, ABSOLUTELY.

19  Q.   IS THERE ANYTHING THAT LIMITS THE AMOUNT OF WEBBING THAT

20  CAN SPOOL OUT IN A CRASH WITH THIS SEATBELT?

21  A.   NO.  WELL, NO, NOT REALLY.

22  Q.   THEORETICALLY, IF THERE WAS NOTHING IN FRONT OF THE PERSON

23  WEARING THE SEATBELT, THEY WOULD KEEP GOING UNTIL THE SEATBELT

24  JUST SPOOLED COMPLETELY OUT; IS THAT RIGHT?

25  A.   YES.  BUT IT MIGHT BE USEFUL TO -- IF I CAN POINT OUT WHY

UNITED STATES DISTRICT COURT

```
 1  IT SPOOLED OUT?

 2  Q.   OKAY.  WELL, LET'S DO THAT, THEN.

 3  A.   OKAY.

 4  Q.   OKAY.  BEFORE WE TALK ABOUT THE SPECIFIC MICAH ANDREWS

 5  SEATBELT, I WANT TO TALK TO YOU, LIKE YOU SAID, ABOUT HOW

 6  TORSION BARS WORK AND THAT KIND OF THING.

 7  A.   SURE.

 8  Q.   WHEN YOU INSPECTED THE SEATBELT IN MICAH ANDREWS' CAR,

 9  WHAT PART OF THE SEATBELT DO YOU IMMEDIATELY FOCUS ON THAT'S

10  CAUSING THE PROBLEM?

11  A.   THAT LONG MARK.  SO THE MARK ON THE BELT WEBBING TELLS ME

12  THAT THE BELT, FIRST OF ALL, LOCKED UP.  IN OTHER WORDS, THE

13  RETRACTOR, THE SPOOL WAS TRYING NOT TO SPIN.  BUT IN THAT -- IN

14  THE FACE OF THAT, IT STILL ALLOWED THE SHOULDER BELT TO SPOOL

15  OUT THAT 20 INCHES.  AND THAT'S WHY WE GOT THAT HEAVY MARK.

16          SO WHAT BECAME IMMEDIATELY OBVIOUS IS THAT THE BELT,

17  FIRST OF ALL, MOVED ACROSS THAT D-RING 20 INCHES, WHICH MEANS

18  THE SHOULDER BELT WAS MOVING AND ALLOWING MICAH'S UPPER TORSO

19  TO MOVE FORWARD THAT FAR, WHICH IS QUITE FAR.  AND RECOGNIZING

20  AND UNDERSTANDING HOW THE RETRACTOR WORKS AND WHAT'S IN THERE,

21  THE ANSWER BECAME QUITE CLEAR AND VERY OBVIOUS.  SO THERE IS A

22  DEVICE IN THERE THAT ALLOWED THAT TO HAPPEN AND THAT'S --

23  Q.   AND WHAT IS THAT CALLED?

24  A.   -- PRESUMABLY WHAT WE WILL TALK ABOUT.  SO --

25  Q.   I AM GOING TO -- MAYBE THIS WILL BE HELPFUL, MR. MEYER.
```

UNITED STATES DISTRICT COURT

1 A.   SO THIS, THE RETRACTOR HAS A DEVICE TO LOCK IT UP.  IT

2 ALSO HAS A DEVICE THAT'S REFERRED TO AS A LOAD LIMITER AND THE

3 LOAD LIMITER --

4          THE COURT:  A WHAT?

5          THE WITNESS:  LOAD LIMITER, LOAD MEANING LIKE FORCE

6 OR TENSION.

7          SO AS THE CAR STOPS, WE START TO FLY FORWARD.  THE

8 SEATBELT LOCKS UP.  WE ENGAGE THE BELT.  YOU CAN ENVISION THAT

9 THEN THERE BECOMES A FORCE BETWEEN THE BELT AND OUR CHEST, OUR

10 UPPER TORSO, AND WE ARE PULLING ON THE BELT.

11          THERE IS A DEVICE IN HERE REFERRED TO AS A LOAD

12 LIMITER AND ITS PURPOSE IS TO LIMIT THE AMOUNT OF FORCE THAT

13 THE BELT CAN PUT ON MY CHEST.  THE WAY IT DOES THAT IS THAT

14 THAT LOAD LIMITER IS REFERRED TO IN THIS CASE AS A TORSION BAR.

15 SO THE SPOOL HAS A SHAFT THROUGH THE MIDDLE OF IT, AN AXLE, IF

16 YOU WILL.

17          ON THE END OF THE SPOOL IS THE LOCKING TEETH THAT THE

18 LOCKUP DEVICE GRABS ONTO TO STOP THE SPOOL FROM SPINNING.  BUT

19 THAT'S REALLY ONLY ON ONE SIDE.  SO THE SHAFT IS THROUGH THE

20 MIDDLE.  I AM GOING TO HOLD ONTO ONE SIDE OF THAT SPOOL.

21          THE WAY THE LOAD LIMITER WORKS IS IF I PULL ON THAT

22 SHAFT HARD ENOUGH, I CAN LITERALLY, IF I PULL ON THAT SPOOL

23 HARD ENOUGH OR PULL ON THAT BELT, I CAN LITERALLY TWIST THE

24 SHAFT.  I CAN JUST BEND IT.  AND AS ENGINEERS, WE CAN CONTROL

25 THAT.  WE CAN MAKE THAT SHAFT OUT OF DIFFERENT MATERIALS.  WE

```
 1   CAN MAKE IT DIFFERENT DIAMETERS.  WE CAN MAKE IT HOWEVER STRONG
 2   TO RESIST HOWEVER MUCH OF THAT TWIST WE WANT TO.
 3             AND SO THAT IS THE LOAD LIMITER AND IT'S DESIGNED SO
 4   THAT IF I PULL ON IT ABOVE THE THRESHOLD, IT WILL BEGIN TO
 5   TWIST, AND SO WE CAN MAKE THAT WHATEVER WE WANT.
 6             TYPICALLY THAT'S MEASURED IN UNITS OF FORCE.
 7   TYPICALLY WE USE KILONEWTONS FOR REASONS THAT ARE INCONVENIENT
 8   TO US.  WE WANT TO THINK OF IT AS POUNDS.  BUT IT'S A SIMPLE
 9   CONVERSION.
10             SO THIS TORSION BAR HAD A PARTICULAR LIMIT TO IT.
11   AND SO WHAT HAPPENS IS, AND HERE'S A PICTURE OF THE TORSION
12   BAR, SO THE TORSION BAR IS THIS AXLE THAT GOES RIGHT IN HERE,
13   RIGHT THROUGH THE MIDDLE OF THE SPOOL.  AND IF WE TAKE IT OUT,
14   IT LOOKS LIKE THAT.  OKAY?
15   BY MS. CANNELLA:
16   Q.   SO IN THIS VIDEO THE TORSION BAR WOULD NORMALLY BE WHERE
17   YOU PUT THAT YELLOW LINE, BUT FOR ILLUSTRATIVE PURPOSES IT'S
18   BEEN PULLED OUT, CORRECT?
19   A.   RIGHT.
20   Q.   OKAY.
21   A.   NOW, IF YOU PLAY THE VIDEO, THE RETRACTOR LOCKS UP AND
22   HOLDS THE SPOOL.  BUT AS YOU PULL THE BELT, IF YOU PULL ABOVE
23   THAT THRESHOLD, YOU LITERALLY TWIST THAT SHAFT.
24   Q.   SO IT'S GOING TO PLAY AGAIN.  AND THOSE RED LINES THERE
25   SHOW HOW IT'S ACTUALLY TWISTING THE METAL, CORRECT?
```

1   A.   RIGHT, RIGHT.  SO IT LITERALLY JUST TWISTS THE SHAFT.  AND

2   THAT'S WHY WE CALL IT A TORSION BAR BECAUSE IT'S TORQUING, IF

3   YOU WILL.

4            SO THAT TORSION BAR TWISTS AND THAT ALLOWS THE SPOOL

5   TO TURN EVEN THOUGH IT'S LOCKED.  AS THE SPOOL TURNS, THE BELT

6   IS SPOOLED OUT AND CORRESPONDINGLY THE OCCUPANT GOES FORWARD.

7            AND YOUR QUESTION ABOUT WHETHER OR NOT THERE IS ANY

8   LIMIT TO THAT IS THAT IN THIS BELT, AS LONG AS THAT FORCE IS

9   ABOVE THAT THRESHOLD, THIS RETRACTOR WILL GO UNTIL YOU RUN OUT

10  OF BELT.  THERE IS NO OTHER DEVICE TO STOP IT.

11  Q.   OKAY.  AND I AM GOING TO GO BACK TO YOUR --

12            THE COURT:  HOLD ON; HOLD ON; HOLD ON.

13            MS. CANNELLA:  OH, I'M SORRY.

14            THE COURT:  WHAT DETERMINES HOW MUCH FORCE THIS

15  TORSION BAR TAKES BEFORE IT ALLOWS IT TO GIVE?

16            THE WITNESS:  THAT'S A FUNCTION OF -- THE ENGINEERS

17  DECIDE THAT.  SO WE CAN MAKE THAT WHATEVER WE WANT.

18            THE COURT:  IS THERE AN INDUSTRY STANDARD THAT

19  DECIDES THAT?

20            THE WITNESS:  GENERALLY SPEAKING, THE MOST COMMON IS

21  ABOUT FOUR KILONEWTONS.  FOUR KILONEWTONS IS ABOUT 900 POUNDS.

22  SO ABOUT 900 POUNDS IS THE MOST COMMON.

23            THERE IS ALSO A NUMBER OF THEM THAT ARE SIX

24  KILONEWTONS, WHICH IS ABOUT 1300 POUNDS, MEANING THAT IF I PULL

25  ON IT FOR 900 -- IF IT'S A SIX-KILONEWTON TORSION BAR, I PULL

1  ON IT FOR 900 POUNDS.  ONCE THERE IS 900 POUNDS OF FORCE

2  BETWEEN THE BELT AND MY CHEST, THEN IT'S GOING TO START TO TURN

3  AND SPIN.

4          NOW, IF THE CRASH IS OVER AND I BACK OFF OF IT, THEN

5  IT DOESN'T GO ANY MORE.  BUT AS LONG AS I CONTINUE TO EXCEED

6  THAT THRESHOLD IT WILL ALLOW ME TO GO FORWARD AND IT WILL SPOOL

7  OUT.

8          IN THIS PARTICULAR RETRACTOR THAT TORSION BAR WAS SET

9  AT TWO KILONEWTONS, TWO, WHICH IS ONLY ABOUT 450 POUNDS.  AND

10  OBVIOUSLY THE STRONGER IT IS, THE HARDER IT IS TO SPOOL THAT

11  BELT OUT, THE LESS FORWARD YOU ARE ALLOWED TO MOVE.  THE WEAKER

12  IT IS, THE FURTHER YOU GO AND THE MORE AGGRESSIVELY YOU GET

13  THERE.

14          THE COURT:  THANK YOU.

15          MS. CANNELLA:  THANK YOU.

16  BY MS. CANNELLA:

17  Q.   OKAY.  THE SLIDE THAT'S UP NOW, CAN YOU TELL US WHAT THIS

18  IS?

19  A.   YES.  SO I QUANTIFIED OR WANTED TO SATISFY MYSELF THAT THE

20  SPOOL-OUT AMOUNT WAS CORRECT IN TWO WAYS:  ONE, AND THE EASY

21  AND OBVIOUS WAY, WAS TO LOOK AT THAT BURN MARK ON THE BELT AND

22  THAT WAS 20 INCHES LONG.

23          I ALSO THEN TOOK THE RETRACTOR APART AND TOOK THAT

24  TORSION BAR OUT OF THE MIDDLE OF MR. ANDREWS' RETRACTOR AND

25  THIS IS A PICTURE OF THAT.  AND YOU CAN SEE THESE ANGLES HERE.


UNITED STATES DISTRICT COURT

1   YOU CAN SEE HOW THE METAL IS TWISTED AND THAT'S WHAT WE ARE

2   SEEING HERE.  SO IT LOOKS LIKE A BARBER SHOP, YOU KNOW, POLE.

3   IT'S LITERALLY -- OR A CANDY CANE.  YOU CAN SEE THOSE ANGLE

4   MARKS BECAUSE THE METAL ITSELF IS TWISTED.  IF YOU LOOK AT ONE

5   THAT HADN'T BEEN TWISTED, THAT'S NOT THERE AT ALL.

6            SO WE CAN MEASURE THE ANGLE OF THAT TWIST AND DO SOME

7   CALCULATIONS.  AND IN GENERAL THE CALCULATIONS BASED UPON THAT

8   ANGLE TELL ME ABOUT 21 INCHES OF BELT.  THREE AND A HALF TURNS.

9   Q.   SO THE IDEA IS IF YOU STRENGTHEN THE TORSION BAR, YOU CAN

10  REDUCE THE NUMBER OF TURNS?

11  A.   YES.

12  Q.   ALL THINGS BEING EQUAL?

13  A.   CORRECT.

14  Q.   LET ME ASK YOU SOMETHING.

15           ARE THERE ANY FEDERAL REGULATIONS THAT DEAL WITH HOW

16  MUCH SPOOL-OUT IS ALLOWED IN A SEATBELT LIKE THIS?

17  A.   NOT REALLY.

18  Q.   THERE ARE FEDERAL REGULATIONS THAT GOVERN SEATBELTS,

19  THOUGH, CORRECT?

20  A.   YES.  BUT THERE'S -- THAT'S NOT REALLY THE APPROACH THAT

21  THEY HAVE TAKEN, SO --

22  Q.   ARE THEY -- I'M SORRY.  ARE THEY MINIMUM STANDARDS OR

23  MAXIMUM STANDARDS?

24  A.   YES.  THERE ARE FEDERAL MOTOR VEHICLE SAFETY STANDARDS.

25  THEY ARE PART OF THE FEDERAL REGISTER.  AND THE INTRO TO THE


UNITED STATES DISTRICT COURT

1    REGISTER, THE PREAMBLE, IF YOU WILL, OR WHATEVER THAT IS

2    CALLED, STATES SPECIFICALLY THAT THEY ARE IN FACT MINIMUM

3    SAFETY STANDARDS.  THEY ARE MINIMUM STANDARDS THAT YOU ARE

4    REQUIRED TO MEET TO SELL THE CAR LEGALLY IN THIS COUNTRY, BUT

5    THEY DO NOT ADDRESS THIS ISSUE PER SE.

6    Q.    AND THERE IS NO MINIMUM, IN FACT, THAT YOU CAN BUILD A

7    SEATBELT WHERE THE SEATBELT SPOOLS OUT ALL THE WAY IN A CRASH

8    AND THAT CAN STILL BE AT A, QUOTE-UNQUOTE, PASS ON THE MINIMUM

9    STANDARD?

10   A.    YES.  WHAT IT SAYS, FOR EXAMPLE, IS IT SAYS THAT THAT

11   SPROCKET HAS TO LOCK UP AT A CERTAIN ACCELERATION LEVEL.

12   BEFORE .7 G'S OF ACCELERATION, IT HAS TO LOCK UP.  THIS, OF

13   COURSE, DOES THAT.  IT LOCKS UP.  THAT'S THE STICKING THE STICK

14   IN THE SPOKE KIND OF IDEA.  IT HAS TO LOCK UP QUICKLY AND AT A

15   REASONABLY LOW THRESHOLD AND IT DOES THAT.  BUT ONCE IT'S

16   LOCKED THERE ISN'T A STANDARD THAT DIRECTLY DEALS WITH THE --

17   HOW MUCH BELT IS ALLOWED TO COME OUT.

18   Q.    AND I AM GOING TO FORWARD PAST YOUR DRAWINGS HERE, BECAUSE

19   I THINK -- I DON'T THINK YOU NEED THEM.

20   A.    TRUE.

21   Q.    BUT LET ME JUST ASK YOU KIND OF A BASIC QUESTION FIRST.

22         THE POINT OF A SEATBELT IS TO KEEP YOU FROM HITTING

23   THINGS IN THE CAR SO HARD YOU GET A SERIOUS INJURY OR GET

24   KILLED, CORRECT?

25   A.    ABSOLUTELY.


                          UNITED STATES DISTRICT COURT

1  Q.   DID THIS SEATBELT DO THIS FOR MR. ANDREWS?

2  A.   NO.

3  Q.   IN YOUR PROFESSIONAL OPINION IS THE SEATBELT DESIGN

4  DEFECTIVE?

5  A.   YES, ABSOLUTELY.

6  Q.   DURING YOUR 30-YEAR CAREER WHAT IS THE RANGE OF STRENGTHS

7  THAT YOU HAVE SEEN IN THE TORSION BAR?

8  A.   IN THE TORSION BAR?  THIS IS THE LOWEST I HAVE EVER SEEN.

9  TYPICALLY, AS I SAY, THEY ARE FOUR TO SIX KILONEWTONS.  I HAVE

10 NEVER SEEN ONE AT TWO OTHER THAN THIS CASE.

11          THE COURT:  THIS IS THE FIRST TIME EVER?

12          THE WITNESS:  FIRST TIME.

13 BY MS. CANNELLA:

14 Q.   DO YOU AGREE THAT THE SEATBELT IS THE PRIMARY LIFESAVING

15 DEVICE IN A CAR?

16 A.   ABSOLUTELY.

17 Q.   I AM GOING TO GIVE YOU WHAT I HAVE MARKED AS PLAINTIFF'S

18 HEARING EXHIBIT 1.

19          CAN YOU PLEASE IDENTIFY THAT FOR THE COURT?

20 A.   THIS IS A PORTION OF AUTOLIV'S WEBSITE.

21          THE COURT:  CAN WE CALL THIS EXHIBIT 3?

22          MR. SCRIBNER:  NO OBJECTION, YOUR HONOR.

23          THE COURT:  ALL RIGHT.  IT'S ADMITTED WITHOUT

24 OBJECTION, EXHIBIT 3.

25          MS. CANNELLA:  I BELIEVE IT'S EXHIBIT NUMBER 1; IS

UNITED STATES DISTRICT COURT

1   THAT RIGHT?

2            THE COURT:  I THOUGHT EXHIBIT -- I THOUGHT EXHIBIT 1

3   WAS SOMETHING ELSE.

4            MS. CANNELLA:  I'M SORRY, YOUR HONOR.  IT'S

5   PLAINTIFF'S EXHIBIT, HEARING EXHIBIT 1.

6            THE COURT:  OH, OKAY.

7            MS. CANNELLA:  I BELIEVE THE AUTOPSY PHOTO WAS

8   EXHIBIT 2, PLAINTIFF'S HEARING EXHIBIT 2.  OKAY.

9   BY MS. CANNELLA:

10  Q.   BASED ON THIS WEBSITE IS IT TRUE THAT EVEN AUTOLIV AGREES

11  THAT THE SEATBELT IS A PRIMARY LIFESAVING DEVICE, THE NUMBER

12  ONE LIFESAVER?

13  A.   YES.  IT'S CLEARLY STATED AS SUCH.

14  Q.   AND THE WHOLE JOB OF IT IS TO KEEP YOU FROM SMASHING INTO

15  THINGS, CORRECT?

16  A.   YES.  THAT'S ITS PURPOSE IN LIFE.

17  Q.   I AM GOING TO SHOW YOU A PHOTO THAT WE HAVE BLOWN UP.  CAN

18  YOU SEE THAT OKAY?

19  A.   YES.

20  Q.   SORRY ABOUT THAT.

21            OKAY.  THIS IS A PHOTOGRAPH OF MICAH ANDREWS'

22  SEATBELT, CORRECT?

23  A.   THAT'S THE STEERING WHEEL.

24  Q.   I'M SORRY.  STEERING WHEEL.  THANK YOU.

25            AND WHAT ARE THOSE LETTERS ON THE STEERING WHEEL?

UNITED STATES DISTRICT COURT

1   A.   SRS AIRBAG IS WHAT IT SAYS.

2   Q.   OKAY.  AND WHAT DOES SRS STAND FOR?

3   A.   SUPPLEMENTAL RESTRAINT SYSTEM.

4   Q.   WHAT IS THE AIRBAG SUPPLEMENTING?

5   A.   THE SEATBELT.  THE SEATBELT IS THE PRIMARY RESTRAINT

6   SYSTEM.  THE AIRBAG IS CONSIDERED SUPPLEMENTING THAT.

7   Q.   AND YOU DID A SURROGATE STUDY TO DETERMINE WHETHER THE

8   SEATBELT, THE AUTOLIV SEATBELT, SERVED ITS PURPOSE OF BEING

9   MICAH ANDREWS' PRIMARY RESTRAINT, CORRECT?

10  A.   YES.

11  Q.   AND WHAT DID YOU CONCLUDE ABOUT THE SEATBELT AS A RESULT

12  OF THAT STUDY?

13  A.   THAT WITH THAT AMOUNT OF SPOOL-OUT AND PAY-OUT THAT HE WAS

14  ALLOWED TO MOVE FORWARD AND SLAM INTO THE STEERING WHEEL

15  SUFFICIENTLY TO KILL HIM.

16  Q.   OKAY.  AND ON THE SLIDES WE HAVE PICTURES FROM A COUPLE OF

17  SURROGATE STUDIES?

18  A.   YES.

19  Q.   CAN YOU TELL US WHAT WE SEE IN THIS PHOTO?

20  A.   YES.  THIS IS MY SURROGATE.  SO WHAT WE DO HERE IS WE GET

21  AN EXEMPLAR VEHICLE, ONE THAT'S THE SAME MAKE AND MODEL THAT

22  HAD NOT BEEN IN A COLLISION, AND WE GET A SURROGATE OCCUPANT,

23  SOMEONE OF SIMILAR STATURE TO THE OCCUPANT IN QUESTION, AND WE

24  PUT THE SEAT IN THE SAME POSITION AND PUT THE BELT ON AND THEN

25  I TAKE MEASUREMENTS AND IT ALLOWS ME TO DECIDE OR DETERMINE

1   WHETHER OR NOT THE MARKS THAT WE FOUND REASONABLY MATCH WHERE
2   WE WOULD EXPECT THEM TO BE IF EVERYTHING WAS APPROPRIATE.
3           AND WHAT THAT TELLS ME FIRST OF ALL IS IT TELLS ME
4   THAT THAT 20-INCH MARK BEGAN WHERE WE WOULD EXPECT IT TO.  IN
5   OTHER WORDS, THAT FOR SOMEONE OF MR. ANDREW'S STATURE IN THAT
6   VEHICLE, THE D-RING WOULD HAVE BEEN LOCATED AT ABOUT 66 INCHES
7   WHERE THAT MARK STARTED.  AND THAT TELLS ME THAT HE WAS WEARING
8   IT PROPERLY OVER HIS SHOULDER, SEATED REASONABLY NORMALLY, AND
9   THAT THAT'S WHERE THE SPOOL-OUT BEGAN.
10          THEN, SECONDLY, WHAT WE CAN DO AND WHAT I HAVE DONE
11  HERE IS TO SPOOL IT OUT TO THE END OF THAT MARK AND SAY, OKAY,
12  NOW WE CAN VISUALLY SEE HOW MUCH, WHAT DOES 20 INCHES LOOK LIKE
13  FOR SOMEONE SITTING IN THE VEHICLE, AND THAT'S WHAT THAT LOOKS
14  LIKE.
15          SO WHEN THE BELT IS SPOOLED OUT TO THE END OF THAT
16  MARK WITH THE D-RING AT 86 INCHES, WE SEE THAT THE BELT ITSELF
17  IS ALMOST AT THE --
18  Q.   OKAY.
19  A.   ALMOST AT THE STEERING WHEEL, WHICH MEANS IT CAN'T
20  POSSIBLY HOLD HIM BACK OR HOLD HIM OUT OF PLOWING INTO THE
21  FRONT OF THE STRUCTURE IN SPITE OF THE FACT THAT THERE IS NO
22  SIGNIFICANT INTRUSION THERE.
23  Q.   OKAY.  SO HE IS HOLDING THE SEATBELT OUT AS FAR AS IT WENT
24  FOR MR. ANDREWS, CORRECT?
25  A.   YES.


                    UNITED STATES DISTRICT COURT

1  Q.   AND THIS PICTURE IS A DIFFERENT SURROGATE ABOUT

2  MR. ANDREWS' SIZE, CORRECT?

3  A.   CORRECT.

4  Q.   AND IT'S SHOWING HIM, HOW FAR HE WOULD BE ABLE TO GET

5  FORWARD WITH THE SEATBELT ON SPOOLED OUT THE SAME AMOUNT THAT

6  MR. ANDREWS' SEATBELT SPOOLED OUT IN OUR CRASH, CORRECT?

7  A.   CORRECT.  SO WHAT WE SEE IS THAT THE BELT IS NOT

8  PREVENTING HIM FROM GETTING AGGRESSIVELY INTO THE STEERING

9  WHEEL.

10  Q.   WHAT IS THE ACTUAL PURPOSE OF HAVING A WEAK SEATBELT?

11  A.   THE WEAK TORSION BAR'S PURPOSE IS TO IMPROVE THE STAR

12  RATING, THE STAR RATING SCORES THAT GO ON THE WINDOW STICKER

13  THAT ARE BASED UPON A FRONTAL IMPACT TEST, AN NCAP TEST.

14  Q.   AN NCAP TEST.  AND WHAT'S AN NCAP TEST?

15  A.   NEW CAR ASSESSMENT PROGRAM IS WHAT THAT STANDS FOR.

16  Q.   OKAY.  AND SO THE STARS ARE BASED ON HOW THE CAR PERFORMS

17  IN THESE SPECIFIC CRASH TESTS THAT ARE RUN ACCORDING TO THE

18  SAME PROTOCOL ON ALL CARS?

19  A.   YES, YES, AND THEY ARE FRONTAL IMPACTS INTO A BARRIER.

20  Q.   SO LET'S TALK ABOUT THE AUTOLIV SEATBELT'S PERFORMANCE IN

21  CRASH TESTING, BUT FIRST LET ME ASK YOU THIS:  IN THE AUTO

22  INDUSTRY, CARS ARE TESTED FOR SAFETY AT SPEEDS THAT SHOULD BE

23  SURVIVABLE, CORRECT?

24  A.   YES.  THE SYSTEMS ARE DESIGNED TO MAKE THEM SURVIVABLE AT

25  THOSE SPEEDS, YES, ABSOLUTELY.


UNITED STATES DISTRICT COURT

1    Q.    THE NCAP FRONTAL COLLISION IS RUN AT 35 MILES AN HOUR?

2    A.    35, YES.

3    Q.    AND THAT WAS WHAT WE HAD IN THIS CASE, CORRECT?

4    A.    YES.

5    Q.    OKAY.  MR. ANDREWS' COLLISION WAS A 35-MILE-AN-HOUR

6    FRONTAL IMPACT LIKE THE NCAP, CORRECT?

7    A.    YES.  THE RECONSTRUCTIONIST CHARACTERIZED IT AS VIRTUALLY

8    IDENTICAL OR VERY NEARLY.  I THINK VIRTUALLY WAS HIS WORD, BUT

9    IT'S THE SAME SPEED.

10   Q.    SO THE NCAP TEST HAS DUMMIES IN IT, CORRECT?

11   A.    YES.

12   Q.    AND THEY ARE INSTRUMENTED.  CAN YOU EXPLAIN WHAT THAT

13   MEANS?

14   A.    YES.  THERE ARE SENSORS IN THEM TO MEASURE FORCES AT

15   VARIOUS LOCATIONS.  AND THOSE FORCES, THEN, WE LOOK AT THOSE

16   FORCES AND COMPARE THEM TO DATA THAT WILL PREDICT THE

17   PROBABILITY OF AN INJURY AT THOSE FORCE LEVELS, WITH THE IDEA

18   BEING THAT THE SAFETY SYSTEMS ARE DESIGNED TO KEEP THOSE INJURY

19   LEVELS, THOSE FORCES DOWN BELOW THE LEVEL OF PRODUCING SERIOUS

20   OR FATAL INJURIES.

21   Q.    SO THEY TAKE THE CAR, RUN IT UP TO 35 MILES AN HOUR AND

22   CRASH IT INTO A BARRIER?

23   A.    CORRECT.

24   Q.    AND WHAT IS A PRINCIPAL DIRECTION OF FORCE?  WHAT DOES

25   THAT MEAN?

UNITED STATES DISTRICT COURT

1  A.   THAT REFERS TO BASICALLY THE ANGLE OF THE IMPACT.  SO, FOR

2  EXAMPLE, IN A FRONTAL IMPACT, THE PRINCIPAL DIRECTION OF FORCE,

3  IF IT WAS PURELY FRONTAL INTO THAT BARRIER, IT WOULD BE 12:00

4  O'CLOCK.  IN OTHER WORDS, THAT'S THE DIRECTION OF THE FORCE

5  THAT'S APPLIED BY THE BARRIER.

6           IF IT'S AN ANGLE OR A SIDE IMPACT, FOR EXAMPLE, IF IT

7  WAS A T-BONE TO THE LEFT, THAT PRINCIPAL DIRECTION OF FORCE

8  MIGHT BE 9:00 O'CLOCK OR 270 DEGREES.

9  Q.   SO WHAT IS THE PDOF OF THE NCAP TEST?

10  A.   ZERO OR 12:00 O'CLOCK.

11  Q.   AND WHAT IS THE PDOF OF MR. ANDREWS' CRASH?

12  A.   I'D HAVE TO LOOK IT UP.  I THINK IT'S ABOUT 10 DEGREES, 15

13  DEGREES TO THE LEFT.  VERY CLOSE.

14  Q.   VERY SIMILAR, CORRECT?

15  A.   VERY SIMILAR, YES.  YES.  SO MAYBE 11:30 AS OPPOSED TO

16  12:00 O'CLOCK.

17  Q.   I WANT TO TALK TO YOU ABOUT THE NCAP TEST ON THE MAZDA3.

18           THE NCAP TEST THAT WAS DONE ON AN '04 MAZDA3, IS THAT

19  THE SAME AS THE '05 MAZDA3?

20  A.   YES.

21  Q.   AND IN THE MAZDA3 NCAP, HOW MUCH INCHES OF SPOOL-OUT DID

22  THE BELT EXPERIENCE IN THE DRIVER'S SEAT?

23  A.   17.

24  Q.   17 INCHES.

25           DID THE DRIVER'S AIRBAG AND THE PRETENSIONER FIRE IN


UNITED STATES DISTRICT COURT

1  THE NCAP TEST?

2  A.    YES.

3  Q.    SO YOU'VE GOT ALMOST 17 INCHES OF SPOOL-OUT EVEN WITH AN

4  AIRBAG?

5  A.    YES.

6  Q.    HOW ABOUT THE PASSENGER SEATBELT, DO YOU RECALL?

7  A.    I THINK IT WAS ABOUT -- I WROTE THAT DOWN.  LET ME LOOK.

8  I'LL GET IT RIGHT.  22.

9  Q.    THE PASSENGER SEATBELT SPOOLED OUT 22 INCHES.  WAS IT THE

10  SAME SEATBELT AS THE DRIVER'S SEATBELT?

11  A.    YES.

12  Q.    WHY DID THE PASSENGER SEATBELT SPOOL OUT AN EXTRA FIVE AND

13  A HALF INCHES?

14  A.    THE PASSENGER DOESN'T HAVE A STEERING WHEEL.  THEY ARE

15  ALLOWED TO GO FURTHER.

16  Q.    SO WITH THIS SEATBELT IF YOU DON'T HAVE THE STEERING WHEEL

17  TO STOP YOU, THEN SOMETHING ELSE IS GOING TO STOP YOU?

18  A.    CORRECT.

19  Q.    YOU'LL GO UNTIL SOMETHING ELSE DOES.

20          OKAY.  WHAT DOES THIS SLIDE TELL US THAT WE ARE

21  LOOKING AT NOW?

22  A.    WHAT THIS SLIDE DOES IS ON THE TOP RIGHT HERE, THIS IS

23  TIME ZERO.  SO AT THE START OF THE EVENT OR AT THE START OF THE

24  CRASH WE SEE THE DUMMY'S HEAD IS RIGHT HERE.  THAT'S THE

25  DRIVER'S HEAD.

1          OKAY.  AND THEN AT 82 MILLISECONDS -- .082.  THAT'S

2   MILLISECONDS.  SO AT 82 MILLISECONDS THE DUMMY'S HEAD, I'M

3   POINTING THIS RED ARROW AT IT, BUT IT'S HARD TO SEE A LITTLE

4   BIT HERE, BUT IT'S DEEP INTO THE AIRBAG.  AND SO HE HAS MOVED

5   HERE (INDICATING), OKAY?

6          THE OTHER THING THAT'S INSTRUMENTED IN THAT

7   INSTRUMENTATION IS THE HEAD ACCELERATION.  SO THERE'S

8   INSTRUMENTS IN THE DUMMY'S HEAD TO MEASURE THE HEAD

9   ACCELERATION.  AND WHAT WE SEE WHEN WE LOOK AT THAT HEAD

10  ACCELERATION IS IT PEAKS.  THE MAXIMUM VALUE THERE FOR THE HEAD

11  ACCELERATION IS AT ABOUT 82 MILLISECONDS, WHICH IS HERE, WHICH

12  IS THAT LOWER RIGHT CORNER.

13         WHAT THAT TELLS ME IS THAT THE MAXIMUM HEAD

14  ACCELERATION IS OCCURRING AS HE IS DEEP INTO THE AIRBAG, AND

15  BECAUSE THAT'S WHERE THE MAX IS, I KNOW THAT HE BOTTOMED OUT

16  THE AIRBAG.  SO HE LITERALLY WAS ALLOWED TO MOVE SO FAR FORWARD

17  THAT HE WENT THROUGH THE AIRBAG AND CONTACTED THE STEERING

18  WHEEL UNDERNEATH IT, AND THAT'S WHAT RESULTED IN THE PEAK

19  ACCELERATION.

20  Q.   SO YOU USED THE TERM "BOTTOMING OUT."  THAT'S WHEN THE

21  HEAD ACTUALLY GOES THROUGH THE AIRBAG AND HITS THE STEERING

22  WHEEL?

23  A.   RIGHT.

24  Q.   IS THAT SUPPOSED TO HAPPEN?

25  A.   NO.

UNITED STATES DISTRICT COURT

1  Q.   AND YOU TALKED ABOUT THIS ARROW POINTING TO SOMETHING ON

2  THE BOTTOM PHOTO, THAT IT'S HARD TO SEE, BUT IS THAT THE AIRBAG

3  THAT THE ARROW IS POINTING AT?

4  A.   IT'S HIS HEAD.  SO IF WE CAN ERASE MY YELLOW SQUIGGLES ON

5  THERE FOR A MINUTE, IS IT POSSIBLE TO ZOOM IN ON THAT?  OR

6  THERE MAY BE ONE MORE SLIDE AFTER THIS THAT IS JUST -- YEAH,

7  THERE YOU GO.  MAYBE THAT ONE.

8  Q.   OKAY.

9  A.   SO WHAT WE SEE HERE IS THAT'S THE SAME TEST.  AND WE SEE

10 THE DUMMY'S HEAD IS HERE AND THE BAG IS DEFORMING AROUND HIM.

11 SO THE BAG IS, OF COURSE, YOU KNOW, FULL OF AIR, BUT IT ALSO

12 HAS VENT HOLES.  SO IT'S NOT LIKE -- IT'S NOT SOLID.  IT'S

13 INTENDED TO VENT AS YOU ENGAGE IT.  AND WHAT HAPPENS HERE IS HE

14 IS ALLOWED TO GO SO FAR FORWARD WITH THAT 17 INCHES THAT THE

15 DUMMY LITERALLY GOES THROUGH THE BAG AND BOTTOMS IT OUT SO THAT

16 HE HITS THE HARD STRUCTURE OF THE STEERING WHEEL BEHIND IT AND

17 THAT'S WHAT PEAKS THE ACCELERATION.

18 Q.   I WANT TO TALK ABOUT HOW THE AUTOLIV SEATBELT IN THE

19 MAZDA3 COMPARES WITH SOME OF THE OTHER SEATBELTS IN THE SAME

20 CLASS AS THE MAZDA3.

21        THE NCAP TEST THAT WE ARE LOOKING AT IS LABELED RIGHT

22 HERE, CORRECT?  IT'S GOT THE DATE THAT IT WAS DONE?

23 A.   YES.

24 Q.   OKAY.  AND WHAT IS THAT DATE?

25 A.   DECEMBER 17TH, '03.


                         UNITED STATES DISTRICT COURT

1  Q.   AND MICAH ANDREWS' CAR WAS WHAT MODEL YEAR?

2  A.   '05.

3  Q.   '05.  AND SO THIS IS A PUBLICLY AVAILABLE CRASH TEST,

4  CORRECT?

5  A.   OF COURSE.

6  Q.   IS THERE ANY QUESTION THAT AUTOLIV, WHETHER AUTOLIV HAD

7  ACCESS TO THIS TEST BEFORE MICAH ANDREWS BOUGHT HIS CAR?

8  A.   NO.

9  Q.   OR WHETHER AUTOLIV HAD ACCESS TO THIS TEST BEFORE MICAH

10  ANDREWS WAS IN HIS CRASH?

11  A.   NO.

12  Q.   NOW I WANT TO TALK ABOUT HOW THE MAZDA3, THE AUTOLIV

13  SEATBELT IN THE MAZDA3 PERFORMED COMPARED TO SOME OTHER CARS IN

14  THE SAME CLASS.  AND I AM GOING TO USE A BOARD.  THIS HAS BEEN

15  MARKED AS PLAINTIFF'S HEARING EXHIBIT 1074 FOR THE RECORD.

16          THE COURT:  ALL RIGHT.  THANK YOU.

17  BY MS. CANNELLA:

18  Q.   HOW DOES THE AUTOLIV SEATBELT COMPARE TO THE SEATBELTS IN

19  THE OTHER CARS IN THE SAME CRASH?

20  A.   THE SPOOL-OUT IS GROSSLY MORE.

21  Q.   SO THE AUTOLIV SEATBELT IN THE MAZDA3 IS UP THERE IN THE

22  RED BAR, CORRECT?

23  A.   YES.  SO WHAT WE HAVE DONE HERE IS PLOTTED THE AMOUNT OF

24  SPOOL-OUT, THE INCHES OF SPOOL-OUT ALLOWED BY THAT LOAD LIMITER

25  DEVICE.  THESE ALL HAVE THEM.  AND I LOOKED AT ALL OF THE

UNITED STATES DISTRICT COURT

1   VEHICLES THAT I COULD FIND DATA FOR IN THE SAME CLASS OF

2   VEHICLE AS THE MAZDA AND THAT'S WHAT THESE ARE.  AND WHEN YOU

3   LOOK AT THOSE, WHAT YOU SEE IS ULTIMATELY ABOUT SIX INCHES, IT

4   TURNS OUT, IS ABOUT THE AVERAGE, WHEREAS THE MAZDA IS SPOOLING

5   OUT, AS I SAID, 17 INCHES IN THAT SAME NCAP TEST AND THESE ARE

6   BASED UPON NCAP RESULTS.

7            THE COURT:  AND THERE IS NO INDUSTRY STANDARD TO SAY

8   THIS IS HOW FAR IT SHOULD GO, IT'S JUST HOW THEY WANTED TO

9   DESIGN IT?

10           THE WITNESS:  IT'S HOW THEY DESIGNED IT.  IT'S THAT

11  TWO-KILONEWTON BAR WITHOUT LIMITING IT.

12           SO THERE'S ANOTHER WAY TO -- THERE'S TWO WAYS,

13  REALLY, TO SLOW THAT DOWN OR TO LIMIT THAT.  ONE IS TO MAKE THE

14  BAR STRONGER.  THAT'S THE EASIEST.  YOU JUST MAKE THE BAR

15  STRONGER.  AND THE WAY THEY DO THAT IS SIMPLY TO MAKE IT BIGGER

16  IN DIAMETER.  IT'S FAIRLY STRAIGHTFORWARD.  I'D LIKE TO PRETEND

17  WE ARE SMARTER THAN THAT, BUT IT'S NOT THAT HARD.

18           THE OTHER WAY TO DO IT IS TO PUT A MECHANICAL STOP IN

19  THERE.  IN OTHER WORDS, TO ONLY ALLOW IT TO TURN SO MANY TIMES.

20  AND WE WILL TALK ABOUT THAT, BUT THAT IS ANOTHER WAY TO DO IT.

21           THE COURT:  NOW, IF YOU DO THAT, DO YOU RUN THE RISK

22  OF THE SEATBELT GOING INTO THE PERSON'S BODY?

23           THE WITNESS:  AS YOU HOLD IT BACK MORE AGGRESSIVELY,

24  THOSE FORCES GO UP, YES.  IF YOU TAKE IT OFF ALTOGETHER, NO

25  SEATBELT FORCE, BUT WE KNOW THAT'S BAD.  SO THAT'S WHAT'S

 1  BEING -- THAT'S WHAT'S BEING TUNED SO TO SPEAK.

 2          THE COURT:  THANK YOU.

 3  BY MS. CANNELLA:

 4  Q.   I WANT TO JUST QUICKLY TOUCH ON THAT BEFORE WE MOVE ON,

 5  BUT WHAT IS THE RISK, THE PRIMARY RISK OF INJURIES IF YOU

 6  TIGHTEN UP A SEATBELT TO YOUR CHEST?

 7  A.   THE RISKS THAT ARE DISCUSSED AND THAT ARE THERE IS

 8  SHOULDER-BELT-INDUCED INJURIES IS THE WAY WE WOULD REFER TO

 9  THAT AND TYPICALLY IT'S BROKEN RIBS.  TYPICALLY IT'S BROKEN

10  RIBS.  IF YOU GO TOO FAR, YOU CAN END UP WITH A FLAILED CHEST.

11  AND IF YOU TAKE IT TO AN EXTREME, PERHAPS A RUPTURED AORTA.

12  BUT THOSE -- TYPICALLY IT'S BROKEN RIBS.

13  Q.   HOW MANY IN 30 YEARS, HOW MANY RUPTURED AORTAS HAVE YOU

14  SEEN FROM A SEATBELT BEFORE OR AFTER THE INCLUSION OF TORSION

15  BARS?

16  A.   WELL, I'VE BEEN DOING THIS A LONG TIME AND I'VE BEEN DOING

17  THIS BEFORE THESE DEVICES WERE IMPLEMENTED AND BECAME POPULAR.

18  Q.   SO BEFORE SEATBELTS WERE MADE TO ALLOW THE SPOOL-OUT?

19  A.   RIGHT.  AND THEY WEREN'T ALWAYS THAT WAY SO THAT LOAD

20  LIMITER WAS NOT ALWAYS THERE.  IT'S ONLY BEEN THERE SINCE ABOUT

21  EARLY 2000'S.  BUT BEFORE THAT, THEY WEREN'T THERE AT ALL, AND

22  EVEN THEN I DIDN'T -- THE RUPTURED AORTAS WERE EXTREMELY RARE

23  AND TYPICALLY AND MOST COMMONLY THEY WERE FROM THE CHEST TO

24  STEERING WHEEL CONTACT, NOT NECESSARILY FROM THE BELT.  BUT I

25  MEAN, IN FAIRNESS, THAT IS PART OF THE DISCUSSION.


                    UNITED STATES DISTRICT COURT

1  Q.   WOULD YOU CHARACTERIZE THE RISK OF A RUPTURED AORTA AS A

2  SIGNIFICANT ONE BASED ON YOUR EXPERIENCE LOOKING AT ALL THESE

3  CASES?

4  A.   NO, IT'S NOT.  IT'S SOMETHING TO BE MINDFUL OF, BUT

5  IT'S -- AGAIN, WE COULD TAKE THE LOAD LIMITER OUT ALTOGETHER

6  AND THAT'S A RELATIVELY MINOR RISK.

7  Q.   OKAY.

8  A.   IT'S MUCH MORE IMPORTANT TO PREVENT THAT FORWARD

9  EXCURSION.  THAT'S WHAT WE WANT TO CONTROL.  WE DON'T WANT THE

10 UPPER TORSO, HEAD AND NECK LEADING, TO SLAM INTO THINGS.

11 Q.   LET'S GO BACK TO THE NCAP DATA.

12        SO TELL US.  THE DATA THAT YOU HAVE IN THIS CHART,

13 WHERE DID IT COME FROM?

14 A.   THAT CAME FROM A SURVEY OF NCAP TESTS JUST LIKE THE ONE WE

15 JUST SAW.

16 Q.   AND NCAP TESTS, THEY ARE PUBLICLY AVAILABLE, CORRECT?

17 A.   YES.

18 Q.   WE CAN ALL GO GET THEM OFF THE INTERNET RIGHT NOW IF WE

19 WANTED TO?

20 A.   THAT'S EXACTLY WHAT I DID.

21 Q.   AND AUTOLIV CAN GO GET THEM OFF THE INTERNET, CORRECT?

22 A.   YES.

23 Q.   AUTOLIV HAD ACCESS TO ALL THIS INFORMATION BEFORE MICAH

24 ANDREWS RECEIVED HIS INJURIES?

25 A.   OF COURSE.

UNITED STATES DISTRICT COURT

1  Q.   AND SO AUTOLIV KNEW THAT ITS SEATBELT WAS PERFORMING MORE

2  THAN TWICE AS BAD AS THE SECOND WORST PERFORMER, CORRECT?

3            THE COURT:  HOLD ON; HOLD ON; HOLD ON.

4            MS. CANNELLA:  SORRY.

5            MR. SCRIBNER:  I HAVE AN OBJECTION TO THE QUESTION AS

6  CALLING FOR PURE SPECULATION.  WE'LL LET AUTOLIV SPEAK FOR WHAT

7  IT KNEW.  THAT'S SPECULATION.

8            MS. CANNELLA:  I CAN REPHRASE.

9            THE COURT:  IF HE KNOWS.  UNLESS HE KNOWS

10 SPECIFICALLY WHAT AUTOLIV KNEW AND HE CAN TESTIFY TO IT, I

11 DON'T WANT HIM SPECULATING.

12           MS. CANNELLA:  OKAY.

13 BY MS. CANNELLA:

14 Q.   I'LL REPHRASE, MR. MEYER.

15           AUTOLIV HAD THE ABILITY TO GET ALL OF THIS

16 INFORMATION, CORRECT?

17 A.   YES.

18 Q.   AND THIS IS A SEATBELT.  THIS IS SEATBELT INFORMATION,

19 RIGHT?

20 A.   YES.

21 Q.   AND AUTOLIV IS A SEATBELT MANUFACTURER?

22 A.   CORRECT.

23 Q.   ONE OF THE BIGGEST IN THE WORLD?

24 A.   YES.

25 Q.   AND IS IT LIKELY THAT OR WOULD YOU EXPECT THAT OTHER

UNITED STATES DISTRICT COURT

1  ENGINEERS WHO MAKE SEATBELTS WOULD STUDY SEATBELTS OUT THERE IN

2  THE WORLD?

3  A.   OF COURSE.

4  Q.   THE SECOND WORST PERFORMER IN THE CLASS, WHICH CAR IS

5  THAT?

6  A.   THE SATURN L SERIES.

7  Q.   AND HOW MUCH SPOOL-OUT DID IT EXPERIENCE?

8  A.   216 MILLIMETERS, WHICH IS PROBABLY ABOUT SEVEN OR EIGHT

9  INCHES BASED UPON YOUR CHART THERE.  IN COMPARISON, THE MAZDA

10  WAS 428 MILLIMETERS, SO LESS THAN HALF.

11  Q.   LESS THAN HALF?

12  A.   YEAH.

13  Q.   IS IT FAIR TO SAY THAT THE AUTOLIV SEATBELT THAT WAS IN

14  THE MAZDA3 IS AN EXTREME OUTLIER FOR THE CARS IN ITS CLASS?

15  A.   OH, ABSOLUTELY.

16  Q.   DO YOU KNOW OF ANY OTHER CARS THAT WERE BUILT ON THE SAME

17  PLATFORM AS THE MAZDA3?

18  A.   YES.

19  Q.   THE VOLVO S40, CORRECT?

20  A.   THE VOLVO S40 IS ONE, YES.

21  Q.   AND HOW DID IT PERFORM COMPARED TO THE MAZDA3?

22  A.   THE SPOOL-OUT REPORTED IN THE SAME TEST, THAT IS, THE NCAP

23  TEST, AGAIN FOR THE MAZDA WAS 428 MILLIMETERS, WHICH IS ABOUT

24  17 INCHES.  THE VOLVO S40 IN THE DRIVER'S POSITION REPORTED 165

25  MILLIMETERS SPOOL-OUT, WHICH IS ABOUT SIX AND A HALF INCHES.


UNITED STATES DISTRICT COURT

1  Q.   OKAY.  AND JUST LOOKING AT VISUALLY THE DIFFERENCE BETWEEN

2  THE SEATBELT IN THE MAZDA3 AND THE SEATBELT IN THE SAME

3  PLATFORM, VOLVO S40, THAT'S ILLUSTRATED ON THE DEMONSTRATIVE

4  THAT I JUST PUT UP IN FRONT OF YOU, CORRECT?

5  A.   YES.

6  Q.   AND AGAIN, THIS IS THE DATA THAT YOU PULLED FROM PUBLIC

7  INFORMATION?

8  A.   CORRECT.

9  Q.   ALL RIGHT.  WHO MANUFACTURED THE SEATBELT IN THE VOLVO

10 S40?

11 A.   AUTOLIV.

12 Q.   SO AUTOLIV KNEW THAT IT COULD MAKE A STRONGER SEATBELT.

13 WE KNOW THAT BECAUSE IT HAD ONE FOR THE VOLVO S40, CORRECT?

14 A.   YES.  THE VOLVO S40 HAD A SIX-KILONEWTON.

15 Q.   AND WHY IS THERE SUCH A DIFFERENCE BETWEEN THE AUTOLIV

16 SEATBELT IN THE MAZDA3 AND THE VOLVO, IN THE AUTOLIV SEATBELT

17 IN THE VOLVO S40 IN TERMS OF SEATBELT SPOOL-OUT?  WHAT'S THE

18 PRIMARY REASON?

19 A.   THAT TORSION BAR.  THE VOLVO IS MUCH STRONGER.  IT'S A

20 SIX-KILONEWTON.  IT IS WHAT IS REFERRED TO AS A DIGRESSIVE ONE.

21 IT STARTS AT SIX AND THEN STEPS DOWN, WHICH IS ANOTHER WAY THAT

22 WE CAN TUNE IT, BUT IT'S MUCH MORE ROBUST.  IT'S A MUCH

23 STRONGER BAR.  TWO KILONEWTONS IS A LOT LESS FORCE REQUIRED TO

24 SPOOL IT OUT THAN SIX.

25 Q.   AND ABOUT HOW MUCH STRONGER IS THE VOLVO THAN THE MAZDA'S?

1  A.   SIX KILONEWTONS IS ABOUT 1350 POUNDS AND TWO KILONEWTONS

2  IS 450 POUNDS.

3  Q.   LET'S PUT IT IN PRACTICAL TERMS.

4           WHAT DOES IT MEAN FOR HOW MUCH RESTRAINT A PERSON

5  WILL RECEIVE WITH THE AUTOLIV SEATBELT IN THE MAZDA3 VERSUS THE

6  AUTOLIV SEATBELT IN THE VOLVO S40?

7  A.   THE VOLVO IS GOING TO PROVIDE MUCH MORE RESTRAINT AND MUCH

8  MORE REDUCTION IN THAT FORWARD MOTION.

9  Q.   AND WE CAN SEE THAT THE VOLVO IS GOING TO HAVE A LOT LESS

10  SPOOL-OUT, CORRECT?

11  A.   YES.

12  Q.   WHAT DOES IT MEAN FOR HOW MUCH DISTANCE A PERSON WILL

13  TRAVEL WITH THE AUTOLIV SEATBELT IN THE MAZDA3 VERSUS THE

14  VOLVO?

15  A.   THAT DISTANCE IS A FUNCTION OF THAT SPOOL-OUT.  SO THE

16  MORE SPOOL-OUT, THE MORE DISTANCE.  SIX INCHES OR SIX AND A

17  HALF INCHES VERSUS 17 IS GOING TO BE A LARGE DIFFERENCE IN

18  FORWARD MOTION, FORWARD EXCURSION.

19  Q.   WHAT DOES IT MEAN FOR THE DIFFERENCE IN HOW FAST A PERSON

20  IS GOING TO MOVE FORWARD IN THE AUTOLIV SEATBELT IN THE MAZDA

21  VERSUS THE AUTOLIV SEATBELT IN THE VOLVO?

22  A.   THAT'S ANOTHER IMPORTANT CONSIDERATION, BECAUSE IT'S NOT

23  JUST THE MOTION BUT THE TWO-KILONEWTON BAR IS NOT GOING TO

24  ABSORB OR TAKE MUCH -- IT'S NOT GOING TO DISSIPATE MUCH ENERGY

25  AS IT'S TWISTING, WHICH MEANS THERE'S GOING TO BE MORE OF THAT

1  KINETIC ENERGY IS STILL IN VELOCITY.  SO IT'S STILL -- THE

2  OCCUPANT IS GOING TO FLY MUCH FASTER FORWARD.

3          EVEN WITH THE SIX KILONEWTON, IF WE ASSUME FOR A

4  MINUTE THAT IT WENT JUST AS FAR, IT WOULD HAVE BURNED UP A LOT

5  MORE ENERGY, AND EVEN IF THE OCCUPANT HAD GOTTEN TO THE SAME

6  PLACE, THEY WOULD HAVE DONE THAT SO MUCH SLOWER AND WITH MUCH

7  LESS ENERGY, MUCH MORE -- IT'S MUCH MORE AGGRESSIVE WITH THE

8  WEAK TORSION BAR.

9  Q.   AND PUT IN SIMPLE TERMS, WHAT WE ARE DOING HERE IS

10 DECIDING WHETHER THE ENERGY IS GOING TO BE ABSORBED IN THE

11 CHEST BY THE CHEST BONES OR IN THE HEAD WHEN SOMEONE HITS THEIR

12 FACE, CORRECT?

13 A.   EXACTLY.

14 Q.   AND SO VOLVO MADE THE CHOICE WITH THE SEATBELT THAT

15 AUTOLIV SOLD TO VOLVO TO PUT MORE OF THAT ENERGY IN THE CHEST,

16 CORRECT?

17 A.   YES.

18 Q.   AND AUTOLIV KNEW THAT THAT WAS HAPPENING WITH THE SAME

19 PLATFORM CAR BECAUSE IT WAS SELLING IT TO THE VOLVO?

20 A.   RIGHT.

21 Q.   IF A PERSON WERE TO -- WELL, LET ME BACK UP.

22          IF YOU ARE WEARING THE SEATBELT THAT AUTOLIV SOLD TO

23 VOLVO, YOU ARE LESS LIKELY TO HIT THE STEERING WHEEL, CORRECT?

24 A.   OH, ABSOLUTELY.

25 Q.   AND IF YOU DO HIT THE STEERING WHEEL, YOU ARE LESS LIKELY

UNITED STATES DISTRICT COURT

1  TO HIT IT HARD ENOUGH TO REALLY HURT YOURSELF BAD?

2  A.   RIGHT.  EVEN IF YOU GET THERE, YOU ARE GOING TO GET THERE

3  WITH A LOT LESS FORCE, A LOT LESS VELOCITY AND A LOT LESS

4  ENERGY.

5  Q.   SO THAT VOLVO AUTOLIV SEATBELT IS GOING TO REDUCE THE

6  LIKELIHOOD THAT, ALL THINGS BEING EQUAL, A PERSON GETS A

7  SERIOUS INJURY OR A FATAL INJURY IN A CRASH?

8          MR. SCRIBNER:  I'M GOING TO OBJECT.  I'M GOING TO

9  OBJECT TO THAT QUESTION.  HE IS NOT A MEDICAL DOCTOR AND HE HAS

10  NO BUSINESS TALKING ABOUT INJURIES.

11          MS. CANNELLA:  I'LL REPHRASE, YOUR HONOR.

12          MR. SCRIBNER:  I'M NOT -- EXCUSE ME.  I'M NOT DONE

13  YET.  I'M SORRY.  THAT'S THE WHOLE FOCUS --

14          THE COURT:  YES, THAT'S THE ARGUMENT.

15          MR. SCRIBNER:  -- OF OUR DAUBERT MOTION, WHICH HAS

16  NOTHING TO DO WITH WHAT I HAVE HEARD FOR AN HOUR NOW, BUT

17  THAT'S OUR OBJECTION.

18          MS. CANNELLA:  YOUR HONOR, I CAN REPHRASE THAT.  I

19  WAS IMPROVISING, WHICH WAS MY FAULT.

20          THE COURT:  I SUSTAIN THAT OBJECTION.  YOU CAN

21  REPHRASE YOUR QUESTION.

22  BY MS. CANNELLA:

23  Q.   OKAY.  THE WHOLE PURPOSE OF THE DESIGN OF STRENGTHENING A

24  TORSION BAR, THE DESIGN PURPOSE OF THAT IS TO SLOW AND REDUCE

25  FORWARD MOTION; IS THAT RIGHT?

UNITED STATES DISTRICT COURT

1  A.  YES.

2  Q.  WHO IS THE INSURANCE INSTITUTE FOR HIGHWAY SAFETY?

3  A.  IT IS A GROUP REFERRED TO AS IIHS.  THE INSURANCE

4  INSTITUTE FOR HIGHWAY SAFETY IS AN ORGANIZATION FUNDED BY THE

5  INSURANCE COMPANIES AND THEY DO A LOT OF CRASH TESTING AND

6  SAFETY RATINGS AND SO FORTH THAT WE SEE ON TV.

7  Q.  AND DID YOU LOOK AT AN IIHS FRONTAL CRASH TEST FOR THE

8  MAZDA3?

9  A.  I DID.

10  Q.  OKAY.  LET'S SEE IF I CAN GET THIS TO PLAY.

11         IS THIS THE CRASH TEST THAT YOU LOOKED AT?

12  A.  YES.

13  Q.  AND HOW DID THE AUTOLIV SEATBELT PERFORM IN THIS TEST?

14  A.  SIMILAR TO WHAT WE SAW IN THE NCAP.  IN OTHER WORDS, IT

15  SPOOLS OUT QUITE AGGRESSIVELY.  THE OCCUPANT, THE DUMMY, IS

16  SEEN TO GET VERY DEEP INTO THE AIRBAG.  THIS TEST IS WHAT'S

17  REFERRED TO AS AN OFFSET FRONTAL SO THAT THE BARRIER THAT IT

18  HITS IS NOT ENTIRELY, COMPLETELY ACROSS THE FRONT OF THE

19  VEHICLE BUT IS OFFSET TO THE DRIVER'S SIDE.

20         BUT IT PERFORMED SIMILARLY TO THE NCAP TEST AND WE

21  SEE THE DUMMY AGAIN GET DEEP INTO THE AIRBAG.  AND WHEN WE SLOW

22  THAT DOWN AND LOOK AT THE MOTION OF THE HEAD, IT'S

23  EFFECTIVELY -- HE'S UNRESTRAINED, EFFECTIVELY, HIS UPPER TORSO

24  BY THE BELT.

25  Q.  DID YOU NOTICE ANY RESTRAINT THAT THE SEATBELT IS

UNITED STATES DISTRICT COURT

1  PROVIDING IN THIS VIDEO?

2  A.   NOTHING MEANINGFUL, NO.

3  Q.   IS THAT HOW YOU WOULD EXPECT A SAFE SEATBELT TO PERFORM?

4  A.   NO.

5  Q.   AND AGAIN, THIS IIH [SIC] CRASH TEST IS PUBLICLY

6  AVAILABLE, CORRECT?

7  A.   YES.

8  Q.   DO YOU KNOW THE DATE IT WAS RUN?

9  A.   I'M SORRY?

10  Q.   DO YOU KNOW THE DATE IT WAS RUN?

11  A.   IT MAY BE ON THE DOOR AGAIN.  I DON'T REMEMBER OFF THE TOP

12  OF MY HEAD, BUT --

13  Q.   DO THEY TYPICALLY RUN --

14  A.   -- THAT IS AN '04 MODEL YEAR, THOUGH, SO IT WAS CERTAINLY

15  RUN BEFORE MR. ANDREWS' VEHICLE WAS MANUFACTURED.

16  Q.   THANK YOU.

17         DURING YOUR DEPOSITION YOU TESTIFIED THAT MR. ANDREWS

18  WAS EFFECTIVELY UNRESTRAINED BY THE AUTOLIV SEATBELT.  IS THAT

19  STILL YOUR OPINION TODAY?

20  A.   YES, AND THIS TEST IN PART DEMONSTRATES THAT.

21  Q.   AND CAN YOU TELL US A LITTLE BIT ABOUT WHY THIS TEST

22  ILLUSTRATES THAT?

23  A.   DO WE HAVE ANY FREEZE FRAMES FROM THE SIDE?

24  Q.   I CAN GIVE YOU ONE.

25  A.   I THINK THERE'S ONE IN THE POWERPOINT.


UNITED STATES DISTRICT COURT

1  Q.   OH, IS THERE?

2  A.   WELL, YOU CAN STOP IT RIGHT THERE AND THEN GO FROM THERE

3  TO THE ONE IN THE POWERPOINT.

4          BUT ONE OF THE THINGS THAT -- SO THE SHOULDER BELT IS

5  OVER THE DUMMY'S LEFT SHOULDER RIGHT HERE AND WE SEE THAT THAT

6  IS SPOOLING OUT.

7          THIS DEVICE RIGHT THERE IS CLAMPED TO THE BELT.

8  THAT'S MEASURING THE LOAD.  WE CAN SEE THAT MOVE.  BUT WHAT IS

9  OF NOTE TO ME IS YOU CAN ALSO SEE THE ANGLE OF THE DUMMY'S HEAD

10  AND NECK, WHICH I AM NOT DOING THIS VERY WELL BUT I WANT TO GET

11  IT A LITTLE MORE LIKE THAT.

12          BUT, AT ANY RATE, THE SHOULDER BELT, IF IT'S

13  PROVIDING ANY MEANINGFUL RESTRAINT, SLOWS DOWN YOUR UPPER

14  TORSO, SLOWS DOWN YOUR CHEST.  AND THEN THE HEAD MOVES, BECAUSE

15  THE HEAD IS CONNECTED, BUT THE SEATBELT IS NOT ON YOUR

16  FOREHEAD.  SO THE HEAD AND NECK WOULD BEGIN TO SEE AN ANGULAR

17  DIFFERENCE BETWEEN THAT AND THE CHEST.  AND I DON'T SEE THAT

18  HERE, WHICH TELLS ME THAT HE IS MOVING FORWARD AND THE SHOULDER

19  BELT IS NOT EVEN GIVING ENOUGH RESISTANCE TO ALLOW THE HEAD TO

20  CHANGE RELATIVE TO THE TORSO.  IT'S MOVING FORWARD AS A UNIT.

21          AND IF YOU HOLD THE CHEST BACK MORE AGGRESSIVELY,

22  THEN THE HEAD ARC AND THE NECK BENDS, AND WE DON'T SEE THAT

23  HERE.  SO WHAT I SEE HERE IS THE WHOLE THING IS GOING FORWARD

24  AND INTO THE BAG AND DEEP INTO THE BAG.  SO THAT'S PART OF THE

25  REASON I SAY EFFECTIVELY UNRESTRAINED.  IN OTHER WORDS, WE EVEN

UNITED STATES DISTRICT COURT

1   LOOK AT THESE VIDEOS AND I DON'T SEE THE SHOULDER BELT CHANGING

2   HIS KINEMATICS AT ALL.

3   Q.   OKAY.  LET ME MAKE SURE I UNDERSTAND.

4          SO HIS HEAD IS UNRESTRAINED AND HIS CHEST IS MOVING

5   AT THE SAME SPEED AS THE HEAD?

6   A.   WELL --

7   Q.   ESSENTIALLY?

8   A.   IT IS UNLESS THE SHOULDER BELT HOLDS IT BACK.

9   Q.   CORRECT.

10   A.   WHICH IS WHAT WE WOULD HOPE.

11   Q.   SO IN THIS VIDEO YOU SEE THE HEAD AND THE -- THE

12   UNRESTRAINED HEAD AND THE SEATBELTED CHEST MOVING TOGETHER AT

13   THE SAME TIME?

14   A.   RIGHT.  WHAT I DON'T SEE IS I DON'T SEE THE HEAD CHANGING

15   ANGLES OR THE NECK CHANGING ANGLES RELATIVE TO THE TORSO.  I

16   SEE THEM MOVING TOGETHER.

17   Q.   OKAY.

18   A.   WHICH TELLS ME THAT THAT LEVEL OF SHOULDER BELT RESTRAINT

19   IS EFFECTIVELY MEANINGLESS.

20   Q.   SO THE REASONS, CAN YOU EXPLAIN TO THE COURT THE REASONS

21   WHY THIS SEATBELT IS DEFECTIVE?

22   A.   BECAUSE THAT LOAD LIMITER IS ALLOWING GROSSLY TOO MUCH

23   EXCURSION AT SUCH A LOW LEVEL.  SO THERE'S TWO ISSUES.  ONE IS

24   THAT THE LEVEL IS SO LOW AND THAT THERE IS NO LIMIT TO IT.  SO

25   ULTIMATELY THOSE TWO THINGS COMBINED EQUAL 20 INCHES, WHICH IS

1  AN UNREASONABLE AMOUNT.  THERE'S NEVER ANY -- AND THE NCAP TEST

2  MADE CLEAR THAT THESE OTHER VEHICLES WITH SIX TO EIGHT INCHES

3  ARE SCORING EQUALLY AS WELL WITH HALF THE SPOOL-OUT.  SO WHY IN

4  THE WORLD WOULD WE EVER WANT THAT MUCH SPOOL-OUT?  THERE IS NO

5  RATIONALE FOR THAT.

6          SO IT'S TOO MUCH SPOOL-OUT AND THAT IS A FUNCTION OF

7  THE LOW THRESHOLD AND IT'S THE LACK OF ANY STOP TO IT.  IF WE

8  MADE THE THRESHOLD HIGHER, THEN IT WOULD HAVE NECESSARILY

9  SPOOLED OUT LESS, SIMILAR TO THE VOLVO, OR IF YOU LIMIT THE

10  NUMBER OF TURNS AND SAY, OKAY, WELL, I'M GOING TO LET IT GO AT

11  TWO KILONEWTONS BUT I'M ONLY GOING TO LET IT TURN ONE OR TWO

12  TIMES AS OPPOSED TO THREE AND A HALF, WHAT THIS ONE DID, THEN

13  THAT WOULD ALSO BE A WAY TO LIMIT THAT.  BUT AT SOME POINT WE

14  HAVE TO HOLD THE OCCUPANT AWAY FROM THE STEERING WHEEL AND THE

15  DASHBOARD AND THE STUFF IN FRONT OF US.  AT SOME POINT YOU HAVE

16  TO LITERALLY RESTRAIN THEM.  OTHERWISE, THAT'S ITS PURPOSE IN

17  LIFE.

18  Q.   BECAUSE NO ONE WANTS TO SMASH INTO THE STEERING WHEEL.

19  YOU DON'T WANT TO ABSORB YOUR ENERGY THERE?

20  A.   RIGHT.

21  Q.   OKAY.  WHAT ARE THE RISKS OF THE DESIGN THAT AUTOLIV CHOSE

22  FOR THIS SEATBELT?

23  A.   THE RISKS FOR THIS ONE?

24  Q.   YES.

25  A.   SERIOUS AND FATAL INTERIOR CONTACT WITH THE FORWARD

1  COMPONENTS, EXACTLY THE RISK THAT OR THE INJURIES THAT MICAH

2  SUFFERED.

3  Q.   IS THERE ANY UTILITY TO HAVING A TORSION BAR THAT IS THIS

4  WEAK, 2.0?

5  A.   NO.

6  Q.   IN FACT, AUTOLIV STARTED MANUFACTURING A STRONGER SEATBELT

7  FOR THE MODEL YEAR THAT WAS RIGHT AFTER MR. ANDREWS' MAZDA3,

8  CORRECT?  THE '06?

9  A.   THE '06, YES.

10  Q.   IN YOUR OPINION DO THE RISKS OF HARM ARISING FROM THE

11  DESIGN OF THIS AUTOLIV SEATBELT OUTWEIGH THE UTILITY OF THAT

12  DESIGN?

13  A.   ABSOLUTELY.

14  Q.   OKAY.  I WANT TO SWITCH GEARS A LITTLE BIT AND TALK ABOUT

15  WHETHER THIS WAS AUTOLIV'S SEATBELT.  I WANT TO TALK ABOUT THE

16  EVIDENCE OF AUTOLIV'S INVOLVEMENT IN THE DESIGN OF THE

17  SEATBELT.

18        DID AUTOLIV DESIGN THE SEATBELT RETRACTOR IN

19  MR. ANDREWS' MAZDA3?

20  A.   YES.

21  Q.   DID IT DESIGN THE TORSION BAR AND THE SEATBELT RETRACTOR

22  IN MR. ANDREWS' MAZDA3?

23  A.   YES.

24  Q.   AND HOW DO YOU KNOW THAT?

25  A.   IT'S CLEAR FROM THE DRAWINGS AS WELL AS OTHER MATERIAL,

UNITED STATES DISTRICT COURT

1  BUT THE DRAWINGS ARE AUTOLIV DRAWINGS.  THEY ARE AUTOLIV'S

2  DESIGN.

3  Q.    I AM GOING TO HAND YOU WHAT I HAVE MARKED AS PLAINTIFF'S

4  EXHIBIT 74, PLAINTIFF'S HEARING EXHIBIT 74, AND WHAT IS THAT

5  DOCUMENT?

6  A.    THAT IS A TECHNICAL DATA DOCUMENT DESCRIBING THE SUBJECT

7  RETRACTOR, WHICH IS INTERNALLY KNOWN AS THE R27LL.

8  Q.    AND THE BATES NUMBER OF IT IS ALIV 3601.  THIS ISN'T A

9  DOCUMENT THAT WAS PRODUCED IN THE ANDREWS CASE, CORRECT?

10  A.    YES.

11  Q.    OH, WELL, THE ANDREWS DOCUMENTS HAVE AUTOLIV AS THEIR

12  PRECEDING BATES NUMBER, CORRECT?  THE WHOLE WORD "AUTOLIV"?

13  A.    THAT'S MY RECOLLECTION, YES.

14  Q.    OKAY.  SO THIS DOCUMENT WAS PRODUCED IN A DIFFERENT CASE,

15  THE STEGALL CASE, CORRECT?

16  A.    YES.

17  Q.    OKAY.  AND JUST FOR BACKGROUND FOR THE COURT, THE STEGALL

18  CASE IS A CASE THAT'S PENDING OUT IN CALIFORNIA; IS THAT RIGHT?

19  A.    YES.

20  Q.    AND WHAT IS THE ALLEGATION THERE?  IS IT THE SAME

21  DEFENDANT, SAME DEFECT, OR --

22  A.    IT'S EFFECTIVELY THE SAME VEHICLE.  IT'S ALSO A FRONTAL

23  IMPACT.  THE RIGHT FRONT OCCUPANT IN THAT CASE SUFFERED FACIAL

24  FRACTURES ASSOCIATED AGAIN WITH ABOUT 20 INCHES OF SPOOL-OUT.

25  THAT WAS ONE OF THE OTHER CASES THAT I HAD SEEN WAS THE SAME

1  VEHICLE IN THE RIGHT FRONT IN THE STEGALL CASE.

2  Q.   AND THE TOP OF THIS DOCUMENT SAYS R27LL.  IS THAT THE

3  RETRACTOR IN MR. ANDREWS' CAR?

4  A.   YES.

5  Q.   AND THIS HAS GOT AN AUTOLIV HEADER ON IT, CORRECT?

6  A.   YES.

7  Q.   AND THERE'S A COMPLETION DATE ON IT.  DO YOU SEE THAT?

8  A.   YES.

9  Q.   WHAT IS THE COMPLETION DATE?

10  A.   1999.

11  Q.   WHAT MONTH IN 1999?

12  A.   JUNE.

13  Q.   DOES IT ALSO LIST OTHER CUSTOMERS WHO ARE BUYING THAT

14  RETRACTOR?

15  A.   YES.

16  Q.   AND WHO ARE THOSE CUSTOMERS?

17  A.   BMW, OPEL AND ROVER.

18  Q.   I AM GOING TO HAND YOU WHAT I HAVE MARKED AS PLAINTIFF'S

19  HEARING EXHIBIT 40.  AND THIS IS THE DEVELOPMENT SCHEDULE FOR

20  THE MAZDA3 THAT'S AT ISSUE IN THIS CASE?

21  A.   YES.

22  Q.   WHAT IS THE KICK-OFF DATE FOR THE MAZDA3 ON THAT DOCUMENT?

23  A.   LATE NOVEMBER, DECEMBER 1999.

24  Q.   SO THE RETRACTOR DOCUMENT THAT WE JUST LOOKED AT SAID THAT

25  THE AUTOLIV RETRACTOR WAS COMPLETED IN JUNE OF '99 AND THE

1   AUTOLIV DOCUMENT I JUST SHOWED YOU SAYS THAT THE MAZDA PROGRAM

2   DIDN'T EVEN START UNTIL SIX MONTHS LATER, CORRECT?

3   A.   CORRECT.

4   Q.   AND WHAT DOES THAT TELL YOU ABOUT WHO DESIGNED THE

5   RETRACTOR?

6   A.   IT'S AN AUTOLIV RETRACTOR AND IT PRECEDED THIS MAZDA

7   VEHICLE.

8   Q.   SO THAT'S THE RETRACTOR.  LET'S LOOK AT THE TORSION BAR.

9        I AM GOING TO HAND YOU A DOCUMENT I HAVE MARKED AS

10  PLAINTIFF'S HEARING EXHIBIT 7.

11  A.   OKAY.

12  Q.   AND CAN YOU IDENTIFY THAT DOCUMENT FOR THE COURT, PLEASE?

13  A.   YES.  THIS IS A DETAILED DRAWING FOR THE TORSION BAR

14  COMPONENT ITSELF FOR THE R27LL RETRACTOR.

15  Q.   AND THE R27LL IS THE RETRACTOR IN MICAH'S CAR?

16  A.   CORRECT.

17  Q.   AND THE NAME ON THIS DRAWING IS AUTOLIV, CORRECT?

18  A.   CORRECT.  THIS IS AN AUTOLIV DESIGN DRAWING.

19  Q.   IT'S SMALL BUT CAN YOU SEE ON THE TOP RIGHT CORNER WHEN

20  VERSION A01 WAS DRAWN?  DO YOU SEE THAT FEBRUARY 20TH, 1998

21  DATE?

22  A.   YES.

23  Q.   AND SO THEREFORE WE CAN CONCLUDE, SINCE WE KNOW THAT THE

24  MAZDA PROGRAM STARTED IN DECEMBER OF OR NOVEMBER OR DECEMBER OF

25  '99 AND THIS TORSION BAR WAS FIRST DRAWN ON FEBRUARY 20TH,

1  1998, OVER A YEAR BEFORE, THAT THE TORSION BAR DESIGN EXISTED

2  BEFORE AUTOLIV EVER EVEN GOT INVOLVED WITH MAZDA, CORRECT?

3  A.   YES.

4  Q.   SO WHAT DOES THAT TELL YOU ABOUT WHO DESIGNED THE TORSION

5  BAR?

6  A.   AUTOLIV DID.

7  Q.   OKAY.  I WANT TO WALK THROUGH SOME OF THE DOCUMENTS THAT

8  YOU DISCUSSED IN YOUR SUPPLEMENTAL REPORT.  I AM GOING TO HAND

9  YOU WHAT I HAVE MARKED PLAINTIFF'S HEARING EXHIBIT 53.

10         WHAT IS A TOLLGATE?

11 A.   TOLLGATE.  IT'S A TERM THAT WAS USED TO DESCRIBE INTERNAL

12 AUTOLIV MEETINGS RELATIVE TO THE MAZDA3 PROGRAM IN THIS CASE.

13 Q.   AND THERE IS A GRAPHIC THAT YOU TALKED ABOUT IN YOUR

14 SUPPLEMENTAL REPORT.  THE PAGES ARE NOT NUMBERED, BUT I THINK

15 IT'S THE FOURTH PAGE, YES.

16         SO THIS IS AN INTERNAL AUTOLIV DOCUMENT, CORRECT?

17 A.   YES.

18 Q.   LIKE SOMETHING AUTOLIV IS PRESENTING INTERNALLY TO ITSELF,

19 IT APPEARS TO BE?

20 A.   YES.

21 Q.   RIGHT.  SO ON THE FOURTH PAGE IT TALKS ABOUT OVERVIEW OF

22 THE PROJECT.  DO YOU SEE WHERE I AM?

23 A.   I DO.

24 Q.   ALL RIGHT.  THAT LAST BULLET.  CHANGES MADE:  ONLY THE

25 FRONT BELT WAS CHANGED.  AND THEN IT'S GOT SOME NUMBERS AND AN

UNITED STATES DISTRICT COURT

1  ARROW AND SOME MORE NUMBERS BELOW IT.

2          CAN YOU TELL THE COURT WHAT THAT MEANS?

3  A.   THE R27LL RETRACTOR IS THE RETRACTOR THAT WAS IN

4  MR. ANDREWS' CAR.  THAT'S THE TWO-KILONEWTON LOAD LIMITER PLUS

5  BPP OR B -- PBP.  IT STANDS FOR PYROTECHNIC BUCKLE

6  PRETENSIONER, WHICH MEANS THAT THE PRETENSIONER WAS ON THE

7  BUCKLE.

8          THERE ARE SOME DESIGNS THAT HAVE THE PRETENSIONER ON

9  THE RETRACTOR.  SO THIS IS A NONPRETENSIONED RETRACTOR, THE

10  TWO-KILONEWTON, WITH THE BUCKLE PRETENSIONER.  THAT WAS THE

11  ORIGINAL DESIGN.  AND THEN IT SWITCHED TO -- THE ARROW IS

12  INDICATING A SWITCH TO AN R200RP, WHICH IS A DIFFERENT

13  RETRACTOR, THE R200 WITH A RETRACTOR PRETENSIONER, WHICH IS

14  WHAT THE "RP" STANDS FOR.  THAT'S A RETRACTOR PRETENSIONER.

15  Q.   SO THIS IS, IN SUMMARY, AUTOLIV DISCUSSING INTERNALLY

16  SWITCHING FROM ONE RETRACTOR AND BUCKLE TO ANOTHER RETRACTOR

17  AND BUCKLE ON THE MAZDA3, CORRECT?

18  A.   CORRECT.

19  Q.   HOLD THIS THOUGHT.  SO I WANT TO TALK ABOUT THE VA/VE

20  DOCUMENTS AND THEY ARE GOING TO RELATE TOGETHER.

21          SO CAN YOU TELL THE COURT WHAT VA/VE IS?

22  A.   VA/VE STANDS FOR VALUE ANALYSIS VALUE ENGINEERING AND IT

23  IS A CONDUIT OR A WAY BY WHICH AUTOLIV COMMUNICATED WITH MAZDA

24  SUGGESTED CHANGES.

25          THE COURT:  SAY THAT LAST PART AGAIN.


                    UNITED STATES DISTRICT COURT

1          THE WITNESS:  SUGGESTED CHANGES.  IT WAS BASICALLY A

2   CONDUIT FOR THE TWO TO COMMUNICATE.

3   BY MS. CANNELLA:

4   Q.   OKAY.  AND THE VA/VE I JUST HANDED YOU, WHICH WAS -- I'M

5   SORRY.  WHAT WAS THE EXHIBIT NUMBER ON THAT?

6   A.   HEARING EXHIBIT 24.

7   Q.   HEARING EXHIBIT 24.  THAT'S THE VA/VE FOR THE SWITCH FROM

8   THE OLD BUCKLE TO THE NEW BUCKLE, CORRECT?

9   A.   YES.  SO IN THE MIDDLE OF THE PAGE IT INDICATES THAT IT'S

10  SUGGESTED BY AUTOLIV THAT THE CURRENT BUCKLE, WHICH WAS THE

11  BUCKLE PRETENSIONER, BE CHANGED TO A NORMAL BUCKLE, THAT IS,

12  ONE WITHOUT THE PRETENSIONER.

13  Q.   OKAY.  SO JUST TO KIND OF TIE ALL THAT TOGETHER,

14  PLAINTIFF'S HEARING EXHIBIT 53, WHICH WAS FROM NOVEMBER 30TH,

15  2004, AUTOLIV IS TALKING ABOUT DOING THIS INTERNALLY.  THE DATE

16  ON THIS VA/VE SUGGESTION I JUST GAVE YOU IS WHAT?  JANUARY

17  2005, CORRECT?

18  A.   MARCH 2005.

19  Q.   I'M SORRY.  MARCH 2005.  THANK YOU.

20          AND THAT'S AFTER THE TOLLGATE?

21  A.   CORRECT.

22  Q.   OKAY.  SO THIS IS A CHANGE THAT AUTOLIV IS SUGGESTING?

23  A.   YES.

24  Q.   WAS IT IMPLEMENTED IN THE MAZDA SEATBELT?

25  A.   YES.

UNITED STATES DISTRICT COURT

1   Q.   WAS IT A DESIGN CHANGE THAT AUTOLIV SUGGESTED AND MAZDA

2   FOLLOWED?

3   A.   YES.

4   Q.   WHAT DOES THAT TELL YOU ABOUT WHETHER AUTOLIV WAS ACTIVELY

5   INVOLVED IN THE DESIGN OF THE SEATBELT IN THE MAZDA3?

6   A.   THEY CERTAINLY WERE.  THEY OF COURSE WERE.

7   Q.   OKAY.  YOUR REPORT ALSO DISCUSSED A COUPLE MORE -- EXCUSE

8   ME.  I JUST WANT TO MAKE SURE THE RECORD IS CORRECT.

9   PLAINTIFF'S HEARING EXHIBIT 24, WE'VE GOT A DATE OF JANUARY

10  28TH, 2005 ON THAT.  I KNOW IT'S SMALL, SO --

11  A.   OH, YEAH.  AND I'M SORRY.  I WAS READING THE DATE AT THE

12  BOTTOM, WHICH APPARENTLY IS NOT THE RIGHT DATE.  NO.  THE

13  SUGGESTED SUBMISSION DATE IS 2005, JANUARY 28.

14  Q.   OKAY.  THERE WERE A COUPLE OTHER VA/VE SUGGESTIONS THAT

15  YOUR REPORT DISCUSSED AND I'VE MARKED THOSE AS PLAINTIFF'S

16  HEARING EXHIBITS 22 AND 23.

17           MS. CANNELLA:  I'LL GIVE THIS TO YOU AT THE SAME

18  TIME.

19           THE COURT:  THANK YOU.

20  BY MS. CANNELLA:

21  Q.   OKAY.  THESE ARE ADDITIONAL VA/VE SUGGESTIONS, CORRECT?

22  A.   YES.

23  Q.   ARE THESE ABOUT THE RETRACTOR OR THE TORSION BAR?

24  A.   ONE IS ABOUT THE RETRACTOR, NOT THE TORSION BAR.

25  Q.   AND WHICH ONE IS THAT?

1  A.   22.

2  Q.   AND WHAT DOES 22 REFLECT?

3  A.   A DISCONTINUATION OF THE ALR FEATURE, ALR/ELR.

4  Q.   WHAT IS THAT?

5  A.   THE RETRACTOR IS -- THERE'S A COUPLE OF WAYS TO DESIGNATE

6  THAT.  THE ELR STANDS FOR EMERGENCY LOCKING RETRACTOR, WHICH

7  MEANS THAT IT IS GOING TO LOCK UP WHEN THE VEHICLE SENSES A

8  CRASH.

9           ANOTHER WAY TO DO IT IS TO HAVE AN AUTOMATIC LOCKING

10  RETRACTOR, WHICH IS THE ALR FEATURE.  AND THE ALR FEATURE IS

11  WHAT CLICKS IN FOR THE PARENTS THAT HAVE CHILD SEATS.  SO IF

12  YOU WANT TO PUT A CHILD SEAT IN THE SEAT AND ATTACH IT WITH A

13  REGULAR SEATBELT, IF YOU PULL THE BELT ALL THE WAY OUT AND THEN

14  LET IT BACK IN, IT CLICKS LIKE A RATCHET (INDICATING).  AND IT

15  WON'T COME OUT AGAIN.  THAT MEANS THAT IT'S SWITCHED INTO AN

16  AUTOMATIC.  IT'S AUTOMATICALLY LOCKED SO IT STAYS LOCKED.  AND

17  THEN THE WAY YOU DISENGAGE THAT IS TO SPOOL IT ALL THE WAY BACK

18  IN, STOW IT, AND THEN IT WILL COME OUT AND WORK NORMALLY AGAIN.

19           THE IDEA FOR THE AUTOMATIC LOCKING RETRACTOR REALLY

20  WAS BASED UPON CHILD SEATS SO THAT WHEN YOU CLICK YOUR CHILD

21  SEAT IN, YOU DON'T WANT THE CHILD SEAT TO FLOP AROUND UNTIL

22  THERE'S A CRASH.  SO YOU PULL THE BELT OUT, PUT YOUR KNEE IN

23  THE SEAT AND CINCH IT UP REALLY TIGHT AND IT WILL STAY THERE.

24  THAT'S THE ALR FEATURE.

25  Q.   SO THAT'S VA/VE DOCUMENTS AUTOLIV MAKING A DESIGN

UNITED STATES DISTRICT COURT

1  SUGGESTION ABOUT THE RETRACTOR TO MAZDA, CORRECT?

2  A.   RIGHT.

3  Q.   AND DID MAZDA ACCEPT THAT DESIGN CHANGE?

4  A.   EXHIBIT 22?

5  Q.   YES, SIR.

6  A.   AS FAR AS I KNOW.

7  Q.   YES.  IS IT REFLECTED ON THE DOCUMENT ITSELF?  CORRECT?

8  A.   WHERE ARE YOU LOOKING?

9  Q.   ON THE LEFT SIDE THERE'S A BOX.

10  A.   I SEE THE CURRENT CHANGE.  I'M NOT -- I SEE THE CURRENT

11  AND THE SUGGESTED.  I'M SORRY.  AM I MISSING IT?

12  Q.   I KNOW IT'S REALLY SMALL WRITING.

13  A.   OH, YES.  I'M SORRY.  "VERIFYING DEPARTMENT COMMENT.  TO

14  BE ADOPTED.  THANK YOU FOR THE SUGGESTION."  YES.

15  Q.   AND THAT'S WRITTEN BY MAZDA, CORRECT?

16  A.   CORRECT.

17  Q.   THAT'S MAZDA?

18  A.   CORRECT.  YES.  I'M SORRY.  I WAS THE LINE UP.

19  Q.   OKAY.  AND PLAINTIFF'S HEARING EXHIBIT 23 IS THE SAME

20  THING, ANOTHER SUGGESTED CHANGE BY AUTOLIV, AND IN THAT SAME

21  BOX VERIFYING DEPARTMENT COMMENT.  TO BE ADOPTED.

22  A.   YES.

23  Q.   AND IT'S GOT A SCHEDULED IMPLEMENTATION DATE THERE AS

24  WELL, CORRECT?

25  A.   YES.

UNITED STATES DISTRICT COURT

1  Q.   AND THIS IS ABOUT A SPONGE COVER INTO A RESIN COVER.  IS

2  THAT SPECIFIC TO OUR CASE?  IS THAT RELEVANT TO OUR CASE?

3  A.   NOT PARTICULARLY.  IT HAS TO DO WITH THE BUCKLE.

4  Q.   SO WHY IS THIS DOCUMENT IMPORTANT TO YOU?

5  A.   THESE DOCUMENTS MAKE CLEAR THAT AUTOLIV IS ACTIVELY

6  PARTICIPATING IN DESIGNING THE RESTRAINT SYSTEM FOR THE MAZDA

7  VEHICLE AND IN FACT MAKING SUGGESTIONS OF CHANGES THAT ARE

8  ULTIMATELY BEING IMPLEMENTED AND RELIED UPON.  AND THERE'S A

9  CONDUIT TO DO THAT BY VIRTUE OF THESE FORMS AND THAT IT HAS AND

10 WAS BEING DONE.

11 Q.   SO THE EXISTENCE OF THE VA/VE PROCESS IS EVIDENCE THAT

12 AUTOLIV HAD THE ABILITY TO MAKE DESIGN CHANGE SUGGESTIONS AND

13 WAS DOING SO AND MAZDA WAS FOLLOWING THOSE SUGGESTIONS; IS THAT

14 CORRECT?

15 A.   OF COURSE, YES.

16 Q.   ALL RIGHT.  I AM GOING TO HAND YOU WHAT I HAVE MARKED AS

17 PLAINTIFF'S HEARING EXHIBIT 25.

18          THE COURT:  THANK YOU.

19 BY MS. CANNELLA:

20 Q.   OKAY.  SO I HAVE HANDED YOU PLAINTIFF'S EXHIBIT 25 AND 26.

21 THESE APPEAR TO BE DOCUMENTS THAT TRACK VA/VE SUGGESTIONS AMONG

22 OTHER THINGS; IS THAT RIGHT?

23 A.   THAT'S MY INTERPRETATION, YES.

24 Q.   OKAY.  AND ON PLAINTIFF'S HEARING EXHIBIT 25 WE'VE GOT A

25 VA/VE PROPOSAL THAT'S HIGHLIGHTED TALKING ABOUT THE SEWING FOR

1  THE FRONT SEAT AND THE RIGHT SEAT LABELS BEING CHANGED; IS THAT

2  RIGHT?

3  A.   YES.

4  Q.   DO WE HAVE THAT VA/VE SUGGESTION?

5  A.   I HAVEN'T FOUND IT AND I DON'T BELIEVE WE HAVE IT.

6  Q.   THEN IT'S GOT ANOTHER ONE HERE TALKING ABOUT A WASHER

7  BEING CHANGED IN ACCORDANCE WITH A VA/VE PROPOSAL; IS THAT

8  RIGHT?

9  A.   YES.

10  Q.   DO WE HAVE THAT VA/VE PROPOSAL?

11  A.   NO.

12  Q.   IT WAS NOT PRODUCED TO US, CORRECT?

13  A.   I DON'T BELIEVE SO.

14  Q.   AND ON PLAINTIFF'S HEARING EXHIBIT 26 THERE IS ANOTHER ONE

15  TALKING ABOUT CAULKING ON A COVER AND THAT SAYS IT'S IN

16  ACCORDANCE WITH A VA/VE PROPOSAL, CORRECT?

17  A.   YES.

18  Q.   DO WE HAVE THAT VA/VE PROPOSAL?

19  A.   NO.

20  Q.   AUTOLIV NEVER PRODUCED IT IN THIS CASE, DID IT?

21  A.   NOT THAT I AM AWARE OF.  I HAVEN'T BEEN ABLE TO FIND IT.

22       THE COURT:  WHY IS THIS INFORMATION IMPORTANT FOR

23  THIS CASE?

24       THE WITNESS:  THE VA/VE PROCESS ITSELF IS TELLING ME

25  THAT AUTOLIV IS PARTICIPATING.  THIS IS TELLING ME THAT WE

UNITED STATES DISTRICT COURT

1  HAVEN'T SEEN THEM ALL.  SO I DON'T KNOW WHAT OTHER CHANGES WERE

2  SUGGESTED OR NOT.

3          THE COURT:  THESE PARTICULAR CHANGES ARE IMPORTANT, I

4  UNDERSTAND, BECAUSE THEY DIDN'T GIVE THEM TO YOU, AND WHAT

5  ELSE?  WHAT ELSE MAKES IT IMPORTANT?

6          THE WITNESS:  FRANKLY, JUST THAT.  THESE CHANGES

7  THEMSELVES, THE STITCHING OF THE LABEL IS NOT IMPORTANT TO THIS

8  CASE.  BUT WHAT THAT DOES TELL ME IS WHEN I AM

9  CROSS-REFERENCING THEM, I AM NOT SEEING ALL OF THE DOCUMENTS

10  THAT I WOULD HAVE EXPECTED TO SEE, WHICH TELLS ME THAT IT'S NOT

11  A COMPLETE SET, WHICH TELLS ME THERE MAY BE OTHERS MISSING AS

12  WELL.

13          THE COURT:  THAT COULD BE IMPORTANT?

14          THE WITNESS:  THAT COULD BE IMPORTANT.  AND IN FACT I

15  THINK THERE'S ANOTHER DOCUMENT THAT SAYS JUST THAT.

16  BY MS. CANNELLA:

17  Q.  OKAY.  I AM GOING TO HAND YOU WHAT I HAVE MARKED AS

18  PLAINTIFF'S HEARING EXHIBIT 10.

19          BEFORE WE TALK ABOUT PLAINTIFF'S HEARING EXHIBIT 10,

20  MR. WEEKS BROUGHT ME PLAINTIFF'S EXHIBIT, HEARING EXHIBIT 49,

21  WHICH GOES TO WHAT YOU WERE JUST EXPLAINING TO THE JUDGE

22  REGARDING OTHER VA/VE PROPOSALS THAT WE DON'T HAVE THAT COULD

23  BE IMPORTANT.

24  Q.  OKAY.  CAN YOU TURN TO AUTOLIV 1051?  WELL, FIRST LET ME

25  ASK YOU, WHAT IS THIS DOCUMENT?

UNITED STATES DISTRICT COURT

1 A.   THIS IS ONE OF THOSE TOLLGATE DOCUMENTS.  THIS IS ENTITLED

2 TOLLGATE-4 RELATIVE TO THE MAZDA3 PROGRAM, THE J48C PLATFORM,

3 DATED NOVEMBER 2003.

4 Q.   DO YOU HAVE THIS VERSION WITH YOU IN YOUR -- DO YOU HAVE

5 THIS DOCUMENT WITH YOU IN YOUR FOLDER THERE?

6 A.   YES.

7        MS. CANNELLA:  OH, GREAT.  I JUST REALIZED THAT THE

8 TRANSLATOR OMITTED PART OF THE DOCUMENT, SO THE ONE THAT I JUST

9 HANDED UP TO THE COURT DOES NOT HAVE ALL OF THE INFORMATION ON

10 IT THAT IT SHOULD.

11       THE COURT:  CAN YOU SUPPLEMENT IT TO ME LATER?

12       MS. CANNELLA:  YES, SIR.

13 BY MS. CANNELLA:

14 Q.   OKAY.  SO AUTOLIV 1051, THE VERSION THAT HAS ALL THE

15 INFORMATION ON IT, WHAT DO YOU SEE ON THAT PAGE THAT'S RELEVANT

16 TO YOUR OPINION?  THERE IS A VA/VE SUGGESTION, CORRECT?

17 A.   YES.

18 Q.   OKAY.

19 A.   YES.  AND ON THAT PAGE -- IS IT HIGHLIGHTED SOMEWHERE?

20 THE FOURTH COLUMN OVER THAT BEGINS 2001, DECEMBER 20TH.  IF YOU

21 GO DOWN THAT COLUMN TO THE THIRD BOX, IT INDICATES THAT THERE

22 IS A NOTATION ABOUT THE -- CHANGING THE LLD TO THE LL.

23 Q.   OKAY.  WHAT DOES THAT MEAN?

24 A.   THE LLD IS THE LOAD LIMITER DIGRESSIVE, WHICH IS ONE OF

25 THOSE STEP-DOWN TYPES, AS COMPARED TO THE LOAD LIMITER, JUST

1  THE SIMPLE LOAD LIMITER, WHICH IS WHAT THIS VEHICLE HAD.

2        SO THIS VEHICLE WAS AT TWO KILONEWTONS ALWAYS.  FOR

3  EXAMPLE, THE VOLVO WAS AT SIX KILONEWTONS AND THEN STEPPED DOWN

4  TO ABOUT TWO AND A HALF, BUT IT STARTED MUCH MORE STRONG.  SO

5  THAT IS TELLING ME THAT THERE WAS A CHANGE THERE RELATIVE TO

6  THE LOAD LIMITER FROM A DIGRESSIVE ONE TO A NONDIGRESSIVE ONE.

7        AND IN THE VERSION I HAVE, THERE IS A FOOTNOTE FIVE

8  THERE THAT TAKES ME TO A TRANSLATION THAT SAYS OTHER -- THE

9  TRANSLATION FOR THAT JAPANESE THERE IS "OTHER SPECIFICATION

10  CHANGE VA/VE," WHICH SUGGESTS THAT THERE SHOULD BE A VA/VE

11  DESCRIBING THE LOAD LIMITER CHANGE FROM A DIGRESSIVE TO A

12  NONDIGRESSIVE AND THAT I CAN'T FIND.  THAT I DON'T BELIEVE WE

13  HAVE.

14  Q.   SO THAT'S A MISSING VA/VE SUGGESTION BY AUTOLIV TO MAZDA

15  ABOUT THE TORSION BAR IN THE MAZDA3; IS THAT RIGHT?

16  A.   CORRECT, WHICH, OF COURSE, IS A RELEVANT TOPIC, YES.

17  Q.   AND THE MOVE FROM A DIGRESSIVE LOAD LIMITER TO A REGULAR

18  LOAD LIMITER, WOULD THAT DECREASE THE STRENGTH OF THE TORSION

19  BAR IF YOU GO FROM LLD TO LL, 2.0 LL?

20  A.   I WOULDN'T EXPECT IT TO BECAUSE I'VE NEVER SEEN -- IT'S

21  NOT GOING TO GO BELOW TWO.  SO IT'S NOT GOING TO START AT TWO

22  AND GO SOMETHING BELOW THAT.  I'VE NEVER SEEN THAT.

23  Q.   OH, I'M SORRY.

24  A.   WHICH MEANS IT'S PROBABLY GOING TO START, IF IT WAS A

25  DIGRESSIVE, IT'S GOING TO START AT SOMETHING MORE ROBUST.  IN

1 THE CASE OF THE VOLVO, SIX.

2 Q.   RIGHT.

3 A.   BUT THREE OR FOUR OR FIVE OR WHATEVER.  AND THEN STEP DOWN

4 MAYBE AS FAR AS A TWO, BUT AGAIN, I HADN'T SEEN THAT BEFORE.

5 BUT I CAN'T ENVISION IT EVER GOING FROM A TWO TO SOMETHING

6 LESS.  I MEAN THAT WOULD -- YOU MAY AS WELL TAKE IT OFF.

7 Q.   JUST TO MAKE SURE MY QUESTION IS CLEAR, FROM THE

8 SUGGESTION THAT AUTOLIV MADE BASED ON THE DOCUMENT THAT YOU

9 HAVE SEEN IS AN LL DIGRESSIVE, A LOAD LIMITER DEGRESSIVE,

10 AUTOLIV SAID, HEY, MAZDA, LET'S GO TO THE REGULAR LOAD LIMITER,

11 NOT DIGRESSIVE?

12 A.   CORRECT.

13 Q.   AND SO MY QUESTION IS:  IF THEY ENDED UP AT A 2.0 FOR THE

14 REGULAR ONE, THE DIGRESSIVE ONE WOULD HAVE TO BE STRONGER,

15 CORRECT?

16 A.   I WOULD BELIEVE THAT'S TRUE, YES.

17 Q.   OKAY.  ALL RIGHT.  MR. MEYER, BASED ON THE DOCUMENT YOU'VE

18 SEEN, THEN, AUTOLIV IS SUGGESTING TO MAZDA TO MAKE THE TORSION

19 BAR AND THE SEATBELT LESS ROBUST, CORRECT?

20 A.   YES.

21 Q.   AND WHERE IS THE DOCUMENT THAT TELLS US WHY THIS HAPPENED

22 OR THAT IT HAPPENED, THE VA/VE?  WE DON'T HAVE THAT, RIGHT?

23 A.   CORRECT.

24 Q.   AND MAZDA ULTIMATELY ACCEPTED THAT SUGGESTION, CORRECT?

25 A.   THAT'S WHAT THEY PUT IN THE CAR.


UNITED STATES DISTRICT COURT

1  Q.   THAT'S WHAT WAS IN THE CAR SO WE KNOW THEY ACCEPTED IT,

2  RIGHT?

3  A.   YES.

4  Q.   SO THIS MOVE TO A LESS ROBUST TORSION BAR ALL STARTED WITH

5  AUTOLIV, AUTOLIV'S SUGGESTION, AUTOLIV VA/VE, CORRECT?

6  A.   ACCORDING TO THIS DOCUMENT, YES, SOMETIME BACK IN '01.

7  Q.   ALL RIGHT.  MR. MEYER, WHAT IS THE BATES NUMBER ON THAT

8  DOCUMENT THAT WE JUST TALKED ABOUT?

9  A.   AUTOLIV01051.

10 Q.   01051.  AND IT TALKS ABOUT A VA/VE.  BEFORE WE GOT

11 DOCUMENTS IN NOVEMBER 2018, DID WE HAVE ANY DOCUMENTS THAT TOLD

12 THE PLAINTIFF OR TOLD YOU AS AN ENGINEER WHAT A VA/VE EVEN WAS?

13 A.   NO.

14 Q.   DID YOU KNOW BEFORE NOVEMBER OF 2018 THAT A VA/VE WAS A

15 DOCUMENT WHERE AUTOLIV IS SUGGESTING DESIGN CHANGES TO MAZDA?

16 A.   NO.

17 Q.   SO THERE WAS NO WAY FOR THE PLAINTIFF TO KNOW, FOR YOU TO

18 KNOW, THAT AUTOLIV WAS INVOLVED IN MAKING A DESIGN SUGGESTION

19 THAT WEAKENED THE SEATBELTS IN THE MAZDA3 BEFORE NOVEMBER 2018?

20 A.   THAT'S CORRECT.

21 Q.   THAT WAS NOT BEFORE THE COURT ON THE MOTION FOR SUMMARY

22 JUDGMENT BACK IN 2016, CORRECT?

23 A.   WELL, I HAVE NO IDEA, BUT I CAN'T IMAGINE HOW IT COULD

24 HAVE BEEN.

25 Q.   GOTCHA.


UNITED STATES DISTRICT COURT

1          OKAY.  I WANT TO MOVE ON TO PLAINTIFF'S EXHIBIT 10,

2  WHICH IS THE STATEMENT OF WORK.

3  A.   OKAY.

4  Q.   I HANDED IT TO YOU WITH A PAGE OPENED AND SOME

5  HIGHLIGHTING.  HAVE YOU GOT THAT PAGE?

6  A.   I DO.

7          THE COURT:  MS. CANNELLA, LET ME JUST ASK ONE

8  QUESTION.  IF ANYBODY NEEDS TO BREAK OR ANYTHING, I AM FINE,

9  BUT SOMETIMES I HAVE BEEN ACCUSED OF GOING TOO LONG.  IS

10 EVERYBODY OKAY?

11         MR. SCRIBNER:  WE'RE GOOD.  THANK YOU, YOUR HONOR.

12         MS. CANNELLA:  ARE YOU OKAY?

13         THE WITNESS:  YES.  THANK YOU, YOUR HONOR.

14         MS. CANNELLA:  OKAY.

15         MR. BUTLER:  CAN WE BREAK FOR LUNCH AT SOME POINT?

16         THE COURT:  WE ARE GOING TO BREAK FOR LUNCH.  I

17 ASSURE YOU OF THAT, MR. BUTLER.

18         MR. BUTLER:  THANK YOU, YOUR HONOR.

19 BY MS. CANNELLA:

20 Q.   OKAY.  THE PORTION THAT I HAVE HIGHLIGHTED THERE IS UNDER

21 THE ROW -- WELL, LET ME BACK UP.  THIS IS A STATEMENT OF WORK,

22 CORRECT?

23 A.   IT IS.

24 Q.   HAVE YOU SEEN STATEMENTS OF WORK IN YOUR EXPERIENCE AS AN

25 ENGINEER?

UNITED STATES DISTRICT COURT

1   A.    YES.

2   Q.    WHAT DO THEY GENERALLY DO?

3   A.    THEY GENERALLY OUTLINE THE VARIOUS RESPONSIBILITIES

4   BETWEEN, IN MY WORLD, AN OEM MANUFACTURER AND/OR A COMPONENT

5   MANUFACTURER OR SUPPLIER OR SOMEONE OTHER THAN THE OEM.

6   Q.    OKAY.  SO THIS IS WHERE THE CAR MANUFACTURER TELLS THE

7   SUPPLIER WHAT ITS RESPONSIBILITIES ARE?

8   A.    YES.  IT'S AN AGREEMENT THAT OUTLINES WHO IS GOING TO DO

9   WHAT.

10  Q.    AND WHEN YOU SAY "OEM," THAT STANDS FOR?

11  A.    ORIGINAL EQUIPMENT MANUFACTURER.  I'M SORRY.  THAT'S THE

12  VEHICLE MANUFACTURER.  IN THIS CASE THAT WOULD BE MAZDA.

13  Q.    ALL RIGHT.  SO THIS IS A LONG DOCUMENT, ISN'T IT?

14  A.    YES.

15  Q.    AND IT LISTS A VARIETY OF THINGS THAT MAZDA IS SUPPOSED TO

16  DO AND THE FSS IS SUPPOSED TO DO?

17  A.    CORRECT.

18  Q.    FSS IS FULL SYSTEM SUPPLIER?

19  A.    FULL SERVICE SUPPLIER, I BELIEVE.

20  Q.    FULL SERVICE SUPPLIER.  THANK YOU.

21         AND WHO IS THAT WITH REGARD TO THE SEATBELT AND THE

22  OCCUPANT RESTRAINT SYSTEM?

23  A.    AUTOLIV.

24  Q.    OKAY.  AND UNDER -- ON PAGE 10 OUT OF 24 OF THE DOCUMENT I

25  AM LOOKING AT UNDER FSS IT SAYS ROLES, AUTHORITY AND

1  RESPONSIBILITY, CORRECT?

2  A.   YES.

3  Q.   OKAY.  AND THIS IS A DOCUMENT THAT'S BEEN CHECK TRANSLATED

4  FROM WHAT WE RECEIVED FROM AUTOLIV.  SO IT SAYS: "IN THE

5  EVENT" -- THAT FIRST BOX UP THERE SAYS: "IN THE EVENT THAT A

6  DEFECT OCCURS IN THE CONTRACTED TEST ITEMS, IT SHOULD BE

7  REPORTED TO MAZDA IMMEDIATELY."  MC IS MAZDA CORPORATION.  "THE

8  CAUSE SHOULD BE INVESTIGATED AND A COUNTERMEASURE SHOULD BE

9  PROPOSED AT THE SAME TIME IN ORDER TO OBTAIN APPROVAL FROM

10  MAZDA CORPORATION."

11          DID I READ THAT CORRECTLY?

12  A.   YOU DID.

13  Q.   OKAY.  AND THEN THE NEXT BOX SAYS: "IN THE EVENT THAT

14  THERE IS AN IMPACT ON THE CONTRACTED EVALUATION DUE TO A DEFECT

15  THAT OCCURS IN MAZDA CORPORATION'S EVALUATION REGION, THIS IS

16  TO BE PROMPTLY REPORTED TO MC, THE NECESSARY ADJUSTMENTS SHOULD

17  BE MADE TOGETHER WITH MC IN RELATION TO THE SUBSEQUENT

18  COUNTERMEASURES AND THE MATTER SHOULD BE HANDLED SO THAT THE

19  LEAST AMOUNT OF DAMAGE POSSIBLE IS CAUSED TO PRODUCT

20  DEVELOPMENT."

21          DID I READ THAT CORRECTLY?

22  A.   YOU DID.

23  Q.   AND THE DIFFERENCE BETWEEN THIS CHECK TRANSLATION, WHICH

24  WAS DONE BY THE SAME TRANSLATOR THAT AUTOLIV USED TO TRANSLATE

25  ITS DOCUMENTS FOR US THAT IT HAD TRANSLATED, THE DIFFERENCE

UNITED STATES DISTRICT COURT

1   THEN IS THAT INSTEAD OF THE WORD "DEFECT," THEY ARE USING THE

2   WORD "CONCERN" IN THE ORIGINAL DOCUMENT WE RECEIVED FROM

3   AUTOLIV, CORRECT?

4   A.   YES.

5   Q.   SO WHAT DOES THIS STATEMENT OF WORK, WHETHER IT SAYS

6   CONCERN OR DEFECT, WHAT DOES THIS TELL YOU ABOUT WHETHER

7   AUTOLIV HAD ANY DESIGN INPUT OR RESPONSIBILITY OR WHETHER IT

8   WAS ACTIVELY INVOLVED IN THE DESIGN OF THE DEFECTIVE SEATBELT?

9   A.   IT TELLS ME THAT THEY ABSOLUTELY DID AND IN FACT NOT ONLY

10  ARE THEY, AS WE HAVE ESTABLISHED WITH THE PRIOR DOCUMENTS,

11  DESIGNING THE ORIGINAL SEATBELT, THEY ARE ALSO TASKED WITH

12  DESIGNING THE COUNTERMEASURES IF A PROBLEM OCCURS, DEFECT OR

13  CONCERN OR OTHERWISE.  BUT THAT'S AN ALTERNATIVE DESIGN

14  PROCESS.  IN OTHER WORDS, THE COUNTERMEASURE IS A FIX.

15  Q.   DID YOU KNOW ABOUT THIS DOCUMENT BEFORE NOVEMBER 2ND,

16  2018?

17  A.   I HADN'T SEEN IT.  I WOULD HAVE ASSUMED THAT THERE WAS

18  ONE, BUT I HADN'T SEEN IT.

19  Q.   SO YOU DID NOT HAVE THE INFORMATION IN THIS STATEMENT OF

20  WORK UNTIL THE CASE GOT BACK FROM APPEAL AND WAS REOPENED AND

21  WE CONTACTED YOU TO LOOK AT IT AGAIN?

22  A.   CORRECT.

23  Q.   OKAY.

24  A.   THIS CAME WITH THE MOST RECENT PRODUCTION TO ME.

25  Q.   BUT IT WAS RELEVANT, IT WAS IMPORTANT TO WHO WAS INVOLVED


UNITED STATES DISTRICT COURT

 1  IN THE DESIGN, CORRECT?

 2  A.   ABSOLUTELY.  SURE.  THAT'S SOMETHING THAT YOU LOOK TO FOR

 3  THOSE ROLES, AUTHORITIES AND RESPONSIBILITIES.

 4  Q.   THE OTHER DOCUMENT THAT WE RECEIVED IN THE NOVEMBER 2018

 5  BATCH WAS A BASIC TRADING AGREEMENT; IS THAT RIGHT?

 6  A.   YES.

 7  Q.   AND DO YOU HAVE THAT IN FRONT OF YOU?

 8  A.   I DO.

 9  Q.   I APOLOGIZE.  I DON'T HAVE COPIES OF THAT ONE, BUT IT'S AN

10  EXHIBIT TO THE --

11          THE COURT:  YOU CAN GIVE IT TO ME LATER.  YOU CAN

12  GIVE IT TO ME LATER.

13          MS. CANNELLA:  OKAY.

14          THE WITNESS:  I HAVE IT.

15  BY MS. CANNELLA:

16  Q.   DID YOU FIND IT?

17  A.   I DID.

18  Q.   OKAY.

19  A.   SO I HAVE IT.

20  Q.   AND WHAT ABOUT THE BASIC TRADING AGREEMENT WAS IMPORTANT

21  TO YOUR OPINION THAT AUTOLIV WAS INVOLVED IN THE DESIGN OF THE

22  DEFECTIVE SEATBELT?

23  A.   IN THE BASIC TRADE AGREEMENT, PAGE NINE, THEY ARE TASKED

24  AS PARTY B AND IT DESCRIBES THAT THEY SHALL ENDEAVOR TO IMPROVE

25  THE UNIT PRICE, QUANTITY, FUNCTION AND PRODUCTION METHOD OF THE

1  DELIVERED ITEMS AND THAT THEY SHALL ACTIVELY CONDUCT NEW

2  TECHNICAL DEVELOPMENTS, PROPOSE IMPROVEMENTS AND PROVIDE

3  INFORMATION AND OTHER COOPERATION TO PARTY "A" TO ACHIEVE THIS.

4          IN OTHER WORDS, THE RELATIONSHIP IS SUCH THAT AUTOLIV

5  IS TASKED AND EXPECTED AND CERTAINLY HAS THE ABILITY TO CONDUCT

6  TECHNICAL DEVELOPMENTS, PROPOSE IMPROVEMENTS, EVALUATE QUALITY,

7  FUNCTION, ET CETERA.  THAT'S ALL PART OF THE DESIGN PROCESS, SO

8  AGAIN THIS IS MORE EVIDENCE THAT THEY ARE ACTIVELY INVOLVED IN

9  THE DESIGN PROCESS.

10 Q.  AND THAT DOCUMENT WE GOT IN NOVEMBER 2018 AS WELL?

11 A.  YES.

12 Q.  SO YOU COULDN'T INCLUDE THAT SPECIFIC LANGUAGE IN YOUR

13 OPINION BACK BEFORE THE CASE WAS ON APPEAL IN 2016?

14 A.  NO.  I HADN'T SEEN IT BACK THEN.

15 Q.  I WANTED TO MENTION ONE OTHER THING ABOUT THE VA/VE

16 PROPOSALS THAT WE ARE MISSING.

17          I AM GOING TO HAND YOU PLAINTIFF'S EXHIBIT,

18 PLAINTIFF'S HEARING EXHIBIT 126.

19          ON THE SECOND PAGE OF THAT DOCUMENT THERE IS A

20 HIGHLIGHTED SECTION AND THE SECOND SENTENCE SAYS -- WELL, LET

21 ME BACK UP.  THIS IS AN INTERNAL AUTOLIV BUSINESS TEAM UPDATE,

22 CORRECT?

23 A.  YES.

24 Q.  AND THIS IS THE AUTOLIV TEAM THAT'S ASSIGNED TO THE MAZDA

25 BUSINESS; IS THAT RIGHT?


                    UNITED STATES DISTRICT COURT

 1  A.    YES.

 2  Q.    OKAY.  AND SO THIS AGENDA OR MEMO THAT MEMORIALIZES WHAT

 3  AUTOLIV IS TALKING ABOUT INCLUDES A SECTION UNDER COST

 4  REDUCTION AND MARGIN IMPROVEMENTS AND IT SAYS THERE, THE SECOND

 5  SENTENCE, WE ARE PLANNING TO INVITE MAZDA ENGINEERS IN OUR HFO

 6  OFFICE TO INTRODUCE VA/VE IDEAS FOR THE J48C ON DECEMBER 24TH

 7  AND DECEMBER 25TH.

 8          DID I READ THAT CORRECTLY?

 9  A.    YOU DID.

10  Q.    THAT'S TWO DAYS OF MEETINGS ABOUT VA/VE PROPOSALS,

11  CORRECT?

12  A.    YES.

13  Q.    SO THAT SEEMS LIKE THAT'S PROBABLY A LOT OF PROPOSALS; IS

14  THAT RIGHT?  IS THAT FAIR?

15  A.    I WOULD THINK SO.

16  Q.    IT'S GOING TO TAKE TWO DAYS TO DISCUSS THEM?

17  A.    I WOULD THINK SO.

18  Q.    AND HOW MANY ACTUAL VA/VE PROPOSALS DO WE HAVE

19  DOCUMENTATION OF?  THREE, CORRECT, OF THE FORMS?

20  A.    YES.

21  Q.    ALL RIGHT, MR. MEYER.  THE LAST THING THAT I WANT TO TALK

22  TO YOU ABOUT IS THE ALTERNATIVE DESIGNS THAT YOU PROPOSED IN

23  THE CASE.  AND LET ME GET THIS.  FOR SOME REASON IT'S NOT

24  TALKING TO EACH OTHER.  ZOOM.

25          OH, GOT IT.  THANKS.


                    UNITED STATES DISTRICT COURT

1           AFTER YOUR INVESTIGATION IN THIS CASE IN WHICH YOU

2   CONCLUDED THAT THE SEATBELT DESIGN IS DEFECTIVE, DID YOU

3   CONSIDER WHETHER THERE WERE ALTERNATIVE DESIGNS TO THE ONE THAT

4   AUTOLIV USED IN THIS SEATBELT?

5   A.   YES.

6   Q.   AND DID YOU CONCLUDE THAT THERE WERE ALTERNATIVE DESIGNS?

7   A.   YES.

8   Q.   LET'S WALK THROUGH THEM ON THE SLIDES.  WHAT IS THE ONE

9   THAT WE SEE RIGHT HERE?

10  A.   THIS IS A LOAD LIMITER ALSO.  IT IS A -- NOT A TORSION BAR

11  DESIGN BUT IT IS A LOAD LIMITER.  AND IN THIS DESIGN, THE

12  RETRACTOR ITSELF, THE ENTIRE RETRACTOR IS ATTACHED TO WHAT

13  LOOKS KIND OF LIKE A LADDER, THAT VERTICAL PIECE THERE THAT

14  LOOKS LIKE A LADDER.

15          AND SO THOSE LITTLE TABS ARE CUT DOWN THE MIDDLE AND

16  THOSE TABS ARE INTENDED TO BEND OUT OF THE WAY.  SO THE WAY

17  THIS ONE IS DESIGNED IS THAT WHEN THE BELT LOCKS UP AND YOU

18  PULL ON THE BELT, WHEN THAT FORCE GETS TO A CERTAIN POINT, THAT

19  THRESHOLD, AND YOU WANT TO SPOOL BELT OUT TO LIMIT THE LOAD,

20  RATHER THAN TWISTING A TORSION BAR IT EFFECTIVELY TEARS THROUGH

21  THE METAL IN THAT LADDER.  SO WHAT HAPPENS IS THE ENTIRE

22  RETRACTOR IS ALLOWED TO MOVE UP, THE B-PILLAR WHERE IT'S

23  ATTACHED, AND IT MOVES UP.  AND AS IT MOVES UP, THEN, OF

24  COURSE, MORE BELT COMES OUT.

25          THE POINT OF THAT IS THAT IN THAT DESIGN, IT WILL

1  ONLY MOVE UP UNTIL IT HITS THE END OF THE LADDER.  SO IT IS A

2  GIVEN AMOUNT, A FINITE AMOUNT, AND THAT TURNS OUT TO BE SIX

3  INCHES.  SO THAT DESIGN OF LOAD LIMITER, AGAIN, WE COULD

4  CONTROL THAT FORCE ANY WAY WE WANTED TO; HOWEVER, WE DESIGNED

5  THE LADDER AND HOW MUCH FORCE IT TAKES TO TEAR THROUGH THERE.

6          BUT THE POINT THAT I AM MAKING HERE IS THAT THAT IS A

7  LIMIT.  IT ONLY WILL GO SIX INCHES BECAUSE THERE IS NO TORSION

8  BAR IN THERE.  SO THAT IS A DIFFERENT DESIGN ALTOGETHER THAT IS

9  A LOAD LIMITER, PROVIDES THE SIMILAR LOAD LIMITER BENEFITS BUT

10 ONLY TO SIX INCHES, ONLY TO A GIVEN AMOUNT, AT WHICH POINT IT

11 WON'T LET OUT ANY MORE.

12 Q.   SO YOU CAN GET THAT BENEFIT OF LESS PRESSURE ON YOUR CHEST

13 BUT YOU CAN ALSO PUT A STOP ON IT THAT SAYS NO MORE THAN SIX

14 INCHES?

15 A.   RIGHT.

16 Q.   OKAY.

17 A.   AT SOME POINT WE HAVE TO STOP YOU.

18 Q.   AT SOME POINT REDUCING YOUR CHANCE OF A RIB FRACTURE IS

19 NOT WORTH SMASHING YOUR SKULL, CORRECT?

20 A.   AT SOME POINT THE HEAD AND NECK IS MORE VULNERABLE THAN

21 THE CHEST.  THE CHEST HAS ALL THAT -- A LOT OF SKELETAL

22 STRUCTURE ACROSS IT.  IT'S A MORE DIFFUSE SPREADING OF THE

23 FORCE.  IT'S DESIGNED IN A MUCH BETTER WAY TO TAKE THAT.  BUT

24 AT SOME POINT, WE HAVE TO SAY NO MORE.

25 Q.   AND HOW ABOUT THIS NEXT SLIDE, WHAT'S A FORCE PLATE LOAD

1   LIMITER?

2   A.   SO THE FORCE PLATE IS A WAY TO -- THIS STILL ALLOWS THE

3   SHAFT TO TURN.  SO THIS STILL HAS A TORSION BAR, IF YOU WILL.

4   SO THIS SHAFT STILL TURNS INSIDE THE RETRACTOR, BUT THERE IS

5   THIS DEVICE AND THE NEXT SLIDE WILL KIND OF DEMONSTRATE IT.

6           SO HERE IS THAT DEVICE, THIS RED THING.  SO WHAT

7   HAPPENS IS AS THE BAR OR THE SPOOL TURNS, THE PIECE OF METAL

8   THAT WAS THAT IN HERE AS DEPICTED IN RED TWISTS AROUND UNTIL

9   EVENTUALLY YOU RUN OUT OF THAT AND THAT STOPS IT FROM TURNING.

10  SO ANOTHER WAY TO SAY, OKAY, WE ARE GOING TO ALLOW THE SHAFT TO

11  TURN, BUT WE ARE GOING TO STOP IT AT A CERTAIN POINT.  WE ARE

12  ONLY GOING TO ALLOW IT TO TURN ONE REVOLUTION OR TWO

13  REVOLUTIONS AND THAT IS A MECHANICAL WAY TO SAY I NOW CAN'T

14  TWIST THAT, I'VE RUN OUT OF THAT LEASH, SO TO SPEAK, AND NOW I

15  AM AT THE END OF MY ROPE AND NO MORE.

16  Q.   OKAY.  HOW ABOUT THIS ONE, THE TORSION BAR WITH A TUNABLE

17  MECHANICAL STOP?

18  A.   THIS IS ANOTHER WAY TO DO IT AND THIS ONE IS TUNABLE

19  BECAUSE -- THEY ARE ALL TUNABLE, BUT THIS ONE IS VERY EASILY

20  TUNABLE BECAUSE THIS IS -- HERE IS YOUR TORSION BAR HERE, RIGHT

21  HERE.  AND THIS IS THE -- THIS PART RIGHT THERE IS THE PART

22  THAT'S GOING TO TURN THAT SHAFT.  WELL, THIS IS INSERTED AND

23  CONNECTED TO THIS.  WE ARE GOING TO CALL THAT A BOLT, OKAY?

24  BECAUSE IT'S GOT THREADS ON IT.  SO THINK OF THAT AS A BOLT.

25  THIS COLLAR RIGHT HERE, THIS COLLAR, THINK OF THAT AS THE NUT,

1  OKAY?  AND THAT'S GOING TO THREAD ONTO THE BOLT.

2        SO WHAT HAPPENS IS WHEN YOU START, THERE IS A GAP

3  HERE BETWEEN THE NUT, WHICH IS HERE, AND THE BOLT END, WHICH IS

4  THERE.  AS THE TORSION BAR TWISTS -- AND THAT'S A LITTLE PIECE

5  OF TWINE THAT I PUT IN THERE SO I WAS TRYING TO DEMONSTRATE

6  THAT TWISTING.  AS THE TORSION BAR TWISTS, THE BOLT TURNS ON

7  THE NUT.  THE NUT STAYS FIXED.  YOU CAN TURN IT UNTIL IT

8  BOTTOMS OUT.  SO IT WOULD BE LIKE YOU TOOK THE NUT AND YOU PUT

9  IT ALL THE WAY TO THE END OF THE BOLT.  NOW IT WON'T TURN ANY

10 MORE.  IT'S TUNABLE BECAUSE I CAN SET THAT GAP AT WHATEVER I

11 WANT.  IF I WANT IT TO TURN SIX TIMES, I CAN PUT THE NUT FAR

12 AWAY AND ALLOW IT TO TURN SIX TIMES.  IF I WANT IT TO TURN

13 THREE TIMES, I CAN PUT IT A LITTLE CLOSER SO IT JUST TURNS

14 THREE TIMES.  IF I WANT TO IT TO TURN JUST ONCE, I CAN PUT IT

15 REAL CLOSE AND THEN IT JUST TURNS ONCE.  AND THAT'S WHAT MAKES

16 IT TUNABLE.

17        SO IT'S REALLY JUST A FUNCTION OF -- IT'S VERY

18 SIMPLE.  YOU JUST ADJUST THAT INITIAL GAP AND PLACEMENT TO

19 WHATEVER, HOWEVER NUMBER OF TURNS YOU WANT TO ALLOW.  USUALLY

20 IT'S ABOUT SIX INCHES OF BELT SPOOL-OUT PER TURN.  SO IF WE LET

21 THE WHOLE THING GO ONCE, SIX INCHES; TWICE, 12; THREE, 18.  IN

22 OUR CASE, 20 IS ABOUT THREE AND A HALF, WHICH IS WHAT I WAS

23 TESTING WHEN I LOOKED AT THAT ANGLE.

24        SO THESE ARE ALL DEVICES THAT WILL ALLOW THE LIMITING

25 OF THE LOAD BUT PUT INTO IT SO IT DOESN'T GO UNTIL YOU RUN OUT

1  OF WEBBING, WHICH IS THE WAY THIS ONE IS DESIGNED.  THIS ONE

2  DOESN'T HAVE ANY OF THOSE FEATURES SO IT WOULD LITERALLY GO

3  UNTIL THERE NO MORE WEBBING ON THE SPOOL OR, IN MR. ANDREWS'

4  CASE, UNTIL HE HITS THE STEERING WHEEL.

5  Q.   AND LET ME ASK YOU THIS AND THIS IS IMPORTANT FOR THIS

6  CASE:  THE TORSION BAR WITH THE TUNABLE MECHANICAL STOP, CAN

7  YOU TUNE IT OR ADJUST IT IN A WAY TO ONLY GET SIX INCHES OF

8  SPOOL-OUT?

9  A.   OF COURSE.

10  Q.   OKAY.  CAN YOU DO THAT WITH THE FORCE PLATE LOAD LIMITER

11  TO ONLY GET SIX INCHES?

12  A.   ABSOLUTELY.

13  Q.   CAN YOU DO THAT WITH THE LADDER-TYPE LOAD LIMITER?

14  A.   EXACTLY, AND THAT ONE IS LIMITED TO SIX.

15  Q.   AND HOW MUCH SPOOL-OUT DID THE VOLVO GET IN THESE NCAP

16  TESTS?

17  A.   SIX AND A HALF.

18  Q.   6.3, CORRECT?

19  A.   YES.

20  Q.   SO BASICALLY THE SAME SPOOL-OUT YOU GOT WITH THE VOLVO,

21  YOU COULD HAVE USED ANY OF THESE ALTERNATIVE DESIGNS TO GET

22  THAT SAME SIX INCHES?

23  A.   YES.  NOW, THE VOLVO DIDN'T DO IT WITH A STOP.  THEY DID

24  IT WITH A STRONGER BAR.

25  Q.   THAT'S A GOOD POINT.  SO ANOTHER ONE OF YOUR ALTERNATIVE


UNITED STATES DISTRICT COURT

1  DESIGNS IS TO MAKE THE TORSION BAR STRONGER?

2  A.   YES.

3  Q.   AND THE DESIGN PURPOSE OF MAKING A STRONGER TORSION BAR IS

4  TO REDUCE SEATBELT PAY-OUT; IS THAT FAIR?

5  A.   YES.  IT'S TO REDUCE THE FORWARD EXCURSION AND REDUCE --

6  AND REDUCE THE POTENTIAL AND PROBABILITY OF INJURIOUS CONTACT.

7  SO IT'S TO HOLD THE OCCUPANT BACK.  THAT'S THE PURPOSE.  THE

8  STRONGER THE TORSION -- THE STRONGER TORSION BAR IS INTENDED,

9  FUNDAMENTALLY DESIGNED TO HOLD THE OCCUPANT AND PROVIDE BETTER

10 RESTRAINT AND KEEP THEM FURTHER AWAY FROM THE STRUCTURE IN

11 FRONT OF THEM.

12 Q.   AND SO WHETHER YOU DO IT WITH A STRONGER TORSION BAR OR A

13 MECHANICAL STOP YOU DESIGN THESE SEATBELTS THESE WAYS TO LIMIT

14 THAT EXCURSION, CORRECT?

15 A.   YES.

16 Q.   AND TOTALLY APART FROM THE ALTERNATIVE DESIGN LABEL, WE'LL

17 SAY, WHAT OTHER MANUFACTURERS ARE DOING AT THE SAME TIME THAT

18 AUTOLIV IS SELLING THIS SEATBELT BOTH -- OR TO MAZDA AND

19 SELLING A DIFFERENT SEATBELT TO VOLVO, ALL OF THOSE CARS ON

20 THAT CHART, THE PERFORMANCE THAT WE SEE THERE IS RELEVANT TO

21 HOW REASONABLE OR UNREASONABLE AUTOLIV WAS IN MANUFACTURING

22 THIS SEATBELT.  IS THAT FAIR?

23 A.   YES.

24 Q.   SO YOU CAN'T UNDERSTAND HOW EXTREME OF AN OUTLIER THE

25 AUTOLIV SEATBELT IN THE MAZDA WAS UNLESS YOU UNDERSTAND THAT IN

UNITED STATES DISTRICT COURT

1  THE VOLVO THERE WAS SIX INCHES OF SPOOL-OUT AND IN THE CAVALIER
2  THERE WAS FOUR INCHES OF SPOOL-OUT AND IN THE CIVIC WE HAD
3  ABOUT FOUR AND A HALF.  IS THAT A FAIR STATEMENT?  IN ORDER TO
4  UNDERSTAND HOW BAD THE SEATBELT WAS YOU NEED TO KNOW ABOUT ALL
5  THESE OTHER SEATBELTS?
6  A.   YES, I THINK THAT'S FAIR.
7       THE OTHER PART OF THE THING THAT I LOOK AT IS, IS
8  THERE ANY REASON FOR THAT RED LINE TO BE SO LONG?  AND THERE IS
9  NOT, BECAUSE WHEN WE LOOK AT THE OTHER ONES, THE OTHER ONES ARE
10  PROVIDING GOOD SAFETY WITH MUCH LESS.  SO WHY IN THE WORLD --
11  AND I CONSIDERED THAT QUESTION, IS THERE ANY BASIS OR RATIONALE
12  TO ALLOW THAT TO HAPPEN?  AND THERE ISN'T.  IT ONLY, ONLY MAKES
13  FOR A RISK.  THERE IS NO BENEFIT THERE.
14       MS. CANNELLA:  THAT'S ALL I HAVE, YOUR HONOR.
15       THE COURT:  MR. SCRIBNER, NO OBJECTION TO ANY OF THE
16  EXHIBITS THAT CAME IN?
17       MR. SCRIBNER:  NO, SIR.
18       THE COURT:  I WAS PLANNING ON BREAKING FOR LUNCH AT
19  12:15.  I DID NOT STOP PLAINTIFF FROM PUTTING FORTH HER WHOLE
20  CASE UNINTERRUPTED.  IT MIGHT BE FAIRER IF WE START YOUR CROSS
21  AFTER LUNCH UNLESS YOU THINK YOU CAN DO IT IN A SHORTER PERIOD
22  OF TIME.
23       MR. SCRIBNER:  I CAN DO IT PRETTY QUICKLY.  I AM NOT
24  SURE ABOUT 15 MINUTES.
25       THE COURT:  20?

UNITED STATES DISTRICT COURT

1            MR. SCRIBNER:  YES.  YOU CAN GIVE ME THE LOOK.

2            THE COURT:  I'LL TELL YOU WHAT.  WE'LL GO UNTIL

3  12:30.

4            MR. SCRIBNER:  THANK YOU, YOUR HONOR.

5            THE COURT:  IS EVERYBODY OKAY BODY-WISE FOR 30 MORE

6  MINUTES?

7            MS. CANNELLA:  YES, YOUR HONOR.

8            THE COURT:  OKAY.

9            MR. BUTLER:  YOUR HONOR, ONE POINT.  I'VE GOT THE

10  EXHIBIT NUMBER FOR THAT BASIC TRADING AGREEMENT THAT WE FAILED

11  TO BRING WITH US.  IT'S PLAINTIFF'S EXHIBIT NUMBER 54 AND YOUR

12  HONOR SAID WE COULD SUBMIT IT LATER.

13            WE CAN BRING FOUR COPIES DOWN TO THE COURT.  HOW

14  WOULD YOU LIKE FOR US TO SUBMIT THAT?

15            THE COURT:  WHAT'S THE EASIEST?  YOU ALL CAN EMAIL IT

16  TO ME OR YOU CAN BRING IT TO ME.  WHAT IS EASIER FOR YOU TO GET

17  IT TO ME?

18            MR. BUTLER:  WE CAN EMAIL IT TO MS. WRIGHT.  IT'S 10

19  OR 15 PAGES.

20            THE CLERK:  DOES IT HAVE ANY COLOR?

21            MS. CANNELLA:  NO, MA'AM.

22            THE CLERK:  OKAY.  BLACK AND WHITE.

23            THE COURT:  JUST EMAIL IT TO US.

24            MR. BUTLER:  OKAY.  THANK YOU, YOUR HONOR.

25            MS. CANNELLA:  THANK YOU.


                    UNITED STATES DISTRICT COURT

```
1              THE COURT:  THAT'S 54?

2              MR. BUTLER:  54, YES, YOUR HONOR.

3              THE COURT:  THANK YOU.

4              YOU MAY PROCEED, SIR.

5              MR. SCRIBNER:  THANK YOU, YOUR HONOR.

6                          CROSS-EXAMINATION

7   BY MR. SCRIBNER:

8   Q.   MR. MEYER, GOOD TO SEE YOU AGAIN.

9   A.   HELLO.

10  Q.   THE JUDGE ASKED YOU ABOUT INDUSTRY STANDARDS.  DO YOU

11  RECALL THAT?

12  A.   YES.

13  Q.   YOU WOULD AGREE THAT YOU HAVE NEVER DESIGNED AN AIRBAG FOR

14  COMMERCIAL USE, TRUE?

15  A.   THAT'S CORRECT.

16  Q.   YOU'VE NEVER DESIGNED A SEATBELT FOR COMMERCIAL USE, TRUE?

17  A.   THAT'S CORRECT.

18  Q.   YOU'VE NEVER DESIGNED AN OCCUPANT RESTRAINT SYSTEM FOR

19  COMMERCIAL USE, TRUE?

20  A.   THAT'S CORRECT.

21  Q.   I LOOKED AT THE DISCLOSURES IN THIS CASE, MR. MEYER, AND

22  IT SAID YOU ARE AN EXPERT IN THE AREAS OF OCCUPANT CRASH

23  PROTECTION AND RESTRAINT SYSTEM DESIGN AND ANALYSIS; IS THAT

24  TRUE?

25  A.   IT IS.
```

UNITED STATES DISTRICT COURT

1  Q.   ONCE UPON A TIME THERE WAS A DIFFERENT BIOMECHANIC WITH A

2  MEDICAL DEGREE.  DO YOU RECALL THAT?

3  A.   YES.

4  Q.   HE IS NO LONGER IN THIS CASE, TRUE?

5  A.   AGREED.

6  Q.   AND SO HE HAS BEEN REPLACED BY DR. ZIEJEWSKI, TRUE?

7  A.   YES.

8  Q.   AND YOU REVIEWED HIS MATERIALS, CORRECT?

9  A.   YES.

10 Q.   PLAINTIFFS HAVE IDENTIFIED HIM AS A BIOMECHANICAL ENGINEER

11 AND AN EXPERT IN THE FIELDS OF INJURY CAUSATION, OCCUPANT

12 KINEMATICS AND BIOMECHANICS IN MOTOR VEHICLE COLLISIONS.  DO

13 YOU AGREE WITH THAT?

14 A.   I DO.

15 Q.   AND THAT'S DIFFERENT FROM WHAT YOUR TESTIMONY IS IN THIS

16 CASE, TRUE?

17 A.   YES, I BELIEVE IT IS.

18 Q.   ALL RIGHT.  YOU ARE NOT A MEDICAL DOCTOR, TRUE?

19 A.   I AM NOT.

20 Q.   THE AIRBAG IN THIS CASE DID NOT DEPLOY, TRUE?

21 A.   CORRECT.

22 Q.   AND WE CAN ALL AGREE THAT IN A VEHICLE IMPACT OF THIS

23 MAGNITUDE, IT SHOULD DEPLOY, TRUE?

24 A.   I THINK WE CAN, YES.

25 Q.   AND YOU WOULD AGREE THAT ALL OF THE FEDERAL TESTS THAT YOU

UNITED STATES DISTRICT COURT

1  HAVE BEEN TALKING ABOUT FOR QUITE SOME TIME INVOLVE THE

2  DEPLOYMENT OF AN AIRBAG, TRUE?

3  A.   YES, THEY ALL DEPLOYED.

4  Q.   BECAUSE WE EXPECT THAT IN A --

5  A.   IN ALL CASES.

6  Q.   I'M SORRY.  NOT TO INTERRUPT.  GO AHEAD.

7  A.   THEY DEPLOYED IN ALL OF THE CASES, YES.

8  Q.   BECAUSE WE EXPECT THAT IN A 35-MILE-PER-HOUR CRASH,

9  CORRECT?

10  A.   WE HOPE.

11  Q.   WE EXPECT IT, TRUE?

12  A.   WE HOPE.  YOU MAY EXPECT IT.  I RECOGNIZE IT DOESN'T

13  ALWAYS HAPPEN, BUT WE HOPE IT DOES, YES.

14  Q.   WELL, THE FEDERAL GOVERNMENT REQUIRES TESTING THAT

15  INVOLVES THE DEPLOYMENT OF AN AIRBAG, TRUE?

16  A.   OF COURSE.

17  Q.   THEY DON'T HAVE ANY TEST AT 35 MILES AN HOUR WHERE THE

18  AIRBAG DOESN'T DEPLOY, DO THEY?

19  A.   NO.

20          MR. SCRIBNER:  ALL RIGHT.  YOUR HONOR, MAY I

21  APPROACH?

22          THE COURT:  YES, SIR.

23          MR. SCRIBNER:  DO YOU NEED MORE WATER?

24          THE WITNESS:  NO.  I'M GOOD.  THANKS.

25          THE COURT:  THANK YOU.


                    UNITED STATES DISTRICT COURT

1          MR. SCRIBNER:  THANK YOU.

2          THE WITNESS:  I HAVE TO MAKE IT UNTIL 12:30,

3   APPARENTLY.

4   BY MR. SCRIBNER:

5   Q.   ALL RIGHT.  I HAVE HANDED YOU A COPY OF YOUR REPORT.

6   A.   YES.

7   Q.   AND THIS IS THE REPORT YOU PREPARED EARLIER IN THE CASE

8   BEFORE THE DOCUMENTS WERE PRODUCED RECENTLY, CORRECT?

9   A.   CORRECT.  THIS WAS PREPARED NOVEMBER 6, 2005.

10  Q.   ALL RIGHT.  NOW, I'D LIKE TO CALL YOUR ATTENTION, SIR, TO

11  PAGE 19 OF THAT REPORT.

12  A.   I HAVE IT.

13  Q.   YOU SAY:  "IMPORTANTLY, THE AIRBAG AND SEATBELT HAVE TO BE

14  MATCHED OR TUNED PROPERLY TO WORK TOGETHER FOR EFFECTIVE

15  OCCUPANT RESTRAINT, OTHERWISE TOO MUCH OCCUPANT EXCURSION MAY

16  RESULT IN OCCUPANT INJURIES."  AND THAT'S YOUR OPINION TODAY,

17  CORRECT?

18  A.   YES.

19  Q.   YOU'VE GOT TO TUNE THAT AIRBAG AND SEATBELT, CORRECT?

20  A.   YES.

21  Q.   THEY'VE GOT TO WORK TOGETHER, CORRECT?

22  A.   YES.

23  Q.   "ALTHOUGH BELT SPOOL-OUT CAN LIMIT BELT-INDUCED CHEST

24  LOADS, IT STILL CORRESPONDINGLY RESULTS IN INCREASED OCCUPANT

25  EXCURSIONS."

UNITED STATES DISTRICT COURT

1            DO YOU SEE THAT?

2  A.   I DO.

3  Q.   IN OTHER WORDS, THE HIGHER THE THRESHOLD, THE LESS FORWARD

4  EXCURSION BUT MORE BELT FORCE.  CAN WE AGREE ON THAT?

5  A.   YES.

6  Q.   "IN THE FRONTAL CRASH MODE THIS ADDITIONAL EXCURSION IS A

7  FUNCTION OF THE LOAD LIMITER DESIGN AND IS ALWAYS EXPECTED TO

8  BE MANAGED BY THE FRONTAL AIRBAG."  IS THAT YOUR OPINION?

9  A.   YES.

10  Q.   YOU AGREE WITH THAT?

11  A.   YES.

12  Q.   DID YOU REVIEW THE EXPERT TESTIMONY FROM MR. CARUSO?

13  A.   NOT RECENTLY.

14  Q.   HE IS THE PLAINTIFF'S AIRBAG EXPERT.  DID YOU REVIEW IT

15  EVER?

16  A.   I THINK I HAVE LOOKED AT IT BUT I DON'T RECALL IT AS I SIT

17  HERE.

18  Q.   DO YOU KNOW WHY HE SAYS THE AIRBAG FAILED TO DEPLOY?

19  A.   PROBABLY, BUT I'M NOT REAL SURE, SO --

20  Q.   CAN WE AGREE THAT --

21  A.   I MEAN HE HAD, HE HAD AN EXPLANATION, BUT I DON'T WANT TO

22  MISSPEAK AND ATTRIBUTE SOMETHING TO HIM THAT IS INACCURATE.

23  Q.   I DON'T WANT YOU TO GUESS.

24            WE CAN AGREE IT WASN'T AUTOLIV'S FAULT, CORRECT?

25  A.   I DON'T RECALL.

UNITED STATES DISTRICT COURT

1    Q.    YOU JUST DON'T KNOW?

2    A.    I DON'T RECALL.

3    Q.    OKAY.

4    A.    IT WAS AN ELECTRONIC ISSUE.

5    Q.    ELECTRONIC ISSUE?

6    A.    RIGHT.

7    Q.    FAILURE TO SEND A SIGNAL TO DEPLOY TO THE ACTUAL AIRBAG,

8    CORRECT?

9    A.    ELECTRONIC ISSUE.  IT COULD BE THAT.  IT COULD BE A

10   SENSOR.  I DON'T -- THE DETAILS I JUST DON'T RECALL.

11   Q.    OKAY.  NOT IMPORTANT TO YOUR OPINIONS?

12   A.    I MEAN I RECOGNIZE IT DIDN'T DEPLOY.  WE TALKED ABOUT

13   THAT.

14   Q.    RIGHT.  THE AIRBAG AND SEATBELT ARE SUPPOSED TO WORK

15   TOGETHER.  YOU TOLD ME THAT, CORRECT?

16   A.    SURE.

17   Q.    BUT YOU DON'T CARE WHY THE AIRBAG DIDN'T DEPLOY; ISN'T

18   THAT RIGHT?

19   A.    NO.  I THINK THAT'S -- THE APPROACH THAT I TOOK IS WE

20   RECOGNIZE THE AIRBAG DIDN'T DEPLOY.  THE QUESTION THAT BECOMES

21   IMPORTANT IS WHETHER OR NOT WE CAN ONE HUNDRED PERCENT RELY

22   UPON THAT DEVICE TO ALWAYS BE THERE WHEN WE MAKE THE DECISIONS

23   WE MAKE IN THE SEATBELT.  I DON'T BELIEVE THAT'S A FAIR

24   ASSUMPTION TO MAKE.

25              HAVING SAID THAT, WHEN I LOOK AT THIS SEATBELT, WHAT

UNITED STATES DISTRICT COURT

1   BECOMES CLEAR WITH THAT AMOUNT OF PAY-OUT IS THERE IS NO WAY

2   THAT THIS SEATBELT WILL PROVIDE ANY PROTECTION, THE SHOULDER

3   BELT, WITHOUT THE AIRBAG, AND THAT, I BELIEVE, IS NOT A

4   REASONABLE TRADEOFF.

5   Q.   THE FOCUS OF YOUR WORK?

6   A.   YES.

7   Q.   THERE IS THIS TRADEOFF.  YOU JUST THINK IT WAS AN

8   UNREASONABLE DECISION WITH RESPECT TO A TWO-KILONEWTON

9   THRESHOLD, CORRECT?

10   A.   WELL, YEAH.  THERE'S 17 INCHES EVEN WITH THE AIRBAG, SO

11   THAT'S STILL A GROSS AMOUNT OF EXCURSION.

12   Q.   THAT'S WHAT I WANT TO TALK ABOUT.  GO TO PAGE 24 OF YOUR

13   REPORT, PLEASE.  AND THAT IS A TABLE THAT I THINK YOU DISCUSSED

14   WITH MS. CANNELLA EARLIER TODAY, CORRECT?

15   A.   YES.

16   Q.   AND YOU FOCUSED ON THE FACT THAT THE BELT PAY-OUT WAS

17   HIGHEST FOR THE MAZDA3, CORRECT?

18   A.   YES.

19   Q.   AND WE CAN AGREE IT'S LOWER FOR THE VOLVO S40 AT THE

20   BOTTOM OF THE PAGE, CORRECT?

21   A.   WE CAN.

22   Q.   WE CAN ALSO AGREE THAT THE SHOULDER BELT LOAD IS MUCH

23   HIGHER FOR THE VOLVO, CORRECT?

24   A.   YES.

25   Q.   THAT'S THE TRADEOFF, CORRECT?

1  A.   THAT'S RIGHT.

2  Q.   AND THAT THRESHOLD, THAT SHOULDER BELT LOAD IS WITH AN

3  AIRBAG, CORRECT?

4  A.   AGREED.

5  Q.   THAT NUMBER WOULD BE HIGHER WITHOUT AN AIRBAG, CORRECT?

6  A.   NO.

7  Q.   YOU DON'T BELIEVE THAT?

8  A.   I DON'T BELIEVE THAT.

9  Q.   OKAY.

10  A.   I THINK THAT LOAD IS CONTROLLED BY THE LOAD LIMITER.  THE

11  LOAD LIMITER IS WHAT'S LIMITING THE LOAD.  IT'S NOT THE AIRBAG.

12  Q.   AND IT'S A SIX-KILONEWTON LOAD LIMITER?

13  A.   RIGHT.

14  Q.   AND AUTOLIV SUPPLIED IT, CORRECT?

15  A.   YES.

16  Q.   AND ONE OF THE THINGS, THE ONLY THING, ACTUALLY, IN THE

17  ENTIRETY OF YOUR TESTIMONY THAT I WROTE DOWN, YOU SAID THAT WAS

18  VOLVO'S DECISION, CORRECT?

19  A.   IT WAS VOLVO'S DECISION TO WHAT?

20  Q.   TO USE A SIX-KILONEWTON THRESHOLD.

21  A.   I ASSUMED THEY WERE IN PART OF THE DECISION, YES, I MEAN

22  ULTIMATELY.

23  Q.   EARLIER YOU SAID IT WAS VOLVO'S DECISION.  DO YOU RECALL

24  THAT?

25  A.   I DON'T RECALL THAT.  I THINK IT WAS, I THINK IT WAS

UNITED STATES DISTRICT COURT

1  MS. CANNELLA'S QUESTION THAT SAID -- AND SHE MAY HAVE SAID THAT

2  WAS VOLVO'S DECISION.

3  Q.   OKAY.  DO YOU HAVE IN FRONT OF YOU, SIR, PLAINTIFF'S

4  HEARING EXHIBIT 74?

5  A.   YES.

6          MR. SCRIBNER:  YOUR HONOR, DO YOU HAVE THAT WITH YOU?

7          THE COURT:  YES.

8          MR. SCRIBNER:  THANK YOU.

9  BY MR. SCRIBNER:

10  Q.   THERE WAS A DISCUSSION ABOUT THIS IS ONE OF THE RECENTLY

11  PRODUCED DOCUMENTS, CORRECT?

12  A.   I BELIEVE SO, YES.

13  Q.   NOW, NONE OF THIS SAYS MAZDA ON IT, CORRECT?  IT TALKS

14  ABOUT CUSTOMER SPECIFICATIONS FOR A BMW, A ROVER AND AN OPEL,

15  CORRECT?

16  A.   AGREED.

17  Q.   AND YOU WOULD ALSO AGREE THAT WHEN YOU TAKE ISSUE WITH

18  THIS PARTICULAR DESIGN, YOU ARE NOT TAKING ISSUE WITH ANYTHING

19  ON THIS PAGE EXCEPT THAT PART THAT TALKS ABOUT LOAD LIMITERS;

20  ISN'T THAT TRUE?

21  A.   YES.

22  Q.   IN OTHER WORDS, YOU'VE NEVER CRITICIZED THE USE OF A LOAD

23  LIMITER, CORRECT?

24  A.   CORRECT.

25  Q.   YOU'VE NEVER CRITICIZED ANY OF THESE DRAWINGS, CORRECT?

1  A.   CORRECT.

2  Q.   CONCEPTUALLY, YOU DON'T HAVE A PROBLEM WITH THE LOAD

3  LIMITER, CORRECT?

4  A.   CORRECT.

5  Q.   AND WE CAN AGREE THAT THIS DOCUMENT SHOWS THAT AUTOLIV

6  WILL SUPPLY IT IN A TWO, THREE, AND A FOUR AND A HALF, CORRECT?

7  A.   YES.

8  Q.   AND THEN ULTIMATELY THE OEM MAKES ITS SELECTION, CORRECT?

9  A.   PERHAPS IN SOME CASES.  IN THIS CASE, OBVIOUSLY, AUTOLIV

10 HAD A WORKING ARRANGEMENT IN MAKING THAT DECISION.

11 Q.   DID AUTOLIV MAKE THAT DECISION, SIR?

12 A.   THEY MADE THE DECISION TO OFFER THE TWO-KILONEWTON, WHICH

13 I THINK IN AND OF ITSELF IS PROBLEMATIC.  I THINK THAT'S WHERE

14 THEY WENT WRONG.  THE TWO-KILONEWTON SHOULDN'T BE OFFERED FOR

15 ANY VEHICLE EVER.

16 Q.   THANK YOU FOR THAT.  JUST OFFERING IT IS A PROBLEM.  BUT

17 YOU ARE NOT SUGGESTING THAT AUTOLIV MADE THE DECISION TO PUT A

18 TWO-KILONEWTON THRESHOLD INTO THE 2005 MAZDA, CORRECT?

19 A.   WELL, WHAT I AM SAYING IS THEY DID MORE THAN OFFER IT.

20 THEY MANUFACTURED IT AND SOLD IT AND PROFITED FROM IT AND I

21 THINK THAT WAS UNREASONABLE.  THAT IS A DEFECTIVE SEATBELT.

22 Q.   CAN WE AGREE ON THIS:  MAZDA HAS SMART ENGINEERS, CORRECT?

23 A.   YES, I BELIEVE THEY DO.

24 Q.   I DON'T HAVE AN ENGINEERING DEGREE AND I AM BARELY GOOD AT

25 MATH, BUT EVERYTHING THAT YOU JUST SAID ABOUT FORWARD MOVEMENT

1  AND EXCURSION, WE ALL UNDERSTAND IT, DO WE NOT?

2  A.   YES, AS DOES AUTOLIV.

3  Q.   AS DOES AUTOLIV.  IN OTHER WORDS, IF YOU WANT TO REDUCE

4  THAT FORWARD EXCURSION, YOU CAN INCREASE THAT THRESHOLD,

5  CORRECT?

6  A.   ABSOLUTELY.

7  Q.   CAN WE AGREE THAT THE ENGINEERS AT MAZDA KNOW THAT BASIC

8  PRINCIPLE?

9  A.   I WOULD ASSUME THAT THEY DO.  I BELIEVE THEY --

10  Q.   LET ME HAND YOU EXHIBIT 2, SIR.

11        MR. SCRIBNER:  MAY I APPROACH?

12        THE COURT:  YES, SIR.

13  BY MR. SCRIBNER:

14  Q.   ARE YOU FAMILIAR WITH THESE DOCUMENTS?

15  A.   I'M -- I'VE JUST REVIEWED THEM.

16  Q.   SURE.  TAKE YOUR TIME.

17        MR. BUTLER:  JUST FOR THE RECORD THIS IS -- EXHIBIT 2

18  IS FOUR DIFFERENT MINUTES OF BUSINESS TEAM MEETINGS; IS THAT

19  RIGHT?

20        MR. SCRIBNER:  YES, SIR, IT'S A COMPOSITE.  I THOUGHT

21  I'D JUST PUT IT TOGETHER IN ONE EXHIBIT, YOUR HONOR.

22        THE COURT:  FINE.

23        MR. BUTLER:  THANK YOU.

24        THE WITNESS:  I HAVE THEM.

25  BY MR. SCRIBNER:

UNITED STATES DISTRICT COURT

1   Q.   OKAY.  AND THESE WERE DOCUMENTS PRODUCED LONG BEFORE JUDGE

2   DUFFEY ISSUED HIS SUMMARY JUDGMENT ORDER, TRUE?

3   A.   I DON'T KNOW WHEN THESE WERE PRODUCED.

4   Q.   I'LL MAKE THAT REPRESENTATION.  I THINK WE ALL AGREE ON

5   THAT.  I'LL PROVE THAT UP ANOTHER WAY.  DON'T WORRY, WORRY

6   ABOUT THAT.

7        DO YOU RECALL LOOKING AT THESE DOCUMENTS BEFORE YOU

8   ISSUED YOUR REPORT THAT WE IDENTIFIED AS EXHIBIT 1?

9   A.   I DON'T RECALL ONE WAY OR THE OTHER AS I SIT HERE.

10  Q.   OKAY.  WELL, LET'S DO THIS, BECAUSE YOU TALKED WITH

11  MS. CANNELLA ABOUT THE VARIOUS ITERATIONS OF THIS PARTICULAR

12  LOAD LIMITER AND YOU KNOW A LOT ABOUT THE DETAILS OF THAT,

13  CORRECT?

14  A.   I DO.

15  Q.   AND SO IF YOU LOOK AT APRIL 2002, THIS BUSINESS TEAM

16  UPDATE, IT SAYS:  "MAZDA REQUESTED A QUOTE FOR THE AGB101RPLL

17  AND STATIC BUCKLE TO SUBSTITUTE THE CURRENT R27LL AND BUCKLE

18  PRETENSIONER."  DO YOU SEE THAT?

19  A.   YES.

20        MR. SCRIBNER:  FOR THE RECORD, YOUR HONOR, THAT

21  HIGHLIGHTING IS NOT IN THE ORIGINAL.  THAT'S OURS.  ALL OF THE

22  HIGHLIGHTING IN THESE DOCUMENTS WE DID AT MY LAW FIRM.

23        THE COURT:  ALL RIGHT.  THANK YOU.

24  BY MR. SCRIBNER:

25  Q.   JUST SO THE COURT UNDERSTANDS, THIS IS MAZDA REQUESTING A

1  QUOTE FOR THE LOAD LIMITER THAT THEY USED IN THE 2006 MAZDA3,

2  CORRECT?

3  A.   YES.

4  Q.   AND THAT'S BACK IN 2002, LONG BEFORE THE 2005 OR 2006 WERE

5  BEING MANUFACTURED, CORRECT?

6  A.   YES.

7  Q.   ALL RIGHT.  NEXT BUSINESS TEAM MEETING.  NOW WE ARE MOVING

8  FORWARD TO SEPTEMBER OF 2002.  IT SAYS "R200RPLL."  DO YOU SEE

9  THAT?

10  A.   YES.

11  Q.   ONCE AGAIN, THAT'S WHAT THEY ULTIMATELY USE IN THE 2006

12  MAZDA3, CORRECT?

13  A.   AGREED.

14  Q.   IT SAYS:  "MAZDA HAS ALMOST DECIDED NOT TO CHANGE TO THE

15  ROTO PRETENSIONER."  DO YOU SEE THAT?

16  A.   YES.

17  Q.   AND IT SAYS:  "BUT THE FINAL DECISION HAS NOT BEEN MADE

18  YET.  MAZDA ARE AWARE THAT TIMING WOULD BE CRITICAL AND THAT

19  THE INVESTMENTS FOR THE BUCKLE PRETENSIONER WERE MADE."  DO YOU

20  SEE THAT?

21  A.   YES.

22  Q.   CAN WE AGREE, SINCE IT SEEMS LIKE YOU ARE OPINING ABOUT

23  WHO IS MAKING VARIOUS DECISIONS, THAT LOOKS LIKE MAZDA IS GOING

24  TO MAKE THE DECISION HERE?  CAN WE AGREE ON THAT?

25  A.   THEY CERTAINLY ARE HAVING A VOTE, YES.


UNITED STATES DISTRICT COURT

1  Q.   WELL, THEY ARE HAVING MORE THAN A VOTE.  IT'S SAYING THEY

2  HAVEN'T DECIDED YET, A DECISION HASN'T BEEN MADE.  THAT'S

3  MAZDA'S DECISION.  CAN WE AGREE ON THAT?

4  A.   YES.

5  Q.   ALL RIGHT.  THIRD REPORT, PLEASE.

6        ONCE AGAIN, THIS IS OCTOBER OF 2002 AND MAZDA IS

7  TALKING ABOUT THE LOAD LIMITER THAT THEY ULTIMATELY USE FOR THE

8  2006 MAZDA3, CORRECT?

9  A.   YES.

10  Q.   "MAZDA HAS NOT ANNOUNCED THE FORMAL DECISION YET."  DO YOU

11  SEE THAT?

12  A.   YES.

13  Q.   DOES THAT SUGGEST TO YOU THAT AUTOLIV IS MAKING THAT

14  DECISION IN ANY WAY?  DOES THAT SENTENCE SAY ANYTHING LIKE

15  THAT?

16  A.   YOU READ IT RIGHT.

17  Q.   OKAY.  "MAZDA TESTING GROUP IS STILL CONSIDERING

18  IMPROVEMENTS FOR U.S. PERFORMANCE."  DO YOU SEE THAT?

19  A.   YES.

20  Q.   AND THAT TESTING IS THE KIND OF TESTING YOU TOLD THE JUDGE

21  ABOUT WHERE YOU ARE SMASHING THAT THING INTO THE WALL AT 35

22  MILES AN HOUR, RIGHT?

23  A.   YES.

24  Q.   AND IT SAYS:  "JUST RECENTLY, THEY HAVE ASKED US FOR

25  DIGRESSIVE LOAD LIMITERS."  DO YOU SEE THAT?


UNITED STATES DISTRICT COURT

1   A.   YES.

2   Q.   THE "THEY" IS MAZDA, CORRECT?

3   A.   YES.

4   Q.   THE "US" IS AUTOLIV, CORRECT?

5   A.   YES.

6   Q.   THIS CERTAINLY SUGGESTS THAT MAZDA IS INTERESTED IN THE

7   DIGRESSIVE LOAD LIMITER, CORRECT?

8   A.   AGREED.

9   Q.   LAST REPORT, SIR.

10          MR. SCRIBNER:  SORRY, YOUR HONOR.

11          THE COURT:  ALL RIGHT.

12  BY MR. SCRIBNER:

13  Q.   NOVEMBER 2002.  I BELIEVE THIS IS ONE YOU COVERED WITH

14  MS. CANNELLA.  MAZDA HAVING DIFFICULTIES TO ACHIEVE THEIR U.S.

15  NCAP TARGETS WITH THE CURRENT RESTRAINT SYSTEMS.

16          DO YOU SEE THAT?

17  A.   YES.

18  Q.   AND THE U.S. NCAP TARGETS ARE THE TARGETS THAT WE WERE

19  TALKING ABOUT WITH THE 35-MILE-AN-HOUR TEST, CORRECT?

20  A.   AGREED.

21  Q.   MAZDA WANTS TO DO BETTER ON THOSE TESTS.  DO YOU SEE THAT?

22  A.   I DO.

23  Q.   AND IT SAYS "THEY."  CAN WE AGREE THAT "THEY" MEANS MAZDA?

24  A.   YES.

25  Q.   MAZDA INTENDS TO CHANGE TO HIGHER LOAD LEVEL, IMPLEMENT

1  DIGRESSIVE LOAD LIMITERS OR RETRACTOR PRETENSIONERS INSTEAD OF

2  R27LL.  DO YOU SEE THAT?

3  A.   YES.

4  Q.   FOR THE COURT'S KNOWLEDGE THE R27LL IS WHAT WENT INTO THE

5  2005 MAZDA3, CORRECT?

6  A.   YES.

7  Q.   AND SO THEY ARE TALKING ABOUT CHANGING THAT IN NOVEMBER OF

8  2002, CORRECT?

9  A.   AGREED.

10 Q.   TIMING AND COSTS WERE SUBMITTED.  MAZDA STILL HAVE NOT

11 COME TO A DECISION.  DO YOU SEE THAT?

12 A.   YES.

13 Q.   SO LET ME CONCLUDE WITH THIS:  THE NOTION THAT A HIGHER

14 THRESHOLD LOAD LIMITER IS NOTHING NEW TO THE ENGINEERS AT

15 MAZDA, CORRECT?

16 A.   I THINK THAT'S FAIR.

17 Q.   AND WE CAN AGREE, AS DR. Z TOLD ME WHEN I DEPOSED HIM,

18 THAT STOPS HAVE BEEN AROUND SINCE THE 1980'S; ISN'T THAT RIGHT?

19 A.   YES.

20 Q.   AND MAZDA IS AWARE OF THOSE?

21 A.   YES.

22 Q.   AND CAN WE AGREE THAT AS OF NOVEMBER 2002, MAZDA IS TRYING

23 TO FIGURE OUT WHAT KIND OF LOAD LIMITER THEY ARE GOING TO USE?

24 A.   THAT SUGGESTS THEY ARE DOING IT BY THEMSELVES, BUT

25 CERTAINLY THEY ARE INVOLVED IN THE PROCESS AS IS AUTOLIV.


                     UNITED STATES DISTRICT COURT

1  Q.   DID THESE DOCUMENTS HAVE ANY IMPORTANCE TO YOU WHEN YOU

2  ISSUED YOUR REPORT?

3  A.   YES.

4  Q.   WELL, I THOUGHT YOU SAID YOU WEREN'T SURE IF YOU EVEN

5  REVIEWED THEM.

6  A.   ASSUMING I DID, THEY WOULD HAVE.

7  Q.   WELL, DID YOU REVIEW THEM OR NOT?

8  A.   I DON'T RECALL AS I SIT HERE.  I JUST -- I JUST DON'T

9  RECALL.

10  Q.   OKAY.  YOU DON'T RECALL.

11  A.   I MEAN THAT WAS 2015.  I'M SORRY.  I DON'T RECALL.

12  Q.   YOU DON'T RECALL IF YOU'VE SEEN THEM.  CAN WE AGREE IF YOU

13  DON'T RECALL SEEING THEM, THEY CERTAINLY DIDN'T TAKE ON THE

14  TYPE OF IMPORTANCE THAT WOULD ALTER OPINIONS IN YOUR REPORT?

15  A.   I'M NOT SURE I UNDERSTAND THAT QUESTION.

16  Q.   LET ME ASK A BETTER QUESTION.  THAT WAS A BAD ONE.

17       IF THESE DOCUMENTS WERE IMPORTANT, YOU WOULD REMEMBER

18  THEM, TRUE?

19  A.   THEY ARE CONSISTENT WITH THE DOCUMENTS WE TALKED ABOUT

20  AND, THAT IS, THOSE TWO COMPANIES ARE COMMUNICATING.  YOUR

21  FOCUS IS ON MAZDA AND I APPRECIATE THOSE ARE THE SECTIONS THAT

22  YOU HAVE HIGHLIGHTED, BUT THEY ARE COMMUNICATING BACK AND

23  FORTH.  AND REMEMBER THAT, YOU KNOW, THE CHANGE OF --

24       THE COURT:  WELL, I NEED AN ANSWER TO HIS QUESTION

25  AND THEN YOU CAN EXPLAIN.  IF THOSE DOCUMENTS WERE IMPORTANT,

1  WOULD YOU REMEMBER REVIEWING THEM?

2          THE WITNESS:  YOUR HONOR, I DON'T KNOW.  I MEAN THE

3  DOCUMENTS THAT ARE REVIEWED BEFORE THOSE REPORTS ARE VOLUMINOUS

4  AND THE DISCOVERY TYPICALLY COMES IN LITERALLY ON HUGE HARD

5  DRIVES, MEGABYTES AND SOMETIMES TERABYTES.  AND A LOT OF THEM

6  ARE NOT IMPORTANT.  SOME OF THEM ARE.  AND I REVIEW A LOT OF

7  THEM.

8          WE ATTEMPT AND DO OUR BEST TO IDENTIFY THOSE THAT ARE

9  IMPORTANT AND THIS IS NOT -- I AM NOT SUGGESTING AND I WOULD

10  NOT SUGGEST TO THE COURT THAT I DID NOT SEE THOSE OR IF I DID

11  SEE THEM THAT THEY WOULDN'T BE IMPORTANT.

12          THIS IS DESCRIBING A COOPERATIVE RELATIONSHIP BETWEEN

13  THOSE TWO COMPANIES ON THE DESIGN PROCESS AS DID THE STATEMENT

14  OF WORK AND AS DID THE OTHER CONTRACTABLE DOCUMENT WE LOOKED

15  AT.  AND THIS IS PART AND PARCEL OF THE SAME AND CONSISTENT

16  WITH THOSE.  SO IT WOULDN'T SURPRISE ME THAT I LOOKED AT THOSE,

17  AND IF I DID, THEY WOULD HAVE BEEN IMPORTANT FOR THE SAME

18  REASONS AS THOSE OTHER DOCUMENTS ARE AND THE CONCLUSION IS THEY

19  ARE WORKING TOGETHER.  THAT'S NOT ALWAYS THE CASE AND THAT

20  WAS --

21          THE COURT:  I CUT YOU OFF.  I CUT YOU OFF FROM YOUR

22  ANSWER.  YOU CAN FINISH YOUR PREVIOUS ANSWER.

23          THE WITNESS:  I THINK I HAVE JUST DONE IT ALL.  I

24  THINK I HAVE JUST WORKED IT OUT.  BUT THAT IS THE POINT.  I

25  MEAN IT IS A COOPERATIVE RELATIONSHIP AND THESE DOCUMENTS ARE

1 FOCUSED ON MAZDA BEING INVOLVED AND THERE CLEARLY IS DOCUMENTS
2 THAT SUPPORT AUTOLIV BEING INVOLVED.  AND WHAT OCCURS TO ME IS
3 THAT BACK IN '01, BEFORE THESE MEETINGS, ARE THE VA/VE
4 DOCUMENTS THAT APPARENTLY ARE SUGGESTING A CHANGE FROM A
5 DIGRESSIVE DOWN TO A STANDARD LOAD LIMITER WHICH ULTIMATELY
6 THEY KEPT.  AND THAT WAS AUTOLIV'S SUGGESTION BEFORE THESE
7 MEETINGS EVEN OCCURRED.
8           SO I MEAN ARE THEY LOOKING AT THE PRICE PROPOSALS?  I
9 ASSUME AND BELIEVE THEY ARE.  BUT, AT ANY RATE, I AM NOT
10 SUGGESTING THAT I DIDN'T LOOK AT THEM, AND IF I DID, THEY WOULD
11 HAVE BEEN IMPORTANT FOR THESE SAME REASONS.  ALL I AM, ALL I AM
12 SAYING IS TO BE CAUTIOUS, AS I SIT HERE TODAY, I JUST DON'T
13 RECALL THEM SPECIFICALLY.
14           THE COURT:  OKAY.
15 BY MR. SCRIBNER:
16 Q.  THANK YOU, MR. MEYER.
17           AFTER THE DOCUMENTS WERE PRODUCED RECENTLY THE
18 PLAINTIFF'S LAWYERS TOOK THE DEPOSITION OF MR. KAMEI.  DID YOU
19 REVIEW THAT DEPOSITION?
20 A.  I DON'T RECALL IT.  WHO IS HE?
21 Q.  HE IS THE LEAD SYSTEM ENGINEER FOR AUTOLIV FOR THIS
22 PARTICULAR SEATBELT.
23           DID YOU REVIEW THAT DEPOSITION, SIR?
24 A.  I DON'T RECALL IT.  IF I DID BEFORE THE REPORTS, I
25 PROBABLY WOULD HAVE MADE A NOTE OF IT.  DID I?

1  Q.   I DIDN'T SEE IT IN YOUR NOTES.

2  A.   I DON'T RECALL THAT.

3  Q.   SO HIS TESTIMONY ABOUT WHAT ALL THOSE DOCUMENTS MEAN, YOU

4  HAVEN'T READ THAT?

5          MS. CANNELLA:  OBJECTION, YOUR HONOR.

6          THE COURT:  HOLD ON.

7          MS. CANNELLA:  OBJECTION, YOUR HONOR.  THE QUESTION

8  MISSTATES THE EVIDENCE OF MR. KAMEI'S DEPOSITION.  HE DID NOT

9  EXPLAIN THE MEANING OF ALL THE DOCUMENTS.  IF THERE IS SPECIFIC

10 TESTIMONY HE WANTS TO ASK HIM ABOUT THEM --

11         THE COURT:  WELL, I AM GOING TO ALLOW HIM TO ASK THAT

12 QUESTION.  I AM GOING TO OVERRULE THE OBJECTION.

13         THE WITNESS:  I DON'T RECALL REVIEWING THAT

14 DEPOSITION.

15 BY MR. SCRIBNER:

16 Q.   DIDN'T YOU WANT TO SEE THE TESTIMONY OF THE LEAD ENGINEER

17 FOR AUTOLIV TO ANSWER QUESTIONS ABOUT AUTOLIV'S INVOLVEMENT?

18 A.   I WOULD HAVE REVIEWED IT, YES.

19 Q.   YOU DID REVIEW IT?

20 A.   I DON'T RECALL REVIEWING IT.

21 Q.   DO YOU RECALL HIM TESTIFYING IN NO UNCERTAIN TERMS THAT AT

22 THE BEGINNING OF PRODUCT DEVELOPMENT, HE PROVIDED MAZDA WITH A

23 LOW LOAD LIMITER, A MEDIUM LOAD LIMITER AND A HIGH LOAD LIMITER

24 AND THAT MAZDA DID THEIR TESTING AND CAME BACK AND SAID WE WANT

25 THE TWO-KILONEWTON?  DID YOU SEE THAT TESTIMONY?

UNITED STATES DISTRICT COURT

1  A.   I DON'T RECALL THAT.

2  Q.   WOULD THAT BE IMPORTANT TO YOU IF HE SAID THAT?

3  A.   AS TO MAZDA'S CONDUCT?  MAYBE.  AS TO AUTOLIV'S?  AS I

4  SAID, I BELIEVE AUTOLIV SHOULD HAVE KNOWN BETTER THAN TO SELL

5  THIS RETRACTOR TO ANYBODY FOR ANY CAR WHETHER THEY AGREED TO DO

6  IT OR NOT.  AUTOLIV HAS DONE SOME TESTING TOO.  AUTOLIV IS WELL

7  AWARE OF WHAT THIS THING IS GOING TO DO.  AUTOLIV IS AWARE OF

8  THAT.  AND TO SELL IT OR PUT IT IN ANY CAR, THERE IS NO CAR ON

9  THE ROAD TODAY EVER THAT WOULD JUSTIFY THIS.

10        SO IF MAZDA MADE THAT DECISION, THEN FINE, MAZDA MADE

11  THAT DECISION, BUT THAT DOESN'T MEAN THAT I DON'T HAVE THE SAME

12  OPINIONS WITH RESPECT TO AUTOLIV, WHICH IS AUTOLIV'S -- THIS IS

13  AUTOLIV'S RETRACTOR.  THEY DESIGNED IT, THEY MANUFACTURED IT,

14  AND THEY SOLD IT AND PUT IT IN THE MARKET.

15  Q.   HAVE YOU REVIEWED THE TESTIMONY FROM MAZDA THAT SAYS THAT

16  ALL DECISIONS REGARDING OCCUPANT SAFETY FOR THE 2005 MAZDA3

17  WERE MADE SOLELY BY MAZDA?  HAVE YOU REVIEWED THAT TESTIMONY?

18  A.   MAYBE.

19        MS. CANNELLA:  OBJECTION, YOUR HONOR.

20        THE COURT:  HOLD ON; HOLD ON; HOLD ON.

21        THE WITNESS:  MAYBE.

22        MS. CANNELLA:  SORRY.  OBJECTION, YOUR HONOR.  IT'S

23  NOT CLEAR WHAT TESTIMONY HE IS ASKING ABOUT, SO IF HE COULD

24  SPECIFY THE TESTIMONY.

25        THE COURT:  THAT'S FAIR; THAT'S FAIR.


UNITED STATES DISTRICT COURT

```
 1              MS. CANNELLA:  AND ACTUALLY --
 2              THE WITNESS:  THAT WOULD BE A MAYBE, THAT STATEMENT.
 3              THE COURT:  HOLD ON; HOLD ON; HOLD ON.
 4              THE WITNESS:  I'M SORRY.
 5              THE COURT:  LET MS. CANNELLA FINISH.
 6              MS. CANNELLA:  THERE WERE NO MAZDA ENGINEERING
 7    DEPOSITIONS IN THE CASE.
 8              THE COURT:  I AGREE WITH HER.  I WILL SUSTAIN THAT
 9    OBJECTION.  REPHRASE IT OR MAKE IT MORE SPECIFIC.
10              MR. SCRIBNER:  SURE.
11    BY MR. SCRIBNER:
12    Q.   HAVE YOU REVIEWED THE DECLARATION THAT MAZDA SUBMITTED
13    THAT JUDGE DUFFEY RELIED ON IN ISSUING HIS ORDER?
14    A.   I DID REVIEW THAT DECLARATION.  I HAVEN'T REVIEWED IT
15    RECENTLY, AND IF YOU HAVE IT, WE CAN LOOK AT IT, AND I HAVE
16    REVIEWED IT.
17    Q.   SO YOU DID REVIEW THAT TESTIMONY FROM MAZDA?
18    A.   YES.
19    Q.   AND YOU ARE NOT SURE IF YOU REVIEWED MR. KAMEI'S
20    DEPOSITION?
21    A.   I JUST DON'T RECALL THAT AS I SIT HERE.
22    Q.   DO YOU WANT TO REVIEW IT?
23    A.   I'M CURIOUS NOW.
24              MR. SCRIBNER:  THAT'S ALL I HAVE.  THANK YOU.
25              THE COURT:  THANK YOU.
```

UNITED STATES DISTRICT COURT

```
1              MS. CANNELLA, I WOULD REALLY LIKE FOR YOU TO DO
2   REDIRECT, BUT I ATE BREAKFAST ABOUT FIVE HOURS AGO AND I THINK
3   JUST ABOUT EVERYBODY -- I KNOW YOU WANT TO GET THIS GENTLEMAN
4   OUT OF HERE AND BACK ON THE AIRPLANE.  HOW LONG WILL YOUR
5   REDIRECT BE?
6              MS. CANNELLA:  YOUR HONOR, NOT LONG BUT WE ARE HAPPY
7   TO TAKE A BREAK.  HE'S GOT PLENTY OF TIME BEFORE HIS FLIGHT.
8              THE COURT:  I'M TEMPTED WHEN YOU SAY "NOT LONG," BUT
9   MY EXPERIENCE SAYS --
10             MS. CANNELLA:  FIVE MINUTES, YOUR HONOR?
11             THE COURT:  GO AHEAD.
12             THE WITNESS:  MINE TOO, YOUR HONOR.
13                         REDIRECT EXAMINATION
14  BY MS. CANNELLA:
15  Q.   HI, MR. MEYER.
16  A.   HI.
17  Q.   YOU TOLD MR. SCRIBNER AUTOLIV MADE THE DECISION TO OFFER
18  THIS SEATBELT WITH A TWO-KILONEWTON LOAD LIMITER AND THAT
19  SHOULD NOT HAVE BEEN OFFERED AT ALL; IS THAT RIGHT?
20  A.   YES.
21  Q.   YOU SAID THAT THAT TWO-KILONEWTON TORSION BAR WAS
22  DEFECTIVE?
23  A.   ABSOLUTELY.
24  Q.   THAT'S THE WHOLE POINT, ISN'T IT?
25  A.   I THINK SO.
```

1   Q.   WAS THERE ANY REASON AT ALL TO ALLOW THIS MUCH SPOOL-OUT,

2   AS MUCH SPOOL-OUT AS WE SEE IN MR. ANDREWS' CAR OR IN THIS NCAP

3   TEST?

4   A.   NO, AND I CONSIDERED THAT QUESTION CAREFULLY BEFORE I

5   CONCLUDED THAT, BUT ABSOLUTELY NOT, NO.

6   Q.   WHO IS THE SEATBELT EXPERT IN THIS CASE?

7   A.   AUTOLIV.  IT'S THE BUSINESS THEY ARE IN.

8   Q.   AS BETWEEN MAZDA AND AUTOLIV, WHICH ONE KNOWS MORE ABOUT

9   SEATBELTS?

10        MR. SCRIBNER:  OBJECT TO THE FORM OF THAT QUESTION,

11   YOUR HONOR.  THAT'S PURE SPECULATION AS TO WHAT AUTOLIV KNOWS

12   AND WHAT MAZDA KNOWS.

13        THE COURT:  I THINK YOU NEED TO REPHRASE THAT ONE,

14   MS. CANNELLA.  I'LL SUSTAIN THAT.

15        MS. CANNELLA:  YES, YOUR HONOR.

16   BY MS. CANNELLA:

17   Q.   WHAT IS AUTOLIV'S BUSINESS?

18   A.   AUTOLIV IS IN THE SEATBELT RESTRAINT BUSINESS WHICH IS WHY

19   MAZDA CONTRACTS WITH THEM FOR THESE COMPONENTS.

20   Q.   AND WHO DESIGNED THE SEATBELT?

21   A.   AUTOLIV.

22   Q.   AND WHO MANUFACTURED THE SEATBELT?

23   A.   AUTOLIV.

24   Q.   AND WHO SOLD THE SEATBELT?

25   A.   AUTOLIV.

1  Q.   AND WHO PROFITED FROM THIS SEATBELT?

2  A.   AUTOLIV.

3  Q.   I WANT TO CLEAR UP ONE MORE THING JUST BECAUSE I THINK IT

4  WAS CONFUSING.

5           PLAINTIFF'S HEARING EXHIBIT 49, WHICH IS TOLLGATE-4

6  THAT YOU HAVE IN YOUR BOOK.

7  A.   RIGHT.

8  Q.   WHAT'S THE DATE ON THAT?

9  A.   WELL, THE DATE ON THE PAGE THAT WE WERE REFERRING TO WAS

10 2001.  THE DATE ON THE DOCUMENT ITSELF IS 2003.

11 Q.   2003?

12 A.   YES.  I'M SORRY.  YES.  2003, NOVEMBER 18.

13 Q.   NOVEMBER 18TH, 2003?

14 A.   YES.  THAT'S THE DATE ON THE DOCUMENT, EXHIBIT 49.

15 Q.   ONE OF DOCUMENTS IN MR. SCRIBNER'S EXHIBIT --

16           MS. CANNELLA:  I BELIEVE IT WAS 2?

17           MR. SCRIBNER:  YES, MA'AM.

18 BY MS. CANNELLA:

19 Q.   (CONTINUING)  -- IN DEFENDANT'S EXHIBIT 2 WAS AN OCTOBER

20 OF 2002 BUSINESS MEETING?

21 A.   YES.

22 Q.   AND THAT IS THE BUSINESS MEETING THAT SAYS:  JUST

23 RECENTLY, THEY, BEING MAZDA, HAVE ASKED US FOR DIGRESSIVE LOAD

24 LIMITERS.

25           DID I READ THAT CORRECTLY?

UNITED STATES DISTRICT COURT

1  A.   YES.

2  Q.   SO THAT HAPPENS IN OCTOBER 2002.  A YEAR LATER WE HAVE

3  PLAINTIFF'S EXHIBIT 49, WHICH IS NOVEMBER 18, 2003, AND THAT IS

4  WHEN AUTOLIV SUGGESTS TO MAZDA TO MOVE FROM A MORE ROBUST,

5  DIGRESSIVE LOAD LIMITER TO THE WEAKER TWO-KILONEWTON LOAD

6  LIMITER?

7  A.   THAT IS THE TIMELINE, YES.

8  Q.   OKAY.  SO MAZDA WANTS DIGRESSIVE.  AUTOLIV BACKS THEM OFF.

9  IS THAT FAIR?

10  A.   YES, THAT'S FAIR.

11        MS. CANNELLA:  THAT'S ALL I HAVE.

12        THE COURT:  RECROSS, MR. SCRIBNER?

13        MR. SCRIBNER:  NOTHING, YOUR HONOR.  THANK YOU.

14        THE COURT:  MS. CANNELLA, ANY OBJECTION TO THE TWO

15  EXHIBITS OFFERED BY MR. SCRIBNER?

16        MS. CANNELLA:  NO, YOUR HONOR.

17        THE COURT:  THEY ARE ADMITTED WITHOUT OBJECTION.

18        WE WILL BREAK HERE FOR LUNCH AND START BACK AT 1:30.

19        MR. SCRIBNER:  YOUR HONOR, MAY I ASK IN TERMS OF

20  TIMING, WE DO HAVE A DAUBERT MOTION ON MR. MEYER.  I DON'T

21  THINK IT REALLY HAD A LOT TO DO WITH HIS TESTIMONY.  IT'S

22  BIOMECHANIC ISSUES.  COULD WE TAKE THAT UP?  GIVEN THAT YOU

23  HAVE JUST HEARD ALL THIS TESTIMONY, IT WOULD BE THE RIGHT TIME

24  TO DO IT AFTER LUNCH.

25        THE COURT:  LET'S DO IT RIGHT AFTER LUNCH.


UNITED STATES DISTRICT COURT

1            MR. SCRIBNER:  THANK YOU.

2            THE COURT:  EVERYBODY HAVE A GOOD LUNCH.  I WOULD

3   SUGGEST THE CAFETERIA, BUT -- YOU KNOW.

4            MR. BUTLER:  1:30 DID YOU SAY?

5            THE COURT:  1:30.

6            MR. BUTLER:  THANK YOU, YOUR HONOR.

7            THE COURT:  THANK YOU.

8                      (NOON RECESS)

9            MS. CANNELLA?  WELL, HOLD ON A SECOND.  LET'S GIVE

10  MR. BUTLER TIME TO GET UP HERE.  I'M A LITTLE BIT EARLY.

11           MS. CANNELLA:  THAT'S ALL RIGHT.  WE'RE HERE.

12           THE COURT:  I APPRECIATE IT.

13           MR. SCRIBNER?

14           MR. SCRIBNER:  YES.  I THINK WE WERE GOING TO PROCEED

15  WITH THE DAUBERT MOTION ON MR. MEYER'S DEPLOYMENT THRESHOLD.

16           THE COURT:  CORRECT.

17           MR. SCRIBNER:  SO I'LL START WITH THE FACT THAT WHEN

18  WE FILED THESE DAUBERT MOTIONS, THE PARTIES HAD NOT YET AGREED

19  TO A BENCH TRIAL.  AND SO THE FACT IS IT'S A RELAXED STANDARD

20  WHEN WE ARE TALKING ABOUT DAUBERT IN A BENCH TRIAL FOR OBVIOUS

21  REASONS.

22           AND WE FILED THREE DAUBERT MOTIONS AND I WILL CONCEDE

23  THAT THE OTHER TWO ARE MORE OF THE TYPE THAT THE COURT'S JUST

24  GOING TO HAVE TO EXERCISE ITS DISCRETION AND FIGURE OUT WHETHER

25  TO GRANT THE MOTION.  THIS ONE WE FEEL A LITTLE BIT DIFFERENTLY

UNITED STATES DISTRICT COURT

```
 1   ABOUT BECAUSE IT'S SO SUBSTANTIVELY AT THE HEART OF THE MERITS
 2   THAT, WHILE RECOGNIZING THAT IT IS A RELAXED STANDARD, WE STILL
 3   FEEL LIKE THIS ONE WITHOUT A DOUBT IS APPROPRIATE.
 4          MR. MEYER TESTIFIED FOR ABOUT TWO HOURS.  HE NEVER
 5   ADDRESSED THE CONCERN THAT WE HAVE WITH HIS OPINION.  AND WE
 6   DISAGREE.  I DON'T WANT TO LEAVE THE COURT WITH THE NOTION THAT
 7   WE DON'T DISAGREE WITH A LOT OF WHAT HE SAID.  THERE ARE SOME
 8   THINGS WE ACTUALLY AGREE WITH.  BUT RATHER THAN, YOU KNOW, TAKE
 9   A DISCOVERY DEPOSITION, I THOUGHT I WOULD JUST GET TO THE
10   LICK-LOG.  BUT I DON'T WANT THE COURT TO THINK THAT WE AGREE
11   WITH A LOT OF IT.
12          THE COURT:  WELL, I NEVER THOUGHT THAT.
13          MR. SCRIBNER:  ALL RIGHT, ALL RIGHT.
14          SO LET ME GET SOME BASIC FACTS OUT THERE BECAUSE I
15   THINK THEY ARE IMPORTANT.
16          ON APRIL 12, 2013, MR. ANDREWS DROVE HIS 2005 MAZDA3
17   OFF THE ROAD WHILE TRAVELING 75 MILES AN HOUR IN A SINGLE
18   VEHICLE ACCIDENT.  THIS WILL BE THE LAST TIME I DO THIS, BUT
19   MR. MEYER SAID IT WAS BECAUSE OF THIS TURTLE.  WELL, YOU KNOW,
20   THE COBB COUNTY POLICE DEPARTMENT SAID IT HAS NOTHING TO DO
21   WITH A TURTLE.  IT WAS JUST CLEAR DRIVER ERROR.  WE JUST
22   DISAGREE.  AND I AM NOT GOING TO DO THAT EVERY TIME IN AN
23   EFFORT TO BE EFFICIENT WITH THE TIME, BUT THAT WOULD BE ONE
24   PARTICULAR AREA WHERE WE DISAGREE.
25          THE AIRBAG DID NOT DEPLOY DESPITE THE FACT THAT IT
```

1   SHOULD DEPLOY WITHOUT A DOUBT IN A VEHICLE ACCIDENT WHERE YOU

2   HAVE A 35-MILE-AN-HOUR DELTA V, THEY CALL IT.

3          AUTOLIV JAPAN SUPPLIED MAZDA WITH THE AIRBAG MODULE,

4   WHICH IS JUST A FANCY WAY OF SAYING THE BAG, AND THE SEATBELT

5   ASSEMBLY.  AND LAST MONTH WE TOOK THE TRIAL DEPOSITION OF

6   MR. CARUSO, WHO IS PLAINTIFF'S AIRBAG EXPERT, HIGHLY

7   CREDENTIALED IN THE FIELD OF AIRBAG DEPLOYMENT, AND HE SAID IN

8   NO UNCERTAIN TERMS THAT THE AIRBAG ITSELF WAS READY TO GO.  IT

9   WAS READY TO DO ITS JOB.

10          AUTOLIV'S AIRBAG WAS DEPRIVED OF ITS OPPORTUNITY TO

11   DO ITS JOB BECAUSE, ACCORDING TO MR. CARUSO, THE SIGNAL TO

12   DEPLOY WAS NOT SENT.  IN OTHER WORDS, WHEN YOU HAVE AN

13   ACCIDENT, JUDGE, YOU ARE STOPPING SO QUICKLY THERE IS A SENSOR

14   IN YOUR VEHICLE THAT SAYS DEPLOY.

15          THE COURT:  YES.

16          MR. SCRIBNER:  AND IT HAS TO HAPPEN NOW.  ACCORDING

17   TO MR. CARUSO, HE SAYS, LOOK, THERE ARE EIGHT DIFFERENT WAYS

18   THAT THIS DESIGN COULD BE BETTER.  ONE EASY WAY TO MAKE IT

19   BETTER IS TO HAVE TWO SENSORS.  BECAUSE THEY DON'T COST

20   ANYTHING.  IN FACT, I THINK HE TOLD ME THEY COST $5.  HE SAID,

21   PUT TWO IN THERE, BECAUSE IF ONE IS, YOU KNOW, DISLODGED, THE

22   OTHER ONE IS GOING TO SEND THAT SIGNAL, THAT AIRBAG IS GOING TO

23   DEPLOY, AND EVERYONE AGREES THAT HE WOULD BE ALIVE TODAY,

24   MR. ANDREWS WOULD BE ALIVE TODAY.  IF OUR AIRBAG HAD THE

25   OPPORTUNITY TO WORK WITH OUR SEATBELT, HE WOULD BE ALIVE TODAY.


UNITED STATES DISTRICT COURT

```
 1              IN MODERN DESIGN, AND I THINK YOU ARE CATCHING ON TO
 2     AT LEAST OUR THEME OF THE CASE, AIRBAGS AND SEATBELTS WORK
 3     TOGETHER.  THE FEDERAL GOVERNMENT REQUIRES THE TESTING TO
 4     INCLUDE BOTH AN AIRBAG AND A SEATBELT.  AND ALL AIRBAGS ARE --
 5     STRIKE THAT.  ALL SEATBELTS TODAY HAVE THESE LOAD LIMITERS THAT
 6     MR. MEYER TALKED ABOUT.  AND THE REASON WHY THEY HAVE THESE
 7     LOAD LIMITERS -- AND MR. MEYER IS MOSTLY, IN OUR VIEW, RIGHT IN
 8     THAT YOU WANT THAT FORWARD EXCURSION.  YOU WANT THAT FORWARD
 9     MOVEMENT.
10              IN THE GOOD OLD DAYS BACK IN THE 1980'S, SEATBELTS
11     WOULD JUST KEEP YOU IN YOUR PLACE AND YOU REALLY, REALLY WOULD
12     HAVE A PROBLEM IN A HIGH-SPEED ACCIDENT.  AND WHAT HE WAS
13     SAYING -- I SAID I WASN'T GOING TO TALK ABOUT WHERE WE
14     DISAGREE, BUT THIS IS JUST GOING TO BE ANOTHER ONE I HAVE TO --
15     YOU KNOW, BRUISING TO THE CHEST, NO.  OUR EXPERTS SAY IF YOU
16     HAVE A HIGH-SPEED ACCIDENT AND YOU DON'T HAVE ENOUGH FORWARD
17     MOVEMENT, IT CAN CRACK YOUR STERNUM.  IT CAN KILL YOU.
18              THE COURT:  I'VE HEARD OF THAT.
19              MR. SCRIBNER:  AND SO THE ISSUES THAT VOLVO AND MAZDA
20     AND ALL THESE AUTOMOBILE MANUFACTURERS THAT ARE DEALING WITH
21     THESE ISSUES, HOW MUCH, HOW MUCH MOVEMENT DO WE WANT?  HOW MUCH
22     RESTRAINT DO WE WANT?  BECAUSE TO COMPLICATE THINGS FURTHER,
23     YOU ASKED A GREAT QUESTION:  HOW BIG DOES THE PERSON HAVE TO
24     BE?
25              YOU KNOW, I HAVE A DAUGHTER WHO IS OLD ENOUGH NOT TO
```

```
 1    HAVE, YOU KNOW, A CHILD SEAT, BUT SHE IS SMALL-STATURED.  AND
 2    SO WHEN THEY HOLD HER IN PLACE, THE LIKELIHOOD THAT SHE HAS
 3    INJURIES VERSUS THE LIKELIHOOD THAT A GROWN MAN LIKE ME HAS
 4    INJURIES, WAY HIGH.  IT'S COMPLICATED.  IT'S JUST REALLY
 5    COMPLICATED.  AND I THINK WHAT MR. MEYER SAID THAT I DO AGREE
 6    WITH IS, YOU KNOW -- I SHOULDN'T SAY THAT HE SAID THIS, BUT HE
 7    CERTAINLY SUGGESTED IT -- ULTIMATELY THE DECISION LIES WITH THE
 8    OEM AND THAT'S BECAUSE THERE ARE SO MANY PARTS THAT CAN IMPACT
 9    OCCUPANT SAFETY.
10          WE HAVE BEEN TALKING ABOUT AIRBAG AND SEATBELT.  IT'S
11    THE VEHICLE.  IT'S THE BUMPER.  IT'S THE STEERING WHEEL.  IT'S
12    THE SEAT.  ALL OF IT.  AND YOU CHANGE ONE LITTLE THING AND IT
13    CAN THROW EVERYTHING OUT OF WHACK, WHICH IS WHY YOU'LL HEAR
14    TESTIMONY FROM OUR EXPERTS THAT SUPPLIERS ANSWER QUESTIONS,
15    MAKE SUGGESTIONS, BUT ULTIMATELY THEY GIVE IT TO THE OEM.  THEY
16    CRASH IT INTO A WALL.  THEY RECORD THE RESULTS AND THEY SAY
17    THIS IS WHAT WE WANT, BECAUSE IT'S OUR VEHICLE.  WE KNOW IT
18    BETTER THAN YOU.
19          WE AGREE WITH MR. MEYER, AND IT'S A FUNCTION OF JUST
20    BASIC ENGINEERING, THAT, ALL THINGS BEING EQUAL, THE LOWER THE
21    DEPLOYMENT THRESHOLD, THE LESS FORCE OR MOMENTUM NEEDED FOR IT
22    TO PAY OUT.  HE'S RIGHT.  HE'S RIGHT ABOUT THAT.
23          IF YOU HAVE A HIGH THRESHOLD, YOU ARE GOING TO NEED
24    MORE FORCE FOR IT TO PAY OUT.  HOWEVER, THAT DOESN'T MEAN IT'S
25    NOT GOING TO PAY OUT.  YOU HAVE TO KNOW WHAT'S HAPPENING IN THE
```

1  ACCIDENT.  YOU HAVE TO KNOW WHETHER THERE IS AN AIRBAG

2  DEPLOYMENT.  YOU HAVE TO KNOW ABOUT THE VEHICLE.  THAT'S WHAT

3  BIOMECHANICS DO.  HE DID NOT PROVIDE BIOMECHANIC TESTIMONY.  HE

4  IS A SEATBELT EXPERT.

5          SO HE SAYS TWO THINGS:  ONE, THAT TWO-KILONEWTON

6  THRESHOLD SHOULD BE HIGHER.  THAT'S ONE OPINION.  THE OTHER

7  OPINION IS JUST HAVE A STOP, STOP IT AFTER SIX INCHES.  NOW, WE

8  WILL AT TRIAL, IF GIVEN THE OPPORTUNITY, TELL YOU WHY THAT IS A

9  BAD IDEA AND WHY PROBABLY MAZDA DIDN'T DO THAT.  BUT SET THAT

10 ASIDE, BECAUSE THE ONE THING I WILL SAY ABOUT THAT OPINION IS

11 THEY HAVE A BIOMECHANIC, DR. ZIEJEWSKI.  I'LL JUST CALL HIM

12 DR. Z, BECAUSE I'LL MESS UP HIS LAST NAME.

13         HE SAYS MORE LIKELY THAN NOT, HAD YOU HAD A STOP,

14 MR. ANDREWS WOULD BE ALIVE TODAY.  I'M A BIOMECHANIC.  I KNOW

15 HOW THE BODY REACTS INSIDE THE VEHICLE.  AND IF THIS THING PAID

16 OUT ONLY SIX INCHES, HIS HEAD WOULD HAVE HIT THE STEERING WHEEL

17 BUT IT WOULDN'T HAVE HIT IT WITH SO MUCH FORCE THAT HE WOULD BE

18 DEAD.  ALL RIGHT.  NOW, WE DISAGREE WITH ALL OF THAT, BUT THAT

19 GETS YOU TO THE FACT FINDER.

20         THE OTHER TESTIMONY OR OTHER DESIGN WE DO TAKE ISSUE

21 WITH:  THIS IS A MASSIVE COLLISION.  IT'S IN THE 99TH

22 PERCENTILE OF ACCIDENTS.

23         MR. BUTLER:  YOUR HONOR, JUST FOR CLARIFICATION, I

24 THOUGHT WE WERE ARGUING A DAUBERT MOTION AS TO MR. MEYER.  THIS

25 SOUNDS LIKE CLOSING ARGUMENT FOR THE TRIAL.  HE IS TALKING

UNITED STATES DISTRICT COURT

1  ABOUT THE WHOLE CASE.

2         THE COURT:  WELL, I WILL ALLOW HIM TO MAKE THIS

3  ARGUMENT.

4         MR. SCRIBNER:  THANK YOU.  AND I'LL GET TO IT.  I

5  THOUGHT I WOULD GET A LITTLE WIDER BERTH AFTER TWO HOURS OF

6  TESTIMONY THAT DIDN'T ANSWER MY QUESTION, BUT I AM GOING TO

7  MOVE ON.

8         THIS IS A MASSIVE COLLISION.  AND TO SAY THAT IT

9  WOULD HAVE MADE A DIFFERENCE IF YOU USED A THREE-KILONEWTON, A

10  FOUR-KILONEWTON, A FIVE-KILONEWTON, A SIX-KILONEWTON THRESHOLD,

11  YOU HAVE TO DO THE MATH.  YOU HAVE TO DO IT.

12         YOU CAN'T UNDER GEORGIA LAW SAY I CAN MAKE SOMETHING

13  SAFER.  YOU HAVE TO SAY YOU CAN MAKE IT SAFER.  THERE ARE CASES

14  OUT THERE WHERE YOU DON'T PROPOSE AN ALTERNATIVE DESIGN, BUT

15  NOT WITH THESE LAWYERS.  THEY ARE TOO GOOD.  GOOD PLAINTIFF'S

16  LAWYERS HAVE AN ALTERNATIVE DESIGN AND THEY SAY YOU DIDN'T

17  INCORPORATE A DESIGN THAT'S SAFER AND WOULD HAVE MADE A

18  DIFFERENCE, BECAUSE IF IT DOESN'T MAKE A DIFFERENCE, IT'S NOT A

19  CLAIM.

20         ALL RIGHT.  SO I WANT TO BACK UP AND TALK A LITTLE

21  BIT ABOUT THE HISTORY HERE OF THE BIOMECHANIC OPINIONS, BECAUSE

22  I THINK WE ARE IN THE POSITION WE ARE BECAUSE OF SOME

23  CIRCUMSTANCES THAT THE COURT NEEDS TO BE AWARE OF.

24         SO ORIGINALLY, REMEMBER, THEY ARE PURSUING A THEORY

25  AGAINST THE AIRBAG AND THE SEATBELT.

UNITED STATES DISTRICT COURT

```
 1           THE COURT:  RIGHT.

 2           MR. SCRIBNER:  BOTH.  AIRBAG WAS NO GOOD BECAUSE IT

 3  DIDN'T HAVE THE DUAL SENSORS.  THE SEATBELT PAYS OUT TOO MUCH.

 4  THEY GET AN EXPERT, DR. JOE BURTON, WHO IS AN M.D., A MEDICAL

 5  DOCTOR.  DR. BURTON, SMARTLY, WISELY, BECAUSE HE'S A SMART GUY,

 6  SAYS I'M NOT GOING TO SEPARATE THE INJURIES RELATED TO THE

 7  AIRBAG AND THE SEATBELT.  I DON'T HAVE TO.  RIGHT?  YOU ARE

 8  PURSUING THOSE TOGETHER.  SO I CAN TELL YOU THIS:  IF THE

 9  AIRBAG DEPLOYS AND THE SEATBELT DOESN'T PAY OUT THAT MUCH, HE

10  IS ALIVE TODAY.  HE NEVER MADE AN ATTEMPT TO SEPARATE THE

11  INJURIES SEPARATELY.  BUT THEY SETTLED WITH MAZDA, NUMBER ONE.

12  AND THE SECOND THING THAT HAPPENED WAS DR. BURTON PLED GUILTY

13  TO VARIOUS FELONIES.

14           SO THEY ARE NOW IN A DIFFERENT SPOT.  THEY HAVE TO

15  GET A NEW BIOMECHANIC.  AND NOW THEY HAVE TO PROVE THAT THAT

16  SEATBELT, REGARDLESS OF THE AIRBAG NOT DEPLOYING, THAT SEATBELT

17  CAUSED THE PROBLEMS.  AND THEY GET TO A FACT FINDER ON THAT

18  STOP.  WE HAVE A LOT TO SAY ABOUT THE STOP, MIND YOU, BUT THEY

19  GET THERE.

20           WITH RESPECT TO THE ALTERNATIVE DESIGN THAT THE

21  HIGHER THRESHOLD WOULD MAKE A DIFFERENCE, YOU KNOW, TWO HOURS

22  HE TESTIFIED AND WHAT WE DIDN'T HEAR IS ANY BIOMECHANIC

23  TESTIMONY THAT WOULD SAY MORE LIKELY THAN NOT IF YOU USED A

24  THREE-KILONEWTON OR A FOUR-KILONEWTON, HE WOULD BE ALIVE TODAY.

25           WHAT WE ARE HEARING IS A BASIC ENGINEERING NOTHING
```

```
 1   BURGER.  AND I MEAN THAT IN THE MOST SINCEREST WAY.  IF I CAN
 2   FIGURE IT OUT, EVERYONE IN THE ROOM CAN FIGURE IT OUT.  A
 3   HIGHER THRESHOLD MEANS LESS MOVEMENT ALL THINGS BEING EQUAL.
 4   YEAH, I CAN GET BEHIND THAT.
 5             THIS VEHICLE WAS TESTED IN NCAP AND IT GOT FOUR OUT
 6   OF FIVE STARS AS DID VOLVO.  THAT TELLS YOU SOMETHING.  IT
 7   TELLS YOU THAT SOME PEOPLE WOULD LOOK AT THOSE MAZDA RESULTS
 8   AFTER AN ACCIDENT LIKE THIS AND MONDAY MORNING QUARTERBACK IT
 9   AND SAY, OH, YOU KNOW, I THINK YOU HAD TOO MUCH PAY-OUT.  YOU
10   SHOULD HAVE HAD A HIGHER THRESHOLD.
11             SOMEONE WOULD LOOK AT THE VOLVO IN A DIFFERENT
12   ACCIDENT AND SAY, OH, LOOK AT THOSE CHEST INJURIES.  BOY, YOU
13   KNOW, YOU SHOULD HAVE HAD MORE PAY-OUT.  ANYBODY CAN MONDAY
14   MORNING QUARTERBACK THIS.
15             THE FACT IS WE SOLD A 3.5-KILONEWTON THRESHOLD TO
16   MAZDA FOR THE 2006.  IT WAS NOT OUR IDEA.  IT WAS NOT OUR
17   SUGGESTION.  COULDN'T DISAGREE MORE WITH WHAT HE SAID.  WE GIVE
18   THEM THE MATERIALS, THEY PERFORM THE TESTING AND THEY INCLUDE
19   IN THE VEHICLE WHAT THEY WANT TO INCLUDE IN THE VEHICLE.  WILL
20   WE ANSWER QUESTIONS?  YES.  ARE THEY GOING TO SAY, HEY, YOU
21   KNOW, WHAT DO YOU THINK ABOUT X?  YEAH.  THAT'S COLLABORATION
22   AND JUDGE DUFFEY KNEW ABOUT ALL OF THAT COLLABORATION.
23             WE SUPPLIED A SIX-KILONEWTON THRESHOLD TO VOLVO
24   BECAUSE THEY ASKED FOR IT.  THERE'S A THING CALLED A
25   SPECIFICATION.  CAPITAL S, SPECIFICATION.  AFTER THEY DO THEIR
```

UNITED STATES DISTRICT COURT

1    TESTING THEY COME BACK AND THEY SAY, LISTEN, MR. SUPPLIER OR

2    MS. SUPPLIER, YOU'VE GOT TO GIVE ME A SEATBELT ASSEMBLY THAT

3    DOES THIS OR AN AIRBAG MODULE THAT DOES THIS.

4              IN THE VOLVO SPECIFICATION, IT SAID 6.0 KILONEWTON.

5    IN THE 2005 MAZDA3, IT SAID TWO KILONEWTON.  IN THE 2006 MODEL

6    3, IT SAID 3.5 KILONEWTON.  THAT'S WHAT WE SUPPLIED.

7              I AGREE WITH MR. MEYER THAT THAT FINE TUNING THAT

8    TAKES PLACE WITH THE VEHICLE HAS TO TAKE PLACE.  THE OEM, THE

9    MAZDAS, THE VOLVOS OF THE WORLD, THEY HAVE TO PERFORM THEIR

10   TESTING AND TOUGH DESIGN DECISIONS HAVE TO BE MADE.  AND I

11   DON'T RELISH BEING IN THAT POSITION.  IT'S HARD.  AND YOU ARE

12   TRYING TO PROTECT LIVES AND, YOU KNOW, IT'S SERIOUS BUSINESS.

13   AND YOU GIVETH WITH ONE HAND, YOU TAKETH AWAY WITH THE OTHER

14   EVERY SINGLE TIME.  THAT'S WHAT YOU ARE GOING TO HEAR FROM OUR

15   EXPERTS, WHICH IS YOU DO ONE THING HERE, IT'S GOING TO HAVE AN

16   IMPACT HERE.  WHETHER THAT DECISION WAS RIGHT, WRONG, OR NOT

17   THAT DECISION WAS A MAZDA DECISION.

18             I WANT TO TALK ABOUT THE LAW BRIEFLY.  IN A PRODUCT

19   LIABILITY CASE IN GEORGIA, EVIDENCE OF AN ALTERNATIVE DESIGN IS

20   ONLY RELEVANT IF THAT ALTERNATIVE DESIGN WOULD HAVE PREVENTED

21   OR MINIMIZED THE PLAINTIFF'S INJURIES.  IT IS NOT ENOUGH TO

22   SHOW THAT YOU HAVE AN ALTERNATIVE DESIGN THAT WOULD MAKE IT

23   SAFER IN A VACUUM.  IT HAS TO HAVE MADE A DIFFERENCE.

24             NOW, THAT'S BEEN THE LAW SINCE THE BANKS DECISION.

25   IT'S A SEMINAL CASE IN PRODUCTS LIABILITY LAW IN GEORGIA, THE

1  SUPREME COURT OF GEORGIA (1995).  IN WILSON FOODS, COURT OF

2  APPEALS, SHORTLY AFTER THE BANKS DECISION, THE WILSON FOODS

3  CASE SAYS AS FOLLOWS AND I QUOTE:  THE PLAINTIFF IN A SUIT

4  INVOLVING A CLAIM OF DEFECTIVE DESIGN MAY INTRODUCE EVIDENCE

5  THAT A FEASIBLE ALTERNATIVE DESIGN WHICH WOULD HAVE -- I'M

6  SORRY -- WHICH COULD HAVE PREVENTED OR MINIMIZED THE

7  PLAINTIFF'S INJURIES WAS AVAILABLE AT THE TIME THE MANUFACTURER

8  MADE ITS DESIGN DECISIONS.

9        NOW, IN PLAINTIFF'S RESPONSE BRIEF TO OUR MOTION,

10 PAGE 16, THEY SAY WE HAVE MISREPRESENTED THE LAW TO THIS COURT.

11 THEY SAY IN SIX SEPARATE PLACES THAT THIS RULE THAT WE ARE

12 CITING IS A MADE-UP RULE.

13        THE COURT:  YES, THEY DID SAY THAT.

14        MR. SCRIBNER:  THEY SAID IT'S A MADE-UP RULE.  THAT

15 IS GOING TO BOTHER ME.

16        MAY I APPROACH, YOUR HONOR?

17        THE COURT:  YES, SIR.

18        THANK YOU.

19        MR. SCRIBNER:  THESE ARE THE SUGGESTED PATTERN JURY

20 INSTRUCTIONS.  AND IF YOU SCROLL BACK TO STRICT LIABILITY,

21 62.660, IT SAYS:  IN DETERMINING WHETHER A PRODUCT WAS

22 DEFECTIVE, YOU MAY CONSIDER EVIDENCE OF AN ALTERNATIVE DESIGN

23 THAT WOULD HAVE MADE THE PRODUCT SAFER AND COULD HAVE PREVENTED

24 OR MINIMIZED THE PLAINTIFF'S INJURY.  AND THEY CITE BANKS AND

25 THEY CITE WILSON FOODS.

1           AND SO IF WE ARE WRONG ABOUT THE LAW, WELL,

2     UNFORTUNATELY, THE COURTS IN THIS STATE HAVE BEEN CHARGING

3     JURIES ON THIS FOR A LONG TIME.  I HEAR OVER MY LEFT SHOULDER

4     MUMBLING ABOUT WOULD HAVE VERSUS COULD HAVE.  THEY ARE WRONG.

5     YOU CAN'T JUST SUBMIT AN ALTERNATIVE DESIGN THAT COULD HAVE

6     THEORETICALLY CHANGED THE OUTCOME.  YOU HAVE TO HAVE AN

7     ALTERNATIVE DESIGN THAT WOULD HAVE MADE A DIFFERENCE.

8     OTHERWISE, WHAT ARE WE TALKING ABOUT?  THAT MR. MEYER CAN SAY

9     THREE IS SAFER THAN TWO?

10           WELL, SAFE IS AN INTERESTING WORD.  IT'S NOT SAFER IF

11     HE IS STILL NOT ALIVE.  YOU COULD HAVE AN EIGHT-KILONEWTON

12     THRESHOLD IN THERE.  WOULD IT BE SAFER?  FOR SOME PEOPLE UNDER

13     CERTAIN CIRCUMSTANCES, PERHAPS.  IS IT SAFER TO MR. ANDREWS?

14     YOU NEED A BIOMECHANIC WHO SAYS WITHOUT A DOUBT I HAVE DONE THE

15     MATH AND IT MAKES A DIFFERENCE.

16           WE ASKED THE BIOMECHANIC THAT THEY HAVE HIRED, DR. Z,

17     HAVE YOU DONE ANY WORK IN THIS AREA?  WHAT HAPPENS TO

18     MR. ANDREWS IF IT'S A THREE-KILONEWTON THRESHOLD?  I DON'T

19     KNOW.  WHAT HAPPENS IF IT'S FOUR?  I DIDN'T DO THAT WORK.  WHAT

20     IF IT'S FIVE OR SIX?  I DON'T KNOW.  HOW MUCH DOES IT PAY OUT?

21     I GO AT IT A DIFFERENT WAY, BECAUSE MAYBE HE'S A CRAFTY GUY.  I

22     MIGHT COME HERE AND HE IS GOING TO SAY, WELL, BUT I DO KNOW IT

23     PAYS OUT THIS MUCH, RIGHT?  DOES IT PAY OUT SEVEN INCHES?  DOES

24     IT PAY OUT 12 INCHES?  DOES IT PAY OUT 20 INCHES?  I DO NOT

25     KNOW, WHICH TELLS ME THAT MR. MEYER IS RIGHT THAT THE HIGHER

1  THE THRESHOLD, THE MORE FORCE THAT IS REQUIRED BEFORE IT PAYS

2  OUT.  TRUE.  BUT NO ONE CAN TESTIFY TO A REASONABLE DEGREE OF

3  SCIENTIFIC CERTAINTY THAT A CHANGE IN THE THRESHOLD MAKES A

4  DIFFERENCE HERE.

5         WE'LL MAKE ONE FINAL POINT AND THEN ANSWER ANY

6  QUESTIONS OR SIT DOWN.

7         IN THEIR MOTION TO EXCLUDE THE TESTIMONY OF DR. VAN

8  ARSDELL, THEY MAKE THE FOLLOWING STATEMENT IN THEIR BRIEF:

9  FEDERAL LAW PROHIBITS ANYONE FROM TESTIFYING AS TO INJURY

10 CAUSATION UNLESS THEY HAVE A MEDICAL DEGREE.  I THINK THEY ARE

11 RIGHT.  I MEAN, YOU KNOW, WITH ALL DUE RESPECT TO MR. MEYER, HE

12 IS AN ACCOMPLISHED FELLOW, BUT HE SHOULDN'T BE TELLING US WHAT

13 KIND OF INJURIES PEOPLE ARE GOING TO SUFFER UNDER CERTAIN

14 CIRCUMSTANCES.  WHAT HE CAN SAY IS WHAT HE SAID:  THE HIGHER

15 THRESHOLD, THE MORE FORCE REQUIRED BEFORE IT PAYS OUT.

16        WE APPRECIATE, YOUR HONOR, THAT IT'S A RELAXED

17 STANDARD.  YOU ARE A VERY EXPERIENCED FACT FINDER AND YOU ARE

18 GOING TO SIFT THE WHEAT FROM THE CHAFF, BUT THIS IS A

19 FUNDAMENTAL ISSUE IN THIS CASE AND I AM AFRAID THAT WE SPENT A

20 BIG PORTION, MAYBE 90 PERCENT OF THAT TWO-HOUR TESTIMONY TODAY,

21 ON THAT ISSUE, THE THRESHOLD, AND WE JUST DON'T THINK THAT IT

22 SATISFIES DAUBERT.  AND I'LL ANSWER ANY QUESTIONS IF YOU HAVE

23 ANY.

24        THE COURT:  NOT AT THIS TIME, MR. SCRIBNER.  THANK

25 YOU.


                    UNITED STATES DISTRICT COURT

```
 1              MR. SCRIBNER:  THANK YOU.
 2              THE COURT:  MS. CANNELLA?
 3                     (PAUSE IN PROCEEDINGS)
 4              MS. CANNELLA:  I'M SORRY, YOUR HONOR.
 5              THE COURT:  OKAY.
 6              MS. CANNELLA:  IT'S A LOT TO UNPACK THERE.
 7              YOUR HONOR, THIS IS KIND OF A STRANGE MOTION AND SO
 8    WE HAVE BEEN SCRATCHING OUR HEADS ABOUT IT TO SOME DEGREE.
 9              AUTOLIV ADMITS WE HAVE EVIDENCE THAT AN ALTERNATIVE
10    DESIGN WOULD HAVE SAVED MICAH, SO THEN STOP.  THERE IS NO
11    QUESTION ABOUT THE ADMISSIBILITY OF THAT.  SO WHAT WE ARE
12    QUIBBLING ABOUT IS WHETHER MR. MEYER AND PLAINTIFFS CAN UTTER
13    THE WORDS WEAK TORSION BAR OR STRONG TORSION BAR OR VOLVO OR
14    ANY OF THE OTHER CARS ON THIS CHART.  AND THE EVIDENCE OF THAT
15    IS ON PAGE 15 TO 17 OF THE BRIEF, THE DAUBERT BRIEF.  THE
16    CONCLUSION SAYS THAT AUTOLIV'S --
17              THE COURT:  WHICH DAUBERT, YOURS OR THEIRS?
18              MS. CANNELLA:  THEIRS, YOUR HONOR.  SORRY.  THEIR
19    MOTION TO EXCLUDE THE ALTERNATIVE DESIGN OPINION OF STEVE MEYER
20    ON PAGE 15 TO 17 HAS A CONCLUSION.  AND THEY SAY THAT AUTOLIV
21    IS NOT JUST ASKING TO EXCLUDE EVIDENCE FROM STEVE MEYER ON THE
22    ALTERNATIVE DESIGN OF THE SEATBELT WITH THE HIGHER THRESHOLD.
23    THEY SAY, QUOTE, ALL EVIDENCE AND ARGUMENT RELATED TO THE
24    SUBJECT SEATBELT'S 2.0 KILONEWTON DEPLOYMENT THRESHOLD SHOULD
25    BE EXCLUDED.  ALL OF IT.  THAT, QUOTE, THE COURT SHOULD
```

1    PRECLUDE PLAINTIFF FROM ARGUING THAT THE DEPLOYMENT THRESHOLD

2    AND THE SUBJECT SEATBELT'S RETRACTOR WAS TOO LOW, UNQUOTE.

3            IN OTHER WORDS, WHAT AUTOLIV REALLY WANTS TO DO IS TO

4    KEEP THE COURT FROM HEARING THIS, HOW BAD THIS SEATBELT WAS,

5    AND THAT DOESN'T MAKE ANY SENSE.  THE REASON THEY DON'T WANT

6    THE COURT TO HEAR THAT IS BECAUSE THE DESIGN ITSELF IS

7    COMPLETELY INDEFENSIBLE, WHICH WE HAVE HEARD TODAY AND WHICH WE

8    CAN SEE JUST BY LOOKING AT THIS CHART.

9            SO AS MR. SCRIBNER RECOGNIZED, THERE IS NO WORRY

10   ABOUT UNFAIR PREJUDICE IN A BENCH TRIAL.  THE COURT IS THE

11   GATEKEEPER AND THE FACT FINDER, SO NONE OF THIS -- THIS IS THE

12   PERFECT EXAMPLE OF A MOTION TO HEAR THE EVIDENCE, LET MR. MEYER

13   COME TALK ABOUT THIS, AND THEN, IF THE COURT DECIDES THAT

14   ALTERNATIVE DESIGN SHOULD ONLY BE USED FOR CERTAIN PURPOSES,

15   THEN IT CAN DO THAT AFTER THE TRIAL.

16           THIS EVIDENCE IS, THE EVIDENCE OF HOW EXTREMELY WEAK

17   THE SEATBELT WAS COMPARED TO OTHER AUTOLIV SEATBELTS BEING USED

18   ON THE SAME PLATFORM IS RELEVANT TO PUNITIVE DAMAGES.  IT IS

19   RELEVANT TO A CONSCIOUS DISREGARD FOR THE SAFETY OF THE PEOPLE

20   WHO ARE USING THIS SEATBELT.  IT'S RELEVANT TO HOW REASONABLE

21   IT WAS FOR AUTOLIV TO SELL THIS, TO PUT THIS INTO THE MARKET.

22   IT'S RELEVANT TO THEIR KNOWLEDGE ABOUT HOW DANGEROUS THIS

23   SEATBELT WAS.  AND IT'S RELEVANT TO HOW MUCH OF AN OUTLIER THIS

24   SEATBELT REALLY WAS.

25           SO WHAT THE MOTION IS ABOUT ISN'T ABOUT MR. MEYER OR

UNITED STATES DISTRICT COURT

```
 1   CAUSATION OR, YOU KNOW, MEDICAL CAUSATION OR ANY OF THOSE
 2   THINGS.  IT'S JUST LET'S NOT EVEN TALK ABOUT HOW WEAK AND HOW
 3   TERRIBLE THIS SEATBELT IS.  AND THAT'S NOT, THAT'S NOT A VALID
 4   ARGUMENT.  ALL OF THIS EVIDENCE IS OBVIOUSLY RELEVANT.
 5              YOUR HONOR, I WANTED TO TOUCH ON SOME OF THE THINGS
 6   THAT MR. SCRIBNER SAID THAT WERE SURPRISING.  ONE OF THEM WAS
 7   THAT -- LET'S SEE IF I CAN FIND IT.  I WROTE IT DOWN.
 8              THE FIRST THING THAT SURPRISED ME OR ONE OF THE
 9   THINGS THAT SURPRISED ME IS THAT HE TALKED ABOUT MAZDA MAKING
10   THESE DECISIONS.  AND WE JUST GOT BACK FROM APPEAL, A 17-MONTH
11   DELAY, DURING WHICH TIME THE ELEVENTH CIRCUIT SAID THAT DOESN'T
12   MATTER.  IF YOU MAKE A SEATBELT THAT IS DEFECTIVE AND YOU SELL
13   IT AND THAT DEFECT CAUSES INJURY, YOU ARE LIABLE.  SO, YOU
14   KNOW, WE ARE BACK KIND OF -- IT FEELS A LITTLE LIKE DEJA VU.
15              THE OTHER THING THAT SURPRISED ME WAS THE
16   REPRESENTATION THAT DR. BURTON DID NOT GIVE AN OPINION THAT THE
17   SEATBELT WITHOUT THE AIRBAG WOULD HAVE SAVED MICAH ANDREWS AND
18   THAT'S NOT CORRECT.  MR. WEEKS HAS PULLED UP THE CITATION TO IT
19   AND HE HANDED IT TO ME SOMEWHERE.  NOW I'VE LOST IT.  OKAY.
20              QUESTION:  "SO I'M HAVING" --
21              MR. BUTLER:  PAGE AND LINE, PLEASE.
22              MS. CANNELLA:  I'M SORRY.  WE'RE ON PAGE --
23              MR. BUTLER:  THE BURTON DEPO?
24              MS. CANNELLA:  IT'S PAGE 127 OF THE DR. BURTON DEPO
25   WHICH IS ON THE RECORD.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  PAGE 127.  LINE?

2          MS. CANNELLA:  21.

3          THE COURT:  21.

4          MS. CANNELLA:  QUESTION -- OH, AND LET ME TELL YOU,

5    TOO, THE DOCUMENT IS DOCUMENT 234.

6          THE COURT:  THANK YOU.

7          MS. CANNELLA:  YES, SIR.

8          QUESTION:  SO I'M HAVING -- ARE YOU SAYING THAT JUST

9    THE -- HAD JUST THE SEATBELT WORKED, AS STATED IN ROMAN NUMERAL

10   V - THAT'S HIS OPINION - THAT HE WOULD NOT HAVE RECEIVED THE

11   FATAL INJURIES REGARDLESS OF THE AIRBAG?

12         ANSWER:  YES.

13         SO I'M NOT SURE WHY THAT MATTERS, BUT THAT WASN'T --

14   THAT'S NOT TRUE.

15         AUTOLIV ALSO TALKED ABOUT CHEST INJURIES BEING CAUSED

16   BY THE VOLVO.  THERE IS NO EVIDENCE OF THAT ANYWHERE IN THE

17   CASE.  SO AUTOLIV WAS SELLING THE VOLVO SEATBELT.  IT WAS A

18   SAFE SEATBELT.  THAT, AGAIN, IS NOT ON THE RECORD.

19         THE DEFENDANT SAID, THE DEFENDANT SAID YOU HAVE TO

20   HAVE AN ALTERNATIVE DESIGN THAT, QUOTE, WOULD HAVE MADE A

21   DIFFERENCE.  YOU HAVE TO HAVE A BIOMECHANIC WHO SAYS WOULD HAVE

22   MADE A DIFFERENCE.  BUT THE CHANGE IS SUBTLE BUT IMPORTANT.

23         THE EXHIBIT 3 THAT AUTOLIV HANDED UP SAYS:  IN

24   DETERMINING WHETHER A PRODUCT WAS DEFECTIVE, YOU MAY CONSIDER

25   EVIDENCE OF ALTERNATIVE DESIGNS THAT WOULD HAVE MADE THE

UNITED STATES DISTRICT COURT

1  PRODUCT SAFER.  WOULD, WOULD HAVE MADE THE PRODUCT SAFER.  AND

2  THE SECOND THING:  AND COULD HAVE PREVENTED OR MINIMIZED THE

3  PLAINTIFF'S INJURY.

4         THOSE ARE TWO SEPARATE THINGS.  WOULD HAVE MADE THE

5  PRODUCT SAFER, WE ONE HUNDRED PERCENT APPROVE THAT TODAY, THAT

6  A SIX-KILONEWTON TORSION BAR IS SAFER.  AND COULD HAVE

7  PREVENTED OR MINIMIZED THE PLAINTIFF'S INJURY.  WELL, IT'S JUST

8  PHYSICS.  MR. MEYER TALKED ABOUT A STRONGER TORSION BAR REDUCES

9  YOUR ABILITY TO MOVE FORWARD.  THAT'S GOING TO MINIMIZE YOUR

10 IMPACT WITH THE STEERING WHEEL.  SO IT MEETS EVEN AUTOLIV'S

11 JURY INSTRUCTION THAT, YOU KNOW, AUTOLIV CONTENDS THIS HELPS

12 IT.  IT DOESN'T HELP IT.  IT SAYS THAT OUR EVIDENCE IS

13 ADMISSIBLE.  IT'S THE SAME KIND OF SHELL GAME THAT GOT AUTOLIV

14 IN TROUBLE WITH THE ELEVENTH CIRCUIT.  IT'S NOT A VALID READING

15 OR A CORRECT READING OF THE JURY INSTRUCTION.

16        I'LL ALSO NOTE, YOUR HONOR, THAT NO CASE, NO GEORGIA

17 CASE HAS EVER SAID IF YOU CANNOT MAKE A ONE HUNDRED PERCENT

18 CONNECTION BETWEEN AN ALTERNATIVE DESIGN AND THE INJURY CAUSED

19 THAT EXPERT IS OUT.  THAT WOULD BE, THIS WOULD BE SOMETHING

20 THAT DOESN'T APPEAR IN THE GEORGIA CASE LAW.

21        SO WE'VE GOT BANKS, WHICH WE'VE QUOTED THE LANGUAGE

22 IN OUR BRIEF, WHICH SAYS THAT YOU HAVE TO PROVE THAT THERE WAS

23 A SAFER ALTERNATIVE, A SAFER ALTERNATIVE, WHICH WE HAVE DONE.

24 AND THEN WHOLE FOODS, WHICH TALKS ABOUT -- IT'S A STRANGE CASE.

25 IT'S 1996, FIRST OF ALL.  WE'VE GOT CERTAINTEED, WHICH IS AN

```
1   ELEVENTH CIRCUIT CASE AFTER THAT, AND WE'VE GOT MULTIPLE
2   GEORGIA SUPREME COURT CASES AFTER THAT WHICH DO NOT USE THE
3   LANGUAGE IN THE WHOLE FOODS CASE, FIRST OF ALL.  SO WHATEVER
4   WAS GOING ON IN WHOLE FOODS HAS NEVER BEEN REPLICATED AT THE
5   GEORGIA SUPREME COURT OR ANY OF THE CASES AFTER IT.  THAT'S
6   NUMBER ONE.
7            NUMBER TWO, THE WHOLE FOODS OPINION IS A VERY STRANGE
8   ONE.  IT TALKS ABOUT THE ALTERNATIVE DESIGN BEING A SUBSEQUENT
9   REMEDIAL MEASURE, THAT THEY WERE POST-INJURY AND
10  POST-MANUFACTURER ALTERNATIVE DESIGNS.  AND IT DOESN'T
11  ACTUALLY -- YOU KNOW, IT'S JUST A VERY STRANGE CASE.  IT
12  DOESN'T REALLY SQUARE WITH ANYTHING ELSE IN GEORGIA LAW.
13           IT'S UNDISPUTED AND UNDISPUTABLE THAT STRONGER
14  TORSION BARS WOULD HAVE DECREASED MR. ANDREWS' FORWARD MOTION.
15  EVEN AUTOLIV ADMITS THAT.  AND EVEN IF HE HAD HIT THE STEERING
16  WHEEL, A STRONGER TORSION BAR WOULD HAVE DONE -- WOULD HAVE
17  REDUCED THE FORCE OF THAT IMPACT.  THAT COULD HAVE MINIMIZED
18  HIS INJURY.  THAT'S WHAT THAT IS FROM THE JURY INSTRUCTIONS.
19           IT IS UNDISPUTED AND UNDISPUTABLE THAT THE WHOLE
20  POINT OF A SIX-KILONEWTON TORSION BAR IS TO REDUCE THAT FORWARD
21  MOTION AND REDUCE, ELIMINATE OR MINIMIZE SUCH AN IMPACT AND THE
22  INJURY.
23           AUTOLIV HAS ADMITTED THAT A STRONGER TORSION BAR
24  ALLOWS LESS SPOOL-OUT.  THAT'S FROM THEIR 30(B)(6) DEPONENT.  A
25  STRONGER TORSION BAR ALLOWS LESS SPOOL-OUT AND THAT'S WHAT WE
```

UNITED STATES DISTRICT COURT

1  ARE TALKING ABOUT HERE.  LESS SPOOL-OUT WOULD HAVE SAVED MICAH

2  ANDREWS.

3          NOW, IT'S IMPORTANT WHEN DECIDING THIS MOTION TO

4  DISTINGUISH BETWEEN WHAT THE COURT CONSIDERS TO DECIDE DEFECT

5  AND WHAT THE COURT CONSIDERS TO DECIDE CAUSATION.  SO FOR

6  DEFECT THE LAW IN GEORGIA IS THAT YOU HAVE TO PROVE

7  REASONABLENESS.  IT'S A RISK UTILITY ANALYSIS.

8          THE LAW SAYS ALTERNATIVE DESIGN IS ADMISSIBLE AS LONG

9  AS IT'S, QUOTE, SAFER THAN THE DESIGN CHOSEN, AND

10 REASONABLENESS OF THE DESIGN LOOKS AT THE DECISION THAT THE

11 DEFENDANT MADE AT THE TIME IT WAS BEING MADE.

12         SO WE ARE NOT TALKING ABOUT MICAH ANDREWS WHEN THEY

13 MADE THIS DECISION BACK IN 1999 TO SELL THIS WEAK TORSION BAR.

14 WE ARE TALKING ABOUT WHAT WAS THE INFORMATION AVAILABLE AT THE

15 TIME TO DECIDE WHETHER THAT WAS A REASONABLE DECISION OR AN

16 UNREASONABLE DECISION.  AND ALL OF THESE, ALL THIS EVIDENCE

17 THAT SHOWS HOW OTHER MANUFACTURERS WERE USING TORSION BARS AND

18 PREVENTING THIS KIND OF SPOOL-OUT SHOWS HOW UNREASONABLE THE

19 DESIGN IS.

20         OKAY.  THE QUESTION FOR THE COURT IS:  WAS THE

21 DECISION REASONABLE WHEN AUTOLIV MADE IT?  AND THAT REQUIRES

22 LOOKING AT ALL ALTERNATIVES AVAILABLE TO AUTOLIV WHEN IT

23 DECIDED TO SELL THIS DANGEROUSLY WEAK TORSION BAR.

24         THE JONES V. NORDIC TRACK DECISION, WHICH IS AFTER

25 THAT WHOLE FOODS DECISION, IT'S A GEORGIA 2001 CASE, SUPREME

1   COURT, 550 SOUTHEAST 2D 101, SAYS THE, QUOTE, HEART OF A DESIGN

2   DEFECT CASE IS THE REASONABLENESS OF SELECTING FROM ALTERNATIVE

3   PRODUCT DESIGNS AND ADOPTING THE SAFEST FEASIBLE ONE.  SO THE

4   HEART OF THE CASE IS THE REASONABLENESS OF SELECTING THE DESIGN

5   FROM THE ALTERNATIVE DESIGNS AND ADOPTING THE SAFEST REASONABLE

6   ONE.

7           YOUR HONOR, I NOTICED WHEN AUTOLIV SAID, WELL, IF IT

8   DOESN'T SAVE HIM, THEN IT DOESN'T MAKE A DIFFERENCE, THEN THERE

9   IS NOT A DEFECT, THAT THAT MAKES KIND OF, I THINK, COMMON SENSE

10  TO PEOPLE.  BUT THE LAW IS YOU PROVE -- IF THE DESIGN IS

11  DEFECTIVE, AND THAT CONSIDERS ALL THE ALTERNATIVES AS LONG AS

12  THEY ARE SAFER, AND THEN YOU LOOK AT WHETHER THE RISK OUTWEIGHS

13  THE UTILITY OR THE UTILITY OUTWEIGHS THE RISK, AND ONCE YOU

14  HAVE A DEFECT YOU LOOK AT THE DEFECT TO SEE IF IT CAUSED THE

15  INJURY.  THAT'S HOW THE ANALYSIS WORKS UNDER GEORGIA LAW.

16          OKAY.  AND LIKE I SAID EARLIER, WE DO HAVE AN

17  ALTERNATIVE DESIGN THAT UNQUESTIONABLY WOULD HAVE SAVED HIM.

18  SO THAT'S NOT REALLY THE ISSUE OF THIS MOTION.

19          THE ELEVENTH CIRCUIT IN THE CERTAINTEED CASE SAID THE

20  SAME THING AS THE JONES V. NORDIC TRACK CASE AND THAT IS THAT

21  AN ALTERNATIVE DESIGN WOULD HAVE MADE THE PRODUCT SAFER THAN

22  THE ORIGINAL DESIGN AND WAS A MARKETABLE REALITY AND

23  TECHNOLOGICALLY FEASIBLE.  THAT'S EXACTLY WHAT MR. MEYER WILL

24  TESTIFY ABOUT AND THAT'S EXACTLY THE EVIDENCE THAT AUTOLIV

25  WANTS THE COURT TO EXCLUDE.  EVIDENCE THAT THE ELEVENTH CIRCUIT

1   SAYS THE COURT MUST CONSIDER IS WHAT AUTOLIV IS ASKING THE

2   COURT TO EXCLUDE.

3          I'M TRYING TO SHORTEN IT UP FOR YOU.

4          THE COURT:  DO WHAT YOU'VE GOT TO DO.

5          MS. CANNELLA:  OKAY.

6          THE COURT:  AFTER TODAY YOU DON'T GET TO SEE ME UNTIL

7   YOU SEE MY RULING.

8          MS. CANNELLA:  THAT'S TRUE.  THANK YOU, YOUR HONOR.

9          OKAY.  BANKS IS ONE OF THOSE UNUSUAL CASES THAT

10  ACTUALLY TELLS YOU WHAT THE HOLDING IS.  SO BANKS IS GREAT FOR

11  THAT PURPOSE.  AND IT IS THE SEMINAL PRODUCTS LIABILITY CASE.

12  IT'S THE ONE THAT CREATES THE RISK UTILITY TEST THAT EXISTS IN

13  GEORGIA TO DECIDE IF SOMETHING IS DEFECTIVE.

14         BANKS SAYS "WE HOLD" AND UNDER "WE HOLD" IT SAYS THE

15  TRIER OF FACT MAY CONSIDER AN ALTERNATIVE DESIGN THAT WOULD

16  HAVE MADE THE PRODUCT SAFER THAN THE ORIGINAL DESIGN, PERIOD.

17  THAT'S WHAT IT SAYS.  WOULD IT HAVE MADE IT SAFER?  YOU CAN

18  CONSIDER IT.

19         THIS IS NOT A TRUE DAUBERT MOTION.  THIS IS A MOTION

20  IN LIMINE TO EXCLUDE EVIDENCE THAT AUTOLIV WANTS THE COURT TO

21  BELIEVE IS NOT RELEVANT, EVIDENCE OF HOW BAD THE SEATBELT WAS,

22  HOW WEAK IT WAS, BECAUSE IT'S SUPPOSEDLY NOT RELEVANT, AND

23  THAT'S REALLY HONESTLY JUST RIDICULOUS.  I DON'T WANT TO

24  CHARACTERIZE, BUT IT IS RIDICULOUS.  THE COURT CAN CONSIDER THE

25  EVIDENCE AND DETERMINE WHAT IS RELEVANT AT THE TRIAL AND THERE

UNITED STATES DISTRICT COURT

1  IS NO DOUBT THAT THIS TESTIMONY BY MR. MEYER IS RELEVANT.

2          THANK YOU.

3          THE COURT:  THANK YOU.

4          MR. SCRIBNER?

5          MR. SCRIBNER:  BRIEFLY, YOUR HONOR?

6          THE COURT:  YOU GET THE LAST WORD.

7          MR. SCRIBNER:  THANK YOU.

8          PERHAPS SHIPS PASSING IN THE NIGHT.  MS. CANNELLA

9  SAID THERE IS NO LAW THAT SAYS YOU HAVE TO HAVE A HUNDRED

10 PERCENT CONNECTION BETWEEN THE ALTERNATIVE DESIGN AND THE

11 OUTCOME.  SHE IS RIGHT ABOUT THAT.  BUT THEY HAVE ZERO.  THEY

12 DON'T HAVE 90 PERCENT.  THEY DON'T HAVE 60 PERCENT.  THEY HAVE

13 ZERO.  THEY LITERALLY HAVE ZERO.

14         YOU WOULD BE AT LIKE A MED. MAL. CASE WHERE SOMEBODY

15 SAYS THE DOCTOR DIDN'T DO IT RIGHT.  THEY PERFORMED THE A-B-C

16 PROCEDURE.  THEY SHOULD HAVE PERFORMED THE X-Y-Z.  UNTIL YOU

17 CAN SHOW THAT THE X-Y-Z WOULD HAVE SAVED HIS LIFE, WHAT ARE WE

18 TALKING ABOUT?  WHAT ARE WE TALKING ABOUT?

19         MS. CANNELLA SAID THAT MEYER DOES IT ALL.  I THINK

20 THAT TELLS YOU EVERYTHING THERE IS TO TELL ABOUT DR. Z.  I

21 DIDN'T HEAR A WORD ABOUT DR. Z SUPPORTING THIS THEORY BECAUSE

22 HE CAN'T.  HE CAN'T DO IT.  HE DIDN'T DO THE BACKBREAKING

23 LABOR.  HE DOESN'T HAVE THE SKILLS TO DO IT.  HE DIDN'T DO THE

24 MATH.

25         WHY HAVE A BIOMECHANIC AT ALL, THEN, IF ALL WE NEED

1  IS THAT FELLOW UP THERE SAYING, "LOOK, HIGHER THRESHOLD.  YOU

2  NEED MORE FORCE"?  WHY HAVE A BIOMECHANIC?  PEOPLE HIRE

3  BIOMECHANICS BECAUSE THEY NEED TO ESTABLISH CAUSATION AND THEY

4  NEED TO SHOW THAT THAT ALTERNATIVE DESIGN WOULD MAKE A

5  DIFFERENCE.  NOT COULD HAVE, THEORETICALLY.  OTHERWISE, THINK

6  ABOUT WHAT TRIALS WOULD BE.  I'D HAVE A THOUSAND ALTERNATIVE

7  DESIGNS THAT THEORETICALLY COULD HAVE MADE A DIFFERENCE.  NO.

8  THEY HAVE TO SHOW THAT MORE LIKELY THAN NOT IT WOULD HAVE, NOT

9  TO A HUNDRED PERCENT CERTAINTY, BUT THEY GOT ZERO HERE.

10          THE LAST THING I'LL MENTION, TWO THINGS THAT I

11  STRONGLY DISAGREE WITH.

12          YES, I DISAGREE WITH THE ELEVENTH CIRCUIT,

13  RESPECTFULLY, BUT THEY DID COME BACK AND SAY, LOOK, I DON'T

14  CARE IF YOU DESIGNED THIS THING OR NOT.  IF IT'S DEFECTIVE, YOU

15  ARE ON THE HOOK.  THAT'S JUDGE WILSON.  WE ARE LIVING WITH

16  THAT.  BUT TO SUGGEST THAT ACTIVE INVOLVEMENT DOESN'T MATTER

17  ANYMORE, THIS COURT WILL ULTIMATELY ALLOCATE RESPONSIBILITY FOR

18  THIS MAN'S TRAGIC LIFE, HIS SINGLE DRIVER ERROR.  DRIVING OFF

19  IS A PART OF THIS.  MAZDA'S AIRBAG IS A PART OF THIS.  MAZDA'S

20  DESIGN DECISION WITH RESPECT TO THE SEATBELT IS A PART OF THIS.

21          OUR INVOLVEMENT AND HOW MUCH WE DID IN TERMS OF THAT

22  DECISION IS THE CRUX OF OUR CASE.  IT'S STILL IMPORTANT.  IT'S

23  NOT IMPORTANT INSOFAR AS, YES, JUDGE WILSON SAID THAT YOU CAN

24  HAVE A LEGAL CLAIM AGAINST US, BUT ULTIMATELY, THE COURT'S

25  GOING TO HAVE TO DECIDE, YOU KNOW, WHO IS AT FAULT.


UNITED STATES DISTRICT COURT

1          THE LAST THING I WILL SAY -- I SAID IT WAS THE LAST

2     THING AND I WAS WRONG.  THERE IS A LOT OF TALK ABOUT WEAK AND

3     STRONG SEATBELTS.  THERE'S NO WEAK OR STRONG SEATBELT.  THAT'S

4     NOT A WEAK SEATBELT.  IT IS A SEATBELT THAT HAS A THRESHOLD

5     THAT REQUIRES LESS FORCE IN ORDER TO PAY OUT.

6          IF MY MISSION WAS TO MAKE SURE THAT THE FACT FINDER

7     DIDN'T HEAR ABOUT ALL OF THIS, I DID A PRETTY BAD JOB BECAUSE

8     YOU HEARD IT ALL.  THAT'S NOT WHY WE ARE DOING THIS.  WE ARE

9     DOING THIS BECAUSE THIS TRIAL SHOULD BE A SHORT TRIAL.  IT'S A

10    BENCH TRIAL.  I THINK THE PARTIES CAN GET TOGETHER AND, YOU

11    KNOW, ENTER MORE STIPULATIONS THAN WE DID PREVIOUSLY.  THIS IS

12    A VERY STRAIGHTFORWARD CASE.  IF WE SPEND DAYS ON A THRESHOLD

13    WHEN IT DOESN'T MATTER AND CAN'T FORM THE BASIS OF YOUR

14    OPINION, I THINK WE ARE NOT DOING OUR JOBS.

15         THE COURT:  THANK YOU.

16         OKAY.  WHAT DO YOU ALL WANT TO DEAL WITH NEXT?

17         MS. CANNELLA:  YOUR HONOR, WE SUGGEST DEALING WITH

18    THE MOTION FOR SANCTIONS NEXT.

19         THE COURT:  MR. SCRIBNER?

20         MR. SCRIBNER:  FINE, YOUR HONOR.

21         MS. CANNELLA:  LET'S SEE.  I'VE GOT ANOTHER

22    POWERPOINT HERE SOMEWHERE IF I CAN GET IT UP.  I'LL MOVE THIS

23    ALONG.

24         UNFORTUNATELY, YOUR HONOR, THERE ARE ONLY TWO

25    DECISIONS FOR THIS COURT TODAY, ONLY TWO CHOICES, TO EITHER

1  ENCOURAGE AUTOLIV'S BEHAVIOR AND BEHAVIOR LIKE IT OR TO

2  DISCOURAGE THIS KIND OF BEHAVIOR IN THE FUTURE.  WE RECOGNIZE

3  IT'S A DIFFICULT DECISION, BUT -- AND IT'S A DIFFICULT POSITION

4  TO BE IN, BUT HERE WE ARE.

5          LET ME GIVE A SHORT DESCRIPTION OF THE PROCEDURAL

6  BACKGROUND IN THE CASE AND LET ME, BEFORE I DO THAT, LET ME

7  GIVE YOU A COPY OF THE POWERPOINT, WHICH IS PLAINTIFF'S 1107.

8          THE COURT:  THANK YOU.

9          MS. CANNELLA:  OKAY.  BACK AT THE TIME THE CASE WAS

10  PENDING IN DISCOVERY, THE DISTRICT COURT ORDERED ALL DOCUMENTS

11  RELATED TO THE DEVELOPMENT OF THE SEATBELT PRODUCED.  AND THERE

12  WERE A NUMBER OF DIFFERENT WAYS THAT THE COURT DID THIS, BUT

13  THE SIMPLEST ONE TO TALK ABOUT IS RPD23, WHICH IS ON THE

14  SCREEN.  PLEASE PRODUCE ALL DOCUMENTS, INCLUDING BUT NOT

15  LIMITED, DRAWINGS OR SCHEMATICS REFLECTING OR DESCRIBING THE

16  DEVELOPMENT OF THE OCCUPANT RESTRAINT SYSTEM IN THE SUBJECT

17  VEHICLE MODEL, WHETHER CREATED BY MAZDA, A SUPPLIER, OR OTHER

18  ENTITY.  THIS REQUEST INCLUDES BUT IS NOT LIMITED TO ALL

19  DOCUMENTS REGARDING THE DEVELOPMENT AND SELECTION OF THE

20  COMPONENTS OF THE SEATBELT SYSTEM, INCLUDING THE TORSION BAR,

21  BUCKLE AND PRETENSIONER FOR THE SUBJECT VEHICLE MODEL.

22          AUTOLIV TOLD THE COURT IT DIDN'T HAVE MUCH OF

23  ANYTHING.  IT SAID THAT THAT'S NOT HOW COMPONENT SUPPLIER

24  RELATIONSHIPS WORK.  WE ARE JUST FILLING AN ORDER.  AND YOU GOT

25  A TASTE OF THAT TODAY.  WE GOT THE SPEC.  WE GOT THIS PRODUCT.

1   WE FILLED THE SPEC.  THEY DID THE TESTING.

2           AUTOLIV FILED A MOTION FOR SUMMARY JUDGMENT ON THE

3   GROUND THAT PLAINTIFF DIDN'T HAVE EVIDENCE OF, QUOTE, ACTIVE

4   INVOLVEMENT.  JUDGE DUFFEY BELIEVED AUTOLIV'S ARGUMENT AND

5   VERSION OF EVENTS AND GRANTED SUMMARY JUDGMENT.

6           AUTOLIV USED THE EXISTENCE OF THE OFFER OF JUDGMENT

7   IT HAD IN PLACE TO PRESSURE MS. ANDREWS INTO DISMISSING HER

8   APPEAL.  TO BE CLEAR, THIS IS NOT A CASE SEEKING SANCTIONS FOR

9   LATE PRODUCTION OR FAILURE TO PRODUCE DOCUMENTS.  THAT'S NOT

10  WHAT'S GOING ON.  WE ARE SEEKING SANCTIONS, ONE, BECAUSE

11  AUTOLIV VIOLATED A COURT ORDER TO PRODUCE DOCUMENTS; AND TWO,

12  BECAUSE AUTOLIV USED THAT CONCEALMENT TO MAINTAIN A DEFENSE

13  THAT WAS FALSE.

14          WE ARE SEEKING SANCTIONS BECAUSE AUTOLIV USED ITS

15  CONCEALMENT TO PROCURE SUMMARY JUDGMENT AND WE ARE SEEKING

16  SANCTIONS BECAUSE AUTOLIV TRIED TO MANIPULATE THAT, I SHOULD

17  SAY, PRESSURE MS. ANDREWS TO ACCEPT THAT ERRONEOUS GRANT OF

18  SUMMARY JUDGMENT BY OBTAINING AN ORDER FORCING HER TO PAY THE

19  ATTORNEY'S FEES OF THIS MULTIBILLION-DOLLAR CORPORATION.

20          WE ARE SEEKING SANCTIONS BECAUSE AUTOLIV FORCED

21  PLAINTIFF TO WASTE YEARS ON APPEAL, WASTED THE DISTRICT COURT'S

22  TIME AND RESOURCES.  IT WAS 17 MONTHS ON APPEAL.  THEN WE GOT

23  BACK HERE.  WE HAD MORE DELAY WHEN WE GOT THE DOCUMENTS.  AND

24  IT WASN'T JUST DISTRICT COURT TIME THAT WAS WASTED.  IT WAS THE

25  ELEVENTH CIRCUIT TIME AS WELL.  ALL THE WHILE MS. ANDREWS

1  INSISTING ON FIGHTING A DECISION THAT SHE BELIEVED WAS UNJUST

2  AND WRONG.

3          THERE HAS TO BE A CONSEQUENCE FOR THIS AND ATTORNEY'S

4  FEES IS NOT IT.  WE CAN TELL BY AUTOLIV'S RESPONSE THAT

5  ATTORNEY'S FEES IS A WIN.  THEY DO NOT CARE ABOUT ATTORNEY'S

6  FEES.  THEY ASKED THE COURT TO CHOOSE THAT SANCTION.

7          THE COURT:  AUTOLIV MAKES TWO ARGUMENTS IN THEIR

8  BRIEFS.  ONE, THAT THE INFORMATION YOU RECEIVED IS NO SMOKING

9  GUN; TWO, IT REALLY DIDN'T HURT YOU, THE DELAY DIDN'T HURT YOU.

10  AND YOU JUST ARGUED THAT THE 17 MONTHS, THE DELAY DID HURT.

11  TELL ME WHY AUTOLIV IS WRONG IN THOSE TWO ARGUMENTS.  ONE, THEY

12  SAY, AND I QUOTE, IT'S INSIGNIFICANT DOCUMENTS.  THEN THEY ALSO

13  SAY IT'S NO SMOKING GUN.  AND THEY END UP SAYING THE PLAINTIFFS

14  WERE NOT PREJUDICED IN THE DELAY IN THE PRODUCTION.  YOU JUST

15  SAID YOU WERE.  EXPAND ON THAT.

16          MS. CANNELLA:  ABSOLUTELY, YOUR HONOR.

17          THREE RESPONSES TO THAT.  THE FIRST IS THAT'S

18  MIND-BOGGLING TO ME.  YOU CAN'T LIE TO A COURT AND THEN COME

19  BACK AND SAY, WELL, IT WAS ONLY 17 MONTHS.  WELL, YOU KNOW,

20  THEY WEREN'T THAT BIG OF A DEAL.  LET'S MOVE ON.

21          THE REPRESENTATIONS THAT ARE IN THEIR BRIEFING AND

22  THAT ARE REFLECTED IN THE COURT'S ORDER SHOW THAT THESE

23  DOCUMENTS WOULD HAVE MADE A DIFFERENCE.  THEY WERE RELEVANT.

24  SO YOU CAN TALK ABOUT AND MR. MEYER DID TALK ABOUT HOW SOME OF

25  THE VA/VE'S ARE EXACTLY ABOUT THE RETRACTOR.  SOME OF THE ONES

1   WE DON'T HAVE ARE ABOUT AUTOLIV'S SUGGESTION TO DECREASE THE

2   ROBUSTNESS OF THE RETRACTOR.

3          THE COURT:  HOW WOULD YOU HAVE ARGUED THE SUMMARY

4   JUDGMENT TO JUDGE DUFFEY DIFFERENTLY IF YOU HAD HAD THIS

5   INFORMATION?  IN READING JUDGE -- I AGREE WITH YOU.  JUDGE

6   DUFFEY'S MOTION FOR SUMMARY JUDGMENT ORDER IS BASED ON FINDING

7   THAT AUTOLIV WAS NOT ACTUALLY INVOLVED IN THE DESIGN.

8          MS. CANNELLA:  ABSOLUTELY.

9          THE COURT:  WHAT WOULD YOU HAVE DONE DIFFERENTLY IF

10  YOU HAD HAD THIS INFORMATION?

11         MS. CANNELLA:  WE WOULD HAVE DONE MULTIPLE THINGS.

12         SO LET ME -- I THINK THIS IS PROBABLY THE MOST

13  HELPFUL WAY TO GO THROUGH THAT IS I HAVE THEM KIND OF LINED UP.

14         SO WHAT YOU SEE ON THE TOP LEFT OF THIS SLIDE IS

15  PLAINTIFF -- IS A QUOTE FROM THE ORDER.  PLAINTIFF OFFERS ONLY

16  BARE SPECULATION TO SUPPORT ITS ARGUMENT THAT AUTOLIV WAS

17  ACTIVELY INVOLVED IN THE DESIGN OF THE SEATBELT ASSEMBLY.  BARE

18  SPECULATION IS WHAT HE SAID.  IF WE WOULD HAVE HAD THESE

19  DOCUMENTS, WE WOULD HAVE BEEN ABLE TO SHOW HIM THAT THE LOAD

20  LIMITING RETRACTOR USED IN MICAH ANDREWS' CAR IS AN AUTOLIV

21  RETRACTOR.  IT'S GOT THE NAME ON IT RIGHT THERE.  IT'S GOT THE

22  COMPLETION DATE THAT IS BEFORE THE DAY THAT THE MAZDA PROGRAM

23  KICKED OFF.  IT ALSO LISTS OTHER CLIENTS THAT AUTOLIV IS

24  SELLING THE SEATBELT TO.  SO THAT STATEMENT RIGHT THERE WE

25  COULD HAVE EXPLAINED TO JUDGE DUFFEY WAS NOT RIGHT.


                    UNITED STATES DISTRICT COURT

```
 1              THE SECOND THING ON THIS SLIDE IS THE EVIDENCE
 2    SUPPORTS ONLY AUTOLIV'S -- ONLY THAT AUTOLIV'S ROLE WAS
 3    LIMITING TO CHOOSING THE COMPONENTS APPROPRIATE FOR THE MAZDA3
 4    BASED ON MAZDA SPECIFICATIONS.  WE KNOW THAT'S NOT TRUE.  WE
 5    HAVE A TOLLGATE THAT SAYS THE VA/VE SUGGESTION WAS AUTOLIV'S
 6    SUGGESTION TO TAKE A LOAD LIMITER THAT WAS DIGRESSIVE, AND
 7    THEREFORE STRONGER, AND TO REDUCE IT TO A WEAKER LOAD LIMITER,
 8    AND EVENTUALLY THE WEAKER ONE IS THE ONE THAT MADE IT INTO THE
 9    MAZDA.  SO THAT'S ANOTHER STATEMENT WE COULD HAVE REBUTTED.
10              THE COURT SAID PLAINTIFF ONLY OFFERS -- OH, I'M
11    SORRY.  LET ME BACK UP.  THAT'S THE SAME QUOTE BUT ADDITIONAL
12    DOCUMENTS THAT WOULD HAVE HELPED US REBUT THAT.
13              ON THE RIGHT IS THE STATEMENT OF WORK, PLAINTIFF'S
14    EXHIBIT 10, AND IT HAS THE STATEMENT THAT IF THERE'S
15    CONCERNS -- CONCERNS IS THE WORD THAT AUTOLIV USED IN THE
16    DOCUMENT IT PRODUCED TO US.  DEFECT IS THE WORD THAT THE
17    JAPANESE TRANSLATOR, CHECK TRANSLATOR, SAID IT ACTUALLY SAYS.
18    SO IT DOESN'T SAY CONCERNS.  IT SAYS DEFECTS.  THAT TRANSLATOR,
19    BY THE WAY, IS THE SAME TRANSLATOR THAT AUTOLIV USED TO CREATE
20    A SEPARATE BATCH OF TRANSLATIONS.  SO SHE'S KIND OF THE GOLD
21    STANDARD.
22              ANYWAY, SO WE WOULD HAVE HAD THIS DOCUMENT THAT
23    AUTOLIV'S ALREADY ADMITTED GOVERN THE RELATIONSHIP BETWEEN
24    AUTOLIV AND MAZDA.  AND THIS DOCUMENT SAYS THAT AUTOLIV HAS A
25    DUTY TO REPORT CONCERNS OR DEFECTS AND INVESTIGATE THEM AND
```

1   PROVIDE COUNTERMEASURES.  IT HAD ALL THOSE DUTIES.  THE COURT

2   DIDN'T KNOW ABOUT ANY OF THOSE THINGS WHEN IT SAID AUTOLIV'S

3   ROLE WAS LIMITED TO CHOOSING COMPONENTS JUST TO MEET THE

4   SPECIFICATION.  THE COURT DIDN'T KNOW THAT.

5         THE COURT DIDN'T KNOW ABOUT THE VA/VE SUGGESTIONS

6   WHERE AUTOLIV ACTUALLY WENT TO MAZDA AND SAID HERE IS A DESIGN

7   CHANGE WE THINK YOU SHOULD MAKE AND MAZDA MADE THE DESIGN

8   CHANGE.  IT MADE EVERY SINGLE ONE OF THE DESIGN CHANGES THAT

9   AUTOLIV SUGGESTED THAT WE KNOW ABOUT.  THE COURT DIDN'T KNOW

10  THAT.  THEY DIDN'T HAVE ANY CLUE, YOU CAN TELL FROM THE ORDER,

11  THAT THAT WAS GOING ON.

12        THE COURT SAID THE PLAINTIFF DOES NOT OFFER ANY

13  EVIDENCE TO SHOW THAT AUTOLIV'S ANALYSIS OF THE COUNTERMEASURES

14  RESULTED IN AUTOLIV SUGGESTING OR ENACTING ANY CHANGES TO THE

15  SEATBELT ASSEMBLY DESIGN.  SO, AGAIN, THESE ARE VA/VE

16  SUGGESTIONS.  MAZDA IS IMPLEMENTING THEM.  SO THAT'S EVIDENCE

17  THAT THE COURT WOULD HAVE PROBABLY WANTED TO HEAR THAT NOT ONLY

18  WERE THEY MAKING SUGGESTIONS BUT THE SUGGESTIONS ARE BEING

19  ADOPTED.  THEY HAD THIS INFLUENCE.

20        THE DISTRICT COURT DID NOT KNOW THAT AUTOLIV WAS

21  RESPONSIBLE FOR REPORTING CONCERNS.  AND YOU CAN SEE THAT IN

22  THIS QUOTE FROM THE ORDER.  QUOTE:  MAZDA, NOT AUTOLIV,

23  PROVIDED THE COUNTERMEASURES THAT AUTOLIV WAS TO LOOK INTO.

24  WELL, GUESS WHAT?  THAT WAS TRUE FOR THE ONE DOCUMENT THAT

25  AUTOLIV HAD GIVEN US THAT THE COURT SAW BUT IT WASN'T TRUE FOR

UNITED STATES DISTRICT COURT

1  THEIR RELATIONSHIP, THE STATEMENT OF WORK THAT GOVERNED THEIR

2  RELATIONSHIP.  SO THEY HAD DUTIES TO DO THESE THINGS AND THE

3  COURT CARED ABOUT THE FACT THAT IT THOUGHT IT DIDN'T HAVE THAT

4  DUTY AND WASN'T DOING IT.  SO THAT WOULD HAVE BEEN DIFFERENT.

5           AUTOLIV ALSO PROVIDED THIS 30(B)(6) TESTIMONY TO THE

6  COURT WHICH THE COURT QUOTED.

7           THE COURT:  I AM GOING TO ASK MR. SCRIBNER ABOUT

8  THAT.

9           MS. CANNELLA:  YES.  THE COURT QUOTED IT RIGHT IN ITS

10  ORDER.

11           MR. PRENTKOWSKI FURTHER TESTIFIED:  I SPECIFICALLY

12  ASKED, "DID MAZDA ASK AUTOLIV JAPAN FOR ANY INPUT ON THE

13  SYSTEM-LEVEL DESIGN SPECIFICATIONS?"

14           THE ANSWER WAS:  "NOT ON THE SEAT."  THE AUTOLIV

15  JAPAN RESPONSE WAS, "NOT ON THE SEATBELT SYSTEMS."

16           THAT'S NOT TRUE.  THAT'S NOT TRUE.  WE DIDN'T HAVE

17  THESE DOCUMENTS WHEN WE DEPOSED MR. PRENTKOWSKI.  WE COULDN'T

18  IMPEACH HIM ABOUT IT, WE COULDN'T ASK HIM ABOUT IT, AND THE

19  COURT DIDN'T HAVE THAT INFORMATION.

20           THE COURT:  YES, MS. CANNELLA.  THAT ONE HAS A STAR

21  BY IT.

22           MS. CANNELLA:  YES.

23           SO WHY DID AUTOLIV FINALLY PRODUCE THE DOCUMENTS?

24  THAT'S AN INTERESTING STORY.

25           THE COURT:  NOW, THEY SAY THERE IS NO NEGLIGENCE.

1  NOT WILLFUL, NOT BAD FAITH.  THEY JUST ASKED AUTOLIV TO PAY HIM

2  TO FIND IT AND THEY WERE NEGLIGENT IN NOT FINDING IT.

3       MS. CANNELLA:  THAT IS -- WE SAID IN THE BRIEF, AND

4  IT'S STILL TRUE, INCREDIBLE CLAIMS REQUIRE OR EXTRAORDINARY

5  CLAIMS REQUIRE EXTRAORDINARY EVIDENCE AND THE EVIDENCE IS

6  OPPOSITE OF THAT.

7       WHAT HAPPENED WAS ON OCTOBER 3RD THE STEGALL

8  PLAINTIFFS OUT IN CALIFORNIA, WHO HAVE A CASE AGAINST AUTOLIV,

9  SENT THIS DOCUMENT REQUEST TO AUTOLIV, REQUEST FOR PRODUCTION

10 NUMBER 26:  ANY AND ALL WRITINGS PRODUCED BY AUTOLIV ENTITIES

11 IN THE ANDREWS VERSUS MAZDA CASE.  AND SO THEN ALL OF US SAID,

12 OH.  IT WAS OCTOBER 3RD.  OH, WELL, THEY ARE WORKING TOGETHER.

13 OKAY.  A TIMELINE IS HELPFUL HERE.

14       OCTOBER 3RD.  STEGALL -- I WROTE ON IT.  I'M SORRY.

15 STEGALL PLAINTIFFS SENT A REQUEST FOR THE DOCUMENTS.  OCTOBER

16 25TH, 21 DAYS LATER, AUTOLIV SENDS ITS GEORGIA COUNSEL THE

17 CONCEALED DOCUMENTS.  NOVEMBER 2ND AUTOLIV PRODUCES SEVEN OF

18 THOSE DOCUMENTS TO PLAINTIFF AND NOVEMBER 6 WE GET A HUNDRED

19 AND 77 MORE PAGES THAT HAD BEEN PRODUCED IN STEGALL JANUARY OF

20 2018 -- 2017.  EXCUSE ME.  EIGHTEEN?  EIGHTEEN.  THANK YOU.

21       SO LOOKING AT THE TIMELINE BIG PICTURE.  IN 2016,

22 DISCOVERY CLOSES; IN 2017, JUDGE DUFFEY GRANTS THE MOTION FOR

23 SUMMARY JUDGMENT.  ON JANUARY 2ND, 2018, AUTOLIV PRODUCES A

24 HUNDRED AND 77 PAGES IN STEGALL THAT IT CONCEALS FROM THE

25 ANDREWS PLAINTIFFS.


                    UNITED STATES DISTRICT COURT

```
 1            ON MARCH 9TH, THREE MONTHS LATER, TWO MONTHS LATER,
 2   WE HAVE ORAL ARGUMENT IN THE ELEVENTH CIRCUIT.  AND AUTOLIV
 3   NEVER PROVIDED THOSE DOCUMENTS TO US, CAME INTO THE ELEVENTH
 4   CIRCUIT, MADE REPRESENTATIONS THAT WERE NOT ACCURATE AND DIDN'T
 5   SUPPLEMENT THE RECORD.  WE HAD NO IDEA.  FORTUNATELY, THE
 6   ELEVENTH CIRCUIT REVERSED ANYWAY DESPITE NOT HAVING THE BENEFIT
 7   OF THIS INFORMATION.  AND THEN AUGUST 15TH, 2018, IS WHEN
 8   AUTOLIV CLAIMS TO HAVE FOUND THESE DOCUMENTS.
 9            ALL RIGHT.  SO THIS IS IMPORTANT FOR THE CLAIM OF
10   INADVERTENCE AND NEGLIGENCE.  THE DOCUMENTS WERE ON THE DESKTOP
11   OF THE PROGRAM MANAGER FOR THE SEATBELT.  IF THEY HADN'T LOOKED
12   ON THE GUY WHO'S MANAGING THE PROGRAM'S COMPUTER, WHERE ELSE
13   DID THEY NOT LOOK?  WHERE ELSE WOULD YOU LOOK?  SO EITHER THEY
14   LOOKED AND DIDN'T PRODUCE THEM OR THEY NEVER LOOKED AND THEY
15   COULD CARE LESS ABOUT WHAT THE COURT HAD ORDERED THEM TO DO IN
16   COMPLYING WITH THAT COURT ORDER.  THOSE ARE THE ONLY TWO
17   OPTIONS.  AND THEN WE HAVE THE REQUEST SENT AND WE'VE TALKED
18   ABOUT THOSE THINGS.
19            SO THE OTHER PROBLEM THAT WE HAVE IS CAPTURED BY WHAT
20   MR. SCRIBNER JUST TOLD THE COURT AT THE END OF HIS ARGUMENT.
21   QUOTE:  OUR INVOLVEMENT IS THE CRUX OF THIS CASE.  END QUOTE.
22   THAT'S THEIR DEFENSE.  IT'S AN APPORTIONMENT DEFENSE, HOW MUCH
23   WERE WE INVOLVED IN THE DESIGN.  SO EVEN THOUGH THE ELEVENTH
24   CIRCUIT HAS SAID YOU ARE LIABLE REGARDLESS, AUTOLIV'S PLAN IS
25   STILL TO ARGUE THAT THEY WEREN'T INVOLVED IN THE DESIGN.
```

1          THE COURT:  WELL, HERE IS ANOTHER QUESTION I AM GOING

2    TO ASK MR. SCRIBNER BUT I'LL RUN IT PAST YOU FIRST.  PAGE 17,

3    FOOTNOTE 13 OF THE DEFENDANT'S BRIEF.  IT SAYS:  DESPITE

4    PLAINTIFF'S CONTENTION TO THE CONTRARY, AUTOLIV HAS NEVER

5    ARGUED THAT IT WAS NOT INVOLVED IN THE DESIGN OR MANUFACTURE OF

6    THE SUBJECT SEATBELT ASSEMBLY.

7          MS. CANNELLA:  YOUR HONOR, WE POINTED THIS OUT IN OUR

8    RESPONSE BRIEF.  IT'S THE SAME, YOU KNOW, COULD SAVE, WOULD

9    SAVE WORD PLAY THING THAT'S HAPPENING.  AND, YOU KNOW, WE'VE

10   SPENT -- I LABORED OVER THAT FOOTNOTE AS WELL.  WE SPENT YEARS

11   ARGUING ON APPEAL, 17 MONTHS ON APPEAL ARGUING ABOUT ACTIVE

12   INVOLVEMENT.  SO, YOU KNOW, THAT'S NOT TRUE.

13         SO THAT'S THE ARGUMENT THAT THEY MADE THAT WE HAD TO

14   DEAL WITH WITHOUT THE EVIDENCE IN THE ELEVENTH CIRCUIT AND IT'S

15   THE ARGUMENT THEY ARE GOING TO MAKE TO THE COURT HERE DURING

16   THE TRIAL.  THE PROBLEM WITH THAT IS WE DON'T HAVE ALL THE

17   DOCUMENTS STILL, WHICH IS ONE OF THE REASONS WHY WE SAID, OKAY,

18   AS A POTENTIAL SOLUTION TO THE PROBLEM, LET'S PREVENT AUTOLIV

19   FROM TRYING TO BLAME ANYBODY ELSE, BECAUSE WE CAN'T ADEQUATELY

20   OR COMPLETELY PRESENT THAT INFORMATION TO THE COURT BECAUSE WE

21   DO NOT HAVE IT ALL.  THE REASON --

22         THE COURT:  HOW DO I HANDLE THAT?  IN OTHER WORDS,

23   UNLIKE A JURY, THEY WOULDN'T KNOW IT.  BENCH TRIAL.  I KNOW NOT

24   THE AMOUNT BUT I KNOW YOU HAVE SETTLED WITH MAZDA.  YOU WANT ME

25   AS ONE OF THE THINGS TO STRIKE THE APPORTIONMENT ASPECT, DON'T

1   EVEN ALLOW THE DEFENSE TO PUT THAT IN THE CASE.

2           MS. CANNELLA:  YOUR HONOR, THIS IS A SANCTION.  THERE

3   IS A CONSEQUENCE FOR THIS KIND OF CONDUCT.

4           THE COURT:  I JUST WANT YOU TO TELL ME WHY I SHOULD

5   APPLY THAT SANCTION.

6           MS. CANNELLA:  BECAUSE, YOUR HONOR, IT IS THE ONLY

7   WAY FOR THIS PLAINTIFF, FOR FUTURE PLAINTIFFS TO GET ANY KIND

8   OF COMPLIANCE WITH ORDERS LIKE WE HAVE IN THIS CASE.

9           MS. ANDREWS AND PLAINTIFFS IN ANY COURT HAVE THE

10  RIGHT TO RELY UPON THE REPRESENTATIONS THAT AUTOLIV MADE TO

11  JUDGE ANAND WHEN IT SAID WE ARE PRODUCING EVERYTHING.  WE ARE

12  NOT GOING TO WITHHOLD ANYTHING.  WE ARE GOING TO PRODUCE

13  EVERYTHING.  SO THAT WHEN WE GO TO THE ELEVENTH CIRCUIT, WE CAN

14  PUT IT ALL ON THE TABLE.  LET'S HEAR IT.  LET'S MAKE A

15  DECISION.  WHEN WE GO TO THE DISTRICT COURT ON A MOTION FOR

16  SUMMARY JUDGMENT FOR THE TRIAL --

17          THE COURT:  LET'S SAY HYPOTHETICALLY, HYPOTHETICALLY,

18  DEFENDANTS, OKAY, I SAY, YEAH, THEY SHOULD HAVE PRODUCED THAT

19  TO YOU.  THERE WAS SOME NEGLIGENCE.  I SAY IT WAS -- IT MAY

20  HAVE NOT BEEN A SMOKING GUN, BUT IT WAS SIGNIFICANT.  THERE

21  SHOULD BE A SANCTION.  BUT THAT PARTICULAR SANCTION, IF I AM

22  UNDERSTANDING WHAT YOU ARE ASKING ME CORRECTLY, IS BASICALLY

23  SAYING HOLD AUTOLIV RESPONSIBLE NOW FOR ALL OF IT.

24          MS. CANNELLA:  NO, YOUR HONOR.

25          THE COURT:  OKAY.

```
 1            MS. CANNELLA:  IT'S SAYING THAT ONE DEFENSE,
 2  APPORTIONMENT DEFENSE, THE ONE DEFENSE OF BLAMING OTHER PARTIES
 3  IS ONE THEY CANNOT MAKE.  WE STILL HAVE TO -- WE STILL HAVE TO
 4  PROVE DEFECT, REASONABLENESS.  WE HAVE TO PROVE THAT THE DEFECT
 5  CAUSED THE INJURY AND WE HAVE TO PROVE DAMAGES.
 6            THE COURT:  I AGREE.  BUT I AM STILL TAKING MAZDA
 7  COMPLETELY OUT OF THE PICTURE WHEN DEALING WITH THAT PARTICULAR
 8  ISSUE IF I AGREE WITH YOU ON THIS SANCTION.
 9            MS. CANNELLA:  SORRY?  SAY THAT AGAIN.
10            THE COURT:  IF I AGREE WITH YOU ON THE SANCTION, THAT
11  IS THE ONE ISSUE THAT MAZDA WOULD NOT BE INVOLVED IN.
12            MS. CANNELLA:  THAT'S TRUE.  IT'S A SANCTION.  BUT
13  THE PROBLEM IS WE CAN'T LITIGATE THE CASE WITHOUT THE SANCTION,
14  BECAUSE WE DON'T HAVE ALL THE DOCUMENTS, AND I AM GOING TO SHOW
15  SOME YOU SOME OF THE REASONS WE KNOW THAT.
16            OKAY.  SO THE DEVELOPMENT SCHEDULE.  THIS COMES FROM
17  THE DEVELOPMENT SCHEDULE THAT WE LOOKED AT EARLIER TODAY.  IT
18  TALKS ABOUT A DRAWING ACCEPTANCE MEETING.  WE DON'T HAVE ANY
19  EVIDENCE OF THAT, THAT THAT TOOK PLACE.  WE DON'T HAVE ANY
20  MEETING NOTES OR ANYTHING LIKE THAT.  IT TALKS ABOUT PROTOTYPE
21  DRAWINGS.  WE NEVER GOT THOSE.  AND THE VA/VE PROPOSALS, WE
22  LOOKED AT THIS DOCUMENT WITH MR. MEYER EARLIER.  THESE, ALL
23  THREE OF THESE WE DO NOT HAVE.
24            OKAY.  SO WHAT DOES THAT TELL YOU?  OH, DO WE NEED
25  THE VA/VE PROPOSAL TALKING ABOUT SEWING FOR THE BELT?  NO, WE
```

1  DON'T.  BUT THERE ARE OTHERS OUT THERE.  AND YOUR HONOR'S POINT

2  ABOUT THESE NOT BEING SMOKING GUNS, WE DON'T HAVE THE SMOKING

3  GUN.  WE DON'T HAVE IT BECAUSE THEY HAVEN'T PRODUCED IT TO US.

4  AND THIS COURT CANNOT HAVE ANY ASSURANCE THAT AUTOLIV WOULD

5  PRODUCE IT TO US.  THE ONLY REASON WE GOT THESE DOCUMENTS IS

6  BECAUSE THEY PRODUCED THEM IN STEGALL.  WE WOULDN'T HAVE THESE

7  EITHER.

8          SO TO SAY THAT THE DOCUMENTS AREN'T IMPORTANT

9  TOTALLY -- AUTOLIV HAS TOTALLY MISSED THE POINT.  THE POINT IS

10  YOU GUYS HAVEN'T PRODUCED EVERYTHING TO US.  HOW ARE WE

11  SUPPOSED TO KNOW WHAT'S OUT THERE?  THESE ARE EVIDENCE THAT WE

12  CAN SHOW YOU TO SAY YOU CAN FEEL COMFORTABLE WHEN YOU RULE.  IF

13  YOU WERE TO GRANT A SANCTION IN THIS CASE, YOU CAN FEEL

14  COMFORTABLE THAT IN YOUR ORDER YOU CAN SAY PLAINTIFFS PRESENTED

15  EVIDENCE THAT NOT ALL DOCUMENTS HAVE BEEN PRODUCED, SO WE STILL

16  KNOW THAT WE ARE STILL AT A DISADVANTAGE.  AND WHAT ELSE IS OUT

17  THERE?  ONLY AUTOLIV KNOWS BUT AUTOLIV CAN'T BE TRUSTED TO GIVE

18  US THAT INFORMATION BECAUSE IT HASN'T.

19          THE OTHER RESPONSIVE DOCUMENT THAT AUTOLIV STILL HAS

20  NOT PRODUCED IN THIS CASE AND HAS ONLY PRODUCED IN STEGALL IS

21  THIS EXTREMELY -- HONESTLY, THIS IS A SMOKING GUN DOCUMENT.

22  THIS IS A DOCUMENT THAT SAYS AUTOLIV DESIGNED, MANUFACTURED AND

23  SOLD THIS SPECIFIC RETRACTOR BEFORE IT EVER STARTED THE MAZDA

24  PROGRAM.  THAT IS ONE HUNDRED PERCENT CONTRARY TO WHAT IT HAS

25  BEEN TELLING THE COURT FOR THE LAST THREE YEARS.  SO THAT'S A

UNITED STATES DISTRICT COURT

1   SMOKING GUN.

2           WHEN WE GOT THE STATEMENT OF WORK AND THE FIRST SEVEN

3   DOCUMENTS, WE WENT THROUGH THEM AND WE PULLED OUT ALL THE

4   REFERENCES TO WHAT LOOKED LIKE DOCUMENTS TO US, THINGS LIKE

5   BENCHMARK REPORTS, NEW TECHNOLOGY, NEW PRODUCT PROPOSALS.  AND

6   KEEP IN MIND THAT NEW TECHNOLOGY, NEW PRODUCT PROPOSAL, THAT'S

7   SOMETHING THAT THE BUSINESS TRADE AGREEMENT REQUIRED AUTOLIV TO

8   DO FOR MAZDA.  YOU HAVE TO GIVE US NEW TECHNOLOGY, INFORMATION

9   ABOUT NEW TECHNOLOGIES.

10          OKAY.  SO THERE IS A DETAILED STATEMENT OF WORK.

11  THERE IS A COST ESTIMATION ANALYSIS SHEET.  THERE'S 80

12  DIFFERENT ITEMS AND THEY ARE ALL IN THIS POWERPOINT THAT I HAVE

13  GIVEN YOU A COPY OF.  BUT PMT ACTIVITY GUIDELINES, USES,

14  CONDITION, INFORMATION, DESIGN CHANGE, ENGINEERING AUDIT

15  RECORD, ALL THESE THINGS THAT WE KIND OF PULLED FROM THE

16  STATEMENT OF WORK.

17          THIS IS A DOCUMENT THAT AUTOLIV HAD THAT GOVERNED ITS

18  RELATIONSHIP WITH MAZDA AND THESE ARE THINGS THAT APPEAR TO BE

19  DOCUMENTS THAT WERE NOT GIVEN TO US.  SO WE WROTE AUTOLIV AND

20  WE SAID, HEY, HERE IS A LIST OF THINGS THAT WE CAN FIND.  WHAT

21  ABOUT THIS STUFF?  AND THEY WROTE BACK AND THEY SAID, OH, WE

22  COULDN'T FIND ANY OF THAT STUFF.  SOME OF IT IS NOT EVEN -- WE

23  ARE NOT EVEN SURE IT'S DOCUMENTS.  SO THAT'S ANOTHER PIECE OF

24  EVIDENCE THAT THE COURT HAS THAT WE ARE MISSING DOCUMENTS THAT

25  COULD BE VERY IMPORTANT.


                        UNITED STATES DISTRICT COURT

```
 1           NOW, THIS CLAIM THAT THE DOCUMENTS WERE INADVERTENTLY

 2   NOT PRODUCED.  I TRIED TO KIND OF REMEMBER EVERYTHING WHEN I

 3   WAS TYPING THIS OUT, AND HOPEFULLY THIS IS A RELATIVELY

 4   COMPLETE LIST, BUT THE REASONS THAT THAT'S NOT A VALID ARGUMENT

 5   IS, ONE, THEY VIOLATED THE COURT ORDERS; TWO, THEY MISLED THE

 6   COURT IN ITS ROLE REGARDING THE DESIGN AND THE EXISTENCE OF

 7   DOCUMENTS REFLECTING THE EVOLUTION OF DESIGN.  THAT'S

 8   IMPORTANT.  YOU CAN'T DO THAT.

 9           NUMBER THREE.  THEY USED THE CONCEALMENT TO ASSERT A

10   FALSE DEFENSE OF NO ACTIVE INVOLVEMENT.  AND THIS IS REALLY

11   WHAT SETS THIS CASE APART, BECAUSE IF YOU DON'T HAVE THE

12   DOCUMENTS, IF YOU DIDN'T LOOK ON THE COMPUTER FOR THE MAN WHO

13   MANAGED THE ENTIRE PROGRAM BECAUSE YOU HAD, YOU KNOW, A BRAIN

14   FART THAT DAY, THEN YOU STILL KNOW THE TRUTH.  YOU ALWAYS KNEW

15   THE TRUTH.  YOU ALWAYS KNEW THE TRUTH AND THE TRUTH WAS NOT

16   WHAT WAS SAID IN THE BRIEFS TO THE COURT.  THAT'S WHY THIS CASE

17   IS DIFFERENT FROM A REGULAR, WHOOPS, WE MISSED THAT DOCUMENT.

18           WE ARE -- THE BAD FAITH IS ALSO EVIDENT AND AFTER

19   HAVING DONE THOSE THINGS, THEN TURNING AROUND AND SEEKING

20   ATTORNEY'S FEES AGAIN MS. ANDREWS, A WIDOW, AGAINST A HUGE

21   GLOBAL CORPORATION, ONE OF THE BIGGEST SEATBELT MANUFACTURERS,

22   SAFETY EQUIPMENT MANUFACTURERS IN THE WORLD, AFTER YOU KNOW

23   THAT YOU HAVE JUST WON SUMMARY JUDGMENT THAT YOU SHOULDN'T HAVE

24   WON HAD WE KNOWN ALL THE FACTS.  THEN YOU TURN AROUND AND YOU

25   SEEK ATTORNEY'S FEES AGAINST HER AND PREVAIL ON THAT.
```

1          THEN, JANUARY 2ND, 2018, AUTOLIV FINDS A HUNDRED AND

2   77 PAGES OF DOCUMENTS THAT THEY PRODUCE IN STEGALL.  THEY STILL

3   DON'T GIVE THEM TO US.  THEY STILL DON'T GIVE THEM TO US.  OUR

4   CASE IS STILL PENDING.  WE'VE GOT ORAL ARGUMENT COMING UP.  WE

5   STILL DON'T GET THESE DOCUMENTS.

6          THEN THEY GO TO THE ELEVENTH CIRCUIT AND MISREPRESENT

7   AGAIN.  THESE 177 DOCUMENTS, MANY OF THESE ARE THE ONES THAT WE

8   ARE TALKING ABOUT.  SO THAT'S MORE EVIDENCE.

9          FAILING TO CORRECT THE RECORD AT ORAL ARGUMENT IN

10  MARCH 2018 AND THEN CAUSING MORE THAN 17 MONTHS OF DELAY.  ALL

11  THE WHILE THERE IS ALWAYS THE RISK THAT WE LOSE AND THAT THE

12  WHOLE CASE GOES AWAY, WASTING RESOURCES OF THIS COURT, OF THE

13  ELEVENTH CIRCUIT, CONTINUING TO CONCEAL DOCUMENTS TO THIS DAY.

14  I MEAN WE EVEN KNOW THERE IS ONE DOCUMENT THAT THEY HAVEN'T

15  PRODUCED IN OUR CASE AT ALL THAT WE TALKED ABOUT, THAT

16  RETRACTOR DOCUMENT WITH A COMPLETION DATE.

17         AND THEN ON TOP OF ALL OF THAT JUST BEING COMPLETELY

18  UNREPENTANT.  IT IS -- THE DEFENSE IS NOT, YOU KNOW, WE ADMIT

19  THAT WE MISREPRESENTED THESE THINGS.  THE DEFENSE IS, OH, THESE

20  ARE ALL DOCUMENTS ABOUT A FOAM COVER AND, YOU KNOW, SEWING ON A

21  SEATBELT.  THAT'S NOT TRUE.  THAT'S NOT WHAT HAPPENED.  THESE

22  ARE IMPORTANT DOCUMENTS AND I HOPE I WAS ABLE TO COMMUNICATE

23  THAT BY COMPARING THEM TO THE COURT'S ORDER.

24         THE COURT:  YOU DID.

25         MS. CANNELLA:  ANOTHER THING THAT I WANT TO MENTION

1   THAT'S EVIDENCE OF BAD FAITH IS THIS TEAM LIST DOCUMENT.  IT

2   WAS PRODUCED AS AUTOLIV 1026 BACK IN 2015.  OKAY.  THIS A TEAM

3   LIST.  IT'S IN JAPANESE AND IT'S GOT, YOU KNOW, ALL THESE

4   DIFFERENT PEOPLE IN IT.

5            WELL, ONE OF THE NEW DOCUMENTS THAT WE GOT NOVEMBER

6   2ND, 2018, IS TOLLGATE-1, WHICH IS ONE OF THE DOCUMENTS WE

7   TALKED ABOUT WITH MR. MEYER.  IT'S ONE OF THE IMPORTANT

8   DOCUMENTS.  AND IN TOLLGATE-1 -- THIS IS THE TRANSLATED

9   VERSION, OKAY?  SO THIS HAS GOT THE ENGLISH NAMES IN IT.  BUT

10  IN TOLLGATE-1 IS THE EXACT SAME TEAM LIST.  IT APPEARS TO HAVE

11  BEEN PULLED OUT OF THE TOLLGATE-1 BACK IN 2015 AND GIVEN US ONE

12  DOCUMENT, BECAUSE WE SPECIFICALLY ASKED ABOUT THIS TEAM LIST IN

13  2015, BUT THEY DIDN'T GIVE US THE REST OF THE DOCUMENTS UNTIL

14  THEY ACCIDENTALLY GAVE IT TO THE STEGALL PEOPLE AND WE FOUND

15  OUT ABOUT IT.  SO THAT'S MORE EVIDENCE OF BAD FAITH.

16           I SKIPPED OVER A LOT OF STUFF, BUT I THINK --

17           THE COURT:  THAT'S MY FAULT.  I STARTED ASKING YOU

18  QUESTIONS AND YOU DID LIKE A GOOD LAWYER.  YOU WENT TO ANSWER

19  THE QUESTION I ASKED YOU.

20           MS. CANNELLA:  WELL, I AM HAPPY TO ANSWER YOUR

21  QUESTIONS.  I AM MUCH MORE INTERESTED IN THAT THAN MY

22  BLABBERING.  SO A LOT OF THE STUFF WE COVERED WITH MR. MEYER

23  AND WE DON'T NEED TO REHASH IT SINCE WE WERE ABLE TO DO HIM

24  FIRST.

25           BUT I DO WANT TO TALK A LITTLE BIT ABOUT THE LAW.

1  RULE 37(B) ALLOWS, WHEN THERE IS A VIOLATION OF A DISCOVERY

2  ORDER, TO ISSUE A SANCTION.  IN ORDER TO AVOID THE SANCTION, IN

3  FACT, AUTOLIV HAS TO PROVE IT, QUOTE, MADE ALL REASONABLE

4  EFFORTS TO FOLLOW THE COURT'S ORDER.  THAT'S IN THAT IN RE

5  CHASE VERSUS -- THE CHASE AND SANBORN CASE FROM THE ELEVENTH

6  CIRCUIT.

7          AUTOLIV CANNOT DO THAT.  THE DOCUMENTS WERE ON THE

8  COMPUTER OF THE PROGRAM MANAGER FOR THE SEATBELT.  SOME OF THEM

9  WERE PRODUCED IN STEGALL NEARLY A YEAR BEFORE WE GOT THEM.  AND

10 SO AUTOLIV HASN'T INTRODUCED ANY EVIDENCE TO MEET THAT BURDEN.

11 THERE IS NO AFFIDAVIT TESTIMONY.  THERE IS NO WITNESS THAT I

12 KNOW OF HERE TODAY TO TALK ABOUT THAT.  AND SO IT'S CONCLUSORY

13 STATEMENTS UNDER THE LAW HAVE TO BE DISREGARDED.  THERE IS NO

14 EVIDENCE OF REASONABLE EFFORTS.

15         THE QUESTION IS NOT WHETHER TO ISSUE SANCTIONS.  IT

16 IS WHICH SANCTIONS TO AWARD.  AND THE BRIEFING GOES THROUGH

17 THREE DIFFERENT REASONS WHY THE COURT HAS THE POWER TO AWARD

18 SANCTIONS, BUT, YOU KNOW, THAT'S NOT REALLY -- THERE IS NO

19 QUESTION ABOUT THAT, SO I AM NOT GOING TO GO THROUGH ALL OF

20 THOSE.

21         37(B) TALKS ABOUT THE OPTIONS.  THE FIRST ONE:

22 ENTERING DEFAULT.  YOU COULD ALSO DIRECT CERTAIN FACTS TO BE

23 TAKEN AS TRUE.  YOU COULD PROHIBIT AUTOLIV FROM SUPPORTING OR

24 OPPOSING DESIGNATED CLAIMS OR DEFENSES OR YOU COULD PROHIBIT

25 AUTOLIV FROM INTRODUCING DESIGNATED MATTERS INTO EVIDENCE.


UNITED STATES DISTRICT COURT

```
 1   THOSE ARE THE OPTIONS THAT THE LAW GIVES YOU.
 2            SO FEDERAL LAW HAS A POLICY OF NOT JUST REMEDYING THE
 3   PROBLEM BUT PUNISHING THE CONDUCT, ESPECIALLY WHERE IT
 4   UNREASONABLY DELAYS OR OTHERWISE INTERFERES WITH THE, QUOTE,
 5   EXPEDITIOUS MANAGEMENT OF TRIAL PREPARATION.  THAT'S THE
 6   GOFORTH V. OWENS IN OUR BRIEF FROM THE ELEVENTH CIRCUIT.
 7            SO TO SAY THAT WE WERE NOT PREJUDICED ALSO IGNORES
 8   ELEVENTH CIRCUIT CASE LAW THAT RECOGNIZES DELAY IN ITSELF IS
 9   PREJUDICE.
10            AUTOLIV'S CONDUCT CERTAINLY CAUSED UNREASONABLE
11   DELAY.  IT CERTAINLY INTERFERED WITH THE EXPEDITIOUS MANAGEMENT
12   OF TRIAL PREPARATION, VIOLATED COURT ORDERS AND CONCEALED
13   CRUCIAL EVIDENCE FOR OVER THREE YEARS, ALL THE WHILE MAKING
14   MISREPRESENTATIONS.  WHAT IT'S DONE IS WORSE THAN DELAY.  IT'S
15   DECEIT.  AND PLAINTIFF'S COUNSEL DOESN'T SAY THIS LIGHTLY.  AND
16   TO BE CLEAR, THIS DOESN'T HAVE ANYTHING TO DO WITH DEFENSE
17   COUNSEL.  IT'S JUST SIMPLY NOT POSSIBLE TO CONCLUDE OTHERWISE
18   THAN THAT THIS WAS A DECEITFUL, A DECEITFUL CONDUCT.
19            THERE ARE INDISPUTABLY MORE DOCUMENTS OUT THERE THAT
20   WE DO NOT HAVE.  THAT FACT IS PROVEN BY THE DOCUMENTS WE DO
21   HAVE.  WHETHER AUTOLIV KNEW THE DOCUMENTS EXISTED OR HAD
22   LOCATED THEM OR, QUOTE, IDENTIFIED THEM IS COMPLETELY BESIDE
23   THE POINT AS I DISCUSSED BEFORE.  IT IS THE FACT THAT AUTOLIV
24   MAINTAINED THE DEFENSE IT DID KNOWING THAT IT WASN'T TRUE.
25            SOMETHING VERY IMPORTANT IS IN AUTOLIV'S RESPONSE
```

1  BRIEF.  AUTOLIV SAYS THAT ISSUE PRECLUSION, PRECLUDING AUTOLIV

2  FROM ARGUING THAT MAZDA IS AT FAULT IS AKIN TO DEFAULT FOR

3  AUTOLIV.  WHY IS THAT?  BECAUSE THE DESIGN IS NOT DEFENSIBLE.

4  THAT'S WHAT THAT ADMITS.  THEY ARE SAYING IF WE CAN'T COME IN

5  AND BLAME SOMEBODY ELSE, THEN WE ARE NOT GOING TO BE ABLE TO

6  SURVIVE.  WE ARE GOING TO BE HELD LIABLE.  BECAUSE THE DESIGN

7  IS DEFECTIVE.  IT'S DEFECTIVE.

8          THERE IS NO QUESTION THAT AUTOLIV IS TALKING ABOUT

9  OTHERS.  THAT'S MAZDA.  THEY ARE TALKING ABOUT MAZDA.  AND THEY

10 ARE STILL TRYING TO BLAME MAZDA FOR THE DESIGN OF A SEATBELT

11 THAT AUTOLIV DESIGNED, MANUFACTURED, SOLD, PROFITED FROM.  AS

12 MR. MEYER SAID, THIS DEFECTIVE SEATBELT IS SO BAD, 17 INCHES,

13 IT'S SO BAD IT SHOULD NOT BE SOLD TO ANYONE.  THERE IS NO

14 DEFENSE IN GEORGIA LAW THAT SAYS YOU ARE NOT LIABLE IF SOMEONE

15 TELLS YOU TO DO IT.  IN PRODUCT DESIGN, IT DOESN'T EXIST.  IF

16 YOU MANUFACTURE SOMETHING THAT'S DEFECTIVE AND IT'S DEFECTIVE

17 WHEN IT LEAVES YOUR HANDS, YOU ARE ON THE HOOK FOR WHATEVER

18 INJURIES IT CAUSES.  THAT'S WHAT THE ELEVENTH CIRCUIT HELD.

19 ONCE YOU ARE A MANUFACTURER YOU ARE LIABLE IF IT'S DEFECTIVE.

20         AUTOLIV WANTS TO APPORTION SOME OF THE FAULT FOR

21 MR. ANDREWS' DEATH TO THE AUTO MANUFACTURER TO WHOM AUTOLIV

22 ITSELF SOLD THE DEFECTIVE PRODUCT.  IT'S THEIR FAULT BECAUSE

23 THEY BOUGHT IT.  IT'S NOT OUR FAULT BECAUSE WE MADE IT.  IT'S

24 THEIR FAULT BECAUSE THEY BOUGHT IT.  THAT'S THE ARGUMENT.  IT'S

25 AS RIDICULOUS AS IT SOUNDS.


                        UNITED STATES DISTRICT COURT

1          THE COURT:  WELL, HIS ARGUMENT IS MORE OR LESS THEY

2    HAD THE FINAL WORD, NOT IT WAS THEIR FAULT BECAUSE THEY BOUGHT

3    IT.  BUT IS AUTOLIV REALLY ARGUING WE MAY HAVE DESIGNED IT OR

4    MANUFACTURED IT BUT ANY CHANGES, THE FINAL DECISION WAS

5    MAZDA'S?

6          MS. CANNELLA:  ANY CHANGES TO THE PRODUCT THAT

7    AUTOLIV MANUFACTURED.  THEIR ARGUMENT, AS I UNDERSTAND IT, IS

8    AUTOLIV -- OR MAZDA ASKED US FOR THIS DESIGN.

9          THE COURT:  NOW, I'M NOT SAYING I AGREE WITH THE

10   ARGUMENT.

11         MS. CANNELLA:  YES; OH, YES.  NO, I HEAR WHAT YOU ARE

12   SAYING.

13         MY UNDERSTANDING OF THE ARGUMENT IS MAZDA ASKED FOR

14   THIS PRODUCT AND THEY TOLD US IF THEY WANTED ANY CHANGES.  AND

15   IF AT THE END OF THE DAY THEY WANT A PRODUCT THAT IS DEFECTIVE,

16   IT'S NOT OUR FAULT IF THEY BOUGHT IT.

17         THE COURT:  YES, THAT'S THE ARGUMENT I UNDERSTAND.

18   THAT'S HOW I UNDERSTAND THE ARGUMENT.  WE GAVE THEM WHAT THEY

19   ASKED FOR.

20         MS. CANNELLA:  WE GAVE THEM WHAT THEY ASKED FOR.  AND

21   THE ELEVENTH CIRCUIT REJECTED THAT ARGUMENT.

22         THE OTHER THING THAT IS IMPORTANT ABOUT AUTOLIV

23   SAYING THAT THE DESIGN -- THAT IF IT CAN'T BLAME MAZDA, THEN

24   THAT'S AKIN TO DEFAULT.

25         THE COURT:  DID THE ELEVENTH CIRCUIT REALLY SAY THAT,

1  THOUGH?  IN OTHER WORDS, I'VE READ THIS OPINION NOW FOUR TIMES.

2  I READ IT AGAIN LAST NIGHT.  IT'S A SHORT OPINION, FIVE PAGES.

3  BUT THEY MORE OR LESS SAY IF YOU MANUFACTURED IT, YOU ARE MORE

4  OR LESS STILL IN THE CASE AS FAR AS SUMMARY JUDGMENT.  AND I

5  MAY HAVE -- AGAIN, I MAY HAVE READ IT WRONG.

6          MS. CANNELLA:  SO THE ELEVENTH CIRCUIT OPINION AS I

7  READ IT, AND YOU'VE ACTUALLY READ IT MORE RECENTLY THAN I HAVE,

8  BUT IT SAID THAT IF YOU ARE A MANUFACTURER, IT DOESN'T MATTER

9  IF YOU ARE INVOLVED IN THE DESIGN.  IF YOU MANUFACTURE IT --

10         THE COURT:  WELL, LET'S DON'T GUESS.  LET'S JUST READ

11  IT.

12         GO AHEAD.  I'M LISTENING TO YOU.

13         MS. CANNELLA:  BUT THE LAW IN GEORGIA IS IF YOU

14  MANUFACTURE A DESIGN AND IT LEAVES YOUR HANDS DEFECTIVE AND

15  THAT DEFECT IS THE ONE THAT KILLED SOMEBODY, THEN YOU ARE

16  RESPONSIBLE FOR THE DEATH.  THAT'S THE LAW.

17         THE COURT:  ON PAGE THREE, AND I MAY NOT BE PICKING

18  OUT THE RIGHT PART TO READ, IT SAYS:  "AUTOLIV MANUFACTURED

19  SEATBELT COMPONENTS IN THE DECEASED'S MAZDA AND PLAINTIFF

20  ALLEGES THAT THOSE COMPONENTS WERE DEFECTIVE WHEN SOLD.

21  CONSEQUENTLY, AUTOLIV CAN BE HELD LIABLE UNDER SECTION 51-1-11

22  IF A COMPONENT IT MANUFACTURED WAS DEFECTIVE WHEN SOLD BY THE

23  MANUFACTURER AND IF THE COMPONENT'S CONDITION WHEN SOLD IS THE

24  PROXIMATE CAUSE OF THE INJURY SUSTAINED UNDER SECTION

25  51-1-11(B)1.  THAT SAID, EVEN IF PLAINTIFF WERE REQUIRED TO

1  ESTABLISH THAT AUTOLIV WAS ACTIVELY INVOLVED IN THE DESIGN OF

2  THE SEATBELT ASSEMBLY IN ORDER TO SHOW THAT AUTOLIV CAN BE HELD

3  LIABLE UNDER SECTION 51-1-11, THE RECORD REFLECTS A GENUINE

4  ISSUE OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON THIS

5  ISSUE."

6          SO DID THEY QUITE GO THAT EXTRA STEP THAT YOU ARE

7  ARGUING OR DID THEY MORE OR LESS SAY THIS GETS YOU PAST SUMMARY

8  JUDGMENT?

9          MS. CANNELLA:  I'M SORRY?  WHAT'S THE EXTRA STEP?

10  BECAUSE I'M NOT CLEAR.  I FEEL LIKE I AM SAYING WHAT THEY ARE

11  SAYING, BUT WHAT PART OF IT IS --

12         THE COURT:  OKAY.  I MAY BE -- I MAY NOT HAVE HEARD

13  YOU CORRECTLY.

14         MS. CANNELLA:  WELL, AND I WANT TO MAKE SURE I

15  UNDERSTAND THE COURT'S QUESTION, BECAUSE I DO THINK IT'S

16  IMPORTANT, WHAT YOU ARE SAYING.

17         THE COURT:  WELL, NOT SO MUCH AN EXTRA STEP.  IT'S

18  JUST THAT, AS I SEE IT, THEY ARE SAYING THE MERE FACT THEY

19  MANUFACTURED IT CREATES A GENUINE ISSUE OF MATERIAL FACT

20  PRECLUDING SUMMARY JUDGMENT ON THIS ISSUE.  SO WE MAY BE SAYING

21  THE SAME THING.

22         MS. CANNELLA:  I THINK WE ARE SAYING THE SAME THING.

23         THE COURT:  I'LL TAKE IT AT THAT.

24         MS. CANNELLA:  OKAY, OKAY.

25         YES, IF YOU MANUFACTURE, IF AUTOLIV MANUFACTURERS THE

UNITED STATES DISTRICT COURT

1   PRODUCT AND THE FACT FINDER FINDS THAT THE PRODUCT IS

2   DEFECTIVE, THEN REGARDLESS OF ACTIVE INVOLVEMENT, THERE IS A

3   STATUTE RIGHT ON POINT THAT'S VERY CLEAR.  THAT WAS OUR WHOLE

4   ARGUMENT ON APPEAL.  IT'S JUST A PLAIN STATUTORY ARGUMENT.

5           THE COURT:  51-1-11.

6           MS. CANNELLA:  THAT'S RIGHT.  AND THERE IS A STATUTE

7   THAT SAYS IF IT'S DEFECTIVE WHEN IT LEAVES YOUR HANDS AND THAT

8   DEFECT CAUSES SOMEONE'S INJURY, YOU ARE ON THE HOOK, SO -- AND

9   AUTOLIV, YOU KNOW, THERE IS NO QUESTION THAT AUTOLIV

10  MANUFACTURED IT.

11          THE FACT THAT AUTOLIV'S DEFENSE IS A

12  WE-WEREN'T-ACTIVELY-INVOLVED DEFENSE SHOWS PRECISELY WHY THESE

13  ARE THE DOCUMENTS THAT GOT CONCEALED.  THESE ARE THE DOCUMENTS

14  THAT MATTER TO US.  SO TO CONCLUDE THAT BY SOME COINCIDENCE

15  THAT AUTOLIV CONCEALED THE DOCUMENTS THAT HELPED DEFEAT ALL

16  THOSE STATEMENTS IN THE COURT'S ORDER THAT WOULD HAVE

17  CONTRADICTED EVERYTHING THAT JUDGE DUFFEY CONCLUDED BY A

18  COINCIDENCE AND THAT IT JUST SO HAPPENS THAT THOSE ARE THE ONES

19  THAT DIDN'T TURN UP IS NOT CREDIBLE.  IT'S NOT CREDIBLE.

20          IF THESE ARE THE DOCUMENTS THAT THEIR ENTIRE DEFENSE

21  DEPENDS UPON AND THESE ARE THE ONES THAT WEREN'T CONCEALED OR

22  THAT WERE CONCEALED THAT WEREN'T PRODUCED, WHY, WHY ARE THESE

23  THE ONES THAT HAPPENED TO NOT GET PRODUCED?  WHY ARE THE MOST

24  IMPORTANT ONES THE ONES THAT DIDN'T TURN UP IN THE SEARCH?  IT

25  JUST DOESN'T MAKE ANY SENSE.  IT'S NOT CREDIBLE.

1          NOW, DEFAULT IS THE MOST SERIOUS SANCTION.  THE COURT

2 CAN ENTER DEFAULT.  WE HAVE ASKED FOR DEFAULT.  BUT THERE IS A

3 LESSER SANCTION AND THE LESSER SANCTION IS PERFECTLY, LIKE A

4 GLOVE, TAILORED TO THE CONDUCT IN THE CASE.  AND THAT LESSER

5 SANCTION -- THERE'S A NUMBER OF THINGS, BUT ONE OF THEM IS TO

6 PROHIBIT AUTOLIV FROM INTRODUCING EVIDENCE OR ARGUMENT THAT

7 OTHER PARTIES ARE AT FAULT.  IF WE DIDN'T GET THE STUFF THAT

8 HELPS US DECIDE IF THEY ARE ACTIVELY INVOLVED, THEN LET'S JUST

9 TAKE THAT OUT OF THE CASE AND WE DON'T HAVE TO WORRY ABOUT IT

10 ANYMORE.

11         IF YOUR HONOR HAS ANY MORE QUESTIONS, I WOULD BE

12 HAPPY TO ANSWER THEM, BUT THAT'S ALL I HAVE TO SAY.

13         THE COURT:  THANK YOU.

14         MS. CANNELLA:  THANK YOU.

15         MR. SCRIBNER:  WELL, UNCHARTED TERRITORY.  I'VE NEVER

16 HAD TO DEFEND AGAINST A MOTION FOR SANCTIONS.  I AM HOPING THIS

17 IS MY FIRST AND MY LAST.

18         THE COURT:  WELL, LET ME MAKE IT QUITE CLEAR.  THEY

19 ARE NOT BLAMING YOU.

20         MR. SCRIBNER:  UNDERSTOOD, UNDERSTOOD, AND I

21 APPRECIATE THAT.  THAT'S VERY MUCH APPRECIATED.  I ONLY KNOW

22 HOW TO START AT THE BEGINNING.

23         OCTOBER 11, 2018, AT 9:04 A.M.  CERTAIN AUTOLIV

24 DOCUMENTS WERE FORWARDED TO ME VIA EMAIL.  MR. PRENTKOWSKI HAD

25 RECEIVED THEM THE NIGHT BEFORE FROM AUTOLIV JAPAN.  HE IS A

 1   SEATBELT ENGINEER.  HE WORKS IN THE LEGAL DEPARTMENT.  HE

 2   SPEAKS ENGLISH.  AND HE OFTENTIMES WILL COMMUNICATE WITH FOLKS

 3   INVOLVED IN A SEATBELT MANUFACTURING SITUATION THAT END UP IN

 4   LITIGATION, INCLUDING HERE WITH THESE JAPANESE-SPEAKING

 5   WITNESSES.  HE IS THE INTERFACE.  HE WAS ALSO OUR CORPORATE

 6   REPRESENTATIVE, MR. PRENTKOWSKI, WHO TESTIFIED ON BEHALF OF

 7   AUTOLIV IN THIS CASE.

 8           THE DOCUMENTS WERE EMAILED TO MR. PRENTKOWSKI FROM

 9   AUTOLIV JAPAN IN CONNECTION WITH THE STEGALL CASE.  HE WAS

10   GETTING READY FOR A 30(B)(6) DEPOSITION.

11           THE STEGALL CASE INVOLVES A PASSENGER SEATBELT

12   ASSEMBLY, AND JUST CANDIDLY, JENNY, JAY AND I, YOU KNOW, WE

13   WEREN'T PAYING ATTENTION TO THAT CASE.  IT JUST DIDN'T FEEL

14   LIKE THAT MATTERED TO US.  WE WEREN'T KEEPING UP WITH IT.

15           A LOT OF THESE DOCUMENTS WERE IN JAPANESE.  I DON'T

16   SPEAK JAPANESE.  I BRIEFLY SCANNED THEM AND I THOUGHT I'M NOT

17   FAMILIAR WITH ALL DOCUMENTS PRODUCED IN THIS CASE BUT THESE

18   DON'T LOOK FAMILIAR TO ME AT ALL.

19           AND SO I WANT TO MAKE SURE THAT THE COURT UNDERSTANDS

20   ONE THING, BECAUSE I THINK IT'S IMPORTANT.  IN THEIR REPLY

21   BRIEF, THEY SAY THAT MR. PRENTKOWSKI HAD BEEN SITTING ON THESE

22   DOCUMENTS FOR MONTHS.  THAT'S A HUNDRED PERCENT INCORRECT.  HE

23   WAS DEPOSED IN THAT CASE, RIGHT?  THE STEGALL CASE.  AND THEY

24   SAY, WHEN DID YOU SEE THESE DOCUMENTS?  AND HERE IS THE QUOTE

25   FROM HIS DEPOSITION:  "I DON'T REMEMBER THE EXACT DATE.


                    UNITED STATES DISTRICT COURT

 1   SOMETIME IN THE LAST 90 DAYS, PERHAPS."  AND IT'S TRUE, HE DID
 2   RECEIVE THEM SOMETIME WITHIN THE LAST 90 DAYS.  BUT I HAVE A
 3   DATE STAMP ON THE DOCUMENT THAT HE SENT TO ME AND IT LITERALLY
 4   WAS THE NIGHT BEFORE AT 11:21.
 5           HE GOT THESE DOCUMENTS IN PREPARATION FOR THE
 6   30(B)(6) AND WITHIN TEN HOURS SENT THEM TO ME.  I LOOKED AT
 7   THEM AND I SAID, WHOA, I DON'T KNOW THAT I HAVE SEEN THESE
 8   BEFORE.  AND WE ISSUED A CODE RED.  WE IMMEDIATELY SET ABOUT TO
 9   TRANSLATE THE JAPANESE DOCUMENTS.  WE IMMEDIATELY SET OUT TO
10   DETERMINE WHETHER THEY HAD BEEN PRODUCED IN THE CASE, BECAUSE
11   REMEMBER, YOU'VE GOT AUTOLIV AND MAZDA.  AND I THOUGHT, WELL,
12   IF MAZDA PRODUCED THEM, THEY ALREADY HAVE THEM.
13           WE ALSO CONNECTED WITH COUNSEL IN THE STEGALL CASE
14   AND SAID, LOOK, IF YOU ALL HAVE PRODUCED DOCUMENTS IN THAT CASE
15   THAT ARE DIFFERENT FROM OURS, WE NEED TO GET THEM TO
16   PLAINTIFF'S COUNSEL IMMEDIATELY.  AND WE WORKED VERY HARD OVER
17   THE NEXT THREE WEEKS AND ON NOVEMBER 2 WE PRODUCED SEVEN
18   DOCUMENTS THAT WERE AMONG WHAT DAVE GAVE ME ORIGINALLY TO THEM.
19   AND WE SAID, LOOK, WE ARE ALSO GOING TO GIVE YOU EVERYTHING IN
20   STEGALL THAT HASN'T BEEN PRODUCED WITHOUT REGARD TO
21   RESPONSIVENESS.  I MEAN I JUST DIDN'T WANT TO GO THROUGH IT.  I
22   DIDN'T WANT TO SPEND THE TIME TO FIGURE IT.  I'M GOING TO GET
23   IT TO YOU.  AND WE NEED TO GET THEM TRANSLATED.  AND THEN WE
24   PAID FOR THE CERTIFIED TRANSLATIONS AND GAVE THEM TO THEM ON
25   NOVEMBER 21.

1          BETWEEN NOVEMBER TWENTY -- I'M SORRY.  BETWEEN

2  NOVEMBER 2 AND NOVEMBER 28 THERE WERE A SERIES OF LETTERS

3  EXCHANGED.  YOU'VE SEEN THOSE.

4          THE COURT:  I SAW THEM.

5          MR. SCRIBNER:  PLAINTIFF'S COUNSEL UNDERSTANDABLY

6  FRUSTRATED THAT DOCUMENTS WERE PRODUCED AT THIS TIME.  I WAS

7  FRUSTRATED.

8          THEY ASKED US TO PROVIDE ADDITIONAL DETAILS ABOUT THE

9  DOCUMENTS.  THEY ASKED US ABOUT SPECIFIC DOCUMENTS OR WHAT THEY

10  THOUGHT WERE DOCUMENTS.  CAN YOU GO BACK AND CHECK AND SEE, YOU

11  KNOW, ARE THERE THESE DOCUMENTS?  NOW, MIND YOU, THIS PROGRAM

12  TOOK PLACE IN 2001, 2002.  THESE ARE OLD DOCUMENTS AND THEY ARE

13  NOT -- MOST OF THEM, THE VAST MAJORITY OF THEM ARE NOT

14  ELECTRONIC DOCUMENTS.  THEY ARE HARD COPY DOCUMENTS THAT PEOPLE

15  ARE FINDING FROM FILES.

16          ULTIMATELY, AFTER COMMUNICATING WITH AUTOLIV JAPAN,

17  THEY CONFIRMED THAT ALL DOCUMENTS RELATED TO THE J48C, WHICH IS

18  THE DRIVER'S SIDE SEATBELT FOR THE 2005 MAZDA3, AND THE J48L

19  PROGRAM, WHICH IS THE DRIVER'S SIDE SEATBELT FOR THE 2006

20  MAZDA3, HAD BEEN PRODUCED SINCE THEY WERE ASKED ABOUT THEM

21  EARLY ON IN THE CASE.

22          SO I THINK PLAINTIFF WAS APPROPRIATE IN ASKING US TO

23  GO BACK AND MAKE SURE THAT WITH SPECIFIC LISTS IN MIND, DO YOU

24  HAVE ANY MORE OF THESE DOCUMENTS?  AND WE CONFIRMED THAT THERE

25  WERE NOT.

UNITED STATES DISTRICT COURT

```
 1            THE COURT:  MR. SCRIBNER, LET ASK YOU A QUESTION.

 2            MR. SCRIBNER:  SURE.

 3            THE COURT:  AND THIS QUESTION MAY NOT BE FAIR TO YOU,

 4   BUT YOU ARE THE ONLY PERSON I CAN ASK.

 5            HOW COULD THEY MISS THESE DOCUMENTS?

 6            MR. SCRIBNER:  WELL, THAT'S A GREAT QUESTION.  AND SO

 7   LET ME START WITH THE S.O.W.  THAT'S PROBABLY -- WE HAVE A LOT

 8   OF THINGS TO SAY ABOUT THE S.O.W., BUT TO DIRECTLY ANSWER YOUR

 9   QUESTION, SO THE INDIVIDUAL WHO HAD THE S.O.W. IS AN INDIVIDUAL

10   WHO NO LONGER IS EMPLOYED BY AUTOLIV, MR. HIRABAYASHI.  HE WAS

11   AN EXECUTIVE LEVEL MANAGEMENT PERSON.  IT WAS ON HIS COMPUTER

12   BUT IT IS IN A PDF FORM.  IN OTHER WORDS, IT'S ON HIS HARD

13   DRIVE.  IT'S NOT SEARCHABLE.  YOU ARE NOT GOING TO FIND IT

14   THROUGH A SEARCH, THAT SORT OF THING.

15            HE WAS AND HIS TEAM WERE ASKED TO PRODUCE S.O.W.'S.

16   DO YOU HAVE S.O.W.'S?  AND WE DID.  WE PRODUCED THREE S.O.W.'S

17   IN THIS CASE.  HE DID NOT PRODUCE THE S.O.W. THAT WAS CREATED

18   BY MAZDA IN 1999, YOU KNOW, THAT WE PRODUCED LATE.  SHOULD IT

19   HAVE BEEN PRODUCED?  IF I HAD KNOWN ABOUT IT, IT WOULD HAVE

20   BEEN PRODUCED FOR SURE.

21            THE COURT:  I DON'T DOUBT THAT.

22            MR. SCRIBNER:  YOU KNOW, HOW DID HE MISS IT?  HE IS

23   NO LONGER EMPLOYED BY AUTOLIV.  I DO THINK THAT THERE IS A

24   COUPLE OF THINGS TO NOTE IN ADDITION TO THE AGE.  YOU ARE

25   TALKING ABOUT A DOCUMENT THAT, ACCORDING TO ITS ELECTRONIC
```

UNITED STATES DISTRICT COURT

1  PROPERTIES, WAS CREATED BY MAZDA IN 1999.  IT WAS SOMETHING

2  THAT WAS ACCESSIBLE TO HIM.

3          I THINK THAT WHEN WE ASKED FOR S.O.W.'S, HE PROVIDED

4  THE S.O.W.'S RELATED TO THIS PROGRAM.  THE S.O.W. ITSELF IS A

5  GENERIC DOCUMENT THAT MAZDA PROVIDES AT A CORPORATE LEVEL TO

6  ALL ITS FULL SERVICE SUPPLIERS.  IT DOESN'T INCLUDE THE WORDS

7  SEATBELT, AUTOLIV, AIRBAG, J48L, J48C, NONE OF THOSE THINGS.

8          AND SO IT'S HARD FOR ME, BECAUSE HE IS A FORMER

9  EMPLOYEE AND, YOU KNOW, I DON'T KNOW WHAT HE WAS THINKING, IT'S

10 HARD FOR ME TO EXPLAIN WHY THIS DIDN'T MAKE ITS WAY INTO THE

11 OTHER THREE S.O.W.'S WE PRODUCED.  BUT I SUSPECT HE THOUGHT,

12 WHAT DOES THIS HAVE TO DO WITH THE PROGRAM, RIGHT?  WHAT HAS

13 THIS GOT TO DO WITH J48C OR J48L?  I MEAN THAT'S CORPORATE

14 LEVEL.  THEY WANT DOCUMENT -- THEY WANT THAT SPECIFICATION.

15 THEY WANT COMMUNICATIONS ABOUT SPECIFIC DESIGN.  I'M GUESSING.

16 DON'T KNOW THE ANSWER TO THAT.  BUT I DON'T THINK IT'S AS --

17 SHOULD IT HAVE BEEN PRODUCED?  ABSOLUTELY.  I DON'T THINK IT'S

18 AS EASY AS THIS IS A REAL CLEAR OBVIOUS ONE.  IT CERTAINLY

19 WASN'T TO THEM AND I CAN SEE WHY IT WASN'T.  THAT'S ALL I CAN

20 SAY.

21          THE COURT:  WHAT MADE IT STAND OUT IN THE CALIFORNIA

22 CASE AS COMPARED TO THIS CASE?

23          MR. SCRIBNER:  WELL, THAT'S ANOTHER VERY GOOD

24 QUESTION.  WHAT WE HAD WAS A DIFFERENT INDIVIDUAL WHO WAS

25 LOCATING DOCUMENTS AND FOUND IT.  AND HE SAID, WELL, HEY,

```
 1  HERE'S AN S.O.W.  DOES IT HAVE ANY MORE RELEVANCE TO THAT CASE
 2  THAN OURS?  NO.  BUT IT'S LITERALLY THE DIFFERENCE BETWEEN
 3  SOMEBODY LEFT THE EMPLOY OF AUTOLIV AND SOMEBODY ELSE GOING
 4  THROUGH AND SAYING, "HEY, I FOUND AN S.O.W.  HERE IT IS."
 5          THE COURT:  LET'S SAY I AM AGREEING WITH YOU IT'S NOT
 6  INTENTIONAL.  ISN'T THE EFFECT, THOUGH, STILL THE SAME ON THE
 7  PLAINTIFF?  IN READING JUDGE DUFFEY'S SUMMARY JUDGMENT ORDER,
 8  THERE IS NO QUESTION IN MY MIND ACTIVELY INVOLVED IS THE REASON
 9  WHY HE GRANTED YOU SUMMARY JUDGMENT AND DIDN'T AGREE WITH THE
10  PLAINTIFF.
11          MR. SCRIBNER:  LET ME PUSH BACK, RESPECTFULLY.
12          THE COURT:  OKAY.
13          MR. SCRIBNER:  ON THAT NOTION.
14          ACTIVE INVOLVEMENT.  THAT PHRASE COMES FROM THE
15  DAVENPORT CASE.
16          THE COURT:  RIGHT.
17          MR. SCRIBNER:  AND IN THE DAVENPORT CASE YOU HAD AN
18  ENGINE SUPPLIER WHO IS SUPPLYING TO A WOOD CHIPPER COMPANY.
19  KIND OF AKIN TO OUR SITUATION.  SEATBELT, CAR, RIGHT?  THE
20  ENGINE SUPPLIER SAID, LOOK, THIS IS GOING TO WORK WITH YOUR
21  WOOD CHIPPER AND HERE IS WHERE I WOULD LOCATE IT.  AND
22  ULTIMATELY THE PLAINTIFF SAID YOU LOCATED IT IN THE WRONG SPOT.
23          EVEN UNDER THOSE FACTS THE COURT OF APPEALS OF
24  GEORGIA SAID THAT'S NOT ACTIVE INVOLVEMENT.  YOU CAN MAKE
25  SUGGESTIONS.  YOU CAN MAKE RECOMMENDATIONS.  ACTIVE INVOLVEMENT
```

1    IS WHO IS ACTIVELY INVOLVED IN THAT DECISION.  AND THE ULTIMATE

2    DECISION THERE, THEY SAID, JUDGE ELLINGTON, I BELIEVE, WAS MADE

3    BY THE OEM, THE WOOD CHIPPING COMPANY.

4            WHAT I THINK JUDGE DUFFEY DID -- AND LOOK, I AM

5    ENGAGING IN RANK SPECULATION.  I HAVE NO IDEA WHAT JUDGE DUFFEY

6    WOULD HAVE DONE WITH ALL OF THIS, BUT I POINT YOUR HONOR TO

7    THREE THINGS THAT HE SAID IN HIS ORDER THAT I THINK --

8            THE COURT:  LET ME ASK YOU ONE QUESTION --

9            MR. SCRIBNER:  SURE, SURE.

10           THE COURT:  -- BEFORE WE MOVE ON FROM THIS POINT.

11           JUDGE DUFFEY IS QUESTIONING MR. PRENTKOWSKI.  AND

12   FORGIVE ME FOR MISPRONOUNCING HIS NAME.

13           MR. SCRIBNER:  YOU GOT THAT RIGHT.  PRENTKOWSKI.

14           THE COURT:  "I SPECIFICALLY ASKED, 'DID MAZDA ASK

15   AUTOLIV JAPAN FOR ANY INPUT ON THE SYSTEM-LEVEL DESIGN

16   SPECIFICATION?'  'NOT ON THE SEAT'-- THE AUTOLIV JAPAN RESPONSE

17   WAS, 'NOT ON THE SEATBELT SYSTEMS.'"

18           EVEN IF YOU TAKE MAYBE A DIFFERENT INTERPRETATION OF

19   ACTIVELY INVOLVED, THIS IS PRETTY SPECIFIC.

20           MR. SCRIBNER:  I BELIEVE THAT DAVE PRENTKOWSKI, WHO

21   IS GOING TO TESTIFY AT TRIAL IF YOU ALLOW IT, WOULD SAY EXACTLY

22   THE SAME THING TODAY.  "SPECIFICATION" IS A TERM OF ART.  A

23   SPECIFICATION IS A DOCUMENT THAT THE OEM PUTS TOGETHER AND

24   PROVIDES TO AUTOLIV AND SAYS GIVE ME THIS THING.  WAS THERE

25   BACK AND FORTH?  WERE THERE EMAIL COMMUNICATIONS?  JUDGE DUFFEY

UNITED STATES DISTRICT COURT

1  KNEW THAT.

2          THERE WERE LOTS OF COMMUNICATIONS THAT HE EVALUATES

3  AND SAYS THIS DOESN'T RISE TO THE LEVEL OF ACTIVE INVOLVEMENT.

4  YEAH, THEY WERE ASKING YOU QUESTIONS.  YEAH, AUTOLIV, YOU WERE

5  DOING SLED TESTING.  YEAH, THEY ASKED YOU ABOUT THE HEAD

6  BOTTOMING OUT.  BUT I DON'T SEE ACTIVE INVOLVEMENT IN WHAT I

7  VIEW HIM SAYING CAN BE SUMMED UP IN THREE POINTS IN HIS COURT

8  ORDER ON PAGES 11 AND 12.

9          AND AGAIN, FORGIVE ME.  THIS IS JUST GUESSWORK, BUT

10  THIS IS WHAT I TOOK HIM TO MEAN.  SO STATEMENT NUMBER ONE FROM

11  JUDGE DUFFEY SAYS AS FOLLOWS:  "THE ALLEGEDLY DEFECTIVE

12  COMPONENT IN THIS CASE IS THE SEATBELT ASSEMBLY.  WITH RESPECT

13  TO THIS COMPONENT, THE EVIDENCE SHOWS THAT AUTOLIV SUPPLIED A

14  SEATBELT ASSEMBLY THAT MET MAZDA'S DETAILED SPECIFICATIONS."

15  THAT STATEMENT REMAINS TRUE TODAY.

16          STATEMENT NUMBER TWO:  "AUTOLIV PROVIDED MAZDA WITH

17  SEVERAL SAMPLES OF SEATBELT COMPONENTS THAT INCLUDED TORSION

18  BARS OF DIFFERENT DEPLOYMENT THRESHOLDS AND MAZDA PERFORMED

19  TESTING AND ULTIMATELY DECIDED TO UTILIZE A LOAD LIMITING

20  RETRACTOR WITH A TORSION BAR WITH A DEPLOYMENT THRESHOLD OF TWO

21  PLUS OR MINUS .5 KILONEWTON."  THAT STATEMENT ALSO REMAINS

22  TRUE.

23          STATEMENT THREE.  AND THIS REALLY GETS RIGHT TO IT.

24  "PUT ANOTHER WAY, AS MAZDA'S EXPERT TESTIFIED, MAZDA WORKED

25  TOGETHER WITH AUTOLIV TO ENSURE THE APPROPRIATENESS OF THE

1   SEATBELT DESIGN FOR THE VEHICLE AND THEN MAZDA ULTIMATELY

2   DECIDED THAT IT MET THEIR SPECIFICATIONS FOR INCORPORATION INTO

3   THE VEHICLE."  THAT STATEMENT ALSO REMAINS TRUE.

4          HE WAS VERY COGNIZANT OF THE FACT THAT, AS HE SAYS

5   RIGHT HERE, AUTOLIV TO ENSURE THE APPROPRIATENESS OF THE

6   SEATBELT DESIGN.  THEY HAD COMMUNICATIONS WITH MAZDA ABOUT THE

7   SEATBELT DESIGN, THE ACTUAL COMPONENTS THAT WE MADE AVAILABLE

8   FOR THEM TO SELECT FROM.

9          I THINK WHAT I WOULD SAY IN SUMMARY ON THE S.O.W.,

10  YOUR HONOR, AND THIS -- I DON'T KNOW HOW TO EXPLAIN THIS,

11  REALLY, BUT I AM GOING TO DO MY BEST.

12         IN A CONTRACT CASE IF YOU AND I HAD A CONTRACT AND WE

13  HAD AN INTERPRETATION ISSUE AND THE COURT SAID IT'S NOT CRYSTAL

14  CLEAR, THEN THEY ARE GOING TO TAKE TESTIMONY FROM YOU AND THEY

15  ARE GOING TO TAKE TESTIMONY FROM ME.  AND IF WE ACTUALLY

16  AGREED, REALLY IT WOULDN'T MATTER WHAT THE CONTRACT SAID.  THAT

17  WOULD BE THE INTENT OF THE PARTIES.

18         WHAT IS A LITTLE UNIQUE HERE IS THAT I THINK JUDGE

19  DUFFEY SAW THAT MAZDA AND AUTOLIV AGREED AS TO HOW THE PROGRAM

20  WAS GOING TO WORK, THAT WE WOULD PROVIDE THEM SUPPORT, THAT WE

21  DID HAVE COMMUNICATIONS, THAT WE DID HAVE INVOLVEMENT.  WHEN I

22  SAY IN MY FOOTNOTE THAT WE HAD -- NO ONE DISPUTES THAT WE HAD

23  INVOLVEMENT.  WE DIDN'T HAVE ACTIVE INVOLVEMENT THE WAY THE

24  DAVENPORT CASE DECIDES.  THAT IS WHAT IS AT THE HEART OF WHAT

25  WE WERE ARGUING TO JUDGE DUFFEY AND I WOULD MAKE THAT SAME

1  ARGUMENT TODAY ON SUMMARY JUDGMENT BUT FOR JUDGE WILSON'S

2  RULING.

3         BUT TO ROUND THAT OUT, SO AFTER THIS THESE DOCUMENTS

4  WERE PRODUCED.  THAT WAS ON NOVEMBER 21.  ON DECEMBER 20, A

5  MONTH LATER, WE PUT UP AT OUR EXPENSE, FLEW HIM OVER TO LOS

6  ANGELES, MR. KAMEI.  HE IS THE LEAD SYSTEM ENGINEER.  HE IS

7  BOOTS ON THE GROUND.  THE GUY THAT HAD THE DOCUMENT, HE WAS

8  SORT OF MANAGERIAL UP HERE.  BUT THE GUY THAT WAS WORKING WITH

9  MAZDA IS MR. KAMEI.  HE IS THE GUY THAT HAS BOOTS ON THE GROUND

10 INTERACTION.

11         THEY DEPOSED HIM.  THEY HAD THESE DOCUMENTS FOR A

12 MONTH.  AND HERE IS THE BACK AND FORTH ON THE S.O.W.

13         QUESTION:  DID YOU FIND THE STATEMENT OF WORK?

14         ANSWER:  I DID NOT FIND IT BUT PERHAPS SOMEBODY ELSE

15 FOUND IT.

16         QUESTION:  WHO FOUND IT?

17         ANSWER:  I DON'T KNOW.

18         QUESTION:  WHY DID YOU SEE -- WHEN DID YOU FIRST SEE

19 THE STATEMENT OF WORK?

20         ANSWER:  I THINK I PROBABLY SAW THE COVER SHEET FOR

21 THE MAZDA S.O.W. WHEN DOING DEVELOPMENT, BUT I HAVE NOT LOOKED

22 AT THE CONTENT IN DETAIL.

23         MR. BUTLER:  WHAT PAGE AND LINE ARE YOU ON, SIR?

24         MR. SCRIBNER:  27 AND 28.

25         MR. BUTLER:  WHAT?


                    UNITED STATES DISTRICT COURT

1          MR. SCRIBNER:  27 AND 28.

2          MR. BUTLER:  27 AND 28 WHAT?  THE PAGE?

3          MR. SCRIBNER:  YES, SIR.

4          MR. BUTLER:  WHAT LINE?

5          MR. SCRIBNER:  27 LINE 12 THROUGH 28 LINE THREE.

6          THAT WAS THE LAST QUESTION THEY ASKED MR. KAMEI ABOUT

7    THE S.O.W.  THEY NEVER ASKED MR. KAMEI A SINGLE QUESTION ABOUT

8    THE S.O.W. OTHER THAN THAT.  THEY NEVER ASKED MR. KAMEI ANY

9    QUESTIONS ABOUT THESE VA/VE DOCUMENTS.  YOU KNOW WHY?  BECAUSE

10   MR. KAMEI WOULD SAY WE DIDN'T MAKE THAT DECISION.  THE DECISION

11   ON THE RETRACTOR AND THE THRESHOLD WAS CLEARLY MADE BY MAZDA.

12   I PROVIDED THEM WITH OPTIONS AND THEY CHOSE WHAT THEY CHOSE.

13   INSTEAD OF GOING WITH WHAT MAZDA SUBMITTED A DECLARATION ON

14   THAT JUDGE DUFFEY CONSIDERED THAT SAID WE AND WE ALONE MAKE ALL

15   DECISIONS REGARDING OCCUPANT SAFETY FOR THE MAZDA3, AUTOLIV'S

16   TESTIMONY SAYS MAZDA IS RIGHT.  THEY MAKE THOSE DECISIONS.  WE

17   SUPPORT BUT THEY MAKE THOSE DECISIONS.

18          JUDGE DUFFEY GRANTS SUMMARY JUDGMENT AND SAYS THERE

19   IS NO ACTIVE INVOLVEMENT.  AND WHAT WE ARE HEARING TODAY IS

20   THESE DOCUMENTS SOMEHOW UPSET THE APPLE CART BECAUSE THEIR

21   EXPERT SAYS SO.  YOU HAVE AUTOLIV AND MAZDA -- GOING BACK TO

22   THE CONTRACT SITUATION, IT'S LIKE AN EXPERT COMING IN SAYING I

23   DON'T CARE, I DON'T CARE WHAT JUDGE JONES AND DOUG SCRIBNER

24   MEANT IN THAT DOCUMENT.  I VIEW IT DIFFERENTLY.

25          THAT'S WHAT WE HAVE.  WE HAVE AN EXPERT WHO IS A

UNITED STATES DISTRICT COURT

1    HUMAN HIGHLIGHTER, WHICH I THINK IS INAPPROPRIATE AND IT'S

2    SUBJECT TO A DAUBERT MOTION, BUT YOU'LL HEAR ALL OF THAT.  FOR

3    SOMEBODY TO COME IN AND SAY I AM A MASTER OF ALL, HE HAS NEVER

4    WORKED IN THE AUTO INDUSTRY.  HE HAS NEVER DESIGNED A SEATBELT

5    IN HIS ENTIRE GOD-GIVEN LIFE.  AND HE IS GOING TO COME IN AND

6    TELL US HERE IS WHAT THESE DOCUMENTS MEAN.  I AM GOING TO

7    INTERPRET THEM DESPITE THE FACT THAT MAZDA AND AUTOLIV DIDN'T

8    INTERPRET IT THAT WAY AT ALL.

9            THE DOCUMENTS SHOULD HAVE BEEN PRODUCED.  I AM

10   MORTIFIED THAT THEY WERE PRODUCED LATE.  ARE THESE

11   GAME-CHANGING DOCUMENTS?  IN OUR VIEW, NO.  WOULD I HAVE MADE

12   THE EXACT SAME ARGUMENT TO JUDGE DUFFEY THAT I AM MAKING THAT

13   MADE BACK THEN?  YES.  WHAT WOULD HE HAVE DONE WITH IT?  I

14   DON'T KNOW.  I DON'T KNOW.  BUT THE ARGUMENT IS THE SAME.

15           THE COURT:  SO THESE DOCUMENTS CHANGED NOTHING?

16           MR. SCRIBNER:  IN MY VIEW, CORRECT.  SHOULD HAVE BEEN

17   PRODUCED.  SHOULD HAVE BEEN PRODUCED.

18           SO IF YOU LOOK AT THE CASE LAW, THREE ESSENTIAL

19   ELEMENTS ARE NEEDED FOR A DEFAULT JUDGMENT.  AND IN ADDITION TO

20   NOTING THAT IT'S A RESULT OF LAST RESORT, THE PLAINTIFF HAS TO

21   SHOW THREE THINGS, OR THE MOVING PARTY, RATHER.

22           THEY NEED TO SHOW, NUMBER ONE, AND I'M QUOTING, "THAT

23   THE NONMOVING PARTY EXHIBITED A WILLFUL OR BAD FAITH FAILURE TO

24   OBEY A DISCOVERY ORDER; TWO, THAT THE MOVING PARTY WAS

25   PREJUDICED BY THAT VIOLATION; AND THREE, THAT A LESSER SANCTION

UNITED STATES DISTRICT COURT

1   WOULD FAIL TO PUNISH THE VIOLATION ADEQUATELY AND WOULD NOT

2   ENSURE FUTURE COMPLIANCE WITH COURT ORDERS."

3            I SUBMIT TO YOU THAT THE FACT THAT THESE DOCUMENTS

4   LANDED ON MY EMAIL WITHIN TEN HOURS OF OUR 30(B)(6)

5   REPRESENTATIVE LEARNING ABOUT THEM FROM THE FOLKS IN JAPAN IS

6   NOT BAD FAITH.  IT'S A MISTAKE.  IT'S GOOD FAITH.  IT'S -- YOU

7   KNOW, WE SHOULD HAVE PRODUCED THESE DOCUMENTS, BUT NOW THAT WE

8   GOT THEM THEY WEREN'T DEEP SIXED.  THEY WERE PRODUCED TO THE

9   PLAINTIFFS IMMEDIATELY.

10           MR. BUTLER:  YOUR HONOR, WE OBJECT.  THERE IS A

11   DIFFERENCE.  HE KEEPS USING THE WORD "WE."  AND WE'VE MADE IT

12   VERY CLEAR.  WE ARE NOT -- THIS IS NOT A MOTION FOR SANCTIONS

13   AGAINST MR. SCRIBNER.  IT'S A MOTION FOR SANCTIONS AGAINST

14   AUTOLIV.  AUTOLIV ALWAYS HAD THESE DOCUMENTS.  AND MS. CANNELLA

15   HAS TOLD YOU WHERE THEY WERE, ON THE COMPUTER OF THE FIRST GUY

16   AUTOLIV SHOULD HAVE GONE TO TO LOOK FOR THEM.

17           AUTOLIV KNEW WHAT MR. SCRIBNER PUT IN THIS BRIEF TO

18   JUDGE DUFFEY AND THE ELEVENTH CIRCUIT WHEN HE ARGUED TO THEM.

19   AUTOLIV MONITORS THIS CASE.  AUTOLIV HAD JUDGE DUFFEY'S ORDER.

20   AUTOLIV KNEW THAT WHAT MS. CANNELLA WENT OVER WITH YOU FROM

21   JUDGE DUFFEY'S ORDER WAS NOT TRUE BASED ON DOCUMENTS THAT

22   AUTOLIV HAD.

23           THIS MOTION IS ABOUT AUTOLIV, NOT ABOUT WHAT

24   PRENTKOWSKI DID IN OCTOBER OF 2018, NOT ABOUT WHAT MR. SCRIBNER

25   DID IN OCTOBER OF 2018.  AUTOLIV ALWAYS HAD THESE DOCUMENTS.


UNITED STATES DISTRICT COURT

1  AUTOLIV HAS ALWAYS HAD THE TRUTH.

2          THE COURT:  THANK YOU.

3          MR. SCRIBNER?

4          MR. SCRIBNER:  THEN WHY PRODUCE THEM?  WHAT IS THE

5  POINT?

6          MR. BUTLER:  BECAUSE THEY SLIPPED UP IN STEGALL AND

7  GOT OUT AND THE FIRST THING --

8          THE COURT:  MR. BUTLER, MR. BUTLER.

9          MR. BUTLER:  I'LL HUSH.

10          THE COURT:  THANK YOU.

11          MR. SCRIBNER:  THEY PRODUCED THEM.  THEY LEARNED

12  IMMEDIATELY AFTER WE TRANSLATED THEM THAT THEY HADN'T BEEN

13  PRODUCED BEFORE AND THEY WERE PRODUCED.

14          IF YOU LOOK AT THE CASE LAW, JUDGE BATTEN, IN THE

15  AMERICAN SUPPLIES CASE, LOOK AT THAT CASE.  HE SAYS, I HAVE

16  FOUND A PATTERN OF MISCONDUCT, A PATTERN OF BAD FAITH CONDUCT.

17  AND HE SAYS, I'M REALLY UNHAPPY AND I'M GOING TO AWARD FEES.  I

18  AM NOT GOING TO ISSUE A DEFAULT JUDGMENT.

19          THE KIPPERMAN CASE, JUDGE FORRESTER.  LISTEN TO THIS

20  ONE.  AGAIN, THIS GIVES YOU A SENSE FOR WHAT JUDGES, YOU KNOW,

21  YOUR CONTEMPORARIES ARE DOING WITH ISSUES WHEN SOMEBODY MAKES A

22  MOTION LIKE THIS.

23          JUDGE FORRESTER ASKED A LAWYER AT A HEARING, QUOTE,

24  SINCE THIS IS THE HEART OF THE CASE, YOU UNDERSTAND THAT IF I

25  LATER FIND THAT THERE ARE DOCUMENTS, AND UNLESS IT'S PRETTY

 1  CLEAR AND COMPELLING THAT THEY WEREN'T JUST SIMPLY OVERLOOKED,

 2  THAT IN THIS COURT'S MIND WOULD BE GROUNDS TO STRIKE YOUR

 3  ANSWER.

 4          GUESS WHAT?  MONTHS LATER THOSE VERY DOCUMENTS WERE

 5  PRODUCED.  WHAT DOES THE COURT DO?  THE COURT SAYS DEFENDANTS

 6  BLATANTLY IGNORED ORDERS OF THE COURT AND PROMPTED MULTIPLE

 7  MOTIONS TO COMPEL.  GIVEN THAT BEHAVIOR, WE ARE TEMPTED TO

 8  GRANT THE REQUEST.  THAT SAID, WE ARE NOT GOING TO STRIKE THE

 9  ANSWER.  IT'S PREFERABLE TO HEAR THESE CASES ON THE MERITS.  WE

10  ARE GOING TO AWARD FEES.

11          IN THE ONLY CASE CITED BY EITHER PARTY WHERE A

12  DEFAULT JUDGMENT WAS ENTERED, THE SUZUKI CASE, THE COURT HELD,

13  AND I QUOTE:  THE DEFENDANT DELIBERATELY WITHHELD INFORMATION

14  FROM THE PLAINTIFF AND THE COMPANY'S COUNSEL PARTICIPATED IN A

15  COVER-UP.

16          NOW, I WANT TO JUXTAPOSE THAT AGAINST WHAT HAPPENED

17  HERE.  IN AUGUST 26, ON AUGUST 26, 2015, WE HAD A HEARING

18  BEFORE MAGISTRATE JUDGE ANAND.  THE FOCUS OF THAT MOTION TO

19  COMPEL WAS NOT THE S.O.W. OR ANY OF THAT STUFF.  IT WAS

20  SUBSTANTIAL SIMILARITY, WHICH YOU GET IN ALL PRODUCTS CASES.

21  THEY SAID, HEY, WE KNOW THAT WE ARE GETTING INFORMATION FOR THE

22  2005 MAZDA3.  WHAT ABOUT SUBSTANTIALLY SIMILAR VEHICLES?  AND

23  IT WAS 85 PERCENT DIRECTED AT MAZDA, OKAY?

24          ULTIMATELY, THE COURT ORDER IS ISSUED AND IT SAYS:

25  HERE IS WHAT SUBSTANTIAL SIMILARITY MEANS FOR YOU, MAZDA, AND

UNITED STATES DISTRICT COURT

1  FOR AUTOLIV, WHAT SUBSTANTIALLY SIMILAR MEANS, WE WANT YOU TO

2  PRODUCE THE SPECIFICATION FOR THAT VOLVO.  AND WE DID IT.

3           I AM NOT SUGGESTING THAT AT THAT HEARING WE DIDN'T

4  TALK ABOUT THE 2005 MAZDA3 AND I AM NOT SUGGESTING THAT I

5  CERTAINLY WAS OF THE OPINION THAT THESE TYPES OF DOCUMENTS THAT

6  WE PRODUCED LATE SHOULD BE PRODUCED.  AND SO I AM NOT

7  SUGGESTING THAT, YOU KNOW, AUTOLIV SHOULDN'T HAVE PRODUCED

8  THESE DOCUMENTS.  I AM SUGGESTING THAT IN THESE OTHER CASES

9  THERE ARE REPEATED ORDERS AND MOTIONS TO COMPEL ABOUT A

10  SPECIFIC SET OF DOCUMENTS AND EVEN THEN THEY ARE NOT STRIKING

11  THE ANSWER.

12           HERE WE ARE TALKING ABOUT STATEMENTS MADE AT A

13  HEARING RELATED TO MAZDA WHERE THE COURT ORDERS US TO PRODUCE

14  DOCUMENTS TO VOLVO OR RELATED TO VOLVO AND WE DID IT.  WE DID

15  IT.

16           THIS WAS OVERSIGHT.  THIS WAS A MISTAKE.  THERE IS NO

17  DOUBT IT'S A MISTAKE.  IF YOU ARE GOING TO HOLD BACK DOCUMENTS,

18  WHY IN THE WORLD WOULD YOU HOLD BACK A DOCUMENT THAT MAZDA

19  CREATED FROM 1999 THAT TALKS ABOUT, YOU KNOW, THE S.O.W. FROM

20  1999?

21           MAZDA, BY THE WAY, DID NOT PRODUCE THAT DOCUMENT IN

22  THIS CASE EITHER.  NOW, DOES THAT MEAN THEY DIDN'T HAVE IT

23  ANYMORE?  MAYBE.  DID THEY VIEW IT AS, WHAT IS THIS?  THIS IS

24  OF NO MOMENT.  I DON'T KNOW.  BUT THEY DIDN'T PRODUCE IT EITHER

25  AND IT'S THEIR DOCUMENT.


UNITED STATES DISTRICT COURT

1              IN TERMS OF PREJUDICE --

2              THE COURT:  THEY ARGUE THEY COULDN'T ARGUE THIS IN

3    FRONT OF JUDGE DUFFEY, THEY COULDN'T ARGUE THIS TO THE ELEVENTH

4    CIRCUIT.  THEY ARGUE THAT MS. ANDREWS FOR LACK OF A BETTER WORD

5    WAS PUT TO A LOT OF STRESS OVER HAVING TO WORRY ABOUT PAYING

6    ATTORNEY'S FEES AND THAT SHOULD BE PUNISHABLE BY MORE THAN A

7    FINE.

8              MR. SCRIBNER:  I UNDERSTAND THEIR ARGUMENT.  THEY

9    HAVE ASKED FOR A DEFAULT JUDGMENT, WHICH DOES NOT FEEL

10   APPROPRIATE HERE AND I DON'T THINK THAT THEY HAVE SATISFIED THE

11   ELEMENTS TO IT HERE.

12             THE SECOND THING I WOULD SAY.  YOU ASKED, YOUR HONOR,

13   ABOUT, YOU KNOW, WHAT ARE THEY SAYING?  WHAT IS AUTOLIV'S

14   DEFENSE?  YOU KNOW, TO PREVENT US FROM ARGUING THAT THIS

15   TRAGEDY WAS IN PART MR. ANDREWS' FAULT FOR HAVING A SINGLE

16   VEHICLE ACCIDENT AND IN PART MAZDA'S FAULT BECAUSE OF THE

17   TESTIMONY FROM THEIR AIRBAG EXPERT IS SORT OF A DEATH KNELL TO

18   THE CASE.

19             I DON'T CONCEDE THAT THE PRODUCT IS DEFECTIVE.  I

20   MEAN, YOU KNOW, WHAT I AM HEARING IS, WELL, WAIT A MINUTE.  YOU

21   KNOW, HE KNOWS HE DOESN'T HAVE A DEFENSE.  HE'S, YOU KNOW,

22   CONCEDING THAT THE PRODUCT IS DEFECTIVE.  I WANT TO BE VERY

23   CLEAR THAT THAT IS NOT TRUE.

24             MY POINT I THINK IS THAT IF YOU STRIKE OUR ABILITY TO

25   ALLOCATE FAULT OR ASK YOU, AS FACT FINDER, TO ALLOCATE FAULT,

1  WE WILL BE DEFENDING A MAZDA DESIGN FOR A SEATBELT ASSEMBLY

2  THAT IS NOT OURS.  IT'S MAZDA'S DECISION.  WE PROVIDED THEM

3  WITH THE OPTIONS AND MAZDA CHOSE WHAT THEY CHOSE AND I HAVE TO

4  DEFEND MAZDA'S DECISION TO GO WITH THE RETRACTOR LEVEL AND THE

5  THRESHOLD LEVEL THAT THEY WENT WITH.  THAT SEEMS PATENTLY

6  UNFAIR GIVEN THAT, YOU KNOW, THESE CASES ALL SEEM TO STAND FOR

7  THE SAME PROPOSITION:  WE WANT CASES TO BE HEARD ON THE MERITS.

8         WE EXPECT FULLY THAT YOU ARE GOING TO ISSUE A RULING

9  AND AUTOLIV KNOWS THAT THESE DOCUMENTS SHOULD HAVE BEEN

10 PRODUCED AND WE ARE ACCEPTING, WE ARE GOING TO ACCEPT OUR FATE.

11 BUT AFTER WE ACCEPT THAT FATE MY HOPE AND EXPECTATION IS TO TRY

12 THIS CASE IN FRONT OF YOU AND LET US MAKE OUR ARGUMENTS,

13 BECAUSE WE HAVE ARGUMENTS.  WE HAVE GOOD ARGUMENTS.  WE HAVE A

14 GOOD CASE.  AND THEN THE CHIPS WILL FALL AND YOU AS THE FACT

15 FINDER WILL MAKE THE DECISION YOU MAKE.

16        I WANT TO TOUCH ON JUST A COUPLE OF DOCUMENTS IN

17 ADDITION TO THE S.O.W.  YOU KNOW -- WELL, LET ME FINISH WITH

18 THE S.O.W.  I GOT A LITTLE SIDETRACKED THERE.

19        IT'S CREATED BY MAZDA IN 1999.  DOESN'T INCLUDE ANY

20 OF THE WORDS THAT YOU WOULD TYPICALLY -- YOU KNOW, AIRBAG,

21 SEATBELT, J48C, THE KIND OF THINGS THAT I SUSPECT PEOPLE WERE

22 LOOKING FOR, THE KIND OF SEARCHES THAT WE RAN.  IT'S NOT

23 PROGRAM SPECIFIC.  THAT DOESN'T MEAN IT'S NOT IMPORTANT.  THEY

24 HAVE PLACED IMPORTANCE ON IT.  I'M NOT GOING TO ARGUE THAT.  I

25 DON'T THINK IT'S IMPORTANT, BUT IT'S NOT PROGRAM SPECIFIC.  IT

1  DOESN'T TALK ABOUT WHO MADE THIS DECISION WITH RESPECT TO THE

2  LOAD LIMITER.

3          MR. KAMEI SUBMITTED A DECLARATION, BECAUSE HE WASN'T

4  ASKED ANY QUESTIONS ABOUT THIS AT HIS DEPOSITION.  SO WE

5  SUBMITTED A DECLARATION.  AND HE SAID, LOOK, I DIDN'T RELY ON

6  THIS THING.  I DIDN'T REVIEW THIS THING.  I WENT ABOUT MY

7  BUSINESS LIKE I TYPICALLY DO.

8          AND THIS NOTION THAT THE S.O.W. SAYS, HEY, IF YOU

9  FIND A PROBLEM, YOU'VE GOT TO, YOU KNOW, HELP FIX IT, WELL, THE

10  PROBLEM IS WHAT?  THIS GOT FOUR OUT OF FIVE STARS.  I SUSPECT

11  THAT WHEN AUTOLIV HEARD THE RESULTS ABOUT THE MAZDA VEHICLE AND

12  CRASH TESTING, THEY SAID, WHOOPEE, YOO-HOO.  FOUR OUT OF FIVE

13  STARS.  GREAT.

14          I ALSO SUSPECT THAT IF ANY ENGINEER WANTED TO REDUCE

15  THE AMOUNT OF PAY-OUT, THEY WOULD INCREASE THE LOAD LIMITER AND

16  WE GAVE THEM THE OPTIONS.  SO TO THE EXTENT YOU ARE SUPPOSED TO

17  PROVIDE A SOLUTION, WHICH IS WHAT I THINK MS. CANNELLA SAID WE

18  WERE SUPPOSED TO DO, WE DID.  WE DID PROVIDE THEM A SOLUTION.

19  BUT THEY GET TO MAKE THE CHOICE AND THEY SHOULD MAKE THE

20  CHOICE.

21          I THINK THE VA/VE DOCUMENTS HAVE NOT BEEN PORTRAYED

22  THE WAY WE WOULD PORTRAY THEM AND I WILL LEAVE IT AT THAT.

23  THESE DOCUMENTS, ACCORDING TO PLAINTIFFS, SAY, YOU KNOW, WE ARE

24  ACTIVELY INVOLVED IN THE DESIGN OF THE 2005 MAZDA3.  IF YOU

25  LOOK AT THE DATES ON THE THREE VA/VE'S, ONE OF WHICH IS

UNITED STATES DISTRICT COURT

1    CHANGING A SPONG COVER TO A PLASTIC COVER -- I THINK YOU ASKED,

2    WELL, WHAT HAS THIS GOT TO DO WITH ANYTHING?  IN ANY EVENT, ALL

3    THREE OF THE VA/VE'S ARE DATED IN A TIME FRAME THAT MEANS IT'S

4    ALREADY PAST THE TIME THAT THE 2005 MAZDA3 IS BEING

5    MANUFACTURED.

6           SO I DON'T WANT THAT LOST ON THE COURT, THAT THE

7    VA/VE IMPORTANCE THAT THEY PLACE ON IT HAS NOTHING TO DO WITH

8    OUR VEHICLE.  IT'S NOT THE 2005.  THESE OCCUR IN EARLY 2005.

9    THE 2005 HAS ALREADY BEEN -- BEING MANUFACTURED FOR MONTHS AND

10   MONTHS.

11          AGAIN, SMOKING GUN DOCUMENTS?  WE CERTAINLY DON'T

12   VIEW THEM THAT WAY.  YOU SAW THE MAZDA TEAM BUSINESS UPDATES

13   THAT WERE USED WITH THEIR EXPERT.  I THINK IT'S ABSOLUTELY ONE

14   HUNDRED PERCENT CLEAR THAT MAZDA WAS MAKING DECISIONS ABOUT

15   WHAT TO USE AND WE WERE WAITING FOR THEIR DECISION.  OVER AND

16   OVER YOU SEE IN THESE NOTES WAITING FOR MAZDA.  THEY'LL TELL US

17   WHAT THEY WANT.

18          THE PRODUCT SHEET THAT MS. CANNELLA WENT BACK TO.  I

19   THOUGHT WE COVERED THAT BUT I WANT TO MAKE SURE THAT THE COURT

20   UNDERSTANDS WHAT OUR POINT IS.

21          MR. MEYER DOESN'T CRITICIZE ANY PART OF THE SEATBELT

22   EXCEPT THE THRESHOLD AND THE LACK OF A STOP, RIGHT?  SO THERE

23   IS A PRODUCT SHEET.  IT DOES DATE BACK PRE WHEN THIS VEHICLE

24   WAS SOLD, BUT IT HAS OPTIONS.  IT SAYS, DO YOU WANT THE TWO?

25   DO YOU WANT THE THREE?  DO YOU WANT THE FOUR PLUS OR MINUS


UNITED STATES DISTRICT COURT

1  POINT FIVE?

2        TO SAY THAT WE DESIGNED THIS PARTICULAR SEATBELT

3  BASED UPON THAT DOCUMENT IS JUST FLAT WRONG, BECAUSE THEY ARE

4  SAYING THE FLAW IS THE THRESHOLD.  AND THE PRODUCT SHEET ITSELF

5  SAYS IF YOU WANT A TWO, WE'LL GIVE IT TO YOU.  IF YOU WANT A

6  THREE, WE'LL GIVE IT TO YOU.  IF YOU WANT A FOUR, WE'LL GIVE IT

7  TO YOU.

8        I HEAR WHAT HE IS SAYING.  HE SAYS TWO IS TOO LOW

9  JUST IN A VACUUM, PERIOD.  WE'LL DEFEND AGAINST THAT.  I'LL

10  HAVE MY MOMENT, IF THE COURT ALLOWS IT, WHERE OUR EXPERT WILL

11  TELL YOU THAT THAT'S NOT HOW WE VIEW THE WORLD AT ALL.  BUT TO

12  SUGGEST THAT WE DESIGNED IT AND HAD THIS DESIGN FOR A LONG TIME

13  BEFORE 2005 ROLLED AROUND, THAT'S JUST NOT RIGHT.  I MEAN WE

14  HAD A PRODUCT SHEET THAT GAVE THEM THE OPTIONS.  THAT'S THE WAY

15  IT WORKS IN THIS INDUSTRY.

16        IN CONCLUSION, A DEFAULT JUDGMENT IS A VERY, VERY

17  DRACONIAN RESULT.  AND I UNDERSTAND THE PLAINTIFF'S

18  FRUSTRATION.  I CAN TELL YOU THAT THE PEOPLE THAT I WORK WITH

19  IN THAT COMPANY AND THE LEGAL TEAM THAT YOU HAVE BEFORE YOU

20  TODAY KNOWS JUST HOW GRAVE THE SITUATION WAS AND IS.

21        WE WILL LIVE WITH WHATEVER RULING YOU GIVE US.  WE

22  WOULD RESPECTFULLY REQUEST THE OPPORTUNITY TO TRY THE CASE ON

23  THE MERITS, ULTIMATELY, TO TRY THE CASE ON THE MERITS WITHOUT

24  HAMPERING OUR ABILITY TO MAKE SURE THAT YOU UNDERSTAND ALL OF

25  THE FACTS AND THAT ULTIMATELY YOU CONCLUDE WHO, IF ANYONE, IS

UNITED STATES DISTRICT COURT

1  RESPONSIBLE FOR THIS TRAGEDY.  THAT'S WHAT WE WOULD ASK FOR.

2  WE THINK IT'S IN KEEPING WITH THE CASE LAW THAT WE HAVE CITED

3  WHERE, YOU KNOW, WHAT I WOULD CONSIDER VERY EGREGIOUS BEHAVIOR

4  RESULTED IN ATTORNEY'S FEES.  I'M SURE THEIR LAWYERS ON THE

5  OTHER SIDE WERE UNHAPPY TOO.  BUT ULTIMATELY, I THINK IT WOULD

6  BE A STEP TOO FAR TO TAKE AWAY OUR RIGHTS TO TRY THE CASE ON

7  THE MERITS.

8           THE COURT:  THANK YOU, MR. SCRIBNER.

9           MR. SCRIBNER:  THANK YOU.

10           THE COURT:  MS. CANNELLA, YOU GET THE LAST WORD.

11           MS. CANNELLA:  THANK YOU, YOUR HONOR.

12           YOUR HONOR, MR. SCRIBNER STARTED HIS ARGUMENT BY

13  SAYING THAT ON OCTOBER 2ND, 2018, MR. PRENTKOWSKI SENT THE

14  DOCUMENTS, QUOTE, TO ME.  THAT IS A TYPICAL RESPONSE IN A

15  SITUATION LIKE THIS FOR A DEFENSE LAWYER TO STEP IN FRONT OF

16  THE BULLET FOR THEIR CLIENT.

17           AUTOLIV ITSELF KNEW THAT THE DOCUMENTS EXISTED.  IT

18  KNEW WHAT THE LAWYERS WERE ARGUING TO JUDGE DUFFEY.  IT KNEW

19  WHAT THE LAWYERS WERE ARGUING TO THE ELEVENTH CIRCUIT.  WE

20  HEARD A LOT OF EXCUSES ABOUT WHY THE DOCUMENTS WEREN'T

21  PRODUCED.  WE DIDN'T HEAR A SINGLE EXCUSE ABOUT WHY

22  MISREPRESENTATIONS WERE MADE TO THE COURTS.  NOTHING.

23           MR. SCRIBNER SAYS HE DID NOT KNOW ABOUT THESE

24  DOCUMENTS CONTRADICTING HIS ARGUMENTS, BUT AUTOLIV KNEW THE

25  ARGUMENTS WEREN'T TRUE.  AUTOLIV GOT JUDGE DUFFEY'S ORDER.


                    UNITED STATES DISTRICT COURT

 1  AUTOLIV KNEW JUDGE DUFFEY'S WRITTEN ASSUMPTIONS WERE NOT TRUE.

 2  AUTOLIV CONCEALED THAT FACT.  IT DID NOT COME BACK TO JUDGE

 3  DUFFEY AND TELL HIM.

 4         WE DO NOT WANT FEES.  THE FACT THAT MAZDA DIDN'T

 5  PRODUCE DOCUMENTS IN THIS CASE, THE FACT THAT THE PRIOR TRIAL

 6  COURT ORDERS THAT AUTOLIV HAS CITED AWARD FEES PROVE THE

 7  PROBLEM WITH FEES.  FEES DON'T PREVENT THIS CONDUCT.  IT JUST

 8  ENCOURAGES IT.

 9         YOUR HONOR SAID TO MR. SCRIBNER YOU ARE THE ONLY

10  PERSON THAT I CAN ASK MY QUESTION TO.  THE REASON HE IS THE

11  ONLY PERSON TO ASK THE QUESTION IS BECAUSE AUTOLIV DIDN'T BRING

12  ANYBODY HERE TO ANSWER THESE QUESTIONS.  AUTOLIV DOES NOT CARE

13  ABOUT THE FACT THAT IT VIOLATED THESE COURT'S ORDERS, THAT IT

14  MADE MISREPRESENTATIONS, THAT IT CAUSED MS. ANDREWS 17 YEARS

15  OF -- OR 17 MONTHS OF DELAY.  IT DOES NOT CARE ABOUT THE

16  DIFFICULTY IT PUT HER THROUGH.  IT'S NOT EVEN HERE TO ANSWER

17  FOR ITS CONDUCT.

18         THERE WAS OTHER STATEMENTS THAT WERE MADE THAT ARE

19  NOT IN EVIDENCE.  THERE IS NO EVIDENCE OF THEM THAT ARE

20  CONTRARY TO THE EVIDENCE.  NUMBER ONE, WHO IS SAYING THAT THESE

21  PDF'S ARE NOT SEARCHABLE ON MR. HIRABAYASHI'S COMPUTER?

22         NUMBER TWO, MR. HIRABAYASHI LEFT EMPLOY OF AUTOLIV.

23  IF YOUR HONOR WILL LOOK AT DOCUMENT 228 ON THE RECORD, THERE IS

24  A STATEMENT FROM HIROKAZU HIRABAYASHI.  HE SUBMITTED AN

25  AFFIDAVIT IN THIS CASE WHILE THE DOCUMENTS ON HIS COMPUTER WERE


UNITED STATES DISTRICT COURT

1 BEING CONCEALED -- OR THE DOCUMENTS THAT HE FOUND WERE

2 CONCEALED.

3          NUMBER THREE.  THE REPRESENTATION THAT AUTOLIV

4 PRODUCED THREE S.O.W.'S.  THEY PRODUCED THREE THINGS THEY

5 CALLED S.O.W.'S IN THEIR RESPONSES, SO WE THOUGHT WE HAD

6 S.O.W.'S.  BUT THEY WERE JUST LISTS OF, YOU KNOW, PRODUCT

7 NUMBERS, BASICALLY, NOTHING LIKE THE DOCUMENT THAT WE HAVE THAT

8 AUTOLIV KNEW EXISTED.

9          NUMBER FOUR.  EXHIBIT NUMBER 2 THAT AUTOLIV

10 SUBMITTED.  ON THE APRIL 2002 MAZDA BUSINESS TEAM UPDATE THAT'S

11 AN AUTOLIV INTERNAL DOCUMENT AUTOLIV SAYS UNDERNEATH THE J48C

12 PROGRAM, THIS PROGRAM, NUMBER THREE, S.O.W., QUOTE, "S.O.W.,"

13 STATEMENT OF WORK.  "SOME IMPORTANT PLACES HAVE BEEN UNDER

14 TRANSLATION IN ENGLISH."

15          AUTOLIV IS USING THE S.O.W. FOR THE J48C PROGRAM.

16 REPRESENTATIONS THAT IT WAS NOT USING THAT S.O.W., THAT IT

17 WASN'T AFFECTING ANYTHING, THAT IT WASN'T SOMETHING THEY WOULD

18 FIND IN RELATION TO THE J48C, TO THE MAZDA3, IS FALSE.  WE HAVE

19 A DOCUMENT RIGHT HERE.  I'LL GIVE THE COURT MY COPY.

20          THE COURT:  WELL, YOU CAN ALWAYS -- IF THIS IS YOUR

21 LAST COPY, YOU CAN JUST HOLD ONTO IT AND EMAIL IT TO ME.

22          MS. CANNELLA:  NO, NO.  THAT'S ALL RIGHT.

23          THE COURT:  MS. CANNELLA?

24          MS. CANNELLA:  YES.

25          THE COURT:  LET'S TALK A FEW MINUTES ABOUT THE

UNITED STATES DISTRICT COURT

1   ARGUMENTS BEING PUT FORTH THAT THEIR INTERPRETATION OF ACTIVELY

2   INVOLVED IS DIFFERENT.  THAT WHEN THEY ARGUED TO JUDGE DUFFEY

3   ACTIVELY INVOLVED — I CAN'T REMEMBER THE NAME OF THE TWO

4   INDIVIDUALS THAT MR. SCRIBNER USED — THAT THEY WERE ON THE SAME

5   PAGE.  IT'S JUST YOUR EXPERT IS INTERPRETING IT DIFFERENTLY.

6           TO ME, THIS CASE, ONE OF THE KEY THINGS IN THIS CASE

7   FOR ME IN DETERMINING WHETHER THERE NEEDS TO BE A SANCTION AND

8   WHAT TYPE OF SANCTION IS WHETHER OR NOT PEOPLE INTENTIONALLY

9   MISLED THE COURT.

10          MS. CANNELLA:  YES, YOUR HONOR.

11          THE COURT:  BUT THE ARGUMENT IS BEING MADE WE DIDN'T

12  MISLEAD THE COURT.  WHEN WE SAID WE WERE NOT ACTIVELY INVOLVED,

13  WE WERE NOT.  THAT STATEMENT YOU HAD UP HERE AND I READ WHEN

14  JUDGE DUFFEY ASKED MR. PRENTKOWSKI AND HE SAYS, NO, WE DIDN'T

15  THINK IT WAS -- THE ARGUMENT IS BEING MADE, WELL, THEY ARE

16  TALKING ABOUT SOMETHING ELSE, JUDGE.

17          MS. CANNELLA:  YES, YOUR HONOR.

18          THE COURT:  LET'S TALK ABOUT THAT.

19          MS. CANNELLA:  LET'S TALK ABOUT THAT.

20          SO ON THE SCREEN ARE EXCERPTS FROM THE AUGUST 26,

21  2015 HEARING.  AUTOLIV SAID WE DON'T DESIGN THE OCCUPANT

22  RESTRAINT SYSTEM.  AND AUTOLIV ACTUALLY SAID THAT TO THE COURT

23  TODAY.  THAT'S PART OF THE PROBLEM.  IT'S JUST A TOTAL

24  UNREPENTANCE.

25          SO WE HAVE SHOWN THE COURT A DOCUMENT THAT SHOWS BOTH

UNITED STATES DISTRICT COURT

1  FOR THE RETRACTOR AND FOR THE TORSION BAR THEY WERE BOTH
2  DESIGNED BEFORE THIS CASE EVER HAPPENED, BEFORE MAZDA WAS EVER
3  CONCEIVED OF, AND THEY ARE STILL SAYING THEY DON'T DESIGN IT.
4  SO THIS IS FROM THE HEARING.
5          AUTOLIV SAYS:  WE DON'T DESIGN YOUR OCCUPANT
6  RESTRAINT SYSTEM.
7          THE COURT SAYS:  SO, IN OTHER WORDS, YOU ONLY GET THE
8  FINAL INSTRUCTION.  YOU DON'T GET EVOLUTIONARY DOCUMENTS OF
9  WHAT OTHER DESIGNS WERE CONSIDERED.
10         AUTOLIV SAYS:  AFTER WE RECEIVE THE SPECIFICATION WE
11  PROVIDE A PRODUCT THAT MEETS OR EXCEEDS THE METRICS CONTAINED
12  WITHIN THAT SPECIFICATION.  THEY GO TEST IT, "THEY" BEING
13  MAZDA.  THEY MAY COME BACK AND SAY WE WANT SOMETHING DIFFERENT.
14  CAN YOU SWITCH OUT ITEMS TWO AND THREE?  WE DO THAT.  WE'VE GOT
15  TO MAKE SURE THAT IT PASSES FEDERAL REGULATIONS AND PASSES THE
16  SPECIFICATION AND THEY GO TEST IT AGAIN.
17         THE COURT IS ASKING, IT IS TRYING TO FIGURE OUT, DO
18  YOU HAVE EVOLUTIONARY DOCUMENTS?
19         AND WHAT DOES AUTOLIV SAY?  WE RECEIVE SPECIFICATIONS
20  AND WE FILL IT TO THAT SPEC.  THAT'S DECEIVING.  THAT IS NOT
21  TRUE.  THAT IS NOT THE FULL PICTURE.  THE COURT IS TRYING TO
22  GET THE FULL PICTURE AND AUTOLIV WON'T GIVE IT TO HIM.
23         HERE'S ANOTHER ONE.  THE COURT SAYS:  HERE IS A
24  PRODUCT WE ARE TESTING -- OH.  SO YOU GO BACK AND FORTH, YOU
25  HAVE JUST DESCRIBED, AND HERE IS THE SPECS.  HERE IS THE


UNITED STATES DISTRICT COURT

1   PRODUCT WE ARE TESTING.  HERE IS WHAT WE WANT YOU TO CHANGE,

2   WHETHER RELATED TO THE TORSION BAR OR ANYTHING ELSE.  YOU WOULD

3   HAVE PRODUCED ALL OF THAT?  QUESTION.

4           AND THE ANSWER THAT AUTOLIV GAVE THE COURT IS KIND OF

5   LONG AND RAMBLING AND IT'S ON PAGE 87, IF THE COURT WANTS TO

6   SEE IT, AND IT GOES ON AND ON, BUT THE ANSWER IS:  WE'VE GIVEN

7   YOU EVERYTHING FOR '05 AND WE UNDERSTAND THE COURT IS REQUIRING

8   US TO PRODUCE '04 TO '09.  THAT WAS THE ANSWER.  AND IT WAS --

9   THE ANSWER WAS VERY HARD TO EXTRACT.

10          IF YOUR HONOR READS THE WHOLE EXCERPT, YOU WILL SEE

11  THAT THE ANSWER WAS:  WE'VE GIVEN YOU ALL THE COMMUNICATIONS.

12  AND THE COURT SAYS, YOU KNOW, OKAY.  WELL, GREAT.  AND THEN WE

13  SAY, NO, NO, NO, NOT JUST COMMUNICATIONS.  AND AUTOLIV SAYS,

14  WELL, OKAY, YOU KNOW, WE UNDERSTAND THE COURT'S ORDER.  AND WE

15  SAY, NO, NO, NO.  LET'S MAKE SURE IT'S ALL DOCUMENTS RESPONSIVE

16  TO RPD23.

17          AND SO FINALLY, AFTER ABOUT A PAGE AND A HALF, WE GET

18  RESOLUTION ON THAT AND THAT'S RPD 23.  AND LET ME TELL YOU

19  SOMETHING ELSE THAT IS INTERESTING ABOUT THAT.  RPD23 IS WHAT

20  THE COURT RULED ON.  IT'S THIS ONE.  ALL DEVELOPMENT, ALL

21  DOCUMENTS REGARDING DEVELOPMENT AND SELECTION OF COMPONENTS OF

22  THE SEATBELT SYSTEM.  THOSE ARE ALL THE DOCUMENTS WE HAVE BEEN

23  TALKING ABOUT TODAY.

24          WOULD YOU BELIEVE THAT IN THE SUPPLEMENT DISCOVERY

25  RESPONSES THAT WE GOT AFTER THAT NOVEMBER PRODUCTION, NOT ONE

1  DOCUMENT LISTED IN RESPONSE TO THIS RPD.  WHY IS THAT?  BECAUSE

2  THIS IS THE RPD THE COURT ISSUED THE ORDER ON.  AND PRODUCING

3  DOCUMENTS IN RESPONSE TO THIS RPD IS AN ADMISSION OF VIOLATION

4  OF THE ORDER.

5          IT'S THAT KIND OF DECEIT THAT HAS GONE ON IN THE CASE

6  OVER AND OVER AGAIN THAT BELIES THIS IDEA OF, YOU KNOW, OOPS,

7  YOU KNOW, IT WAS AN ACCIDENT.  COMING IN HERE AND SAYING THAT

8  THE DOCUMENTS WEREN'T FOUND BECAUSE THE JAPANESE GENTLEMAN

9  WAS -- LEFT THE EMPLOY WHEN WE HAVE AN AFFIDAVIT ON THE RECORD

10  THAT HE WAS WORKING THERE DURING DISCOVERY.  YOU KNOW, NOT

11  RESPONDING TO RPD 23, NOT BEING HONEST WITH THE COURT, AND

12  SAYING THINGS LIKE THIS.  WE ASKED, YOU KNOW, WHAT THEIR

13  INVOLVEMENT WAS.  MAZDA PROVIDED AUTOLIV WITH ITS REQUIREMENTS

14  AND SPECIFICATIONS AND AUTOLIV JAPAN SUPPLIED MAZDA WITH ITS

15  PRODUCTS THAT MET THE REQUIREMENTS FOR THOSE SPECIFICATIONS.

16  THAT'S BEEN THE STORY THIS WHOLE TIME.  NO ACTIVE INVOLVEMENT.

17          HERE IS THEIR RESPONSE IN THE MSJ REPLY:  THERE IS NO

18  EVIDENCE THAT AUTOLIV WAS ACTIVELY INVOLVED IN THE DESIGN,

19  SPECIFICATION OR FORMULATION OF THE SEATBELT ASSEMBLY OR

20  TORSION BAR THRESHOLD.  THAT'S WHAT THEY TOLD THE COURT.

21  THAT'S WHAT THE COURT BELIEVED.  THAT IS NOT TRUE.  AND SO IT

22  DOESN'T MATTER HOW YOU INTERPRET DAVENPORT.

23          AND HERE IS ANOTHER THING ABOUT DAVENPORT THAT

24  AUTOLIV DIDN'T MENTION.  DAVENPORT INVOLVED A CASE WHERE THE

25  DEFENDANT DIDN'T MANUFACTURE THE PRODUCT.  SO, YOU KNOW, TO SAY

UNITED STATES DISTRICT COURT

1   ACTIVE INVOLVEMENT WAS SOME THING.  IT WAS NEVER A THING.  BUT

2   THAT'S NEITHER HERE NOR THERE.  THAT'S JUST ANOTHER ONE OF

3   THOSE SLEIGHT OF HANDS THAT KEEPS GOING ON IN THIS CASE.

4           THIS IS AN EXCERPT FROM THE OOJ THAT AUTOLIV SENT US.

5   AUTOLIV BELIEVES THAT JUDGE DUFFEY WILL ENTER SUMMARY JUDGMENT

6   IN ITS FAVOR BECAUSE, QUOTE, STRICT LIABILITY DOES NOT APPLY TO

7   DESIGN DEFECT CASES AND BECAUSE PLAINTIFF HAS OFFERED NO

8   EVIDENCE THAT AUTOLIV WAS ACTIVELY INVOLVED IN THE DESIGN,

9   SPECIFICATION OR FORMULATION OF A DEFECTIVE COMPONENT PRODUCT

10  PART WHICH FAILED DURING THE USE OF THE PRODUCT AND CAUSED

11  INJURY.  WE DIDN'T HAVE THAT EVIDENCE BECAUSE AUTOLIV DIDN'T

12  GIVE IT TO US AND AUTOLIV KNEW IT WASN'T TRUE, KNEW IT EXISTED.

13          YOUR HONOR ASKED MR. SCRIBNER ABOUT OUR INABILITY TO

14  ARGUE, TO MAKE THESE ARGUMENTS TO THE DISTRICT COURT.  AND I

15  WANT TO BE CLEAR, AND I HOPE I HAVE BEEN, THAT IT'S NOT JUST

16  ABOUT WHAT WE COULD OR COULDN'T ARGUE.  IT'S ABOUT AUTOLIV

17  SAYING THINGS THAT WEREN'T TRUE, USING THIS CONCEALMENT TO SAY

18  THINGS THAT WEREN'T TRUE.  THAT'S WHY THE CASE IS DIFFERENT.

19          THIS IS KIND OF A SIDESHOW, BUT, YOU KNOW, IN THE

20  BRIEFING AUTOLIV MAKES A BIG DEAL ABOUT PLAINTIFF NOT ASKING

21  QUESTIONS TO KAMEI ABOUT THESE DOCUMENTS.

22          THE COURT:  YES.

23          MS. CANNELLA:  AND THE REASON WE DIDN'T ASK THOSE

24  QUESTIONS IS BECAUSE WE DIDN'T WANT TO HEAR MR. SCRIBNER'S

25  COACHED ANSWERS TO THEM.  I MEAN WE HAVE HEARD IT.  IF YOU READ

1   THE WHOLE DEPOSITION, IT'S LIKE A WINDUP DOLL.  AUTOLIV WAS

2   FOLLOWING INSTRUCTIONS.  AUTOLIV WAS FOLLOWING INSTRUCTIONS.

3   AUTOLIV WAS FOLLOWING INSTRUCTIONS.  WE DIDN'T NEED MR. KAMEI

4   TO CONTINUE TO REPEAT THOSE THINGS.

5           WE BELIEVE IT'S CLEAR THAT AUTOLIV COMMITTED

6   MISCONDUCT AND THERE ARE ONLY TWO CHOICES, TO EITHER ENCOURAGE

7   THAT MISCONDUCT OR DISCOURAGE THAT MISCONDUCT.

8           THERE IS A SPEECH BY PRESIDENT ROOSEVELT BACK FROM

9   1910 AND IN IT HE PRAISES, QUOTE, THE MAN IN THE ARENA.  AND HE

10  IS TALKING ABOUT THE PERSON WHO TRIES TO MAKE THINGS BETTER,

11  WHO, QUOTE, STRIVES VALIANTLY, WHO ERRS, WHO COMES SHORT AGAIN

12  AND AGAIN BECAUSE THERE IS NO EFFORT WITHOUT AN ERROR AND

13  SHORTCOMING BUT WHO DOES ACTUALLY STRIVE TO DO THE DEED.

14          THE QUOTE IS LONG AND THE COURT IS FAMILIAR WITH IT

15  AND I WON'T REPEAT IT ENTIRELY.  BUT IT COMES TO MIND BECAUSE

16  WE KEEP SEEING THIS KIND OF MISCONDUCT IN THESE AUTO PRODUCT

17  CASES.  WE SEE IT MORE AND MORE.  AND DEFENDANTS HAVE BECOME SO

18  BOLD IN THEIR DISREGARD FOR COURT ORDERS THAT IT'S ALMOST HARD

19  TO ACCEPT IT.  IT'S HARD FOR THE BRAIN TO BELIEVE IT SOMETIMES.

20          AND OUR FIRM SAW THIS IN THE HILL V. FORD CASE, WHICH

21  WAS IN GWINNETT STATE COURT, AND THE DEFENDANT THERE REPEATEDLY

22  VIOLATED COURT ORDERS SO MANY TIMES THAT THERE ENDED UP BEING A

23  MISTRIAL AND ACTUALLY STATED ON THE RECORD THAT IT BELIEVED IT

24  WAS ENTITLED TO VIOLATE THOSE ORDERS BECAUSE IT DISAGREED WITH

25  THEM.


UNITED STATES DISTRICT COURT

1          THE STAKES ARE SO HIGH IN THESE AUTO PRODUCT CASES

2    BECAUSE THE PRODUCT IS IN MANY VEHICLES AND HAS THE POTENTIAL

3    TO AFFECT MANY CASES.  AND SO IT BECOMES DIFFICULT OR HARDER

4    FOR AN AUTO PRODUCT DEFENDANT TO SAY, OKAY, WE ARE GOING TO

5    TURN OVER THE EVIDENCE THAT IS GOING TO PROVE WE ARE AT FAULT.

6    THAT'S SOMETHING AUTO PRODUCT COMPANIES NATURALLY DON'T WANT TO

7    DO.

8          THE COURT:  WHAT MADE THEM TURN OVER THE HUNDRED AND

9    77 PAGES?

10          MS. CANNELLA:  YOUR HONOR, THAT'S A GREAT QUESTION.

11   I THINK WE HEARD THE ANSWER TODAY.  THEY DON'T THINK THEY ARE

12   IMPORTANT.  THEY THINK THEY ARE RELATED TO, YOU KNOW, THE

13   SECOND GENERATION.  THERE ARE OTHER DOCUMENTS OUT THERE.  HAVE

14   NO DOUBT ABOUT THAT.  THERE ARE MORE DOCUMENTS THAT WE HAVEN'T

15   SEEN.  WE KNOW THAT.

16          SO WHY THEY PRODUCED IT IN STEGALL, IT WAS AN

17   ACCIDENT OR BECAUSE THEY DIDN'T THINK ANYBODY WAS GOING TO LOOK

18   THAT CLOSELY AT THEM OR BECAUSE THEY DIDN'T THINK THAT ANYBODY

19   WAS GOING TO BE ABLE TO REALLY USE THEM.  BECAUSE THEY ARE

20   ABOUT COVERS AND SOME OF THEM ARE ABOUT, YOU KNOW, SEWING AND

21   THAT KIND OF THING.  MAYBE THAT'S WHY.  MAYBE IT WAS AN

22   ACCIDENT.

23          BUT REGARDLESS OF WHAT IT IS, THEY SURE WEREN'T GOING

24   TO GIVE THEM TO US UNTIL THEY FOUND OUT ABOUT US TALKING TO THE

25   STEGALL PEOPLE AND THAT'S WHAT MATTERS.


UNITED STATES DISTRICT COURT

1          AND EVEN SETTING THAT ASIDE, NONE OF THAT, NONE OF

2     THAT EXCUSES COMING INTO THE COURT AND SAYING THINGS THAT

3     AREN'T TRUE.  NONE OF THAT EXCUSES REPRESENTING TO THE COURT

4     THAT ALL WE DID WAS FILL AN ORDER TO A SPECIFICATION.  WE

5     WEREN'T ACTIVELY INVOLVED.  YOU CAN'T DO THAT.  WE ALWAYS KNEW

6     THE TRUTH REGARDLESS OF THE DOCUMENTS.

7          THIS CASE IS A CASE STUDY IN THE PHENOMENON OF AUTO

8     MANUFACTURERS NOT WANTING TO PRODUCE DOCUMENTS.  AUTOLIV TALKS

9     ABOUT MAZDA NOT PRODUCING DOCUMENTS.  THAT'S A REALLY GREAT

10    POINT.  WHY DON'T AUTO MANUFACTURERS PRODUCE THESE DOCUMENTS?

11    WHY DON'T THEY DO IT?  BECAUSE IT'S GOING TO HURT THEM.

12         THE ARENA THAT THE COURT FINDS ITSELF IN IS THIS AUTO

13    PRODUCT PROBLEM.  THE HESITATION AMONG COURTS TO SANCTION

14    VIOLATIONS OF COURT ORDERS SEEMS TO BE COMPOUNDING WITH THE

15    YEARS AS THEY GO BY.  AND THE REASON FOR THAT IS THAT JUDGES

16    DON'T DISCOURAGE THIS MISCONDUCT.  THEY SLAP ATTORNEY'S FEES OR

17    THEY MOVE ALONG AND THERE IS NO REAL PUNISHMENT FOR DOING THIS.

18         AUTOLIV IS HERE SAYING, WELL, LET'S JUST TRY THE

19    CASE.  OKAY.  YOU'VE GOT THEM.  LET'S GO.  THERE IS NO

20    PUNISHMENT FOR IT.  WE COULD HAVE GOTTEN -- WE COULD HAVE LOST

21    ON APPEAL.  MS. ANDREWS COULD HAVE TAKEN THE, YOU KNOW, OFFER

22    TO GET RID OF THE CASE.  SHE COULD HAVE TRIED TO SETTLE IT.

23    ANYTHING COULD HAVE HAPPENED AND THE TRUTH WOULD HAVE NEVER

24    COME OUT.  AND THERE IS NO, THERE IS NO DOWNSIDE FOR AUTOLIV TO

25    DOING THAT, NO DOWNSIDE UNLESS THERE IS A REAL PUNISHMENT FOR

1  IT.

2            WHETHER THE COURT GRANTS OR DENIES THE MOTION FOR

3  SANCTIONS IT WILL IMPACT THE CONDUCT OF AUTO PRODUCT DEFENDANTS

4  GOING FORWARD.  THEY WATCH THESE DECISIONS.  THEY MONITOR THEM.

5  THEY DECIDE WHETHER THEY ARE ENCOURAGED TO COMMIT THIS CONDUCT

6  OR WHETHER THE CONDUCT IS TOO EXPENSIVE, TOO RISKY.

7            WE KNOW IT'S A HARD DECISION, BUT EITHER THE KIND OF

8  CONDUCT THAT THE COURT HAS SEEN WILL BE ENCOURAGED OR

9  DISCOURAGED.  THOSE ARE THE ONLY TWO OPTIONS.  IT'S NOT UP TO

10  US OR TO AUTOLIV.  NO ONE HAS THE POWER TO ENFORCE COURT ORDERS

11  BUT THE COURT ITSELF.

12            WE RESPECTFULLY REQUEST THE COURT GRANT THE MOTION

13  FOR SANCTIONS AND ENTER EITHER A DEFAULT OR PRECLUDE AUTOLIV

14  FROM ENTERING EVIDENCE OR MAKING ANY ARGUMENT THAT SOME OTHER

15  PERSON WAS AT FAULT FOR MR. ANDREWS' INJURIES AND DEATH.

16            THANK YOU.

17            THE COURT:  THANK YOU.

18            THANK YOU ALL.

19            I WAS GOING TO FINISH READING WHAT YOU ALL HAVE GIVEN

20  ME TODAY, GO BACK AND LOOK AT WHAT I HAVE READ BEFORE.  I WANT

21  TO APOLOGIZE TO YOU ALL UP FRONT.  I WISH I COULD GIVE YOU ALL

22  A TRIAL DATE, BUT I CAN'T GIVE YOU A TRIAL DATE UNTIL I CAN

23  TELL YOU WHAT YOU ARE GOING TO BE TRYING.

24            BUT WE ARE GOING TO TRY TO GET AN ORDER BACK TO YOU

25  ALL AS FAST AS POSSIBLE, BUT THERE ARE -- IT'S GOING TO TAKE A

UNITED STATES DISTRICT COURT

 1  LITTLE TIME BECAUSE I HAVE ONE OR TWO OTHER CASES, AN ELECTION

 2  CASE I'VE GOT TO RULE ON.  BUT I WANT TO GET YOU ALL AN ORDER

 3  AS QUICK AS POSSIBLE.  I WILL START WORKING ON THIS NOT

 4  TONIGHT.  I WORKED ON IT LAST NIGHT.  I LOVE YOU ALL BUT I'M

 5  NOT GOING TO WORK ON IT TWO STRAIGHT NIGHTS.  BUT WE'LL START

 6  WORKING ON IT AGAIN THIS WEEKEND.

 7          NOW, LET'S MAKE SURE I HAVE EVERYTHING FROM THE

 8  PLAINTIFF AND I HAVE EVERYTHING FROM THE DEFENDANT SO WHEN I

 9  START WORKING ON IT.  I KNOW I'M GOING TO GET 54 FROM YOU ALL.

10          MS. CANNELLA:  YES.

11          THE COURT:  IS THAT THE ONLY THING I NEED ELSE FROM

12  THE PLAINTIFF?

13          WHILE THEY ARE THINKING, MR. SCRIBNER, DO I HAVE

14  EVERYTHING FROM YOU ALL THAT YOU WANT ME TO HAVE?

15          MR. SCRIBNER:  I THINK SO, YOUR HONOR.

16          MS. CANNELLA:  YOUR HONOR, WE ARE ALSO GOING TO SEND

17  PLAINTIFF'S EXHIBIT 49.  IN ORDER TO AVOID BURDENING THE

18  COURT'S EMAIL SYSTEM, WE CAN HAND-DELIVER COPIES IF THAT'S ALL

19  RIGHT.

20          THE COURT:  THAT'S FINE WITH ME.

21          MS. CANNELLA:  THANK YOU.

22          THE CLERK:  49 WASN'T COMPLETE.  THE 49 THEY GAVE ME

23  WASN'T COMPLETE.

24          THANK YOU ALL.  I REALLY APPRECIATE IT.  YOU ALL MADE

25  IT A TOUGH DECISION, BUT THANK YOU ALL.


                    UNITED STATES DISTRICT COURT

1           MS. CANNELLA:  THANK YOU, YOUR HONOR.

2           THE COURT:  HAVE A GREAT AFTERNOON AND A GREAT WEEK.

3           MR. BUTLER:  DOES THE COURT NOT WANT TO HEAR

4   AUTOLIV'S MOTION ABOUT MR. CARUSO?

5           THE COURT:  I WILL HEAR ALL THE MOTIONS YOU ALL WANT

6   TO TELL ME TODAY.  THAT'S WHY I ASKED YOU IS THERE ANYTHING

7   ELSE.

8           MR. SCRIBNER:  I THINK WE HAVE TWO ADDITIONAL DAUBERT

9   MOTIONS AND THEY HAVE TWO ADDITIONAL DAUBERT MOTIONS.

10          THE COURT:  LET'S SIT BACK DOWN AND HEAR THEM.

11          MS. CANNELLA:  CAN WE TAKE A BRIEF RESTROOM BREAK?

12          THE COURT:  YES.

13          MS. CANNELLA:  FIVE MINUTES?

14          THE COURT:  YES.

15          MR. SCRIBNER:  THANK YOU, YOUR HONOR.

16          MS. CANNELLA:  THANK YOU.

17          THE COURT:  WE ARE GOING TO TAKE A TEN-MINUTE RECESS

18  AND START BACK AT 3:50.

19          MR. BUTLER:  THANK YOU, YOUR HONOR.

20          THE COURT:  THANK YOU ALL.

21                      (RECESS)

22          OKAY.  ARE YOU ALL READY?  I'M READY.

23          MR. BUTLER:  YOUR HONOR, WE'VE GOT TWO MOTIONS THAT

24  HAVE TO DO WITH AUTOLIV'S TWO EXPERTS, MS. RAPHAEL,

25  DR. RAPHAEL, AND MR. VAN ARSDELL.


                    UNITED STATES DISTRICT COURT

1          THE COURT:  YES.

2          MR. BUTLER:  AND WE WERE TALKING ABOUT THAT DURING

3  THE BREAK AND WE THINK THOSE TWO MOTIONS ARE WELL BRIEFED, AND

4  WITH RESPECT TO THE COURT'S TIME, WE DON'T REALLY THINK THAT

5  ORAL ARGUMENT IS NECESSARY.

6          THE COURT:  THEY ARE WELL BRIEFED.  I AM NOT GOING TO

7  ARGUE WITH YOU THERE.  THEY ARE WELL BRIEFED.

8          MR. BUTLER:  THE DECISION, YOU KNOW, WHAT THE COURT

9  DECIDES WITH RESPECT TO THE MOTION FOR SANCTIONS CAN IMPACT

10  WHAT THE COURT DECIDES WITH RESPECT TO THOSE TWO MOTIONS AND I

11  WON'T ARGUE WHY SO WE JUST SAVE THE COURT SOME TIME.

12          THE COURT:  THANK YOU, MR. BUTLER.  THANK YOU,

13  MR. SCRIBNER.

14          MR. SCRIBNER:  I FIND MYSELF IN STARK AGREEMENT.  I

15  WAS JUST GOING TO SAY THE EXACT SAME THING.  WE HAVE TWO

16  ADDITIONAL DAUBERT MOTIONS.  THEY REALLY ARE BETTER ON THE

17  PAPERS.  THE LAW IS, YOU KNOW, WHAT THE LAW IS AND SO WE AGREE.

18          THE COURT:  ALL RIGHT.

19          MR. BUTLER:  I DON'T KNOW THAT I AGREE WITH RESPECT

20  TO AUTOLIV'S MOTION ABOUT MR. CARUSO.  THAT'S THE ONLY THING

21  MS. CANNELLA ASSIGNED TO ME AND I'VE GOT A LOT I WANT TO SAY

22  ABOUT IT.

23          THE COURT:  SHE'LL PROBABLY LET YOU MAKE YOUR

24  ARGUMENT BACK AT THE OFFICE.

25          MR. BUTLER:  WELL, I'VE GOT ALL MY BULLETS READY,


UNITED STATES DISTRICT COURT

1  YOUR HONOR.

2           MS. CANNELLA:  NO, YOUR HONOR.

3           MR. BUTLER:  AND THE FIRST THING I WOULD SAY IS WE

4  DISAGREE WITH THE CHARACTERIZATION THAT IT'S A DAUBERT MOTION.

5  IT'S NOT A DAUBERT MOTION.  IT'S A MOTION IN LIMINE JUST LIKE

6  THE MOTION WITH RESPECT TO MR. MEYER.  IT'S A MOTION TO TRY TO

7  KEEP OUT EVIDENCE THAT'S LABELED A DAUBERT MOTION.  I HAVE SEEN

8  LOTS OF DAUBERT MOTIONS.  THIS AIN'T ONE.  BUT IF MR. SCRIBNER

9  DOESN'T WANT TO ARGUE HIS MOTIONS, THEN I GUESS I'LL SIT DOWN.

10          MR. SCRIBNER:  TO BE CLEAR, I THINK MINE IS A DEAD

11 BANG WINNER, BUT WE DON'T NEED TO ARGUE.

12          THE COURT:  ALL RIGHT.

13          MR. BUTLER:  WELL, MY REPLY WOULD BE THAT IT'S A DEAD

14 BANG WINNER.

15          THE COURT:  I'M GOING TO LET IT STAY RIGHT THERE.

16          THANK YOU ALL.

17          MR. BUTLER:  THANK YOU, YOUR HONOR.

18          MS. CANNELLA:  THANK YOU, YOUR HONOR.

19          THE COURT:  HAVE A GREAT DAY.

20          MR. SCRIBNER:  THANKS.

21          MS. CANNELLA:  THANK YOU.

22              (PROCEEDINGS CONCLUDED)

23

24

25


                    UNITED STATES DISTRICT COURT

1                 C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA

4    NORTHERN DISTRICT OF GEORGIA

5            I, DAVID A. RITCHIE, OFFICIAL COURT REPORTER OF THE

6    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

7    GEORGIA, DO HEREBY CERTIFY THAT THE FOREGOING 200 PAGES

8    CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE SAID

9    COURT, HELD IN THE CITY OF ATLANTA, GEORGIA, IN THE MATTER

10   THEREIN STATED.

11           IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS,

12   THE 22ND DAY OF JUNE, 2019.

13

14

15                      _____

16                      DAVID A. RITCHIE
                        OFFICIAL COURT REPORTER
17                      NORTHERN DISTRICT OF GEORGIA

18

19

20

21

22

23

24

25



                        UNITED STATES DISTRICT COURT