## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JAMIE LEE ANDREWS, as** | * | |
| **Surviving Spouse of** | * | |
| **MICAH LEE ANDREWS, Deceased,** | * | **CIVIL ACTION FILE** |
| **and JAMIE LEE ANDREWS, as** | * | |
| **Administrator of the Estate of** | * | **NO. 1:14-CV-03432-SCJ** |
| **MICAH LEE ANDREWS, Deceased,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **AUTOLIV JAPAN, LTD.,** | * | |
| | * | |
| **Defendant.** | * | |

## PLAINTIFF'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Plaintiff filed this products liability action in the State Court of Fulton

County, Georgia on September 18, 2014. Doc. No. [1-2].[2] This action was removed

to this Court on October 24, 2014. Doc. No. [1]. Defendant Autoliv Japan, Ltd.

---

[1] Pursuant to Local Rule 16.4(B)(25), Plaintiff submits the following proposed
Findings of Fact and Conclusions of Law in advance of the bench trial set for
October 4, 2021.

[2] All record citations (including transcripts and depositions) are to the CM/ECF
electronic docket unless otherwise noted, and all page numbers are derived from
the headers imprinted by the Court's docketing software. Transcripts are cited as
numbered by the court reporter, using a "Tr." citation.

("Autoliv") consented to removal. Doc. No. [2]. At that time, this case was assigned to Judge William S. Duffey Jr. After Judge Duffey granted summary judgment in Autoliv's favor in January 2017, Plaintiff appealed. Doc. Nos. [274, 285]. On March 16, 2018, one week after oral argument, the U.S. Court of Appeals for the Eleventh Circuit reversed in substantive part the summary judgment entered in Autoliv's favor. Doc. No. [309]. On July 23, 2018, the Eleventh Circuit issued its mandate, remanding the case to this Court. Because Judge Duffey had retired from this Court on July 1, 2018, this case was reassigned to the undersigned. Doc. No. [313].

By consent of the parties, this case was tried before the Court without a jury on October 4–__, 2021. After examining the entire record, considering the arguments of counsel, and determining the credibility of the witnesses, the Court finds that Plaintiff has proved by a preponderance of the credible evidence that Micah Andrews' injuries and death on April 12, 2013, were caused by a defective seatbelt designed and manufactured by Autoliv.

Accordingly, the Court finds that Plaintiff, as the administrator of Micah Andrews' estate, is entitled to recover special damages in the amount of $19,343.40 for funeral and medical expenses[3] and general damages in the amount of

---

[3] The parties stipulated before trial that the medical expenses arising from Mr.

$_____ for the predeath fright, shock, terror, and pain and suffering that Micah Andrews endured.

The Court finds that Plaintiff, as the surviving spouse of Micah Andrews, is entitled to recover the full value of Micah Andrews' life. The full value of Micah Andrews' life is determined from his perspective and has two components under Georgia law: an intangible component and an economic component. Based on the evidence, the Court finds that the full value of Micah Andrews' life was $_____.

The Court also finds that Plaintiff has proved by clear and convincing evidence that Autoliv's conduct in designing, manufacturing, and selling the subject seatbelt showed "that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). As a result, the Court finds that punitive damages should be awarded to "punish, penalize, or deter" Autoliv, not to compensate Plaintiff. § 51-12-5.1(c). The amount of punitive damages awarded is $_____, and that amount is not

---

Andrews' collision totaled $6,750.00 and the funeral expenses for Mr. Andrews' burial totaled $12,593.40. Doc. No. [503], ¶¶ 8, 9.

limited by law because Plaintiff's cause of action is one for products liability. § 51-12-5.1(e)(1).[4]

## I.      FINDINGS OF FACT[5]

### A.      The Court has subject matter jurisdiction.

Plaintiff Jamie Andrews is a citizen of Georgia. She is the widow of Micah Andrews who died on April 12, 2013. Mr. Andrews was a citizen of Georgia at the time of his death. Defendant Autoliv Japan, Ltd. is wholly owned Japanese subsidiary of Autoliv, Inc., a corporation publicly traded on the New York Stock Exchange. The principal place of business of Autoliv Japan, Ltd. is in Japan. The parties are completely diverse, and this Court has subject matter jurisdiction to hear this case under 28 U.S.C. §§ 1332(a)(2), 1441(b).[6]

---

[4] Autoliv adduced no evidence at trial to show that any other court in Georgia (or applying Georgia law) had ever imposed punitive damages on Autoliv for its conduct related to the subject seatbelt—much less that such punitive damages have ever been "recovered" in a prior action. § 51-12-5.1(e)(1).

[5] To the extent that these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

[6] Both this Court and the Eleventh Circuit have previously exercised subject matter jurisdiction over this case.

**B.   Micah Andrews died in a collision on April 12, 2013.**

On April 12, 2013, Micah Andrews left work at the Georgia Aquarium and headed to his home in Woodstock, Georgia. *See* Doc. No. [503], ¶ 12. He was driving his 2005 Mazda3. *Id.* His route home took him north on Interstate 575 and through Cobb County. The speed limit on I-575 North was 65 mph, Doc. No. [503], ¶ 2, and Mr. Andrews was traveling around that speed on the four-lane divided interstate just before the fatal collision.

While traveling in the right northbound lane, Mr. Andrews came up behind a black Ford F-150. He changed lanes to pass the pickup truck. As he changed lanes back into the right lane, Mr. Andrews suddenly "steered hard right" and braked in "an avoidance maneuver." Doc. No. [230], Tr. p. 172, lines 10–15. The car left the interstate, crossed the paved shoulder, and entered the grassy shoulder. The grassy shoulder sloped away from the interstate and toward a growth of trees.

Once the car left the interstate, the grassy shoulder and its side slope made it impossible for Mr. Andrews to return his car to the roadway. Despite steering and braking to avoid a collision, Mr. Andrews' car struck three trees at about 35 mph. *See* Doc. No. [503], ¶¶ 3, 14. The impact's principal direction of force was 10–15 degrees to the left of straight ahead, roughly the 11:30 position on a clock. Doc. No. [503], ¶ 15. Although a frontal collision at that speed should have caused the

driver's airbag to activate and deploy, the airbag did not deploy. The airbag had been manufactured by Autoliv and sold to Mazda for the Mazda3. Despite wearing his seatbelt properly, Doc. No. [503], ¶¶ 1, 13, Mr. Andrews' Autoliv seatbelt spooled out approximately 20 inches during the collision, Doc. No. [503], ¶ 17. Mr. Andrews' head struck the steering wheel. Doc. No. [503], ¶ 4, 18. In fact, Mr. Andrews' head struck the steering wheel so hard and so fast that the impact caused a basilar skull fracture and permanently imprinted the steering wheel's grip pattern onto his face. *Compare* PX 3 (steering wheel photo), *with* PX 2 (medical examiner photo of Micah Andrews' face postmortem). The skull fracture led to the death of Mr. Andrews at the scene.

Mr. Andrews was 38 years old at the time of his death. Doc. No. [503], ¶ 5. Mr. Andrews had a life expectancy of 36.18 years. Doc. No. [503], ¶ 7. He is survived by his widow Jamie Andrews and their daughter S.C. Andrews, who was four years old at the time of the wreck. S.C. was 12 years old at the time of trial. Doc. No. [503], ¶ 6.

### 1.    Mr. Andrews was not at fault for his own injuries and death.

Autoliv has contended that Mr. Andrews was at fault for his own death. But what caused the wreck is not the issue in this case. The issue is the failure of the seatbelt to protect Mr. Andrews when the wreck occurred. To state the obvious:

Mr. Andrews did not need a functioning seatbelt until there was a wreck. The Court finds that wrecks are foreseeable to Autoliv, that this 35-mph wreck was foreseeable to Autoliv, and that a driver does not need a seatbelt unless there is a wreck. If a manufacturer could escape liability or diminish its own liability for the failure of a safety restraint by blaming others for the wreck that made the safety restraint necessary that would be both illogical and would be detrimental to automotive safety.

Moreover, the Court also finds that Mr. Andrews was in fact not at fault for the wreck. The evidence demonstrates that he most likely swerved to avoid a perceived danger in the road. There is no evidence that Mr. Andrews was trying to hurt himself, nor is there any evidence that something went wrong with the car to cause it to go off the road.[7] Mr. Andrews was awake and alert before the collision: he passed a Ford F-150 before he suddenly swerved to the right and braked, and he continued to brake and steer his car after it exited the interstate and before it struck the trees.

---

[7] Weather played no role in Mr. Andrews' collision. Doc. No. [503], ¶ 19. Nor did alcohol or drugs.

The evidence shows that he likely swerved to avoid something in the road—a very large turtle. Shortly after Mr. Andrews' collision, another motorist on I-575 North called 911 and explained: "So I'm on 575 North and this car was just, -- I mean, they, -- God. *It was like a box or something in the road.* I went over it, but it scared them and they just literally took their car and veered full speed ahead off the road." PX 46, Tr. p. 2, lines 11–15 (emphasis added).

The Cobb County Police Department officers who investigated the collision did not note the presence of a box at the scene, but they did confirm that a "large turtle" had been run over on the interstate and was found dead on the left shoulder of the road. PX 96 (ANDREWS 0030) (Rep. of Officer J.B. Melton from April 12, 2013). Photos of the scene show that investigators thought the turtle was important enough to their analysis of what caused the collision that they marked with green paint both the turtle's final resting place and a trail of its biological matter scattered along the interstate. *See* Pxs 495–500. The medical examiner's supplemental report notes that "an alligator snapping turtle was in the roadway. It appears the decedent [Mr. Andrews] may have swerved to miss the turtle." PX 92 (ANDREWS 0393).

Plaintiff's accident reconstructionist G. Bryant Buchner, a professional engineer, inspected the collision location and analyzed the police photos of the

scene, including those marking the final resting place of the turtle and the trail of turtle parts across the road. Mr. Buchner concluded that the start of the turtle's biological matter (i.e., where the turtle was run over) was near where Mr. Andrews steered hard right in an avoidance maneuver. Mr. Buchner's reconstruction diagram shows exactly that. PX 258 (Mr. Buchner's reconstruction drawing showing turtle evidence). Considering all the physical evidence, Mr. Buchner concluded that the turtle's presence on the road was "probably related" to Mr. Andrews' decision to hard steer to the right and brake in an avoidance maneuver. Doc. No. [230], Tr. p. 172, lines 4–18.

Although the Cobb County Police Department Selective Traffic Enforcement Program ("STEP") investigators said that they believed that turtle was unrelated to the collision, they did not do the same sort of investigation that Mr. Buchner did. Mr. Buchner explained that while Mr. Andrews' car did not run over the turtle, the turtle's presence near the location where Mr. Andrews swerved hard right and braked plus the 911 caller's report of something in the road supported his conclusion that Mr. Andrews' sudden avoidance maneuver was in response to the turtle.

> [Defense counsel]: Are you aware that the STEP investigators think it's not related?

