THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JAMIE LEE ANDREWS, as | * | |
| Surviving Spouse of | * | |
| MICAH LEE ANDREWS, Deceased, | * | CIVIL ACTION FILE |
| and JAMIE LEE ANDREWS, as | * | |
| Administrator of the Estate of | * | NO. 1:14-CV-03432-SCJ |
| MICAH LEE ANDREWS, Deceased, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| AUTOLIV JAPAN, LTD., | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFF'S REVISED PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

Plaintiff Jamie Andrews filed this products liability action in the State Court

of Fulton County, Georgia on September 18, 2014. Doc. No. [1-2].[2] Defendants,

including Autoliv, removed Plaintiff's lawsuit to this Court on October 24, 2014.

---

[1] Pursuant to Local Rule 16.4(B)(25), Plaintiff submitted proposed Findings of Fact and Conclusions of Law in advance of the bench trial on October 4, 2021. Doc. No. [523]. At the conclusion of the bench trial, the Court ordered that the parties submit revised proposed Findings of Fact and Conclusions of Law.

[2] All record citations (including transcripts and depositions) are to the CM/ECF electronic docket unless otherwise noted, and all page numbers are derived from the headers imprinted by the Court's docketing software. Transcripts are cited as numbered by the court reporter, using a "Tr." citation.

Docs. No. [1, 2]. At that time, this case was assigned to Judge William S. Duffey Jr. After Judge Duffey granted summary judgment in Autoliv's favor in January 2017, Plaintiff appealed. Doc. Nos. [274, 285]. On March 16, 2018, one week after oral argument, the U.S. Court of Appeals for the Eleventh Circuit reversed in substantive part the summary judgment entered in Autoliv's favor. Doc. No. [309]. On July 23, 2018, the Eleventh Circuit issued its mandate, remanding the case to this Court. Because Judge Duffey had retired from this Court on July 1, 2018, this case was reassigned to the undersigned. Doc. No. [313].

By consent of the parties, this case was tried before the Court without a jury on October 4–13, 2021. Despite having many engineers with knowledge of the subject seatbelt and despite having executives who knew about the decision to sell the subject seatbelt, Autoliv did not present the testimony of any of those engineers or executives at trial. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 10, lines 6–15, 21–24; *id.* at p. 11, line 24–p. 12, line 5. After examining the evidence, determining the credibility of the witnesses, and considering the arguments of counsel, the Court finds that Plaintiff has proved by a preponderance of the credible evidence that Micah Andrews' injuries and death on April 12, 2013, were caused by a defective seatbelt designed and manufactured by Autoliv.

Accordingly, the Court finds that Plaintiff, as the administrator of Micah Andrews' estate, is entitled to recover special damages in the amount of $19,343.40 for funeral and medical expenses[3] and general damages in the amount of $_____ for the predeath fright, shock, terror, and pain and suffering that Micah Andrews endured. In closing, Plaintiff left the amount of predeath fright, shock, terror, and pain and suffering up to the Court's enlightened conscience. In response, Autoliv did not so dispute that Mr. Andrews did not suffer predeath fright, shock, terror, and pain and suffering.

The Court finds that Plaintiff, as the surviving spouse of Micah Andrews, is entitled to recover the full value of Micah Andrews' life. The full value of Micah Andrews' life is determined from his perspective and has two components under Georgia law: an intangible component and an economic component. Based on the evidence, the Court finds that the full value of Micah Andrews' life was $25,000,000.00 (twenty-five million dollars). In closing, Plaintiff asked that the Court award full value of the life damages in an amount of not less than $25

---

[3] The parties stipulated before trial that the medical expenses arising from Mr. Andrews' collision totaled $6,750.00 and the funeral expenses for Mr. Andrews' burial totaled $12,593.40. Doc. No. [503], ¶¶ 8, 9.

million. Autoliv did not dispute, by any evidence or in argument, that the full value of Mr. Andrews' life was at least $25 million.

The Court also finds that Plaintiff has proved by clear and convincing evidence that Autoliv's conduct in designing, manufacturing, and selling the subject seatbelt showed "that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). As a result, the Court finds that punitive damages should be awarded to "punish, penalize, or deter" Autoliv, not to compensate Plaintiff. § 51-12-5.1(c). The amount of punitive damages awarded is $100,000,000.00 (one-hundred million dollars), and that amount is not limited by law because Plaintiff's cause of action is one for products liability. § 51-12-5.1(e)(1).[4] In closing, Plaintiff asked that the Court award punitive damages of not less than $100 million.

---

[4] Autoliv adduced no evidence at trial to show that any other court in Georgia (or applying Georgia law) had ever imposed punitive damages on Autoliv for its conduct related to the subject seatbelt—much less that such punitive damages have ever been "recovered" in a prior action. § 51-12-5.1(e)(1).

## I.   FINDINGS OF FACT[5]

### A.   The Court has subject matter jurisdiction.

Plaintiff Jamie Andrews is a citizen of Georgia. She is the widow of Micah Andrews who died on April 12, 2013. Mr. Andrews was a citizen of Georgia at the time of his death. Defendant Autoliv Japan, Ltd. is a subsidiary of Autoliv, Inc., wholly owned by that corporation. Autoliv, Inc. is publicly traded on the New York Stock Exchange. The principal place of business of Autoliv Japan, Ltd. is in Japan. The parties are completely diverse, and this Court has subject matter jurisdiction to hear this case under 28 U.S.C. §§ 1332(a)(2), 1441(b).[6]

### B.   Micah Andrews died in a collision on April 12, 2013.

On April 12, 2013, Micah Andrews left work at the Georgia Aquarium and headed to his home in Woodstock, Georgia. *See* Doc. No. [503], ¶ 12. He was driving his 2005 Mazda3. *Id.* His route home took him north on Interstate 575 and through Cobb County. The speed limit on I-575 North was 65 mph, Doc. No. [503],

---

[5] To the extent that these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

[6] Both this Court and the Eleventh Circuit have previously exercised subject matter jurisdiction over this case.

¶ 2, and Mr. Andrews was traveling around that speed on the four-lane divided interstate just before the fatal collision.

While traveling in the right northbound lane, Mr. Andrews came up behind a black Ford F-150. He changed lanes to pass the pickup truck. As he changed lanes back into the right lane, Mr. Andrews engaged in a "hard right-hand steer avoidance maneuver." Buchner testimony, 10/5/21 AM Trial Tr. p. 39, lines 2–4. The car left the interstate, crossed the paved shoulder, and entered the grassy shoulder. The grassy shoulder sloped away from the interstate and toward a growth of trees.

Once the car left the interstate, the grassy shoulder and its cross slope made it impossible for Mr. Andrews to return his car to the roadway. Buchner testimony, 10/5/21 AM Trial. Tr. p. 21, line 19–p. 22, line 2. Despite steering and braking to avoid a collision, Mr. Andrews' car struck three trees at about 35 mph. *See* Doc. No. [503], ¶¶ 3, 14. The impact's principal direction of force was 10–15 degrees to the left of straight ahead, roughly the 11:30 position on a clock. Doc. No. [503], ¶ 15. Although a frontal collision at that speed should have caused the driver's airbag to activate and deploy, the airbag did not deploy. The airbag had been manufactured by Autoliv and sold to Mazda for the Mazda3. Despite wearing his seatbelt properly, Doc. No. [503], ¶¶ 1, 13, Mr. Andrews' Autoliv seatbelt spooled

6

out approximately 20 inches during the collision, Doc. No. [503], ¶ 17. Mr. Andrews' face struck the steering wheel. Doc. No. [503], ¶¶ 4, 18. In fact, Mr. Andrews' face struck the steering wheel so hard and so fast that the impact caused a basilar skull fracture and permanently imprinted the steering wheel's grip pattern onto his face. *Compare* PX 3 (steering wheel photo), *with* PX 2 (medical examiner photo of Micah Andrews' face postmortem). The basilar skull fracture led to the death of Mr. Andrews at the scene. Frist testimony, 10/4/21 AM Trial Tr. p. 79, line 23–p. 80, line 1.

Mr. Andrews was 38 years old at the time of his death. Doc. No. [503], ¶ 5. Mr. Andrews had a life expectancy of 36.18 years. Doc. No. [503], ¶ 7. He is survived by his widow Jamie Andrews and their daughter S.C. Andrews, who was four years old at the time of the wreck. S.C. was 12 years old at the time of trial. Doc. No. [503], ¶ 6.

### 1.    Mr. Andrews was not at fault for his own injuries and death.

Autoliv has contended that Mr. Andrews was at fault for his own death. But what caused the wreck is not the issue in this case. The issue is the failure of the seatbelt to protect Mr. Andrews when the wreck occurred. To state the obvious: Mr. Andrews did not need a functioning seatbelt until there was a wreck. Autoliv's corporate representative David Prentkowski admitted that "this case starts when

the car hit those trees because that's when the question arises, who is at fault for the airbag not working and the seat belt not working." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 54, lines 19–23. The Court finds that wrecks are foreseeable to Autoliv, that this 35-mph wreck was foreseeable to Autoliv, and that a driver does not need a seatbelt unless there is a wreck. If a manufacturer could escape liability or diminish its own liability for the failure of a safety restraint by blaming others for the wreck that made the safety restraint necessary that would be both illogical and detrimental to automotive safety.

Furthermore, the parties agree that Mr. Andrews would have survived the wreck if his occupant restraint system had functioned properly. In other words, when Mr. Andrews' went off the road and hit three trees at 35 mph, death was not the likely result of his action. Thus, he was not the proximate cause of his own death.

For the foregoing reasons, the Court finds that what caused the wreck itself is irrelevant. However, the evidence did convincingly demonstrate that Mr. Andrews left the road because of a sudden avoidance maneuver. There is no evidence that Mr. Andrews was trying to hurt himself, nor is there any evidence

that something went wrong with the car to cause it to go off the road.[7] Mr. Andrews was awake and alert before the collision: he passed a Ford F-150 before he steered hard right and braked, and he continued to brake and steer his car after it exited the interstate and before it struck the trees.

The evidence shows it is likely that Mr. Andrews swerved to avoid a very large turtle, some three feet in length. Shortly after the wreck happened another motorist on I-575 North called 911 and explained: "So I'm on 575 North and this car was just, -- I mean, they, -- God. *It was like a box or something in the road.* I went over it, but it scared them and they just literally took their car and veered full speed ahead off the road." PX 46, Tr. p. 2, lines 11–15 (emphasis added).

The Cobb County Police Department officers who investigated the collision did not note the presence of a box at the scene, but they did confirm that a "large turtle" had been run over on the interstate and was found dead on the left shoulder of the road. Photos of the scene show that investigators thought the turtle was important enough to their analysis of what caused the collision that they marked with green paint both the turtle's final resting place and a trail of its biological

---

[7] Weather played no role in Mr. Andrews' collision. Doc. No. [503], ¶ 19. Nor did alcohol or drugs.

matter scattered along the interstate. *See* PXs 499, 526. The medical examiner's supplemental report notes that "an alligator snapping turtle was in the roadway. It appears the decedent [Mr. Andrews] may have swerved to miss the turtle." PX 214 (ANDREWS 0174).

Plaintiff's accident reconstructionist G. Bryant Buchner, a professional engineer, inspected the collision location and analyzed the police photos of the scene, including those marking the final resting place of the turtle and the trail of turtle parts across the road. Mr. Buchner concluded that the start of the turtle's biological matter (i.e., where the turtle was run over) was near where Mr. Andrews steered hard right in an avoidance maneuver. Mr. Buchner's reconstruction diagram shows exactly that. Considering all the physical evidence, Mr. Buchner opined that the turtle's presence on the road "just in front of the car when the swerve began" was "probably" related to Mr. Andrews' decision to hard steer to the right and brake in an avoidance maneuver. Buchner testimony, 10/5/21 AM, Trial Tr. p. 39, lines 6–14.[8] Mr. Buchner's opinion about the turtle's role in the

---

[8] Although the Cobb County Police Department Selective Traffic Enforcement Program ("STEP") investigators said they believed that turtle was unrelated to the collision, they did not do the same detailed investigation that Mr. Buchner did.

conclusion was asserted to "a reasonable degree of scientific certainty." Buchner

testimony, 10/5/21 AM Trial Tr. p. 49, line 20–p. 50, line 4.

Autoliv elected not to present at trial any reconstruction engineer like Mr.

Buchner. Instead, Autoliv called to testify a former Cobb County Police Officer,

William Rogers. The Court finds that Mr. Rogers' testimony was just not credible.

Among other things, he denied that the speed of the car on impact with the trees

was 35 mph—which is something Autoliv had stipulated to as fact prior to trial.

Doc. No. [503]. Mr. Rogers also denied that Mr. Andrews had braked or steered

after leaving the road. Mr. Rogers had no explanation for how the car could go

from interstate highway speeds down a steep incline and hit the trees at only 35

mph without braking and steering—which is a logical impossibility. Mr. Rogers'

opinions were not based on any sort of forensic analysis of the scene or even

consideration of all the evidence.

### 2. Mr. Andrews was alive and conscious for more than four minutes after the collision.

William Kemp was driving the black F-150 pickup truck that Mr. Andrews

passed just before he swerved to the right and braked in an avoidance maneuver.

Mr. Kemp saw Mr. Andrews' car leave the road. Concerned, Mr. Kemp pulled

over to check on the driver. When he got to the wrecked car, Mr. Andrews was

sitting in the driver's seat with his seatbelt still on, but the seatbelt had spooled out

so much that Mr. Andrews' head and body were draped over the center console and into the passenger seat. Mr. Andrews' head was dripping blood, which had filled the cup holders in the center console.

Mr. Kemp vividly remembered what happened next. He described Mr. Andrews trying to respond to a question from Mr. Kemp by groaning and trying to raise his body. Mr. Kemp's own words best describe what happened:

> **Q.** Mr. Kemp, when you opened the door, what did you see?
>
> **A.** I saw a man bleeding from his head leaning over across the center console, head over the passenger seat bleeding badly.
>
> **Q.** And so his butt was in the driver's seat; correct?
>
> **A.** That is correct.
>
> **Q.** And can you show us how he was positioned in the driver seat?
>
> **A.** Yes. (Witness indicates.)
>
> **Q.** So his head was actually leaned over into the passenger seat?
>
> **A.** That's correct.
>
> **Q.** And what did -- did you say anything to Mr. Andrews?
>
> **A.** At first I asked if he was okay, and then he kind of tried to raise up and he got out, like, a groan. And I told him not to speak, not to move, that help was on the way.

