## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JAMIE LEE ANDREWS, as surviving spouse of Micah Lee Andrews, Deceased, and JAMIE LEE ANDREWS, as Administrator of the Estate of Micah Lee Andrews, Deceased,<br><br>        Plaintiffs,<br><br>v.<br><br>AUTOLIV JAPAN, LTD.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>) Case No. 1:14-cv-3432-SCJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT AUTOLIV JAPAN, LTD.'S AMENDED
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Local Rule 16.4(B)(25) and the Court's instruction, Defendant

Autoliv Japan, Ltd. ("Autoliv") submits the following Proposed Findings of Fact and

Conclusions of Law following the nonjury trial in the above-referenced matter,

which concluded on October 13, 2021.[1]

---

[1] Attached as Exhibit 1 is a redline comparison showing all changes between Autoliv's original Proposed Findings of Fact and Conclusions of Law (Dkt. No. [522]) and these Amended Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

**I.     The Underlying Accident**

1.     On April 12, 2013, Micah Andrews was involved in a single-car accident while traveling on I-575 in his 2005 Mazda 3.  (Def. Trial Ex. 14).

2.     A witness to the accident, William Kemp, was driving in the right lane—at approximately 65 mph (the maximum speed limit)—when he saw Mr. Andrews's vehicle approaching him in his rearview mirror.  (Trial Tr. Vol. 1 A.M. at 60:10-15, 70:22-24).

3.     After passing Mr. Kemp's vehicle and returning to the right line, Mr. Andrews went "flying off the road" and down a steep embankment.  (*Id.* at 60:10-15, 68:8-10, 70:11-21).

4.     Ultimately, Mr. Andrews's vehicle struck multiple trees while traveling approximately 35 mph, resulting in a frontal collision.  (Dkt. No. [503] ¶ 3).

5.     The driver side airbag ("DAB") in Mr. Andrews's vehicle should have deployed, but it did not.  (Trial Tr. Vol. 2 A.M. at 76:11-15; Trial Tr. Vol. 3 A.M. at 20:13-16, 103:11-13).

6.     As a result, Mr. Andrews's seatbelt paid out approximately 20 inches, and his head hit the steering wheel.  (Trial Tr. Vol. 5 A.M. at 57:5-7, 60:20-61:2;

Trial Tr. Vol. 4 P.M. at 26:16-27:22, 49:12-50:2; Pl. Trial Ex. 1163 at 37:7-15; Dkt. No. [503] ¶ 4).

7.    Upon seeing Mr. Andrews's vehicle drive off the highway, Mr. Kemp called 911.  (Trial Tr. Vol. 1 A.M. at 73:13-15).

8.    Approximately three to five minutes after being contacted by 911 dispatch, Cobb County Police Officer Aaron Porter reached the scene of the accident.  (Trial Tr. Vol. 1 P.M. at 86:12-14).

9.    Mr. Andrews died in Officer Porter's presence, before Cobb County EMS and the Cobb County Fire Department reached Mr. Andrews.  (*Id.* at 100:16-18, 101:16-18; *see also* Trial Tr. Vol. 6 A.M. at 39:10-11 (Plaintiff's counsel arguing at closing that "[i]t appears that Micah Andrews lived for four minutes, approximately four minutes")).

10.    Mr. Andrews died from the head injuries he sustained in the collision—specifically from sequelae of generalized trauma.  (Trial Tr. Vol. 1 A.M. at 79:20-80:1).

## II.    Cause of the Underlying Accident

11.    Four Cobb County Police Officers who were part of the County's STEP (Selective Traffic Enforcement Program) Team—i.e., its accident reconstruction

team—investigated Mr. Andrews's accident. (Trial Tr. Vol. 4 A.M. at 49:9-50:6, 55:11-56:3).

12.     The STEP Team concluded that Mr. Andrews's actions were the cause of the accident which resulted in his death. (*Id.* at 70:20-25; Def. Trial Ex. 14).

13.     The STEP Team cited Mr. Andrews for failing to maintain his lane in violation of O.C.G.A. § 40-6-48. (Trial Tr. Vol. 4 A.M. at 70:20-25; Def. Trial Ex. 14).

14.     While the STEP Team noted the presence of remains of a dead turtle on I-575, the STEP Team concluded that the turtle was not involved in the accident. (Trial Tr. Vol. 4 A.M. at 58:15-59:9).

15.     Indeed, there is no credible evidence that the turtle had any involvement in the subject accident. (*Id.* at 69:13-16).

16.     There is no evidence of any other accidents occurring on I-575 in the vicinity of Mr. Andrews's accident on the night of April 13.

17.     The STEP Team concluded that the airbag in Mr. Andrews's vehicle should have deployed, and informed Mr. Andrews's wife, Jamie Lee Andrews, that she had a legal claim because there was potentially a defect associated with the airbag system. (*Id.* at 32:22-33:20).

### III.    The Instant Suit

18.    Subsequently, on September 18, 2014, Jamie Lee Andrews, as surviving spouse and administrator of the estate of Micah Andrews, filed this suit—involving strict liability and negligence causes of actions—against Mazda Motor Corporation and Mazda Motor of America, Inc. (collectively "Mazda"); Robert Bosch LLC and several of its affiliates (collectively "Bosch"); and Autoliv Japan, Ltd. ("Autoliv") and several of its affiliates, alleging that Mr. Andrews died as a result of allegedly defective airbag and seatbelt systems within the 2005 Mazda 3. (Dkt. No. [1-2]).

19.    On May 5, 2015 Plaintiff dismissed all of the Autoliv entities except Autoliv Japan, Ltd.  (Dkt. No. [108]).

20.    Plaintiff dismissed each of the Bosch entities on August 21, 2015 (Dkt. No. [131]) and each of the Mazda entities on July 6, 2016 (Dkt. No. [271]), leaving Autoliv Japan, Ltd. as the only remaining Defendant.

### IV.    The Occupant Restraint System

21.    A vehicle's occupant restraint system is a complex tapestry of numerous different, but interrelated parts, including but not limited to the vehicle's airbags, seatbelts, seatbelt pretensioners, seat backs, steering wheel, and overall

interior design.  (Trial Tr. Vol. 3 P.M. at 107:11-108:6; Trial Tr. Vol. 4 P.M. at 5:18-6:9; Trial Tr. Vol. 5 A.M. at 25:12-26:3).

