## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JAMIE LEE ANDREWS, as     *
Surviving Spouse of     *
MICAH LEE ANDREWS, Deceased,     *     **CIVIL ACTION FILE**
and JAMIE LEE ANDREWS, as     *
Administrator of the Estate of     *     **NO. 1:14-CV-03432-SCJ**
MICAH LEE ANDREWS, Deceased,     *
    *
      Plaintiff,     *
    *
v.     *
    *
AUTOLIV JAPAN, LTD.,     *
    *
      Defendant.     *

## FINAL ORDER AND JUDGMENT
## INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Plaintiff Jamie Andrews filed this products liability action in the State Court

of Fulton County, Georgia on September 18, 2014. Doc. No. [1-2].[2] Defendants,

---

[1] Pursuant to Local Rule 16.4(B)(25), both parties presented proposed findings of fact and conclusions of law. After review and in accordance with applicable rules, the Court has exercised its discretion to adopt parts of the proposals presented by both parties. Doc. Nos. [530]; [531]. To the extent Plaintiff's proposals cited exhibits that were not admitted at trial (e.g., PX 83, 151), those exhibits have been omitted from this Order.

[2] All record citations are to the CM/ECF electronic docket unless otherwise noted, and all page numbers are derived from the headers imprinted by the Court's docketing software. The Trial Transcripts are not yet available on CM/ECF. The Trial Transcripts citations herein were derived from the final versions electronically submitted to the Court

including Autoliv, removed Plaintiff's lawsuit to this Court on October 24, 2014. Doc. Nos. [1]; [2].[3] The case was assigned to Judge William S. Duffey Jr. After Judge Duffey granted summary judgment in Autoliv's favor in January 2017, Plaintiff appealed. Doc. Nos. [274]; [285]. On March 16, 2018, the United States Court of Appeals for the Eleventh Circuit reversed, in substantive part, the summary judgment that was entered in Autoliv's favor. Doc. No. [309]. On July 23, 2018, the Eleventh Circuit issued its mandate, remanding the case to this Court. Doc. No. [312]. Because Judge Duffey retired from this Court on July 1, 2018, this case was reassigned to the undersigned. Doc. No. [313].

By consent of the parties, this case was tried before the Court without a jury on October 4–13, 2021. Doc. Nos. [366]; [498]. After examining the evidence, determining the credibility of the witnesses, and considering the arguments of

---

by the court reporters. (For purposes of clarification, the Court notes that it received one final transcript for October 7, 2021 which contained a typographical error in the header section bearing the "afternoon session" label. Said volume was actually the A.M. session and has been cited herein accordingly.) Lastly, all transcripts referenced in this Order are cited as numbered by the court reporter, using a "Tr." citation.

[3] The Defendants listed in the Notice of Removal are: Mazda Motor Corporation, Mazda Motor of America, Inc. (collectively "Mazda" unless otherwise noted), Autoliv, Inc., Autoliv ASP, Inc., Autoliv AB, Autoliv Japan, Ltd., Autoliv Safety Technology, Inc., Autoliv LLC, Autoliv North America, Inc., Robert Bosch LLC and Robert Bosch North America Corporation (collectively "Bosch" unless otherwise noted). Over the course of the litigation, most of these defendants settled or were dismissed from the case. The bench trial only involved Autoliv Japan, Ltd. (hereinafter "Autoliv" unless otherwise noted).

counsel, the Court finds that Plaintiff has proven by a preponderance of the credible evidence that Micah Andrews's injuries and death on April 12, 2013 were caused by a defective seatbelt designed and manufactured by Autoliv.[4]

Accordingly, the Court finds special damages are warranted in the amount of **$19,343.40** (**Nineteen Thousand Three-Hundred Forty Three Dollars and Forty Cents**) for funeral and medical expenses[5] and general damages in the amount of **$2,000,000.00** (**Two Million Dollars**) for the predeath fright, shock, terror, and pain and suffering that Mr. Andrews endured.[6] In closing argument, Plaintiff left the amount of predeath fright, shock, terror, and pain and suffering up to the enlightened conscience of the Court.[7] In response, Autoliv did present evidence or argument to dispute that Mr. Andrews suffered predeath fright, shock, terror, and pain and suffering.

---

[4] Plaintiff withdrew her negligence and negligent design claims per the Pretrial Order. Doc. No. [485], 4 n.1; 16.

[5] The parties stipulated before trial that the medical expenses arising from Mr. Andrews's collision totaled $6,750.00 and the funeral expenses for Mr. Andrews's burial totaled $12,593.40. Doc. No. [503], ¶¶ 8, 9.

[6] See e.g., Beam v. Kingsley, 255 Ga. App. 715, 716, 566 S.E.2d 437, 439 (2002) (indicating that evidence that the decedent was aware of the impending collision, swerved to avoid it, suffered injuries, survived for as much as two minutes after the crash, and could be heard choking and gasping for breath as he drowned in his own blood supported an award of $2,584,000 in damages for pain and suffering and funeral expenses).

[7] The amounts herein will be apportioned at the conclusion of this judgment.

The Court finds that damages should be awarded for the full value of Mr. Andrews's life. The full value of Mr. Andrews's life is determined from his perspective and has two components under Georgia law: an intangible component and an economic component. In closing argument, Plaintiff asked that the Court award full value of life damages in an amount of not less than $25,000,000.00. Autoliv did not dispute, by evidence or argument, that the full value of Mr. Andrews's life is at least $25,000,000.00. Based on the evidence, the Court finds that the full value of Mr. Andrews's life is **$25,000,000.00** (**Twenty-Five Million Dollars)**.

The Court also finds that Plaintiff has proven by clear and convincing evidence that Autoliv's conduct in designing, manufacturing, and selling the subject seatbelt showed "that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). As a result, the Court finds that punitive damages should be awarded to "punish, penalize, or deter" Autoliv, not to compensate Plaintiff. O.C.G.A. § 51-12-5.1(c). In closing argument, Plaintiff asked that the Court award punitive damages of not less than $100 million. The Court deems said amount appropriate after consideration of all evidence and applicable law. Accordingly, the amount of punitive damages awarded is **$100,000,000.00** (**One-Hundred Million Dollars**),

and said amount is not limited by law because Plaintiff's cause of action is one for products liability. O.C.G.A. § 51-12-5.1(e)(1).[8]

## I.     FINDINGS OF FACT[9]

### A.     The Court has subject matter jurisdiction.

Plaintiff Jamie Andrews is a citizen of Georgia. She is the widow of Mr. Micah Andrews who died on April 12, 2013. Mr. Andrews was a citizen of Georgia at the time of his death. Defendant Autoliv Japan, Ltd. is a subsidiary of Autoliv, Inc., wholly owned by that corporation. Autoliv, Inc. is publicly traded on the New York Stock Exchange. The principal place of business of Autoliv Japan, Ltd. is in Japan. The parties are completely diverse, and this Court has subject matter jurisdiction to hear this case under 28 U.S.C. §§ 1332(a)(2), 1441(b).[10]

---

[8] There is also no statutory punitive damages recovery bar as Autoliv adduced no evidence at trial to show that any other Georgia court has imposed punitive damages on Autoliv for its conduct related to the subject seatbelt. See O.C.G.A. § 51-12-5.1(e)(1) ("Only one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission.").

[9] The Court has used the term "findings of fact" for simplicity's sake, but the Court notes that some of the foregoing findings are also conclusions of law. Similarly, the "conclusions of law" section contains some findings of fact.

[10] Both this Court and the Eleventh Circuit have previously exercised subject matter jurisdiction over this case. See Doc. No. [298] (indicating that the record as supplemented on appeal, combined with the notice of removal and second amended complaint established diversity-based subject matter jurisdiction). Other evidence of citizenship of

**B.     Mr. Andrews died in a collision on April 12, 2013.**

On April 12, 2013, Mr. Andrews left work at the Georgia Aquarium and headed to his home in Woodstock, Georgia. <u>See</u> Doc. No. [503], ¶ 12. He was driving his 2005 Mazda3. <u>Id.</u> His route home took him north on Interstate 575 and through Cobb County. The speed limit on I-575 North was 65 mph and Mr. Andrews was traveling around that speed on the four-lane divided interstate just before the fatal collision. <u>Id.</u> ¶ 2.

While traveling in the right northbound lane, Mr. Andrews came up behind a black Ford F-150. He changed lanes to pass the pickup truck. As he changed lanes back into the right lane, Mr. Andrews engaged in a "hard right-hand steer avoidance maneuver." Buchner testimony, 10/5/21 AM Trial Tr. p. 39, lines 2–4. The car left the interstate, crossed the paved shoulder, and entered the grassy shoulder. The grassy shoulder sloped away from the interstate and toward a growth of trees.

---

the parties is found in the record. <u>See</u> Andrews testimony, 10/7/21 AM Trial Tr. p. 28, lines 20–21 (stating "[w]e're Georgians" and Mr. Andrews's home was in Woodstock, Georgia); PX 1138 (stating that Autoliv is headquartered Stockholm, Sweden and incorporated in Delaware, United States).

Once the car left the interstate, the grassy shoulder and its cross slope made it "very, very difficult" for Mr. Andrews to return his car to the roadway in the remaining territory before encountering trees. Buchner testimony, 10/5/21 AM Trial. Tr. p. 21, line 19–p. 22, line 2. Despite steering and braking to avoid a collision, Mr. Andrews's car struck three trees at about 35 mph. See Doc. No. [503], ¶¶ 3, 14. The impact's principal direction of force was 10–15 degrees to the left of straight ahead, roughly the 11:30 position on a clock. Id. ¶ 15. Although a frontal collision at that speed should have caused the driver's airbag to activate and deploy, the airbag did not deploy. The airbag had been manufactured by Autoliv and sold to Mazda for the 2005 Mazda3.

Despite wearing his seatbelt properly, Mr. Andrews's seatbelt spooled out approximately 20 inches during the collision. Id. ¶¶ 1, 13, 17. Mr. Andrews's face struck the steering wheel and the steering wheel collapsed. Id. ¶¶ 4, 18. Mr. Andrews's face struck the steering wheel so hard and so fast that the impact caused a basilar skull fracture and permanently imprinted the steering wheel's grip pattern onto his face. Compare PX 3 (steering wheel photo), with PX 2

(medical examiner photo of Mr. Andrews's face postmortem).[11] The basilar skull fracture led to the death of Mr. Andrews at the scene. Frist testimony, 10/4/21 AM Trial Tr. p. 79, line 23–p. 80, line 1.

Mr. Andrews was 38 years old at the time of his death. Doc. No. [503], ¶ 5. Mr. Andrews had an additional life expectancy of 36.18 years. Id. ¶ 7. He is survived by his widow, Jamie Andrews, and their daughter, S.C. Andrews, who was four years old at the time of the wreck. S.C. was 12 years old at the time of trial. Id. ¶ 6.

### 1.    Mr. Andrews was not at fault for his own injuries and death.

Autoliv has contended that Mr. Andrews was at fault for his own death. But what caused the wreck is not the issue in this case. The issue concerns whether the seatbelt in Mr. Andrews's 2005 Mazda3 failed to protect Mr. Andrews when the wreck occurred as Mr. Andrews did not need a functioning seatbelt (for survival purposes) until there was a wreck. Autoliv's corporate representative David Prentkowski admitted that "this case starts when the car hit those trees

---

[11] A basilar skull fracture is "the most serious type of skull fracture, and involves a break in the bone at the base of the skull." Head Injury, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/head-injury (last visited Dec. 4, 2021). Plaintiff's expert explained that the basilar skull is "right at your ear level coming forward toward your nose and back." Frist testimony, 10/4/21 AM, Trial Tr. p. 84, lines 3–7.

because that's when the question arises, who is at fault for the airbag not working and the seat belt not working." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 54, lines 19–23. The Court finds that wrecks are foreseeable to Autoliv, that this 35-mph wreck was foreseeable to Autoliv, and that a driver does not need a seatbelt (for survival purposes) unless there is a wreck.

Furthermore, the parties agree that Mr. Andrews would have survived the wreck if his occupant restraint system had functioned properly. See Doc. No. [531], ¶ 13.[12] In other words, when Mr. Andrews's Mazda3 went off the road and hit three trees at 35 mph, death was not the likely result of his action. Thus, Mr. Andrews was not the proximate cause of his own death.

For the foregoing reasons, the Court finds that what caused the wreck itself is irrelevant. However, the evidence did convincingly demonstrate that Mr. Andrews left the road because of a sudden avoidance maneuver. There is no evidence that Mr. Andrews was trying to hurt himself, nor is there any evidence

---

[12] There was testimony at trial that indicated that a vehicle's occupant restraint system is a made up of numerous different, but interrelated parts, including but not limited to the vehicle's airbags, seatbelts, seatbelt pretensioners, seat backs, steering wheel, and overall interior design. Meyer testimony, 10/6/21 PM Trial Tr. p. 107, line 1–p. 108, line 10; Prentkowski testimony, 10/7/21 PM Trial Tr. p. 5, lines 18–25; Van Arsdell testimony, 10/12/21 AM Trial Tr. p. 25, lines 15–25. There was also testimony that the primary restraint in an occupant restraint system is the seatbelt. Caruso testimony, 10/6/21 AM Trial Tr. p. 25, line 24–p. 26, line 1.

that something went wrong with the car to cause it to go off the road.[13] Mr. Andrews was awake and alert before the collision: he passed a Ford F-150 before he steered hard right and braked, and he continued to brake and steer his car after it exited the interstate and before it struck the trees.

The evidence shows it is likely that Mr. Andrews swerved to avoid a very large turtle, some three feet in length. Shortly after the wreck happened, another motorist on I-575 North called 911 and explained: "So I'm on 575 North and this car was just, -- I mean, they, -- God. It was like a box or something in the road. I went over it, but it scared them and they just literally took their car and veered full speed ahead off the road." PX 46, 911 Call, Tr. p. 2, lines 11–15.

The Cobb County Police Department officers who investigated the collision did not note the presence of a box at the scene. The officers did, however, confirm that a large turtle had been run over on the interstate and was found dead on the left shoulder of the road. Photos of the scene show that investigators documented the turtle evidence by marking with green paint both the turtle's final resting place and a trail of its biological matter scattered along the interstate. See PXs 499, 526.

---

[13]  Weather played no role in Mr. Andrews's collision. Doc. No. [503], ¶ 19. There was also no evidence of alcohol or drugs playing a role in the collision.

10

The medical examiner's supplemental report notes that "an alligator snapping turtle was in the roadway. It appears the decedent [Mr. Andrews] may have swerved to miss the turtle." PX 214 (ANDREWS 0174).

Plaintiff's accident reconstructionist, G. Bryant Buchner, a professional engineer, inspected the collision location and analyzed the police photos of the scene, including those marking the final resting place of the turtle and the trail of turtle parts across the road. Mr. Buchner concluded that the start of the turtle's biological matter (i.e., where the turtle was run over) was near where Mr. Andrews steered hard right in an avoidance maneuver. Mr. Buchner's reconstruction diagram[14] also showed this. Considering all the physical evidence, Mr. Buchner opined that the turtle's presence on the road "just in front of the car when the swerve began" was "probably" related to Mr. Andrews's decision to hard steer to the right and brake in an avoidance maneuver. Buchner testimony, 10/5/21 AM, Trial Tr. p. 39, lines 6–14.[15] Mr. Buchner's opinion about the turtle's role in the

_____

[14]  The diagram was not admitted into evidence, but it was used for demonstrative purposes without objection from Defense Counsel. See Buchner testimony, 10/5/21 AM, Trial Tr. p. 48, lines 12–15.

[15]  The Court recognizes that there is evidence that the Cobb County Police Department Selective Traffic Enforcement Program ("STEP") investigators said they believed that turtle was unrelated to the collision. See Rogers testimony, 10/7/21 PM Trial Tr. p. 58,

collision was asserted to "a reasonable degree of scientific certainty." Id. at p. 49, line 20–p. 50, line 4.

