# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| JAMIE LEE ANDREWS, as surviving | ) | |
| spouse of Micah Lee Andrews, Deceased, | ) | |
| and JAMIE LEE ANDREWS, as | ) | |
| Administrator of the Estate of Micah Lee | ) | |
| Andrews, Deceased, | ) | Case No. 1:14-cv-3432-SCJ |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| AUTOLIV JAPAN, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO AMEND THE JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

In its Final Order and Judgment (the "Judgment") (Dkt. No. [534]), the Court awarded $100 million in punitive damages against Autoliv Japan, Ltd. ("Autoliv Japan") and failed to apportion any fault to Bosch. For the reasons set forth below, the $100 million punitive damages award should be eliminated altogether because the evidence in this case does not authorize any award of punitive damages as a matter of Georgia law. If not eliminated entirely, the award should, at a minimum, be reduced because it is unconstitutionally excessive and improperly based on the financial condition of non-party Autoliv, Inc. The compensatory damages award against Autoliv Japan should similarly be reduced because fault for Mr. Andrews's

death should have been apportioned to Bosch.  Alternatively, the Court should order a new trial so that compensatory damages and punitive damages can be properly reconsidered.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59 authorizes this Court to revisit its earlier decision to correct "clear error or manifest injustice."  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010); *McCall v. Mitchem*, No. 11-CV-00507-KD-C, 2012 WL 2946268, at *1 (S.D. Ala. July 19, 2012).[1]  Here, the Court should eliminate or, at a minimum, reduce its punitive damages award because it represents a plain error of law that rises to the level of manifest injustice.  The Court should also apportion fault to Bosch and thereby reduce the compensatory damages award against Autoliv Japan because failing to apportion fault to Bosch under these circumstances is likewise a manifest injustice.

## ARGUMENT

### I.    The Punitive Damages Award Should Be Eliminated Altogether.

The punitive damages award against Autoliv Japan should be eliminated altogether because the evidence in this case does not authorize any award of punitive

---

[1] Similarly, Rule 52(b) permits the Court "to correct plain errors of law or fact." *Roadmaster Corp. v. Calmodal Freight Sys.*, 153 F. App'x 827, 829 (3d Cir. 2005).

damages as a matter of Georgia law. Punitive damages are only authorized in cases "in which it is <u>proven by clear and convincing evidence</u> that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b) (emphasis added). A "conscious indifference to consequences" "relates to an intentional disregard of the rights of another, knowingly or willfully disregarding such rights," and it excludes conduct that is wrongful but nevertheless based on "good faith and honest belief[s]." *Gilman Paper Co. v. James*, 235 Ga. 348, 351, 219 S.E.2d 447, 450 (1975). Neither negligence nor gross negligence is sufficient, without more, to authorize punitive damages. *See Banks v. ICI Ams., Inc.*, 266 Ga. 607, 610, 469 S.E.2d 171, 175 (1996). Moreover, the Georgia Supreme Court has said that "punitive damages, the purpose of which is to punish, penalize or deter, are, as a general rule, improper where a defendant has adhered to [applicable] safety regulations." *Stone Man v. Green*, 263 Ga. 470, 472, 435 S.E.2d 205, 206 (1993) (cleaned up). Indeed, compliance with regulations "tend[s] to show that there is no clear and convincing evidence of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." *Id.* at 471-

72, 435 S.E.2d at 206 (cleaned up); *see also Welch v. Gen. Motors Corp.*, 949 F. Supp. 843, 844-46 (N.D. Ga. 1996).

Here, it is undisputed that the seatbelt in question complied with all applicable federal safety regulations, and as the Court acknowledged, that is at least "some evidence of due care." *See* Judgment at 81.  Moreover, the evidence does not <u>clearly and convincingly</u> establish that Autoliv Japan, notwithstanding its compliance with the applicable safety regulations, supplied the seatbelt in question with wanton or conscious indifference to the safety of consumers.  Indeed, unlike *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 885, 447 S.E.2d 302, 311-12 (1994) (physical precedent only), there is <u>no</u> evidence in this case that Autoliv Japan made any relevant engineering choices based on economic considerations.[2]

Rather, the evidence establishes beyond reasonable dispute that the design of a seatbelt—and in particular, the extent to which a seatbelt will pay out in a

---

[2] *Cf. Mack Trucks v. Conkle*, 263 Ga. 539, 544, 436 S.E.2d 635, 640 (1993) (record was "replete with evidence showing that, for four years prior to the incident which gave rise to Conkle's injuries, Mack's engineering division repeatedly informed other divisions of the corporation that the frame rail on the type of truck driven by Conkle was inadequate and should be replaced with a reinforced frame"); *Hosp. Auth. of Gwinnett Cnty. v. Jones*, 261 Ga. 613, 614, 409 S.E.2d 501, 502 (1991) (steering patients in need of emergency or specialized care based on economic considerations, not medical judgments, reflected wanton and conscious indifference); *Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp.2d 1363, 1374 (S.D. Ga. 2009) (denying summary judgment on punitive damages claim where tire

controlled manner in the event of a crash—reflects an engineering tradeoff between the avoidance of head-impact injuries, on the one hand, and thoracic injuries, on the other.[3]  All else being equal, limiting seatbelt pay out—whether by increasing the deployment threshold or by adding a stop—may decrease the risk of a head injury (by limiting forward excursion), but it also increases the risk of serious thoracic injury, particularly for smaller individuals, women, and the elderly.[4]  Striking a

---

manufacturer rejected safety measures widely adopted in industry for financial reasons).

[3] *See* Trial Tr. Vol. 3 P.M. at 113:21-114:3 (Plaintiff's seatbelt expert acknowledging that seatbelt experts are looking at "the chest injuries that can occur when the belt remains too tight during a frontal impact as opposed to the head injuries that can occur if there's too much pay-out"); *id.* at 114:16-115:10 (Plaintiff's seatbelt expert testifying that seatbelt designers have to be concerned about "possible chest injuries," which may be as slight as fractured ribs or as severe as a "ruptured aorta"); Trial Tr. Vol. 2 P.M. at 69:12-70:11 (Plaintiff's biomechanics expert testifying that there is a "tradeoff between thoracic injur[ies] versus head injur[ies]" and that "[e]ngineering is always a tradeoff"); *see also* Trial Tr. Vol. 5 P.M. at 26:1-4 (Autoliv Japan's biomechanics expert testifying that "there is a tradeoff between forward movement and increase in chest forces when it comes to seatbelt assemblies"); Trial Tr. Vol. 5 A.M. at 26:17-21 (Autoliv Japan's seatbelt expert testifying that load limiting seatbelts "reduce[] the load on the chest to try to reduce the risk of injury, especially to smaller stature people and older people").

