THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JAMIE LEE ANDREWS, as | * | |
| Surviving Spouse of | * | |
| MICAH LEE ANDREWS, Deceased, | * | CIVIL ACTION FILE |
| and JAMIE LEE ANDREWS, as | * | |
| Administrator of the Estate of | * | NO. 1:14-CV-03432-SCJ |
| MICAH LEE ANDREWS, Deceased, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| AUTOLIV JAPAN, LTD., | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFF'S RESPONSE TO AUTOLIV'S MOTION TO AMEND THE
JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

On January 31, Law360 ran an article about Autoliv's posttrial motion.[1]

Gabriella Ekelund, a senior vice president of communications, spoke for the

defendant.  Ms. Ekelund, however, does not work in Japan with "Autoliv Japan,

Ltd."  She works in Stockholm, Sweden, where *Autoliv AB* is headquartered.[2]  In

an official statement emailed to Law360, Autoliv proclaimed "final judgment

---

[1] Humberto J. Rocha, *Autoliv Says $100M Punitive Damage Award 'Excessive*,'
Law360, https://www.law360.com/articles/1459950 (attached as Exhibit 1).

[2] Gabriella Ekelund, LinkedIn, https://www.linkedin.com/in/gabriella-ekelund-0218b110/ (attached as Exhibit 2).

should be modified in several respects for the reasons set forth in ***our motion***."[3]

Whenever "Autoliv Japan, Ltd." speaks in court or to the public about this case, it always does so through someone who works for another Autoliv, Inc. subsidiary. As the Court already concluded, since Autoliv does not distinguish between Autoliv entities, this Court should not either.  Doc. 534 at 93.

Autoliv's posttrial motion is just the latest example of Autoliv's frivolity. Litigiousness pays.  That's why it's such a problem.  Autoliv escaped trial for 7½ years and has still not paid anything for killing Micah Andrews.  It is a pure fact: Autoliv has profited off its litigiousness.  Assuming a modest investment return on investments of 6% annually, Autoliv has made money by paying lawyers to litigate rather than paying Plaintiff—even if the interest is simple rather than compound.[4]

## INTRODUCTION

The Court presided over the trial of this case, which included five days of testimony, 16 witnesses, and dozens of exhibits.  The Court then issued a detailed, 96-page Final Order and Judgment containing its findings of fact and conclusions of law with careful citations to the record.  Despite its overwhelming evidentiary

---

[3] *Id.* (emphasis added).

[4] To illustrate, consider the interest on $25 million.  At 6% per year, Autoliv earns $1.5 million per year.  In the 7½ years since Plaintiff filed this case, Autoliv's interest on that $25 million would be $11.25 million.

support, Autoliv attacks the Final Order and Judgment as "counterintuitive,"

"excessive," "improper," and representing a "manifest injustice." Doc. 543 at 1, 2,

35. It tells the Court that "the evidence in this case does not authorize any award

of punitive damages as a matter of Georgia law" and that the punitive damages

award "should be eliminated altogether." Doc. 543 at 1.

Punitive damages are not just "authorized" in this case—they are *required* to

deter and punish Autoliv. Autoliv's motion proves that fact: it is unrepentant, it

takes no responsibility, and it has no remorse. It continues to blame Mazda for

choosing to buy the defective seatbelt that Autoliv designed, manufactured, and

sold. *See, e.g.*, Doc. 543 at 9 ("Autoliv Japan supplied the subject seatbelt to a

sophisticated consumer who was fully aware of alternative options"). Instead of

complying with the postsale duty to warn, Autoliv persists in pretending there is

nothing wrong with its seatbelt. Doc. 534 at 86-87. Autoliv's motion is replete

with indignation and devoid of contrition.

Autoliv is *strictly liable* for Mr. Andrews' death because it designed,

manufactured, and sold the defective seatbelt that killed him. It is *subject to

punitive damages* because it knew its seatbelt was far below industry standards, it

knew about the danger to people like Mr. Andrews, and it was utterly indifferent to

the risk and foreseeable consequences of its own actions. Doc. 534 at 82-87.

Autoliv did nothing to make sure its seatbelt worked in real-world collisions, despite knowing that airbags fail and that its seatbelt would not protect people when that happened.  Instead, Autoliv suggested a design change that made the seatbelt *weaker* as part of a cost-savings program.  Autoliv's seatbelt was not simply defective, it was an extreme outlier that allowed more than twice the spoolout of any other car in its class.  Autoliv knew that.  Despite knowing about its seatbelt's many problems, Autoliv's corporate representative testified that "Mazda was not concerned, so we [Autoliv] weren't concerned."  Doc. 534 at 31.[5] The Court's punitive damages award is both amply supported by the evidence and constitutionally permissible.

## LEGAL STANDARDS

Autoliv's posttrial motion to amend the judgment or, in the alternative, for new trial should be denied because Autoliv cannot meet the standards for relief.

Rule 52(b) permits the Court to amend its findings or make additional filings and to amend the judgment in response to a party's motion.  But the Court should do so only "***to correct plain errors of law or fact***, ***or***, in limited situations, ***to allow the parties to present newly discovered evidence***, but not to allow the relitigation

---

[5] The Court, however, found that Mazda was concerned.  Yet Autoliv presented no evidence or argument at trial that it ever provided Mazda with Autoliv's expert advice on how to solve the problem with the seatbelt.  Doc. 534 at 31.

of old issues, a rehearing on the merits, or the presentation of new theories of the case." *Hannover Ins. Co. v. Dolly Trans Freight, Inc.*, No. 6:05-cv-576, 2007 WL 170788, at *2 (M.D. Fla. Jan. 18, 2007) (emphasis added). Rule 52(b) motions, like motions for new trial, "are to be granted sparingly, and only when dispositive factual matters or controlling decisions of law were brought to the Court's attention, ***but not considered***." *Id.* (emphasis added).

Rule 59(e) allows a party to move to alter or amend a judgment. "The only grounds for granting [a Rule 59(e)] motion ***are newly-discovered evidence*** or ***manifest errors of law or fact***." *In re Kellogg,* 197 F.3d 1116, 1119 (11th Cir. 1999) (emphasis added). A Rule 59(e) motion is no substitute for an appeal and thus cannot be used "to relitigate old matters, [or] raise argument or present evidence that could have been raised prior to the entry of judgment."[6] *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010); *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005).