> [Mr. Buchner]: People can have opinions. That's fine with me. I don't know that they -- I don't know that they've done the analysis we did. I believe that it's not related in that I don't think the Mazda hit it. I think someone else hit it. **But I believe it is related in that it's proximal to where the vehicle left the road and that the swerve started just before the vehicle got to the turtle.**

Doc. No. [230], Tr. pp. 172, line 19–173, line 2 (emphasis added). Mr. Buchner's conclusion is an "engineering conclusion" based on the documented physical evidence at the scene. Doc. No. [230], Tr. p. 188, lines 9–14. Unlike the STEP investigators, Mr. Buchner based his engineering conclusion on a thorough reconstruction of the entire collision scene. Mr. Buchner's engineering conclusion is both credible and unrebutted, as Autoliv did not hire anyone to reconstruct the collision. The Court credits Mr. Buchner's explanation. Autoliv presented no evidence to dispute or refute Mr. Buchner's findings and testimony.

### 2. Mr. Andrews was alive and conscious for more than four minutes after the collision.

William Kemp was driving the black F-150 pickup truck that Mr. Andrews passed just before he swerved to the right and braked in an avoidance maneuver. Mr. Kemp saw Mr. Andrews' car leave the road. Concerned, Mr. Kemp pulled over to check on the driver. When he got to the wrecked car, Mr. Andrews was sitting in the driver's seat with his seatbelt still on, but the seatbelt had spooled out so much that Mr. Andrews' head and body were draped over the center console

and into the passenger seat. Mr. Andrews' head was dripping blood, which had filled the cup holders in the center console.

Mr. Kemp vividly remembered what happened next. He described Mr. Andrews trying to respond to a question from Mr. Kemp by groaning and trying to raise his body. Mr. Kemp's own words best describe what happened:

> Q. Okay. After you opened the passenger door, what did you do after that?
> A. I asked him if he was okay. And he started to rise and let out a groan, and I said, Stay calm, help is on the way.
> Q. Did he respond to your first question as to whether he was okay?
> A. **He responded with that noise I just told you about, and I told him not to move**.
> Q. You said he started to rise. How do you mean?
> A. **His body moved as if he was wanting to tell me something, you know, as he let out a groan, and I said, Be calm, help is on the way**.

Doc. No. [229], Tr. pp. 29, line 17–30, line 5.

That interaction with Mr. Andrews, which Mr. Kemp vividly recalled, occurred *after* Mr. Kemp pulled his pickup truck off the road, spent four minutes and nine seconds on the phone with the 911 dispatcher, and had run to Mr. Andrews' car. The evidence thus shows that Mr. Andrews was alive and conscious from the time of the collision until after Mr. Kemp pulled off the road and stopped his car, finished his 911 call, and then went to Mr. Andrews' car.

After Mr. Kemp saw Mr. Andrews' response, Officer Aaron Porter arrived at the scene. At that time, Officer Porter had been with the Cobb County Police

Department for over seven years. Before joining the Cobb County Police Department, he was a corporal in the Marine Corps for four years and served two tours of duty overseas, including in Operation Iraqi Freedom. He testified that between his combat and law enforcement experience, he has witnessed roughly 50 people die before Mr. Andrews. Officer Porter testified that he was the last person to see Micah Andrews alive. When he arrived at the scene, it took Officer Porter about 30 seconds to get to the car. About 30–45 seconds after he reached the car, he observed Mr. Andrews take his last two breaths, which Officer Porter described as "agonal breaths." Officer Porter testified that the breaths were "very labored" breathing with a "prominent sound." Mr. Andrews was pronounced dead at Kennestone Hospital about 40 minutes later.

### C.   The occupant restraint system in Mr. Andrews' car was defective.

Mr. Andrews' 2005 Mazda3 had a defective occupant restraint system. A car's occupant restraint system has two principal parts: seatbelts and airbags. Both the airbag system and the driver's seatbelt in Mr. Andrews' car were defective.

The seatbelt of an automobile is indisputably the primary safety restraint system, a fact admitted in Autoliv's own documents. By law and in fact, an airbag is, and must be labeled as, a "supplemental restraint system." Airbags are labeled as such by Autoliv. That means "supplemental" to the seatbelt.

In this wreck the airbag failed to deploy. That airbag was designed, manufactured, and sold by Autoliv. However, the airbag sensor system that directs the airbag to deploy was not designed and manufactured by Autoliv. The sensor system failed to send a signal to the airbag to deploy. That airbags sometimes do not deploy was indisputably known to, and foreseen by, Autoliv. Autoliv did nothing to attempt to make certain the airbag would deploy. More specifically, Autoliv knew nothing about the sensor and sensor connector used by Mazda to signal the Autoliv airbag to deploy.

It was foreseeable to Autoliv that if the Autoliv airbag in Mr. Andrews' Mazda3 did not deploy in this wreck the Autoliv seatbelt would fail to keep Mr. Andrews' head from striking the steering wheel. For the driver of a car, the primary duty of a seatbelt is to keep the driver's head from hitting the steering wheel.

Autoliv did nothing to warn Mazda, or any consumers, that with this Autoliv seatbelt design if the driver's airbag failed to deploy the seatbelt would be useless—the driver would be effectively unrestrained.

Despite Autoliv's knowledge that airbags sometimes do not deploy in frontal collisions, and despite Autoliv's knowledge that it had done nothing to

make sure the airbag would deploy, Autoliv did not sell a seatbelt that would keep the driver's head from hitting the steering wheel.

Autoliv knew how to design and built a safer seatbelt that would not spool out as much as this seatbelt did. In fact, Autoliv admits that before it sold the subject seatbelt to Mazda it had already designed and manufactured another seatbelt that would not allow so much spoolout.[8]

### 1.    The airbag system in Mr. Andrews' car was defective.

The airbag in Mr. Andrews' car did not deploy in the April 12, 2013 collision.

The airbag system in Mr. Andrews' car was complex and comprised many different products including (1) the airbag itself located in the steering wheel; (2) the car's computer diagnostic unit located under the car's center console, which Mazda calls the "supplemental airbag system" or "SAS" unit; (3) the upfront sensor ("UFS," also known as the electronic front sensor ("EFS")), a single sensor located behind the car's front grill that is supposed to detect a frontal impact and

---

[8] Doc. No. [503], ¶ 26 ("At the time Autoliv sold Mazda the seatbelt in Mr. Andrews' car, Autoliv had manufactured another seatbelt retractor with a load limiting threshold higher than the one in Mr. Andrews' seatbelt."), ¶ 29 ("The seatbelt assembly that Autoliv supplied to Volvo for the driver's seat of the 2004 through 2009 model year Volvo S40 had a torsion bar with a deployment threshold of 6.0 kilonewtons.").

send a deploy/no deploy signal to the SAS; (4) the wiring running from the SAS to the UFS and from the SAS to the airbag module and pretensioners; (5) sensors for the driver seat track position, seatbelt buckles, and passenger seat weight; and (6) warning lamps.

The airbag system in Mr. Andrews' car was defective. The sensor behind the car's front grill was supposed to transmit information about the collision's severity to the car's diagnostic computer. It did not do so because the sensor's wiring became disconnected before the collision information was sent. That in turn meant the diagnostic computer did not send a signal to the driver's airbag to deploy. The parties agree that Mazda Motor Corporation and Mazda Motor of America, Inc. (collectively, "Mazda") were responsible for the sensor system, though the parties dispute how much fault Mazda should bear. Mazda settled with Plaintiff in June 2016 and thus took no part in the bench trial.

That airbags fail is well known to automotive companies like Autoliv. Autoliv itself makes, tests, and sells airbag components. Airbags are complicated—involving various sensors, an onboard computer, and firing mechanisms. Autoliv knew that airbags could fail in a 35-mph frontal collision like this one. Those in the automotive industry know that the airbag will not deploy in

every collision, so the seatbelt must work properly and provide protection whether the airbag deploys or not.

Mr. Andrews' collision was one in which the airbag did not deploy. Mr. Andrews' collision illustrates the importance of having a seatbelt that works. Yet the Autoliv seatbelt did not do its most basic job. The Autoliv seatbelt was so weak that, as Plaintiff's seatbelt expert Mr. Meyer testified, it left Mr. Andrews "effectively unrestrained in this frontal crash." Doc. No. [238], Tr. p. 24, lines 11-14. As a result, Mr. Andrews traveled "as far forward" as possible "until something else stop[ped] him." *Id.* That something else was his face slamming into the steering wheel. The Autoliv seatbelt was useless to Mr. Andrews because it was defective.

### 2.   The seatbelt in Mr. Andrews' car was defectively designed.

#### i.   Autoliv designed and manufactured the seatbelt.

Autoliv, its parent company Autoliv, Inc., and its sibling companies (almost all of which, like Autoliv, are wholly owned subsidiaries of Autoliv, Inc.) are in the business of designing, manufacturing, and selling seatbelts, airbags, and other automotive safety equipment. *See* PX 170 at 3 (Autoliv Form 10-K for fiscal year 2017 stating that "Autoliv is the world's leading supplier of automotive safety systems"); PX 1131 at 3 (Autoliv Form 10-K for fiscal year 2019 stating that

"Autoliv is a leading developer, manufacturer and supplier of safety systems to the automotive industry with a broad range of product offerings, primarily passive restraint systems"[9]); *see also* Doc. No. [503], ¶ 11 ("The defendant in this case, Autoliv, is a manufacturer of components used in cars made by many automakers.").

For the years 2003–2020 Autoliv, Inc. had revenues from selling seatbelts that totaled over $45 billion.[10] Those revenues were generated through the business of its subsidiaries. PX 1139 at 59.

The seatbelt[11] at issue has several parts, but its basic design is denoted by the graphic below:

---

[9] As used by Autoliv in PX 1131 at 3, "[p]assive safety systems include modules and components for frontal-impact airbag protection systems, side-impact protection systems, seatbelts, steering wheels, inflator technologies, batter cable cutters and protection systems for vulnerable road users such as pedestrians and cyclists."

[10] PX 189 at 53; PX 190 at 57; PX 191 at 63; PX 192 at 65; PX 193 at 69; PX 194 at 71; PX 195 at 75; PX 196 at 85; PX 197 at 85; PX 198 at 89; PX 199 at 89; PX 200 at 89; PX 201 at 93; PX 202 at 93; PX 203 SEC 10-K Filing at 54; PX 1128 SEC 10-K Filing at 28; PX 1129 SEC 10-K Filing at 29; PX 1138 at 39.

[11] To describe the safety device that Autoliv made and which Mr. Andrews was using to secure himself into the driver's seat, Autoliv repeatedly used the phrase "seatbelt assembly" whereas Plaintiff used the word "seatbelt." Not only does Plaintiff's description align with common usage, but the word "seatbelt" is also consistent with the federal regulation's definition of "seat belts." As used in the federal regulations, the term "seat belts" "includes the webbing, buckle,





PX 1059.

Autoliv's corporate representative David Prentkowski admitted that Autoliv designed Mr. Andrews' seatbelt. He admitted that Mr. Andrews' seatbelt was a "standard" Autoliv design. The undisputed evidence shows that Autoliv

---

anchorage, retractor, belt pretensioner devices, load limiters, and all components, hardware and software associated with an automatic or manual seat belt system addressed by FMVSS No. 209 or 2010." 49 C.F.R. § 579.4(c). The Court, accordingly, uses the word "seatbelt" to describe the safety device at issue.

designed the R27LL retractor and the ultra-weak torsion bar for the seatbelt.  Doc. No. [503], ¶ 28. Those were the specific components that caused Mr. Andrews' seatbelt to spool out 20 inches in the collision—five or six months before Mazda began any work on the type of car Mr. Andrews was driving, known internally at Mazda as the J48C[12]. *Compare* PX 74 (design document for R27LL retractor showing "Completion date: 14/06/1999"), *and* PX 7 (torsion bar design drawing showing that first iteration of the torsion bar's design drawing created in February 1998), *with* PX 40 (J48C development scheduling showing "Platform Kick-off" in November or December 1999).