Kemp testimony, 10/4/21 AM Trial Tr. p. 65, lines 13–25. That interaction with Mr. Andrews, which Mr. Kemp vividly recalled, occurred *after* Mr. Kemp pulled

his pickup truck off the road, spent four minutes and twelve seconds on the phone with the 911 dispatcher, and had run to Mr. Andrews' car. PX 45; Kemp testimony, 10/4/21 AM Trial Tr. p. 65, lines 3–5. Dr. Brian Frist, the former medical examiner of Cobb County, an independent pathologist who completed more than 10,000 autopsies and post-mortem examinations in his career, gave unrebutted testimony that Mr. Kemp's description of his interaction with Mr. Andrews was consistent with Mr. Andrews being conscious. Frist testimony, 10/4/21 AM Trial Tr. p. 84, line 21–p. 85, line 10. The evidence thus shows that Mr. Andrews was alive and conscious from the time of the collision until after Mr. Kemp pulled off the road and stopped his car, finished his 911 call, and then went to Mr. Andrews' car.

After Mr. Kemp saw Mr. Andrews' response, Officer Aaron Porter arrived at the scene. At that time, Officer Porter had been with the Cobb County Police Department for over seven years. Before joining the Cobb County Police Department, he was a corporal in the Marine Corps for four years and served two tours of duty overseas, including in Operation Iraqi Freedom. He testified that between his combat and law enforcement experience, he has witnessed roughly 50 people die before Mr. Andrews. When he arrived at the scene, it took Officer Porter about 30 seconds to get to the car. After he reached the car, Officer Porter observed Mr. Andrews take his last two breaths, which Officer Porter described as

13

"breathing agonally." Porter testimony, 10/4/21 PM Trial Tr. p. 89, lines 2–15. Officer Porter testified that he was the last person to see Mr. Andrews alive. *Id.* at p. 99, lines 16–18.

### C.   The occupant restraint system in Mr. Andrews' car was defective.

Mr. Andrews' 2005 Mazda3 had a defective occupant restraint system. A car's occupant restraint system has two principal parts: seatbelts and airbags. Both the airbag system and the driver's seatbelt in Mr. Andrews' car were defective.

The seatbelt of an automobile is indisputably the primary safety restraint system. Autoliv's own documents prove that fact, and Autoliv's hired seatbelt expert William Van Arsdell, Ph.D., admitted that fact. Van Arsdell testimony, 10/12/21 AM Trial Tr. p. 113, lines 1–3. Oddly, both Autoliv engineers who testified at trial—corporate representative David Prentkowski and seatbelt engineer Yuji Kamei—refused to admit that the seatbelt was the primary safety device in the car. By law and in fact, an airbag is, and must be labeled as, a "supplemental restraint system." Autoliv labels the airbags as such. That means "supplemental" to the seatbelt.

In this wreck the airbag failed to deploy. That airbag was designed, manufactured, and sold by Autoliv. However, the airbag sensor system that directs the airbag to deploy was not designed and manufactured by Autoliv. The

sensor system failed to send a signal to the airbag to deploy. That airbags sometimes do not deploy was indisputably known to, and foreseen by, Autoliv — as Autoliv's corporate representative Mr. Prentkowski admitted. *See* Prentkowski testimony, 10/7/21 PM Trial Tr. p. 52, lines 15–17 ("Q. Isn't it true that it was foreseeable to Autoliv that this airbag might not deploy. A. Yes."). Airbags can fail in many situations, all of which were foreseeable to Autoliv, a manufacturer of airbags. Caruso testimony, 10/6/21 AM Trial Tr. p. 34, lines 6–14.

Despite the fact deployment of the Autoliv- manufactured airbag was entirely dependent upon a functioning sensor system to signal the airbag to deploy, Autoliv's corporate representative admitted that Autoliv had "no clue what kind of sensor, what kind of sensor connector, what kind of wires were going to be put into the car." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 77, lines 16–20.

It was foreseeable to Autoliv that if the Autoliv airbag in Mr. Andrews' Mazda3 did not deploy in this wreck the Autoliv seatbelt would fail to keep Mr. Andrews' head from striking the steering wheel. Autoliv's corporate representative admitted that not only was the seatbelt manufactured and designed so that it was capable of spooling out 20 inches but also that Autoliv knew that the seatbelt was going to spool out 20 inches if deployment of the airbag did not stop

15

the spool out. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 21, lines 11–19; p. 22, lines 12–14.

For the driver of a car, the primary duty of a seatbelt is to keep the driver's head from hitting the steering wheel. *See* Meyer testimony, 10/6/21 PM Trial Tr. p. 48, lines 19–22 ("Q. What is the whole job of the seatbelt?" A. The seatbelt is to prevent the occupant from slamming into interior components like the steering wheel so hard that it creates a permanent or a fatal injury.").

But Autoliv's corporate representative admitted that Mr. Andrews' seatbelt "failed" and did not provide "sufficient restraint." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 51, line 23–p. 52, line 3; Prentkowski testimony, 10/4/21 PM Trial Tr. p. 41, line 25–p. 42, line 5. Autoliv's corporate representative admitted that Mr. Andrews' seatbelt was "useless" to Mr. Andrews. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 16, lines 8–15.

Autoliv's corporate representative admitted that Autoliv did nothing to warn Mazda, or any consumers, that if the airbag failed to deploy the driver would be effectively unrestrained and his head could strike the steering wheel with fatal force. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 32, lines 3-16; 10/7/21 PM Trial Tr. p. 56, lines 7–9.

Despite Autoliv's knowledge that airbags sometimes do not deploy in frontal collisions, and despite Autoliv's knowledge that it had done nothing to make sure the airbag would deploy, Autoliv did not sell a seatbelt that would keep the driver's head from hitting the steering wheel with fatal force in a foreseeable collision.

Autoliv knew how to design and build a safer seatbelt that would not spool out as much as this seatbelt did. In fact, Autoliv admits that before it sold the subject seatbelt to Mazda it had already designed and manufactured another seatbelt that would not allow so much spoolout.[9]

### 1.   The airbag system in Mr. Andrews' car was defective.

The Autoliv airbag in Mr. Andrews' car did not deploy in the April 12, 2013 collision.

The airbag system in Mr. Andrews' car was complex and comprised many different products including (1) the airbag itself located in the steering wheel; (2)

---

[9] Doc. No. [503], ¶ 26 ("At the time Autoliv sold Mazda the seatbelt in Mr. Andrews' car, Autoliv had manufactured another seatbelt retractor with a load limiting threshold higher than the one in Mr. Andrews' seatbelt."), ¶ 29 ("The seatbelt assembly that Autoliv supplied to Volvo for the driver's seat of the 2004 through 2009 model year Volvo S40 had a torsion bar with a deployment threshold of 6.0 kilonewtons.").

the car's computer diagnostic unit located under the car's center console, which Mazda calls the "supplemental airbag system" or "SAS" unit; (3) the upfront sensor ("UFS," also known as the electronic front sensor ("EFS")), a single sensor located behind the car's front grill that is supposed to detect a frontal impact and send a deploy/no deploy signal to the SAS; (4) the wiring running from the SAS to the UFS and from the SAS to the airbag module and pretensioners; (5) sensors for the driver seat track position, seatbelt buckles, and passenger seat weight; and (6) warning lamps. *See* Caruso testimony, 10/6/21 AM Trial Tr. p. 34, line 17–p. 35, line 23.

The airbag system in Mr. Andrews' car was defective. The sensor behind the car's front grill was supposed to transmit information about the collision's severity to the car's diagnostic computer. It did not do so because the sensor's connector became disconnected before the collision information was sent. Caruso testimony, 10/6/21 AM Trial Tr. p. 44, lines 18–24. That in turn meant the diagnostic computer did not send a signal to the driver's airbag to deploy. *Id.*

The parties agree that Mazda Motor Corporation and Mazda Motor of America, Inc. (collectively, "Mazda") were responsible for the sensor system, though the parties dispute how much fault Mazda should bear. Mazda settled with Plaintiff in June 2016 and thus took no part in the bench trial.

That airbags fail is well known to companies like Autoliv that work in the automotive industry. Caruso testimony, 10/6/21 AM Trial Tr. p. 34, lines 6–14. Autoliv itself makes, tests, and sells airbag components. Airbags are complicated—involving various sensors, an onboard computer, and firing mechanisms. Autoliv knew that airbags could fail in a 35-mph frontal collision like this one. Prentkowski testimony, 10/7/21 PM Trial Tr. p. 52, lines 15–17. Those in the automotive industry know that the airbag will not deploy in every collision, so the seatbelt must work properly and provide protection whether the airbag deploys or not.[10]

Mr. Andrews' collision was one in which the airbag did not deploy. Mr. Andrews' collision illustrates the importance of having a seatbelt that works. Yet the Autoliv seatbelt did not do its most basic job. Meyer testimony, 10/6/21 PM Trial Tr. p. 48, lines 19–22 ("Q. What is the whole job of the seatbelt?" A. The seatbelt is to prevent the occupant from slamming into interior components like

---

[10] Plaintiff's airbag expert Chris Caruso, who Autoliv also designated as an expert who might testify and of whom Autoliv took a trial deposition in April 2019, testified that many things could go wrong and cause an airbag not to deploy. If that happens, Mr. Caruso testified that it is "absolutely vital that the seat belt provide some restraint and important occupant protection to the people" in the car. Caruso testimony, 10/6/21 AM Trial Tr. p. 44, line 25–p. 45, line 10.

the steering wheel so hard that it creates a permanent or a fatal injury."). The Autoliv seatbelt was so weak that, as Plaintiff's seatbelt expert Mr. Meyer testified and as Autoliv's own corporate representative admitted, Mr. Andrews was "effectively unrestrained" in this frontal crash. Meyer testimony, 10/6/21 PM Trial Tr. p. 63, line 20–p. 64, line 2; Prentkowski testimony, 10/4/21 PM Trial Tr. p. 16, lines 8-10. The Autoliv seatbelt was useless to Mr. Andrews because it was defective.

### 2.   The seatbelt in Mr. Andrews' car was defectively designed.

### i.   Autoliv designed and manufactured the seatbelt.

Autoliv, its parent company Autoliv, Inc., and its sibling companies (almost all of which, like Autoliv, are wholly owned subsidiaries of Autoliv, Inc.) are in the business of designing, manufacturing, and selling seatbelts, airbags, and other automotive safety equipment. *See* PX 1138 at 3-5 (Autoliv 2020 Annual Report stating that Autoliv is "The World's Largest Automotive Safety Supplier"); PX 1138 SEC 10-K Filing at 3 (stating that "Autoliv is a leading developer, manufacturer and supplier of safety systems to the automotive industry with a broad range of product offerings, primarily passive restraint systems"[11]); *see also*

---

[11] As used by Autoliv in PX 1138 at 3, "[p]assive safety systems include modules

Doc. No. [503], ¶ 11 ("The defendant in this case, Autoliv, is a manufacturer of components used in cars made by many automakers."). Autoliv sells its products to all major car manufacturers. PX 1138 at 5.

For the years 2003–2020, Autoliv, Inc. had revenues from selling seatbelts that totaled over $45 billion.[12] Those revenues were generated through the business of its subsidiaries. PX 1139 at 59.

The seatbelt[13] at issue has several parts, but its basic design is denoted by the graphic below:

---

and components for frontal-impact airbag protection systems, side-impact protection systems, seatbelts, steering wheels, inflator technologies, battery cable cutters and protection systems for vulnerable road users such as pedestrians and cyclists."

[12] PX 189A at 53; PX 190A at 57; PX 191A at 63; PX 192A at 65; PX 193A at 69; PX 194A at 71; PX 195A at 75; PX 196A at 85; PX 197A at 85; PX 198A at 89; PX 199A at 89; PX 200A at 89; PX 201A at 93; PX 202A at 93; PX 203A SEC 10-K Filing at 54; PX 1128A SEC 10-K Filing at 28; PX 1129A SEC 10-K Filing at 29; PX 1138A at 39.

[13] To describe the safety device that Autoliv made and which Mr. Andrews was using to secure himself into the driver's seat, Autoliv repeatedly used the phrase "seatbelt assembly" whereas Plaintiff used the word "seatbelt." Not only does Plaintiff's description align with common usage, but the word "seatbelt" is also consistent with the federal regulation's definition of "seat belts." As used in the federal regulations, the term "seat belts" "includes the webbing, buckle, anchorage, retractor, belt pretensioner devices, load limiters, and all components, hardware and software associated with an automatic or manual seat belt system addressed by FMVSS No. 209 or 210." 49 C.F.R. § 579.4(c). The Court, accordingly, uses the word "seatbelt" to describe the safety device at issue.

**SEATBELT ASSEMBLY SCHEMATIC**



PX 1059. Autoliv's corporate representative David Prentkowski admitted that this graphic is "accurate." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 73, lines 2–4. Mr. Prentkowski also admitted that the retractor is the "heart" of the seatbelt in that it is the part responsible for the webbing's spoolout. *Id.* at p. 74, lines 10–18.

The undisputed evidence shows that Autoliv designed the R27LL retractor and the ultra-weak torsion bar for the seatbelt. Doc. No. [503], ¶ 28. Those were the specific components that caused Mr. Andrews' seatbelt to spool out 20 inches in the collision. The undisputed evidence proved that design of those components was completed five or six months before Autoliv was asked by Mazda to begin

22

any work on the type of car Mr. Andrews was driving, known internally at Mazda as the J48C[14]. *Compare* PX 74 (design document for R27LL retractor showing "Completion date: 14/06/1999"), *and* PX 7 (torsion bar design drawing showing that first iteration of the torsion bar's design drawing created in February 1998), *with* PX 40 (J48C development scheduling showing "Platform Kick-off" in November or December 1999); *see also* Prentkowski testimony, 10/7/21 PM Trial Tr. p. 72, lines 19–22 (admitting that the R27LL retractor's design was completed at least five months before Mazda asked Autoliv to do any work for the Mazda3).