22.     Because these parts vary from vehicle to vehicle, the occupant restraint system within each vehicle is different.  (Trial Tr. Vol. 4 P.M. at 6:10-22; Trial Tr. Vol. 5 A.M. at 48:7-25).

23.     A vehicle's seatbelts and airbags are designed to work together, along with the other components of the vehicle's restraint system.  (Trial Tr. Vol. 3 P.M. at 110:16-18; Trial Tr. Vol. 5 A.M. at 25:12-26:3, 29:13-30:20).

24.     All vehicles sold in the United States today have airbags.  (Trial Tr. Vol. 1 P.M. Trial at 44:6-8).

25.     All vehicles sold in the United States today have seatbelts, virtually all of which contain a loading limiting feature in the retractor.  (Trial Tr. Vol. 5 A.M. at 27:17-25).

26.     A pretensioner is a component that is designed to remove initial looseness that might exist in the seatbelt at the beginning of a crash event.  (*Id.* at 30:21-31:19).  Like the vehicle's airbags, the vehicle's pretensioners activate only after receiving a signal to deploy from the vehicle's Electronic Front Sensor ("EFS") or Sensors.  (Trial Tr. Vol. 3 A.M. at 107:10-12; Trial Tr. Vol. 5 A.M. at 58:17-59:19).

27.    A load limiting retractor is a component that allows the seatbelt to pay out webbing in a controlled manner during a collision.  (Trial Tr. Vol. 5 A.M. at 26:4-21).

28.    Vehicle manufacturers use load limiting retractors to reduce chest and thoracic injuries, which are caused by the seatbelt remaining too tight during a frontal collision.  (Trial Tr. Vol. 3 P.M. at 113:21-114:19; Trial Tr. Vol. 5 A.M. at 26:4-21; Trial Tr. Vol. 5 P.M. at 23:6-16).

29.    A seatbelt with a load limiting retractor—by design—allows more forward movement and has to be "tuned" with the airbag by the vehicle manufacturer to prevent too much forward movement by the occupant.  (Trial Tr. Vol. 5 A.M. at 35:11-37:18).

30.    Because the design of each vehicle is different, a vehicle's manufacturer is in the best position to decide which component parts should be incorporated into the vehicle's occupant restraint system.  (*Id.* at 31:20-22, 34:1-35:4) (Dr. William Van Arsdell testifying that "the OEM is the only one who can run those tests and make those decisions and specify those things [components]")).

31.    The vehicle's manufacturer makes these decisions after considering and testing the various options provided by component part suppliers like Autoliv.  (*Id.* at 34:1-35:10).

32.     Ultimately, the vehicle manufacturer provides its component suppliers with an engineering specification that specifies precisely which components (e.g., seatbelt, airbags, pretensioners, etc.) should be supplied for inclusion in the vehicle. (Trial Tr. Vol. 3 A.M. at 125:1-13; Trial Tr. Vol. 4 P.M. at 8:12-24; Trial Tr. Vol. 5 A.M. at 43:7-44:13).

33.      Before a new vehicle is sold, its manufacturer conducts crash testing and certifies its results to the federal government.  Vehicle manufacturers do this, at minimum, during testing required by Federal Motor Vehicle Safety Standard ("FMVSS") No. 208 testing and during New Car Assessment Program ("NCAP") testing.  Federal Motor Vehicle Safety Standards are issued by the National Highway Traffic Safety Administration ("NHTSA").  (Trial Tr. Vol. 3 P.M. at 108:11-18; Trial Tr. Vol. 5 A.M. at 38:25-41:16).

34.     FMVSS 208 testing involves a series of standardized crash tests— conducted by the vehicle manufacturer—at various speeds, including a full frontal collision in which the vehicle is driven into a solid barrier at 30 mph.  (Trial Tr. Vol. 2 P.M. at 86:4-16; Trial Tr. Vol. 3 P.M. at 109:9-20; Def. Trial Ex. 104).

35.     NCAP testing involves a very similar series of tests, though the full frontal collision occurs at 35 mph.  (Trial Tr. Vol. 2 P.M. at 31:20-21; Trial Tr. Vol. 3 P.M. at 50:6-7; Trial Tr. Vol. 5 A.M. at 53:24-54:5; Def. Trial Ex. 1151).

8

36.     The vehicle's airbags are designed to and do deploy during the FMVSS 208 and NCAP testing.  (Trial Tr. Vol. 2 P.M. at 31:25-32:1, 71:13-17, 87:21-88:18; Trial Tr. Vol. 3 P.M. at 108:25-109:20; Trial Tr. Vol. 5 A.M. at 50:11-15, 54:10-11). In fact, NHTSA does not require any testing in which a vehicle's airbags are intentionally suppressed.  (Trial Tr. Vol. 2 P.M. at 87:21-88:18; Trial Tr. Vol. 5 A.M. at 53:6-18).

37.     The 2005 Mazda 3 passed both the FMVSS 208 and NCAP crash testing, receiving a four out of five star rating in connection with the NCAP testing. (*Id.* at 50:1-5, 53:24-54:9; Def. Trial Exs. 104, 1151; Pl. Trial Ex. 9; Trial Tr. Vol. 3 A.M. at 104:20-21).

38.     Also before a new vehicle is sold, its seatbelts must go through FMVSS 209 testing, which involves a series of component-level, non-crash tests to ensure the functionality and durability of the seatbelt assembly.  (Trial Tr. Vol. 5 A.M. at 39:20-40:2).

39.     The subject seatbelt passed the tests required by FMVSS 209.  (*Id.* at 40:11-22).

## V.    The Driver Side Airbag

40.    The driver side airbag in Mr. Andrews's vehicle, which was supplied by Autoliv, did not deploy during the accident because it did not receive a signal to deploy.  (Trial Tr. Vol. 3 A.M. at 106:20-107:4).

41.    The pretensioner in Mr. Andrews's seatbelt similarly did not deploy because it did not receive a signal to deploy.  (*Id.* at 107:5-9).