Autoliv did not present a reconstructionist engineer at trial. Instead, Autoliv called as its witness, former Cobb County Police Officer, William Rogers, to testify about his role in investigating Mr. Andrews's collision.

The Court finds that Mr. Rogers's testimony was not credible in part as he denied that the speed of the car on impact with the trees was 35 mph—which is something Autoliv had stipulated to as fact prior to trial. Doc. No. [503], ¶ 3. Mr. Rogers also denied that Mr. Andrews had braked or steered after leaving the roadway; however, he had no explanation for how the car could go from interstate highway speeds down a steep incline and hit the trees at only 35 mph without braking and steering. Mr. Rogers's opinions were not based on a forensic analysis of the scene and consideration of all the evidence. Rogers testimony, 10/7/21 PM Trial Tr. p. 75, line 7–25. Accordingly, the Court gives no weight to Mr. Roger's opinions and the portions of his testimony that were not credible.

---

lines 13–25. However, the Court gives more weight to Mr. Buchner's opinions as his investigation was more forensically and scientifically detailed.

### 2. Mr. Andrews was alive and conscious for more than four minutes after the collision.

William Kemp was driving the black F-150 pickup truck that Mr. Andrews passed just before he swerved to the right and braked in an avoidance maneuver. Mr. Kemp saw Mr. Andrews's car leave the road. Concerned, Mr. Kemp pulled over to check on the driver. When he got to the wrecked car, Mr. Andrews was sitting in the driver's seat with his seatbelt still on, but the seatbelt had spooled out so much that Mr. Andrews's head and body were draped over the center console and into the passenger seat. Mr. Andrews's head was dripping blood, which had filled the cup holders in the center console.

Mr. Kemp vividly remembered what happened next. He described Mr. Andrews trying to respond to a question from Mr. Kemp by groaning and trying to raise his body. At trial, Mr. Kemp testified as follows:

**Q.** Mr. Kemp, when you opened the door, what did you see?

**A.** I saw a man bleeding from his head leaning over across the center console, head over the passenger seat bleeding badly.

**Q.** And so his butt was in the driver's seat; correct?

**A.** That is correct.

**Q.** And can you show us how he was positioned in the driver seat?

**A.** Yes. (Witness indicates.)

**Q.** So his head was actually leaned over into the passenger seat?

**A.** That's correct.

**Q.** And what did -- did you say anything to Mr. Andrews?

**A.** At first I asked if he was okay, and then he kind of tried to raise up and he got out, like, a groan. And I told him not to speak, not to move, that help was on the way.

Kemp testimony, 10/4/21 AM Trial Tr. p. 65, lines 13–25. That interaction with Mr. Andrews, which Mr. Kemp vividly recalled, occurred after Mr. Kemp pulled his pickup truck off the road, spent four minutes and twelve seconds on the phone with the 911 dispatcher, and had run to Mr. Andrews's car. PX 45; Kemp testimony, 10/4/21 AM Trial Tr. p. 65, lines 3–5.

Dr. Brian Frist, the former medical examiner of Cobb County, an independent pathologist who completed more than 10,000 autopsies and post-mortem examinations in his career, gave unrebutted testimony that Mr. Kemp's description of his interaction with Mr. Andrews was consistent with Mr. Andrews being conscious. Frist testimony, 10/4/21 AM Trial Tr. p. 84, line 21–p. 85, line 10. The evidence thus shows that Mr. Andrews was alive and conscious from the time of the collision until after Mr. Kemp pulled off the road, stopped his car, finished his 911 call, and then went to Mr. Andrews's car.

After Mr. Kemp saw Mr. Andrews's response, Officer Aaron Porter arrived at the scene. At that time, Officer Porter had been with the Cobb County Police Department for over seven years. Before joining the Cobb County Police Department, he was a corporal in the Marine Corps for four years and served two tours of duty overseas, including Operation Iraqi Freedom. He testified that between his combat and law enforcement experience, he had witnessed roughly fifty people die before Mr. Andrews. When he arrived at the scene, it took Officer Porter about thirty seconds to get to the car. After he reached the car, Officer Porter observed Mr. Andrews take his last two breaths, which Officer Porter described as "breathing agonally." Porter testimony, 10/4/21 PM Trial Tr. p. 90, lines 2–15. Officer Porter testified that he was the last person to see Mr. Andrews alive. Id. at p. 100, lines 16–18.

### C.    The occupant restraint system in Mr. Andrews's car was defective.

Mr. Andrews's 2005 Mazda3 had a defective occupant restraint system. While as indicated above, the evidence at trial showed that there are multiple parts to a car's occupant restraint system, the evidence also showed that the two principal parts of a car's occupant restraint system are: seatbelts and airbags. After review, the Court concludes that both the airbag system and the driver's seatbelt in Mr. Andrews's 2005 Mazda3 were defective.

The seatbelt of an automobile is indisputably the primary safety restraint system. Autoliv's own documents prove that fact, and Autoliv's hired seatbelt expert William Van Arsdell, Ph.D., admitted that fact. Van Arsdell testimony, 10/12/21 AM Trial Tr. p. 113, lines 1–3; PX 1. Both Autoliv engineers who testified at trial—corporate representative David Prentkowski and seatbelt engineer Yuji Kamei—refused to admit that the seatbelt was the primary safety device in the car. By law and in fact, an airbag is a "supplemental restraint system"—i.e., supplemental to the seatbelt. See 49 C.F.R. § 571.208(f)(1) (describing information to appear in owner's manual and stating that "air bag is a supplemental restraint."); see also PX 61A. Autoliv labels their airbags as such. See PX 1163, Kamei testimony, p. 23, lines 21–22.

In this wreck the airbag failed to deploy. That airbag module was designed, manufactured, and sold by Autoliv. Doc. No. [503], ¶ 32. However, the airbag electronic front sensor system that directs the airbag to deploy was not designed and manufactured by Autoliv—it was supplied by Bosch in accordance with Mazda's specification.[16] See Caruso testimony, 10/6/21 AM Trial Tr. p. 90, lines

---

[16] A specification is "a detailed document or set of documents that define the engineering object." Van Arsdell testimony, 10/12/21 AM, p. 43, lines 19–25. Defendant's expert described the purpose of the specification as follows: "[i]t's the way that Mazda

1–6; p. 115, lines 4–16. The sensor system failed to send a signal to the airbag to deploy. That airbags sometimes do not deploy was indisputably known to, and foreseen by, Autoliv—as Autoliv's corporate representative Mr. Prentkowski admitted. See Prentkowski testimony, 10/7/21 PM Trial Tr. p. 52, lines 15–17 ("Q. Isn't it true that it was foreseeable to Autoliv that this airbag might not deploy. A. Yes."). Airbags can fail in many situations, all of which (prior to the subject collision) were foreseeable to airbag companies, which includes Autoliv, a manufacturer of airbags. Caruso testimony, 10/6/21 AM Trial Tr. p. 34, lines 6–14.

It was also foreseeable to Autoliv that if the Autoliv airbag in Mr. Andrews's 2005 Mazda3 did not deploy in this wreck the Autoliv seatbelt, which spools out 20 inches, would fail to keep Mr. Andrews's head from striking the steering wheel. Further, Autoliv's corporate representative admitted that not only was the seatbelt manufactured and designed so that it was capable of spooling out 20 inches, but also that Autoliv knew that the seatbelt was going to spool out 20 inches if

---

communicates their design to Autoliv in such a way that Autoliv can supply exactly what Mazda wants." Id. at p. 44, lines 7–12. There was also testimony at trial that also referred to the specification as an "engineering specification" or a "design specification." See e.g., Prentowski testimony, 10/4/21 PM, p. 73, line 4; p. 75, lines 14–18. Plaintiff's Exhibit 35 was also labeled an "Engineering Specification." PX 35.

deployment of the airbag did not stop the spool out. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 22, lines 11–19; p. 23, lines 12–14.

For the driver of a car, the primary duty of a seatbelt is to keep the driver from slamming into interior components (like the steering wheel) so hard that there is a permanent fatal injury. See Meyer testimony, 10/6/21 PM Trial Tr. p. 48, lines 19–22 ("Q. What is the whole job of the seatbelt? A. The seatbelt is to prevent the occupant from slamming into interior components like the steering wheel so hard that it creates a permanent or a fatal injury.").

But Autoliv's corporate representative admitted that Mr. Andrews's seatbelt "failed" when "[l]acking an airbag" and did not provide "sufficient restraint." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 51, line 23–p. 52, line 3; Prentkowski testimony, 10/4/21 PM Trial Tr. p. 42, line 25–p. 43, line 5. Autoliv's corporate representative also admitted that Mr. Andrews's seatbelt was "useless" to Mr. Andrews. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 17, lines 8–15.

Autoliv's corporate representative further admitted that Autoliv did nothing to warn Mazda, or any consumers, that if the airbag failed to deploy the driver would be effectively unrestrained and his head could strike the steering wheel with fatal force. Id. at p. 33, lines 3-16; 10/7/21 PM Trial Tr. p. 56, lines 7–9.

Despite Autoliv's knowledge that airbags sometimes do not deploy in frontal collisions, Autoliv sold a seatbelt to Mazda that would not keep the driver's head from hitting the steering wheel with fatal force in a foreseeable collision.

Autoliv knew how to design and build a safer seatbelt. In fact, Autoliv admits that before it sold the subject seatbelt to Mazda it had already designed and manufactured another seatbelt that would not allow so much spool out.[17]

### 1.   The airbag system in Mr. Andrews's car was defective.

The Autoliv airbag in Mr. Andrews's car did not deploy in the April 12, 2013 collision.

The airbag system in Mr. Andrews's car was complex and comprised of many different products including: (1) the airbag itself, located in the steering wheel; (2) the car's computer diagnostic unit located under the car's center console, which Mazda calls the "supplemental airbag system" or "SAS" unit; (3) the upfront sensor ("UFS," also known as the electronic front sensor ("EFS")), a single sensor located behind the car's front grill that is supposed to detect a frontal impact

---

[17] See Doc. No. [503], ¶ 26 ("At the time Autoliv sold Mazda the seatbelt in Mr. Andrews's car, Autoliv had manufactured another seatbelt retractor with a load limiting threshold higher than the one in Mr. Andrews's seatbelt."), ¶ 29 ("The seatbelt assembly that Autoliv supplied to Volvo for the driver's seat of the 2004 through 2009 model year Volvo S40 had a torsion bar with a deployment threshold of 6.0 kilonewtons.").

and send a deploy/no deploy signal to the SAS; (4) the wiring running from the SAS to the UFS and from the SAS to the airbag module and pretensioners; (5) sensors for the driver seat track position, seatbelt buckles, and passenger seat weight; and (6) warning lamps. See Caruso testimony, 10/6/21 AM Trial Tr. p. 34, line 17–p. 35, line 23.

The airbag system in Mr. Andrews's car was defective. The sensor behind the car's front grill was supposed to transmit information about the collision's severity to the car's diagnostic computer. Id. at p. 44, lines 18–24. It did not do so because the sensor's connector became disconnected before the collision information was sent. Id. That in turn meant the diagnostic computer did not send a signal to the driver's airbag to deploy. Id.

Plaintiff's expert clarified that while it was Bosch's airbag electronic front sensor system component that ultimately caused the non-deployment of the airbag, "it was the connector and the wire connected to that sensor that failed, not the sensor itself." Id. at p. 88, lines 10–13. He further testified that "if the wire had not been cut, the system was designed reasonably well, it would have deployed the airbags." Id. at lines 18–22. He also testified that the fault for the wire getting cut and the sensor coming apart "was a combination of Mazda's decision on how

to route the wire and the decision to use this substandard connector," which Plaintiff's expert garnered was a Mazda decision. Id. at line 23–p. 89, line 5.

There appears to be no dispute that Mazda Motor Corporation and Mazda Motor of America, Inc. (collectively, "Mazda") were responsible for the sensor system that Bosch supplied, though the parties dispute how much fault Mazda and Bosch should bear. See Def. Proposed Findings, Doc. Nos. [530], 18; [531], ¶¶ 40–53; see also Def. Closing Argument, Trial Tr. p. 75, lines 23–25. Mazda settled with Plaintiff in June 2016 and thus took no part in the bench trial. The multiple Bosch defendants were dismissed prior to trial for various reasons to include: lack of personal jurisdiction, amendment of the complaint, and consent motion to dismiss. Doc. Nos. [90]; [106]; [131].

### i.   Autoliv designed and manufactured the seatbelt.

Autoliv, its parent company Autoliv, Inc., and its sibling companies (almost all of which, like Autoliv, are wholly owned subsidiaries of Autoliv, Inc.) are in the business of designing, manufacturing, and selling seatbelts, airbags, and other automotive safety equipment. See PX 1138 at 3–5 (Autoliv 2020 Annual Report stating that Autoliv is "The World's Largest Automotive Safety Supplier"); PX 1139A SEC 10-K Filing (stating that "Autoliv is a leading developer, manufacturer and supplier of safety systems to the automotive industry. The

Company has a broad range of product offerings, primarily passive restraint systems"); see also Doc. No. [503], ¶ 11 ("The defendant in this case, Autoliv, is a manufacturer of components used in cars made by many automakers."). Autoliv sells its products to all major car manufacturers. PX 1138 at 5.

The seatbelt at issue has several parts, but its basic design is illustrated by the following graphic:



SEATBELT ASSEMBLY SCHEMATIC

PLAINTIFF'S EXHIBIT PX 1059

LATCH PLATE / BUCKLE

D-RING

TRIM EXIT

RETRACTOR

OUTBOARD ANCHOR

PX 1059. [18] Autoliv's corporate representative David Prentkowski admitted that this graphic is "accurate." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 73, lines 2–4. Mr. Prentkowski also admitted that the retractor is the "heart" of the seatbelt in that it is the part responsible for the webbing's spool out. Id. at p. 74, lines 10–18.

The undisputed evidence shows that Autoliv designed the R27LL retractor and the torsion bar for the seatbelt at issue in this case. Doc. No. [503], ¶ 28. Those were the specific components that caused Mr. Andrews's seatbelt to spool out 20 inches in the collision. The undisputed evidence also proved that the design of those components was completed five or six months before Autoliv was asked by Mazda to begin any work on the type of car Mr. Andrews was driving, known internally at Mazda as the J48C. [19] Compare PX 74 (design document for R27LL retractor showing "Completion date: 14/06/1999"), and PX 7 (torsion bar design

---

[18]  To describe the safety device that Autoliv made and which Mr. Andrews was using to secure himself into the driver's seat, the terms "seatbelt" and "seatbelt assembly" were used at trial. As used in the federal regulations, the term "seat belts" "includes the webbing, buckle, anchorage, retractor, belt pretensioner devices, load limiters, and all components, hardware and software associated with an automatic or manual seat belt system addressed by FMVSS No. 209 or 210." 49 C.F.R. § 579.4(c).

[19]  The parties stipulated that J48C was the internal designation code for the 2004 through 2005 Mazda3. Doc. No. [503], ¶ 10. The parties also stipulated that J48L was the internal designation code for the 2007 through 2009 Mazda3. Id. at ¶ 31.

drawing showing that first iteration of the torsion bar's design drawing created in February 1998), with PX 40 (J48C development scheduling showing "Platform Kick-off" in November or December 1999); see also Prentkowski testimony, 10/7/21 PM Trial Tr. p. 72, lines 19–22 (admitting that the R27LL retractor's design was completed at least five months before Mazda asked Autoliv to do any work for the Mazda3).

The Autoliv seatbelt spooled out 20 inches because of the torsion bar in the seatbelt's retractor.[20] See Meyer testimony, 10/6/21 PM Trial Tr. p. 37, lines 3–25. Torsion bars are a type of load limiter and are intended to avoid belt-induced injuries, like broken ribs. See Doc. No. [503], ¶ 22. Load limiters come in a variety of designs, though torsion bars are the most common type. The load limiter in the Autoliv seatbelt was a torsion bar, a metal bar around which the seatbelt webbing is wrapped. Id. ¶ 23. In a wreck, the torsion bar twists and allows seatbelt webbing to spool out. Id. ¶ 21. How easily a torsion bar twists and allows webbing to spool out depends on its deployment threshold (i.e., strength). Id. ¶ 25.