[4] *See* Trial Tr. Vol. 3 P.M. at 124:3-125:5 (Plaintiff's seatbelt expert testifying that "the stronger the belt or load limiter, the more pressure, force, that ends up on the upper torso"); Trial Tr. Vol. 5 P.M. at 23:6-16, 24:11-25:1 (Autoliv Japan's biomechanics expert testifying that "if you incorporate a stop into a seatbelt that has a load limiter, then the forces are going to rise, and that's going to impart more force on the occupant's chest, and for certain occupants, that can be injurious or even fatal"); *see also* Trial Tr. Vol. 5 P.M. at 26:12-29:10 (Autoliv Japan's biomechanics

balance between these risks requires consideration of other aspects of vehicle design as well, including the vehicle's overall structure, the airbag system involved, and the sizes of the various occupants of the vehicle.[5]

Accordingly, it is one thing for the Court to say that the balance was struck unreasonably in this instance. It is quite another to say that striking the balance unreasonably—in a way that afforded greater protection to consumers from thoracic injuries—reflects a wanton or conscious indifference to consumer safety.[6]  *See Vazquez v. Raymond Corp.*, No. 2:17-CV-20-RWS, 2019 WL 176106, at *7 (N.D. Ga. Jan. 11, 2019) (granting summary judgment on punitive damages claim

---

expert testifying that the data upon which Plaintiff's expert relies demonstrates that, with a stop, Mr. Andrews would have endured 2,700 pounds of force on his chest—akin to a vehicle being placed on his chest).

[5] *See* Trial Tr. Vol. 2 P.M. at 111:10-24 (Plaintiff's biomechanics expert testifying that the "vehicle's structure" (or "the pulse") "can definitely impact occupant safety"); Trial Tr. Vol. 3 P.M. at 111:1-9 (Plaintiff's seatbelt expert testifying that load-limiting retractors "are only supposed to be installed with an airbag" and are designed "to work with an airbag");  Trial Tr. Vol. 2 P.M. at 40:16-19 (Plaintiff's biomechanics expert testifying that "the size of a person make[s] a difference" as far as the seatbelt is concerned); Trial Tr. Vol. 5 P.M. at 24:22-25:1 (Autoliv Japan's biomechanics expert testifying that "the elderly, whose chest walls are not as strong and whose bones are more brittle, but also smaller people and women, whose chests aren't as strong" are most likely to be seriously injured by a stop in a seatbelt).

[6] *See Hernandez v. Crown Equip. Co.*, 92 F. Supp. 3d 1325, 1357 (M.D. Ga. 2015) (even considering 741 prior accidents, where design decisions were driven by engineering considerations—weighing "the benefits of a particular design against the possibility that other risks might be increased"—Georgia law did not authorize punitive damages).

emphasizing that testimony by "engineers who disagree with Defendant's choice <u>in trading one danger for another</u> is not enough [to establish a punitive damages claim]" where the forklift at issue was "designed in compliance with all applicable standards and regulations"  (emphasis added)).

That is especially true when, as here, Plaintiff—despite repeatedly emphasizing the 2.0 kN deployment threshold of the subject seatbelt[7]—did not offer <u>any</u> testimony demonstrating that Mr. Andrews would have survived the accident with a deployment threshold greater than 2.0 kN.[8]  Based on the evidence Plaintiff offered at trial, Mr. Andrews could only have avoided fatal head injuries in the subject accident (where there was no airbag deployment) if his seatbelt included a 6-inch "stop"—a feature that is not commonly used in the industry and would have caused Mr. Andrews serious to fatal thoracic injuries.[9]

Furthermore, the evidence shows that modern seatbelts are designed to work in conjunction with airbag systems, and had Mr. Andrews's airbag system not been

---

[7] *See, e.g.*, Pl. Trial Exs. 9, 1074; Judgment at 25, 42, 47.

[8] *See* Trial Tr. Vol. 2 P.M. at 112:20-113:10.  The record is also devoid of any evidence demonstrating that Mr. Andrews's head would have avoided contact with the steering wheel if (i) Mr. Andrews's seatbelt had a deployment threshold greater than 2.0 kN and (ii) his airbag failed to deploy.

[9] *See* Judgment at 53 n.50; Trial Tr. Vol. 4 P.M. at 28:21-29:1; Trial Tr. Vol. 5 P.M. at 29:3-9.

defective, Mr. Andrews would have survived with the subject seatbelt as designed.[10]

And although the Court faulted Autoliv Japan for failing to design a seatbelt that

would prevent impact with the steering wheel in the event an airbag failed to deploy

(*see* Judgment at 17-19, 33-36, 67, 73, 83-84), the evidence shows that "it's very

rare for an airbag not to deploy when it should." *See* Trial Tr. Vol. 5 A.M. at 53:6-

18, 60:10-19.    To find that Autoliv Japan acted with wanton or conscious

indifference to consumer safety in these circumstances, there would have to be (at a

minimum) evidence of the frequency with which airbags fail to deploy in crashes

presenting a materially similar risk of serious head injuries[11] and that Autoliv Japan

was aware of that frequency—neither of which is the case here.[12]  *Cf. Ford Motor*

---

[10] Trial Tr. Vol. 3 P.M. at 110:16-18 (Plaintiff's seatbelt expert agreeing that "airbags and seatbelts are designed to work together"); Judgment at 20, 71 (noting, on multiple occasions, that "Bosch's airbag electronic front sensor system component [] ultimately caused the non-deployment of the airbag"); Trial Tr. Vol. 2 P.M. at 103:15-23 (Plaintiff's biomechanics expert testifying that "if the airbag had deployed, Mr. Andrews would have survived this accident").

[11] It is telling that the National Highway Traffic Safety Administration ("NHTSA") does not require <u>any</u> crash testing in which an airbag does not deploy, and OEMs only conduct such testing "once in a blue moon, but very rare[ly]."  *See* Trial Tr. Vol. 2 P.M. at 87:17-88:1 (Plaintiff's biomechanics expert testifying that NHTSA does not require any Rule 208 crash testing without airbag deploying); Trial Tr. Vol. 3 P.M. at 108:11-109:20 (Plaintiff's seatbelt expert testifying that "the airbags always deploy" during required testing); Trial Tr. Vol. 5 A.M. at 53:6-10.