---

[6] Plaintiff does not address each of the arguments that the Court explicitly addressed in its Final Order and Judgment because of space limitations. *See, e.g.*, Doc. 534 at 50-54; 44-45 (addressing Autoliv's causation argument).

# ARGUMENT

## I.   AUTOLIV'S CONDUCT IS REPREHENSIBLE, AND PUNITIVE DAMAGES ARE NECESSARY TO PUNISH AND DETER IT.

The evidence is "clear and convincing,"—in fact, it is overwhelming—that Autoliv's actions constituted "reckless and wanton misconduct" and "that entire want of care which would raise the presumption of conscious indifference to consequences." *See* Doc. 534 at 86; O.C.G.A. § 51-12-5.1.  Autoliv's motion is just a rehash of its failed trial arguments, which Rules 52 and 59 do not allow. *See Jacobs*, 626 F.3d at 1344.  But Autoliv's motion illustrates why punitive damages are necessary.  Plaintiff thus focuses her response on why.

The Court knows the facts of this case well.  Autoliv designed, manufactured, and sold a seatbelt it knew would spool out excessively in a foreseeable 35-mph impact when the airbag failed to deploy.  Doc. 534 at 33.  In the 35-mph NCAP crash test, the Autoliv seatbelt in the Mazda3 spooled out 16.85 inches.  Doc. 534 at 27.  That was nearly twice the amount of spoolout as the second-worst performer.  PX 9; Doc. 534 at 27; *see also id*. (describing Mr. Meyer's testimony on how far below industry standard this seatbelt was).  The crash test dummy in the NCAP test was belted and the airbag deployed, but the dummy's head still went through the airbag and hit the steering wheel because the seatbelt was so weak.  *See* Doc. 534 at 27.  "The undisputed evidence shows that in

6

terms of providing restraint and preventing an occupant's forward movement toward structures inside the car, the Autoliv seatbelt in Mr. Andrews's car was by far the worst—an extreme outlier."  Doc. 534 at 27; *see also id*. ("Plaintiff's seatbelt expert, Mr. Meyer, testified that the seatbelt was 'weak,' allowed a 'gross amount of pay-out,' and was 'literally the lowest' kilonewton bar seatbelt he had 'ever seen' in his thirty years of investigating car crashes.")

During the long life of this litigation, Autoliv has falsely claimed it had no role in causing this weak seatbelt to be incorporated into the Mazda3 and was helpless to influence the design.  It makes that argument again in its posttrial motion: "component suppliers (like Autoliv Japan) cannot deviate from the instructions included with the engineering specifications provided by vehicle manufacturers (like Mazda)."  Doc. 543 at 11.  This statement is stunning because it starkly contradicts the actual evidence of Autoliv's role as a component supplier and the Court's findings of fact.

Most evidence of Autoliv's duties as a component supplier comes from Autoliv's own documents and the testimony of its witness.  Autoliv's statement of work for the Mazda3 program states it has a duty regarding addressing defects, development quality, and conforming with the user's needs.  Doc. 534 at 81; PX 11 (Statement of Work); PX 54 (Basic Trading Agreement).  Chris Caruso—an expert

on *Autoliv's* witness list—testified that Autoliv was "obligated to work directly with Mazda to address defects in the seatbelt, like the excessive spool out problem." Doc. 534 at 30. Mr. Caruso testified that Autoliv had a duty of due care to share its "superior knowledge about [its] products and how they perform with the goal of getting the system to work right in the real world," but it failed to do so. Doc. 534 at 36.

Autoliv was responsible for reviewing and studying the data from testing done by Mazda. Doc. 534 at 31. In 2002, Mazda wrote to Autoliv asking for Autoliv's help because computer testing showed occupants would hit their heads on the steering wheel in the NCAP test. Doc. 534 at 31. "Autoliv presented no evidence that it provided such help." Doc. 534 at 31.[7]

Autoliv's documents reveal that in 2002 it discussed internally that the seatbelt was not meeting its targets, and Mazda intended to strengthen it. Autoliv, however, never told Mazda to use a different, safer seatbelt to protect people. Doc. 543 at 31. Autoliv's sled test showed that in a 31-mph wreck without an airbag,

---

[7] Autoliv complains that the Court relied upon PX 128 without addressing its second page. Autoliv's corporate representative speculated that in this email Autoliv asked Mazda if the computer simulation was run at the wrong speed. It is unclear why Autoliv thinks that helps its position. There was no evidence that Mazda responded to Autoliv's question or that Autoliv responded to Mazda's request for help.

the amount of seatbelt spoolout exceeded the distance between the driver and the steering wheel.  Doc. 534 at 33.  Despite all this knowledge, Autoliv warned no one of the dangers it knew existed in its seatbelt.  Doc. 534 at 36-37.

Autoliv presented no evidence at trial that it ever proposed a single change to the seatbelt that would have made it safer.  Doc. 534 at 31.  Instead, in December 2001, Autoliv suggested a change to the seatbelt that made it even weaker than was originally planned.  Doc. 534 at 30-31.  This suggestion was part of a "cost reduction" effort.  Doc. 534 at 34.

Autoliv recycles its claim that it could not prevent Mazda from buying its defective seatbelt—which means Autoliv has still not gotten the message that it has a responsibility not to sell dangerously defective seatbelts that will kill people. Autoliv must be punished and deterred to avoid future deaths and injuries. Leaving the Court's punitive damages award intact is the only way to do so.

Autoliv also argues that because it "complied with applicable safety regulations," it cannot be subject to punitive damages, citing *Stone Man v. Green*, 435 S.E.2d 205, 206 (Ga. 1993).  Doc. 543 at 4.  That argument fails for two reasons.  *First*, Autoliv did not comply with any "applicable" safety regulation because there are no safety regulations governing torsion bar strength.[8]

---

[8] As the Court notes, the Eleventh Circuit has said, "[w]e do not, naturally, dismiss

*Second*, the Court explicitly considered this argument and correctly found that "an award of punitive damages is not precluded by compliance with industry standards because there is evidence that shows willful misconduct and that entire want of care that would raise the presumption of conscious indifference to the consequences." Doc. 534 at 82. Courts have repeatedly held that, under Georgia law, a defendant cannot escape liability for punitive damages simply because it complied with federal safety standards.[9] Despite compliance with federal regulations, punitive damages are warranted if there is evidence of "culpable behavior."[10] The evidence demonstrates Autoliv's abundant "culpable behavior."