The Autoliv seatbelt spooled out 20 inches because of the torsion bar in the seatbelt's retractor.[13] Torsion bars are a type of load limiter and are intended to avoid belt-induced injuries, like broken ribs. *See* Doc. No. [503], ¶ 22. Load limiters come in a variety of designs, though torsion bars are the most common type. The load limiter in the Autoliv seatbelt was a torsion bar, a metal bar around which the

---

[12] The parties stipulated that J48C was the internal designation code for the 2004 through 2005 Mazda3. Doc. No. [503], ¶ 10. The parties also stipulated that J48L was the internal designation code for the 2007 through 2009 Mazda3. *Id.* at ¶ 31.

[13] The seatbelt retractor holds the unused seatbelt webbing and contains the locking mechanism that prevents spool out in an emergency stop. Doc. No. [503], ¶ 20; Doc. No. [237], Tr. p. 86, lines 16–18, pp. 134, line 12–135, line 5.

seatbelt webbing is wrapped. Doc. No. [503], ¶ 23. In a wreck, the torsion bar twists and allows seatbelt webbing to spool out. Doc. No. [503], ¶ 21. How easily a torsion bar twists and allows webbing to spool out depends on its deployment threshold (i.e., strength). Doc. No. [503], ¶ 25.

The basic parts of the seatbelt's retractor appear below:



PX 1064.

The Autoliv seatbelt in Mr. Andrews' car had a torsion bar with a low deployment threshold (2.0 kN) and no "stop" limiting the amount of webbing that could spool out in a wreck. PX 20; Doc. No. [503], ¶ 27. Plaintiff's seatbelt expert Mr. Meyer testified that the resistance provided by the torsion bar was "not unlike the retractor failing to lock at all" because the "load limiter is so low, it doesn't

provide much resistance."[14] The load-limiting torsion bar in the Autoliv seatbelt was so weak that it allowed 20 inches of belt to freely come off the retractor. The seatbelt essentially did not slow Mr. Andrews down at all, and he struck the steering wheel with almost the same velocity that he started off from an upright position. The purpose of a seatbelt is to keep occupants from striking objects inside the car with enough force to cause death or serious injury. This Autoliv seatbelt did not meet the basic purpose of a seatbelt.

In Mr. Andrews' April 12, 2013 collision, the Autoliv seatbelt spooled out nearly 20 inches of webbing—not because of product misuse or unforeseen circumstances but because of the way it was designed and manufactured.

Twenty inches of spoolout is a staggering amount. The photos below show just how dramatic 20 inches of spoolout is.

---

[14] Doc. No. [238], Tr. p. 38, lines 14–17.



Pxs 209, 1021.

Seatbelt manufacturers such as Autoliv know that 35-mph frontal collisions into fixed objects, like Mr. Andrews' collision, happen in the real world. Mr. Andrews' collision was not only foreseeable; it was actually foreseen by Autoliv. A 35-mph frontal crash test is done to assess the performance of occupant restraints in the U.S. government's New Car Assessment Program ("NCAP"). The seatbelt Autoliv designed, manufactured, and sold for use in Mazda3 cars like Mr. Andrews' car underwent the NCAP test. In that crash test, the Autoliv seatbelt spooled out 16.85 inches—nearly twice as much as any other car in the same class of cars as the Mazda3. *See* PX 1074. The undisputed evidence shows that in terms of providing restraint and preventing an occupant's forward movement toward structures inside the car, the Autoliv seatbelt in Mr. Andrews' car was by far the worst—an extreme outlier. Plaintiff's seatbelt expert Steven Meyer testified that

this was the weakest and worst performing seatbelt he had ever seen in his 30 years investigating car crashes.

Seatbelts are supposed to be designed to protect occupants in frontal collisions like Mr. Andrews' collision on April 12, 2013. Mr. Andrews should have survived the collision. But he did not—despite wearing his Autoliv seatbelt properly. Had the Autoliv seatbelt done what seatbelts are supposed to do and restrained him in this foreseeable collision, Mr. Andrews would be alive. As the designer and manufacturer of Mr. Andrews' seatbelt, Autoliv is responsible for the defects in the seatbelt.

> ### ii.     Autoliv could have limited the amount of spoolout by using one of three alternative designs.

According to Plaintiff's seatbelt expert Mr. Meyer, there are alternative designs that would prevent a seatbelt from spooling out 20 inches in a 35-mph crash. After all, *every other car* in the Mazda3's class had a seatbelt design that prevented that much spoolout. Autoliv actually had available at least three alternative, feasible seatbelt designs that would keep occupants from slamming into the structures inside the car.

*First*, Autoliv could have increased the strength of the load limiter, making it harder for the seatbelt to spoolout 20 inches. In fact, at the time Autoliv sold the subject seatbelt to Mazda Autoliv had already designed and manufactured a

seatbelt with a torsion bar nearly twice as strong as the one in the 2005 Mazda3. *See* Doc. No. [503], ¶ 26 ("At the time Autoliv sold Mazda the seatbelt in Mr. Andrews's car, Autoliv had manufactured another seatbelt retractor with a load limiting threshold higher than the one in Mr. Andrews' seatbelt."). In fact, Autoliv's corporate representative David Prentkowski testified that Autoliv started selling Mazda such a seatbelt just months after Micah Andrews' car was manufactured.[15]

*Second*, Autoliv could have used an even better seatbelt. Autoliv provided the seatbelt for the Volvo S40, a car built on the same platform as the 2005 Mazda3.[16] The Autoliv seatbelt in the Volvo S40 used a 6.0 kN deployment threshold, three times as strong as the Mazda3's seatbelt. Doc. No. [503], ¶ 29. This is a significant difference because, as Autoliv's corporate representative testified, "everything else about the crash . . . being equal," a "higher level" or stronger torsion bar

---

[15] Doc. No. [237], Tr. p. 117, lines 5–12.

[16] "*Platform* means the basic structure of a vehicle including, but not limited to, the majority of the floorpan or undercarriage, and elements of the engine compartment. The term includes a structure that a manufacturer designates as a platform. A group of vehicles sharing a common structure or chassis shall be considered to have a common platform regardless of whether such vehicles are of the same type, are of the same make, or are sold by the same manufacturer." 49 C.F.R. § 579.4.

results in less spoolout. Doc. No. [237], Tr. p. 87, lines 10–18. In NCAP tests, the Volvo S40 had 10 inches fewer of spoolout than the Mazda3. PX 9.

*Third*, Autoliv could have put a stop on the load limiter to limit the amount of belt that could spool out. When the 2005 Mazda3 was designed and manufactured, Autoliv actually had available a seatbelt retractor that included a stop, which would limit the amount of belt webbing that could spool out in a wreck.

No one from Autoliv and no witness presented at trial by Autoliv disputes that these were available alternative designs. Despite the undisputed existence of safe, alternative designs that Autoliv actually manufactured and offered for sale, Autoliv sold to Mazda, for the 2005 Mazda3, an unsafe and defective seatbelt.

### D. Autoliv knew about the defects in its seatbelt years before Mr. Andrews' death but did nothing to prevent it.

Mr. Andrews did not know that Autoliv had intentionally designed and manufactured his seatbelt so that it would spool out 20 inches in a 35-mph frontal collision. But Autoliv did—years before Mr. Andrews' collision.

Autoliv's role was not limited to designing and manufacturing the seatbelt. Autoliv was obligated to work directly with Mazda to address defects in the seatbelt, like the excessive spoolout problem with Mr. Andrews's seatbelt. PX 10 at 10. But that defect was never fixed. Autoliv also had the authority and duty to

25

propose design changes and improvements to the seatbelt and seatbelt technology in Mr. Andrews' car. Autoliv made several design change suggestions to Mazda, and each time Mazda accepted the change. One of Autoliv's design change suggestions involved changing the torsion bar in the seatbelt from a digressive load limiter to a regular load limiter—a change that *reduced* the strength of the torsion bar. PX 49 (AUTOLIV01051). Autoliv never proposed changes in the seatbelt that would make it safer. Autoliv never advised Mazda that it should instead buy a safer seatbelt to protect people. When the seatbelt was changed and the torsion bar was strengthened for the 2006 Mazda3, this change was expressly made "to propose a more inexpensive buckle switch that will result in improved profit." PX 53 (AUTOLIV03342). In other words, profit not safety was the driving force behind the 2006 change in the seatbelt's design.

Autoliv was also responsible for reviewing and studying the data from Mazda's sled testing. In January 2002, an Autoliv employee wrote to Mazda that he had analyzed the computer modeling of the crash performance of the Mazda3 in an offset deformable barrier test. That modeling evaluated the very seatbelt Autoliv sold Mazda for use in Mr. Andrews' car. Using Autoliv's seatbelt, Autoliv saw in that computer modeling that *the dummy's head was slamming into the steering wheel*. Mazda asked Autoliv for help coming up with a solution, PX 128, but there

is no evidence that Autoliv ever did so. Later in 2002, Autoliv had internal discussions about the fact that the restraint system in the Mazda3 was not meeting its crash test performance targets. Autoliv knew that Mazda needed to make changes to the seatbelt and listed several options, including a stronger torsion bar. PX 126.

In May 2003, months before Autoliv began full-scale production of the seatbelt it sold to Mazda for the 2005 Mazda3, Autoliv performed sled testing.[17] That sled testing simulated a frontal collision at 31 mph in which an airbag did not deploy. In Autoliv's two sled tests using a seatbelt like the one in Mr. Andrews' car, the dummy experienced 15.2 and 15.4 inches of chest movement in a 31-mph frontal collision. PX 83 (AUTOLIV00016). Autoliv thus knew that the seatbelt would spoolout excessively in a frontal collision without an airbag before it sold that seatbelt to Mazda, before Mr. Andrews' Mazda3 car was even built, and ***ten years before*** that seatbelt failed to protect Mr. Andrews in the April 12, 2013 collision.

---

[17] Sled testing is performed by mounting part of the car's interior (usually the seat and the seatbelt system) on a "sled," accelerating it, and then stopping it to recreate the forces in a frontal collision.

Despite knowing that the seatbelt allowed a dangerous amount of spoolout and would not restrain people in foreseeable collisions, Autoliv did nothing to improve the seatbelt's performance. Nor did Autoliv ever tell Mazda that it should buy a different, better seatbelt.

Autoliv knew that the seatbelt's spoolout problem needed to be, and should be, fixed. Shortly after Mr. Andrews' 2005 Mazda3 was manufactured, Autoliv designed and sold Mazda a seatbelt with a much stronger torsion bar that would prevent so much dangerous spoolout. PX 35 (3.5 ± 0.9 kN torsion bar specification). That was *eight years before* Mr. Andrews died because the Autoliv seatbelt failed to protect him.