The Autoliv seatbelt spooled out 20 inches because of the torsion bar in the seatbelt's retractor.[15] *See* Prentkowski testimony, 10/7/21 PM Trial Tr. p. 74, lines 16–18. Torsion bars are a type of load limiter and are intended to avoid belt-induced injuries, like broken ribs. *See* Doc. No. [503], ¶ 22. Load limiters come in a variety of designs, though torsion bars are the most common type. The load limiter in the Autoliv seatbelt was a torsion bar, a metal bar around which the seatbelt

---

[14] The parties stipulated that J48C was the internal designation code for the 2004 through 2005 Mazda3. Doc. No. [503], ¶ 10. The parties also stipulated that J48L was the internal designation code for the 2007 through 2009 Mazda3. *Id.* at ¶ 31.

[15] The seatbelt retractor holds the unused seatbelt webbing and contains the locking mechanism that prevents spool out in an emergency stop. Doc. No. [503], ¶ 20; Doc. No. [237], Tr. p. 86, lines 16–18, pp. 134, line 12–135, line 5.

webbing is wrapped. Doc. No. [503], ¶ 23. In a wreck, the torsion bar twists and allows seatbelt webbing to spool out. Doc. No. [503], ¶ 21. How easily a torsion bar twists and allows webbing to spool out depends on its deployment threshold (i.e., strength). Doc. No. [503], ¶ 25.

The Autoliv seatbelt in Mr. Andrews' car had a torsion bar with a "lower-than-low" deployment threshold (2.0 kN) and no "stop" limiting the amount of webbing that could spool out in a wreck. PXs 20 & 74; Doc. No. [503], ¶ 27; Prentkowski testimony, 10/7/21 PM Trial Tr. p. 75, lines 8–20 (admitting that 2.0 kN torsion bar in Mr. Andrews' car was "lower than low" compared to the R27LL retractor sheet stating that low was "2,5"[16]). Plaintiff's seatbelt expert Mr. Meyer testified that the resistance provided by the torsion bar left Mr. Andrews "effectively unrestrained." Because the threshold was so low, the seatbelt "didn't provide any meaningful restraint" and even though it spooled out so far, "it wasn't

---

[16] At trial, Autoliv's counsel implied that the text "2,5" in PX 74 did not mean "2.5." Autoliv's corporate representative subsequently agreed that to suggest that "2,5" did not mean "2.5" was "inaccurate" and "misleading." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 75, line 21–p. 76, line 16. That was hardly the only "incorrect" and "misleading" thing that Autoliv's counsel did during trial. Other obvious examples include *twice* quoting the prior testimony of Plaintiff's experts so selectively as to be extremely misleading. Caruso testimony, 10/6/21 AM Trial Tr. p. 131, line 17–p. 133, line 18; Ziejewski testimony, 10/5/21 PM Trial Tr. p. 124, line 11–p. 126, line 13; PX 1159.

the seatbelt that stopped him, it was the steering wheel and the dashboard." Meyer testimony, 10/6/21 PM Trial Tr. p. 63, line 20–p. 64, line 2. The load-limiting torsion bar in the Autoliv seatbelt was so weak that it allowed 20 inches of belt to come off the retractor. The seatbelt essentially did not slow Mr. Andrews down at all, and he struck the steering wheel with enough velocity to collapse the steering wheel column 2 to 3 inches and fatally fracture his skull. This Autoliv seatbelt did not meet the basic purpose of a seatbelt; it was, as admitted by Autoliv's own corporate representative, "useless" to Mr. Andrews.

In Mr. Andrews' April 12, 2013 collision, the Autoliv seatbelt spooled out nearly 20 inches of webbing—not because of product misuse or unforeseen circumstances but because of the way it was designed and manufactured.

Twenty inches of spoolout is a staggering amount. The photos below show just how dramatic 20 inches of spoolout is.



PXs 209, 894.

Seatbelt manufacturers such as Autoliv know that 35-mph frontal collisions into fixed objects, like Mr. Andrews' collision, happen in the real world. Mr. Andrews' collision was not only foreseeable; it was actually foreseen by Autoliv. Meyer testimony, 10/6/21 PM Trial Tr. p. 50, line 25–p. 51, line 2. A 35-mph frontal crash test is done to assess the performance of occupant restraints in the U.S. government's New Car Assessment Program ("NCAP"). *Id.* at 29, line 20– p. 11. The seatbelt Autoliv designed, manufactured, and sold for use in Mazda3 cars like Mr. Andrews' car underwent the NCAP test. In that crash test, the Autoliv seatbelt spooled out 16.85 inches—nearly twice as much as any other car in the same class of cars as the Mazda3. *See* PX 9. The undisputed evidence shows that in terms of providing restraint and preventing an occupant's forward movement toward structures inside the car, the Autoliv seatbelt in Mr. Andrews' car was by far the worst—an extreme outlier. *See* Meyer testimony, 10/6/21 PM Trial Tr. p. 43, line 17–p. 45, line 15. Plaintiff's seatbelt expert Steven Meyer testified that this was the weakest and worst performing seatbelt he had ever seen in his 30 years investigating car crashes. The parties agreed that there is a trade-off in designing seatbelts: a stronger seatbelt makes it less likely the driver will impact the steering wheel, but more likely he will incur injuries like rib fractures. No other

manufacturer chose a design that favored such significant impact with the steering wheel over chest injuries.

Seatbelts are supposed to be designed to protect occupants in frontal collisions like Mr. Andrews' collision on April 12, 2013. Mr. Andrews should have survived the collision. But he did not—despite wearing his Autoliv seatbelt properly. Had the Autoliv seatbelt done what seatbelts are supposed to do and restrained him in this foreseeable collision, Mr. Andrews would be alive. As the designer and manufacturer of Mr. Andrews' seatbelt, Autoliv is responsible for the defects in the seatbelt.

### ii.   Autoliv could have limited the amount of spoolout by using one of three alternative designs.

According to Plaintiff's seatbelt expert Mr. Meyer, there are alternative designs that would prevent a seatbelt from spooling out 20 inches in a 35-mph crash. After all, *every other car* in the Mazda3's class had a seatbelt design that prevented that much spoolout. Autoliv actually had available at least three alternative, feasible seatbelt designs that would keep occupants from slamming into the structures inside the car.

*First*, Autoliv could have increased the strength of the load limiter, making it harder for the seatbelt to spoolout 20 inches. In fact, at the time Autoliv sold the subject seatbelt to Mazda Autoliv had already designed and manufactured a

seatbelt with a torsion bar nearly twice as strong as the one in the 2005 Mazda3. *See* Doc. No. [503], ¶ 26 ("At the time Autoliv sold Mazda the seatbelt in Mr. Andrews's car, Autoliv had manufactured another seatbelt retractor with a load limiting threshold higher than the one in Mr. Andrews' seatbelt."). In fact, Autoliv's corporate representative David Prentkowski testified that Autoliv started selling Mazda such a seatbelt just months after Micah Andrews' car was manufactured.[17]

*Second*, Autoliv could have used an even better seatbelt. Autoliv provided the seatbelt for the Volvo S40, a car built on the same platform as the 2005 Mazda3. [18] The Autoliv seatbelt in the Volvo S40 used a 6.0 kN deployment threshold, three times as strong as the Mazda3's seatbelt. Doc. No. [503], ¶ 29. This is a significant difference because all else being equal, a higher deployment level or a stronger torsion bar results in less spoolout. Meyer testimony, 10/6/21 PM Trial Tr. p. 37,

---

[17] Doc. No. [237], Tr. p. 117, lines 5–12.

[18] "*Platform* means the basic structure of a vehicle including, but not limited to, the majority of the floorpan or undercarriage, and elements of the engine compartment. The term includes a structure that a manufacturer designates as a platform. A group of vehicles sharing a common structure or chassis shall be considered to have a common platform regardless of whether such vehicles are of the same type, are of the same make, or are sold by the same manufacturer." 49 C.F.R. § 579.4.

lines 19–22, p. 63, lines 18–19. In NCAP tests, the Volvo S40 had 10 inches fewer of spoolout than the Mazda3. PX 9.

*Third*, Autoliv could have put a stop on the load limiter to limit the amount of belt that could spool out. When the 2005 Mazda3 was designed and manufactured, Autoliv actually had available a seatbelt retractor that included a stop, which would limit the amount of belt webbing that could spool out in a wreck. Meyer testimony, 10/6/21 PM Trial Tr. p. 73, line 13-p. 74, line 4.

All these alternative designs were safer and would have prevented or mitigated Mr. Andrews' interaction with the steering wheel. Ziejewski testimony, 10/5/21 PM Trial Tr. p. 116, line 1–p. 117, line 2. Autoliv presented no witness to dispute the testimony that all these alternative designs were safer. Despite the undisputed existence of safe, alternative designs, including designs that Autoliv actually manufactured and offered for sale, Autoliv sold to Mazda for the 2005 Mazda3 an unsafe and defective seatbelt.

### D.   Autoliv knew about the defects in its seatbelt years before Mr. Andrews' death but did nothing to prevent it.

Mr. Andrews did not know that Autoliv had intentionally designed and manufactured his seatbelt so that it would spool out 20 inches in a 35-mph frontal collision. But Autoliv did know that—years before Mr. Andrews' collision.

Autoliv's role was not limited to designing and manufacturing the seatbelt. Autoliv was obligated to work directly with Mazda to address defects in the seatbelt, like the excessive spoolout problem with Mr. Andrews's seatbelt. PX 11 at 1; Caruso testimony, 10/6/21 AM Trial Tr. p. 62, line 2–p. 65, line 7. But that defect was never fixed.

Autoliv also had the authority and duty to propose design changes and improvements to the seatbelt and seatbelt technology in Mr. Andrews' car. Autoliv made several design change suggestions to Mazda, and each time Mazda accepted the change. One of Autoliv's design change suggestions involved changing the torsion bar in the seatbelt from a digressive load limiter to a regular load limiter — a change that *reduced* the strength of the torsion bar. PXs 372, 49 (AUTOLIV01051); Meyer testimony, 10/6/21 PM Trial Tr. p. 84, line 22–p. 88, line 10.

At trial Autoliv presented no evidence that it ever proposed changes to the seatbelt that would make it safer. Nor did Autoliv offer any evidence that it ever advised Mazda to use a safer seatbelt to protect people. Autoliv's attitude is best summed up by the testimony of its corporate representative: "Mazda was not concerned, so we [Autoliv] weren't concerned." Prentkowski testimony, 10/4/21 PM Trial Tr. p. 33, line 5.

Autoliv was responsible for reviewing and studying the data from sled

testing done by Mazda.  In January 2002, a Mazda employee wrote to Autoliv that he had analyzed the computer modeling of the crash performance of the Mazda3 in an offset deformable barrier test. That modeling evaluated the very seatbelt Autoliv sold Mazda for use in Mr. Andrews' car. Autoliv thus knew then—in January 2002—that *the dummy's head was slamming into the steering wheel*. Mazda asked Autoliv for help coming up with a solution. PX 128. Autoliv presented no evidence that it ever provided any such help.

Later in 2002, Autoliv had internal discussions about the fact that the restraint system in the Mazda3 was not meeting its crash test performance targets. Autoliv knew that Mazda needed to make changes to the seatbelt and listed several options, including a stronger torsion bar. PX 126. Autoliv presented no evidence that it ever advised Mazda to make such changes.

In May 2003, months before Autoliv began full-scale production of the seatbelt it sold to Mazda for the 2005 Mazda3, Autoliv performed sled testing.[19] That sled testing simulated a frontal collision at 31 mph in which an airbag did not deploy. In Autoliv's two sled tests using a seatbelt like the one in Mr. Andrews'

---

[19] Sled testing is performed by mounting part of the car's interior (usually the seat and the seatbelt system) on a "sled," accelerating it, and then stopping it to recreate the forces in a frontal collision.

car, the dummy experienced 15.2 and 15.4 inches of chest movement in a 31-mph frontal collision. PX 83 (AUTOLIV00016). Autoliv therefore knew, before it sold that seatbelt to Mazda, that the seatbelt would spoolout excessively in a frontal collision when the airbag failed to deploy and to stop the spoolout. Autoliv knew that before Mr. Andrews' Mazda3 car was even built, and ***ten years before*** that seatbelt failed to protect Mr. Andrews in the April 12, 2013 collision.

Despite knowing that the seatbelt allowed a dangerous amount of spoolout and would not restrain people in foreseeable collisions, Autoliv did nothing to improve the seatbelt's performance. Nor did Autoliv ever tell Mazda that it should buy a different, better seatbelt. Autoliv admitted it did not have to sell the seatbelt to Mazda, Prentkowski testimony, 10/7/21 Trial Tr. p. 46, line 24–p. 47, line 1, yet it sold the seatbelt knowing it was defective.

Autoliv knew that the seatbelt's spoolout problem needed to be, and should be, fixed. Shortly after Mr. Andrews' 2005 Mazda3 was manufactured, Autoliv designed and sold Mazda a seatbelt with a much stronger torsion bar that would prevent so much dangerous spoolout. PX 35 (3.5 ± 0.9 kN torsion bar specification). That was ***eight years before*** Mr. Andrews died because the Autoliv seatbelt failed to protect him.

32

To recap, here is the chronology of events.

| | |
|---|---|
| August 1997 | Autoliv GmbH completes initial drawing of torsion bar *later used* in the 2005 Mazda3 seatbelt.[20] |
| June 1999 | "Autoliv" completes the design of the R27LL retractor, which is the "heart" of the 2005 Mazda3 seatbelt.[21] |
| December 1999 | Mazda kicks off development of the Mazda3 platform.[22] |
| December 2001 | Autoliv sends Mazda a VA/VE suggestion to change from a digressive load limiter to a regular load limiter. This change made the seatbelt weaker and less safe. Autoliv's corporate representative testified that VA/VE suggestions were only about saving money.[23] |
| January 2002 | Mazda sends email to Autoliv notifying Autoliv about dummy heads bottoming on the steering wheel and asking Autoliv for assistance with the problem.[24] Autoliv presented no evidence that it ever offered any assistance or advice. |
| November 2002 | Autoliv document from a business team update show that Autoliv knew Mazda was having trouble making its NCAP targets based on its testing.[25] |

---

[20] PX 7.

[21] PX 74; Prentkowski testimony, 10/7/21 Trial Tr. p. 74, lines 10–15.

[22] PX 40.

[23] PXs 372, 49; Meyer testimony, 10/6/21 PM Trial Tr. p. 84, line 22–p. 88, line 10; Prentkowski testimony, 10/7/21 Trial Tr. p. 34, lines 3–11.