42.    Had the airbag received a signal to deploy, it would have deployed, and Mr. Andrews would still be alive today.  (*Id.* at 107:10-12; Trial Tr. Vol. 2 P.M. at 103:21-23; Trial Tr. Vol. 5 A.M. at 58:17-59:10; Trial Tr. Vol. 5 P.M. at 21:22-25).

43.    The airbag and pretensioner did not receive signals to deploy because, during the crash, the EFS and the EFS Connector became disconnected before the EFS Connector could send a signal to deploy to the airbag and pretensioner.  (Trial Tr. Vol. 3 A.M. at 44:18-24).

44.    The EFS and the EFS Connector were disconnected too early during the crash event as a result of a design defect in the 2005 Mazda 3's EFS system.  (*Id.* at 20:11-16, 44:18-24).

45.    Specifically, the EFS system in the 2005 Mazda 3 was defectively designed because it only contained a single sensor, as opposed to dual sensors.  (*Id.* at 107:13-108:21).

10

46. A Dual EFS system design would have provided redundant crash protection in the event that the single EFS became disconnected before a signal to deploy could be sent to the airbag system, as was the case with the single EFS in Mr. Andrews's 2005 Mazda 3. (*Id.* at 108:16-109:2).

47. Several other vehicles in the same class as the 2005 Mazda 3—i.e., the 2005 Honda Civic, the 2005 Toyota Corolla, and the 2005 Volvo S40—incorporated a Dual EFS system. (*Id.* at 109:23-110:10).

48. Incorporating the Dual EFS system into the 2005 Mazda 3 would have cost Mazda an additional $5.00 per vehicle. (*Id.* at 110:11-22).

49. Bosch supplied Mazda with the EFS system for the 2005 Mazda 3. (*Id.* at 115:1-5).

50. During product development, Bosch provided Mazda with Single and Dual EFS system options. (*Id.* at 119:2-120:1; Def. Trial Ex. 101 at BOSCH STLMT 00195). Mazda ultimately selected the Single EFS system option. (Trial Tr. Vol. 3 A.M. at 119:14-24).

51. The EFS system in the 2005 Mazda 3 was also defective for two additional reasons.

52. First, the EFS system contained a "press fit" connector without a locking mechanism to prevent the EFS from separating from the EFS Connector.

11

(*Id.* at 111:4-114:14).  The EFS system in the 2005 Mazda 3 should have contained a connector with multiple locking mechanisms, just as the EFS systems in the 2005 Chevrolet Cavalier and the 2003 Honda Civic did.  (*Id.* at 111:4-113:2).  Had an EFS Connector with multiple locking mechanisms been in place, the EFS and EFS Connector would not have separated during the accident, and a signal to deploy would have been sent to the airbag system.  (*See id.* at 114:3-14).

53.     Second, the cover for the EFS Connector was defectively designed. The cover was designed such that it could knock the EFS Connector loose, thereby separating the EFS Connector from the airbag system.  (*See id.* at 114:15-25).  Had the cover for the EFS Connector been appropriately designed, it would not have knocked the EFS Connector loose, and a signal to deploy would have been sent to the airbag system.  (*See id.*).

## VI.   The Driver Side Seatbelt

54.     Having dismissed Mazda and Bosch, Plaintiff claims Autoliv should be liable for Mr. Andrews's death, alleging that the driver side seatbelt in the 2005 Mazda 3 was defective because (i) the deployment threshold in its load limiting retractor was not higher than 2.0 ± .5 kN and (ii) the seatbelt did not contain a

"stop"—i.e., a device that would have limited seatbelt payout to six inches. (*See* Trial Tr. Vol. 3 P.M. at 107:3-10).

55.     In the years since the 2005 Mazda 3 was offered for sale, Plaintiff is the only person to have asserted a claim that this vehicle's driver side seatbelt is defective.  (Trial Tr. Vol. 4 P.M. at 29:11-30:16; Def. Trial. Ex. 206 ¶ 12 (Mazda interrogatory response stating that Mazda sold 71,058 2005 Mazda 3s in the United States)).

### A.     Deployment Threshold

56.     As an initial matter, Autoliv supplied the driver side seatbelts for the 2005 Mazda 3 in accordance with Mazda's design specification.  (Pl. Trial Ex. 1163 at 37:24-38:4, 38:13-21, 96:5-13).

57.     Mazda's design specification specified that the driver side seatbelt should include a load limiting retractor with a deployment threshold of 2.0 ± .5 kN. (Trial Tr. Vol. 4 P.M. at 16:13-17:8; Def. Trial Ex. 42 at 11).

58.     A retractor's "deployment threshold" refers to the point (i.e., the amount of force) at which the retractor allows the seatbelt to pay out webbing to reduce the amount of force exerted on the occupant's chest and thoracic regions. (Trial Tr. Vol. 3 P.M. at 37:19-38:17; Trial Tr. Vol. 5 A.M. at 26:4-21).

59.     During product development for the 2005 Mazda 3, Autoliv provided Mazda with three different deployment threshold options for the retractor in the driver side seatbelt:

        a.  a "high" deployment threshold option;

        b.  a "medium" deployment threshold option; and

        c.  a "low" deployment threshold option.

(Pl. Trial Ex. 1163 at 97:14-19).

60.     Ultimately, Mazda selected the "low" option for the 2005 Mazda 3, which had a deployment threshold of $2.0 \pm .5$ kN.  (*Id.*; Def. Trial Ex. 42 at 11).

61.     Autoliv also previously supplied load limiting retractors with a deployment threshold of $2.0 \pm .5$ kN to Honda for the Honda CRV and to Mitsubishi for the Mitsubishi Outlander.  Autoliv also previously supplied a load limiting retractor with a deployment threshold lower than $2.0 \pm .5$ kN to Isuzu for the Isuzu Trooper.  (Pl. Trial Ex. 1163 at 96:20-97:13).

62.     All else being equal, a load limiting retractor with a higher deployment threshold will result in less seatbelt payout than a retractor with a lower deployment threshold—a fact Mazda was aware of at the time it selected the $2.0 \pm .5$ kN deployment threshold for the 2005 Mazda 3.  (Trial Tr. Vol. 3 P.M. at 37:19-38:17, 122:19-125:5; *see also* Trial Tr. Vol. 5 A.M. at 63:1-15).