---

[20]  The seatbelt retractor holds the unused seatbelt webbing and contains the locking mechanism that prevents spool out in an emergency stop. Doc. No. [503], ¶ 20.

The Autoliv seatbelt in Mr. Andrews's car had a torsion bar with a "lower-than-low" deployment threshold (2.0 kN) and no "stop" limiting the amount of webbing that could spool out in a wreck. PXs 20, 74; Doc. No. [503], ¶ 27; Prentkowski testimony, 10/7/21 PM Trial Tr. p. 75, lines 8–20 (admitting that 2.0 kN torsion bar in Mr. Andrews's car was "lower than low" compared to the R27LL retractor sheet stating that low was "2,5").[21]

Plaintiff's seatbelt expert, Mr. Steven Meyer, testified that the resistance provided by the torsion bar left Mr. Andrews "effectively unrestrained." Meyer testimony, 10/6/21 PM Trial Tr. p. 63, lines 20–22. He further testified that the seatbelt "didn't provide any meaningful restraint" and "it wasn't the seatbelt that stopped [his forward movement in the collision], it was the steering wheel and the dashboard." Id. at p. 63, line 20–p. 64, line 2.

---

[21] To clarify, the "lower-than-low" description is comparing the seatbelt actually installed in Mr. Andrews's 2005 Mazda3 to Autoliv's product/retractor sheet describing the "low" version of its seatbelt. See PX 74. There was also evidence at the trial that in Europe and Japan, a comma is used like a period is used in the United States. Meyer testimony, 10/6/21 PM Trial Tr. p. 147, lines 9–13. And the "2,5" number should be read as "2.5" for purposes of this case. Prentkowski testimony, 10/7/21 PM, Trial Tr. p. 76, lines 1–16. In addition, PX 35 showed Mazda's seatbelt specification as a 2.0 ± 0.5 kN torsion bar for driver seatbelt in the 2004–2005 Mazda3, which means "anywhere from 1.5 to 2.5." Meyer testimony, 10/6/21 PM Trial Tr. p. 145, lines 11–14.

Autoliv's own corporate representative admitted that the seatbelt was "useless" to Mr. Andrews. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 17, lines 8–10.

In Mr. Andrews's April 12, 2013 collision, the Autoliv seatbelt spooled out nearly 20 inches of webbing—not because of product misuse or unforeseen circumstances, but because of the way it was designed and manufactured.

The photos below illustrate 20 inches of spool out.



PXs 209, 894.

Seatbelt manufacturers, such as Autoliv, know that 35-mph frontal collisions into fixed objects, like Mr. Andrews's collision, happen in the real world. Mr. Andrews's collision was foreseeable to Autoliv. Meyer testimony, 10/6/21 PM Trial Tr. p. 50, line 25–p. 51, line 2. A 35-mph frontal crash test is done to assess the performance of occupant restraints in the United States government's New Car Assessment Program ("NCAP"). Id. at 29, line 20–p. 30, line 19. The

seatbelt Autoliv designed, manufactured, and sold for use in 2005 Mazda3 cars like Mr. Andrews's car underwent the NCAP test. In that crash test for the 2004 Mazda3,[22] the Autoliv seatbelt spooled out 16.85 inches—nearly twice as much as any other car in the same class of cars as the Mazda3. See PX 9. Plaintiff's seatbelt expert also testified that after reviewing video of the NCAP test for the Mazda3, it was his belief that even with the airbag and seatbelt on, the dummy's head was going through the airbag and hitting the steering wheel. Meyer testimony, 10/6/21 PM Trial Tr. p. 55, line 10–p. 56, line 1.

The undisputed evidence shows that in terms of providing restraint and preventing an occupant's forward movement toward structures inside the car, the Autoliv seatbelt in Mr. Andrews's car was by far the worst—an extreme outlier. Id. at p. 43, line 17–p. 45, line 15. Plaintiff's seatbelt expert, Mr. Meyer, testified that the seatbelt was "weak," allowed a "gross amount of pay-out," and was "literally the lowest" kilonewton bar seatbelt he had "ever seen" in his thirty years of investigating car crashes. Id. at p. 64, lines 5–16.

---

[22] The crash test actually involved the 2004 Mazda3; however, the 2004 Mazda3 is the same as Mr. Andrews's 2005 Mazda3. Ziejewski testimony, Trial Tr. p. 32, lines 7–10.

As the designer and manufacturer of Mr. Andrews's seatbelt, Autoliv is responsible for the defects in the seatbelt.

> **ii.     Autoliv could have limited the amount of spool out by using one of three alternative designs.**

According to Plaintiff's seatbelt expert, Mr. Meyer, there are alternative designs that would prevent a seatbelt from spooling out 20 inches in a 35-mph crash. Meyer testimony, 10/6/21 PM Trial Tr. p. 70, lines 6–18. More specifically, Autoliv had available at least three alternative, feasible seatbelt designs that would keep occupants from slamming into the structures inside the car.

First, Autoliv could have increased the strength of the load limiter, making it harder for the seatbelt to spool out 20 inches. In fact, at the time Autoliv sold the subject seatbelt to Mazda Autoliv had already designed and manufactured a seatbelt with a torsion bar nearly twice as strong as the one in the 2005 Mazda3. See Doc. No. [503], ¶ 26 ("At the time Autoliv sold Mazda the seatbelt in Mr. Andrews's car, Autoliv had manufactured another seatbelt retractor with a load limiting threshold higher than the one in Mr. Andrews's seatbelt.").

Second, Autoliv could have used an even better seatbelt. Autoliv provided the seatbelt for the 2004-2009 model year Volvo S40, a car built on the same

platform as the 2005 Mazda3.[23] The Autoliv seatbelt in the 2004-2009 Volvo S40 used a 6.0 kN deployment threshold, three times as strong as the 2005 Mazda3's seatbelt. Doc. No. [503], ¶ 29. This is a significant difference because all else being equal, a higher deployment level or a stronger torsion bar results in less spool out. Meyer testimony, 10/6/21 PM Trial Tr. p. 37, lines 19–22, p. 63, lines 18–19. In NCAP tests, the 2004-2009 Volvo S40 had 10 inches fewer of spool out than the 2004 Mazda3. See PX 9.

Third, Autoliv could have put a stop on the load limiter to limit the amount of belt that could spool out. When the 2005 Mazda3 was designed and manufactured, Autoliv actually had available a seatbelt retractor that included a stop, which would limit the amount of belt webbing that could spool out in a wreck. Meyer testimony, 10/6/21 PM Trial Tr. p. 73, line 13–p. 74, line 4.

Plaintiff's biomechanics expert testified that all these alternative designs were safer and would have prevented or mitigated Mr. Andrews's interaction with

---

[23] "Platform means the basic structure of a vehicle including, but not limited to, the majority of the floorpan or undercarriage, and elements of the engine compartment. The term includes a structure that a manufacturer designates as a platform. A group of vehicles sharing a common structure or chassis shall be considered to have a common platform regardless of whether such vehicles are of the same type, are of the same make, or are sold by the same manufacturer." 49 C.F.R. § 579.4.

the steering wheel. Ziejewski testimony, 10/5/21 PM Trial Tr. p. 116, line 1–p. 117, line 2. In opposition, Defendant presented the testimony of its own biomechanics expert, Dr. Elizabeth Raphael. 10/12/21 Trial Tr. pp. 4–55.

### D. Autoliv knew about the defects in its seatbelt years before Mr. Andrews's death but did nothing to prevent it.

Autoliv's role was not limited to designing and manufacturing the seatbelt. Autoliv was obligated to work directly with Mazda to address defects in the seatbelt, like the excessive spool out problem with Mr. Andrews's seatbelt under their Statement of Work.[24] PX 11 at 1; Caruso testimony, 10/6/21 AM Trial Tr. p. 62, line 2–p. 65, line 7; Meyer testimony, 10/6/21 AM Trial Tr. p. 82, lines 5–18. But there is no evidence that the defect was ever fixed for the 2005 Mazda3.

Under the Statement of Work and according to Plaintiff's expert, Mr. Caruso, Autoliv had the authority and duty to propose design changes and improvements to the seatbelt and seatbelt technology in Mr. Andrews's car. Caruso testimony, 10/6/21 AM Trial Tr. p. 62, line 2–p. 65, line 7. One of Autoliv's design change suggestions involved changing the torsion bar in the seatbelt from

---

[24] The Statement of Work "is provided to the supplier by the [original equipment manufacturer], and it, basically, outlines what the tasks and what the requirements are going to be in the relationship." Caruso testimony, 10/6/21 AM Trial Tr. p. 62, lines 12–16.

a digressive load limiter to a regular load limiter—a change that reduced the strength of the torsion bar. See Meyer testimony, 10/6/21 PM Trial Tr. p. 84, line 22–p. 88, line 10; PXs 372, 49 (AUTOLIV01051).

Autoliv presented no evidence at trial that it ever proposed changes to the seatbelt at issue that would have made it safer. Nor did Autoliv offer any evidence that it ever advised Mazda to use a safer seatbelt to protect vehicle occupants. Autoliv's corporate representative testified as follows: "Mazda was not concerned, so we [Autoliv] weren't concerned." Prentkowski testimony, 10/4/21 PM Trial Tr. p. 34, line 5.

Autoliv was responsible for reviewing and studying the data from testing done by Mazda. In January 2002, a Mazda employee wrote to Autoliv that he had analyzed the computer modeling of the crash performance of the Mazda3 at issue in an offset deformable barrier test and stated that the "target was not obtained, bottoming of the head occurred on the [steering wheel]." PX 128.[25] Plaintiff's expert described "bottoming" as "hitting something rigid." Ziejewski testimony,

---

[25] That modeling evaluated the very seatbelt Autoliv sold Mazda for use in Mr. Andrews's car. PX 128.

10/5/21 PM Trial Tr. p. 122, lines 10–15.[26] Autoliv thus knew then—in January 2002—that the dummy's head was "bottoming" on the steering wheel. Id. Mazda asked Autoliv for help coming up with a solution. PX 128. Autoliv presented no evidence that it ever provided any such help.

Later in 2002, Autoliv had internal discussions about the fact that the restraint system in the Mazda3 at issue was not meeting its crash test performance targets. Autoliv knew that Mazda needed to make changes to the seatbelt and a "Business Team Update" document shows that Mazda "intended to change to [a] higher load level, implement digressive load limiters or retractor pretensioners instead of [the] R27LL." PX 126. Autoliv presented no evidence that it ever advised Mazda to make such changes.

In May 2003, months before Autoliv began full-scale production of the seatbelt it sold to Mazda for the 2005 Mazda3, Autoliv performed sled testing.[27] PX 15. That sled testing simulated a frontal collision at 31 mph in which an airbag did not deploy. In Autoliv's two sled tests using a seatbelt like the one in

---

[26] Another expert testified that bottoming is "very bad, because head injuries are a very nebulous thing." Caruso testimony, 10/6/21 AM Trial Tr. p. 72, line 7.

[27] Sled testing is performed by mounting part of the car's interior (usually the seat and the seatbelt system) on a "sled," accelerating it, and then stopping it to recreate the forces in a frontal collision. Van Arsdell testimony, 10/12/21 Trial Tr. pp. 8–9.

Mr. Andrews's car, the dummy experienced 15.4 inches of chest movement in a 31-mph frontal collision. Id.; Ziejewski testimony, 10/5/21 PM p. 35, lines 24–25. The 15.4 inches was "more inches than the occupant had space before [the occupant] hit the steering wheel." Id. at 36, lines 1–4. Autoliv therefore knew, before it sold the seatbelt at issue to Mazda, that the seatbelt would spool out excessively in a frontal collision for which the airbag failed to deploy.

Despite knowing that the seatbelt allowed a dangerous amount of spool out and would not restrain a driver in foreseeable collisions, Autoliv did nothing to improve the seatbelt's performance. Nor did Autoliv ever tell Mazda that it should buy a different, better seatbelt. Autoliv admitted it did not have to sell the seatbelt to Mazda, Prentkowski testimony, 10/7/21 PM Trial Tr. p. 46, line 24–p. 47, line 1, yet it sold the seatbelt knowing it was defective.

Shortly after Mr. Andrews's 2005 Mazda3 was manufactured, Autoliv designed and sold Mazda a seatbelt with a much stronger torsion bar. See PX 35 (3.5 ± 0.9 kN torsion bar specification).

To recap, here is the chronology of events.

| | |
|---|---|
| August 1997 | Autoliv GmbH completes initial drawing of torsion bar later used in the 2005 Mazda3 seatbelt.[28] |

---

[28] PX 7.

33

| June 1999 | Autoliv completes the design of the R27LL retractor, which is the "heart" of the 2005 Mazda3 seatbelt.[29] |
|---|---|
| December 1999 | Mazda kicks off development of the Mazda3 platform.[30] |
| December 2001 | Autoliv sends Mazda a VA/VE suggestion to change from a digressive load limiter to a regular load limiter. This change made the seatbelt weaker and less safe. Autoliv's corporate representative testified that VA/VE suggestions were only about "cost reductions."[31] |
| January 2002 | Mazda sends email to Autoliv notifying Autoliv about dummy heads bottoming[32] on the steering wheel and asking Autoliv for assistance with the problem.[33] Autoliv presented no evidence that it ever offered any assistance or advice. |
| November 2002 | An Autoliv document from a business team update shows that Autoliv knew that Mazda was having trouble making its NCAP targets based on its testing.[34] |
| May 2003 | Autoliv runs a sled test on the seatbelt in the 2005 Mazda3; no airbag is included in this sled test. The test shows that seatbelt allowed the dummy's chest to move forward 15.4 inches.[35] |

---

[29] PX 74; Prentkowski testimony, 10/7/21 PM Trial Tr. p. 74, lines 10–15.

[30] PX 40.

[31] PXs 49, 372; Meyer testimony, 10/6/21 PM Trial Tr. p. 84, line 22–p. 88, line 10; Prentkowski testimony, 10/7/21 Trial Tr. p. 34, lines 3–11.

[32] Plaintiff's expert described "bottoming" as "hitting something rigid." Ziejewski testimony, 10/5/21 PM Trial Tr. p. 122, lines 10–15.

[33] PX 128.

[34] PX 126.

[35] PX 15; Ziejewski testimony, 10/5/21 PM Trial Tr. p. 33, line 12–p. 35, line 25.

| | |
|---|---|
| December 2003 | The NCAP test shows that the Autoliv seatbelt in the driver's side spooled out 16.85 inches while the passenger side spooled out 22.4 inches.[36] That amount is twice as much as the other cars in the Mazda3's class.[37] |
| | This test also shows that the driver's seatbelt spooled out farther then the distance between the dummy's chest and the steering wheel (13.0 inches versus 16.85 inches).[38] |
| | This test also shows that the passenger seatbelt spooled out farther than the distance between the dummy's chest and the dashboard on the passenger side (21.9 inches versus 22.4 inches).[39] |
| January 2005 | The driver's seatbelt specification for the 2006 Mazda3 was changed to include a stronger 3.5 kN torsion bar.[40] |

At trial, Plaintiff's expert witness Mr. Caruso explained that automotive suppliers have a duty of "due care." Caruso testimony, 10/6/21 AM Trial Tr. p. 48, line 19–p. 49, line 9. Under this duty, manufacturers of automotive component parts should not design their products to simply satisfy the federal regulations, but rather should make sure that their products (and the systems those products are used in) are designed to work for foreseeable real world collisions. Id. at p. 82, lines 4–10. Mr. Caruso testified that manufacturers must make sure that their

---

[36] PX 9; 160.

[37] PX 9.

[38] Meyer testimony, 10/6/21 PM Trial Tr. p. 78, line 12–p. 79, line 4.

[39] Id. at p. 79, line 5–p. 80, line 5.