[12] Indeed, there is <u>no</u> evidence of a prior accident involving the subject vehicle in which the airbag failed to deploy and the seatbelt in question failed to protect the

*Co. v. Sasser*, 274 Ga. App. 459, 470-73, 618 S.E.2d 47, 56-58 (2005) (evidence supported finding that auto manufacturer was consciously indifferent to consumer safety where it showed not only that manufacturer knew that unlatched seats compromised occupant safety in the event of a crash, but also knew that unlatched seats were not uncommon, citing evidence of "numerous problems" with latching on prototype vehicles, assembly line inspections that revealed "a large number of vehicles" with latching problems, and "hundreds of [consumer] complaints").

The fact that Autoliv Japan supplied the subject seatbelt to a sophisticated consumer[13] who was fully aware of alternative options—and was the final decisionmaker for the seatbelt—also indicates that the company did not act with wanton or conscious indifference.  Indeed, it is undisputed that Mazda's engineers, prior to production of the subject vehicle, were well aware of the ability to use a

---

occupant from a serious head-impact injury. *Cf. Welch*, 949 F. Supp. at 845-46 (holding punitive damages unavailable as a matter of law, noting that danger posed by brake problems would be realized only in limited circumstances, and limited evidence of brake problems showed the risk to be "at best de minimis or statistically negligible").  While an incident in California was raised at trial, that case involved passenger seatbelt assemblies, and the passenger claiming head injuries—who received the benefit of an airbag—would have been adequately protected but for an unusual rear force.  *See* Trial Tr. Vol. 3 P.M. at 89:23-90:22, 94:8-95:5, 97:5-20.

[13] *See* Trial Tr. Vol. 4 P.M. at 4:12-5:10, 8:25-9:8 (testimony of Dave Prentkowski—an engineer who has been working in seatbelt development for nearly 38 years—indicating that all vehicle manufacturers, including Mazda, have sophisticated crashworthiness teams).

higher load limiting threshold or a stop in the subject seatbelt.[14]  Mazda's engineers,

as Plaintiff's seatbelt expert admitted, were similarly aware that a load limiter with

a higher deployment threshold provides more restraint on the occupant and less

forward excursion than a load limiter with a lower deployment threshold.  *See* Trial

Tr. Vol. 3 P.M. at 123:16-125:5 (testimony of Plaintiff's seatbelt expert).  But in the

end, Autoliv Japan provided Mazda with "high," "medium," and "low" deployment

threshold options, and Mazda, aware of the test results (including those within

Plaintiff's Trial Exhibit 128[15]), stated—within its engineering specification for the

---

[14] *See* Def. Trial Ex. 100 at 1 (pre-production meeting notes from November 2002 indicating that "Mazda have difficulties to achieve their US NCAP targets with the current restraints system.  They intend to change to higher load level, implement digressive load limiters or retractor pretensioners instead of R27LL"); Trial Tr. Vol. 3 A.M. at 122:13-124:20 (Plaintiff's component supplier expert testifying that Mazda had awareness of the ability to use a higher deployment threshold as early as 2002, "long before" production); *id.* at 124:19-20 (Plaintiff's component supplier expert testifying that "if [Mazda is] looking at the higher load level, then it appears that they're aware that that's a problem"); Trial Tr. Vol. 5 A.M. at 63:1-15 (Autoliv Japan's seatbelt and component supplier expert testifying that Mazda had previously "built cars with higher spec load limiters" and "manufactured cars with stops"); Trial Tr. Vol. 2 P.M. at 112:4-7 (Plaintiff's biomechanics expert agreeing that "the Mazda engineering team back in the 1980s knew about the use of stops").

[15] Throughout its Judgment, the Court emphasized Plaintiff's Trial Exhibit 128—a January 2002 (pre-production) email from Mazda to Autoliv Japan in which Mazda notes that "bottoming" of a dummy's head "occurred on the [steering] wheel" during computed simulated testing.  *See* Judgment at 31-32, 34, 36, 75, 83-84; Trial Tr. Vol. 4 P.M. at 18:25-19:21.  On page two of Exhibit 128 (and despite Plaintiff's suggestion to the contrary), Autoliv Japan did respond to Mazda indicating that the

subject vehicle—that Autoliv Japan should provide the "low" option.  *See* Judgment at 80; Pl. Ex. 35.  And component suppliers (like Autoliv Japan) cannot deviate from the instructions included within the engineering specifications provided by vehicle manufacturers (like Mazda).  *See* Trial Tr. Vol. 5 A.M. at 46:10-20.

Moreover, because a vehicle's manufacturer—unlike component suppliers—is familiar with all components of a given vehicle's safety system (e.g., the seatbelts, airbags, crash pulse, steering wheel), the vehicle manufacturer is in the best position—and has the ultimate responsibility—to determine how the components (e.g., airbags and seatbelts) will work together and strike the balance between the avoidance of head injuries, on the one hand, and the avoidance of serious chest injuries, on the other.  *See* Trial Tr. Vol. 4 P.M. at 5:18-6:22; Trial Tr. Vol. 5 A.M. at 31:20-23, 34:1-36:4.  And although other vehicle manufacturers may ultimately have selected seatbelts with higher deployment thresholds, the evidence shows that Mazda is <u>not</u> the only vehicle manufacturer to choose a seatbelt with a 2.0 kN deployment threshold for its vehicle.  *See* Deposition of Yuji Kamei, admitted as

---

computer testing (and thus Mazda's concerns) may be skewed because it appears the simulation test at issue took place at 25 m/s, 90 km/h (56 mph)—a severe speed at which testing does not take place.  *See* Trial Tr. Vol. 3 P.M. at 115:18-20; Trial Tr. Vol. 4 P.M. at 19:14-21:11.  Plaintiff did not rebut this fact at trial, and the Court did not address it in its Judgment, although it repeatedly relied on Exhibit 128 in awarding compensatory and punitive damages against Autoliv Japan.

Plaintiff's Trial Exhibit 1163, at 96:20-97:13 (indicating that Honda, Mitsubishi, and Isuzu previously incorporated deployment thresholds of 2.0 kN or less into their vehicles). And the evidence also shows that Autoliv is not the only manufacturer to sell seatbelts that will pay out 20 inches where, as here, there is no airbag deployment. *See* Trial Tr. Vol. 4 P.M. at 66:8-21 (David Prentkowski testifying that "[p]retty much every seat belt manufacturer on the planet" is selling load limiters that will pay out 20 inches if there is no airbag deployment).