---

a manufacturer's compliance with industry standards, but we must also remember that those standards may sometimes merely reflect an industry's laxness, inefficiency, or inattention to innovation." Doc. 534 at 82 (quoting *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1508 (11th Cir. 1990) (citations omitted)). That observation is certainly true of NHTSA, the agency that oversees and promulgates the federal minimum standards for automobiles.

[9] *Barger v. Garden Way, Inc.*, 499 S.E.2d 737, 743 (Ga. Ct. App. 1998) ("[A] manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products."), *disapproved of on other grounds by Johns v. Suzuki Motor of Am., Inc.*, 850 S.E.2d 59 (Ga. 2020).

[10] *Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp. 2d 1363, 1374 (S.D. Ga. 2009) (The *Stone Man* rule "is not hard and fast, particularly where the manufacturer's conduct shows some wanton or otherwise culpable behavior. Cooper cannot escape liability for punitive damages as a matter of law just because it complied with the applicable federal safety standards."); *Reid v. BMW of N. Am.*, 430 F. Supp. 2d 1365, 1374 (N.D. Ga.), *amended on reconsideration in part*, 464 F. Supp. 2d 1267 (N.D. Ga. 2006) ("[E]ven if there are applicable regulations or

The Court's Order devoted 11 pages to the evidence supporting its conclusion that "Autoliv's conduct amounted not only to an entire want of care and conscious indifference to the consequences," but also "reckless and wanton misconduct." Doc. 534 at 86; *id*. 77-87.

Autoliv also persists in blaming Mazda for buying Autoliv's defective seatbelt—despite the Eleventh Circuit's holding that it is unlawful to manufacture and sell defective products, even if an automaker orders it. *See* Doc. 534 at 40; 309 at 3. Autoliv's corporate representative and Autoliv's engineer for the subject seatbelt both agreed: Autoliv did not have to sell this seatbelt to Mazda. Doc. 534 at 33, 48. Autoliv, however, considered it "indispensable" that Mazda choose Autoliv for the Mazda3 restraint system. 10/6/21 PM Trial Tr. 82/24-83/7.

Autoliv suggests—incorrectly—that when the manufacturer complies with federal regulations, Georgia law allows punitive damages only if the manufacturer was motivated by "economic considerations." Doc. 543 at 4. That rule simply does not exist—as already noted, even if a manufacturer has complied with the federal regulations, punitive damages are appropriate if there is evidence of culpable conduct. *See supra* at 10 nn.9-10. The evidence proved that when

---

standards and the BMW defendants complied with such regulations, other evidence showing culpable behavior can still justify an award of punitive damages.").

Autoliv sold the seatbelt it knew the seatbelt was defective; it knew that airbags fail in foreseeable wrecks; and it knew that if the airbag failed, the seatbelt would be useless.  Doc. 534 at 33, 79.  Selling a defective seatbelt is an economic choice.  The only reason to do so was to keep Mazda's "indispensable" business and the money it brings.

Repeating another argument the Court rejected, Autoliv mischaracterizes the evidence as simply showing a difference of "opinion" among experts about how to strike a "balance" and make the appropriate "tradeoff" in designing the seatbelt to try to suggest Autoliv had a "good faith and honest belief" that the seatbelt was not defective.  Doc. 543 at 3, 5-7.  Nothing could be further from the truth.  *First*, the evidence was that this seatbelt was an extreme outlier, and not the result of some reasonable engineering judgment.  Mr. Meyer testified that there is *no* benefit to a seatbelt that spools out like the Autoliv seatbelt.  10/6/21 PM Trial Tr. 143/4-13.  Autoliv's "persist[ance] in insisting there is nothing wrong with that seatbelt . . . is without merit in light of the evidence presented at trial."  Doc. 534 at 86-87.

*Second*, for Autoliv to suggest that it believed in "good faith" that the seatbelt was safe is risible: the evidence showed that Mazda was concerned about the seatbelt's performance, Autoliv possessed test results showing the seatbelt's poor performance, and Autoliv sold Volvo a seatbelt three times stronger for the

Volvo S40—a car built on the same platform as the Mazda3.

*Third*, Autoliv has no evidence that it was trying to "strike a balance" in designing its seatbelt.  Instead, it falsely claims it had no control over the design.  Autoliv's abandonment of its duty to make sure its seatbelt would work in real-word crashes (or even to make sure the seatbelt "struck a balance" of safety) is itself one reason punitive damages are justified.  *See supra* at 7-8.

*Fourth*, Autoliv's motion conveniently omits the testimony of Autoliv's handpicked corporate representative David Prentkowski.  Through Mr. Prentkowski, Autoliv admitted that the seatbelt—the safety device that is supposed to restrain occupants—was *useless* to protect Mr. Andrews.  Doc. 534 at 85.  Autoliv admitted that before the Mazda3, the lowest strength it offered the retractor at was 2.5 kN, but it nonetheless sold Mazda a seatbelt that was even lower than the lowest strength it designed the retractor to have.  Doc. 534 at 83-84.  Autoliv's representative summarized why Autoliv did nothing to make sure its seatbelt would work in real-world collisions: "Mazda was not concerned, so we weren't concerned."  Doc. 534 at 31.  That is explicit, direct testimony from Autoliv that it consciously disregarded the safety of people relying on its seatbelt.

Autoliv claims that it cannot be liable for punitive damages without evidence of "the frequency with which airbags fail to deploy in crashes presenting a

materially similar risk of serious head injuries."  Doc. 543 at 8.  Again, Autoliv has fabricated a "rule" that has no support in Georgia law.  Worse, Autoliv's argument presumes there is an acceptable mortality rate for its useless seatbelt.  Plaintiff, however, introduced evidence of numerous instances in which airbags will foreseeably fail.  10/6/21 AM Trial Tr. 34/6-45/10.  Autoliv's website even acknowledged that airbags are not always available in every crash.  PX 1 ("Seatbelts . . . help to properly position occupants to maximize the airbag's benefits and—unlike airbags—they also protect occupants in multiple-collision crashes.").  And Autoliv itself admitted numerous times that it knows airbags fail to deploy when they should.  *See, e.g.*, Doc. 534 at 12; Doc. 543 at 12.