Autoliv never warned anyone about the dangers of the seatbelt, despite being fully aware of those dangers. Autoliv did not warn people, including Mr. Andrews, that the Autoliv seatbelt would not protect them in a totally foreseeable frontal collision. Years later, the defective seatbelt caused Mr. Andrews' death.

## II.   CONCLUSIONS OF LAW[18]

### A.   Autoliv is liable for Micah Andrews' injuries and wrongful death.

To prevail on a claim for strict products liability under O.C.G.A. § 51-1-11(b), Plaintiff had to prove that

    (1)   Autoliv manufactured the seatbelt in her husband's 2005 Mazda3;

    (2)   when sold, the Autoliv seatbelt was not merchantable and reasonably suited for its intended use (i.e., the Autoliv seatbelt was defective); and

    (3)   the Autoliv seatbelt was a proximate cause of Mr. Andrews' wrongful death.

*See id.*; *Chi. Hardware & Fixture Co. v. Letterman*, 510 S.E.2d 875, 877-78 (Ga. Ct. App. 1999). Plaintiff proved each of these elements; thus, Autoliv is liable for Mr. Andrews' injuries and death.

### 1.   Autoliv is the manufacturer of the seatbelt under Georgia law.

Georgia's strict products liability statute, O.C.G.A. § 51-1-11, was enacted in 1968.[19] The statute "imposes strict liability for defective products"; a product is

---

[18] To the extent that these Conclusions of Law constitute Findings of Fact, they are hereby adopted as both.

[19] *See* "Liability of Manufacturers and Sellers of Personal Property to Users," 1968 Ga. Laws 1166 (then-codified at O.C.G.A. § 105-106).

"defective" when it is "not merchantable and reasonably suited to the use intended." *Ctr. Chem. Co. v. Parzini*, 218 S.E.2d 580, 582 (Ga. 1975). A product can be defective because of problems with its manufacturing *or* design *or* warnings. *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 672 (Ga. 1994).

The Georgia strict liability statute "is in derogation of common law" and thus "must be strictly construed or limited strictly to the meaning of the language employed and not extended beyond [its] plain and explicit terms." *Daniel v. Am. Optical Corp.*, 304 S.E.2d 383, 385 (Ga. 1983); *Ford Motor Co. v. Carter*, 238 S.E.2d 361, 365 (Ga. 1977). That statute does not define *manufacturer*, so that term is given its plain meaning. *See Hartford Fire Ins. Co. v. iFreedom Direct Corp.*, 718 S.E.2d 103, 106 (Ga. Ct. App. 2011) (interpreting statute in derogation of common law by "the plain meaning of the language employed in the statute"); *see generally* O.C.G.A. § 1-3-1(b).

Manufacturing and designing seatbelts is Autoliv's business: it is the world's leading developer, manufacturer, and supplier of such products.[20]

---

[20] PX 170 at 3

Globally, Autoliv has a seatbelt market share of 44 percent.[21] Autoliv's corporate representative testified that the seatbelt was manufactured by "Autoliv Japan" and "the people who worked on the seatbelt" worked "[f]or Autoliv Japan."[22] The label on Mr. Andrews' seatbelt says "MFD. BY: Autoliv Japan Ltd."



PX 874. Accordingly, Autoliv is the *manufacturer* of the seatbelt under the plain meaning and the Georgia courts' construction of the strict liability statute.

Furthermore, in reversing the summary judgment entered in Autoliv's favor by a former judge of this Court, the Eleventh Circuit found that Autoliv was an "actual manufacturer[]" that "manufactured" the subject seatbelt. *See* Doc. No. [309] at 2 ("The 'product seller' provision expressly does not apply to actual manufacturers such as Autoliv. . . . Autoliv manufactured seatbelt components in

---

[21] PX 1139 at 4.

[22] Doc. No. [237], p. 9, lines 10–16.

the deceased's Mazda and Plaintiff alleges that those components were defective when sold."). The Eleventh Circuit's finding that Autoliv is the seatbelt's manufacturer for purposes of O.C.G.A. § 51-1-11 is binding on this Court under the "specific application" of the law-of-the-case doctrine known as "the mandate rule." *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir. 1985).[23]

Because Autoliv is the manufacturer of the seatbelt, Autoliv is strictly liable for any defects—whether in manufacturing *or* design *or* warnings—in the seatbelt.

### 2. The Autoliv seatbelt is defective.

In Georgia, to determine whether a product is defectively designed, the factfinder applies the "risk-utility analysis," which requires "balancing the risks inherent in a product design against the utility of the product so designed." *Banks*, 450 S.E.2d at 674. The Georgia Supreme Court has held that "[t]he 'heart' of a

---

[23] "Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That & The Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1283 (11th Cir. 2006) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)). The mandate rule "bars relitigation of issues that were decided either explicitly or by necessary implication." *Id.* The mandate rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1296 (11th Cir. 2014) (quoting *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001)).

design defect case is the reasonableness of selecting from among alternative product designs and adopting the safest feasible one." *Jones v. NordicTrack, Inc.*, 550 S.E.2d 101, 103 (Ga. 2001). "[I]n determining whether a product was defectively designed, the trier of fact may consider evidence that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." *CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641, 644 (2016) (quoting *Banks*, 450 S.E.2d at 674-75).

For that reason, "the appropriate analysis" in a design defect case like this one often "includes consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product." *Jones*, 550 S.E.2d at 103.

Other factors that the Court, as factfinder, may consider include:

the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

*Banks*, 450 S.E.2d at 675 n.6; *see also* COUNCIL OF SUPERIOR COURT JUDGES, SUGGESTED PATTERN JURY INSTRUCTIONS, VOL. I: CIVIL CASES § 62.650 (5th ed. 2020). This list of factors is nonexhaustive, and not all factors apply in every case.

Here, the Court concludes that the risk of the design of the Autoliv seatbelt in Mr. Andrews' 2005 Mazda3 greatly outweighs the utility of that design. The risk of a seatbelt with a very weak torsion bar is death or serious injury to an occupant in a collision in which the airbag does not deploy. The utility of seatbelt with a very weak torsion bar is that the car might get slightly better scores for potential chest injuries in the NCAP test.[24] Better test scores might translate into a higher "star" safety rating, which is good for marketing purposes. But in a real-world collision in which an airbag does not deploy, slightly better scores on a standardized crash test will not keep the occupant from striking objects inside the car (e.g., steering wheel or dashboard) with injurious force—the primary purpose of a seatbelt.

---

[24] Autoliv presented the testimony of its retained experts to argue that stronger torsion bars could result in serious injury to occupants. However, the Court does not find this argument persuasive. The Volvo S40 seatbelt, for example, was 300% stronger than the Mazda3 seatbelt, and it performed well in testing.

Plaintiff's seatbelt expert Steve Meyer testified that there were alternative designs for the subject seatbelt that would have been safer and that were actually on the market. Mr. Prentkowski, Autoliv's corporate representative, testified that all else being equal a stronger torsion bar allows much less spoolout. Doc. No. [237], Tr. p. 86, lines 13–16. Autoliv made and sold a seatbelt that was 1.75 times stronger for the 2006–2009 Mazda3. *See* PX 35 (seatbelt specification showing 2.0 ± 0.5 kN torsion bar for driver seatbelt in 2004–2005 Mazda3 but 3.5 ± 0.9 kN torsion bar for driver seatbelt in the 2006–2009 Mazda3).

Autoliv also made and sold the seatbelt for the 2004–2009 Volvo S40. That is significant because the Volvo S40 was built on the same "platform" as the Mazda3, meaning the cars share the same "basic structure." *See* 49 C.F.R. § 579.4(c) (defining *platform*). The Autoliv seatbelt in the Volvo S40 had a first-phase deployment threshold of 6.0 kN, meaning it was three times as strong as the Mazda3 seatbelt. Doc. No. [503], ¶ 29. The real-world consequences of the stronger seatbelt in the Volvo S40 come through in the NCAP test where the Volvo S40 seatbelt spooled out only 6.50 inches compared to the mindboggling 16.85 inches that the Mazda3 allowed.



Pl.'s Demonstrative. The record is clear: Autoliv had safer seatbelts that it could have sold to Mazda. Autoliv engineer Yuji Kamei admitted that Autoliv did not have to sell Mazda an unsafe seatbelt. Doc. No. [340], Tr. p. 61, lines 19–24.

Autoliv could have made the seatbelt safer another way. The Autoliv seatbelt had no limit on the amount of webbing that could spoolout in a collision. Autoliv could have put a stop on the seatbelt to limit the amount of webbing that spooled out. Autoliv's corporate representative testified that when Autoliv designed, manufactured, and sold the subject seatbelt to Mazda, it also had for sale

a seatbelt with a stop to limit the amount of spoolout. Doc. No. [237], Tr. p. 91, lines 9–21. The Court thus concludes that there were feasible, alternative designs that would have made the Autoliv seatbelt safer.

There is significant evidence that the Autoliv seatbelt's design is an extreme outlier. Plaintiff's seatbelt expert, Steve Meyer, testified that the Autoliv seatbelt had the lowest deployment threshold of any car in the Mazda3's class and of any car he had ever seen. Doc. No. [238], Tr. p. 81, lines 2–6 (lowest in class); *id.* Tr. pp. 106, line 22–107, line 4 (lowest ever seen). Similarly, Autoliv's own seatbelt expert struggled to identify any other car with a similarly weak deployment threshold. *See* Doc. No. [232], Tr. p. 213, lines 13–16 ("Q. Okay. So as you sit here today, you can't tell us other 2-kilonewton [seatbelt] systems that are single phase? A. Right."). Both in terms of performance and use, the Autoliv seatbelt in the J48C Mazda3 is unique—and in the worst way.

The record shows that the danger that the Autoliv seatbelt posed to foreseeable users like Mr. Andrews was unknown to the public. Autoliv's corporate representative testified that the public would not know that a seatbelt would spool out so far and so freely that an occupant's head could slam into the steering wheel hard enough to kill in a 35-mph frontal collision. Doc. No. [237], Tr. p. 127, lines 3–16. The record also shows that there was no warning on the seatbelt

or in the owner's manual about the danger the Autoliv seatbelt posed. Nor have there been any public statements by Autoliv (or Mazda) warning the public either before or after Mr. Andrews' collision about the Autoliv seatbelt's dangers in a 35-mph collision. The Court finds that there is no common knowledge among the public that many seatbelts today are designed to allow webbing to spool out in a collision after the retractor locks. The Court also finds that because the risk of spoolout is unknown to the public, the public cannot avoid the risks of injury and death that the Autoliv seatbelt poses.

The availability of safer alternative designs that were actually used in other cars in the Mazda3's class—and manufactured and sold by Autoliv—proves that the weak Autoliv seatbelt was not "state of the art." Just the opposite. The Autoliv seatbelt was an extreme outlier and unsafe. That other cars in the Mazda3's class were able to use stronger, safer torsion bars is proof that it was possible for Autoliv to manufacture and sell Mazda a safer seatbelt without impairing the seatbelt's usefulness or making it too expensive.

After considering the relevant factors for purposes of the risk-utility analysis, the Court concludes that the risks of the Autoliv seatbelt in Micah Andrews' car outweigh its utility. Thus, the Autoliv seatbelt was defectively designed.