[24] PX 128.

[25] PX 126.

| | |
|---|---|
| May 2003 | Autoliv runs a sled test on the seatbelt in the 2005 Mazda3; no airbag is included in this sled test. The test shows that seatbelt allowed the dummy's chest to move forward 15.4 inches.[26] |
| December 2003 | The NCAP test shows that the Autoliv seatbelt in the driver's side spooled out 16.85 inches while the passenger side spooled out 22.4 inches.[27] That amount is twice as much as the other cars in the Mazda3's class.[28] |
| | This test also shows that the driver's seatbelt spooled out farther then the distance between the dummy's chest and the steering wheel (13.0 inches vs. 16.85 inches).[29] |
| | This test also shows that the passenger seatbelt spooled out farther than the distance between the dummy's chest and the dashboard on the passenger side (21.9 inches vs. 22.4 inches).[30] |
| November 2004 | Autoliv files a business trip report that says the driver's side airbag still has a tendency for bottoming, meaning that bottoming was still a problem.[31] |
| January 2005 | The driver's seatbelt specification for the 2006 Mazda3 was changed to include a stronger 3.5 kN torsion bar. |

Autoliv knew that the occupant restraint system was not keeping the heads of dummies off the steering wheel *years before* Mr. Andrews' 2005 Mazda3 was made. Autoliv did absolutely nothing during this period to get Mazda to purchase

---

[26] PX 15; Ziejewski testimony, 10/5/21 PM Trial Tr. p. 33, line 12–p. 35, line 25.

[27] PX 160.

[28] PX 9.

[29] Meyer testimony, 10/6/21 PM Trial Tr. p. 73, line 15–p. 74, line 7.

[30] Meyer testimony, 10/6/21 PM Trial Tr. p. 74, line 8–p. 75, line 11.

[31] PX 151.

a stronger seatbelt that would provide restraint in the event that an airbag failed to deploy.

Plaintiff's expert witness Mr. Caruso explained that automotive suppliers have a duty of "due care."[32] Under this duty, manufacturers of automotive component parts should not design their products to simply satisfy the federal regulations but rather should make sure that their products, and the systems those products are used in, are designed to work for foreseeable real-world collisions. Caruso testimony, 10/6/21 AM Trial Tr. p. 26, line 23–p. 27, line 9. Mr. Caruso testified that manufacturers must make sure that their products work in the real world and not just on the required tests. *Id.* at p. 31, lines 15–18.

Due care, Mr. Caruso explained, requires suppliers to share their superior knowledge about their products and how they perform with the automaker with the goal of getting the system to work right in the real world. *Id.* at p. 48, line 19– p. 49, line 9. Due care also means not only speaking up and letting the automaker know that the supplier is concerned about a problem but also proposing a solution.

---

[32] Autoliv virtually adopted Mr. Caruso as its own expert witness. "[w]e wanted to bring you Chris Caruso's testimony." 10/4/21 AM Trial Tr. p. 37, line 23 (Autoliv Opening Statement). "Mr. Caruso is highly qualified, no doubt about it . . ." Id. at p. 38, lines 12-13.

*Id.* at p. 54, lines 9–10 ("Due care means I'm going to let you [the automaker] know that I'm concerned and let's talk about a possible resolution.").

Mr. Caruso testified that Autoliv did not meet its duty of due care after learning that dummy's heads were bottoming on the steering wheel in crash tests and simulations, based on the records produced. Autoliv did not share its expertise about how to solve the bottoming problem with Mazda in any document produced at trial. Autoliv also did not raise a "red flag" about the bottoming problem with Mazda based on the documents produced at trial. Caruso testimony, 10/6/21 AM Trial Tr. p. 78, line 22–p. 79, line 22. Autoliv produced no evidence at trial that contradicted Mr. Caruso's testimony.

Autoliv not only breached its duty of due care, but it also never warned anyone about the dangers of the seatbelt, despite being fully aware of those dangers. Autoliv did not warn people, including Mr. Andrews, that the Autoliv seatbelt would not protect them in a totally foreseeable frontal collision. Years later, the defective seatbelt caused Mr. Andrews' death.

## II.   CONCLUSIONS OF LAW[33]

### A.   Autoliv is liable for Micah Andrews' injuries and wrongful death.

To prevail on a claim for strict products liability under O.C.G.A. § 51-1-11(b), Plaintiff had to prove that

(1)   Autoliv manufactured the seatbelt in her husband's 2005 Mazda3;

(2)   when sold, the Autoliv seatbelt was not merchantable and reasonably suited for its intended use (i.e., the Autoliv seatbelt was defective); and

(3)   the Autoliv seatbelt was a proximate cause of Mr. Andrews' wrongful death.

*See id.*; *Chi. Hardware & Fixture Co. v. Letterman*, 510 S.E.2d 875, 877-78 (Ga. Ct. App. 1999). Plaintiff proved each of these elements; thus, Autoliv is liable for Mr. Andrews' injuries and death.

### 1.   Autoliv is the manufacturer of the seatbelt under Georgia law.

Georgia's strict products liability statute, O.C.G.A. § 51-1-11, was enacted in 1968.[34] The statute "imposes strict liability for defective products"; a product is

---

[33] To the extent that these Conclusions of Law constitute Findings of Fact, they are hereby adopted as both.

[34] *See* "Liability of Manufacturers and Sellers of Personal Property to Users," 1968 Ga. Laws 1166 (then-codified at O.C.G.A. § 105-106).

"defective" when it is "not merchantable and reasonably suited to the use intended." *Ctr. Chem. Co. v. Parzini*, 218 S.E.2d 580, 582 (Ga. 1975). A product can be defective because of problems with its manufacturing *or* design *or* warnings. *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 672 (Ga. 1994).

The Georgia strict liability statute "is in derogation of common law" and thus "must be strictly construed or limited strictly to the meaning of the language employed and not extended beyond [its] plain and explicit terms." *Daniel v. Am. Optical Corp.*, 304 S.E.2d 383, 385 (Ga. 1983); *Ford Motor Co. v. Carter*, 238 S.E.2d 361, 365 (Ga. 1977). That statute does not define *manufacturer*, so that term is given its plain meaning. *See Hartford Fire Ins. Co. v. iFreedom Direct Corp.*, 718 S.E.2d 103, 106 (Ga. Ct. App. 2011) (interpreting statute in derogation of common law by "the plain meaning of the language employed in the statute"); *see generally* O.C.G.A. § 1-3-1(b).

Manufacturing and designing seatbelts is Autoliv's business: it is the world's leading developer, manufacturer, and supplier of such products.[35] Globally, Autoliv has a seatbelt market share of 44 percent.[36] At trial, it was

---

[35] PX 1138A.

[36] PX 1138 SEC 10-K Filing at 4.

undisputed that Autoliv manufactured Mr. Andrews' seatbelt. Accordingly, Autoliv is the *manufacturer* of the seatbelt under the plain meaning and the Georgia courts' construction of the strict liability statute.

At trial, Autoliv repeatedly tried to claim that Mr. Andrews' seatbelt was "designed by Mazda." But when Autoliv's corporate representative Mr. Prentkowski was asked directly whether it was his sworn testimony that the seatbelt was "designed by Mazda," he dodged the question stating that he could not give a "yes-or-no answer." Prentkowski testimony, 10/4/21 PM Trial Tr. p., 63, lines 3–20. That evasion is telling. More importantly, neither Mr. Prentkowski nor Mr. Kamei identified any part of the seatbelt that was specifically "designed by Mazda." The absurdity of Autoliv's claim that the seatbelt was "designed by Mazda" was aptly demonstrated by the following exchange:

> So my wife's daughter, my bonus daughter just turned 16, and she's getting my wife's seven-year-old, seven-and-a-half-year-old Subaru Outback.
>
> So my wife has tried to order a new Subaru Outback, and she has specified that she wants charcoal gray, dark charcoal gray, dark tan interior, the Hibbetted roof racks for her kayaks, a towing package and what she calls the full muddy dog package; she's very specific about what she wants in that car.
>
> Is my wife a designer of that new Subaru Outback, in your mind, sir?
>
> That's just as ridiculous as it sounds, isn't it?

39

A. Well, no. Your wife is asking for a specific set of components in a vehicle that makes it unique to her requests.

Q. And that's exactly what Autoliv says Mazda did, and that's exactly the basis for Autoliv telling this Court that, quote, Mazda designed the seatbelt; is that right?

A. Yes.

Prentkowski testimony, 10/4/21 PM Trial Tr. p. 68, lines 6–23. Just as it makes no sense to say that Plaintiff's counsel's wife is the designer of a new Subaru Outback, the Court finds it makes no sense to for Autoliv to claim that its seatbelt was "designed by Mazda."

Furthermore, in reversing the summary judgment entered in Autoliv's favor by a former judge of this Court, the Eleventh Circuit found that Autoliv was an "actual manufacturer[]" that "manufactured" the subject seatbelt. *See* Doc. No. [309] at 2 ("The 'product seller' provision expressly does not apply to actual manufacturers such as Autoliv. . . . Autoliv manufactured seatbelt components in the deceased's Mazda and Plaintiff alleges that those components were defective when sold."). The Eleventh Circuit's finding that Autoliv is the seatbelt's manufacturer for purposes of O.C.G.A. § 51-1-11 is binding on this Court under

40

the "specific application" of the law-of-the-case doctrine known as "the mandate rule." *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir. 1985).[37]

Because Autoliv is the manufacturer of the seatbelt, Autoliv is strictly liable for any defects—whether in manufacturing *or* design *or* warnings—in the seatbelt.

### 2.     The Autoliv seatbelt is defective.

In Georgia, to determine whether a product is defectively designed, the factfinder applies the "risk-utility analysis," which requires "balancing the risks inherent in a product design against the utility of the product so designed." *Banks*, 450 S.E.2d at 674. The Georgia Supreme Court has held that "[t]he 'heart' of a design defect case is the reasonableness of selecting from among alternative product designs and adopting the safest feasible one." *Jones v. NordicTrack, Inc.*, 550 S.E.2d 101, 103 (Ga. 2001). "[I]n determining whether a product was

---

[37] "Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That & The Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1283 (11th Cir. 2006) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)). The mandate rule "bars relitigation of issues that were decided either explicitly or by necessary implication." *Id.* The mandate rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1296 (11th Cir. 2014) (quoting *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001)).

defectively designed, the trier of fact may consider evidence that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." *CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641, 644 (Ga. 2016) (quoting *Banks*, 450 S.E.2d at 674-75).

Before proceeding to the defect analysis, the Court makes a preliminary observation. Plaintiff has asserted a strict products liability claim related to the design of the Autoliv seatbelt. At trial, Plaintiff represented evidence through her seatbelt expert Steve Meyer about the specific features of the seatbelt's design that were defective. Mr. Meyer specifically pointed out that this seatbelt's design incorporates both an extremely low 2.0 kN deployment threshold and does not incorporate a "stop" to limit the amount of seatbelt spoolout once the deployment threshold has been reached. Mr. Meyer's testimony that there were other seatbelt designs available and actually in use that allow a lot less spoolout in a 35-mph frontal collision was unrebutted by any evidence from Autoliv.

At the close of Plaintiff's evidence, Autoliv moved for a judgment as a matter of law on what Autoliv itself labeled the "deployment threshold" defect. *See* Autoliv motion, 10/7/21 AM, Trial Tr. p. 36, line 6–p. 39, line 20. The Court ultimately denied Autoliv's motion, *id.* at p. 46, lines 2–6, and Autoliv's renewal of

that same motion, 10/12/21 PM, Trial Tr. p. 62, line 8–p. 63, line 8. Autoliv's motion has several fatal flaws.

*First*, Plaintiff has only one design defect claim in this case—not two. At trial, Plaintiff proved that there were several ways to make the seatbelt *safer*—a higher deployment threshold or a stop. But those improvements are not independent design defects. To resolve Plaintiff's sole design defect claim under Georgia law, the Court as factfinder must answer a single question: do the risks of the seatbelt's design outweigh its utility? *Banks*, 450 S.E.2d at 674. The answer, as explained below, is yes.

*Second*, Autoliv's argument for judgment as a matter of law rests on a fundamental misunderstanding of the meaning of "alternative design" under Georgia law. For purposes of the risk-utility analysis in Georgia, the existence of an "alternative design" is just one factor for the factfinder to consider when determining if the at-issue design is defective. That factor—alternative design— relates only to the issue of defect, meaning to the risk-utility analysis. Though Autoliv claims otherwise, "alternative design" has nothing to do with proximate cause under Georgia law. *Contra* Autoliv closing, 10/13/21 AM Trial Tr. p. 54, line 17–p. 55, line 6.

The proof is in the caselaw. For another design to qualify as an "alternative

design," the Georgia Supreme Court held that design needs to be something that "would have made the product *safer* than the original design," and it must be a "marketable reality" and "technologically feasible." *Banks*, 450 S.E.2d at 674-75; *CertainTeed*, 794 S.E.2d at 644. There is no requirement in any Georgia Supreme Court decision that the alternative design have "saved" the injured person. That's because "alternative designs" under Georgia law help the factfinder determine if the manufacturer's decision to go with the at-issue design was "reasonable" given the available alternatives. *See Jones*, 550 S.E.2d at 103.

Also, if Georgia law incorporated "alternative design" into the proximate cause analysis, as Autoliv argues, then proof of an alternative design would be mandatory. But the law in Georgia is clear: proof of an alternative design isn't required to prevail on a design defect claim. *Bodymasters Sports Industries, Inc. v. Wimberley*, 501 S.E.2d 556, 560 (Ga. Ct. App. 1998); *see also Volkswagen of Am., Inc. v. Gentry*, 564 S.E.2d 733, 741–742 (Ga. Ct. App. 2002) (failure to charge jury that plaintiffs had to offer proof of an alternative, safer design, practicable under the circumstances was not error); *Timmons v. Ford Motor Co.*, 982 F. Supp. 1475, 1479 (S.D. Ga. 1997) ("While at the 'heart' of the analysis, the Georgia Supreme Court clearly found that alternative designs were a factor that may be considered and not a requirement."). Because proof of an "alternative design" is not mandatory

44

under Georgia law, Autoliv's argument that Plaintiff has to show her alternative designs would have "saved" her husband's life to establish proximate cause is incorrect.