14

63.     Importantly, however, a load limiting retractor is not more effective simply because it includes a higher deployment threshold.  (Trial Tr. Vol. 5 A.M. at 15:10-16:19, 18:9-21).

64.     For example, the 2005 Volvo S40 (which had a deployment threshold of 6.0 ± .5 kN) and the 2005 Mazda 3 (which had a deployment threshold of 2.0 ± .5 kN) received the same four out of five star rating during NCAP testing.  (Pl. Trial Ex. 9; Pl. Trial Ex. 140 at 17; Def. Trial Ex. 42 at 11).

65.     There is no evidence regarding how much seatbelt webbing would have paid out during Mr. Andrews's collision had the load limiting retractor within his seatbelt had a deployment threshold higher than 2.0 ± .5 kN.  (*See* Trial Tr. Vol. 2 P.M. at 112:20-113:10).

66.     There is no evidence that Mr. Andrews would have survived the subject accident had the load limiting retractor within his seatbelt had a deployment threshold higher than 2.0 ± .5 kN.  (*Id.*).

**B.     "Stop"**

67.     A "stop" is a device added to a seatbelt to limit an occupant's forward excursion by limiting the amount of seatbelt webbing that pays out during a collision. (Trial Tr. Vol. 5 A.M. at 62:1-10).

68.    Within its design specification for the 2005 Mazda 3, Mazda did not specify that the driver side seatbelt should include a stop.  (Def. Trial Ex. 42 at 11).

69.    Given its knowledge of the automotive industry and occupant restraint systems generally, Mazda was aware that a stop could have been incorporated into Mr. Andrews's seatbelt.  (Trial Tr. Vol. 3 P.M. at 123:16-24; Trial Tr. Vol. 5 A.M. at 63:1-15).

70.    Mazda was also aware that a stop could have been incorporated into Mr. Andrews's seatbelt because at least two of its prior vehicles—the 1987 Mazda 626 and the 1991 Mazda Prodigy—incorporated stops.  (Trial Tr. Vol. 2 P.M. at 111:25-112:7).

71.    In other words, Mazda was aware of stop features as early as 1987.  (*See id.*).

72.    Regardless, had Mr. Andrews's seatbelt included a stop that limited seatbelt payout to six inches, that would have been akin to a seatbelt with no load limiting feature at all, increasing the forces to his thoracic area (which load limiters are designed to reduce).  (Trial Tr. Vol. 5 P.M. at 24:11-21, 52:25-53:1).

73.    In fact, had Mr. Andrews been wearing seatbelt that included a stop that limited seatbelt payout to 6 inches during his 35-mph collision, he would have been

exposed to serious or fatal thoracic injuries during the subject accident.  (*See id.* at 27:11-28:13, 29:3-9).

## CONCLUSIONS OF LAW

1.      Under Georgia law, "[t]he manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort . . . [for personal injury resulting] because the property when sold by the manufacturer was [defective] and its condition when sold is the proximate cause of the injury sustained."  O.C.G.A. § 51-1-11(b)(1).

2.      In other words, to recover damages under O.C.G.A. § 51-1-11, a person injured by an allegedly defective product must establish the following three elements by a preponderance of the evidence:

> 1) the product was defective,
>
> 2) the defect existed at the time the product left the manufacturer's control, and
>
> 3) the defect in the product was the proximate cause of the plaintiff's injury.

Georgia Pattern Instruction No. 62.610.

3.      Here, Plaintiff alleges that Mr. Andrews's seatbelt was defectively designed and that defect was the proximate cause of his death.  However, at trial, Plaintiff failed to prove either of these elements by a preponderance of evidence.

**I.     The Driver Side Seatbelt in Mr. Andrews's 2005 Mazda 3 Was Not Defectively Designed.**

4.     In Georgia, courts apply a risk-utility analysis to determine whether a product is defective. *See Banks v. ICI Ams., Inc.*, 264 Ga. 732, 735 (1994).

5.     The risk-utility analysis "incorporates the concept of 'reasonableness,' i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk." *Id.* at 734.

6.     As part of the risk-utility analysis, "the trier of fact may consider evidence establishing that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." *Id.* at 736.

7.     However, evidence of an alternative design can only be considered if it "would have made the product safer and could have prevented or minimized the plaintiff's injury." Georgia Pattern Instruction No. 62.660; *Banks*, 264 Ga. at 737 (adopting the risk-utility test because the Supreme Court could "no longer accept the position that a manufacturer cannot be liable for injuries proximately caused by a product that functions for its intended use, regardless of . . . the plaintiff's ability to adduce evidence that a feasible alternative design, <u>which could have prevented or</u>

18

minimized the plaintiff's injury, was available at the time the manufacturer made its design . . . decision[]" (emphasis added)); *Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 78 (1995) ("The plaintiff in a suit involving a claim of defective design may introduce evidence that a feasible alternative design, which could have prevented or minimized the plaintiff's injury, was available at the time the manufacturer made its design decisions." (internal quotation marks and citation omitted) (emphasis added)); *see also McGee v. Evenflo Co.*, No. 5:02-CV-0259, 2003 WL 23350439, at *10-11 (M.D. Ga. Dec. 11, 2003) (highlighting an expert's failure "to show that his alternative designs would have prevented the injuries suffered" in an order excluding his alternative design opinions); *Little v. NCR Corp.*, No. 1:93-CV-1555, 1995 WL 929019, at *16 n.3 (N.D. Ga. Dec. 7, 1995) (concluding that the plaintiff's expert failed to produce evidence of viable alternative designs because the expert did not explain how his proposed alternatives would eliminate problems associated with the syndrome at issue).

8.     Ultimately, the "essential inquiry" is "whether the design chosen was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware." *Id.* at 736 (emphasis added).

9.    In this case, as an initial matter, it is undisputed that airbags and seatbelts are in every new vehicle and are designed to work together to protect vehicle occupants during collisions.  (*See* Paragraphs 23-25 *supra*).