[40] PX 372; Meyer testimony 10/6/21 PM Trial Tr. p. 129, lines 6–19.

products work in the real world and not just on the required tests. Id. at p. 31, lines 15–18.

Due care, Mr. Caruso explained, requires suppliers to share their superior knowledge about their products and how they perform with the automaker with the goal of getting the system to work right in the real world. Id. at p. 48, line 19–p. 49, line 9. Mr. Caruso further stated: "[d]ue care means I'm going to let you [the automaker] know that I'm concerned [as the component manufacturer/supplier] and let's talk about a possible resolution." Id. at p. 54, lines 9–10. Mr. Caruso also expressed a belief that it is industry standard for a component manufacturer to inform the automaker of problems and work with the automaker to solve those problems. Id. at p. 59, lines 1–8.

Mr. Caruso testified that Autoliv did not meet its duty of due care after learning that dummies' heads were bottoming on the steering wheel in crash tests and simulations, based on the records produced—as there was no document produced at trial that showed that Autoliv shared its expertise about how to solve the bottoming problem with Mazda or raised a "red flag" about the bottoming problem with Mazda. Id. at p. 53, line 21–p. 54, lines 1–10; p. 78, line 22–p. 79, line 22.

Autoliv produced no evidence at trial that contradicted Mr. Caruso's

testimony. There was also no evidence presented at trial that showed that Autoliv ever warned anyone about the dangers of the seatbelt at issue, despite Autoliv being fully aware of those dangers. [41]

## II.   CONCLUSIONS OF LAW

### A.   Autoliv is liable for Mr. Andrews's injuries and wrongful death.

To prevail on a claim for strict products liability under O.C.G.A. § 51-1-11(b), Plaintiff had to prove that:

(1)   Autoliv manufactured the seatbelt in Mr. Andrews's 2005 Mazda3;

(2)   when sold, the Autoliv seatbelt was not merchantable and reasonably suited for its intended use (i.e., the Autoliv seatbelt was defective); and

(3)   the Autoliv seatbelt was a proximate cause of Mr. Andrews's wrongful death.

See Chicago Hardware & Fixture Co. v. Letterman, 236 Ga. App. 21, 24, 510 S.E.2d 875, 877–78 (1999). Plaintiff proved each of these elements; thus, Autoliv is liable for Mr. Andrews's injuries and death.

---

[41]  The Court recognizes Defendant's argument that it was not required to tell Mazda about something that Mazda already knew. The Court will address said arguments, infra.

### 1. Autoliv is the manufacturer of the seatbelt under Georgia law.

Georgia's strict liability statute, O.C.G.A. § 51-1-11, "imposes strict liability for defective products"—a product is "defective" when it is "not merchantable and reasonably suited to the use intended." Ctr. Chem. Co. v. Parzini, 234 Ga. 868, 869, 218 S.E.2d 580, 582 (1975). A product can be defective because of problems with its manufacturing, design, or warnings. Banks v. ICI Ams., Inc., 260 Ga. 732, 733, 450 S.E.2d 671, 672 (1994).

The Georgia strict liability statute "is in derogation of common law" and thus "must be strictly construed or limited strictly to the meaning of the language employed and not extended beyond [its] plain and explicit terms." Daniel v. Am. Optical Corp., 251 Ga. 166, 167, 304 S.E.2d 383, 385 (1983); Ford Motor Co. v. Carter, 239 Ga. 657, 658, 238 S.E.2d 361, 363 (1977). The strict liability statute does not define "manufacturer," so that term is given its plain meaning. See Hartford Fire Ins. Co. v. iFreedom Direct Corp., 312 Ga. App. 262, 264, 718 S.E.2d 103, 106 (2011) (interpreting statute in derogation of common law by "the plain meaning of the language employed in the statute"); see generally O.C.G.A. § 1-3-1(b).

Manufacturing and designing seatbelts are Autoliv's business: it is the world's leading developer, manufacturer, and supplier of such products.[42] Globally, Autoliv has a seatbelt market share of 44%.[43] At trial, it was undisputed that Autoliv manufactured Mr. Andrews's seatbelt. Accordingly, Autoliv is the manufacturer of the seatbelt under the plain meaning and the Georgia courts' construction of the strict liability statute.

At trial, Autoliv argued that Mr. Andrews's seatbelt was "designed" by Mazda. See Def. Closing Argument, 10/13/21 AM Trial Tr. p. 76, lines 1–11. But when Autoliv's corporate representative Mr. Prentkowski was asked directly whether it was his sworn testimony that the seatbelt was "designed by Mazda," he stated that he could not give a "yes-or-no answer." Prentkowski testimony, 10/4/21 PM Trial Tr. p. 64, lines 3–20. More importantly, neither Mr. Prentkowski nor Autoliv's seatbelt engineer, Yuji Kamei, identified any part of the seatbelt that was specifically "designed by Mazda." Thus, Autoliv's claim that the seatbelt was "designed by Mazda" is not reasonable in light of the testimony.

---

[42] PX 1138.

[43] PX 1139A, SEC 10-K Filing at 4.

Furthermore, in reversing the summary judgment entered in Autoliv's favor by a former judge of this Court, the Eleventh Circuit found that Autoliv was an "actual manufacturer[]" that "manufactured" the subject seatbelt. See Doc. No. [309] at 3 ("The 'product seller' provision expressly does not apply to actual manufacturers such as Autoliv. . . . Autoliv manufactured seatbelt components in the deceased's Mazda and Plaintiff alleges that those components were defective when sold."). The Eleventh Circuit's finding that Autoliv is the seatbelt's manufacturer for purposes of O.C.G.A. § 51-1-11 is binding on this Court under the "specific application" of the law-of-the-case doctrine known as "the mandate rule." Piambino v. Bailey, 757 F.2d 1112, 1119 (11th Cir. 1985).[44]

Because Autoliv is the manufacturer of the seatbelt, Autoliv is strictly liable for any defects—whether in manufacturing, design, or warnings—in the seatbelt.

---

[44] "Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty., 439 F.3d 1275, 1283 (11th Cir. 2006) (quoting Heathcoat v. Potts, 905 F.2d 367, 370 (11th Cir. 1990)). The mandate rule "bars relitigation of issues that were decided either explicitly or by necessary implication." Id. The mandate rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." In re Checking Account Overdraft Litig., 754 F.3d 1290, 1296 (11th Cir. 2014) (quoting United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001)).

2.      **The Autoliv seatbelt is defective.**

In Georgia, to determine whether a product is defectively designed, the factfinder applies the "risk-utility analysis," which requires "balancing the risks inherent in a product design against the utility of the product so designed." Banks, 264 Ga. at 735, 450 S.E.2d at 674. The Georgia Supreme Court has held that "[t]he 'heart' of a design defect case is the reasonableness of selecting from among alternative product designs and adopting the safest feasible one." Jones v. NordicTrack, Inc., 274 Ga. 115, 118, 550 S.E.2d 101, 103 (2001). "[I]n determining whether a product was defectively designed, the trier of fact may consider evidence establishing that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." CertainTeed Corp. v. Fletcher, 300 Ga. 327, 329, 794 S.E.2d 641, 644 (2016) (quoting Banks, 246 Ga. at 736, 450 S.E.2d at 674–75).

Before proceeding to the defect analysis, the Court makes a preliminary observation. Plaintiff has asserted a strict products liability claim related to the design of the Autoliv seatbelt. At trial, Plaintiff presented evidence through her seatbelt expert, Mr. Meyer, about the specific features of the seatbelt's design that were defective. Mr. Meyer specifically pointed out that this seatbelt's design

incorporates both a "very low" 2.0 kN deployment threshold and does not incorporate a "stop" to limit the amount of seatbelt spool out once the deployment threshold has been reached. Meyer testimony, 10/6/21 PM, Trial Tr. p. 64, line 5–p. 65, line 9.[45] Mr. Meyer's testimony that there were other seatbelt designs available and actually in use that allow a lot less spool out in a 35-mph frontal collision was unrebutted by any evidence from Autoliv. Id. at p. 71, lines 1–17.

At the close of Plaintiff's evidence, Autoliv moved for a judgment as a matter of law on what Autoliv itself labeled the "deployment threshold" defect. See Autoliv motion, 10/7/21 AM, Trial Tr. p. 36, line 6–p. 39, line 20. The Court ultimately denied Autoliv's motion, id. at p. 46, lines 2–6, and Autoliv's renewal of that same motion, 10/12/21 PM, Trial Tr. p. 62, line 8–63, line 8. The Court now perfects the record by noting the flaws in the motion.

First, Plaintiff asserts that she has only one design defect claim in this case—not two. At trial, Plaintiff proved that there were several ways to make the seatbelt safer—a higher deployment threshold or a stop. But those improvements are not independent design defects. To resolve Plaintiff's sole design defect claim under

_____

[45] Mr. Meyer also used the phrase "very weak" when testifying about the seatbelt torsion bar at issue. Meyer testimony, 10/6/21 PM, Trial Tr. p. 64, line 5–p. 65, line 9.

Georgia law, the Court as factfinder must answer a single question: Do the risks of the seatbelt's design outweigh its utility? Banks, 264 Ga. at 735, 450 S.E.2d at 674. The answer, as explained below, is yes.

Second, though Autoliv asserts otherwise, "alternative design" does not appear to encompass proximate cause under Georgia law. Contra Def. Closing Arg., 10/13/21 AM Trial Tr. p. 54, line 17–p. 55, line 6. For purposes of the risk-utility analysis in Georgia, the existence of an "alternative design" is just one factor for the factfinder to consider when determining if the at-issue design is defective. See Bodymasters Sports Indus., Inc., 232 Ga. App. at 173, 501 S.E.2d at 560 ("[A]lthough Banks identifies the existence of an alternative design as one factor affecting the risk-utility analysis, it does not indicate that such factor is controlling."). That factor—alternative design—relates only to the issue of defect for the risk-utility analysis.

The Court derives guidance on this issue from Georgia case law. For another design to qualify as an "alternative design," the Georgia Supreme Court has held that design needs to be something that "would have made the product safer than the original design," and it must be a "marketable reality" and "technologically feasible." Banks, 264 Ga. at 736, 450 S.E.2d at 674-75; CertainTeed, 300 Ga. at 328, 794 S.E.2d at 644. The Georgia pattern civil instructions also indicate that

43

"evidence of alternative designs that would have made the product safer and could have prevented or minimized the plaintiff's injury" may be considered by the factfinder. Council of Superior Court Judges, <u>Suggested Pattern Jury Instructions</u>, Vol. I: Civil Cases § 62.650 (5th ed. 2020) (citing <u>Banks</u>, 264 Ga. at 732 and <u>Wilson Foods Corp. v. Turner</u>, 218 Ga. App. 74, 460 S.E.2d 532 (1995)).[46]

Also, if Georgia law incorporated "alternative design" into the proximate cause analysis, as Autoliv argues, then proof of an alternative design would be mandatory. But the law in Georgia is clear: proof of an alternative design is not required to prevail on a design defect claim. <u>Bodymasters Sports Indus., Inc. v. Wimberley</u>, 232 Ga. App. 170, 173, 501 S.E.2d 556, 560 (1998); <u>see also</u> <u>Volkswagen of Am., Inc. v. Gentry</u>, 254 Ga. App. 888, 896, 564 S.E.2d 733, 741–42 (2002) (failure to charge jury that plaintiffs had to offer proof of an alternative, safer design, practicable under the circumstances was not error); <u>Timmons v. Ford Motor Co.</u>, 982 F. Supp. 1475, 1479 (S.D. Ga. 1997) ("While at the 'heart' of the analysis, the Georgia Supreme Court clearly found that alternative designs were a factor that

---

[46] Defendant Autoliv, through Counsel, interprets this case law as an issue of whether the alternative design could have "saved" Mr. Andrews, however, the word "saved" is not in the above-stated standards. The Court will, instead, conduct its analysis utilizing the language of the standards set forth by the Georgia courts.

may be considered and not a requirement.") (citations omitted). Because proof of an "alternative design" is not mandatory under Georgia law, the Court is unable to uphold Autoliv's argument that Plaintiff has to show her alternative designs would have "saved" her husband's life to establish proximate cause.

The Court now proceeds with the defect analysis. The Georgia Supreme Court has held that "the appropriate analysis" in a design defect case like this one often "includes consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product." Jones, 274 Ga. at 118, 550 S.E.2d at 103. Other factors that the Court, as factfinder, may consider include:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

Banks, 24 Ga. at 737, 450 S.E.2d at 675 n.6; see also Council of Superior Court Judges, Suggested Pattern Jury Instructions, Vol. I: Civil Cases § 62.650 (5th ed. 2020). This list of factors is nonexhaustive, and not all factors apply in every case.

Here, the Court concludes that the risk of the design of the Autoliv seatbelt in Mr. Andrews's 2005 Mazda3 outweighs the utility of that design. The risk of a seatbelt with a very weak torsion bar is death or serious injury to an occupant in a collision in which the airbag does not deploy. The utility of seatbelt with a very weak torsion bar is that the car might get slightly better scores for potential chest injuries in the NCAP test.[47] But in a real-world collision in which an airbag does not deploy, slightly better scores on a standardized crash test will not keep the occupant from striking objects inside the car (e.g., steering wheel or dashboard) with injurious force—the primary purpose of a seatbelt.[48]

---

[47] Autoliv presented the testimony of its retained experts to argue that stronger torsion bars could result in serious injury to occupants. However, the Court does not find this argument persuasive. The 2004-2009 Volvo S40 seatbelt, for example, was three times stronger than the 2005 Mazda3 seatbelt, and it performed well in testing. Meyer testimony, 10/6/21 PM Trial Tr. p. 71, lines 7–23.

[48] See Meyer testimony, 10/6/21 PM Trial Tr. p. 48, lines 19–22 ("Q. What is the whole job of the seatbelt? A. The seatbelt is to prevent the occupant from slamming into interior components like the steering wheel so hard that it creates a permanent or a fatal injury.").

Plaintiff's seatbelt expert, Mr. Meyer, testified that there were alternative designs for the subject seatbelt that would have been safer and that were actually on the market. Mr. Meyer testified that all else being equal, a stronger torsion bar allows much less spool out. Meyer testimony, 10/6/21 PM Trial Tr. p. 37, lines 19–22, p. 63, lines 18–19. Autoliv made and sold a seatbelt that was 1.75 times stronger for the 2006–2009 Mazda3. See PX 35 (seatbelt specification showing 2.0 ± 0.5 kN torsion bar for driver seatbelt in 2004–2005 Mazda3 but 3.5 ± 0.9 kN torsion bar for driver seatbelt in the 2006–2009 Mazda3).

Autoliv also made and sold the seatbelt for the 2004–2009 Volvo S40. That is significant because the 2004-2009 Volvo S40 was built on the same "platform" as the 2005 Mazda3, meaning the cars share the same "basic structure." See 49 C.F.R. § 579.4(c) (defining the term "platform"). The Autoliv seatbelt in the 2004-2009 Volvo S40 had a first-phase deployment threshold of 6.0 kN, meaning it was three times as strong as the 2005 Mazda3 seatbelt. Doc. No. [503], ¶ 29. The real-world consequences of the stronger seatbelt in the 2004-2009 Volvo S40 come through in the NCAP test where the 2004-2009 Volvo S40 seatbelt spooled out only 6.50 inches compared to the 16.85 inches that the Mazda3 at issue allowed. PX 9.



Pl.'s Demonstrative. The record is clear: Autoliv had safer seatbelts that it could have sold to Mazda. And Autoliv engineer Yuji Kamei admitted that Autoliv did not have to sell Mazda an unsafe seatbelt. PX 1163, Tr. p. 61, lines 19–24.

Autoliv could have also made the seatbelt safer another way. The Autoliv seatbelt had no limit on the amount of webbing that could spool out in a collision. Autoliv could have put a stop on the seatbelt to limit the amount of webbing that spooled out. The undisputed testimony at trial was that when Autoliv designed, manufactured, and sold the subject seatbelt to Mazda, it also had for sale a seatbelt with a stop to limit the amount of spool out. Meyer testimony, 10/6/21 PM Trial

Tr. p. 73, line 13–p. 74, line 4. The Court thus concludes that there were feasible, alternative designs that would have made the Autoliv seatbelt safer.