In sum, evidence that Autoliv Japan knew that airbags sometimes fail to deploy (in unspecified circumstances and with unknown frequency) and that, if an airbag failed in certain circumstances, the extent of pay out permitted by the subject seatbelt would fail to protect a consumer from a head-impact injury does not show wanton or conscious indifference to consumer safety in light of the other circumstances of this case. Those circumstances include the absence of evidence indicating that Autoliv Japan's decision to offer alternate seatbelt choices to Mazda was driven by financial considerations, as well as affirmative evidence showing that the chosen seatbelt design complied with all applicable federal regulations, that increasing the deployment threshold (or including a stop) would increase the risk of thoracic injuries in other circumstances, that Autoliv Japan gave Mazda choices for its seatbelt, that Mazda was aware of the restraint features of the seatbelt ultimately

used in this case, and that Mr. Andrews could have only survived the subject accident with the implementation of a seatbelt design that is not commonly used. The Georgia Supreme Court has never held circumstances like these authorize an award of punitive damages.[16] Georgia law does not authorize punitive damages here, and the Court should eliminate the award of punitive damages against Autoliv Japan.

## II.   The Punitive Damages Award Should Be Reduced.

If the Court does not eliminate the award of punitive damages altogether, it should, at a minimum, reduce the award because it is unconstitutionally excessive and because the Court improperly relied upon evidence of non-party Autoliv, Inc.'s financial condition in assessing punitive damages against Autoliv Japan.

### A.   The Punitive Damages Award Violates the Due Process Clause.

Due process "prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). In assessing whether a punitive damages award is excessive for due process purposes, the United States Supreme Court has identified "[t]hree guideposts" to

---

[16] *See Gen. Refactories Co. v. Rogers*, 240 Ga. 228, 234, 239 S.E.2d 795, 800 (1977) ("But in examining the cases approving punitive damages awards, we find there has been one or more <u>clear</u> acts supporting wilful or wanton conduct, malice, oppression, conduct exemplifying conscious indifference to consequences or a succession of tortious acts. Without proof of such conduct awards have been uniformly disapproved." (emphasis added) (cleaned up)).

which courts should look: (i) "the degree of reprehensibility of the [conduct for which punitive damages were awarded]," (ii) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award," and (iii) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 574-75.

## 1.    Reprehensibility

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575.

> [E]xemplary damages imposed on a defendant should reflect the enormity of his offense. This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that nonviolent crimes are less serious than crimes marked by violence or the threat of violence. Similarly, trickery and deceit are more reprehensible than negligence.

*Id.* at 575-76 (cleaned up).  While "reprehensible conduct alone can justify a punitive damages award," punitive damages should only be awarded "if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 750-51 (11th Cir. 2020) (cleaned up).

The Supreme Court has identified five factors as relevant to assessing the degree of reprehensibility: (i) physical or economic harm; (ii) indifference or reckless disregard of health or safety; (iii) financial vulnerability of the victim; (iv) the repeated nature of the conduct; and (v) malice, trickery, or deceit. *BMW*, 517 U.S. at 576-77. When considering the four factors relevant in this case[17], no fair view of the evidence suggests a <u>high</u> degree of reprehensibility. Indeed, while there is a physical injury here, the other three factors do not show a degree of reprehensibility that would justify a $100 million punitive damages award, particularly given the following reasons.[18]

**<u>First</u>**, the seatbelt met federal regulatory standards, which, as the Court recognized, was "some evidence of due care." *See* Judgment at 81; *Stone Man*, 263 Ga. at 472, 435 S.E.2d at 206. The 2005 Mazda 3, which included the seatbelt at

---

[17] Courts have found that factor three—financial vulnerability of the victim—"is not particularly relevant in a mostly noneconomic damages case like this one." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 973-74 (9th Cir. 2021); *see also Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1066 (10th Cir. 2016).

[18] *See BMW*, 517 U.S. at 580 ("That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages[,] does not establish the high degree of culpability that warrants a substantial punitive damages award."); *see also Lompe*, 818 F.3d at 1066-67 (examining the second, fourth, and fifth factors, and stating that although evidence showed some degree of indifference to safety concerns and repeated failures to act, "we cannot ignore the evidence that distances [the defendant]'s misconduct from the 'extreme reprehensibility' end of the constitutional reprehensibility spectrum in the due process analysis") (cleaned up).

issue, also received a score of 4 out of 5 stars on the New Car Assessment Program ("NCAP") test—the very same score as the 2005 Volvo S40, a vehicle that is mentioned no less than 13 times in the Judgment.  *See* Pl. Trial Ex. 9; Pl. Ex. 140.

**Second**, as discussed more fully in Section I *supra*, the design of a seatbelt necessarily reflects a tradeoff between the prevention of head injuries, on the one hand, and the avoidance of serious thoracic injuries caused by the belt itself, on the other.  Where exactly to strike the balance between these injuries is a reasonably debatable question, and differing views of the optimal balance does not clearly and convincingly show indifference to, or reckless disregard of, health and safety. Indeed, Plaintiff's own biomechanics expert testified that it is "unfortunate[]," but "there's always a tradeoff; you gain a little bit here and you have to give up a little bit over there."  *See* Trial Tr. Vol. 2 P.M. at 45:13-18; Trial Tr. Vol. 3 A.M. at 130:7-18 (Plaintiff's airbag expert testifying that "making design decisions" is "hard" and that "in engineering systems there's always trade-offs").

**Third**, as explained in Section I *supra*, Autoliv Japan provided Mazda—a sophisticated consumer and the entity best positioned to select and incorporate all safety components of the 2005 Mazda 3—with "high," "medium," and "low" deployment threshold options, and Mazda selected the "low" option, while well aware of the ability to use a higher threshold or a stop in the subject seatbelt.