Autoliv knew how weak the seatbelt was, how poorly it performed in testing, how much it would spool out without an airbag, and that two people have filed lawsuits for serious injuries they allege arose from the seatbelt's defects.  Yet it presented no evidence that it monitors the seatbelt's performance in real-world collisions.  Doc. 534 at 85.  Autoliv also did nothing to make sure the airbag would work, knowing that the seatbelt that would be useless without an airbag in a 35-mph impact.  10/4/21 PM Trial Tr. 58/5-15.  Autoliv has not notified NHTSA or Georgians about the defect, nor has it told Mazda to do so.  Given that Autoliv knew how terrible its seatbelt was, it had a duty to do *something* to find out how

14

many lives would be lost because of it.  But it did nothing to discover that information.  That was "reckless and wanton."  Doc. 534 at 85.

## II.   THE COURT'S PUNITIVE DAMAGES AWARD IS CORRECT.

Autoliv says a punitive damages award over $4 million is unconstitutional. That is nonsense.  A $4 million punitive damages award cannot achieve the purpose of punitive damages: to "punish, penalize, and deter" Autoliv from future misconduct.  O.C.G.A. § 51-12-51.1(c).  Four million dollars is pocket change to Autoliv.  As the Court found, in fiscal year 2020 Autoliv had net sales of $7.4 billion, seatbelt sales of over $2.5 billion, and total assets of $8.1 billion.  Doc. 534 at 90.  Given those figures, $4 million is trivial: Autoliv made $4 million in the first five hours of 2020.  For Autoliv's 2020 fiscal year, $4 million represents only 0.049% of Autoliv's total assets, 0.054% of Autoliv's net sales, and 0.16% of Autoliv's seatbelt sales.[11]

In its posttrial motion, Autoliv portrays the Court's $100 million punitive damages award as oppressive and excessive.  But outside the courtroom, Autoliv paints a much different picture of the Court's Judgment.  Autoliv has informed its investors about this Court's verdict.  Autoliv Form 8-K at 6 (Jan. 28, 2022)

---

[11] Even $100 million is only 1.23% of Autoliv's total assets in 2020; 1.35% of Autoliv's net sales in 2020; and 4.00% of Autoliv's seatbelt sales in 2020.

(attached as Exhibit 3).  It told them Autoliv "cannot predict or estimate the duration or ultimate outcome of this matter," but it assured them that whatever the outcome it "believes that the ultimate resolution of this lawsuit ***will not materially impact Autoliv's liquidity or its ability to conduct daily operations***."  *Id.* (emphasis added).  The truth is that paying $100 million does not "materially" affect Autoliv, and any representations to the Court otherwise are false.

Autoliv also admits that "[i]t is reasonably possible that the Company may have to pay the entire amount of damages awarded by the court" ($113.5 million).  Autoliv "believes that its insurance should cover all of the types of damages awarded by the Court,"[12] and, recognizing possible uncertainty, it promised to "aggressively pursue" all potential coverage when the case ends.

*     *     *

Autoliv challenges the Court's punitive damages award in three ways.  *First*,

---

[12] This statement piqued Plaintiff's counsel's curiosity.  In discovery, Autoliv produced only one insurance policy (issued to Autoliv AB, a Swedish company, but covering Autoliv Japan) that provided or possibly provided coverage for Plaintiff's claims.  That policy excludes coverage for "fines penalties punitive exemplary or treble damages or any other damages resulting from the multiplication of compensatory damages."  That language, it seems to Plaintiff's counsel, plainly excludes coverage for punitive damages.  If that plain reading is correct and if Autoliv has insurance coverage for punitive damages as it says in its January 28 SEC filing, then Autoliv must have another insurance policy.  If that additional insurance policy exists, that means Autoliv has once again withheld important, relevant documents from Plaintiff and the Court.

Autoliv argues that the award violates the U.S. Constitution.  That argument has three premises.  *One*.  Autoliv's misconduct was reprehensible but not ***that*** reprehensible.  *Two*.  By arranging the damages amounts just right, the ratio of punitive to compensatory damages can be twisted to look constitutionally suspect. *Three*.  Looking only at the maximum civil penalty manufacturers could face for flouting the federal minimum standards or the defect-reporting requirements in 2004, when Mr. Andrews' Mazda3 was manufactured—and completely ignoring that Congress has since *septupled* that maximum to $105 million, presumably because the old amount did not sufficiently punish and deter multibillion-dollar manufacturers—the Court's punitive damages award looks excessive.

*Second*, Autoliv half-heartedly argues that the Court's punitive damages award violates the Excessive Fines Clause of the Georgia Constitution based on a 1988 plurality opinion of the Georgia Supreme Court that has never been followed.

*Third*, Autoliv once again argues that the Court cannot consider the financial condition of Autoliv, Inc. when deciding the amount of punitive damages needed to punish and deter Autoliv.

All Autoliv's arguments are meritless.

A.      **The Court's punitive damages award against Autoliv is constitutional.[13]**

About three decades ago, the U.S. Supreme Court created (or revived) a "substantive due process" right against a "grossly excessive" punitive damages awards. *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 470 & n.* (1993) (Scalia, J., concurring in the judgment) (refusing to join plurality opinion because "it makes explicit . . . the existence of a so-called 'substantive due process' right that punitive damages be reasonable").[14]   Autoliv claims the Court's punitive

---

[13] If the Judgment is appealed, the Eleventh Circuit will review this Court's conclusions of law and its "interpretation of Georgia law and its application of the law to the facts" de novo. *Jackson Nat'l Life Ins. Co. v. Crum*, --- F.4th ----, 2022 WL 336264, at *4 (11th Cir. 2022).  The Eleventh Circuit will review this Court's findings of fact only for clear error. *Id.*  Similar standards govern the review of the Court's order on Autoliv's posttrial motion. *See Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 846 (11th Cir. 2021) ("We review *de novo* the constitutionality of a punitive damages award and defer to the district court's findings of fact unless clearly erroneous.").