### 3.     The Autoliv seatbelt was a proximate cause of Mr. Andrews' death.

Having determined that the Autoliv seatbelt is defective, the sole question remaining to establish liability is whether the Autoliv's seatbelt was a proximate cause of Mr. Andrews' injuries and death. The Court concludes that it was.

In May 2021, the Georgia Supreme Court expounded on the nature of "proximate cause" under Georgia law. "Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Johnson v. Avis Rent a Car Sys., LLC*, 858 S.E.2d 23, 29 (Ga. 2021) (quoting *Zwiren v. Thompson*, 578 S.E.2d 862, 865 (Ga. 2003)). A defendant who breaches a duty owed to the plaintiff is liable for the plaintiff's damages (i.e., is a proximate cause) when the consequences of the defendant's breach of duty "is probable, according to ordinary and usual experience." *Id.* (quoting *Johnson v. Am. Nat'l Red Cross*, 578 S.E.2d 106, 109 (Ga. 2003)). *Probable*, for purposes of proximate cause, "does not mean 'more likely than not,' but rather 'not unlikely'"; put more definitely: "'such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen.'" *Id.* (quoting Jeremiah Smith, *Legal Cause in Actions of Tort*, 25 Harv. L. Rev. 103, 116 (1991)).

39

In one sense, "proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." *Id.* (quoting *Atlanta Obstetrics & Gynecology Grp. v. Coleman*, 398 S.E.2d 16, 17 (1990)). The conclusion that proximate cause exists "requires both factfinding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent." *Id.* (quoting *Atlanta Obstetrics & Gynecology*, 398 S.E.2d at 17)).

Here, what happened is clear: Mr. Andrews crashed into three trees at about 35 mph; the driver's airbag in his car did not deploy; the Autoliv seatbelt that Mr. Andrews was wearing properly spooled out 20 inches of webbing. Because the seatbelt did not securely couple Mr. Andrews to his seat early in the crash and because the seatbelt did not provide sufficient restraining force, Mr. Andrews' head struck the steering wheel with enough force to cause a fatal basilar skull fracture.[25] Plaintiff's biomechanical expert testified that had the airbag deployed

---

[25] A basilar skull fracture is "the most serious type of skull fracture, and involves a break in the bone at the base of the skull." Head Injury, JOHNS HOPKINS MEDICINE,        https://www.hopkinsmedicine.org/health/conditions-and-diseases/head-injury.

(as it was designed) *or* had the seatbelt limited the amount of spoolout, then Mr. Andrews would not have struck the steering wheel with fatal force.

Autoliv knew that the seatbelt allowed an excessive amount of spoolout in standardized 35-mph crash tests—both in terms of the cars in the 2005 Mazda3's class and in terms of other Autoliv seatbelts (e.g., the 2004 Volvo S40). Autoliv also knew from its own sled testing that the seatbelt in the 2005 Mazda3 allowed more than 15 inches of chest displacement in a 31-mph frontal collision without an airbag. Put simply, Autoliv knew that the seatbelt in Mr. Andrews' car provided hardly any restraining force. Autoliv also knew that airbags do not always deploy in a collision. Autoliv also knew that people could be seriously injured or killed if they are not adequately restrained in a frontal collision.

Accordingly, the Court concludes that Autoliv knew that a person properly wearing the subject seatbelt was at risk of suffering serious injury or death if the airbag did not deploy in a 35-mph frontal collision. The probable consequence of Autoliv's breach of a legal duty owed to Mr. Andrews (i.e., designing a defective seatbelt) is that Mr. Andrews might be in a frontal collision in which his airbag did not deploy and might as a result suffer serious injury or death because the seatbelt failed to adequately restrain him. The defectively designed Autoliv seatbelt was thus a proximate cause of Mr. Andrews' injuries and death.

41

**B.      Damages**

Having determined that Autoliv is liable for Mr. Andrews' death, the Court now turns to the question of damages.

### 1.      Estate claim: Micah Andrews' special damages.

Plaintiff, as personal representative of Mr. Andrews' estate, seeks special damages[26] for Mr. Andrews' medical bills and funeral costs. The parties stipulated that the amount of these damages are $19,343.40. *See supra* n.3. Accordingly, the Court awards special damages to Plaintiff as personal representative of Mr. Andrews' estate in the amount of $19,343.40.

### 2.      Estate claim: Micah Andrews' general damages.

Under Georgia law, a claim for wrongful death damages and a claim for the conscious pain and suffering that the decedent experienced before death are distinct. *Grant v. Ga. Pac. Corp.*, 521 S.E.2d 868, 870 (Ga. Ct. App. 1999). Whether the decedent experienced conscious pain and suffering is a question for the factfinder to decide. *See Walker v. Daniels*, 407 S.E.2d 70, 75–76 (Ga. Ct. App. 1991).

---

[26] Under Georgia law, "[s]pecial damages are those which actually flow from a tortious act." O.C.G.A. § 51-12-2(b). General damages, on the other hand, "are those which the law presumes to flow from any tortious act." § 51-12-2(a).

Here, the undisputed evidence from Mr. Kemp was that after he hung up with 911—a call that lasted four minutes and nine seconds—he went to Mr. Andrews' car and told Mr. Andrews that help was on the way. Mr. Kemp vividly remembers that Mr. Andrews tried to respond by groaning and trying to raise his body. Officer Porter testified that he witnessed Mr. Andrews' last two breaths, after Mr. Kemp had spoken with Mr. Andrews. Based on the undisputed evidence at trial, which the Court finds is credible, the Court concludes that Mr. Andrews was alive and conscious from the time of the collision until after Mr. Kemp pulled off the road and stopped his car, finished his 911 call, and then went to Mr. Andrews' car—over four minutes and nine seconds.[27]

According, the Court awards Plaintiff, as Micah Andrews' personal representative, general damages for the postimpact pain and suffering Mr. Andrews endured in the amount of $_____.

---

[27] *See Holland v. Cypress Ins. Co.*, No. 2:17-cv-120, 2020 WL 5742250, *10 (N.D. Ga. Aug. 21, 2020) (Story, J.) (denying defendant's renewed motion for judgment as a matter of law or, in the alternative, for new trial on issue of postimpact pain and suffering where there was credible evidence that a witness heard the decedent moan after being unattended for some period after the collision).

### 3. Wrongful death damages: the full value of Micah Andrews' life.

Micah Andrews was 38 years old at the time of his death. Doc. No. [503], ¶ 5. The parties agree that his life expectancy at the time of his death was 36.18 years. Doc. No. [503], ¶ 7.

Georgia places a premium on life. For over one hundred years, the civil remedy in Georgia for causing a person to lose their life is not the sum of the foregone paychecks or the services the deceased would have rendered—it is the "the full value of the life of the deceased." 1878 Ga. Laws. 59, 59–60; *see also Bibbs v. Toyota Motor Corp.*, 815 S.E.2d 850, 853 (Ga. 2018).[28] That "full value" is not what someone else would assign to the life—not even family or friends. Instead, it is the value of the life through the eyes of the person who lost it. *See Bibbs*, 815 S.E.2d at 854–55 (the full value of a decedent's life is measured from the perspective of the decedent rather than the perspective of the survivors).

––––––––––––––––––––

[28] In 1887, the General Assembly clarified that the measure of damages for wrongful death were "the full value of the life of the deceased, as shown by the evidence without any deduction for necessary or other personal expenses of the deceased had he lived." 1887 Ga. Laws 43, 43-45. That measure of damages remains the law in Georgia. *See* O.C.G.A. §§ 51-4-1(a) (defining "[f]ull value of the life of the decedent, as shown by the evidence"), 51-4-2(a) (proscribing whom is entitled to recover for the death of a person with a surviving spouse or children).

Georgia courts have clarified that the full value of a decedent's life has two components: (1) the economic component of the decedent's life, such as "lost potential lifetime earnings, income, or services, reduced to present case value" and (2) the intangible component "whose value cannot be precisely quantified, such as a parent's 'society, advice, example and counsel' as determined by the enlightened conscience of the [factfinder]." *TGM Ashley Lakes, Inc. v. Jennings*, 590 S.E.2d 807, 819 (Ga. Ct. App. 2003); *see also Bibbs*, 815 S.E.2d at 856. As a result, the Court must determine the full value of Micah Andrews' life based on both its "economic" and "intangible" worth.

In terms of economic value, the parties stipulated that the present value of Mr. Andrews' lost income, lost fringe benefits, and lost household services was $2,027,141. Doc. No. [503], ¶ 38.[29]

In terms of intangible value, Plaintiff presented considerable, credible evidence that proves Mr. Andrews loved his life, his family, his friends, and his

---

[29] The parties' stipulation about the economic value of Mr. Andrews life was based on the unrebutted testimony of Plaintiff's economist Michael Daniels, Ph.D. The Court notes that Dr. Daniels testified at his deposition that the present value calculation of the economic loss arising from Micah Andrews' death was "conservative" in several different ways. *See* Doc. No. [280-1], Tr. pp. 85, line 3–86, line 14.

work. In reaching a conclusion about the full value of Mr. Andrews' life, the Court is guided by the verdicts that actual Georgia juries have returned in cases referenced in Plaintiff's Corrected Trial Brief on the Full Value of Micah Andrews' Life. Doc. No. [468-1]. Accordingly, the Court awards Plaintiff, as surviving spouse, the full value of Micah Andrews' life, both economic and intangible, in the amount of $_____.[30]

### 4.    Apportionment

In 2005, the Georgia General Assembly amended O.C.G.A. § 51-12-33, the so-called "apportionment statute." *See Couch v. Red Roof Inns, Inc.*, 729 S.E.2d 378, 381 (Ga. 2012). Since its enactment, this statute has spawned a plethora of litigation in the Georgia appellate courts, and that litigation continues unabated. Even so, the features of Georgia apportionment law relevant to this case can be distilled as follows.

*First*, where the apportionment statute applies, the factfinder makes two different (albeit related) determinations: the amount of the plaintiff's damages and

---

[30] Georgia law gives the right to bring a wrongful death claim to the surviving spouse of the decedent. O.C.G.A. § 51-4-2(a). The wrongful death award, however, is shared between the surviving spouse and the decedent's children. § 51-4-2(d)(1). Here, that means that Jamie Andrews and her and Micah's daughter S.C. will split the wrongful death damages equally.

the percentages of fault of all persons who contributed to the plaintiff's injuries or damages. *See* O.C.G.A. § 51-12-33(a)–(c); *Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC*, 843 S.E.2d 613, 620 (Ga. Ct. App. 2020) ("[T]he apportionment statute obligates us to distinguish between the trier of fact's determination of damages and that of fault."), *aff'd in pertinent part by* --- S.E.2d ----, 2021 WL 3501075 (Ga. 2021).