The Court now proceeds with the defect analysis. The Georgia Supreme Court has held that "the appropriate analysis" in a design defect case like this one often "includes consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product." *Jones*, 550 S.E.2d at 103. Other factors that the Court, as factfinder, may consider include:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

*Banks*, 450 S.E.2d at 675 n.6; *see also* COUNCIL OF SUPERIOR COURT JUDGES, SUGGESTED PATTERN JURY INSTRUCTIONS, VOL. I: CIVIL CASES § 62.650 (5th ed. 2020). This list of factors is nonexhaustive, and not all factors apply in every case.

Here, the Court concludes that the risk of the design of the Autoliv seatbelt in Mr. Andrews' 2005 Mazda3 greatly outweighs the utility of that design. The risk

of a seatbelt with a very weak torsion bar is death or serious injury to an occupant in a collision in which the airbag does not deploy. The utility of seatbelt with a very weak torsion bar is that the car might get slightly better scores for potential chest injuries in the NCAP test.[38] Better test scores might translate into a higher "star" safety rating, which is good for marketing purposes. But in a real-world collision in which an airbag does not deploy, slightly better scores on a standardized crash test will not keep the occupant from striking objects inside the car (e.g., steering wheel or dashboard) with injurious force—the primary purpose of a seatbelt.[39]

Plaintiff's seatbelt expert Steve Meyer testified that there were alternative designs for the subject seatbelt that would have been safer and that were actually on the market. Mr. Meyer testified that all else being equal a stronger torsion bar allows much less spoolout. Meyer testimony, 10/6/21 PM Trial Tr. p. 37, lines 19–

---

[38] Autoliv presented the testimony of its retained experts to argue that stronger torsion bars could result in serious injury to occupants. However, the Court does not find this argument persuasive. The Volvo S40 seatbelt, for example, was 300% stronger than the Mazda3 seatbelt, and it performed well in testing.

[39] *See* Meyer testimony, 10/6/21 PM Trial Tr. p. 48, lines 19–22 ("Q. What is the whole job of the seatbelt?" A. The seatbelt is to prevent the occupant from slamming into interior components like the steering wheel so hard that it creates a permanent or a fatal injury.").

22, p. 63, lines 18–19. Autoliv made and sold a seatbelt that was 1.75 times stronger for the 2006–2009 Mazda3. *See* PX 35 (seatbelt specification showing 2.0 ± 0.5 kN torsion bar for driver seatbelt in 2004–2005 Mazda3 but 3.5 ± 0.9 kN torsion bar for driver seatbelt in the 2006–2009 Mazda3).

Autoliv also made and sold the seatbelt for the 2004–2009 Volvo S40. That is significant because the Volvo S40 was built on the same "platform" as the Mazda3, meaning the cars share the same "basic structure." *See* 49 C.F.R. § 579.4(c) (defining *platform*). The Autoliv seatbelt in the Volvo S40 had a first-phase deployment threshold of 6.0 kN, meaning it was three times as strong as the Mazda3 seatbelt. Doc. No. [503], ¶ 29. The real-world consequences of the stronger seatbelt in the Volvo S40 come through in the NCAP test where the Volvo S40 seatbelt spooled out only 6.50 inches compared to the mindboggling 16.85 inches that the Mazda3 allowed. PX 9.



Pl.'s Demonstrative. The record is clear: Autoliv had safer seatbelts that it could have sold to Mazda. Autoliv engineer Yuji Kamei admitted that Autoliv did not have to sell Mazda an unsafe seatbelt. Doc. No. [340], Tr. p. 61, lines 19–24.

Autoliv could have made the seatbelt safer another way. The Autoliv seatbelt had no limit on the amount of webbing that could spoolout in a collision. Autoliv could have put a stop on the seatbelt to limit the amount of webbing that spooled out. The undisputed testimony at trial was that when Autoliv designed, manufactured, and sold the subject seatbelt to Mazda, it also had for sale a seatbelt

with a stop to limit the amount of spoolout. Meyer testimony, 10/6/21 PM Trial Tr. p. 73, line 13-p. 74, line 4. The Court thus concludes that there were feasible, alternative designs that would have made the Autoliv seatbelt safer.

There is significant evidence that the Autoliv seatbelt's design is an extreme outlier. Plaintiff's seatbelt expert, Steve Meyer, testified that the Autoliv seatbelt had the lowest deployment threshold of any car he had ever seen. Meyer testimony, 10/6/21 PM Trial Tr. p. 65, lines 15–16 (lowest ever seen). Both in terms of performance and use, the Autoliv seatbelt in the J48C Mazda3 is unique—and in the worst way.

The record shows that the danger that the Autoliv seatbelt posed to foreseeable users like Mr. Andrews was unknown to the public. Autoliv's corporate representative admitted that Mr. Andrews "had no warning that if the airbag failed, the seat belt would be useless to him." Prentkowski testimony, 10/7/21 Trial Tr. p. 56, lines 7–9. The record also shows that there was no warning on the seatbelt or in the owner's manual about the danger the Autoliv seatbelt posed. Nor have there been any public statements by Autoliv (or Mazda) warning the public either before or after Mr. Andrews' collision about the Autoliv seatbelt's dangers in a 35-mph collision.

The availability of safer alternative designs that were actually used in other cars in the Mazda3's class—and manufactured and sold by Autoliv—proves that the weak Autoliv seatbelt was not "state of the art." Just the opposite. The Autoliv seatbelt was an extreme outlier and unsafe. That other cars in the Mazda3's class were able to use stronger, safer torsion bars is proof that it was possible for Autoliv to manufacture and sell Mazda a safer seatbelt without impairing the seatbelt's usefulness or making it too expensive.

After considering the relevant factors for purposes of the risk-utility analysis, the Court concludes that the risks of the Autoliv seatbelt in Micah Andrews' car outweigh its utility. Thus, the Autoliv seatbelt was defectively designed.

### 3. The Autoliv seatbelt was a proximate cause of Mr. Andrews' death.

Having determined that the Autoliv seatbelt is defective, the sole question remaining to establish liability is whether the Autoliv's seatbelt was a proximate cause of Mr. Andrews' injuries and death. The Court concludes that it was.

In May 2021, the Georgia Supreme Court expounded on the nature of "proximate cause" under Georgia law. "Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Johnson v. Avis Rent a Car*

*Sys., LLC*, 858 S.E.2d 23, 29 (Ga. 2021) (quoting *Zwiren v. Thompson*, 578 S.E.2d 862, 865 (Ga. 2003)). A defendant who breaches a duty owed to the plaintiff is liable for the plaintiff's damages (i.e., is a proximate cause) when the consequences of the defendant's breach of duty "is probable, according to ordinary and usual experience." *Id.* (quoting *Johnson v. Am. Nat'l Red Cross*, 578 S.E.2d 106, 109 (Ga. 2003)). *Probable*, for purposes of proximate cause, "does not mean 'more likely than not,' but rather 'not unlikely'"; put more definitely: "'such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen.'" *Id.* (quoting Jeremiah Smith, *Legal Cause in Actions of Tort*, 25 Harv. L. Rev. 103, 116 (1911)).

In one sense, "proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." *Id.* (quoting *Atlanta Obstetrics & Gynecology Grp. v. Coleman*, 398 S.E.2d 16, 17 (Ga. 1990)). The conclusion that proximate cause exists "requires both factfinding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent." *Id.* (quoting *Atlanta Obstetrics & Gynecology*, 398 S.E.2d at 17)).

Here, what happened is clear: Mr. Andrews crashed into three trees at about 35 mph; the driver's airbag in his car did not deploy; the Autoliv seatbelt that Mr. Andrews was wearing properly spooled out 20 inches of webbing. Because the seatbelt did not securely couple Mr. Andrews to his seat early in the crash and because the seatbelt did not provide sufficient restraining force, Mr. Andrews' head struck the steering wheel with enough force to cause a fatal basilar skull fracture.[40] Plaintiff's biomechanical expert testified that had the airbag deployed (as it was designed) *or* had the seatbelt limited the amount of spoolout, then Mr. Andrews would not have struck the steering wheel with fatal force.

Autoliv knew that the seatbelt allowed an excessive amount of spoolout in standardized 35-mph crash tests. The Autoliv seatbelt allowed more than twice as much spoolout as the other cars in 2005 Mazda3's class and more than twice as much spoolout as the seatbelt in the Volvo S40, a car built on the same platform as the Mazda3.

_____

[40] A basilar skull fracture is "the most serious type of skull fracture, and involves a break in the bone at the base of the skull." Head Injury, JOHNS HOPKINS MEDICINE,                https://www.hopkinsmedicine.org/health/conditions-and-diseases/head-injury. Dr. Frist explained that the basilar skull is "right at your ear level coming forward toward your nose and back." Frist testimony, 10/4/21 AM, Trial Tr. p. 84, lines 3–7.

Autoliv also knew from its own sled testing that the seatbelt in the 2005 Mazda3 allowed more than 15 inches of chest displacement in a 31-mph frontal collision without an airbag. Put simply, Autoliv knew that the seatbelt in Mr. Andrews' car provided hardly any restraining force. Autoliv also knew that airbags do not always deploy in a collision. Autoliv also knew that people could be seriously injured or killed if they are not adequately restrained in a frontal collision.

Accordingly, the Court concludes that Autoliv knew that a person properly wearing the subject seatbelt was at risk of suffering serious injury or death if the airbag did not deploy in a 35-mph frontal collision. The probable consequence of Autoliv's breach of a legal duty owed to Mr. Andrews is that Mr. Andrews might be in a frontal collision in which his airbag did not deploy and might as a result suffer serious injury or death because the seatbelt failed to adequately restrain him. The defectively designed Autoliv seatbelt was thus a proximate cause of Mr. Andrews' injuries and death.

### B.     Damages

Having determined that Autoliv is liable for Mr. Andrews' death, the Court now turns to the question of damages.

### 1.   Estate claim: Micah Andrews' special damages.

Plaintiff, as personal representative of Mr. Andrews' estate, seeks special damages[41] for Mr. Andrews' medical bills and funeral costs. The parties stipulated that the amount of these damages are $19,343.40. *See supra* n.3. Accordingly, the Court awards special damages to Plaintiff as personal representative of Mr. Andrews' estate in the amount of $19,343.40.

### 2.   Estate claim: Micah Andrews' general damages.

Under Georgia law, a claim for wrongful death damages and a claim for the conscious pain and suffering that the decedent experienced before death are distinct. *Grant v. Ga. Pac. Corp.*, 521 S.E.2d 868, 870 (Ga. Ct. App. 1999). Whether the decedent experienced conscious pain and suffering is a question for the factfinder to decide. *See Walker v. Daniels*, 407 S.E.2d 70, 75–76 (Ga. Ct. App. 1991).

Here, the undisputed evidence from Mr. Kemp was that after he hung up with 911—a call that lasted four minutes and twelve seconds—he went to Mr. Andrews' car and told Mr. Andrews that help was on the way. Mr. Kemp vividly remembers that Mr. Andrews tried to respond by groaning and trying to raise his

---

[41] Under Georgia law, "[s]pecial damages are those which actually flow from a tortious act." O.C.G.A. § 51-12-2(b). General damages, on the other hand, "are those which the law presumes to flow from any tortious act." § 51-12-2(a).

body. Officer Porter testified that he witnessed Mr. Andrews' last two breaths, after Mr. Kemp had spoken with Mr. Andrews. Dr. Frist testified that what Mr. Kemp observed was consistent with Mr. Andrews having been conscious at that time. All this testimony was undisputed. Based on the undisputed evidence at trial, which the Court finds is credible, the Court concludes that Mr. Andrews was alive and conscious from the time of the collision until after Mr. Kemp pulled off the road and stopped his car, finished his 911 call, and then went to Mr. Andrews' car—over four minutes and twelve seconds.[42]

According, the Court awards Plaintiff, as Micah Andrews' personal representative, general damages for the postimpact pain and suffering Mr. Andrews endured in the amount of $_____.

---

[42] *See Holland v. Cypress Ins. Co.*, No. 2:17-cv-120, 2020 WL 5742250, *10 (N.D. Ga. Aug. 21, 2020) (Story, J.) (denying defendant's renewed motion for judgment as a matter of law or, in the alternative, for new trial on issue of postimpact pain and suffering where there was credible evidence that a witness heard the decedent moan after being unattended for some period after the collision).

### 3. Wrongful death damages: the full value of Micah Andrews' life.

Micah Andrews was 38 years old at the time of his death. Doc. No. [503], ¶ 5. The parties agree that his life expectancy at the time of his death was 36.18 years. Doc. No. [503], ¶ 7.

Georgia places a premium on life. For over one hundred years, the civil remedy in Georgia for causing a person to lose their life is not the sum of the foregone paychecks or the services the deceased would have rendered—it is the "the full value of the life of the deceased." 1878 Ga. Laws. 59, 59–60; *see also Bibbs v. Toyota Motor Corp.*, 815 S.E.2d 850, 853 (Ga. 2018).[43] That "full value" is not what someone else would assign to the life—not even family or friends. Instead, it is the value of the life through the eyes of the person who lost it. *See Bibbs*, 815 S.E.2d at 854–55 (the full value of a decedent's life is measured from the perspective of the decedent rather than the perspective of the survivors).

---

[43] In 1887, the General Assembly clarified that the measure of damages for wrongful death were "the full value of the life of the deceased, as shown by the evidence without any deduction for necessary or other personal expenses of the deceased had he lived." 1887 Ga. Laws 43, 43-45. That measure of damages remains the law in Georgia. *See* O.C.G.A. §§ 51-4-1(a) (defining "[f]ull value of the life of the decedent, as shown by the evidence"), 51-4-2(a) (proscribing whom is entitled to recover for the death of a person with a surviving spouse or children).

In terms of economic value, the parties stipulated that the present value of Mr. Andrews' lost income, lost fringe benefits, and lost household services was $2,027,141. Doc. No. [503], ¶ 38.[44]

In terms of intangible value, Plaintiff presented considerable, credible evidence proving that Mr. Andrews was an exemplary citizen and father with a real zest and love of life, his family, his friends, and his work. Autoliv did not dispute any of that proof; indeed, Autoliv did not ask Plaintiff's damages witnesses a single question or present any inconsistent evidence.