10.    Virtually all seatbelts, including Mr. Andrews's seatbelt, include a load limiting mechanism that reduces the amount of force exerted on the occupant's chest and thoracic regions by allowing the seatbelt to pay out webbing in a controlled manner during a collision.  (Trial Tr. Vol. 5 A.M. at 26:4-21, 27:17-20 (Dr. William Van Arsdell testifying that he is "not aware of any vehicle without a load limiter today"); Trial Tr. Vol. 5 P.M. at 23:6-16, 24:2-7 (Dr. Elizabeth Raphael testifying that load-limiting seatbelts are in "[e]very modern vehicle" that she inspects)).  This has the effect of allowing the occupant to move forward during the collision.  (Trial Tr. Vol. 5 A.M. at 26:4-21; Trial Tr. Vol. 5 P.M. at 23:22-25).  Airbags are in place to, among other things, cushion an occupant's interaction with the steering wheel (thus reducing the forces on his head) and manage forward excursion (thus reducing seatbelt payout).  (Trial Tr. Vol. 5 A.M. at 29:13-30:20 (Dr. William Van Arsdell testifying that "the seatbelt and the airbag work together, and the airbag is supplying the force to help you stop"); Trial Tr. Vol. 5 P.M. at 23:17-24:1 (Dr. Elizabeth Raphael testifying that "airbags and seatbelts work hand in hand" and explaining why)).

11.     Here, all parties agree that Mr. Andrews's airbag should have deployed. (Trial Tr. Vol. 3 A.M. at 103:11-15).

12.     The airbag did not deploy because the EFS System—which was supplied by Bosch in accordance with Mazda's design specification—was defective. (*See* Paragraphs 43-53 *supra*).

13.     All parties similarly agree that had Mr. Andrews's airbag deployed, Mr. Andrews would have survived the subject accident, having received the benefit of both the seatbelt and airbag working together.  (Trial Tr. Vol. 2 P.M. at 103:21-23; Trial Tr. Vol. 5 P.M. at 21:22-25).

14.     Despite these circumstances, Plaintiff nevertheless argues that the subject seatbelt—which was supplied by Autoliv in accordance with Mazda's design specification—was defective and caused Mr. Andrews's death.

15.     Specifically, Plaintiff alleges that Mr. Andrews's seatbelt was defective because it did not incorporate either of two proposed alternative designs.  (Trial Tr. Vol. 3 P.M. at 107:3-10).

16.     First, Plaintiff contends that the seatbelt was defective because it did not incorporate a load limiting retractor with a deployment threshold higher than 2.0 ± .5 kN (the "Deployment Threshold Alternative").  (*Id.*).

17.     Second, Plaintiff contends that the seatbelt was defective because it did not incorporate a "stop" (the "Stop Alternative").  (*Id.*).

18.     For the reasons below, Mr. Andrews's seatbelt was not defective.

**A.     The Subject Seatbelt Was Not Defective By Virtue of Its Deployment Threshold of 2.0 ± .5 kN.**

19.     Mazda's decision to incorporate a deployment threshold of 2.0 ± .5 kN was reasonable.  (Trial Tr. Vol. 5 A.M. at 56:12-15, 60:20-61:16).

20.     As an initial matter, because the components that make up the occupant restraint system (e.g., airbags, seatbelts, seatbelt pretensioners, seat backs, steering wheel, and overall interior design) differ from vehicle to vehicle, the appropriate deployment threshold varies from vehicle to vehicle, and the decision as to what deployment threshold is appropriate for a given vehicle is best suited for the vehicle's manufacturer—i.e., the company that is familiar with all aspects of the occupant restraint system and conducts the in-vehicle testing for the vehicle.  (Trial Tr. Vol. 4 P.M. at 6:10-22; Trial Tr. Vol. 5 A.M. at 31:20-22, 34:1-35:10, 48:7-25).

21.     And here, after Autoliv presented Mazda with "high," "medium," and "low" deployment threshold options, Mazda selected the "low" option (2.0 ± .5 kN) as best suited for its vehicle.  (Pl. Trial Ex. 1163 at 97:14-19; Def. Trial Ex. 42 at 11).

22.     Deployment thresholds within load limiting retractors typically range from $2.0 \pm .5$ kN to $6.0 \pm .5$ kN.  Indeed, on the one hand, Autoliv has supplied load limiting thresholds at or below $2.0 \pm .5$ kN for several vehicles (e.g., the Mazda 3, the Honda CRV, the Isuzu Trooper, and the Mitsubishi Outlander).  (Pl. Trial Ex. 1163 at 96:20-97:13).  On the other hand, Autoliv has supplied a load limiting threshold as high as $6.0 \pm .5$ kN (for the Volvo S40).  (Trial Tr. Vol. 3 P.M. at 71:5-11; Pl. Trial Ex. 140 at 17).

23.     Additionally, the 2005 Mazda 3 passed the required NHTSA safety testing and the NCAP testing.  In fact, for the NCAP testing, the 2005 Mazda 3 received a 4 out of 5 star rating.  (Trial Tr. Vol. 5 A.M. at 50:1-5, 53:24-54:9; Def. Trial Exs. 104, 1151; Pl. Trial Ex. 9).

24.     The 2005 Volvo S40 received the exact same four out of five star rating, even though the retractor in the driver side seatbelt in the 2005 Volvo S40 had a load limiting threshold of $6.0 \pm .5$ kN—a fact that Plaintiff repeatedly emphasizes.  (Pl. Trial Ex. 9; Pl. Trial Ex. 140 at 17; Def. Trial Ex. 42 at 11).

25.     In other words, a higher deployment threshold does not necessarily make a seatbelt safer.  (Trial Tr. Vol. 5 A.M. at 15:10-16:19, 18:9-21 (discussing Dr. Van Ardell's research on the effect of load limiters on occupant restraint system

performance)).  If it did, then vehicle manufacturers would always use the highest deployment threshold available.  But they do not.

26.     Furthermore, while Plaintiff argues that the 2.0 ± .5 kN deployment threshold was defectively low because it allowed 20 inches of payout in the absence of airbag deployment, none of Plaintiff's experts have offered an opinion regarding how much webbing Mr. Andrews's seatbelt would have paid out if the deployment threshold was 2.5 kN, 3.0 kN, 3.5 kN, 4.0 kN, 4.5 kN, 5.0 kN, 5.5 kN, or 6.0 kN. (*See* Trial Tr. Vol. 2 P.M. at 112:20-113:10).