There is also significant evidence that the Autoliv seatbelt's design is an extreme outlier. Plaintiff's seatbelt expert, Steve Meyer, testified that the Autoliv seatbelt had the lowest deployment threshold of any car he had ever seen. Meyer testimony, 10/6/21 PM Trial Tr. p. 64, lines 15–16 ("lowest one I've ever seen"). Both in terms of performance and use, the Autoliv seatbelt in the 2005 Mazda3 is unlike others in the similar class of vehicles.

The record shows that the danger that the Autoliv seatbelt posed to foreseeable users like Mr. Andrews was unknown to the public. Autoliv's corporate representative admitted that Mr. Andrews "had no warning that if the airbag failed, the seat belt would be useless to him." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 56, lines 7–9. The record also shows that there was no warning on the seatbelt or in the owner's manual about the danger the Autoliv seatbelt posed. Nor have there been any public statements by Autoliv (or Mazda) warning the public either before or after Mr. Andrews's collision about the Autoliv seatbelt's dangers in a 35-mph collision.

The availability of safer alternative designs that were actually used in other cars in the Mazda3's class—and manufactured and sold by Autoliv—proves that

49

the weak Autoliv seatbelt was not "state of the art." The Autoliv seatbelt was an extreme outlier and unsafe. That other cars in the Mazda3's class were able to use stronger, safer torsion bars is proof that it was possible for Autoliv to manufacture and sell Mazda a safer seatbelt without impairing the seatbelt's usefulness or making it too expensive.

After considering the relevant factors for purposes of the risk-utility analysis, the Court concludes that the risks of the Autoliv seatbelt in Mr. Andrews's car outweigh its utility. Thus, the Autoliv seatbelt was defectively designed.

### 3. The Autoliv seatbelt was a proximate cause of Mr. Andrews's death.

Having determined that the Autoliv seatbelt is defective, the sole question remaining to establish liability is whether the Autoliv's seatbelt was a proximate cause of Mr. Andrews's injuries and death. The Court concludes that it was.

More specifically, "[t]o prevail in a Georgia products liability action, whether based on negligence or strict liability, a plaintiff must show that the proximate cause of the injury was a defect which existed when the product was sold." Carmical v. Bell Helicopter Textron, Inc., a Subsidiary of Textron, Inc., 117 F.3d 490, 494 (11th Cir. 1997) (citations omitted).

In May 2021, the Georgia Supreme Court expounded on the nature of "proximate cause" under Georgia law. "Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." <u>Johnson v. Avis Rent a Car Sys., LLC</u>, 311 Ga. 588, 592, 858 S.E.2d 23, 29 (2021) (quoting <u>Zwiren v. Thompson</u>, 276 Ga. 498, 500 578 S.E.2d 862, 865 (2003)). A defendant who breaches a duty owed to the plaintiff is liable for the plaintiff's damages (i.e., is a proximate cause) when the consequences of the defendant's breach of duty "is probable, according to ordinary and usual experience." <u>Id.</u> (quoting <u>Johnson v. Am. Nat'l Red Cross</u>, 276 Ga. 270, 273, 578 S.E.2d 106, 109 (2003)).[49]

In one sense, "proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance

_____

[49]  The Georgia Supreme Court noted that it was important to recognize that

> "[p]robable," . . . in the . . . rule as to causation, does not mean "more likely than not" but rather "not unlikely"; or, more definitely, "such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen."

<u>Johnson</u>, 311 Ga. at 592, 858 S.E.2d at 29 (quoting Jeremiah Smith, <u>Legal Cause in Actions of Tort</u>, 25 Harv. L. Rev. 103, 116 (1911)).

recovery." Id. (quoting Atlanta Obstetrics & Gynecology Grp. v. Coleman, 260 Ga. 569, 569, 398 S.E.2d 16, 17 (1990)). The conclusion that proximate cause exists "requires both factfinding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent." Id. (citations omitted).

Applying the above-stated case law, the factfinding in the "what happened" sense is that the evidence at trial showed that Mr. Andrews would not have been killed when his head struck his car's steering wheel with enough force to cause a fatal basilar skull fracture had he received the benefit of his airbag or a seatbelt that did not spool out 20 inches. See Ziejewski testimony, Trial Tr. p. 46, lines 7–9 ("Q. Would Mr. Andrews have had a fatal thoracic injury if the seatbelt would have kept him off the steering wheel? A. No, he would not."); Id. at p. 103, lines 21–23 ("Q: You know that if the airbag had deployed, Mr. Andrews would have survived this accident? A. Yes.").

The evidence also showed that Autoliv knew that the seatbelt allowed an excessive amount of spool out in standardized 35-mph crash tests and hardly provided any restraining force. The Autoliv seatbelt allowed more than twice as much spool out as the other cars in the Mazda3's class and more than twice as much spool out as the seatbelt in the 2004-2009 Volvo S40, a car built on the same

platform as the 2005 Mazda3. In addition, Autoliv knew that airbags do not always deploy in a collision. Autoliv also knew that people could be seriously injured or killed if the seatbelt did not adequately restrain the driver during a frontal collision. Accordingly, the Court concludes that Autoliv knew that a person properly wearing the subject seatbelt was at risk of suffering serious injury or death if the airbag did not deploy in a 35-mph frontal collision.

Next, the Court evaluates whether the facts measure up to the legal standard set by precedent. The Court finds that the facts measure up to yield a finding of proximate cause as Plaintiff has proved that but for Autoliv's conduct, Mr. Andrews would not have sustained the fatal injury. See Strength v. Lovett, 311 Ga. App. 35, 43–44, 714 S.E.2d 723, 730 (2011) ("To show that the wrongful conduct of the defendant is a cause in fact of his injuries, a plaintiff ordinarily must prove that, but for this conduct, he would not have sustained the injury: 'The defendant's conduct is not a cause of the event, if the event would have occurred without it.'") (citations omitted).[50]

_____

[50] The Court recognizes that Autoliv interprets this case law as requiring Plaintiff to show that Mr. Andrews "would not have died had the subject seatbelt included a deployment threshold greater than 2.0 ± .5 kN" or that Mr. Andrews would not have died had the subject seatbelt included a "stop." See Doc. No. [531], ¶¶ 44, 50. However, as indicated above, the Court declines to conflate alternative designs (of higher thresholds

In addition, the probable consequence of Autoliv's breach of a legal duty owed to Mr. Andrews is that Mr. Andrews might be in a frontal collision in which his airbag did not deploy and suffer serious injury or death because the seatbelt failed to adequately restrain him. See Chrysler Corp. v. Batten, 264 Ga. 723, 724, 450 S.E.2d 208, 211 (1994) ("[A] manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses.").

The defectively designed Autoliv seatbelt was thus a proximate cause of Mr. Andrews's injuries and death.

---

and a stop) and proximate cause. The Court reads the case law as more generalized, i.e., of focusing on Autoliv's actual conduct and how it related to Mr. Andrews' fatal injury, i.e., selling a seatbelt that allowed for 20 inches of spool out in a foreseeable accident in which an airbag does not deploy. Further, to the extent that Autoliv's interpretation of the law/issue is correct, the evidence from both Plaintiff's and Defendant's experts still shows by a preponderance of the evidence that had the seatbelt included at least one of the alternative designs (i.e., a stop), Mr. Andrews would have experienced survivable head injuries, which Defense Counsel acknowledged in closing. See 10/13/21 AM Trial Tr. p. 58, lines 21–25 ("Dr. Rafael said you're talking about that kind of force, you could have heart lacerations, lung lacerations, flailed chest, very serious things. I thought she was very credible and forthright when she said, I can't say that he would have died, I can't."); see also Dr. Ziejewski testimony, 10/5/21 Trial Tr. p. 105, lines 16–p. 106, line 8 (opining that with a stop of 6 inches pay out, Mr. Andrews would have received a "concussion, mild traumatic brain injury").

**B.     Damages**

Having determined that Autoliv is liable for Mr. Andrews's death, the Court now turns to the question of damages.

### 1.     Estate claim: Mr. Andrews's special damages.

Plaintiff, as personal representative of Mr. Andrews's estate, seeks special damages[51] for Mr. Andrews's medical bills and funeral costs. The parties stipulated that the amount of these damages is $19,343.40. Doc. No. [503], ¶¶ 8, 9. Accordingly, the Court finds that special damages in the amount of **$19,343.40** are appropriate.

### 2.     Estate claim: Mr. Andrews's general damages.

Under Georgia law, a claim for wrongful death damages and a claim for the conscious pain and suffering that the decedent experienced before death are distinct. Grant v. Ga. Pac. Corp., 239 Ga. App. 748, 751, 521 S.E.2d 868, 870 (1999). Whether the decedent experienced conscious pain and suffering is a question for the factfinder to decide. See Walker v. Daniels, 200 Ga. App. 150, 157, 407 S.E.2d 70, 75–76 (1991).

---

[51] Under Georgia law, "[s]pecial damages are those which actually flow from a tortious act." O.C.G.A. § 51-12-2(b). General damages, on the other hand, "are those which the law presumes to flow from any tortious act." O.C.G.A. § 51-12-2(a).

Here, the undisputed evidence from Mr. Kemp was that after he hung up with 911—a call that lasted four minutes and twelve seconds—he went to Mr. Andrews's car and told Mr. Andrews that help was on the way. Mr. Kemp vividly remembers that Mr. Andrews tried to respond by groaning and trying to raise his body. Officer Porter testified that he witnessed Mr. Andrews's last two breaths, after Mr. Kemp had spoken with Mr. Andrews. Dr. Frist testified that what Mr. Kemp observed was consistent with Mr. Andrews having been conscious at that time. All this testimony was undisputed. Based on the undisputed evidence at trial, which the Court finds is credible, the Court concludes that Mr. Andrews was alive and conscious from the time of the collision until after Mr. Kemp pulled off the road and stopped his car, finished his 911 call, and then went to Mr. Andrews's car—over four minutes and twelve seconds.[52]

Accordingly, the Court finds general damages for the postimpact pain and suffering Mr. Andrews endured in the amount of **$2,000,000.00** are appropriate.

---

[52] See Holland v. Cypress Ins. Co., No. 2:17-cv-120, 2020 WL 5742250, *10 (N.D. Ga. Aug. 21, 2020) (Story, J.) (denying defendant's renewed motion for judgment as a matter of law or, in the alternative, for new trial on issue of postimpact pain and suffering where there was credible evidence that a witness heard the decedent moan after being unattended for some period after the collision).

### 3. Wrongful death damages: the full value of Mr. Andrews's life.

Mr. Andrews was 38 years old at the time of his death. Doc. No. [503], ¶ 5. The parties agree that his life expectancy at the time of his death was an additional 36.18 years. Id. ¶ 7.

Georgia places a premium on life. For over one hundred years, the civil remedy in Georgia for causing a person to lose their life is not the sum of the foregone paychecks or the services the deceased would have rendered—it is the "the full value of the life of the deceased." See Bibbs v. Toyota Motor Corp., 304 Ga. 68, 70, 815 S.E.2d 850, 853 (2018) (providing a historical overview of Georgia's wrongful death laws). That "full value" is not what someone else would assign to the life—not even family or friends. Instead, it is the value of the life through the eyes of the person who lost it. Id. at 73, 815 S.E.2d at 854–55 (the full value of a decedent's life is measured from the perspective of the decedent rather than the perspective of the survivors); see also O.C.G.A. § 51-4-1(a) (defining "[f]ull value of the life of the decedent, as shown by the evidence").

In terms of economic value, the parties stipulated that the present value of Mr. Andrews's lost income, lost fringe benefits, and lost household services is $2,027,141.00. Doc. No. [503], ¶ 38.[53]

In terms of intangible value, Plaintiff presented considerable, credible evidence proving that Mr. Andrews was an exemplary citizen and father with a real zest and love of life, his family, his friends, and his work. Autoliv did not dispute any of that proof; indeed, Autoliv did not ask Plaintiff's damages witnesses a single question or present any inconsistent evidence.

In reaching a conclusion about the full value of Mr. Andrews's life, the Court has considered the verdicts that actual Georgia juries have returned in cases referenced in Plaintiff's Corrected and Supplemental Trial Briefs on the Full Value of Mr. Andrews's Life. Doc. Nos. [468-1]; [533]. The Court also notes that in its closing argument Autoliv did not dispute, challenge, or otherwise try to diminish the amount that Plaintiff placed on the "full value" of Mr. Andrews's life of "not less than $25 million." Pl. Closing Arg., 10/13/21 AM, Trial Tr. p. 39, line 1.[54]

---

[53] According to Plaintiff, the parties' stipulation about the economic value of Mr. Andrews's life was based on the deposition testimony of Plaintiff's economist Michael Daniels, Ph.D.

[54]  Autoliv asked for a "defense verdict" only. Def. Closing Arg., 10/13/21 AM, Trial Tr. p. 76, lines 20–22.

Accordingly, the Court finds the the full value of Mr. Andrews's life, both economic and intangible, is **$25,000,000.00 (Twenty-Five Million Dollars)**.[55]

### 4.     Apportionment

In 2005, the Georgia General Assembly amended O.C.G.A. § 51-12-33, commonly known as the "apportionment statute." See Couch v. Red Roof Inns, Inc., 291 Ga. 359, 362, 729 S.E.2d 378, 381 (2012). Since its enactment, this statute has spawned a plethora of litigation in the Georgia appellate courts, and that litigation continues unabated. Even so, the features of Georgia apportionment law relevant to this case can be distilled as follows.

First, where the apportionment statute applies, the factfinder makes two different (albeit related) determinations: the amount of the plaintiff's damages and the percentages of fault of all persons who contributed to the plaintiff's injuries or damages. See O.C.G.A. § 51-12-33(a)–(c); Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC, 355 Ga. App. 525, 534, 843 S.E.2d 613, 620 (2020) ("[T]he apportionment statute obligates us to distinguish between the trier of fact's

---

[55] Georgia law gives the right to bring a wrongful death claim to the surviving spouse of the decedent. O.C.G.A. § 51-4-2(a). The wrongful death award, however, is shared between the surviving spouse and the decedent's children. O.C.G.A. § 51-4-2(d)(1). Here, that means that Jamie Andrews and her and Mr. Andrews's daughter, S.C., will split the wrongful death damages equally.

determination of damages and that of fault."), <u>aff'd in pertinent part by</u> 862 S.E.2d 295 (Ga. 2021).

Second, where a defendant claims that the plaintiff's injuries or damages were the fault of another party or a nonparty, the defendant bears the burden of proving that another party or nonparty was responsible for the plaintiff's injuries or damages. <u>See</u> <u>Brown v. Tucker</u>, 337 Ga. App. 704, 716, 788 S.E.2d 810, 821 (2016) ("The affirmative defense that the jury should apportion fault against someone other than the defendant is no different analytically from the defense of contributory negligence. Once the plaintiff establishes her prima facie case, the defendant seeking to establish that someone else bears responsibility for the damages has the burden of proving that defense."). Here, Autoliv not only denied that it is liable for Mr. Andrews's injuries and death but also claimed that Mr. Andrews's injuries and death were caused by (1) Mr. Andrews himself, (2) Mazda, and (3) Bosch. Under Georgia law, Autoliv's claims that others were at fault for Mr. Andrews's injuries and death are "affirmative defense[s]," and Autoliv "had the burden of showing by a preponderance of the evidence" that each purportedly responsible other party was at fault for Mr. Andrews's injuries and death. <u>Id.</u>

That conclusion is buttressed by the Georgia Supreme Court's construction of the term "fault" in subsections (a), (b), and (c) of O.C.G.A. § 51-12-33. As construed by the Georgia Supreme Court, "fault" in subsection (a) refers "to a breach of a legal duty that the plaintiff owes for his own protection that is a proximate cause of his injury";[56] "fault" in subsection (b) refers "to a breach of a legal duty that a defendant owes for the protection of the plaintiff that is a proximate cause of the injury to the plaintiff"; and "fault" that "contributed to the alleged injury or damages" in subsection (c) refers "to a breach of a legal duty in the nature of tort that is owed for the protection of the plaintiff, the breach of which is a proximate cause of his injury." Zaldivar v. Prickett, 297 Ga. 589, 595, 774 S.E.2d 688, 694 (2015).[57]

---

[56] Under O.C.G.A. § 51-12-33(g), "if the plaintiff is 50 percent or more responsible for the injury or damages claims," then the plaintiff cannot recover any damages. According to the Georgia Supreme Court, "[t]ogether, subsections (a) and (g) codify the doctrine of comparative negligence, a doctrine that was recognized in Georgia long before the present apportionment statute was enacted in 2005." Zaldivar v. Prickett, 297 Ga. 589, 774 S.E.2d 688, 693 (2015) (internal citation and footnote omitted).