16

**Fourth**, it is undisputed that airbags and seatbelts are designed to work together, and had the airbag sensor system in Mr. Andrews's vehicle not been defective (which it was for reasons unattributable to Autoliv Japan), then Mr. Andrews would have survived with the subject seatbelt as designed. *See* Judgment at 16-17; Trial Tr. Vol. 3 P.M. at 110:16-18 (Plaintiff's seatbelt expert agreeing that "airbags and seatbelts are designed to work together"); Judgment at 20, 71 (noting, on multiple occasions, that "Bosch's airbag electronic front sensor system component [] ultimately caused the non-deployment of the airbag"); Trial Tr. Vol. 2 P.M. at 103:21-23 (Plaintiff's biomechanics expert testifying that "if the airbag had deployed, Mr. Andrews would have survived this accident"). In fact, based on the evidence introduced at trial, the only way Mr. Andrews could have survived the subject accident without the deployment of an airbag was through use of a "stop" seatbelt feature, which is not commonly used in the industry and would have caused Mr. Andrews to suffer serious to fatal thoracic injuries.[19]

**Fifth**, Autoliv Japan's conduct was not "repeated" in this case, as this case only involves the design of a singular seatbelt. But even if the Court concludes that it was, repeated conduct alone does not establish a high degree of reprehensibility.

---

[19] *See* Judgment at 53 n. 50; Trial Tr. Vol. 4 P.M. at 28:21-29:1; Trial Tr. Vol. 5 P.M. at 29:3-9.

Rather, it is "evidence that a defendant has repeatedly engaged in prohibited conduct while <u>knowing or suspecting</u> that it was unlawful [that] would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *BMW*, 517 U.S. at 576-77 (emphasis added).  And, here, there was no evidence of the frequency with which airbags fail to deploy, much less the frequency with which they fail to deploy in crashes materially similar to this one. Thus, as noted above, the evidence does not show clearly and convincingly that Autoliv Japan supplied a seatbelt that it <u>knew or suspected</u> to be based on an unreasonable design.  Indeed, if knowledge that a driver would make contact with the steering wheel if his airbag did not deploy is enough to put vehicle and seatbelt manufacturers on notice that a seatbelt is "unreasonably designed," then surely NHTSA would have promulgated a regulation to that end, but it has not.  In fact, NHTSA does not require <u>any</u> crash testing where the airbag does not deploy.  *See* Trial Tr. Vol. 2 P.M. at 87:17-88:1 (Plaintiff's biomechanics expert testifying that NHTSA does not require any Rule 208 crash testing without airbag deploying); Trial Tr. Vol. 3 P.M. at 108:11-109:20 (Plaintiff's seatbelt expert testifying that "the airbags always deploy" during required testing).

And **<u>sixth</u>**, there is no indication that Autoliv Japan intended any harm to come to any occupants of vehicles, or that it employed any trickery or deceit in the sale of its seatbelts.

The evidence does not show a high degree of reprehensibility here.

### 2.     Ratio of Compensatory Damages to Punitive Damages

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW*, 517 U.S. at 580 (cleaned up).  Historically, the Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," and it has declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003) (cleaned up).  But the Supreme Court has indicated that (i) "a ratio greater than 4:1 between punitive and compensatory damages will likely be close to the line of constitutional impropriety" and (ii) "few awards exceeding a single-digit ratio (that is, anything greater than a 9:1 ratio) to a significant degree will satisfy due process." *Williams*, 947 F.3d at 750.  In doing so, however, the Supreme Court has emphasized that:

> [t]hese are not hard and fast rules. Sometime even a 4:1 ratio may be
> too great. If, for example, the plaintiff has received a substantial

compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee and a punitive damages award that exceeds that ratio will be suspect. On the other hand, if a particularly egregious act has resulted in only a small amount of compensatory damages, then a greater ratio can be justified.

*Id.* at 754-55.

### a.      The Relevant Amount of Compensatory Damages

In its Judgment, the Court awarded Plaintiff special damages for funeral and medical expenses in the amount of approximately $19,000, general damages for predeath fright, shock, terror, and pain and suffering in the amount of $2 million, and wrongful death damages for the full value of Mr. Andrews's life in the amount of $25 million.  *See* Judgment at 3-4.  But under the Georgia apportionment statute, because 50 percent of the fault was attributed to Mazda, the Court entered an award against Autoliv Japan for only half of these amounts, totaling approximately $13.5 million.  *See id.* at 75, 96; *Lompe*, 818 F.3d at 1068 (stating that, for constitutional ratio purposes in a case in which compensatory damages are apportioned, the proper comparison is "the proportion of the punitive damages award assessed against each [d]efendant with only that [d]efendant's individual portion of the total compensatory damages").  In this case, however, $13.5 million is not the relevant amount of compensatory damages for purposes of ascertaining the constitutional ratio of punitive to compensatory damages.

Indeed, the wrongful death damages for the full value of Mr. Andrews's life should not be counted as compensatory damages relevant to the constitutional ratio. Under long-established, black-letter law, punitive damages are categorically unavailable for wrongful death in Georgia. *See, e.g.*, *Engle v. Finch*, 165 Ga. 131, 134, 139 S.E. 868, 869 (1927).[20]  Accordingly, in this case, while Plaintiff could seek punitive damages for the estate of Mr. Andrews on its claim for strict product liability, she could not as a matter of law seek punitive damages as his surviving spouse on her distinct claim for wrongful death.  And, as a number of courts have held, when considering the ratio of compensatory and punitive damages in a case—like this one—in which punitive damages are awarded on fewer than all of the claims for which compensatory damages are awarded, only those compensatory damages awarded on the claims that gave rise to the punitive damages should be counted toward the ratio.[21]

---

[20] *See also Sw. R.R. Co. v. Paulk*, 24 Ga. 356, 366 (1858); Robert E. Cleary, Jr., Eldridge's Georgia Wrongful Death Actions § 6:2 (4th ed. 2022) ("Punitive or exemplary damages even for willful and wanton acts are prohibited in a Georgia wrongful death action . . . .").

[21] *See, e.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (calculating ratio using only compensatory damages awarded on claim for which punitive damages were awarded); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001) ("We believe that it is appropriate to construct the ratio by looking only to the count on which punitive damages were awarded . . . ."); *Ishimatsu*

Excluding wrongful death damages from the compensatory damages for purposes of the constitutional ratio is especially warranted here because wrongful death damages under Georgia law are themselves already inherently punitive. As the Georgia Supreme Court has explained, wrongful death damages are "punitive in nature" and "intended to make homicide expensive." *Bibbs v. Toyota Motor Corp.*, 304 Ga. 68, 80, 815 S.E.2d 850, 859 (2018). Indeed, wrongful death damages are punitive not only because their measure is "the full value of the life of the deceased, irrespective of its real value to the person in whom the cause of action is vested," but also because the "full value" of life may exceed its "actual value." *Id.* To allow additional punitive damages on a wrongful death claim would, as the Georgia Supreme Court has said, impose upon the defendant "a double penalty."[22]

---

*v. Royal Crown Ins. Corp.*, 8 N. Mar. I. 424, 439, 2010 N. Mar. I. LEXIS 8, at *45-47 (N. Mar. I. 2010) (eliminating compensatory damages awarded on claims for which punitive damages were not available in calculation of ratio); *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 282 (Ill. App. Ct. 2009) (separately calculating constitutional ratios for punitive and compensatory damages awarded on separate claims); *cf. Audiotext Commc'ns Network v. US Telecom*, No. 94-2395-GT, 1996 WL 568839, at *8 (D. Kan. Sep. 4, 1996) (under Florida statute presumptively limiting punitive damages to three times the amount of compensatory damages, "[i]t is implicit under the statute that the calculation of the appropriate amount of punitive damages should be limited to compensatory damages awarded on claims upon which the claimant is entitled to punitive damages").