[14] For preservation purposes, Plaintiff notes that the foundation of the "substantive due process" right against "grossly excessive" punitive damages awards supposedly arising from the Due Process Clause of the Fourteenth Amendment is faulty.  The constitutional rule of *Gore*, *State Farm*, their forerunners, and the follow-on circuit cases is inconsistent with the text of the U.S. Constitution and the principles of federalism.  Plaintiff preserves the right to challenge the precedential value of these decisions at the appropriate time.  Put simply, the dissenters in *Gore*—then-Chief Justice Rehnquist and Justices Scalia, Thomas, and Ginsburg—were correct: the reasonableness (or excessiveness) of a punitive damages award is a question the U.S. Constitution leaves to the States.  *See Gore*, 517 U.S. at 598, 599 (Scalia, J., joined by Thomas, J., dissenting) ("Since the Constitution does not make that concern ["about punitive damages that 'run wild'"] any of our business, the Court's activities in this area are an unjustified incursion into the province of

damages award violates this right.

In *Gore*, the Supreme Court noted that "[e]lementary notions of fairness" in its "constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). To decide "whether a punitive damages award is unconstitutionally excessive," the Court considers "three 'guideposts'": (1) "the degree of reprehensibility of the defendant's misconduct"; (2) "the ratio of the punitive damages award to the actual or potential harm suffered by the plaintiff"; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Cote*, 985 F.3d at 847.

Here, Autoliv's misconduct is highly reprehensible; the ratio of punitive to compensatory damages (3.70:1) is low and comparable to other ratios the Eleventh Circuit affirmed; and the punitive damages award is *less than* civil penalties authorized or imposed in other cases. Autoliv thus had fair notice that its misconduct, detailed in the Final Order and Judgment, could subject it to punitive

state governments.") *Gore*, 517 U.S. at 607 (Ginsburg, J., joined by Rehnquist, C.J., dissenting) (explaining that the Court's decision "unnecessarily and unwisely ventures into territory traditionally within the States' domain").

damages of $100 million in Georgia.  The punitive damages award is not "grossly

excessive" given Georgia's legitimate interests in protecting people from defective

products and in ensuring that punitive damages punish, penalize, and deter.

### 1.    Autoliv's misconduct is reprehensible.

The Supreme Court holds that the first guidepost—reprehensibility—is the

"most important indicium of the reasonableness of a punitive damages award."

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  For this

guidepost, the Court considers five factors:

> (1) whether "the harm caused was physical as opposed to economic";
> (2) whether "the tortious conduct evinced an indifference to or a
> reckless disregard of the health or safety of others"; (3) whether "the
> target of the conduct had financial vulnerability"; (4) whether "the
> conduct involved repeated actions or was an isolated incident"; and
> (5) whether "the harm was the result of intentional malice, trickery, or
> deceit, or mere accident."

*Cote*, 985 F.3d at 847 (citation omitted).  No specific number of factors must be

present, but "reprehensibility grows more likely as more factors are present."  *Id.*

The four relevant factors (financial vulnerability is not relevant) strongly

favor a finding of extreme reprehensibility.[15]

---

[15] Autoliv offers six "reasons" why its misconduct wasn't ***that*** reprehensible.  *See*
Doc. 543 at 15 ("[N]o fair view of the evidence suggests a high degree of
reprehensibility.").  These arguments (really quibbles with the Court's factual
findings) aren't new and were addressed in the Introduction and Part I.

### i.    Autoliv caused extreme physical harm: Mr. Andrews' death.

Autoliv's reprehensibility analysis makes absolutely no mention of the most important factor: the fact that its misconduct killed Mr. Andrews.  He didn't break a rib or lose a limb.  He lost his life, because of Autoliv's recklessness, wantonness, and extreme lack of care that rises to the level of conscious in difference.  This factor fully supports a finding of extreme reprehensibility.

### ii.    Autoliv has been and continues to be indifferent to and recklessly disregard the health and safety of Georgians.

The Court's Final Order and Judgment spends 11 pages laying out the evidence supporting its finding that "Autoliv's conduct amounted not only to an entire want of care and conscious indifference to the consequences," but also to "reckless and wanton misconduct."  Doc. 534 at 86; *id*. 77-87; *see also supra* Part I.  Plaintiff incorporates those findings here.

Autoliv's misconduct is especially egregious because it sold a *safety device*—something people rely on to keep themselves and their loved ones safe— that is useless in foreseeable crashes when the airbag does not deploy.  Innocent people still put this Autoliv seatbelt on every day unaware that it will not restrain them when they need it the most.  Autoliv designed, manufactured, and sold a safety device that it knew was indefensibly defective, while allowing people to unwittingly rely on it, and still refuses to provide a warning.  This factor heavily

21

favors a finding of extreme reprehensibility.

### iii.    Autoliv's misconduct is ongoing and may be repeated.

The Court's Final Order and Judgment recognizes Autoliv's continuing duty to warn and its failure every day to provide a warning, despite its knowledge that people in the Mazda3 are in danger.  Doc. 534 at 86-87.  Autoliv's corporate representative also testified that Autoliv has sold seatbelts even weaker than the one in the Mazda3, and it would do so again in the future.  10/7/21 PM Trial Tr. 78/2-4, 76/18-21.  This factor heavily favors a finding of reprehensibility.

### iv.    Autoliv's misconduct that killed Mr. Andrews was equivalent to intentional misconduct.

As this Court noted in its Final Order and Judgment, Autoliv's corporate representative at trial David Prentkowski[16] *twice* admitted that Autoliv's failure to mitigate the avoidable, known risks associated with its seatbelt was, practically speaking, intentional conduct.  Doc. 534 at 83-84.  A defendant rarely admits intentional conduct.  The Court should give this admission heavy weight.

Allowing people to rely on a seatbelt that Autoliv knows will not restrain them in a foreseeable 35-mph wreck also involves an element of deceit that weighs

---

[16] Autoliv Japan chose David Prentkowski to testify as its corporate representative at trial (and in a Rule 30(b)(6) deposition) even though he works for Autoliv ASP, another subsidiary of Autoliv, Inc.  Doc. 534 at 94.

in favor of a finding of reprehensibility.

      2.    **The 3.70 to 1 ratio of punitive to compensatory damages is not constitutionally excessive.**

The next guidepost is "the disparity between the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award." *Gore*, 517 U.S. at 575; *see also Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 750 (11th Cir. 2020).