*Second*, where a defendant claims that the plaintiff's injuries or damages were the fault of another party or a nonparty, the defendant bears the burden of proving that another party or nonparty was responsible for the plaintiff's injuries or damages. *See Brown v. Tucker*, 788 S.E.2d 810, 821 (Ga. Ct. App. 2016) ("The affirmative defense that the jury should apportion fault against someone other than the defendant is no different analytically from the defense of contributory negligence. Once the plaintiff establishes her prima facie case, the defendant seeking to establish that someone else bears responsibility for the damages has the burden of proving that defense."). Here, Autoliv not only denied that it is liable for Mr. Andrews' injuries or death but also claimed that Mr. Andrews' injuries and death were caused by (1) Mr. Andrews himself, (2) Mazda, and (3) "Bosch." Under Georgia law, Autoliv's claims that others were at fault for Mr. Andrews' injuries and death are "affirmative defense[s]," and Autoliv "had the burden of showing

47

by a preponderance of the evidence" that each supposedly responsible other party was at fault for Mr. Andrews' injuries and death. *Id.*

That conclusion is buttressed by the Georgia Supreme Court's construction of the term "fault" in subsections (a), (b), and (c) of O.C.G.A. § 51-12-33. As construed by the Georgia Supreme Court, "fault" in subsection (a) refers "to a breach of a legal duty that the plaintiff owes for his own protection that is a proximate cause of his injury";[31] "fault" in subsection (b) refers "to a breach of a legal duty that a defendant owes for the protection of the plaintiff that is a proximate cause of the injury to the plaintiff"; and "fault" that "contributed to the alleged injury or damages" in subsection (c) refers "to a breach of a legal duty in the nature of tort that is owed for the protection of the plaintiff, the breach of which is a proximate cause of his injury." *Zaldivar v. Prickett*, 774 S.E.2d 688, 694 (Ga. 2015).[32]

---

[31] Under § 51-12-33(g), "if the plaintiff is 50 percent or more responsible for the injury or damages claims," then the plaintiff cannot recover any damages. According to the Georgia Supreme Court, "[t]ogether, subsections (a) and (g) codify the doctrine of comparative negligence, a doctrine that was recognized in Georgia long before the present apportionment statute was enacted in 2005." *Zaldivar v. Prickett*, 774 S.E.2d 688, 693 (Ga. 2015) (internal citation and footnote omitted).

[32] "Subsection (c), then, is properly understood to require the consideration of the 'fault' of four classes of persons or entities: plaintiffs (also covered in subsection

48

*Third*, even where, as here, the plaintiff brings a strict products liability claim against a defendant under O.C.G.A. § 51-1-11(b)(1), the factfinder can determine the plaintiff's percentage of fault for the plaintiff's injuries or damages. *See Johns v. Suzuki Motor of Am., Inc.*, 850 S.E.2d 59, 67 (Ga. 2020).

*Fourth*, Plaintiff initially sued Mazda and several Bosch entities,[33] but that does not mean that the Court, as factfinder, must consider the potential fault of Mazda or "Bosch" under § 51-12-33(d)(1). Although subsection (d)(1) provides that the "[n]egligence or fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty," the Georgia Court of Appeals has "decline[d] to interpret" that subsection "as requiring a trier of fact to automatically consider the potential fault of a settled entity." *Union Carbide Corp. v. Fields*, 726 S.E.2d 521, 526 (Ga. Ct. App. 2012).[34] Instead, the "defending party"

---

(a)), defendants with liability (also covered in subsection (b)), defendants without liability, and nonparties." *Zaldivar*, 774 S.E.2d at 695 n.6

[33] Plaintiff's Complaint named four Bosch entities: (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, (3) Robert Bosch Motor Systems Corporation, and (4) Bosch Corporation. Doc. No. [1-2], p. 1. Plaintiff's First Amended Complaint dropped Robert Bosch Motor Systems Corporation as improperly named and added Robert Bosch GmbH. Doc. No. [17], p. 2.

[34] The Georgia Supreme Court granted certiorari and reversed a portion of *Fields* unrelated to this holding. *Ga.-Pac., LLC v. Fields*, 748 S.E.2d 407 (Ga. 2013). When the case returned to the Georgia Court of Appeals, the intermediate appellate court vacated the reversed portion of its earlier opinion and substituted the Georgia

49

must produce evidence that "the settled entity 'contributed to the alleged injury or damages' before its fault can be assessed by the trier of fact." *Id.* at 525-26 (quoting § 51-12-33(c)). Thus, even though Plaintiff settled with Mazda and dismissed certain Bosch entities years ago, Autoliv must still produce evidence that Mazda and "Bosch" breached a legal duty in the nature of a tort for the protection of Mr. Andrews and that breach was a proximate cause of Mr. Andrews' injuries and death before the Court, as factfinder, can assess any fault to Mazda or "Bosch."

*Fifth*, Autoliv must produce evidence that affords the factfinder a rational basis to apportion fault. *See Stewart Ausband Enters., Inc. v. Holden*, 826 S.E.2d 138, 144 (Ga. 2019) ("It is the defendants' burden to establish a basis for apportionment, and it is the factfinder's role to assign fault accordingly."). Whether a rational basis exists to apportion fault is a question of fact. *Couch v. Red Roof Inns, Inc.*, 729 S.E.2d 378, 384 (Ga. 2012). When a defendant, such as a product manufacturer, takes an

---

Supreme Court's opinion. *Union Carbide Corp. v. Fields*, 758 S.E.2d 335 (Ga. Ct. App. 2014). But the Georgia Court of Appeals' interpretation of § 51-12-33(d)(1) in *Fields* became binding when the case returned to that court. *See id.* at 336 ("Since those portions of our earlier opinion are consistent with the Supreme Court's opinion, Divisions 1(a)–(c), (e) and Division 2 of our earlier opinion 'become binding upon the return of the remittitur.'").

"all or nothing" approach to fault for the plaintiff's injuries—that the manufacturer's product was not defective or that the plaintiff received all injuries because of the fault of another party—the defense of apportionment is unavailable to the defendant. *See Ford Motor Co. v. Reese*, 684 S.E.2d 279, 286 (Ga. Ct. App. 2009).

Apportionment of fault requires the factfinder to determine, in terms of percentage, the relative extent to which each tortfeasor contributed as a proximate cause of the plaintiff's injury. *See Zaldivar*, 297 Ga. at 595. For that reason, the defendant must present some evidence at trial providing the factfinder a rational basis for apportionment based on percentages of fault.

### iii.    Mr. Andrews is not at fault for his own injuries and death.

Under subsection (a) of the Georgia apportionment statute, "[w]here an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed," the factfinder "shall determine the percentage of fault of the plaintiff and the judge shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault."

To allocate any "fault" to Mr. Andrews, the Court would have to find that Mr. Andrews' injuries and death were proximately caused by his own negligence. That is impossible to do in this case as Mr. Andrews did not design or

manufacturer the seatbelt that spooled out 20 inches or the airbag (or its wiring, sensor, or control computer) that resulted in the airbag not deploying. Mr. Andrews is not the proximate cause of his fatal injuries or death. Therefore, no fault can be apportioned to him under Georgia law.

Additionally, Georgia embraces the doctrine of sudden emergency. The sudden emergency doctrine applies when "acts occur immediately following the apprehension of the danger or crisis before there is time for careful reflection." *Willis v. Love*, 502 S.E.2d 487, 489 (Ga. Ct. App. 1998) (citation omitted). Under that doctrine, a person confronted with a sudden emergency who "acts according to his best judgment or, because of want of time in which to form a judgment, acts in the most judicious manner, is not chargeable with negligence." *Id.*; *Curtis v. United States*, 274 F. Supp. 3d 1366, 1378 (N.D. Ga. 2017) (Batten, J.) ("Under that doctrine, a person who is faced with a sudden emergency and either acts within his 'best judgment' or does not have sufficient time to form such a judgment is 'not chargeable with negligence.'" (quoting *Willis*)). Georgia law defines an emergency as "sudden peril caused by circumstances in which the defendant did not participate and which offered him a choice of conduct without time for thought so that negligence in his choice might be attributable not lack of care but to lack of time to assess the situation." *Willis*, 502 S.E.2d at 489. One situation in which the

sudden emergency doctrine has been held to apply is when a driver suddenly confronts an animal in the road. *See Stephens v. Hypes*, 610 S.E.2d 631, 633 (Ga. Ct. App. 2005) ("[C]ommon sense dictates that that a deer in the road could give rise to a sudden emergency."); *see also Adams v. Finlayson*, 406 S.E.2d 227, 228–29 (Ga. Ct. App. 1991) (affirming trial court's charge on sudden emergency where evidence showed that collision followed driver's decision to swerve in response to dog on the road). Other courts have held that "a normally careful person" would react to avoid "a large animal" that suddenly appeared in the road by veering onto the shoulder. *Whitehead v. Cruse*, 279 So. 2d 802, 804 (La. Ct. App. 1973).

Here, Mr. Andrews faced a sudden emergency not of his own making: apparently the presence of a large snapping turtle in the middle of the interstate. Seeing the turtle, Mr. Andrews swerved hard right and applied his brakes. Unfortunately, that avoidance maneuver took Mr. Andrews off the interstate and onto the grassy shoulder of I-575. That grassy shoulder was so steep that Mr. Andrews could not recover and return his car to the road. Under the circumstances, Mr. Andrews' avoidance maneuver was reasonable. Because Mr. Andrews acted reasonably under the circumstances, Mr. Andrews did not "breach a legal duty that [he] owed for his own protection" and thus no "fault" within the

meaning of § 51-12-33(a) can be apportioned to Mr. Andrews. *See Zaldivar*, 744 S.E.2d at 694.

> **iv.   No fault can be apportioned to Bosch because Autoliv did not prove that Bosch breached any legal duty owed to Mr. Andrews or that Bosch's conduct contributed to Mr. Andrews' injuries or death.**

Between the Complaint and First Amended Complaint, Plaintiff named five "Bosch" entities: (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, (3) Bosch Corporation, (4) Robert Bosch Motor Systems Corporation, and (5) Robert Bosch GmbH. *See* Doc. Nos. [1-2], p. 1; [17], p. 2. Based on the evidence adduced at trial, none of these Bosch entities is at fault for Mr. Andrews' injuries and death.

Plaintiff dismissed Robert Bosch Motor Systems Corporation as improperly named. Autoliv produced no evidence to the contrary at trial, nor did Autoliv produce any evidence proving that Robert Bosch Motor Systems Corporation was involved in any way in designing or manufacturing any allegedly defective product in Mr. Andrews' car. Thus, the Court cannot apportion any "fault" for Mr. Andrews' injuries or death to Robert Bosch Motor Systems Corporation. *See Union Carbide*, 726 S.E.2d at 525–26.

Bosch Corporation moved to dismiss Plaintiff's claim against it for lack of personal jurisdiction. Doc. No. [27]. The Court granted that motion because

Plaintiff had no evidence that Bosch Corporation did any business in Georgia. Doc. No. [106]. Similarly, at the bench trial, Autoliv adduced no evidence that Bosch Corporation had anything to do with any allegedly defective product in Mr. Andrews' car. Without evidence that Bosch Corporation was a "manufacturer" or "designer" of an allegedly defective product under Georgia law and without evidence that the product was actually defective,[35] Autoliv cannot prove that Bosch Corporation breached any "legal duty in the nature of tort" owed to protect Mr. Andrews. *See Zaldivar*, 774 S.E.2d at 694. Thus, the Court cannot apportion any "fault" for Mr. Andrews' injuries or death (within the meaning of the apportionment statute) to Bosch Corporation. *See Union Carbide*, 726 S.E.2d at 525–26.