In reaching a conclusion about the full value of Mr. Andrews' life, the Court has considered the verdicts that actual Georgia juries have returned in cases referenced in Plaintiff's Corrected Trial Brief on the Full Value of Micah Andrews' Life. Doc. No. [468-1]. The Court also notes that in its closing argument Autoliv did not dispute, challenge, or otherwise try to diminish the amount that Plaintiff

---

[44] The parties' stipulation about the economic value of Mr. Andrews life was based on the unrebutted testimony of Plaintiff's economist Michael Daniels, Ph.D. The Court notes that Dr. Daniels testified at his deposition that the present value calculation of the economic loss arising from Micah Andrews' death was "conservative" in several different ways. *See* Doc. No. [280-1], Tr. pp. 85, line 3–86, line 14.

placed on the "full value" of Mr. Andrews' life: "not less than $25 million." Plaintiff's closing, 10/13/21 AM, Trial Tr. p. 39, line 1.[45]

Accordingly, the Court awards Plaintiff, as surviving spouse, the full value of Micah Andrews' life, both economic and intangible, in the amount of $25,000,000.00 (twenty-five million dollars).[46]

### 4.   Apportionment

In 2005, the Georgia General Assembly amended O.C.G.A. § 51-12-33, the so-called "apportionment statute." *See Couch v. Red Roof Inns, Inc.*, 729 S.E.2d 378, 381 (Ga. 2012). Since its enactment, this statute has spawned a plethora of litigation in the Georgia appellate courts, and that litigation continues unabated. Even so, the features of Georgia apportionment law relevant to this case can be distilled as follows.

*First*, where the apportionment statute applies, the factfinder makes two different (albeit related) determinations: the amount of the plaintiff's damages and

---

[45] Autoliv asked for a "defense verdict" only. Autoliv closing, 10/13/21 AM, Trial Tr. p. 76, lines 20–22.

[46] Georgia law gives the right to bring a wrongful death claim to the surviving spouse of the decedent. O.C.G.A. § 51-4-2(a). The wrongful death award, however, is shared between the surviving spouse and the decedent's children. § 51-4-2(d)(1). Here, that means that Jamie Andrews and her and Micah's daughter S.C. will split the wrongful death damages equally.

the percentages of fault of all persons who contributed to the plaintiff's injuries or damages. *See* O.C.G.A. § 51-12-33(a)–(c); *Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC*, 843 S.E.2d 613, 620 (Ga. Ct. App. 2020) ("[T]he apportionment statute obligates us to distinguish between the trier of fact's determination of damages and that of fault."), *aff'd in pertinent part by* 862 S.E.2d 295 (Ga. 2021).

*Second*, where a defendant claims that the plaintiff's injuries or damages were the fault of another party or a nonparty, *the defendant bears the burden of proving* that another party or nonparty was responsible for the plaintiff's injuries or damages. *See Brown v. Tucker*, 788 S.E.2d 810, 821 (Ga. Ct. App. 2016) ("The affirmative defense that the jury should apportion fault against someone other than the defendant is no different analytically from the defense of contributory negligence. Once the plaintiff establishes her prima facie case, the defendant seeking to establish that someone else bears responsibility for the damages has the burden of proving that defense."). Here, Autoliv not only denied that it is liable for Mr. Andrews' injuries and death but also claimed that Mr. Andrews' injuries and death were caused by (1) Mr. Andrews himself, (2) Mazda, and (3) "Bosch." Under Georgia law, Autoliv's claims that others were at fault for Mr. Andrews' injuries and death are "affirmative defense[s]," and Autoliv "had the burden of

59

showing by a preponderance of the evidence" that each supposedly responsible other party was at fault for Mr. Andrews' injuries and death. *Id.*

That conclusion is buttressed by the Georgia Supreme Court's construction of the term "fault" in subsections (a), (b), and (c) of O.C.G.A. § 51-12-33. As construed by the Georgia Supreme Court, "fault" in subsection (a) refers "to a breach of a legal duty that the plaintiff owes for his own protection that is a proximate cause of his injury";[47] "fault" in subsection (b) refers "to a breach of a legal duty that a defendant owes for the protection of the plaintiff that is a proximate cause of the injury to the plaintiff"; and "fault" that "contributed to the alleged injury or damages" in subsection (c) refers "to a breach of a legal duty in the nature of tort that is owed for the protection of the plaintiff, the breach of which is a proximate cause of his injury." *Zaldivar v. Prickett*, 774 S.E.2d 688, 694 (Ga. 2015).[48]

---

[47] Under § 51-12-33(g), "if the plaintiff is 50 percent or more responsible for the injury or damages claims," then the plaintiff cannot recover any damages. According to the Georgia Supreme Court, "[t]ogether, subsections (a) and (g) codify the doctrine of comparative negligence, a doctrine that was recognized in Georgia long before the present apportionment statute was enacted in 2005." *Zaldivar v. Prickett*, 774 S.E.2d 688, 693 (Ga. 2015) (internal citation and footnote omitted).

[48] "Subsection (c), then, is properly understood to require the consideration of the

*Third*, even where, as here, the plaintiff brings a strict products liability claim against a defendant under O.C.G.A. § 51-1-11(b)(1), the factfinder can determine the plaintiff's percentage of fault for the plaintiff's injuries or damages if there is evidence that the plaintiff was at fault for them. *See Johns v. Suzuki Motor of Am., Inc.*, 850 S.E.2d 59, 67 (Ga. 2020).

*Fourth*, Plaintiff initially sued Mazda and several Bosch entities,[49] but that does not mean that the Court, as factfinder, must consider the potential fault of Mazda or "Bosch" under § 51-12-33(d)(1). Although subsection (d)(1) provides that the "[n]egligence or fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty," the Georgia Court of Appeals has "decline[d] to interpret" that subsection "as requiring a trier of fact to automatically consider the potential fault of a settled entity." *Union Carbide Corp.*

---

'fault' of four classes of persons or entities: plaintiffs (also covered in subsection (a)), defendants with liability (also covered in subsection (b)), defendants without liability, and nonparties." *Zaldivar*, 774 S.E.2d at 695 n.6

[49] Plaintiff's Complaint named four Bosch entities: (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, (3) Robert Bosch Motor Systems Corporation, and (4) Bosch Corporation. Doc. No. [1-2], p. 1. Plaintiff's First Amended Complaint dropped Robert Bosch Motor Systems Corporation as improperly named and added Robert Bosch GmbH. Doc. No. [17], p. 2.

*v. Fields*, 726 S.E.2d 521, 526 (Ga. Ct. App. 2012).[50] Instead, the "defending party" must produce evidence that "the settled entity 'contributed to the alleged injury or damages' before its fault can be assessed by the trier of fact." *Id.* at 525-26 (quoting § 51-12-33(c)). Thus, even though Plaintiff settled with Mazda and dismissed certain Bosch entities years ago, Autoliv must still produce evidence that Mazda and "Bosch" breached a legal duty in the nature of a tort for the protection of Mr. Andrews and that breach was a proximate cause of Mr. Andrews' injuries and death before the Court, as factfinder, can assess any fault to Mazda or "Bosch."

*Fifth*, Autoliv must produce evidence that affords the factfinder *a rational basis* to apportion fault. *See Stewart Ausband Enters., Inc. v. Holden*, 826 S.E.2d 138, 144 (Ga. 2019) ("It is the defendants' burden to establish a basis for apportionment,

---

[50] The Georgia Supreme Court granted certiorari and reversed a portion of *Fields* unrelated to this holding. *Ga.-Pac., LLC v. Fields*, 748 S.E.2d 407 (Ga. 2013). When the case returned to the Georgia Court of Appeals, the intermediate appellate court vacated the reversed portion of its earlier opinion and substituted the Georgia Supreme Court's opinion. *Union Carbide Corp. v. Fields*, 758 S.E.2d 335 (Ga. Ct. App. 2014). But the Georgia Court of Appeals' interpretation of § 51-12-33(d)(1) in *Fields* became binding when the case returned to that court. *See id.* at 336 ("Since those portions of our earlier opinion are consistent with the Supreme Court's opinion, Divisions 1(a)–(c), (e) and Division 2 of our earlier opinion 'become binding upon the return of the remittitur.'").

and it is the factfinder's role to assign fault accordingly."). Whether a rational basis exists to apportion fault is a question of fact. *Couch v. Red Roof Inns, Inc.*, 729 S.E.2d 378, 384 (Ga. 2012). When a defendant, such as a product manufacturer, takes an "all or nothing" approach to fault for the plaintiff's injuries—that the manufacturer's product was not defective or that the plaintiff received all injuries because of the fault of another party—the defense of apportionment is unavailable to the manufacturer. *See Ford Motor Co. v. Reese*, 684 S.E.2d 279, 286 (Ga. Ct. App. 2009).

Apportionment of fault requires the factfinder to determine, in terms of percentage, the relative extent to which each tortfeasor contributed as a proximate cause of the plaintiff's injury. *See Zaldivar*, 297 Ga. at 595. For that reason, the defendant must present some evidence at trial providing the factfinder a rational basis for apportionment based on percentages of fault.

### i. Mr. Andrews is not at fault for his own injuries and death.

Under subsection (a) of the Georgia apportionment statute, "[w]here an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed," the factfinder "shall determine the percentage of fault of the plaintiff and the judge

shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault."

To allocate any "fault" to Mr. Andrews, the Court would have to find that Mr. Andrews' injuries and death were proximately caused by his own negligence. That is impossible to do in this case as Mr. Andrews did not design or manufacture the seatbelt that spooled out 20 inches, or the airbag, or the crash sensing system (i.e., the wiring, sensor, or control computer) that resulted in the airbag not deploying.[51]

Dr. Frist testified, without contradiction, that Mr. Andrews would not have had a basilar skull facture had his head not hit the steering wheel with such force and velocity. Dr. Frist also testified, without contradiction, that Mr. Andrews had no life-threatening injuries besides the basilar skull fracture. Frist testimony, 10/4/21 AM, Trial Tr. p. 82, lines 4–21. The evidence in the case showed that Mr. Andrews head only hit the steering wheel with such force and velocity because his seatbelt spooled out 20 inches and the airbag did not deploy. Mr. Andrews had no

---

[51] Again, as Autoliv's own corporate representative admitted at trial, and as is both logical and irrefutable, "this case starts when the car hit those trees because that's when the question arises, who is at fault for the airbag not working and the seat belt not working." Prentkowski testimony, 10/7/21 Trial Tr. p. 54, lines 19–23.

control of the seatbelt's design or the mechanisms that should have led to the airbag deploying. The undisputed evidence at trial showed that the expected outcome of a 35-mph frontal collision is survival with relatively minor injuries—as long as the occupant restraint system works. Accordingly, the Court concludes that Mr. Andrews is not the proximate cause of his fatal injuries or death. For that reason, no fault can be apportioned to him under Georgia law.

Additionally, Georgia embraces the doctrine of sudden emergency. The sudden emergency doctrine applies when "acts occur immediately following the apprehension of the danger or crisis before there is time for careful reflection." *Willis v. Love*, 502 S.E.2d 487, 489 (Ga. Ct. App. 1998) (citation omitted). Under that doctrine, a person confronted with a sudden emergency who "acts according to his best judgment or, because of want of time in which to form a judgment, acts in the most judicious manner, is not chargeable with negligence." *Id.*; *Curtis v. United States*, 274 F. Supp. 3d 1366, 1378 (N.D. Ga. 2017) (Batten, J.) ("Under that doctrine, a person who is faced with a sudden emergency and either acts within his 'best judgment' or does not have sufficient time to form such a judgment is 'not chargeable with negligence.'" (quoting *Willis*)). Georgia law defines an emergency as "sudden peril caused by circumstances in which the defendant did not participate and which offered him a choice of conduct without time for thought so

that negligence in his choice might be attributable not lack of care but to lack of time to assess the situation." *Willis*, 502 S.E.2d at 489. One situation in which the sudden emergency doctrine has been held to apply is when a driver suddenly confronts an animal in the road. *See Stephens v. Hypes*, 610 S.E.2d 631, 633 (Ga. Ct. App. 2005) ("[C]ommon sense dictates that that a deer in the road could give rise to a sudden emergency."); *see also Adams v. Finlayson*, 406 S.E.2d 227, 228–29 (Ga. Ct. App. 1991) (affirming trial court's charge on sudden emergency where evidence showed that collision followed driver's decision to swerve in response to dog on the road). Other courts have held that "a normally careful person" would react to avoid "a large animal" that suddenly appeared in the road by veering onto the shoulder. *Whitehead v. Cruse*, 279 So. 2d 802, 804 (La. Ct. App. 1973).

Here, Mr. Andrews faced a sudden emergency not of his own making: the presence of a large snapping turtle in the middle of the interstate. Seeing the turtle, Mr. Andrews swerved hard right and applied his brakes. Unfortunately, that avoidance maneuver took Mr. Andrews off the interstate and onto the grassy shoulder of I-575. That grassy shoulder was so steep that Mr. Andrews could not recover and return his car to the road. Under the circumstances, Mr. Andrews' avoidance maneuver was reasonable. Because Mr. Andrews acted reasonably under the circumstances, Mr. Andrews did not "breach a legal duty that [he] owed

for his own protection" and thus no "fault" within the meaning of § 51-12-33(a)

can be apportioned to Mr. Andrews. *See Zaldivar*, 744 S.E.2d at 694.

> **ii.    No fault can be apportioned to Bosch because Autoliv did not prove that Bosch breached any legal duty owed to Mr. Andrews or that Bosch's conduct contributed to Mr. Andrews' injuries or death.**

Between the Complaint and First Amended Complaint, Plaintiff named five

"Bosch" entities.[52] Based on the evidence adduced at trial, none of these Bosch

entities is at fault for Mr. Andrews' injuries and death.

Plaintiff dismissed Robert Bosch Motor Systems Corporation as improperly

named. Autoliv produced no evidence to the contrary at trial, nor did Autoliv

produce any evidence proving that Robert Bosch Motor Systems Corporation was

involved in any way in designing or manufacturing any allegedly defective

product in Mr. Andrews' car. Thus, the Court cannot apportion any "fault" for Mr.

Andrews' injuries or death to Robert Bosch Motor Systems Corporation. *See Union*

*Carbide*, 726 S.E.2d at 525–26.

---

[52] (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, (3) Bosch Corporation, (4) Robert Bosch Motor Systems Corporation, and (5) Robert Bosch GmbH. *See* Doc. Nos. [1-2], p. 1; [17], p. 2.