27.     Autoliv argues that Plaintiff's experts have not offered such an opinion because, given the forces at play in the 35 mph collision and Mr. Andrews's mass (226 pounds), a higher deployment threshold would not have meaningfully reduced the amount of webbing that paid out.  In other words, even if a higher deployment threshold was used, the result would have been the same—i.e., Mr. Andrews's head would have met the steering wheel with a tremendous amount of force.  (*See* Trial Tr. Vol. 5 P.M. at 26:13-24).

28.     Regardless of the reason Plaintiff has not offered such a calculation, Plaintiff, without this calculation, cannot establish that a higher deployment threshold "would have made the [seatbelt] safer and could have prevented or minimized the plaintiff's injury."  Georgia Pattern Instruction No. 62.660; *see also*

Paragraph 7 *supra*.  And without such evidence, Plaintiff's Deployment Threshold Alternative cannot be considered as evidence that the subject seatbelt's design was defective.

### B.     The Subject Seatbelt Was Not Defective By Virtue of Not Having a "Stop."

29.     Mazda's decision not to include a "stop"—which would have limited the subject seatbelt's webbing payout to six inches—was also reasonable.  (*See* Trial Tr. Vol. 5 A.M. at 56:12-15, 60:20-61:16).

30.     As noted above, a "stop" is a device added to a seatbelt to limit an occupant's forward excursion by limiting the amount of seatbelt webbing that pays out during a collision.  (Trial Tr. Vol. 5 A.M. at 62:1-10).

31.     At the time of production of the subject vehicle, Mazda was familiar with "stop" features and had been for decades.  (Trial Tr. Vol. 2 P.M. at 111:25-112:7).  Indeed, both the 1987 Mazda 626 and the 1991 Mazda Protégé included "stop" technology.  (*Id.*).

32.     However, limiting the amount of webbing payout during a crash event to as little as 6 inches is akin to having a seatbelt with no load limiter at all to reduce chest and thoracic injuries.  (Trial Tr. Vol. 5 P.M. at 24:11-21, 52:25-53:1 (Dr. Elizabeth Raphael testifying that "having a 6-inch stop is like having no load limiter at all")).

33.     Industry experts have consistently recognized the benefit of employing load limiters to reduce forces on the chests of occupants, particularly for young adult, small female, and elderly occupants, who may not be strong enough to otherwise withstand the chest forces that can cause severe or even fatal injuries.  (*See id.* at 24:11-25:1).

34.     In fact, the overwhelming majority, if not all, driver side seatbelts included in vehicles manufactured today incorporate load limiters.  (Trial Tr. Vol. 5 A.M. at 27:17-20; Trial Tr. Vol. 5 P.M. at 24:2-7).   NHTSA even encourages automakers to use load limiters.  (Trial Tr. Vol. 3 P.M. at 113:1-3).

35.     Furthermore, including a "stop" that limits webbing payout to 6 inches is not a standard industry practice.  (Trial Tr. Vol. 4 P.M. at 28:23-29:1 (David Prentkowski testifying that stops are not commonly used)).   Perhaps the best evidence of this is Plaintiff's Trial Exhibit 1074, a chart that identifies the amount of webbing payout—during 35 mph NCAP testing—by the driver side seatbelt in 19 different vehicles in the same class as the 2005 Mazda 3.

36.     More specifically, the chart demonstrates that even during the NCAP test—during which the driver side airbag and pretensioner both deploy—at least two-thirds of the vehicles identified paid out more than 6 inches of seatbelt webbing.  (Pl. Trial Ex. 1074 at 2; Trial Tr. Vol. 5 A.M. at 55:8-17).   The chart also

demonstrates that each of the 19 vehicles identified would likely pay out more than 6 inches if the driver side airbag and pretensioner did not deploy, as was the case in Mr. Andrews's accident.  (*See* Pl. Trial Ex. 1074 at 2; Trial Tr. Vol. 2 P.M. at 80:8-12; Trial Tr. Vol. 5 A.M. at 55:8-56:10).

37.    Ultimately, a vehicle manufacturer's decision as to whether or not to include a "stop" involves an engineering tradeoff, as incorporating a "stop" can reduce the likelihood of head injuries by limiting the amount of webbing that pays out during a collision, but not without increasing the likelihood of severe or even fatal chest injuries.  (Trial Tr. Vol. 2 P.M. at 45:13-18, 70:5-10 (Dr. Mariusz Ziejewski testifying that "[e]ngineering is always a tradeoff"); Trial Tr. Vol. 4 P.M. at 29:6-9 (David Prentkowski testifying that "[t]he big trade-off is when you introduce a stop into the system . . . you run the risk of increasing forces on the chest"); Trial Tr. Vol. 5 P.M. at 24:11-25:1, 26:1-8 (Dr. Elizabeth Raphael testifying that "there is a tradeoff between forward movement and [an] increase in chest forces when it comes to seatbelt assemblies"); Trial Tr. Vol. 3 P.M. at 113:11-115:10 (Steven Meyer testifying that the seatbelt design process involves a "tradeoff")).

38.    This and other engineering tradeoffs involve hard decisions that vehicle manufacturers must make for their vehicles.  (Trial Tr. Vol. 3 A.M. at 129:25-130:24

(Chris Caruso testifying that "[i]t's hard, what GM and these other automakers do" and stating that "in engineering systems there's always trade-offs")).

39.     Accordingly, Mazda's decision not to incorporate a six-inch stop in the subject seatbelt was reasonable, just as Mazda's decision to include a deployment threshold of 2.0 ± .5 kN was reasonable.[2]  *See* Paragraph 19 *supra*.

40.     When considering these facts—along with the 2005 Mazda 3's compliance with federal testing regulations, its 4-star NCAP safety rating, and the use of 2.0 ± .5 kN deployment thresholds in other vehicles—the Court concludes that the subject seatbelt was not defectively designed.  As a result, Plaintiff's strict liability claim fails, and she is not entitled to compensatory damages.

## II.     Even if the Driver Side Seatbelt in Mr. Andrews's 2005 Mazda 3 Was Defectively Designed, That Defect Did Not Cause Mr. Andrews's Death.

41.     Even if the subject seatbelt was defectively designed, Plaintiff's strict liability claim still fails as a matter of law because Plaintiff did not meet her burden of demonstrating that the alleged defects proximately caused Mr. Andrews's death.