[57] "Subsection (c), then, is properly understood to require the consideration of the 'fault' of four classes of persons or entities: plaintiffs (also covered in subsection (a)), defendants with liability (also covered in subsection (b)), defendants without liability, and nonparties." Zaldivar, 297 Ga. at 598, 774 S.E.2d at 695 n.6

Third, even where, as here, a plaintiff brings a strict products liability claim against a defendant under O.C.G.A. § 51-1-11(b)(1), the factfinder can determine the plaintiff's percentage of fault for the plaintiff's injuries or damages if there is evidence that the plaintiff was at fault for them. See Johns v. Suzuki Motor of Am., Inc., 310 Ga. 159, 169, 850 S.E.2d 59, 67 (2020).

Fourth, Plaintiff initially sued Mazda and several Bosch entities,[58] but that does not mean that the Court, as factfinder, must consider the potential fault of Mazda or Bosch under O.C.G.A. § 51-12-33(d)(1). Although subsection (d)(1) provides that the "[n]egligence or fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty," the Georgia Court of Appeals has "decline[d] to interpret" that subsection "as requiring a trier of fact to automatically consider the potential fault of a settled entity." Union Carbide Corp. v. Fields, 315 Ga. App. 554, 559, 726 S.E.2d 521, 526 (2012), reversed

---

[58] Plaintiff's Complaint named four Bosch entities: (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, (3) Robert Bosch Motor Systems Corporation, and (4) Bosch Corporation. Doc. No. [1-2], p. 1. Plaintiff's First Amended Complaint dropped Robert Bosch Motor Systems Corporation as improperly named and added Robert Bosch GmbH. Doc. No. [17], p. 2. For purposes of this section of the Order, the Bosch entities will be referenced collectively as "Bosch."

in part by Ga.-Pac., LLC v. Fields, 293 Ga. 499, 748 S.E.2d 407 (2013).[59] Instead, the "defending party" must produce evidence that "the settled entity 'contributed to the alleged injury or damages' before its fault can be assessed by the trier of fact." Id. at 559, 726 S.E.2d at 525–26 (quoting O.C.G.A. § 51-12-33(c)). Thus, even though Plaintiff settled with Mazda and dismissed certain Bosch entities years ago, Autoliv must still produce evidence that Mazda and Bosch breached a legal duty in the nature of a tort for the protection of Mr. Andrews and that breach was a proximate cause of Mr. Andrews's injuries and death before the Court, as factfinder, can assess any fault to Mazda or Bosch.

Fifth, Autoliv must produce evidence that affords the factfinder a rational basis to apportion fault. See Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC, 862 S.E.2d 295, 303 (Ga. 2021) ("Whether fault is divisible as a matter of fact, by contrast, is for the trier of fact to determine so long as some evidence is presented

---

[59] The Georgia Supreme Court granted certiorari and reversed a portion of Fields unrelated to this holding. Ga.-Pac., LLC v. Fields, 293 Ga. 499, 748 S.E.2d 407 (2013). When the case returned to the Georgia Court of Appeals, the intermediate appellate court vacated the reversed portion of its earlier opinion and substituted the Georgia Supreme Court's opinion. Union Carbide Corp. v. Fields, 327 Ga. App. 264, 758 S.E.2d 335 (2014). But the Georgia Court of Appeals' interpretation of O.C.G.A. § 51-12-33(d)(1) in Fields became binding when the case returned to that court. See id. at 336 ("Since those portions of our earlier opinion are consistent with the Supreme Court's opinion, Divisions 1(a)–(c), (e) and Division 2 of our earlier opinion 'become binding upon the return of the remittitur.'").

that would allow a rational division.");[60] see also Stewart Ausband Enters., Inc. v. Holden, 349 Ga. App. 295, 300, 826 S.E.2d 138, 144 (2019) ("It is the defendants' burden to establish a basis for apportionment, and it is the factfinder's role to assign fault accordingly.").

Whether a rational basis exists to apportion fault is a question of fact. Couch, 291 Ga. at 366, 729 S.E.2d at 384.

Apportionment of fault requires the factfinder to determine, in terms of percentage, the relative extent to which each tortfeasor contributed as a proximate cause of the plaintiff's injury. See Zaldivar, 297 Ga. at 595, 774 S.E.2d at 693. For that reason, a defendant must present some evidence at trial providing the factfinder a rational basis for apportionment based on percentages of fault.

In applying the above-stated features and principles of Georgia law, the Court concludes that Autoliv has not established a rational basis for apportionment as to Mr. Andrews and Bosch, but has established a rational basis for apportionment as to Mazda.

---

[60] The Court recognizes that the Georgia Court of Appeals has held that the "rational basis" standard is not the law for apportionment in Georgia. See Brown, 337 Ga. App. at 717, 788 S.E.2d at 821. However, the most recent Georgia Supreme Court case, cited above, indicates that "rational division" is the correct standard.

The Court also recognizes Plaintiff's opposition argument that there should be no apportionment based on Autoliv's employment of an "all or nothing" strategy at trial, i.e., asserting that its product was not defective and was not the proximate cause of Mr. Andrews's injuries.

In support of this argument, Plaintiff relies upon the case of: <u>Ford Motor Company v. Reese</u>, 300 Ga. App. 82, 684 S.E.2d 279 (2009). In the <u>Ford</u> case, the plaintiff's decedent died after the Ford vehicle that she was driving was rear-ended by a dump truck. <u>Id.</u> Her surviving children sued Ford, asserting a claim for defective design based upon the seat design. <u>Id.</u> The jury returned a verdict against Ford and on appeal, Ford argued that "the trial court's jury instruction was incomplete because it did not inform the jury that Ford could limit its liability by demonstrating a rational basis for apportioning liability for [the decedent's] injuries" between Ford and the dump truck driver. <u>Id.</u> at 88, 684 S.E.2d at 286. In finding that that the trial court had properly instructed the jury, the Georgia Court of Appeals noted that Ford had taken an "all or nothing" approach to liability at trial and "made no effort to show how her injuries could be rationally apportioned between the collision with the dump truck" and the alleged defect in her car. <u>Id.</u> at 89, 684 S.E.2d at 286.

After review, the Court finds that the <u>Ford</u> case is distinguishable from the case *sub judice* in that, as stated above, Autoliv did make an effort (through evidence presentation at trial and reference to the apportionment statute in closing argument) to show how the injuries could be apportioned between it and Mazda. Further, while Plaintiff is correct that it can be argued that Autoliv took an "all or nothing" approach to liability at trial, the Georgia Court of Appeals has held that "[a] defendant need not necessarily concede the essential facts of the plaintiff's claim to raise a burden-shifting affirmative defense." <u>Brown</u>, 337 Ga. App. at 715, 788 S.E.2d at 820. "A defendant may deny the essential facts asserted and also claim in the alternative that, if the plaintiff had been injured, the injury was due to causes other than the defendant's actions." <u>Id.</u> Such is what happened in the case *sub judice*, as Defendant maintained at trial that Mr. Andrews's injuries were due to causes other than Autoliv's actions.

### i. Mr. Andrews is not at fault for his own injuries and death.

Under subsection (a) of the Georgia apportionment statute, "[w]here an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed," the factfinder "shall determine the percentage of fault of the plaintiff and the judge

shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault." O.C.G.A. § 51-12-33(a).

To allocate any "fault" to Mr. Andrews, the Court would have to find that Mr. Andrews's injuries and death were proximately caused by his own negligence. That is not possible to do in this case as Mr. Andrews did not design or manufacture the seatbelt that spooled out 20 inches, or the airbag, or the crash sensing system (i.e., the wiring, sensor, or control computer) that resulted in the airbag not deploying.[61]

Plaintiff's expert, Dr. Frist, testified, without contradiction, that Mr. Andrews would not have had a basilar skull fracture had his head not hit the steering wheel with such force and velocity. Dr. Frist also testified, without contradiction, that Mr. Andrews had no life-threatening injuries besides the basilar skull fracture. Frist testimony, 10/4/21 AM, Trial Tr. p. 82, lines 4–21. The evidence in the case showed that Mr. Andrews's head hit the steering wheel with such force and velocity only because his seatbelt spooled out 20 inches and the

---

[61] As indicated above, Autoliv's own corporate representative admitted at trial, "this case starts when the car hit those trees because that's when the question arises, who is at fault for the airbag not working and the seat belt not working." Prentkowski testimony, 10/7/21 PM Trial Tr. p. 54, lines 19–23.

airbag did not deploy. Mr. Andrews had no control of the seatbelt's design or the mechanisms that should have led to the airbag deploying. The undisputed evidence at trial showed that the expected outcome of a 35-mph frontal collision is survival with relatively minor injuries—as long as the occupant restraint system works. Accordingly, the Court concludes that Mr. Andrews is not the proximate cause of his fatal injuries or death. For that reason, no fault can be apportioned to him under Georgia law.

Additionally, Georgia embraces the doctrine of sudden emergency. The sudden emergency doctrine applies when "acts which occur immediately following the apprehension of the danger or crisis and before there is time for careful reflection." Willis v. Love, 232 Ga. App. 543, 545, 502 S.E.2d 487, 489 (1998) (citation omitted). Under that doctrine, a person confronted with a sudden emergency who "acts according to his best judgment or, because of want of time in which to form a judgment, acts in the most judicious manner, is not chargeable with negligence." Id.; Curtis v. United States, 274 F. Supp. 3d 1366, 1378 (N.D. Ga. 2017) (Batten, J.) ("Under that doctrine, a person who is faced with a sudden emergency and either acts within his 'best judgment' or does not have sufficient time to form such a judgment is 'not chargeable with negligence.'" (quoting Willis, 232 Ga. App. at 545, 502 S.E.2d at 489)). Georgia law defines an emergency as

"sudden peril caused by circumstances in which the [person] did not participate and which offered [him] a choice of conduct without time for thought so that negligence in [his] choice might be attributable not to lack of care but to lack of time to assess the situation." Willis, 232 Ga. App. at 545, 502 S.E.2d at 489 (citations omitted). One situation in which the sudden emergency doctrine has been held to apply is when a driver suddenly confronts an animal in the road. See Stephens v. Hypes, 199 Ga. App. 821, 822, 610 S.E.2d 631, 633 (2005) ("[C]ommon sense dictates that that a deer in the road could give rise to a sudden emergency."); see also Adams v. Finlayson, 199 Ga. App. 821, 822, 406 S.E.2d 227, 228–29 (1991) (affirming trial court's charge on sudden emergency where evidence showed that collision followed driver's decision to swerve in response to dog on the road). Another court has held that "a normally careful person" would react to avoid "a large animal" that suddenly appeared in the road by veering onto the shoulder. Whitehead v. Cruse, 279 So. 2d 802, 804 (La. Ct. App. 1973).

Here, Mr. Andrews faced a sudden emergency not of his own making: the presence of a large snapping turtle in the middle of the interstate. Mr. Andrews swerved hard right and applied his brakes. Unfortunately, that avoidance maneuver took Mr. Andrews off the interstate and onto the grassy shoulder of I-575. That grassy shoulder was so steep that Mr. Andrews could not recover and

return his car to the road. Under the circumstances, Mr. Andrews's avoidance maneuver was reasonable. Because Mr. Andrews acted reasonably under the circumstances, Mr. Andrews did not breach a legal duty that he owed for his "own protection" and thus no "fault" within the meaning of O.C.G.A. § 51-12-33(a) can be apportioned to Mr. Andrews. See Zaldivar, 297 Ga. at 595, 744 S.E.2d at 694.

> ii. **No fault can be apportioned to Bosch because Autoliv did not prove that Bosch breached any legal duty owed to Mr. Andrews or that Bosch's conduct contributed to Mr. Andrews's injuries or death.**

As indicated above, between the Complaint and First Amended Complaint, Plaintiff named five "Bosch" entities.[62] Based on the evidence adduced at trial, none of these Bosch entities is at fault for Mr. Andrews's injuries and death.

Plaintiff dismissed Robert Bosch Motor Systems Corporation as improperly named. Autoliv produced no evidence to the contrary at trial, nor did Autoliv produce any evidence proving that Robert Bosch Motor Systems Corporation was involved in any way in designing or manufacturing any allegedly defective

---

[62] Said entities are: (1) Robert Bosch LLC, (2) Robert Bosch North America Corporation, (3) Bosch Corporation, (4) Robert Bosch Motor Systems Corporation, and (5) Robert Bosch GmbH. See Doc. Nos. [1-2], p. 1; [17], p. 2.

product in Mr. Andrews's car. Thus, the Court cannot apportion any "fault" for Mr. Andrews's injuries or death to Robert Bosch Motor Systems Corporation.

That leaves four Bosch entities: (1) Bosch Corporation, (2) Robert Bosch LLC, (3) Robert Bosch North America Corporation, and (4) Robert Bosch GmbH (collectively, "Bosch").

At trial, Autoliv presented testimony that Bosch supplied the airbag electronic front sensor system component for Mr. Andrews's car. Plaintiff's expert clarified that while it was Bosch's airbag electronic front sensor system component that ultimately caused the non-deployment of the airbag in Mr. Andrews's collision, "it was the connector and the wire connected to that sensor that failed, not the sensor itself." Caruso testimony, 10/6/21 AM Trial Tr. p. 88, lines 10–13. He further testified that "if the wire had not been cut, the system was designed reasonably well, it would have deployed the airbags." Id. at lines 18–22. He also testified that the fault for the wire getting cut and the sensor coming apart "was a combination of Mazda's decision on how to route the wire and the decision to use [a] substandard connector," which Plaintiff's expert garnered was a Mazda decision. Id. at line 23–p. 89, line 5.

On cross-examination of Mr. Caruso, Plaintiff's expert in airbag system design and automaker supplier relationships, Autoliv attempted to elicit

additional testimony about Bosch's level of fault for the airbag's failure to deploy in Mr. Andrew's April 12, 2013 collision. But Mr. Caruso testified that based on his review of the documentary evidence and inspection of Mr. Andrews's car, he "could not find any fault in the airbag system -- the crash sensing system performance as it related to Bosch." Caruso testimony, 10/6/21 AM Trial Tr. p. 87, lines 20–24. Caruso testified that he "felt that Bosch had taken due care," including with respect to Mazda's decision not to implement dual front sensors, which Bosch suggested at one point and that Mazda presumably rejected. Id. at p. 90, lines 1–6.

Thus, Autoliv did not prove that Bosch designed or manufactured any defective product in the Mr. Andrews's car or that Bosch otherwise breached a "legal duty in the nature of tort" owed to protect Mr. Andrews. Accordingly, the Court cannot assign or otherwise apportion any "fault" to Bosch.

### iii. Fault can be apportioned to Mazda because Autoliv presented evidence that affords the Court a rational basis to apportion fault.