[22] *Engle*, 165 Ga. at 134, 139 S.E. at 869; *see also Action Marine, Inc. v. Cont'l Carbon, Inc.,* 481 F.3d 1302, 1321 (11th Cir. 2007) (looking to state law in assessing

Accordingly, when excluding the damages awarded for wrongful death here, the proper amount of compensatory damages for purposes of the constitutional ratio is approximately $1 million—the combined amount of special and general damages awarded against Autoliv Japan for (i) funeral and medical expenses and (ii) predeath fright, shock, terror, and pain and suffering.

### b.    The Ratio

When counting only the special and general damages awarded against Autoliv Japan, the ratio of punitive damages to compensatory damages is approximately 100:1.[23]  And even if the special and general damages apportioned to Mazda were included, the ratio still would be nearly 50:1.[24]  Either way, the ratio reflects a punitive damages award that is grossly excessive and contrary to the constitutional guarantee of due process.[25]  *See State Farm*, 538 U.S. at 425 ("[F]ew awards

---

whether particular components of damages award should be considered "compensatory" for purposes of constitutional ratio); *cf. Zhang*, 339 F.3d at 1044 (not counting compensatory damages awarded under statute authorizing double damages toward constitutional ratio calculation).

[23] $100,000,000.00 : $1,009,671.70.

[24] $100,000,000.00 : $2,019,343.40.

[25] A survey of the reported decisions since *BMW* indicates that the Eleventh Circuit has approved punitive damages awards with a ratio exceeding a single-digit multiplier in only three cases, all involving very different circumstances than those presented here, and all involving substantially smaller awards.  *See, e.g., Kemp v. AT&T*, 393 F.3d 1354, 1365 (11th Cir. 2004) (finding $1 million punitive award

exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."); *see also Williams*, 947 F.3d at 755 (holding that a 13:1 ratio "raise[d] a red flag that the punitive damage amount likely violates the due process clause"). Although the United States Supreme Court has left some room for the possibility of a constitutionally permissible double-digit ratio in cases involving uncommonly extreme culpability, this is not such a case (as the assessment of reprehensibility above demonstrates). Furthermore, even if the wrongful death damages were included as "compensatory" damages in the ratio, the ratio still would reflect an unconstitutionally excessive award.

Indeed, including the wrongful death damages awarded against Autoliv Japan would yield a ratio of approximately 7.4:1[26], or approximately 3.7:1 if including the

_____

excessive in a state racketeering case with $115 award of compensatory damages, but concluding that $250,000 in punitive damages would pass constitutional muster because anything less "would not serve as a meaningful deterrent to a corporation like AT&T"); *U.S. EEOC v. W&O Inc.*, 213 F.3d 600, 616-17 (11th Cir. 2000) (affirming $100,000 punitive awards for employees with compensatory damages of only $3,800 and $6,225 in employment discrimination case, noting that "the combination of a small damages award and a strong state interest in deterrence of a particular wrongful act may justify ratios higher than might otherwise be acceptable"); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339-40 (11th Cir. 1999) (affirming $4.35 million punitive award in environmental pollution case in which total actual damages of several property owners was only $47,000).

[26] $100,000,000.00 : $13,509,671.70.

wrongful death damages apportioned to Mazda.[27]  The former ratio would be well in excess of the 4:1 ratio that, the United States Supreme Court has said, "might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425; *see also BMW*, 517 U.S. at 581; *Williams*, 947 F.3d at 755 (characterizing 4:1 ratio as "default" for "uppermost range" of punitive damages awards). And the latter ratio closely approaches 4:1.  But when compensatory damages are as substantial as $13.5 million (or $27 million)—and especially when those "compensatory" damages include wrongful death damages that are punitive in nature—even a 4:1 ratio may be constitutionally impermissible. *See State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").[28]  Here, given the limited degree of reprehensibility, even a 4:1 ratio

---

[27] $100,000,000.00 : $27,019,343.40.

[28] As for what the Supreme Court meant by "substantial" compensatory damages, it characterized the $1 million compensatory damages award in *State Farm* as "substantial." *See* 538 U.S. at 426; *see also Lompe*, 818 F.3d at 1069 ("[I]n cases decided since *State Farm,* compensatory damages have often been considered 'substantial' when they are over $1,000,000.").

predicated on $13.5 million or $27 million in compensatory damages is unconstitutional.[29]

### 3.   Other Civil Penalties Authorized by Law

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW*, 517 U.S. at 583. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (cleaned up).

Here, the closest comparable penalty appears to be the civil penalty authorized under 49 U.S.C. § 30165 (a) for certain violations of the federal Motor Vehicle Safety Act or federal motor vehicle safety standards promulgated under the Act by the Secretary of Transportation. *See Clark*, 436 F.3d at 608 (looking to 49 U.S.C. §

---

[29] *Cf. Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding, in a wrongful death case alleging defective design of cigarettes in which the jury awarded $4 million in compensatory damages, that 1:1 ratio of punitive damages to compensatory damages was constitutionally appropriate, notwithstanding evidence of a high degree of reprehensibility, including tobacco manufacturer's efforts to mislead consumers about health risks associated with smoking); *Clark v. Chrysler Corp.*, 436 F.3d 594, 607 (6th Cir. 2006) (holding, in wrongful death case alleging defective design of pickup truck, and in which jury awarded only $236,000 in compensatory damages, that 2:1 ratio of punitive to compensatory damages marked limit of constitutional permissibility).

30165 (a) as the relevant civil penalty for comparison under the third guidepost in case involving defective design of motor vehicle).  Because the seatbelt at issue here indisputably complied with federal automotive safety regulations, Autoliv Japan could not actually be subject to any civil penalty under 49 U.S.C. § 30165.