Autoliv argues that to find the punitive to compensatory damages ratio, the Court can only consider the personal injury damages suffered by Mr. Andrews in the roughly four minutes it took him to die. That is, Autoliv argues that the only damages that matter are those apportioned to Autoliv for Plaintiff's claims on behalf of Mr. Andrews' estate. Autoliv argues that because wrongful death damages *alone* cannot support punitive damages, they are not "harm" that the Court can consider in its constitutional analysis. Autoliv is wrong. The question is not whether punitive damages are recoverable on a wrongful death claim (they are not); rather, the question is what the court may consider in determining the disparity between the harm and the award.

That requires the Court to consider the "actual *or potential*" harm from Autoliv's misconduct. *Gore*, 517 U.S. at 575 (emphasis added). Here, Autoliv's misconduct caused the ultimate "actual harm": Mr. Andrews' tragic death. The

Court placed a value on that harm of $25 million.  Those wrongful death damages are compensatory damages[17] that may be considered for purposes of this analysis.

The Court must also consider the "potential harm that might result from the defendant's conduct."  *TXO*, 509 U.S. at 460 (considering potential harm to uphold a $10 million punitive damages award where actual harm was $19,000).  The "potential harm" of hitting the steering wheel while wearing a useless seatbelt is any number of catastrophic injuries.

Take, for example, a catastrophic brain injury that left Mr. Andrews (or another Georgia citizen) in a persistent coma, totally and permanently disabled for the rest of his natural life.  *See* 10/6/21 PM Trial Tr. 46/5-9 (noting 20 inches of spool out can cause "severe head and neck injuries").  Indeed, Autoliv cites a case in which the plaintiff suffered that exact fate: *Bibbs v. Toyota Motor Corp.*  85 S.E.2d 850, 852 (Ga. 2018) (Blackwell, J.).

*Bibbs* is instructive for two reasons.  *One.*  When Delia Bibbs' case against Toyota was tried almost 30 years ago, a Georgia jury returned a verdict awarding her $36 million in compensatory damages, including "more than $400,000 for past medical expenses, $6 million for future life care expenses, and $30 million for past

---

[17] *See, e.g.*, *Bagley v. Shortt*, 410 S.E.2d 738, 738-39 (Ga. 1991) (categorizing wrongful death damages as compensatory).

and future pain and suffering." *Bibbs*, 85 S.E.2d at 852.  Using *Bibbs* as a yard stick, the "potential harm" of Autoliv's misconduct is *more than* $25 million.

Put differently, had Autoliv's misconduct left Mr. Andrews in a coma, totally and permanently disabled, Autoliv could not dispute that all compensatory damages awarded for *that* injury get included in the damages ratio.  Had Mr. Andrews suffered such an injury, a reasonable factfinder could easily have awarded compensatory damages of $25 million or more.  Because such an injury is a "potential harm" of Autoliv's misconduct, it was not error for the Court to include the wrongful death damages when calculating the damages ratio.

*Second*, the *Bibbs* opinion explains that the "harm" compensated in a wrongful death case is essentially the same as the "harm" in a personal injury case involving total and permanent disability.  Specifically, the Georgia Supreme Court held that the damages in a wrongful death case are "substantially the same as the kinds of damages that may be recovered in personal injury actions."  *Id.* at 856.  Wrongful death damages "cover the losses suffered by the injured person and include economic components, such as lost earnings, and non-economic components, such as loss of enjoyment of life."  *Id.*  Because wrongful death damages compensate for substantially the same losses as personal injury damages, wrongful death damages can be considered as "harm" for purposes of the second

guidepost of the constitutionality analysis.

*Two*.  To argue that the ratio should include only those claims that allow punitive damages, Autoliv relies on a few out-of-circuit cases.  Doc. 543 at 21 n.21.  But those cases provide almost no analysis for their conclusions and thus have no persuasive value.  *E.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (no analysis); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001) (statement without analysis).  Other courts, however, have considered concluded that the Supreme Court's precedent permits the aggregation of all compensatory damages under the second guidepost.

For example, in *Fastenal Co. v. Crawford*, then-district judge Amul Thapar (now on the Sixth Circuit) noted that the few circuit decisions he found "analyzing the constitutionality of punitive damage awards on individual claims" differed in their results.  609 F. Supp. 2d 650, 660 (E.D. Ky. 2009).  Because the Supreme Court's punitive damages jurisprudence has consistently held that "potential harm" is relevant to the damages ratio, Judge Thapar concluded that "[i]f a court is not limited to compensatory damages that actually occurred in calculating the ratio"— and the Supreme Court's cases make clear it is not—"it follows that a court is not confined only to the compensatory damages under particular claims and instead can look at damages found by a jury on related claims."  *Id.* at 661.  That is

especially true where, as here, the same misconduct gives rise to multiple causes of action. *See id.* at 661 ("*State Farm*, [*Gore*], and *TXO* all suggest that a court can aggregate compensatory damages from multiple related causes of action when comparing compensatory damages to punitive damages."). Here, the Court should follow Judge Thapar's well-reasoned decision and conclude that the damages ratio can be calculated using the aggregate amount of compensatory damages awarded for all of Plaintiff's related causes of action arising from Autoliv's misconduct.

The Court also should calculate the damages ratio using the full amount of the compensatory damages award, not just the amount apportioned to Autoliv. All compensatory damages should be included because under *Georgia CVS Pharmacy, LLC v. Carmichael*, 865 S.E.2d 559 (Ga. Ct. App. 2021), Autoliv is 100% responsible for those damages. The wrongful death damages also should be included because (1) under *Bibbs*, wrongful death damages closely approximate a potential harm caused by Autoliv's misconduct (a persistent coma with total and permanent disability), and (2) wrongful death damages are akin to personal injury damages and are an accurate estimation of the actual harm that Autoliv's misconduct caused. Applying this rubric, the damages ratio is 3.7:1. That is within the 4:1 ratio that the Supreme Court has provided as "instructive" for the constitutionality analysis. *State Farm*, 538 U.S. at 425.