That leaves three Bosch entities: (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, and (3) Robert Bosch GmbH (collectively, "Bosch").

At trial, Autoliv presented testimony that "Bosch" provided the "crash sensing system" for Mr. Andrews' car. The crash sensing system comprises, among other things, (1) the car's computer diagnostic unit located under the car's

---

[35] *See, e.g.*, O.C.G.A. § 51-1-11(b); *Boyce v. Gregory Poole Equip. Co.*, 605 S.E.2d 384, 388 (Ga. Ct. App. 2004) ("Strict product liability applies only to the product manufacturer or designer.").

center console, which Mazda calls the "Supplemental Airbag System" or "SAS" unit; (2) the upfront sensor ("UFS," also known as the electronic front sensor ("EFS")), a single sensor located behind the car's front grill; (3) the UFS sensor connector; and (4) the wiring running from the SAS to the UFS.

Autoliv called Chris Caruso, an expert in airbag system design, to try to prove that it was Bosch's fault Mr. Andrews' airbag did not deploy in the April 12, 2013 collision. But Mr. Caruso testified that he did not believe Bosch did anything wrong based on his review of the documentary evidence and inspection of Mr. Andrews' car. Mr. Caruso specifically testified that he had "no evidence to indicate the SAS unit is defective," and he did not have the opinion it was defective. Caruso Dep. Tr. p. 108, lines 18–24 (Apr. 24, 2019). Despite Autoliv's repeated inquiries, Mr. Caruso testified that he had "no criticism" of the SAS's ability to assemble information from the car's crash sensors and to determine whether or not to deploy an airbag. *Id.* Tr. pp. 144, line 5–145, line 3. Mr. Caruso testified that he could not determine that Bosch did anything specific wrong, including with respect to Mazda's decision not to implement dual front sensors, which Bosch suggested at one point, a suggestion that Mazda apparently rejected. *Id.* Thus, Autoliv did not prove that Bosch designed or manufactured any defective product in the Mr. Andrews' car or that Bosch otherwise breached a "legal duty in the

nature of tort" owed to protect Mr. Andrews. Accordingly, the Court cannot apportion any "fault" to Bosch.

> **v.   No fault can be apportioned to Mazda because Autoliv presented no evidence that affords the Court a rational basis to apportion fault.**

Throughout the trial, Autoliv steadfastly insisted that it did nothing wrong and that the design of its seatbelt was not defective. Autoliv also contended that its seatbelt was not a proximate cause of Mr. Andrews' injuries and death, and that any fault for Mr. Andrews' injuries and death rested with some other party (Mr. Andrews himself, Mazda, or "Bosch"). Autoliv presented a corporate witness, a Japanese engineer, and two experts (one on seatbelt design and one on rebuttal of biomechanics) to support its claims that the seatbelt's design was not defective and that something besides the seatbelt was the proximate cause of Mr. Andrews' injuries and death.

Autoliv did call several experts initially retained by Plaintiff to opine about the defects in the airbag system. The unrebutted testimony of Plaintiff's former experts is credible and establishes that both the airbag system was defectively designed and those defects resulted in the nondeployment of the Autoliv airbag in the steering wheel. Plaintiff's biomechanics expert testified that had the airbag deployed as designed (or the seatbelt not allowed 20 inches of spoolout), Mr.

Andrews would not have struck the steering wheel with fatal force. To be clear, no one employed by Autoliv or hired by Autoliv actually testified that Mazda's design of the airbag system was defective and that this defective design was a proximate cause of Mr. Andrews' injuries and death. Yet the evidence adduced at trial allows the Court, as factfinder, to conclude that Mazda "breached a legal duty in the nature of tort" owed to protect Mr. Andrews and thus is at "fault" for Mr. Andrews' injuries and death.

But establishing fault of a nonparty is not enough to prevail on the affirmative defense of apportionment. Autoliv also had to present competent evidence that would establish a "rational basis for apportionment." *Holden*, 826 S.E.2d at 144. Whether Autoliv established a rational basis that would enable the Court, as factfinder, to apportion fault—as a percentage—between Autoliv, which the Court already held was liable for Mr. Andrews' injuries and death, and Mazda is a question of fact. *Couch*, 729 S.E.2d at 384. The Court finds that Autoliv presented no evidence that established a rational basis to apportion fault as a percentage between Autoliv and Mazda. Without such evidence, the Court's apportionment of fault as a percentage between Autoliv and Mazda would rest on nothing more than speculation and guesswork—something the law prohibits factfinders from doing. *See FDIC v. Loudermilk*, 930 F.3d 1280, 1290 (11th Cir. 2019)

("Because the decision to approve a loan was a group decision, a jury could not assign percentages of fault to individual directors. Any percentage would be arbitrary because the jury would be left speculating. And Georgia courts have said that 'liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence.'" (citation omitted)).

There is another reason Autoliv's apportionment affirmative defense fails. Autoliv employed an "all or nothing" strategy at trial. Autoliv claimed its product wasn't defective and that it wasn't the proximate cause of Mr. Andrews' injuries and death. Autoliv claims were, however, unsupported by the record evidence. Because Autoliv failed to present any evidence to afford a rational basis for the apportionment of fault, the apportionment defense is unavailable to Autoliv. *See Ford Motor Co.*, 684 S.E.2d 286 ("Ford . . . took an 'all or nothing' approach to liability and made no effort to show how her injuries could be rationally apportioned between the collision with the dump truck and the alleged collapse of the [car's] seat. It follows that under the evidence presented at trial, Ford was either liability as a joint tortfeasor with the driver of the dump truck, or not liable at all.").

### 5.    Autoliv's misconduct in this case warrants punitive damages.

### i.    Autoliv's misconduct warrants punitive damages.

Under Georgia law, punitive damages may be awarded in tort cases where there is "clear and convincing evidence[36] that the defendant's actions showed . . . that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). To deserve punitive damages, the defendant need not be "guilty of willful and intentional misconduct"; rather, the defendant's misconduct need only "be done under such circumstances as evinces an entire want of care and a conscious indifference to the consequences." *Scapa Dryer Fabrics, Inc. v. Knight*, 770 S.E.2d 334, 343 (Ga. Ct. App. 2015) (citation omitted).[37]

---

[36] "[C]lear and convincing evidence is an intermediate standard of proof, requiring a higher minimum level of proof than the preponderance of the evidence standard, but less than that required for proof beyond a reasonable doubt." *Clarke v. Cotton*, 440 S.E.2d 165, 166 n.1 (Ga. 1994).

[37] The Georgia Supreme Court granted certiorari and reversed a portion of *Knight* unrelated to this holding. *Scapa Dryer Fabrics, Inc. v. Knight*, 788 S.E.2d 421(Ga. 2016). When the case returned to the Georgia Court of Appeals, the intermediate appellate court vacated the reversed portion of its earlier opinion and substituted the Georgia Supreme Court's opinion. *Scapa Dryer Fabrics, Inc. v. Knight*, 796 S.E.2d 918 (Ga. Ct. App. 2017). But the Georgia Court of Appeals' discussion of both the nature of the misconduct necessary to warrant punitive damages as well as the court's conclusion that punitive damages were properly a jury question under the facts presented remain good law. *See id.* at 919.

Punitive damages are available in a products liability action. In *Knight*, for example, the court held that evidence that the defendant "knew or should have known about the health dangers of asbestos exposure as a result of the weaving process at its plant, but did not warn about the dangers, or take any steps to protect plant works from the dangers" created a jury question on the issue of punitive damages. *See Knight*, 770 S.E.2d at 339, 343. In another case, the Georgia Court of Appeals held that the trial court did not err in denying summary judgment and sending the issue of punitive damages to the jury in a products liability case in which there was evidence from which the jury could find that the design of the product at issue (a carpet-wrapping machine) proximately caused a repairman's fatal injury. *Dixie Grp., Inc. v. Shaw Indus. Grp., Inc.*, 693 S.E.2d 888, 893, 894 (Ga. Ct. App. 2010).

Here, the Court has concluded that the Autoliv seatbelt is defective. Not only is the seatbelt defective, it is an extreme outlier—the worst Plaintiff's seatbelt expert has ever seen and the worst in its class. The seatbelt is so bad that no other automaker has ever purchased it. Autoliv should never have put this seatbelt on the market for sale.

A wreck like this one at this speed was indisputably foreseeable to Autoliv. Autoliv knew that airbags fail. Autoliv knew that if the airbag in a car such as Mr.

Andrews' Mazda3 failed then the Autoliv seatbelt would spool out so much it would be useless to a driver and could result in exactly what happened to Mr. Andrews. Yet Autoliv sold the defective seatbelt anyway. Not only that, Autoliv did not warn Mazda that Mazda's customers could be killed because of excessive spoolout. Nor did Autoliv itself warn any consumers. It is undisputed that Autoliv knew how to design and manufacture a seatbelt that was not so defective, that was not such an outlier: Autoliv had already done just that—before it sold this defective seatbelt to Mazda.

What is foreseeable can be avoided. Choosing not to avoid foreseeable and dreadful results is, as a practical matter, the equivalent of intentional misconduct.

There is simply no room to doubt that Autoliv's conduct amounted not only to an "entire want of care and a conscious indifference to the consequences" but was also recklessness and wantonness.

In addition, despite knowing for years that the seatbelt in Mr. Andrews' car spooled out 20 inches in a 35-mph frontal collision, Autoliv has not taken a single step to warn Georgians about the risk of serious injury or death. Yet Autoliv, as a manufacturer of a product that it knows is dangers, has a postsale duty to warn under Georgia law. *See Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994). Autoliv has not made offered any warnings to the public since Mr. Andrews'

collision because Autoliv does not believe that it has done anything wrong. Autoliv knew that the seatbelt was not performing well in safety tests before the seatbelt went to market, yet Autoliv put the seatbelt on the market anyway. There is clear and convincing evidence that Autoliv's misconduct "evinces an entire want of care and a conscious indifference to the consequences." *Knight*, 770 S.E.2d at 343. Punitive damages are thus warranted.

## ii. The amount of punitive damages.

Under Georgia law, punitive damages "shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c). Where, as here, the defendant's conduct calls for punitive damages, the factfinder "shall . . . set the amount to be awarded" after receiving "such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case." § 51-12-5.1(d)(2). Georgia does not cap the amount of punitive damages in a products liability case, although 75 percent of the award ("less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge") must be paid to Georgia's Office of the State Treasurer. § 51-12-5.1(e)(1)-(2). "[U]nlike compensatory damages, punitive damages serve the public interest by punishing, penalizing, and deterring the

wrongdoer." *Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 552 (Ga. 2006).

Having concluded that Autoliv's misconduct warrants punitive damages, the Court must decide what amount of punitive damages will punish, penalize, and deter Autoliv from manufacturing and selling seatbelts that do not protect people in foreseeable, real-world collisions. To accurately assess the necessary amount of punitive damages, the Court has considered Autoliv's "financial circumstances." *See Holland v. Caviness*, 737 S.E.2d 669, 671 (Ga. 2013) ("[I]f a cause of action is within the ambit of O.C.G.A. § 51-12-5.1, evidence of the defendant's financial circumstances may be admissible."); COUNCIL OF SUPERIOR COURT JUDGES, GEORGIA SUGGESTED PATTERN JURY INSTRUCTIONS, VOL. 1 CIVIL 66.750 (5th ed. 2020) ("In considering the amount of punitive damages, you may consider . . . the financial circumstances, that is, the financial condition and[/]or the net worth of the defendant.").