That leaves four Bosch entities: (1) Bosch Corporation, (2) Robert Bosch LLC, (3) Robert Bosch North America Corporation, and (4) Robert Bosch GmbH (collectively, "Bosch").

At trial, Autoliv presented testimony that "Bosch" provided the "crash sensing system" for Mr. Andrews' car. The crash sensing system comprises, among other things, (1) the car's computer diagnostic unit located under the car's center console, which Mazda calls the "Supplemental Airbag System" or "SAS" unit; (2) the upfront sensor ("UFS," also known as the electronic front sensor ("EFS")), a single sensor located behind the car's front grill; (3) the UFS sensor connector; and (4) the wiring running from the SAS to the UFS.

Plaintiff called Chris Caruso, an expert in airbag system design and the automaker–supplier relationship. Autoliv used its cross-examination of Mr. Caruso to try to prove that it was Bosch's fault Mr. Andrews' airbag did not deploy in the April 12, 2013 collision. But Mr. Caruso testified that he did not believe Bosch did anything wrong based on his review of the documentary evidence and inspection of Mr. Andrews' car. Mr. Caruso specifically testified that he had "no evidence to indicate the SAS unit is defective," and he did not have the opinion it was defective. Caruso testimony, 10/6/21 AM Trial Tr. p. 87, lines 16–24; p. 88, line 23–p. 24, line 8. Mr. Caruso testified that he could not determine that Bosch

did anything specific wrong, including with respect to Mazda's decision not to implement dual front sensors, which Bosch suggested at one point, a suggestion that Mazda apparently rejected. *Id.* at p. 90, line 24–p. 91, line 6.

Additionally, Autoliv's corporate representative admitted that Autoliv did not recommend to Mazda that it use the "industry standard" of dual sensors. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 51, line 5–p. 52, line 6. In fact, Mr. Prentkowski admitted that Autoliv did nothing to make sure that the front sensor, which is essential to the functioning of the Autoliv airbag, actually worked and worked well. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 56, lines 3–9; *id.* at p. 57, line 19–p. 58, line 15.

Thus, Autoliv did not prove that Bosch designed or manufactured any defective product in the Mr. Andrews' car or that Bosch otherwise breached a "legal duty in the nature of tort" owed to protect Mr. Andrews. Accordingly, the Court cannot apportion any "fault" to Bosch.

### iii. No fault can be apportioned to Mazda because Autoliv presented no evidence that affords the Court a rational basis to apportion fault.

At trial, Autoliv insisted that it did nothing wrong and that the design of its seatbelt was not defective. Autoliv also contended that its seatbelt was not a proximate cause of Mr. Andrews' injuries and death, and that any fault for Mr.

Andrews' injuries and death rested with some other party (Mr. Andrews himself, Mazda, or "Bosch"). Autoliv presented at trial only a corporate representative and two expert witnesses who regularly testify on behalf of automotive manufacturers to support its claims that the seatbelt's design was not defective and that something besides the seatbelt was the proximate cause of Mr. Andrews' injuries and death.[53]

Autoliv indicated in the Pretrial Order that it might call several experts initially retained by Plaintiff to opine about the defects in the airbag system. At trial, the only airbag expert to testify was Chris Caruso.[54] The unrebutted testimony of Chris Caruso is credible and establishes that both the airbag system was defectively designed and those defects resulted in the nondeployment of the Autoliv airbag in the steering wheel. Plaintiff's biomechanics expert testified that had the airbag deployed as designed (or the seatbelt not allowed 20 inches of

---

[53] A Japanese engineer who worked on the defective seatbelt also testified—but only because Plaintiff took his videotaped trial deposition in December 2018.

[54] In April 2019, Autoliv took a videotaped deposition for use at trial of Mr. Caruso. Because Mr. Caruso appeared live and was called by Plaintiff, Autoliv had no reason to introduce the portions of Mr. Caruso's April 2019 testimony that Autoliv had designated in the Pretrial Order. Autoliv was able to elicit any testimony it wanted from Mr. Caruso during his cross-examination. The Court discussed this with the parties during the pretrial conference. *See* 5/12/20 Hearing Tr. p. 11, line 20–p. 17, line 24.

spoolout), Mr. Andrews would not have struck the steering wheel with fatal force. Ziejewski testimony, 10/5/21 PM Trial Tr. p. 103, lines 21–23.

Autoliv's seatbelt expert William Van Arsdell, Ph.D., did not investigate why the airbag failed to deploy in this collision—despite having expertise in airbags. Dr. Van Arsdell testified that Autoliv did not hire or ask him to investigate why the airbag did not deploy, so he did not do so. Van Arsdell testimony, 10/12/21 AM Trial Tr. p. 97, line 21–p. 97, line 23. Yet the evidence adduced at trial allows the Court, as factfinder, to conclude that Mazda "breached a legal duty in the nature of tort" owed to protect Mr. Andrews and thus is at "fault" for Mr. Andrews' injuries and death.

But establishing fault of a nonparty is not enough to prevail on the affirmative defense of apportionment. Autoliv also had to present competent evidence that would establish a "rational basis for apportionment." *Holden*, 826 S.E.2d at 144. Whether Autoliv established a rational basis that would enable the Court, as factfinder, to apportion fault—as a percentage—between Autoliv, which the Court already held was liable for Mr. Andrews' injuries and death, and Mazda is a question of fact. *Couch*, 729 S.E.2d at 384. Autoliv's attempt to blame Mazda for *buying* the defective Autoliv seatbelt allows no rational basis for

71

apportionment.[55] The Court finds that Autoliv presented no evidence that established a rational basis to apportion fault as a percentage between Autoliv and Mazda. Without such evidence, the Court's apportionment of fault as a percentage between Autoliv and Mazda would rest on nothing more than speculation and guesswork—something the law prohibits factfinders from doing. *See FDIC v. Loudermilk*, 930 F.3d 1280, 1290 (11th Cir. 2019) ("Because the decision to approve a loan was a group decision, a jury could not assign percentages of fault to individual directors. Any percentage would be arbitrary because the jury would be left speculating. And Georgia courts have said that 'liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence.'" (citation omitted)).

There is another reason Autoliv's apportionment affirmative defense fails. Autoliv employed an "all or nothing" strategy at trial. Autoliv claimed its product wasn't defective and that it wasn't the proximate cause of Mr. Andrews' injuries and death. Autoliv claims were, however, unsupported by the credible evidence adduced at trial. Because Autoliv failed to present any evidence to afford a rational

---

[55] Georgia's strict liability statute establishes that a manufacturer is responsible for defects in the products it sells, if those defects are present when the product is sold. O.C.G.A. § 51-1-11.

basis for the apportionment of fault, the apportionment defense is unavailable to Autoliv. *See Ford Motor Co.*, 684 S.E.2d 286 ("Ford . . . took an 'all or nothing' approach to liability and made no effort to show how her injuries could be rationally apportioned between the collision with the dump truck and the alleged collapse of the [car's] seat. It follows that under the evidence presented at trial, Ford was either liability as a joint tortfeasor with the driver of the dump truck, or not liable at all.").

### 5. Autoliv's misconduct in this case warrants punitive damages.

#### i. Autoliv's misconduct warrants punitive damages.

Under Georgia law, punitive damages may be awarded in tort cases where there is "clear and convincing evidence[56] that the defendant's actions showed . . . that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). To deserve punitive damages, the defendant need not be "guilty of willful and intentional misconduct"; rather, the defendant's misconduct need only "be done under such

---

[56] "[C]lear and convincing evidence is an intermediate standard of proof, requiring a higher minimum level of proof than the preponderance of the evidence standard, but less than that required for proof beyond a reasonable doubt." *Clarke v. Cotton*, 440 S.E.2d 165, 166 n.1 (Ga. 1994).

circumstances as evinces an entire want of care and a conscious indifference to the consequences." *Scapa Dryer Fabrics, Inc. v. Knight*, 770 S.E.2d 334, 343 (Ga. Ct. App. 2015) (citation omitted).[57]

Punitive damages are available in a products liability action. In *Knight*, for example, the court held that evidence that the defendant "knew or should have known about the health dangers of asbestos exposure as a result of the weaving process at its plant, but did not warn about the dangers, or take any steps to protect plant works from the dangers" created a jury question on the issue of punitive damages. *See Knight*, 770 S.E.2d at 339, 343. In another case, the Georgia Court of Appeals held that the trial court did not err in denying summary judgment and sending the issue of punitive damages to the jury in a products liability case in which there was evidence from which the jury could find that the design of the product at issue (a carpet-wrapping machine) proximately caused a repairman's

---

[57] The Georgia Supreme Court granted certiorari and reversed a portion of *Knight* unrelated to this holding. *Scapa Dryer Fabrics, Inc. v. Knight*, 788 S.E.2d 421(Ga. 2016). When the case returned to the Georgia Court of Appeals, the intermediate appellate court vacated the reversed portion of its earlier opinion and substituted the Georgia Supreme Court's opinion. *Scapa Dryer Fabrics, Inc. v. Knight*, 796 S.E.2d 918 (Ga. Ct. App. 2017). But the Georgia Court of Appeals' discussion of both the nature of the misconduct necessary to warrant punitive damages as well as the court's conclusion that punitive damages were properly a jury question under the facts presented remain good law. *See id.* at 919.

fatal injury. *Dixie Grp., Inc. v. Shaw Indus. Grp., Inc.*, 693 S.E.2d 888, 893, 894 (Ga. Ct. App. 2010).

Here, the Court has concluded that the Autoliv seatbelt is defective. Not only is the seatbelt defective, it is an extreme outlier—the worst Plaintiff's seatbelt expert has ever seen and the worst in its class. The seatbelt is so bad that no other automaker has ever purchased it. Autoliv should never have put this seatbelt on the market for sale.

A wreck like this one at this speed was indisputably foreseeable to Autoliv—as it is essentially the same as the NCAP test. Buchner testimony, 10/5/21 AM Trial Tr. p. 41, lines 5–25. Autoliv knew that airbags fail. Prentkowski testimony, 10/7/21 Trial Tr. p. 52, lines 15–17. Autoliv knew that if the airbag in Mr. Andrews' Mazda3 failed to deploy, then the Autoliv seatbelt would spool out so much it would be useless to a driver and could result in exactly what happened to Mr. Andrews. *See* Prentkowski testimony, 10/7/21 Trial Tr. p. 56, lines 7–9. Yet Autoliv sold the defective seatbelt anyway—despite not having to do so. *Id.* at p. 46, line 24–p. 47, line 1. Not only that, Autoliv did not warn Mazda that Mazda's customers could be killed because of excessive spoolout. Nor did Autoliv itself warn any consumers. *See* Prentkowski testimony, 10/4/21 PM Trial Tr. p. 32, lines 3–16 (admitting that during the 11 years between Mazda's January 2002 email

notifying Autoliv that dummy's heads were bottoming out on the steering wheel and Mr. Andrews' collision, Autoliv never warned anyone that if the "piece of junk" sensor fails in a frontal collision, the driver's head could hit the steering wheel so hard it kills). It is undisputed that Autoliv knew how to design and manufacture a seatbelt that was not so defective, that was not such an outlier: Autoliv had already done just that—before it sold this defective seatbelt to Mazda. *See* Doc. No. [503], ¶ 29.

Autoliv's corporate representative David Prentkowski admitted that Autoliv knew that Mr. Andrews' seatbelt would spool out 20 inches if the airbag did not deploy, and he admitted that it was foreseeable to Autoliv that the airbag might not deploy. Prentkowski testimony, 10/7/21 Trial Tr. p. 52, lines 12–17. Autoliv admitted that what is foreseeable can be avoided. *Id.* at p. 52, lines 19–20. Autoliv admitted that the 20 inches of spoolout that Mr. Andrews' seatbelt had in this wreck was avoidable. *Id.* at p. 52, lines 21–23. Even so, Mr. Prentkowski could not identify *a single thing* that Autoliv did to try to avoid the 20 inches of spoolout that killed Micah Andrews when the airbag in his car foreseeably failed to deploy. *Id.* at p. 53, lines 7–18. Mr. Prentkowski *twice* admitted that *refusing to avoid the foreseeable when opportunities exist to do so is, as a practical matter, the equivalent of*

*intentional misconduct. Id.* at p. 52, line 24–p. 53, line 2; 10/4/21 PM Trial Tr. p. 23, line 22–p. 24, line 18.

Autoliv not only failed take this seatbelt off the market or provide Mazda with any guidance or warning about the defect—it actually suggested a design change that weakened the seatbelt. *See supra* at p. 31. Autoliv knew this seatbelt was extremely weak compared to the Volvo S40, built on the same platform, and compared to all the other seatbelts on the market, yet Autoliv was the author of the design change that made the seatbelt even worse. Autoliv made no attempt to dispute that evidence.

Autoliv tried to make much of the fact that Plaintiff had not proved that there were other incidents just like this one. But there are two problems with that claim. First, there was another incident involving the passenger seatbelt in a California case. Second, Mr. Prentkowski admitted that he did not know—because no one told him—how many times this seatbelt has spooled out this much or almost this much and someone was killed. Prentkowski testimony, 10/7/21 Trial Tr. p. 59, line 22–p. 60, line 11. Mr. Prentkowski also admitted that he did not know of anything that Autoliv did to monitor the "field performance" of its products and that he did not know who at Autoliv does know what Autoliv does to monitor the "field performance" of its products. *Id.* at p. 61, line 4–p. 62, line 11. Given that

Autoliv knew that this seatbelt was effectively useless unless the airbag deployed and knew that airbags sometimes fail to deploy, Autoliv's failure to do anything to find out if such incidents were happening was reckless and wanton. Autoliv's "couldn't care less" conduct is precisely the kind of conduct that punitive damages are intended to punish and deter.

Despite knowing that there is a defect in the crash sensing system of the 2005 Mazda3, Autoliv has not notified either National Highway Traffic Safety Administration ("NHTSA"), nor has Autoliv told Mazda to report that defect to NHTSA. Prentkowski testimony, 10/7/21 Trial Tr. p. 70, line 12–p. 71, line 4.

There is simply no basis to doubt that Autoliv's conduct amounted not only to an "entire want of care and a conscious indifference to the consequences" but also amounted to reckless and wanton misconduct.

In addition, despite knowing for years that the seatbelt in Mr. Andrews' car spooled out 20 inches in a 35-mph frontal collision, Autoliv has not taken a single step to warn Georgians about the risk of serious injury or death. Yet Autoliv, as a manufacturer of a product that it knows is dangers, has a postsale duty to warn under Georgia law. *See Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994). Autoliv knew that the seatbelt was not performing well in safety tests before the seatbelt went to market, yet Autoliv put the seatbelt on the market anyway.

Instead of warning potential victims of its defective seatbelt Autoliv has persisted in insisting there's nothing wrong with that seatbelt—an argument that is so entirely without basis it also mandates imposition of punitive damages. There is clear and convincing evidence that Autoliv's misconduct "evinces an entire want of care and a conscious indifference to the consequences." *Knight*, 770 S.E.2d at 343. Punitive damages are thus warranted.

### ii.    The amount of punitive damages.

Under Georgia law, punitive damages "shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c). Where, as here, the defendant's conduct calls for punitive damages, the factfinder "shall . . . set the amount to be awarded" after receiving "such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case." § 51-12-5.1(d)(2). Georgia does not cap the amount of punitive damages in a products liability case, although 75 percent of the award ("less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge") must be paid to Georgia's Office of the State Treasurer. § 51-12-5.1(e)(1)-(2). "[U]nlike compensatory damages, punitive damages serve the public interest by punishing, penalizing, and deterring the

wrongdoer." *Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 552 (Ga. 2006).

Having concluded that Autoliv's misconduct warrants punitive damages, the Court must decide what amount of punitive damages will punish, penalize, and deter Autoliv from manufacturing and selling seatbelts that do not protect people in foreseeable, real-world collisions. To accurately assess the necessary amount of punitive damages, the Court has considered Autoliv's "financial circumstances." *See Holland v. Caviness*, 737 S.E.2d 669, 671 (Ga. 2013) ("[I]f a cause of action is within the ambit of O.C.G.A. § 51-12-5.1, evidence of the defendant's financial circumstances may be admissible."); COUNCIL OF SUPERIOR COURT JUDGES, GEORGIA SUGGESTED PATTERN JURY INSTRUCTIONS, VOL. 1 CIVIL 66.750 (5th ed. 2020) ("In considering the amount of punitive damages, you may consider . . . the financial circumstances, that is, the financial condition and[/]or the net worth of the defendant.").

Nearly 30 years ago, the Georgia Court of Appeals, sitting en banc, held unanimously that "financial evidence"—an annual corporate financial report and a Form 10-K submitted to the Securities and Exchange Commission—was "relevant and admissible" to help the factfinder determine the amount of punitive damages. *J.B. Hunt Transp., Inc. v. Bentley*, 427 S.E.2d 499, 506 (Ga. Ct. App. 1992)

(en banc).[58] Here, Plaintiff introduced evidence of Autoliv's annual reports and Form 10-K filings of Autoliv's parent company Autoliv, Inc. at trial.

Autoliv, Inc.'s annual reports and Form 10-K fillings contain information relevant to Autoliv's financial condition. Autoliv, Inc.'s annual financial reports show that it is a multibillion-dollar company. For example, for fiscal year 2020, the most recent fiscal year, Autoliv, Inc. reported net sales of $7.4 billion and an operating income of $382 million. PX 1138 SEC 10-K Filing at 28. Focusing only on seatbelt sales, Autoliv, Inc. has reported annual sales over $2.5 billion in every year since 2013, when Micah Andrews' fatal collision occurred. PX 203A at 31 (years 2013–2017); PX 1138 SEC 10-K Filing at 28 (years 2018–2020). Since 2003, Autoliv has amassed over $45 billion in seatbelt sales.[59] Autoliv closed the 2020 fiscal year with $8.1 billion in total assets. PX 1138 SEC 10-K Filing at 28.

---

[58] While the relevance and admissibility of evidence in a case pending in federal court are generally questions of governed by the Federal Rules of Evidence, state-court evidentiary rulings are nonetheless persuasive authority that the Court may look to for guidance. The Court finds, in the exercise of its discretion, that Autoliv's annual reports and Form 10-K filings are both relevant and admissible evidence on the issue of Autoliv's financial condition.

[59] PX 189A at 53; PX 190A at 57; PX 191A at 63; PX 192A at 65; PX 193A at 69; PX 194A at 71; PX 195A at 75; PX 196A at 85; PX 197A at 85; PX 198A at 89; PX 199A at 89; PX 200A at 89; PX 201A at 93; PX 202A at 93; PX 203A SEC 10-K Filing at 54; PX 1128A SEC 10-K Filing at 28; PX 1129A SEC 10-K Filing at 29; PX 1138A at 39.

Autoliv, Inc. is publicly traded on the New York Stock Exchange and functions as a holding corporation. PX 1138 SEC 10-K Filing at 26. Autoliv, Inc. owns "two principal subsidiaries": Autoliv AB, a Swedish company, and Autoliv ASP, Inc., an American company. *Id.* at 3. Autoliv, Inc. also owns Autoliv Japan, Ltd. *Id.* at Ex. 21 (listing subsidiaries). Autoliv, Inc. has also booked "reserves" on its consolidated balance sheet for "product liability and warranty claims in the event that the Company's products fail to perform as represented and such failure results . . . in bodily injury." *Id.* at 74. Based on the record and evidence introduced at trial, the Court concludes that Autoliv, Inc. operated as a single enterprise for purposes of designing, manufacturing, and selling the seatbelt at issue.

Plaintiff initially named Autoliv, Inc. in this lawsuit. In May 2015, Autoliv told Plaintiff and this Court that "if any Autoliv entity was involved in the design, testing, manufacture, or supply of components of the occupant restraint system in the Mazda 3 at issue in this case, it was Autoliv Japan, Ltd." Doc. No. [108], p. 2.[60]

---

[60] Based on that representation, Plaintiff voluntarily dismissed her claims against Autoliv, Inc. (and other Autoliv entities), and the Autoliv entities agreed that the statutes of limitation and repose would be tolled until Plaintiff's claims against Autoliv Japan were resolved. Doc. No. [108], p. 3. The Court entered an Order dismissing the other Autoliv entities and tolling the statutes of limitations and repose. Doc. No. [137], p. 2.

In other words, Autoliv told Plaintiff and this Court that no other Autoliv entity, including its parent company Autoliv, Inc., needed to be a part of this case for Plaintiff to obtain complete relief for her claims, which have always included a claim for punitive damages against Autoliv. *See* Doc. No. [1-2], pp. 35–36 (count 10); Doc. No. [17], pp. 30–31 (count 10); Doc. No. [90], p. 31 (count 10). Plaintiff worked with Autoliv to ensure the correct parties were named in the lawsuit. Plaintiff agreed to dismiss Autoliv, Inc. and all other Autoliv entities in reliance on Autoliv's representations that Autoliv Japan, Ltd. was the correct entity and that Autoliv would produce in discovery any documents in the possession custody and control of any Autoliv entity. *Id.*[61]

The documents Autoliv produced in this case prove that Autoliv has ignored formal divisions among corporate Autoliv entities when it comes to this seatbelt. The earliest documents about the defective seatbelt, which prove that the defective Autoliv seatbelt design existed before Mazda even started the Mazda3 program, have the Autoliv corporate logo—not the "Autoliv Japan" insignia—at

---

[61] The annual financial reports and 10-K forms of Autoliv, Inc. were undoubtedly in the possession of an Autoliv entity. These documents are publicly available through Autoliv's website and the SEC's Edgar system. *See* https://www.autoliv.com/investors/reports-presentations-transcripts.

the top. *See* PXs 72, 74 (details about the seatbelt pretensioner in Mr. Andrews' car; R27LL load limiting retractor, the retractor in Mr. Andrews' car). These documents provide the proprietary, confidential design information specific to the defective seatbelt. Autoliv as the parent company is using them across subsidiaries and branding them with the parent logo. The detailed design drawing for the weak torsion bar Autoliv designed and manufactured for Mr. Andrews' car, shown below, proves that the design came from Autoliv GmbH, a German subsidiary of Autoliv, Inc., not Autoliv Japan, Ltd.



PX 7. Even when the detailed seatbelt design drawings contain the name of "NSK Autoliv Co., Ltd.," it is clear that the copyright for the drawing document and its data belong to Autoliv, Inc.

PX 1149. This Court need not distinguish between Autoliv entities when Autoliv's own documents reflect no such distinction.

Autoliv's annual investor reports contain further proof that Autoliv is a single company. Autoliv's 2020 annual report proclaims that Autoliv is "[t]he [w]orld's [l]argest [a]utomotive [s]afety [s]upplier" and has over 68,000 associates in 27 countries. PX 1138A at pp. 3–5. Autoliv also claims that its products have saved more than 30,000 lives—without any effort to separate the lives saved by subsidiary. Id.[62]

Autoliv's conduct in this case also contradicts any claim that Autoliv Japan, Ltd. is autonomous from its parent and sibling companies. Autoliv hand-picked

---

[62] The Japanese website for Autoliv (www.autoliv.jp) offers further proof that Autoliv is a single company. The bottom of the Japanese website clearly says—in English—that "Autoliv, Inc." holds the copyright on the website, not Autoliv Japan, Ltd. See Doc. No. [450-1], p. 3.

David Prentkowski as its corporate witness to testify about Autoliv Japan, Ltd.'s "role in designing, testing, manufacturing, marketing, distributing, and selling the subject seatbelt" and [t]he reasons Autoliv designed the subject seatbelt such that it could spool out 20″ in a frontal collision," among other topics at Autoliv's deposition under Fed. R. Civ. P. 30(b)(6). Doc. No. [205], p. 2–4. Mr. Prentkowski, however, does not work for Autoliv Japan. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 9, lines 3–14. He works for a different subsidiary of Autoliv, Inc. called Autoliv ASP. *Id.* Mr. Prentkowski did not work on the subject seatbelt at all. *Id.* at p. 9, lines 20–22. Yet he testified for Autoliv as Autoliv's corporate representative at trial. *Id.* at p. 7, lines 16–18.

The Court has already held that evidence of Autoliv, Inc.'s financial condition, as shown by its 10-K filings with the Securities and Exchange Commissions, is relevant to the issue of punitive damages. Doc. No. [494], p. 6–7.

Autoliv told Plaintiff in discovery that it has a $25 million insurance policy that covers Plaintiff's products liability claims. *See* Doc. Nos. [217, 451-1]. The existence and amount of insurance coverage is relevant and admissible on the amount of punitive damages to award. As Judge Totenberg concluded in another case, if an insurance policy provides coverage for any part of the plaintiff's award (as Autoliv has admitted), "the insurance policy is relevant to [the defendant's]

overall financial condition and resources available," which the factfinder should consider to determine the amount of punitive damages, even if the insurance policy excludes coverage for punitive damages (something Autoliv has not claimed). *Cooper v. Marten Transp., Ltd.*, No. 1:10-cv-3044, 2014 WL 11517830, at *6 (N.D. Ga. May 23, 2014) (Totenberg, J.) (citing *Hosp. Auth. of Gwinnett Cnty. v. Jones*, 386 S.E.2d 120, 124 n.13 (Ga. 1989), *reinstated on remand*, 409 S.E.2d 501 (Ga. 1991)).

In determining the amount of punitive damages to award to achieve the goals of punishing Autoliv and determining future wrongdoing, the Court has taken note of Autoliv's refusal to accept *any* responsibility for Mr. Andrews' injuries and death during the course of litigation or at trial. *See Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168, 1184 (D. Nev. 2008) (finding that defendant's refusal to accept responsibility for its own conduct because others in the industry acted the same actually "supports the need for a higher award of punitive damages to accomplish the deterrent purpose of such awards"). Autoliv's seatbelt spooled out 20 inches. Absent that much spoolout, Mr. Andrews' head would not have slammed into the steering wheel with enough force to fracture the base of his skull and to brand his face with the stippling pattern of the steering wheel hub.

Based on the evidence adduced at the bench trial, the Court imposes punitive damages against Autoliv in the amount of $100,000,000.00 (one-hundred million dollars).

## III.   CONCLUSION

The Court enters a verdict in the amount described above against Autoliv Japan, Ltd.

Respectfully submitted this 25th day of October, 2021.

BUTLER WOOTEN & PEAK LLP

*/s/ Rory A. Weeks*

JAMES E. BUTLER, JR.
  jim@butlerwooten.com
  Georgia Bar No. 099625
TEDRA L. CANNELLA
  tedra@butlerwooten.com
  Georgia Bar No. 881085
RORY A. WEEKS
  rory@butlerwooten.com
  Georgia Bar No. 113491
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax


BALLARD & FEAGLE, LLP

WILLIAM L. BALLARD
  bill@ballardandfeagle.com
  Georgia Bar No. 035625
GREGORY R. FEAGLE
  greg@ballardandfeagle.com
  Georgia Bar No. 256913
Building One, Suite 100
4200 Northside Parkway NW
Atlanta, GA 30327
(404) 873-1220

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in Book Antiqua 13-point font.

*/s/ Rory A. Weeks*

JAMES E. BUTLER, JR.
   jim@butlerwooten.com
   Georgia Bar No. 099625
TEDRA L. CANNELLA
   tedra@butlerwooten.com
   Georgia Bar No. 881085
RORY A. WEEKS
   rory@butlerwooten.com
   Georgia Bar No. 113491
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

## CERTIFICATE OF SERVICE

This is to certify that on October 25, 2021, I electronically filed the foregoing

pleading with the Clerk of the Court using the CM/ECF system which will

automatically send email notification of such filing to the following attorneys of

records follows:

Douglas G. Scribner, Esq.
Jenny A. Hergenrother, Esq.
William J. Repko III, Esq.
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424


This 25th day of October, 2021.

                                        */s/ Rory A. Weeks*
                                        JAMES E. BUTLER, JR.
                                          jim@butlerwooten.com
                                          Georgia Bar No. 099625
                                        TEDRA L. CANNELLA
                                          tedra@butlerwooten.com
                                          Georgia Bar No. 881085
                                        RORY A. WEEKS
                                          rory@butlerwooten.com
                                          Georgia Bar No. 113491
                                        BUTLER WOOTEN & PEAK LLP
                                        2719 Buford Highway
                                        Atlanta, Georgia 30324
                                        (404) 321-1700
                                        (404) 321-1713 Fax