---

[2] Unlike Plaintiff's Deployment Threshold Alternative, the Court may consider Plaintiff's Stop Alternative as evidence of defectiveness because Plaintiff—through her biomechanics expert—did present testimony that had Mazda employed the Stop Alternative, Mr. Andrews would have survived the subject accident.  *See* Paragraph 28 *supra*.  Such testimony, however, was contradicted by the testimony of Autoliv's biomechanics expert, as discussed in Section II *infra*.

42.     As noted above, Plaintiff has alleged that the subject seatbelt was defective because it (i) did not incorporate a deployment threshold greater than 2.0 ± .5 kN (the "Load Limiting Defect") and/or (ii) did not incorporate a "stop" limiting seatbelt payout to six inches (the "Stop Defect").  (*See* Trial Tr. Vol. 3 P.M. at 107:3-10).

43.     In order to demonstrate that the Load Limiting Defect proximately caused Mr. Andrews's death, Plaintiff was required to show that but for the Load Limiting Defect, Mr. Andrews would have survived the accident.  *See Strength v. Lovett*, 311 Ga. App. 35, 40 (2011) ("[T]o prove causation, the plaintiff must show that the wrongdoing is both a cause in fact and a proximate cause of the injuries."); *id.* at 43-44 ("To show that the wrongful conduct of the defendant is a cause in fact of his injuries, a plaintiff ordinarily must prove that, but for this conduct, he would not have sustained the injury.").

44.     In other words, Plaintiff was required to show that Mr. Andrews would not have died had the subject seatbelt included a deployment threshold greater than 2.0 ± .5 kN.

45.     But Plaintiff did not make such a showing.  (*See* Trial Tr. Vol. 2 P.M. at 112:20-113:10).

29

46.     Plaintiff—whether through expert testimony or otherwise—offered no evidence as to (i) how much webbing would have paid out had Mr. Andrews's seatbelt included a higher (e.g., a 2.5 kN, 3.0 kN, 3.5 kN, 4.0 kN, 4.5 kN, 5.0 kN, 5.5 kN, or 6.0 kN) deployment threshold or (ii) whether Mr. Andrews would have survived the collision given that level of webbing payout.  (*Id.*).

47.     Plaintiff similarly offered no evidence as to (i) the amount of force with which Mr. Andrews's head would have hit the subject steering wheel had his seatbelt included a higher threshold or (ii) whether Mr. Andrews would have survived the subject collision given that level of force.  (*Id.*).

48.     In the absence of such evidence, the alleged Load Limiting Defect did not proximately cause Mr. Andrews's injuries.

49.     Meanwhile, in order to demonstrate that the Stop Defect proximately caused Mr. Andrews's death, Plaintiff was required to show that but for the Stop Defect, Mr. Andrews would have survived the accident.  *See Strength*, 311 Ga. App. at 40, 43-44.

50.     In other words, Plaintiff was required to show that Mr. Andrews would not have died had the subject seatbelt included a "stop."

51.     To make this showing, Plaintiff presented evidence suggesting that had the subject seatbelt included a "stop," Mr. Andrews would have experienced survivable *head* injuries.  (Trial Tr. Vol. 2 P.M. at 105:18-106:8).

52.     However, Autoliv's biomechanics expert testified that had Mr. Andrews's seatbelt included a stop, Mr. Andrews would have been exposed to serious or fatal *thoracic* injuries.  (Trial Tr. Vol. 5 P.M. at 26:12-27:10, 28:14-29:2 (Dr. Elizabeth Raphael testifying that the test results upon which Plaintiff's biomechanics expert relies show that Mr. Andrews would have been exposed to upwards of 2,700 pounds of chest forces in the test vehicle); *id.* at 27:16-28:7 (Dr. Elizabeth Raphael testifying that 2,700 pounds of chest force would result in AIS Level 3 to fatal injuries, which include "laceration of the heart, lacerations of the lungs, injury to the esophagus, multiple rib fractures, flailed chest"); *id.* at 29:3-9 (Dr. Elizabeth Raphael testifying that "Mr. Andrews would have suffered AIS Level 3 injuries or death if a 6-inch stop was included in the 2005 Mazda 3"); *see also* Trial Tr. Vol. 3 P.M. at 114:16-115:10 (Steven Meyer testifying that a ruptured aorta is a chest injury that can be caused by a seatbelt)).

53.     After considering the testimony from Autoliv's biomechanics expert, the Court cannot conclude that Plaintiff has demonstrated, by a preponderance of the evidence, that had Mr. Andrews's seatbelt included a "stop," he would have survived

the subject collision.  Accordingly, the alleged Stop Defect did not proximately cause Mr. Andrews's injuries.

54.     As neither the alleged Load Limiting Defect nor the alleged Stop Defect was the proximate cause of Mr. Andrews's death, Plaintiff's strict liability claim fails, even if the subject seatbelt were defectively designed (which it was not).  Thus, Plaintiff is not entitled to compensatory damages for this additional reason.

## III.    Plaintiff Is Not Entitled to Punitive Damages.

55.     Because Plaintiff is not entitled to compensatory damages, her punitive damages claim fails as a matter of law.  *See S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 270 (1992) ("Punitive damages may not be recovered where there is no entitlement to compensatory damages.").

56.     Moreover, even if Plaintiff were entitled to a recovery of compensatory damages (which she is not), she would not be entitled to a recovery of punitive damages.

57.     Under Georgia law, punitive damages may be awarded only when "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."  O.C.G.A. § 51-12-5.1.

58.     Here, Plaintiff has failed to meet that burden.

59.     As explained above, Autoliv supplied Mazda with "high," "medium," and "low" options for the deployment threshold within the subject seatbelt retractor, and Mazda ultimately selected the low option, which a had deployment threshold of 2.0 kN ± .5 kN—a deployment threshold that Autoliv had previously supplied to other major vehicle manufacturers.  (Pl. Trial Ex. 1163 at 96:20-97:19; Def. Trial Ex. 42 at 11).

60.     Then, before it was offered for sale, the subject vehicle—which included a driver side seatbelt that contained a retractor with a deployment threshold of 2.0 kN ± .5 kN and no "stop"—passed the in-vehicle crash testing required by NHTSA and even received a 4 out of 5 star rating during NCAP testing.  This 4-star rating was the exact same rating that the 2005 Volvo S40 received, and the driver side seatbelt in that vehicle contained a retractor with a deployment threshold of 6.0 kN ± .5 kN.  (Trial Tr. Vol. 3 P.M. at 71:5-11; Pl. Trial Ex. 9; Pl. Trial Ex. 140 at 17).

61.     The subject seatbelt also passed the seatbelt-specific testing required by NHTSA in FMVSS 209.  *See Stone Man v. Green*, 263 Ga. 470, 472 (1993) (reversing award of punitive damages and stating that "[Defendant's] compliance with county, state, and federal regulations is not the type of behavior which supports

an award of punitive damages; indeed, punitive damages, the purpose of which is to 'punish, penalize or deter,' are, as a general rule, improper where a defendant has adhered to environmental and safety regulations").

62.     Furthermore, in the years since the 2005 Mazda 3 was offered for sale, Plaintiff is the only person to have asserted a claim that the driver side seatbelt in the 2005 Mazda 3 was defective.  (Trial Tr. Vol. 4 P.M. at 29:11-30:16; Def. Trial. Ex. 206 ¶ 12 (Mazda interrogatory response stating that Mazda sold 71,058 2005 Mazda 3s in the United States)).

63.     At trial, Plaintiff relied upon the testimony of Chris Caruso, Plaintiff's expert on the role of the component supplier, in arguing that punitive damages should be imposed against Autoliv.  Specifically, Mr. Caruso testified that it is the role of a component supplier to make a vehicle manufacturer aware of component designs that might be better than others.  (Trial Tr. Vol. 3 A.M. at 120:4-122:18). As part of his testimony, Mr. Caruso also compared the conduct of Bosch—who supplied the defective EFS for the subject vehicle—with the conduct of Autoliv and concluded that Bosch, unlike Autoliv, should bear no fault for the component part it supplied because Bosch made Mazda aware of an alternative design for that component.  (*Id.* at 118:11-122:18).  According to Mr. Caruso, he had not seen

anything that showed that Mazda was aware of other designs for the subject seatbelt. (*Id.* at 123:4-7).

64.     Despite Mr. Caruso's testimony, the evidence at trial was clear that (i) Autoliv presented Mazda with higher load limiting threshold options for the subject seatbelt and (ii) Mazda was plainly familiar with the use of "stop" features at the time of product development.  (Pl. Trial Ex. 1163 at 97:14-19; Trial Tr. Vol. 2 P.M. at 111:25-112:7).  In other words, during product development, Mazda was aware of alternative design options for the subject seatbelt—just as it was aware of alternative design options for the EFS that Bosch supplied.

65.     Moreover, when shown Defendant's Trial Exhibit 100 (Plaintiff's Trial Exhibit 126) on cross examination, Mr. Caruso admitted that Mazda was aware that a higher load limiting threshold was an option for the driver seatbelt in the 2005 Mazda 3.  (Trial Tr. Vol. 3 A.M. at 123:8-124:20).  Indeed, Defendant's Trial Exhibit 100 (Plaintiff's Trial Exhibit 126)—which consists of Autoliv's notes from meetings with Mazda—specifically states that Mazda, as early as November 2002, was "**intend[ing] to change to [a] higher load level**, implement digressive load limiters or retractor pretensioners." (Emphasis added; Trial Tr. Vol. 4 P.M. at 21:12-22:14).

66.     Mr. Caruso also admitted on cross examination that it is "perfectly clear" that vehicle manufacturers—not component suppliers—make the final

decision as to which components will be incorporated into their vehicles.  (Trial Tr. Vol. 3 A.M. at 129:13-130:6).  In fact, while working for a component supplier, Mr. Caruso was forced to supply a product he believed to be defective because the vehicle manufacturer requested that specific component part for its vehicle.  (*Id.* at 127:22-130:6; *see also* Trial Tr. Vol. 4 P.M. at 17:9-11 (David Prentkowski testifying that Autoliv cannot depart from the specification once it is set by a vehicle manufacturer)).

67.    These facts and circumstances preclude a finding that Autoliv's actions demonstrated "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."  O.C.G.A. § 51-12-5.1.

68.    Accordingly, Plaintiff's punitive damages claim fails for this additional reason.

## **CONCLUSION**

Having held a nonjury trial, it is hereby ordered and adjudged that, as to the claims asserted in the Second Amended Complaint (Doc. No. [90]), the Court finds

in favor of Autoliv and instructs the Clerk to enter judgment in favor of Autoliv and

against Plaintiff.[3]

Respectfully submitted this 25th day of October, 2021.

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 (telephone)

/s/ William J. Repko III, Esq.
Doug Scribner, Esq.
Georgia Bar No. 632755
doug.scribner@alston.com
Jenny A. Hergenrother, Esq.
Georgia Bar No. 447183
jenny.hergenrother@alston.com
William J. Repko III, Esq.
Georgia Bar No. 301797
jay.repko@alston.com

*Attorneys for Autoliv Japan, Ltd.*

---

[3] Should the Court conclude that Plaintiff has established a claim for strict liability, the Court should apply O.C.G.A. § 51-12-33 and allocate liability among Plaintiff, Autoliv, Mazda, and Bosch.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in Times New Roman, 14 point font.

/s/ William J. Repko III, Esq.
Doug Scribner, Esq.
Georgia Bar No. 632755
doug.scribner@alston.com
Jenny A. Hergenrother, Esq.
Georgia Bar No. 447183
jenny.hergenrother@alston.com
William J. Repko III, Esq.
Georgia Bar No. 301797
jay.repko@alston.com

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 (telephone)
(404) 881-7777 (facsimile)

*Attorneys for Autoliv Japan, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 25, 2021, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> James E. Butler, Jr
> Tedra Cannella
> Rory Weeks
> BUTLER WOOTEN & PEAK LLP
> 2719 Buford Highway
> Atlanta, Georgia 30324
>
> William L. Ballard
> Gregory R. Feagle
> BALLARD & FEAGLE, LLP
> 4200 Northside Parkway NW
> Atlanta, Georgia 30327
>
> ***Attorneys for Plaintiff***

<u>/s/ William J. Repko III</u>
William J. Repko III
Georgia Bar No.  301797