At trial, Autoliv insisted that it did nothing wrong and that the design of its seatbelt was not defective. Autoliv also contended that its seatbelt was not a proximate cause of Mr. Andrews's injuries and death, and that any fault for Mr. Andrews's injuries and death rested with some other party (i.e., Mr. Andrews himself, Mazda, or Bosch). Autoliv presented at trial only a corporate

representative, an engineer, and two expert witnesses to support its claims that the seatbelt's design was not defective and that something besides the seatbelt was the proximate cause of Mr. Andrews's injuries and death.

The unrebutted testimony of Plaintiff's expert, Mr. Caruso, is credible and established that as to defect with the airbag system and the cause for the non-deployment of the airbag, "it was the connector and the wire connected to that sensor that failed, not the sensor itself." Caruso testimony, 10/6/21 AM Trial Tr. p. 88, lines 10–13. He further testified that "if the wire had not been cut, the system was designed reasonably well, it would have deployed the airbags." Id. at lines 18–22. He also testified that the fault for the wire getting cut and the sensor coming apart "was a combination of Mazda's decision on how to route the wire and the decision to use [a] substandard connector," which Plaintiff's expert garnered was a Mazda decision. Id. at line 23–p. 89, line 5.

Plaintiff's biomechanics expert also testified that had the airbag deployed as designed (or had the seatbelt not allowed 20 inches of spool out), Mr. Andrews would not have struck the steering wheel with fatal force. Ziejewski testimony, 10/5/21 PM Trial Tr. pp. 6, lines 18–25; 103, lines 21–23. This evidence allows the Court, as factfinder, to conclude that Mazda "breached a legal duty in the nature of tort" owed to protect Mr. Andrews and thus is at "fault" for Mr. Andrews's

injuries and death. See Chrysler Corp., 264 Ga. at 724, 450 S.E.2d at 211 ("[A] manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses."). Plaintiff also acknowledged in her own proposed findings of fact that the evidence adduced at trial allows the Court, as factfinder, to conclude that Mazda "breached a legal duty in the nature of tort" owed to protect Mr. Andrews and thus is at "fault" for Mr. Andrews's injuries and death. Doc. No. [523], 74.

But establishing fault of a nonparty is not enough to prevail on the affirmative defense of apportionment. Autoliv also had to present competent evidence that would establish a "rational basis for apportionment." Couch, 291 Ga. at 366, 729 S.E.2d at 384; see also Holden, 349 Ga. App. at 300, 826 S.E.2d at 144. Whether Autoliv established a rational basis that would enable the Court, as factfinder, to apportion fault—as a percentage—between Autoliv (which the Court already held was liable for Mr. Andrews's injuries and death) and Mazda is a question of fact. Couch, 291 Ga. at 366, 729 S.E.2d at 384; see also Alston & Bird, LLP, 862 S.E.2d at 303 ("Whether fault is divisible as a matter of fact, by contrast, is for the trier of fact to determine so long as some evidence is presented that would allow a rational division.").

In addition, "in arriving at how to express [the] different degrees of culpability in mathematical terms," the factfinder is "not bound by any specific formula; instead, the matter [is] to be 'determined according to the enlightened conscience of [the] fair and impartial'" factfinder. Surles v. Cornell Corr. of Calif., Inc., 290 Ga. App. 260, 270, 659 S.E.2d 683, 691 (2008).

The Court resolves the question of fact of whether fault is divisible to Mazda by finding that Autoliv presented some evidence that established a basis to apportion fault (as a percentage) between Autoliv and Mazda. In addition, to the above-stated evidence concerning Mazda's conduct as it relates to its responsibilities for the 2005 Mazda3, the Court notes that Mazda also placed the 2005 Mazda3 in the stream of commerce for foreseeable users to purchase despite concerns about the dummy's head bottoming out on the steering wheel in testing.

From this evidence, the Court can rule based on logic and reason and its enlightened conscience (rather than emotion or guesswork) that Mazda should be assigned 50 % of the fault and Autoliv should be assigned 50% fault. More specifically, the Court allocates fault as follows:

**50%   Autoliv**
**50%   Mazda**[63]

---

[63] As indicated above, 0% of the fault is allocated to Mr. Andrews and Bosch. In addition,

_____

**100% total fault**

The Court recognizes Plaintiff's opposition arguments that it simply is not the law that someone can sell a defective product, then blame the buyer (here, Mazda was the initial buyer of the seatbelt as a component of the 2005 Mazda3 and placed the Mazda3 in the stream of commerce). Plaintiff's argument is based upon the common law of apportionment. However, the Georgia Supreme Court has recently recognized that in Georgia, the common law of apportionment has been displaced by the apportionment statute, which states in relevant part: "[i]n assessing percentages of fault, the trier of fact shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit." O.C.G.A. § 51-12-33(c); see also Johns, 310 Ga. at 169, 850 S.E.2d at 67.

In the Johns case, the Georgia Supreme Court considered arguments that were similar to those raised by Plaintiff in the case *sub judice* and the court declined to ignore the plain language of Georgia's apportionment statute. Id. at 169, 850 S.E.2d at 67. The court also declined to write into the statute an exception for strict

_____

Mazda has already settled with Plaintiff. Therefore, no judgment will issue against Mazda.

liability claims. Id. The court recognized that "[t]here is a policy argument that the protection of consumers is so important that it should extend to ignoring their contribution to injuries caused by defective products," but noted that "some courts and scholars 'have argued that it is unwise to relieve users and consumers of all responsibility for safe product use and consumption.'" Id. (citing Restatement (Third) of Torts: Products Liability § 17, reporters' note on comment a. (1998)). The court concluded by stating that the Georgia General Assembly balanced these competing policy considerations by choosing to enact the apportionment statute. Id. at 170, 850 S.E.2d at 67. In light of this authority, this Court declines to uphold Plaintiff's "can't blame the buyer" of a defective product argument.

### 5. Autoliv's misconduct in this case warrants punitive damages.

#### i. Autoliv's misconduct warrants punitive damages.

Under Georgia law, punitive damages may be awarded in tort cases where there is "clear and convincing evidence[64] that the defendant's actions showed . . . that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). To deserve punitive

---

[64] "'[C]lear and convincing evidence' is an intermediate standard of proof, requiring a higher minimum level of proof than the preponderance of the evidence standard, but less than that required for proof beyond a reasonable doubt." Clarke v. Cotton, 263 Ga. 861, 862, 440 S.E.2d 165, 166 n.1 (1994).

damages, the defendant need not be "guilty of willful and intentional misconduct"; rather, the defendant's misconduct need only "be done under such circumstances as evinces an entire want of care and a conscious indifference to the consequences." Scapa Dryer Fabrics, Inc. v. Knight, 332 Ga. App. 82, 91, 770 S.E.2d 334, 343 (2015), rev'd on other grounds, 299 Ga. 286, 788 S.E.2d 421 (2016).[65]

Punitive damages are available in a products liability action. In Knight, for example, the court held that evidence that the defendant "knew or should have known about the health dangers of asbestos exposure as a result of the weaving process at its plant, but did not warn about the dangers, or take any steps to protect plant workers from the dangers" created a jury question on the issue of punitive damages. See Knight, 332 Ga. App. at 84, 90–91, 770 S.E.2d at 339, 343. In another case, the Georgia Court of Appeals held that the trial court did not err in denying summary judgment and sending the issue of punitive damages to the jury in a

---

[65] The Georgia Supreme Court granted certiorari and reversed a portion of Knight unrelated to this holding. Scapa Dryer Fabrics, Inc. v. Knight, 299 Ga. 286, 788 S.E.2d 421 (2016). When the case returned to the Georgia Court of Appeals, the intermediate appellate court vacated the reversed portion of its earlier opinion and substituted the Georgia Supreme Court's opinion. Scapa Dryer Fabrics, Inc. v. Knight, 340 Ga. App. 199, 796 S.E.2d 918 (2017). But the Georgia Court of Appeals' discussion of both the nature of the misconduct necessary to warrant punitive damages as well as the court's conclusion that punitive damages were properly a jury question under the facts presented remain good law. See id.

products liability case in which there was evidence from which the jury could find that the design of the product at issue (a carpet-wrapping machine) proximately caused a repairman's fatal injury. Dixie Grp., Inc. v. Shaw Indus. Grp., Inc., 303 Ga. App. 459, 466, 693 S.E.2d 888, 893–94 (2010).

Here, the Court has concluded that the Autoliv seatbelt is defective. Not only is the seatbelt defective, it is also an extreme outlier as it was made up of the lowest kilonewton torsion bar that Plaintiff's expert had every seen, allowed a gross amount of payout, and was the worst in its class as demonstrated by Plaintiff's comparison exhibits.

A wreck like the one at issue in this case was indisputably foreseeable to Autoliv—as it is essentially the same speed/circumstances as the NCAP test. Buchner testimony, 10/5/21 AM Trial Tr. p. 41, lines 5–25. Autoliv knew that airbags fail. Prentkowski testimony, 10/7/21 Trial Tr. p. 52, lines 15–17. Autoliv knew that if the airbag in Mr. Andrews's 2005 Mazda3 failed to deploy, then the Autoliv seatbelt would spool out so much it would be useless to a driver and could result in exactly what happened to Mr. Andrews. Id. at p. 56, lines 7–9. Yet Autoliv sold the defective seatbelt anyway—despite not having to do so. Id. at p. 46, line

79

24–p. 47, line 1. Not only that, Autoliv did not warn Mazda that Mazda's customers could be killed because of excessive spool out.[66]

The Court recognizes Autoliv's opposition arguments, i.e., that it supplied Mazda with high, medium, and low options for the deployment thresholds for the subject seatbelt retractor for which Mazda chose the low option, and that even Plaintiff's expert acknowledged that Autoliv did not need to tell Mazda that they could use a higher threshold if Mazda was telling Autoliv that they already knew about the higher threshold. See Caruso testimony, 10/6/21 AM Trial Tr. p. 124, lines 17–21. The Court also recognizes Autoliv's argument that the seatbelt passed seatbelt-specific federal testing and the vehicle at issue received a 4 out of 5-star rating during NCAP testing.[67]

---

[66] As stated in the Court's ruling denying Autoliv's Motion in Limine to Exclude Failure to Warn Evidence and Arguments, while Plaintiff's failure to warn claim was dismissed from this case prior to trial, the failure to warn evidence is still relevant to the Plaintiff's design defect and punitive damages claim. See Doc. No. [492].

[67] Autoliv also argues that automobile manufacturers, not the component suppliers, make the final decision as to which components will be incorporated into their vehicle. While true (according to the evidence presented at trial), such evidence still does not prevent Autoliv from being held liable under the Eleventh Circuit's earlier opinion rendered in this case (which, as indicated above, constitutes law of the case and binds this Court). See Doc. No. [309], 3 ("Autoliv manufactured seatbelt components in the deceased's Mazda and Plaintiff alleges that those components were defective when sold. Consequently, Autoliv can be held liable under [O.C.G.A.] § 51-1-11 if a component it manufactured was defective 'when sold by the manufacturer' and if the component's

Even though, according to Plaintiff's expert, Autoliv did not need to tell Mazda about something that it already knew, Autoliv has cited no binding authority that shows that the punitive damages consideration ends there for purposes of the circumstances of the case *sub judice*. Further, after providing the testimony that Autoliv now relies upon, Plaintiff's expert went on to testify that he still believed that Autoliv had a duty to warn Mazda of the weaknesses in Autoliv's product. See Caruso testimony, 10/6/21 AM Trial Tr. p. 136, lines 11–14. The Statement of Work between Autoliv and Mazda also showed that Autoliv had contractual duties concerning quality development targets and conformity to users' needs. PX 11. The evidence at trial further showed that there was a lack of warnings by Autoliv to the foreseeable users of the seatbelt, i.e., Mr. Andrews and the other purchasers of the 2005 Mazda3.

While the fact that the Mazda vehicle and seatbelt at issue complied with applicable federal safety regulations is some evidence of due care, it does not conclusively eliminate Autoliv's liability for its design of a defective product under Eleventh Circuit precedent. See Richards v. Michelin Tire Corp., 21 F.3d

---

'condition when sold is the proximate cause of the injury sustained.'") (citing O.C.G.A. § 51-1-11(b)(1)).

1048, 1059 (11th Cir. 1994) (holding that "compliance with both federal regulations and industry practices is some evidence of due care"); <u>Elliott v. Brunswick Corp.</u>, 903 F.2d 1505, 1508 (11th Cir. 1990) ("[W]e agree, that a manufacturer's proof of compliance with either industry-wide practices, or even federal regulations, fails to eliminate conclusively its liability for its design of allegedly defective products."). As stated by the Eleventh Circuit, "[w]e do not, naturally, dismiss a manufacturer's compliance with industry standards, but we must also remember that those standards may sometimes merely reflect an industry's laxness, inefficiency, or inattention to innovation." <u>Elliott</u>, 903 F.2d at 1508 (citations omitted). [68]

In the case *sub judice*, an award of punitive damages is not precluded by compliance with industry standards because there is evidence that shows willful misconduct and that entire want of care that would raise the presumption of conscious indifference to the consequences. <u>See</u> <u>Oglethorpe Power Corp. v. Est. of Forrister</u>, 332 Ga. App. 693, 705, 774 S.E.2d 755, 765 (2015) (holding that "compliance [with industry standards], while tending to show a lack of evidence

---

[68] The Court recognizes that the Eleventh Circuit was considering Alabama law in the <u>Richards</u> and <u>Elliott</u> cases, but the legal principle is persuasive authority for purposes of the case *sub judice*.

supporting the award of punitive damages, does not absolutely preclude such an award if the evidence shows 'willful misconduct, malice, fraud, oppression, or that entire want of care which would raise the presumption of a conscious indifference to the consequences.'") (citations omitted). Said evidence is the fact that Autoliv did not warn any foreseeable users/consumers of the product, such as Mr. Andrews, of the dangers of the product. <u>See</u> Prentkowski testimony, 10/4/2 PM Trial Tr. p. 33, lines 3–16 (admitting that during the 11 years between Mazda's January 2002 email notifying Autoliv that dummies' heads were bottoming out on the steering wheel and Mr. Andrews's collision, Autoliv never warned anyone that if the airbag sensor fails in a frontal collision, the driver's head could hit the steering wheel so hard it kills). It is undisputed that Autoliv knew how to design and manufacture a seatbelt that was not so defective, because Autoliv had already done just that with the 2004-2009 Volvo S40—before it sold this defective seatbelt to Mazda. <u>See</u> Doc. No. [503], ¶¶ 26, 29.

Autoliv's corporate representative Mr. Prentkowski admitted that Autoliv knew that Mr. Andrews's seatbelt would spool out 20 inches if the airbag did not deploy, and he admitted that it was foreseeable to Autoliv that the airbag might not deploy. Prentkowski testimony, 10/7/21 PM Trial Tr. p. 52, lines 12–17. Autoliv admitted that what is foreseeable can be avoided. <u>Id.</u> at p. 52, lines 19–20.

Autoliv further admitted that the 20 inches of spool out that Mr. Andrews's seatbelt had in this wreck was avoidable. Id. at p. 52, lines 21–23. Even so, Mr. Prentkowski never identified a single thing that Autoliv did to try to avoid the 20 inches of spool out that killed Mr. Andrews when the airbag in his car foreseeably failed to deploy—other than saying Autoliv supplied what was requested by Mazda. Id. at p. 53, lines 7–18. Mr. Prentkowski twice admitted that refusing to avoid the foreseeable when opportunities exist to do so is, as a practical matter, the equivalent of intentional misconduct. Id. at p. 52, line 24–p. 53, line 2; 10/4/21 PM Trial Tr. p. 23, line 22–p. 24, line 25.

Mr. Prentkowski also testified that "Mazda was not concerned, so we weren't concerned." 10/4/21 PM Trial Tr. p. 34, line 5. However, the evidence at trial showed that Mazda was concerned about the testing of the vehicle at issue that showed that the dummies' heads were bottoming out in the steering wheel.

The evidence at trial also showed that Autoliv suggested a design change that weakened the seatbelt. See Meyer testimony, 10/6/21 PM Trial Tr. pp. 87–89. Autoliv knew this seatbelt was very weak compared to the 2004-2009 Volvo S40, built on the same platform, and compared to all the other seatbelts on the market at the time, yet Autoliv was the author of the design change that made the seatbelt weaker. Autoliv made no attempt to dispute that evidence.

The Court recognizes Autoliv's argument that Plaintiff has not proven that there were other incidents just like this one; however, this argument is not determinative for two reasons. First, there was another incident involving the passenger seatbelt (with a similar spool out as at issue here) in a California case. Second, Mr. Prentkowski admitted that he did not know—because no one told him—how many times this seatbelt has spooled out this much or almost this much and someone was killed. Prentkowski testimony, 10/7/21 PM Trial Tr. p. 59, line 22–p. 60, line 11. Mr. Prentkowski also admitted that he did not know of anything that Autoliv did to monitor the "field performance" of its products and that he did not know who at Autoliv does know what Autoliv does to monitor the "field performance" of its products. Id. at p. 61, line 4–p. 62, line 11. Given that Autoliv knew that this seatbelt was effectively useless unless the airbag deployed and knew that airbags sometimes fail to deploy, Autoliv's failure to do anything to find out if such incidents were happening was reckless and wanton.

Despite knowing that there is a defect in the crash sensing system of the 2005 Mazda3, Autoliv has not notified the National Highway Traffic Safety Administration ("NHTSA"), nor has Autoliv told Mazda to report that defect to NHTSA. Prentkowski testimony, 10/7/21 Trial Tr. p. 70, line 12–p. 71, line 4.

The Court finds that Autoliv's conduct amounted not only to an "entire want of care and a conscious indifference to the consequences" but also amounted to reckless and wanton misconduct.

In addition, despite knowing for years that the seatbelt in Mr. Andrews's car spooled out 20 inches in a 35-mph frontal collision, Autoliv has not taken a single step to warn Georgians about the risk of serious injury or death. Yet Autoliv, as a manufacturer of a product that it knows is dangerous, has a post-sale duty to warn under Georgia law. See Chrysler, 264 Ga. at  725, 450 S.E.2d at 211 (holding that a manufacturer has a duty to warn even if it acquires that knowledge decades after the first sale of the product); see also Giodano v. Ford Motor Co., 165 Ga. App. 644, 644, 299 S.E.2d 897, 899 (1993) ("[W]here the [component] product reaches the ultimate user essentially in its original state,…the manufacturer is not necessarily absolved from the duty to warn, if such a duty would otherwise exist."). Autoliv knew that the seatbelt was not performing well in safety tests before the seatbelt went to market, yet Autoliv put the seatbelt on the market anyway.[69] Instead of warning potential victims of its defective seatbelt Autoliv has

---

[69] As indicated above, the fact that the seatbelt eventually passed federal safety testing does not preclude punitive damages.

persisted in insisting there is nothing wrong with that seatbelt—an argument that is without merit in light of the evidence presented at trial. There is clear and convincing evidence that Autoliv's misconduct "evinces an entire want of care and a conscious indifference to the consequences." Knight, 332 Ga. App. at 91, 770 S.E.2d at 343 (citation omitted).[70] Punitive damages are thus warranted.

### ii.    The amount of punitive damages.

Under Georgia law, punitive damages "shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c).[71] Where, as here, the defendant's conduct calls for punitive damages, the factfinder "shall . . . set the amount to be awarded" after receiving "such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the

---

[70] The evidence at trial also created an inference of Autoliv's conscious indifference. See Tookes v. Murray, 297 Ga. App. 765, 768, 678 S.E.2d 209, 213 (2009) (indicating that a factfinder "may award punitive damages even where the clear and convincing evidence only creates an inference of the defendant's conscious indifference to the consequences of his acts").

[71] This section of the Order focuses only on Autoliv's conduct and financial circumstances. Accordingly, there is no discussion of apportionment and Mazda in this section of the Order. Cf. Surles, 290 Ga. App. at 270, 659 S.E.2d at 691 (indicating that a factfinder is not bound by any specific formula in arriving at how to express degrees of culpability in mathematical terms and "the matter [of punitive damages] was to be 'determined according to the enlightened conscience of [the] fair and impartial'" factfinder) (citations omitted).

circumstances of the case." O.C.G.A. § 51-12-5.1(d)(2). Georgia does not cap the amount of punitive damages in a products liability case, although 75 percent of the award ("less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge") must be paid to Georgia's Office of the State Treasurer. O.C.G.A. § 51-12-5.1(e)(1)–(2). "[U]nlike compensatory damages, punitive damages serve the public interest by punishing, penalizing, and deterring the wrongdoer." Brown & Williamson Tobacco Corp. v. Gault, 280 Ga. 420, 423, 627 S.E.2d 549, 552 (2006).

Having concluded that Autoliv's misconduct warrants punitive damages, the Court must decide what amount of punitive damages will punish, penalize, and deter Autoliv from manufacturing and selling seatbelts that do not protect people in foreseeable, real world collisions. To accurately assess the necessary amount of punitive damages, the Court has considered Autoliv's "financial circumstances." See Holland v. Caviness, 292 Ga. 332, 335, 737 S.E.2d 669, 671 (2013) ("[I]f a cause of action is within the ambit of O.C.G.A. § 51-12-5.1, evidence of the defendant's financial circumstances may be admissible."); Council of Superior Court Judges, Georgia Suggested Pattern Jury Instructions, Vol. 1 Civil 66.750 (5th ed. 2020) ("In considering the amount of punitive damages, you may

consider . . . the financial circumstances, that is, the financial condition and[/]or the net worth of the defendant.").

Nearly thirty years ago, the Georgia Court of Appeals, sitting en banc, held unanimously that "financial evidence"—an annual corporate financial report and a Form 10-K submitted to the Securities and Exchange Commission—was "relevant and admissible" to help the factfinder determine the amount of punitive damages. J.B. Hunt Transp., Inc. v. Bentley, 207 Ga. App. 250, 257–58, 427 S.E.2d 499, 506 (1992) (en banc).[72] Here, Plaintiff introduced evidence of Autoliv's annual reports and Form 10-K filings of Autoliv's parent company Autoliv, Inc. at trial.[73]

---

[72] While the relevance and admissibility of evidence in a case pending in federal court are generally questions of governed by the Federal Rules of Evidence, state-court evidentiary rulings are nonetheless persuasive authority that the Court may look to for guidance. Atwater v. Schwartz, No. 2:18-CV-146, 2020 WL 7249626, at *1 (S.D. Ga. Dec. 9, 2020) ("For procedural evidentiary issues, Georgia law is only relevant as persuasive authority or to the extent the Federal Rules of Evidence or the federal courts deem state law relevant to an evidentiary issue."). The Court finds, in the exercise of its discretion, that Autoliv's annual reports and Form 10-K filings are both relevant and admissible evidence on the issue of Autoliv's financial condition. See also Daugherty v. Ocwen Loan Servicing, LLC, 701 F. App'x 246, 258 (4th Cir. 2017) (holding that a parent company's Form 10-K filed with the United States Securities and Exchange Commission "was not perfect evidence of [the defendant-subsidiary's] financial worth, . . . [however, the SEC] filings were sufficiently related to [the defendant-subsidiary's] finances to be relevant for determining the appropriate amount of punitive damages").

[73] Stipulations concerning net profit of the Defendant Autoliv Japan, Ltd. are in the record at Doc. No. [526].

Autoliv, Inc.'s annual reports and Form 10-K fillings contain information relevant to Autoliv's financial condition. Autoliv, Inc.'s annual financial reports show that it is a multibillion-dollar company. For example, for fiscal year 2020, the most recent fiscal year, Autoliv, Inc. reported net sales of $7.4 billion and an operating income of $382 million. PX 1138 SEC 10-K Filing. Focusing only on seatbelt sales, Autoliv, Inc. has reported annual sales over $2.5 billion in every year since 2013, when Mr. Andrews's fatal collision occurred. PX 203A at 31 (years 2013–2017); PX 1138 SEC 10-K Filing at 39 (years 2018–2020). Since 2003, Autoliv has amassed over $45 billion in seatbelt sales.[74] Autoliv closed the 2020 fiscal year with $8.1 billion in total assets. PX 1138 SEC 10-K Filing at 39.

Plaintiff initially named Autoliv, Inc. in this lawsuit. In May 2015, Autoliv told Plaintiff and this Court that "if any Autoliv entity was involved in the design, testing, manufacture, or supply of components of the occupant restraint system in the Mazda3 at issue in this case, it was Autoliv Japan, Ltd." Doc. No. [108], 2.[75] In

---

[74] PX 189A at 53; PX 190 at 57; PX 191A at 63; PX 192A at 65; PX 193A at 69; PX 194 at 71; PX 195A at 75; PX 196A at 85; PX 197A at 85; PX 198A at 89; PX 199A at 89; PX 200A at 89; PX 201A at 93; PX 202A at 93; PX 203A SEC 10-K Filing at 31; PX 1128 SEC 10-K Filing at 28; PX 1129 SEC 10-K Filing at 29; PX 1138 at 39.

[75] Based on that representation, Plaintiff voluntarily dismissed her claims against Autoliv, Inc. (and other Autoliv entities), and the Autoliv entities agreed that the statutes

other words, Autoliv told Plaintiff and this Court that no other Autoliv entity, including its parent company Autoliv, Inc., needed to be a part of this case for Plaintiff to obtain complete relief for her claims, which have always included a claim for punitive damages against Autoliv. See Doc. No. [1-2], 35–36 (count ten); Doc. No. [17], 30–31 (count ten); Doc. No. [90], 31 (count ten). Plaintiff worked with Autoliv to ensure the correct parties were named in the lawsuit. Plaintiff agreed to dismiss Autoliv, Inc. and all other Autoliv entities in reliance on Autoliv's representations that Autoliv Japan, Ltd. was the correct entity and that Autoliv would produce in discovery any documents in the possession custody and control of any Autoliv entity. Id.[76]

Plaintiff has introduced evidence that proves that Autoliv has ignored formal divisions among corporate Autoliv entities when it comes to the seatbelt at issue. The earliest documents about the seatbelt, which prove that the defective Autoliv seatbelt design existed before Mazda even started the Mazda3 program,

---

of limitation and repose would be tolled until Plaintiff's claims against Autoliv Japan were resolved. Doc. No. [108], 3. The Court entered an Order dismissing the other Autoliv entities and tolling the statutes of limitations and repose. Doc. No. [137], 2.

[76]  The annual financial reports and 10-K forms of Autoliv, Inc. are publicly available through the SEC's Edgar system and there appears to be no dispute that they were within the possession of at least one Autoliv entity.

have the Autoliv corporate logo—not the "Autoliv Japan" insignia—at the top. See PXs 72, 74 (details about the seatbelt pretensioner in Mr. Andrews's car; R27LL load limiting retractor, the retractor in Mr. Andrews's car). These documents provide the proprietary, confidential design information specific to the defective seatbelt. Autoliv as the parent company is using documents across subsidiaries and branding them with the parent logo. The detailed design drawing for the torsion bar Autoliv designed and manufactured for Mr. Andrews's car, shown below, proves that the design came from Autoliv GmbH, a German subsidiary of Autoliv, Inc., not Autoliv Japan, Ltd.



PX 7. Even when the detailed seatbelt design drawings contain the name of "NSK Autoliv Co., Ltd.," it is clear that the copyright for the drawing document and its data belong to Autoliv, Inc.

PX 1149. Therefore, this Court need not distinguish between Autoliv entities when Autoliv's own documents reflect no such distinction.

Autoliv's annual investor reports contain further proof that Autoliv is a single company. Autoliv's 2020 annual report proclaims that Autoliv is "[t]he [w]orld's [l]argest [a]utomotive [s]afety [s]upplier" and has over 68,000 associates in 27 countries. PX 1138 at pp. 3–5. Autoliv also claims that its products have saved more than 30,000 lives—without any effort to separate the lives saved by subsidiary. Id.[77]

Autoliv's conduct in this case also contradicts any claim that Autoliv Japan, Ltd. is autonomous from its parent and sibling companies. Autoliv designated

_____

[77] The Japanese website for Autoliv (www.autoliv.jp) offers further proof that Autoliv is a single company. The bottom of the Japanese website clearly says—in English—that "Autoliv, Inc." holds the copyright on the website, not Autoliv Japan, Ltd. See Doc. No. [450-1], 3.

Mr. Prentkowski as its corporate representative to testify about Autoliv Japan, Ltd.'s "role in designing, testing, manufacturing, marketing, distributing, and selling the subject seatbelt" and [t]he reasons Autoliv designed the subject seatbelt such that it could spool out 20" in a frontal collision," among other topics at Autoliv's deposition under Fed. R. Civ. P. 30(b)(6). Doc. No. [205], 2–4. Mr. Prentkowski, however, does not work for Autoliv Japan. Prentkowski testimony, 10/4/21 PM Trial Tr. p. 10, lines 3–14. He works for a different subsidiary of Autoliv, Inc. called Autoliv ASP. Id. Mr. Prentkowski did not work on the subject seatbelt at all. Id. at p. 9, lines 20–22. Yet he testified for Autoliv as Autoliv's corporate representative at trial. Id. at p. 8, lines 16–18.

Based on the record and evidence introduced at trial, the Court concludes that Autoliv, Inc. operated as a single enterprise for purposes of designing, manufacturing, and selling the seatbelt at issue.

The Court has already held that evidence of Autoliv, Inc.'s financial condition, as shown by its 10-K filings with the Securities and Exchange Commissions, is relevant to the issue of punitive damages. Doc. No. [494], 6–7.

Autoliv told Plaintiff in discovery that it has a $25 million insurance policy that covers Plaintiff's products liability claims. See Doc. Nos. [217]; [451-1]. The existence and amount of insurance coverage is relevant and admissible on the

amount of punitive damages to award. As Judge Totenberg concluded in another case, if an insurance policy provides coverage for any part of the plaintiff's award (as Autoliv has admitted), "the insurance policy is relevant to [the defendant's] overall financial condition and resources available," which the factfinder should consider to determine the amount of punitive damages, even if the insurance policy excludes coverage for punitive damages (something Autoliv has not claimed). Cooper v. Marten Transp., Ltd., No. 1:10-cv-3044, 2014 WL 11517830, at *6 (N.D. Ga. May 23, 2014) (Totenberg, J.) (citing Hosp. Auth. of Gwinnett Cnty. v. Jones, 259 Ga. 759, 763, 386 S.E.2d 120, 124 n.13 (1989), reinstated on remand, 261 Ga. 613, 409 S.E.2d 501 (1991)).

In determining the amount of punitive damages to award to achieve the goals of punishing Autoliv and determining future wrongdoing, the Court has taken note of Autoliv's refusal to accept any responsibility for Mr. Andrews's injuries and death during the course of litigation or at trial. See Merrick v. Paul Revere Life Ins. Co., 594 F. Supp. 2d 1168, 1184 (D. Nev. 2008) (finding that defendant's refusal to accept responsibility for its own conduct because others in the industry acted the same actually "supports the need for a higher award of punitive damages to accomplish the deterrent purpose of such awards").

Based on the evidence adduced at the bench trial, the Court imposes punitive damages against Autoliv in the amount of $100,000,000.00 (One-Hundred Million Dollars).

## III.  CONCLUSION

The Court enters judgment in favor of Plaintiff and against Defendant, Autoliv Japan, Ltd., and awards the following apportioned amounts to Plaintiff:

**$9,671.70** for funeral and medical expenses;

**$1,000,000.00** in general damages for the predeath fright, shock, terror, and pain and suffering that Micah Andrews endured;

**$12,500,000.00** for the full value of Micah Andrews's life; and

**$100,000,000.00** for punitive damages.

The Clerk is **DIRECTED** to enter this Final Order and Judgment and close this case.[78]

**IT IS SO ORDERED** this ___31st___ day of December, 2021.

_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[78] The Court recognizes that certain post-judgment issues remain concerning attorney's fees and sanctions. The parties shall follow the Court's prior instructions on these matters. See Doc. Nos. [427]; [524].