But even if Autoliv were subject to such a penalty, at the time of the design and manufacture of the 2005 Mazda 3, that statute authorized "a civil penalty of not more than $5,000 for each violation," and it capped the "maximum penalty under this subsection for a related series of violations [at] $15,000,000." Transp. Recall Enhancement, Accountability, and Documentation Act, Pub. L. No. 106-414, 114 Stat. 1800, § 5 (enacted Nov. 1, 2000) (amending 49 U.S.C. § 30165 (a)).  Therefore, the $100 million punitive award in this case, of course, substantially exceeds—and is nearly seven times—the maximum amount of aggregate civil penalties for related violations under the version of 49 U.S.C. § 30165 (a) applicable at the time of the conduct at issue. This too suggests that the punitive damages award is constitutionally excessive.  *See Clark*, 436 F.3d at 608.

*      *      *

In sum, for the reasons above, the "three guideposts" for assessing the excessiveness of a punitive damages award under the Due Process Clause of the United States Constitution demonstrate that the Court's punitive damages award in

27

this case is constitutionally excessive and should be reduced.[30]  Given the Supreme Court precedent discussed above, Autoliv Japan submits that if the Court is still inclined to issue any award of punitive damages (notwithstanding the arguments in Section I *supra*), that amount of punitive damages should not exceed $4 million.

### B.    The Punitive Damages Award Violates the Excessive Fines Clause of the Georgia Constitution.

The punitive damages award should also be reduced because it violates the Excessive Fines Clause of the Georgia Constitution, which, as the Georgia Supreme Court has recognized, applies in cases in which punitive damages are awarded.  *See Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 120, 365 S.E.2d 827, 831 (1988) (plurality op.).[31]  The Excessive Fines Clause provides that "excessive fines" shall not be imposed, and in order to satisfy the Clause, an award of punitive damages must bear a "rational relationship" to the wrongdoing that the award is meant to punish, as determined based on a comparison of the amount of the punitive damages

---

[30] The punitive damages award is also excessive, for these reasons, under due process as guaranteed by the Georgia Constitution.  *See* Ga. Const. of 1983, Art. I, Sec. I, Para. I.

[31] Although only a plurality joined the opinion for the Court in *Colonial Pipeline,* majority opinions in subsequent decisions of the Georgia Supreme Court have cited the *Colonial Pipeline* plurality with approval.  *See, e.g.*, *Democratic Party of Ga. v. Perdue*, 288 Ga. 720, 728 n.12, 707 S.E.2d 67 (2011); *Powell v. State*, 270 Ga. 327, 331 n.3, 510 S.E.2d 18 (1998).

award to the nature of the wrongdoing, including as reflected by the amount of actual damages awarded.[32]  *See* Ga. Const. of 1983, Art. I, Sec. I, Para. XVII; *Colonial Pipeline,* 258 Ga. at 123, 365 S.E.2d at 833.

Applying that framework in this case, the punitive damages award of $100 million is grossly disproportionate to the defectively designed seatbelt that is the basis of the award, and Georgia law cannot authorize the imposition of such an excessive award consistent with the Excessive Fines Clause.  As discussed above, there is scant evidence in this case reflecting a wanton and conscious indifference to consumer safety.  And even if the Court concludes that this evidence is enough to clearly and convincingly establish a basis for punitive damages, it most certainly does not show the sort of wrongdoing that would warrant $100 million in punitive damages.[33]

---

[32] In a later decision distinguishing *Colonial Pipeline*, the Georgia Supreme Court suggested that, where wrongdoing <u>threatens</u> serious harm but a particular plaintiff <u>sustains</u> only "slight harm" and recovers only nominal or a small amount of actual damages, the comparison has less force. *See Hosp. Auth. of Gwinnett Cnty.*, 261 Ga. at 615, 409 S.E.2d at 503. This case, of course, involves neither "slight" harm nor a minimal award of compensatory damages.

[33] *See Colonial Pipeline*, 258 Ga. at 123, 365 S.E.2d at 833 (reversing $5 million punitive damages award as unconstitutionally excessive, especially in comparison to actual damages).

**C.      The Court Improperly Considered Evidence of Non-Party Autoliv, Inc.'s Financial Condition.**

The punitive damages award should also be reduced because the Court, in determining the punitive damages award against Defendant Autoliv Japan, improperly relied on the financial condition of Autoliv Japan's parent company, non-party Autoliv, Inc.[34]  *See* Judgment at 90-94.  Before trial, Autoliv Japan moved to exclude evidence of Autoliv, Inc.'s financial condition on the grounds that Plaintiff had never alleged, much less established, that Autoliv Japan was an "alter ego" of Autoliv, Inc., such that the "corporate veil" could be pierced and Autoliv, Inc.'s financials could be considered for purposes of punitive damages against Autoliv Japan.  *See* Dkt. No. [455] at 2.

In its subsequent order, the Court stated that "there appears to be a dearth of binding authority that controls the issue of whether, in the absence of proof of alter ego, evidence of the parent company's financial condition is relevant to the subsidiary's financial circumstances (which are admissible at trial)."  *See* Dkt. No. [494] at 5.  Nevertheless, the Court denied Autoliv Japan's motion, relying on a Fourth Circuit decision—*Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x

---

[34] Autoliv, Inc. is far wealthier than its subsidiary, Autoliv Japan.  *Compare* Judgment at 90 & n.74, *with* Dkt. Nos. [485-5] *and* [526].

246 (4th Cir. 2017)—in which the Fourth Circuit was reviewing an award of punitive damages under the Fair Credit Reporting Act. *See id.* at 6-7. In doing so, this Court emphasized that, in *Daugherty*, the Fourth Circuit upheld the introduction of a parent company's Form 10-K as evidence of the defendant-subsidiary's finances because "[the Form 10-K] filings were sufficiently related to [the defendant-subsidiary's] finances." *See id.* (cleaned up).

Autoliv Japan submits that the Georgia Supreme Court would not permit a trial court to rely upon evidence of a non-party parent corporation's financial condition for purposes of imposing damages under Georgia law against a subsidiary based on a finding that the parent's financials were "sufficiently related" to the subsidiary's financials. *See id.*; *Molinos Valle del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011) ("Where the highest court—in this case, the [Georgia] Supreme Court—has spoken on the topic, we follow its rule. Where that court has not spoken, however, we must predict how the highest court would decide this case."). Instead, the Georgia Supreme Court would only permit such reliance if there was a showing of "abuse" such that the corporate veil should be pierced. *See United States v. Fid. Cap. Corp.*, 920 F.2d 827, 837 (11th Cir. 1991) (interpreting Georgia law and stating that "courts must exercise great caution, and must not

disregard the corporate entity without a showing that the corporate form has been abused").

And here, no such showing has been made. The fact that (i) the "Autoliv corporate logo – not the Autoliv Japan insignia" appears on Autoliv Japan documents; (ii) Autoliv, Inc. claims to be the "world's largest automotive safety supplier" (when accounting for its various subsidiaries); (iii) Autoliv, Inc. has stated that its products have saved more than 30,000 lives "without any effort to separate the lives saved by subsidiary"; and (iv) Autoliv Japan's corporate representative was an employee of another Autoliv subsidiary do not rise to the level of abuse. *See* Judgment at 91-94. Indeed:

> The mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends. Similarly, that two corporations have been incorporated by the same party and have the same officers does not mean that the two corporations are interchangeable. More evidence of abuse, such as evidence that the controlling person commingled the corporation's assets with his own or those of other corporations he controlled, or that he failed to maintain corporate records separately, is essential.

*Fid. Cap. Corp.*, 920 F.2d at 837 (interpreting Georgia law) (cleaned up).

Accordingly, the Court should not have considered the financials of non-party Autoliv, Inc., and as a result, the award of punitive damages should be reduced.

**III.    The Compensatory Damages Award Against Autoliv Japan Should Be Reduced.**

The Judgment should also be reduced because the Court should have apportioned fault to Bosch and consequently reduced the compensatory damages award against Autoliv Japan.  While the Court held Autoliv Japan liable in this case pursuant to Georgia's strict products liability statute (*see* Judgment at 37), the evidence adduced at trial also demonstrates that Bosch would have been liable under that same statute had Bosch been a defendant at trial.  *See* Resp. to Pl.'s Mot. to Amend J., Dkt. No. [541] at 15-18 (identifying the three elements of Georgia's products liability statute and explaining how the trial record demonstrates that each element was satisfied as to Bosch's conduct in this case).  Accordingly, holding Autoliv Japan liable under the products liability statute, but not apportioning fault to Bosch would be a manifest injustice.  *See Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 365, 729 S.E.2d 378, 383 (2012) ("The purpose of the apportionment statute is to . . . consider all of the tortfeasors who may be liable to the plaintiff together, so their respective responsibilities for the harm can be determined.")

Specifically, Autoliv Japan requests that Bosch be assigned at least 25 percent of the fault for Mr. Andrews's death, that Autoliv Japan's percentage of fault be reduced to at least 25 percent, and that Mazda's percentage of fault remain at least 50 percent.  As it is undisputed that Mazda made the final design decisions as to both

the airbag and seatbelt systems, holding Mazda liable for anything less than 50 percent would be counterintuitive.  *See* Judgment at 72, 73, 80 n.67.  As between Bosch and Autoliv Japan, both entities supplied their components to Mazda only after initially providing multiple options from which Mazda could choose.  *See* Def. Trial Ex. 101; Trial Tr. Vol. 3 A.M. at 118:11-120:1; Judgment at 80.  And, based on the Court's Judgment and testimony from Plaintiff's experts, had either of those components not been defective when supplied by Bosch and Autoliv Japan, Mr. Andrews would have survived.[35]  Therefore, Bosch and Autoliv Japan should be apportioned fault to the same extent.

## CONCLUSION

For these reasons, Autoliv Japan respectfully requests that the Court grant the instant Motion and (i) reduce the award of compensatory damages against Autoliv Japan and (ii) eliminate, or at a minimum reduce, the award of punitive damages

---

[35] *See* Judgment at 53 n.50; *id.* at 20, 71 (noting, on multiple occasions, that "Bosch's airbag electronic front sensor system component [] ultimately caused the non-deployment of the airbag") Trial Tr. Vol. 3 A.M. at 107:10-12 (Plaintiff's airbag expert testifying that if the "Bosch-designed electronic system had sent a signal to the Autoliv airbag, it would have deployed"); Trial Tr. Vol. 2 P.M. at 103:21-23 (Plaintiff's biomechanics expert testifying that "if the airbag had deployed, Mr. Andrews would have survived this accident").

against Autoliv Japan.   In the alternative, Autoliv Japan requests that the Court

vacate the Judgment and order a new trial.

Respectfully submitted this 28th day of January, 2022.

|  |  |
|---|---|
| ALSTON & BIRD LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309-3424<br>(404) 881-7000 (telephone) | /s/ William J. Repko III, Esq.<br>Doug Scribner, Esq.<br>Georgia Bar No. 632755<br>doug.scribner@alston.com<br>Keith R. Blackwell, Esq.<br>Georgia Bar No. 024493<br>keith.blackwell@alston.com<br>Jenny A. Hergenrother, Esq.<br>Georgia Bar No. 447183<br>jenny.hergenrother@alston.com<br>William J. Repko III, Esq.<br>Georgia Bar No. 301797 |
| *Attorneys for Autoliv Japan, Ltd.* | jay.repko@alston.com |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing

filing complies with the applicable font and size requirements and is formatted in

Times New Roman, 14 point font.

<u>/s/ William J. Repko III, Esq.</u>
Doug Scribner, Esq.
Georgia Bar No. 632755
doug.scribner@alston.com
Keith R. Blackwell, Esq.
Georgia Bar No. 024493
keith.blackwell@alston.com
Jenny A. Hergenrother, Esq.
Georgia Bar No. 447183
jenny.hergenrother@alston.com
William J. Repko III, Esq.
Georgia Bar No. 301797
jay.repko@alston.com

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 (telephone)
(404) 881-7777 (facsimile)

*Attorneys for Autoliv Japan, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on January 28, 2022, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

James E. Butler, Jr.
Michael F. Williford
BUTLER PRATHER LLP
2719 Buford Highway
Atlanta, Georgia 30324

Tedra Cannella
Rory Weeks
CANNELLA SNYDER LLC
Post Office Box 1399
Decatur, Georgia 30031

William L. Ballard
Gregory R. Feagle
BALLARD & FEAGLE, LLP
4200 Northside Parkway NW
Atlanta, Georgia 30327

***Attorneys for Plaintiff***

/s/ William J. Repko III
William J. Repko III
Georgia Bar No.  301797