Autoliv's final attempt to constrain the punitive damages award seizes on language in the Eleventh Circuit's decision in *Williams*, derived from language in *State Farm*, to argue that even if this Court includes all compensatory damages—whether that is $13.5 million or $27 million—the punitive damages award should be capped at that amount because the compensatory damages award is "substantial."  Doc. 543 at 19-20, 25-26.  Last year, the Eleventh Circuit rejected that exact argument.  In *Cote*, Philip Morris argued that punitive damages should be capped at $6.25 million, the amount of the "substantial" compensatory damages award.  985 F.3d at 849.  The Eleventh Circuit held there were three problems with that argument.  *First*, the Eleventh Circuit "has characterized the language [in *State Farm*] Philip Morris relies on as dicta."  *Id.  Second*, "even if [the language in *State Farm*] weren't dicta, the very next sentence in *State Farm* says the precise award in each case 'must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.'"  *Id.* (quoting *State Farm*, 538 U.S. at 425).  *Third*, "requiring a 1-to-1 ratio whenever a defendant asserts that the compensatory damages are 'substantial' would impose a 'bright-line ratio' that the Supreme Court has expressly declined to adopt."  *Id.*  In *Cote*, the Eleventh Circuit affirmed a $20.7 million punitive damages award with a damages ratio of 3.3-to-1 because it was not constitutionally excessive.  *Id.* at 849, 850.  Here, the ratio is similar—

3.7:1—and is also not constitutionally excessive.

### 3. The Court's punitive damages award is consistent with available civil penalties.

The third guidepost looks at "the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418.  The Court should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583.  Even so, "[t]his guidepost is 'accorded less weight . . . than the first two guideposts." *Cote*, 985 F.3d at 850.

Autoliv says that the closest comparable civil penalties are those authorized by 49 U.S.C. § 30165(a) for violating certain aspects of the National Traffic and Motor Vehicle Safety Act of 1966, as amended.  Doc. 543 at 26-27.  Autoliv correctly notes that in 2004, when Mr. Andrews' Mazda3 was manufactured, $15 million was maximum civil penalty under that section. *Id.* at 27.

Once again, however, Autoliv omits relevant context.  *First*, as part of the Safety Act, § 30165 is not the only relevant civil penalty statute.  Congress has made clear the Federal Motor Vehicle Safety Standards are only "a minimum standard for motor vehicle or motor vehicle equipment performance."  49 U.S.C. § 30102(10).  Congress has also made clear that compliance with those minimum standards "does not exempt a person from liability at common law."  49 U.S.C. §

29

30103(e).  Because the Safety Act leaves manufacturers still subject to the

common law, that means § 30165 is not the only relevant civil penalties statute:

Georgia's punitive damages statute is also a relevant statute for comparison.

Products liability cases are one of the very few instances in which Georgia

law allows for uncapped punitive damages.  Applying that statute, the Georgia

Court of Appeals in 1994 concluded that a $101 million[18] punitive damages award

was "not unreasonable and rationally served the purpose of punishing and

deterring" given the deterrent effect that the award was supposed to achieve, "the

public nature of the harm in this case, the corporate defendant . . . involved, and the

protection afforded by the statutory 'one award' provision" despite the

manufacturer's compliance with the minimum federal safety regulations.  *Gen.*

*Motors Corp. v. Moseley*, 447 S.E.2d 302, 312 (Ga. Ct. App. 1994) (physical

precedent).  *Moseley* thus provided Autoliv adequate notice that it could face a

punitive damages award of $100 million if its conduct warranted it.

*Second*, a manufacturer that knows about a safety-related defect but does not

notify the appropriate federal authority and the "owners, purchasers, and dealers of

the vehicle or equipment of the defect or noncompliance" can face civil penalties.

---

[18] Using a conservative average inflation rate of 2.15% (based on the Consumer
Price Index), $100 million in 1994 would be roughly $181.6 million today.

49 U.S.C. § 30118(c).  That obligation is ongoing and did not end when the

product was sold.  And today, unlike in 2004, those penalties can be up to $105

million under § 30165(a).  Thus, the Court's $100 million punitive damages award

does not, as Autoliv claims, "substantially exceed" the available civil penalties.

*Contra* Doc. 543 at 27.

Because the Court's punitive damages award is comparable to the civil

penalties authorized or imposed in comparable cases, this guidepost favors a

finding that the punitive damages award is not constitutionally excessive.

> **B.     The Court's punitive damages award does not violate the Excessive Fines Clause of the Georgia Constitution.**

The Excessive Fines Clause of the Georgia Constitution does not prohibit

the Court's punitive damages award.  The Georgia Supreme Court has never held

that the Excessive Fines Clause applies to punitive damages in a civil case.

Autoliv cites only the plurality opinion in *Colonial Pipeline Co. v. Brown*, 365

S.E.2d 827 (Ga. 1988), for its argument that the Excessive Fines Clause applies to

punitive damages.  But *Colonial Pipeline* contains no such holding.

To be sure, *Colonial Pipeline* confusingly says "*[w]e hold* that the excessive

fines clause . . . applies to the imposition of punitive damages in civil cases."  365

S.E.2d at 831 (emphasis added).  But only three of seven justices joined that

31

portion.[19]  The plurality's statement is not binding Georgia precedent.  *See*

*Schoicket v. Georgia*, 865 S.E.2d 170, 176 (Ga. 2021) ("Language that sounds like

a holding—but actually exceeds the scope of the case's factual context—is not a

holding no matter how much it sounds like one.").[20]

Since 1988, the Georgia Supreme Court has referenced the Excessive Fines

Clause of the Georgia Constitution and punitive damages together only twice.  In

both, the Court rejected the excessive fines challenge practically out of hand.

The first case is *Hospital Authority of Gwinnett County v. Jones*, 386 S.E.2d

120 (Ga. 1989), *affirmed & reinstated on remand*, 409 S.E.2d 501 (Ga. 1991).

There, the Court cited *Colonial Pipeline* for the proposition that courts can

---

[19] *See* 365 S.E.2d at 833 (Weltner, J., concurring specially) (concurring in the "judgment reversing the award of punitive damages" but doing so because "such a result properly is reached without considering the scope of our state constitution's prohibition of unusual punishments"); *id.* (Clarke, P.J., dissenting and joined by Gregory & Hunt, JJ.) (dissenting from the opinions of the plurality and Justice Weltner because "the award of punitive damages by the jury in this case is authorized by law").

[20] Autoliv notes that two Georgia Supreme Court cases have "cited the *Colonial Pipeline* plurality with approval."  Doc. 543 at 28 n.31.  Not exactly.  Each case cites *Colonial Pipeline* in a footnote string cite to illustrate the truism that state courts can interpret a state constitutional provision that parallels the federal constitution so that it affords greater protection to the state's citizens.  *See Democratic Party of Ga. v. Perdue*, 707 S.E.2d 67, 74 n.12 (Ga. 2011); *Powell v. Georgia*, 510 S.E.2d 18, 22 n.3 (Ga. 1998).  Regardless, *Colonial Pipeline*'s inclusion in a string cite cannot turn nonbinding dicta into binding precedent.

consider the relationship between punitive and actual damages because it may be relevant to the question of excessiveness. *Id.* at 123. Given the facts of that case, the Court found no violation of the Excessive Fines Clause. *Id.*

The second case is *Mack Trucks, Inc. v. Conkle*, 436 S.E.2d 635 (Ga. 1993). There, the defendant challenged the punitive damages award as excessive under the Due Process Clauses of the Georgia and U.S. Constitutions; the Eighth Amendment to the U.S. Constitution; and the Excessive Fines Clause of the Georgia Constitution. *Id.* at 640. Emphasizing its holdings in *Jones*, the Supreme Court held that the potential risk of harm from Mack Trucks misconduct supported punitive damages. *Id.* The entire excessiveness analysis is one paragraph.

No majority of the Georgia Supreme Court has ever reversed a punitive damages award under the Excessive Fines Clause of the Georgia Constitution. No case after *Colonial Pipeline* has seriously considered or addressed that argument. Clear and convincing (and often unrebutted) evidence supports the Court's punitive damages award. That award does not violate the U.S. Constitution, nor does it violate the Excessive Fines Clause of the Georgia Constitution.

**C.    The Court properly considered evidence of the financial condition of Autoliv, Inc.**

The Court was well within its discretion to consider the financial condition of Autoliv, Inc. in determining the appropriate amount of punitive damages.

33

Autoliv concedes that it made and lost this same argument in a motion in limine.

*See* Doc. 543 at 30.  Because Autoliv's Rule 59(e) motion cannot be used "to

relitigate old matters," the Court should reject Autoliv's repeated request to

completely disregard the evidence of Autoliv, Inc's financial condition and revise

the punitive damages award.  *See Michael Linet*, 408 F.3d at 763.[21]

## III.   THE COURT'S ALLOCATION OF FAULT TO AUTOLIV IS NOT CLEARLY ERRONEOUS.

The "credible" and "undisputed" evidence proved that Bosch played no part

in the nondeployment of the Mazda3's airbag.  All fault for the airbag's

nondeployment rests with Mazda.  Doc. 534 at 70-73.

At trial, Autoliv asked this Court to enter "a 'defense verdict' only."  Doc.

534 at 58 n.54.  During closing argument, Autoliv claimed that all blame for Mr.

Andrews' injuries and death lay with Mr. Andrews himself, Mazda, and Bosch.

---

[21] Autoliv speculates that the Georgia Supreme Court would prohibit evidence of a parent company's financial condition in a case involving a subsidiary absent piercing of the corporate veil.  Doc. 543 at 31-32.  That speculation is a red herring.  Questions of "relevance and admissibility of evidence in a case pending in federal court" are generally "governed by the Federal Rules of Evidence"; and while "state-court evidentiary rulings are nonetheless persuasive authority that the Court may look to for guidance," the Court's discretion is not limited by them.  *See* Doc. 534 at 89 n.72.  Autoliv, Inc. also falsely represented that "if in fact any Autoliv entity was involved in the design, testing, manufacture, or supply of components of the occupant restraint system …, it was Autoliv Japan, Ltd."  *See* Doc. 108 (stating Plaintiff dismissed other Autoliv entities in reliance on this representation).  Autoliv should not profit from that dishonesty.

The Court considered the evidence and concluded that "Autoliv has not established a rational basis for apportionment as to Mr. Andrews and Bosch, but has established a rational basis for apportionment as to Mazda."  Doc. 534 at 64. Autoliv claims that the Court committed a "clear error" that if left uncorrected will result in "a manifest injustice" by not allocating some fault to Bosch.  *See* Doc. 543 at 2, 33-34.  But the Court made no error—much less a "clear error."

Chris Caruso was the only expert called to testify about the airbag defects. He testified that the Autoliv airbag did not deploy because the electronic front sensor got disconnected before it could send a signal to the car's airbag control module (i.e., the blackbox).  10/6/21 AM, Trial Tr. 44/18-24, 87/12-24; Doc. 534 at 71-72.  He testified that Mazda, not Bosch, was responsible for that failure.  His testimony on this issue was "credible" and "unrebutted."  *Id.* at 73.  Without any other evidence, the Court had to conclude that Autoliv did not prove that Bosch was at fault.  The Court's allocation of fault is not clearly erroneous, and Autoliv's request for the Court to "change its mind" about that allocation should be denied.

## CONCLUSION

Autoliv's posttrial motion should be denied.

Respectfully submitted on February 21, 2022.

BUTLER PRATHER LLP

*/s/ James E. Butler, Jr.*

JAMES E. BUTLER, JR.
  jim@butlerprather.com
  Georgia Bar No. 099625
MICHAEL F. WILLIFORD
  michael@butlerprather.com
  Georgia Bar No. 243464
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

CANNELLA SNYDER LLC

TEDRA L. CANNELLA
  tedra@cannellasnyder.com
  Georgia Bar No. 881085
RORY A. WEEKS
  rory@cannellasnyder.com
  Georgia Bar No. 113491
315 W. Ponce de Leon Ave, Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365

BALLARD & FEAGLE, LLP

WILLIAM L. BALLARD
  bill@ballardandfeagle.com
  Georgia Bar No. 035625
GREGORY R. FEAGLE
  greg@ballardandfeagle.com
  Georgia Bar No. 256913

Building One, Suite 100
4200 Northside Parkway NW
Atlanta, GA 30327
(404) 873-1220

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in Times New Roman, 14-point font.


*/s/ James E. Butler, Jr.*

JAMES E. BUTLER, JR.
jim@butlerprather.com
Georgia Bar No. 099625

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on February 21, 2022, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of records follows:

Douglas G. Scribner, Esq.
Keith R. Blackwell, Esq.
Jenny A. Hergenrother, Esq.
William J. Repko III, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424


*/s/ James E. Butler, Jr.*
JAMES E. BUTLER, JR.
jim@butlerprather.com
Georgia Bar No. 099625