Nearly 30 years ago, the Georgia Court of Appeals, sitting en banc, held unanimously that "financial evidence"—an annual corporate financial report and a Form 10-K submitted to the Securities and Exchange Commission—was "relevant and admissible" to help the factfinder determine the amount of punitive damages. *J.B. Hunt Transp., Inc. v. Bentley*, 427 S.E.2d 499, 506 (Ga. Ct. App. 1992)

(en banc).[38] Here, Plaintiff introduced evidence of Autoliv's annual reports and Form 10-K filings of Autoliv's parent company Autoliv, Inc. at trial. *See* Pxs 170–203, 1128–1131, 1138–1139.

Autoliv, Inc.'s annual reports and Form 10-K fillings contain information relevant to Autoliv's financial condition. Autoliv, Inc.'s annual financial reports show that it is a multibillion-dollar company. For example, for fiscal year 2020, the most recent fiscal year, Autoliv, Inc. reported net sales of $7.4 billion and an operating income of $382 million. PX 1139 at 28. Focusing only on seatbelt sales, Autoliv, Inc. has reported annual sales over $2.5 billion in every year since 2013, when Micah Andrews' fatal collision occurred. PX 170 at 31 (years 2013–2017); PX 1139 at 29 (years 2018–2020). Autoliv closed the 2020 fiscal year with $8.1 billion in total assets.

Autoliv, Inc. is publicly traded on the New York Stock Exchange and functions as a holding corporation. PX 1139 at 26. Autoliv, Inc. owns "two

---

[38] While the relevance and admissibility of evidence in a case pending in federal court are generally questions of governed by the Federal Rules of Evidence, state-court evidentiary rulings are nonetheless persuasive authority that the Court may look to for guidance. The Court finds, in the exercise of its discretion, that Autoliv's annual reports and Form 10-K filings are both relevant and admissible evidence on the issue of Autoliv's financial condition.

principal subsidiaries": Autoliv AB, a Swedish company, and Autoliv ASP, Inc., an American company. *Id.* at 3. Autoliv, Inc. also owns Autoliv Japan, Ltd. *Id.* at Ex. 21 (listing subsidiaries). Autoliv, Inc. has also booked "reserves" on its consolidated balance sheet for "product liability and warranty claims in the event that the Company's products fail to perform as represented and such failure results . . . in bodily injury." *Id.* at 74. Based on the record and evidence introduced during the bench trial, the Court concludes that Autoliv, Inc. operated as a single enterprise for purposes of designing, manufacturing, and selling the seatbelt at issue.

Plaintiff initially named Autoliv, Inc. in this lawsuit. In May 2015, Autoliv told Plaintiff and this Court that "if any Autoliv entity was involved in the design, testing, manufacture, or supply of components of the occupant restraint system in the Mazda 3 at issue in this case, it was Autoliv Japan, Ltd." Doc. No. [108], p. 2.[39] In other words, Autoliv told Plaintiff and this Court that no other Autoliv entity,

---

[39] Based on that representation, Plaintiff voluntarily dismissed her claims against Autoliv, Inc. (and other Autoliv entities), and the Autoliv entities agreed that the statutes of limitation and repose would be tolled until Plaintiff's claims against Autoliv Japan were resolved. Doc. No. [108], p. 3. The Court entered an Order dismissing the other Autoliv entities and tolling the statutes of limitations and repose. Doc. No. [137], p. 2.

including its parent company Autoliv, Inc., needed to be a part of this case for Plaintiff to obtain complete relief for her claims, which have always included a claim for punitive damages against Autoliv. *See* Doc. No. [1-2], pp. 35–36 (count 10); Doc. No. [17], pp. 30–31 (count 10); Doc. No. [90], p. 31 (count 10). Plaintiff worked with Autoliv to ensure the correct parties were named in the lawsuit. Plaintiff agreed to dismiss Autoliv, Inc. and all other Autoliv entities in reliance on Autoliv's representations that Autoliv Japan, Ltd. was the correct entity and that Autoliv would produce in discovery any documents in the possession custody and control of any Autoliv entity. *Id.*[40]

The documents Autoliv produced in this case prove that Autoliv has ignored formal divisions among corporate Autoliv entities when it comes to this seatbelt. The earliest documents about the defective seatbelt, which prove that the defective Autoliv seatbelt design existed before Mazda even started the Mazda3 program, have the Autoliv corporate logo—not the "Autoliv Japan" insignia—at the top. *See* Pxs 72-74 (details about the seatbelt pretensioner in Mr. Andrews' car;

---

[40] The annual financial reports and 10-K forms of Autoliv, Inc. were undoubtedly in the possession of an Autoliv entity. These documents are publicly available through Autoliv's website and the SEC's Edgar system. *See* https://www.autoliv.com/investors/reports-presentations-transcripts.

R200LL load limiting retractor, the retractor Autoliv sold Mazda for the 2006–2009

Mazda3; R27LL load limiting retractor, the retractor in Mr. Andrews' car). These

documents provide the proprietary, confidential design information specific to the

defective seatbelt. Autoliv as the parent company is using them across subsidiaries

and branding them with the parent logo. The detailed design drawing for the weak

torsion bar Autoliv designed and manufactured for Mr. Andrews' car, shown

below, proves that the design came from Autoliv GmbH, a German subsidiary of

Autoliv, Inc., not Autoliv Japan, Ltd.



PX 7. This Court need not distinguish between Autoliv entities when Autoliv's

own documents reflect no such distinction.

The Autoliv website contains further proof that Autoliv is a single company.

The website's homepage proclaims that "Autoliv is the world's largest automotive

safety supplier" and has over "68,000 associates in 27 countries." Autoliv,

www.autoliv.com. Autoliv also claims that its products have saved more than 30,000 lives—without any effort to separate the lives saved by subsidiary. *Id.* In fact, the Japanese website for Autoliv (www.autoliv.jp) offers further proof that Autoliv is a single company. The bottom of the Japanese website clearly says—in English—that "Autoliv, Inc." holds the copyright on the website, not Autoliv Japan, Ltd.

Autoliv's conduct in this case also contradicts any claim that Autoliv Japan, Ltd. is autonomous from its parent and sibling companies. Autoliv hand-picked David Prentkowski as its corporate witness to testify about Autoliv Japan, Ltd.'s "role in designing, testing, manufacturing, marketing, distributing, and selling the subject seatbelt" and [t]he reasons Autoliv designed the subject seatbelt such that it could spool out 20" in a frontal collision," among other topics. Doc. No. [205], p. 2–4. Mr. Prentkowski, however, does not work for Autoliv Japan. He lives in Michigan and works for a different subsidiary of Autoliv, Inc. called Autoliv ASP, located in Auburn Hills, Michigan. Doc. No. [237], Tr. p. 8, lines 13–15. Mr. Prentkowski did not work on the subject seatbelt at all. Doc. No. [237], p. 9, lines 5–9. Yet he testified for Autoliv at trial. His sole involvement in this case is as the voice for Autoliv Japan, Ltd.

The Court has already held that evidence of Autoliv, Inc.'s financial condition, as shown by its 10-K filings with the Securities and Exchange Commissions, is relevant to the issue of punitive damages. Doc. No. [494], p. 6–7.

Autoliv told Plaintiff in discovery that it has a $25 million insurance policy that covers Plaintiff's products liability claims. *See* Doc. Nos. [217, 451-1]. The existence and amount of insurance coverage is relevant and admissible on the amount of punitive damages to award. As Judge Totenberg concluded in another case, if an insurance policy provides coverage for any part of the plaintiff's award (as Autoliv has admitted), "the insurance policy is relevant to [the defendant's] overall financial condition and resources available," which the factfinder should consider to determine the amount of punitive damages, even if the insurance policy excludes coverage for punitive damages (something Autoliv has not claimed). *Cooper v. Marten Transp., Ltd.*, No. 1:10-cv-3044, 2014 WL 11517830, at *6 (N.D. Ga. May 23, 2014) (Totenberg, J.) (citing *Hosp. Auth. of Gwinnett Cnty. v. Jones*, 386 S.E.2d 120, 124 n.13 (Ga. 1989), *reinstated on remand*, 409 S.E.2d 501 (Ga. 1991)).

In determining the amount of punitive damages to award to achieve the goals of punishing Autoliv and determining future wrongdoing, the Court has taken note of Autoliv's refusal to accept *any* responsibility for Mr. Andrews' injuries and death. *See Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168, 1184

(D. Nev. 2008) (finding that defendant's refusal to accept responsibility for its own conduct because others in the industry acted the same actually "supports the need for a higher award of punitive damages to accomplish the deterrent purpose of such awards"). Autoliv's seatbelt spooled out 20 inches. Absent that much spoolout, Mr. Andrews' head would not have slammed into the steering wheel with enough force to fracture the base of his skull and to brand his face with the stippling pattern of the steering wheel hub.

Based on the evidence adduced at the bench trial, the Court imposes punitive damages against Autoliv in the amount of $_____.

## III.   CONCLUSION

The Court enters a verdict in the amount described above against Autoliv Japan, Ltd.

Respectfully submitted this 4th day of October, 2021.

BUTLER WOOTEN & PEAK LLP

*/s/ Rory A. Weeks*

JAMES E. BUTLER, JR.
  jim@butlerwooten.com
  Georgia Bar No. 099625
TEDRA L. CANNELLA
  tedra@butlerwooten.com
  Georgia Bar No. 881085
RORY A. WEEKS
  rory@butlerwooten.com
  Georgia Bar No. 113491
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax


BALLARD & FEAGLE, LLP

WILLIAM L. BALLARD
  bill@ballardandfeagle.com
  Georgia Bar No. 035625
GREGORY R. FEAGLE
  greg@ballardandfeagle.com
  Georgia Bar No. 256913
Building One, Suite 100
4200 Northside Parkway NW
Atlanta, GA 30327
(404) 873-1220

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in Book Antiqua, 13-point font.

*/s/ Rory A. Weeks*

JAMES E. BUTLER, JR.
  jim@butlerwooten.com
  Georgia Bar No. 099625
TEDRA L. CANNELLA
  tedra@butlerwooten.com
  Georgia Bar No. 881085
RORY A. WEEKS
  rory@butlerwooten.com
  Georgia Bar No. 113491
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 4, 2021, I electronically filed the foregoing

pleading with the Clerk of the Court using the CM/ECF system which will

automatically send email notification of such filing to the following attorneys of

records follows:

Douglas G. Scribner, Esq.
Jenny A. Hergenrother, Esq.
William J. Repko III, Esq.
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

This 4th day of October, 2021.

/s/ Rory A. Weeks
JAMES E. BUTLER, JR.
  jim@butlerwooten.com
  Georgia Bar No. 099625
TEDRA L. CANNELLA
  tedra@butlerwooten.com
  Georgia Bar No. 881085
RORY A. WEEKS
  rory@butlerwooten.com
  Georgia Bar No. 113491
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax