# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JAMIE LEE ANDREWS, as surviving spouse of Micah Lee Andrews, Deceased, and JAMIE LEE ANDREWS, as Administrator of the Estate of Micah Lee Andrews, Deceased, <br><br> Plaintiff, <br> v. <br><br> AUTOLIV JAPAN, LTD., <br><br> Defendant. | Case No. 1:14-cv-3432-SCJ |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO AMEND THE JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

Plaintiff's Response spills a lot of ink on insignificant matters, such as post-trial press releases and financial statements, but it does not show that Defendant Autoliv Japan, Ltd.'s ("Autoliv Japan") Motion should be denied.

## ARGUMENT

**I.    The Punitive Damages Award Should Be Eliminated Altogether.**

As Autoliv Japan has explained, the punitive damages award should be eliminated altogether because Georgia law does not authorize punitive damages in this case. *See* Motion at 2-13. In response, Plaintiff argues that Autoliv Japan has "fabricated" bright-line legal rules, that the subject seatbelt was an "extreme outlier,"

and that Autoliv Japan "consciously disregarded" Mazda concerns. These arguments mischaracterize Autoliv Japan's contentions and the evidence presented at trial.

### A. Autoliv Japan Has Not "Fabricated" Any Bright-Line Rules.

Plaintiff mischaracterizes Autoliv Japan's arguments, suggesting that Autoliv Japan is relying on bright-line rules that do not exist. First, Plaintiff submits that "Autoliv . . . argues that because it complied with applicable safety regulations, it cannot be subject to punitive damages." *See* Response at 9 (cleaned up). While the subject seatbelt did "compl[y] with applicable safety regulations" (*see* Judgment at 81), Autoliv Japan has not argued that this fact *alone* precludes punitive damages. Instead, Autoliv Japan has emphasized (as this Court found) that regulatory compliance is "some evidence of due care," and because punitive damages require "clear and convincing evidence of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences that will support an award of punitive damages," regulatory compliance cuts strongly against punitive damages. *See* Judgment at 81; *Stone Man v. Green*, 435 S.E.2d 205, 206 (Ga. 1993). That sets the bar for punitive damages even higher in this case.

The other evidence in this case does not clear that high bar. In its Motion, Autoliv Japan noted that unlike *General Motors Corp. v. Moseley*, 447 S.E.2d 302

(Ga. 1994) (physical precedent only)—another case in which the subject design complied with federal regulations—there is no evidence here that the defendant (Autoliv Japan) made any relevant engineering choices based on economic considerations.[1,2] *See* Motion at 4. In an attempt to dismiss this fact, Plaintiff responds stating that Autoliv Japan was seeking to apply a bright-line rule that "when [a] manufacturer complies with federal regulations, Georgia law allows punitive damages only if the manufacturer was motivated by economic considerations." *See* Response at 11 (cleaned up). Plaintiff again mischaracterizes Autoliv Japan's argument. Autoliv Japan simply highlighted that, when considering

---

[1] There is no evidence that selling a seatbelt with a 2.0 kN deployment threshold was more profitable for Autoliv Japan than selling a seatbelt with a higher threshold or a stop. Moreover, despite Plaintiff's speculation to the contrary, there is no evidence that Autoliv Japan was concerned that Mazda would have chosen another seatbelt supplier for the 2005 Mazda 3 if Autoliv Japan had expressly recommended a seatbelt with a higher deployment threshold (or a stop) over the subject seatbelt.

[2] The "cost reduction effort" that Plaintiff references on page nine of her Response refers to a cost-reduction suggestion that Plaintiff's seatbelt expert, interpreting Autoliv Japan documents, believes Autoliv Japan made. *See* Judgment at 30-31; Trial Tr. Vol. 3 P.M. at 84:22-88:10. To the extent Autoliv Japan made such a suggestion, it did so on a form (i.e., a VA/VE document) that Mazda required, as Mazda, not Autoliv Japan, attempted to realize cost savings. Trial Tr. Vol. 4 P.M. at 33:18-34:11. According to Plaintiff's expert, this particular suggestion involved changing the subject load limiter from a digressive load limiter to a non-digressive load limiter and made the seatbelt "weaker." *See* Response at 9; Trial Tr. Vol. 3 P.M. at 84:22-88:10. Regardless, however, there is no evidence that Mr. Andrews's likelihood of survival would have been any greater had his seatbelt included a digressive load limiter, making this VA/VE recommendation immaterial.

3

the evidence necessary for an award of punitive damages where applicable safety regulations have been met, Georgia appellate courts have placed significance on whether profit motives overrode safety considerations, which did not occur here. *See* Motion at 4 & n.2.

Plaintiff further misrepresents Autoliv Japan's arguments in suggesting that Autoliv Japan "fabricated" a bright-line rule that a seatbelt supplier cannot be liable for punitive damages "without evidence of the frequency with which airbags fail to deploy in crashes presenting a materially similar risk of serious head injuries." *See* Response at 13-14 (cleaned up). Autoliv Japan has not suggested that such a rule exists. Rather, Autoliv Japan has highlighted evidence that "it's very rare for an airbag not to deploy when it should" (Trial Tr. Vol. 5 A.M. at 53:6-18, 60:10-19) and explained that, in order to find that Autoliv Japan acted with wanton or conscious indifference to consumer safety on *the facts of this case*, there would have to be (at a minimum) evidence of the frequency with which airbags fail to deploy in crashes presenting a materially similar risk of serious head injuries and evidence that Autoliv Japan was aware of that frequency—neither of which is true here. *See* Motion at 7-8. This argument is not based on a bright-line *legal* rule, but rather the common-sense proposition that, on these facts, one cannot logically conclude that failing to change the seatbelt's design (to account for an airbag's potential failure to deploy)

reflects wanton or conscious indifference to safety unless there is some evidence of how frequently airbags fail to deploy in crashes like this one.

**B.     The Subject Seatbelt Was Not an "Outlier" in Any Material Way.**

Plaintiff also argues that punitive damages are appropriate because the subject seatbelt was an "extreme outlier" in terms of payout, as compared to the seatbelts in other vehicles in the same class. *See* Response at 4, 7, 12. Importantly, however, there is *no* evidence that the difference between the payout in the subject seatbelt and those other seatbelts would have made a difference for Mr. Andrews.

Indeed, Plaintiff only offered evidence that Mr. Andrews would have survived the subject accident if payout had been limited to six inches. *See* Trial Tr. Vol. 2 P.M. at 72:13-17, 74:11-14, 112:20-113:1. Plaintiff offered *no* evidence of survival had the payout been anything more than six inches. *See id.* And of the nineteen vehicles identified on Plaintiff's Trial Exhibit 1074[3], thirteen have driver seatbelts that are indisputably designed to pay out *more than six inches* if their airbags and pretensioners fail to deploy (as was the case here) because their driver seatbelts already pay out at least six inches *with airbag and pretensioner deployment* (which

---

[3] Plaintiff relies upon Plaintiff's Trial Exhibits 9 and 1074 to show the amount of payout by the vehicles in the 2005 Mazda 3's class during 35 mph NCAP testing.

limits payout).[4] Given how close their payout amount is to six inches *with* airbag and pretensioner deployment, the driver seatbelts within the remaining six vehicles almost certainly would pay out more than six inches without deployment.[5]

Accordingly, there is no evidence that Mr. Andrews would have survived the subject accident had the driver seatbelts in *any* of the other vehicles identified in Plaintiff's exhibits been incorporated into the 2005 Mazda 3. Thus, Plaintiff's characterization of the subject seatbelt as an "extreme" outlier is extremely overstated, and it is no basis for punitive damages.

Moreover, while Plaintiff's seatbelt expert Steven Meyer testified that there is "no benefit" to the design of the driver seatbelt in the 2005 Mazda 3, the seatbelt indisputably reduces chest forces on the occupant more so than the driver seatbelt in any other vehicle identified in Plaintiff's Trial Exhibits 9 and 1074.[6] It is also

---

[4] *See* Pl. Trial Ex. 1074 (identifying payout amounts during "35 mph NCAP Tests"); Trial Tr. Vol. 2 P.M. at 72:2-12 (Plaintiff's biomechanics expert testifying that 13 of the 19 vehicles identified on Exhibit 1074 have 6 inches of webbing payout); *id.* at 78:2-9 (testifying that NCAP tests involve airbag and pretensioner deployment); *id.* at 78:10-22 (admitting that webbing payout amount will increase if the airbag does not deploy); *id.* at 75:14-19 (testifying that a firing pretensioner takes out "2, 3 inches" of slack); Trial Tr. Vol. 5 A.M. at 55:8-56:10 (Autoliv Japan's seatbelt expert testifying that the payout amounts on Exhibit 1074 will increase without airbag and pretensioner deployment).

[5] *See id.*

[6] *See* Pl.'s Trial Ex. 9 (indicating that the driver shoulder belt load in the 2005 Mazda 3 during NCAP testing was "3,586.8 N"—the lowest of any vehicle identified).

6

undisputed that the design of a seatbelt reflects an engineering tradeoff between the avoidance of head injuries, on the one hand, and chest injuries, on the other.[7] Where precisely to strike the balance between these injuries is a reasonably debatable question, and differing views of the optimal balance does not clearly and convincingly show indifference to, or reckless disregard of, health and safety.[8,9]

### C. Autoliv Japan Did Not "Consciously Disregard" Mazda Concerns.

Within her Response, Plaintiff cherry-picks a sentence from David Prentkowski's testimony—"Mazda was not concerned, so we weren't concerned"—and uses it to suggest that Autoliv Japan "consciously disregarded" concerns raised by Mazda during product development. *See* Response at 4, 13. But that is not what Mr. Prentkowski was conveying. Under the fairest reading, Mr. Prentkowski testified that "Mazda was not concerned" during the time period *after official NCAP testing*. *See* Trial Tr. Vol. 1 P.M. at 33:17-34:5. Indeed, in the preceding sentence, Mr. Prentkowski noted that the vehicle achieved a "Four-star rating out of Five

---

[7] *See* Motion at 5 n.3 (excerpting relevant testimony).
[8] *See id.* at 6 (citing authorities).
[9] Autoliv Japan also notes that, while Mr. Prentkowski testified that Autoliv would sell a seatbelt with a threshold of less than 2.0 kN, he also testified that Autoliv would only do so "[i]f the seatbelt is designed, developed, properly tested, evaluated, [and] certified to meeting the regulatory and customer and other requirements." *See* Trial Tr. Vol. 4 P.M. at 76:18-24. Furthermore, while Plaintiff emphasizes that Autoliv has previously sold seatbelts with deployment thresholds of less than 2.0 kN, Plaintiff has not introduced evidence of any injuries caused by those designs.

7

Stars" on the "U.S. NCAP" test (which was conducted on December 17, 2003, after product development, but before "the Mazda3 was ever built" and sold to consumers[10]). And in follow up, Mr. Prentkowski stated that the vehicle "did very well in the NCAP . . . so there's no area to be concerned." *See id.* at 34:1-35:2. Mr. Prentkowski also clarified that Mazda did express concerns earlier in the process, as reflected by a January 2002 *pre-NCAP* document (Plaintiff's Trial Exhibit 126)— testimony Mr. Prentkowski would not have offered had he believed "Mazda was not concerned" during product development. *See id.* at 35:14-24.

Importantly, Plaintiff cannot rebut Mr. Prentkowski's testimony that Mazda was not concerned during the time period *after official NCAP testing* because there is no evidence to the contrary. Indeed, the Mazda "concerns" that Plaintiff emphasizes were raised in two documents that pre-date official NCAP testing— Plaintiff's Trial Exhibits 126 and 128—and both show that Autoliv was responsive. *See* Trial Tr. Vol. 1 P.M. at 31:7-38:8.[11] Thus, Mr. Prentkowski's testimony is not a basis for concluding that Mazda's concerns were "consciously disregarded."

---

[10] *See* Def. Trial Ex. 1151 at 1; Trial Tr. Vol. 5 A.M. at 53:24-54:2, 54:18-25; Trial Tr. Vol. 1 P.M. at 32:24-33:5.

[11] Specifically, in response to the "head bottoming" email in Plaintiff's Trial Exhibit 128, an Autoliv Japan representative responded indicating that the testing (and thus Mazda's concerns) may be skewed because it appears the simulation test at issue took place at 25 m/s, 90 km/h (56 mph)—a severe speed at which testing does not

8

**II. The Punitive Damages Award Should Be Reduced.**

**A. The Punitive Damages Award Violates the Due Process Clause.**

Despite Plaintiff's arguments to the contrary, the three constitutional guideposts demonstrate that the punitive damages award is excessive.

**1. Reprehensibility**

Autoliv Japan refers the Court to the reprehensibility arguments in its Motion and its rebuttal of Plaintiff's arguments in Section I *supra*, which demonstrate that the degree of reprehensibility here does not justify a $100 million punitive award.

**2. Ratio of Compensatory Damages to Punitive Damages**

**a. The Relevant Amount of Compensatory Damages**

For purposes of the constitutional ratio of compensatory to punitive damages, the wrongful death damages for the full value of Mr. Andrews' life should not be

---

take place (*see* Trial Tr. Vol. 3 P.M. at 115:18-20; Trial Tr. Vol. 4 P.M. at 19:14-21:11), a fact which Mr. Prentkowski tried multiple times to point out to Plaintiff's counsel. *See* Trial Tr. Vol. 1 P.M. at 31:7-14 ("Can I add to that, please?"); *id.* at 31:20-22 ("That is what the emails says, but I would like to look at Page 2 of this email, if I could please."); *id.* at 33:17-25 ("I tried to point you to another item . . . and I wasn't allowed to respond so . . ."); Trial Tr. Vol. 4 P.M. at 18:1-21:11. As for Plaintiff's Trial Exhibit 126, that document indicates that, because it had difficulties achieving its targets for the "US NCAP" (on which the 2005 Mazda 3 later received four stars), "[Mazda] intend[ed] to change to [a] higher load level, implement digressive load limiters or retractor pretensioners instead of R27LL." The document also indicates that Autoliv Japan, in response to Mazda's intended changes, submitted "[t]iming and costs" for such changes and was awaiting Mazda's decision.

9

counted as compensatory damages for several reasons, as explained by Autoliv Japan in its Motion. First, Georgia law does not permit the recovery of punitive damages in addition to full-value-of-life damages on a wrongful death claim, and as several courts have held, only those compensatory damages awarded on claims that gave rise to punitive damages should be counted toward the ratio.[12] And in any event, even if it might be appropriate in some cases to include compensatory damages awarded on claims other than those for which punitive damages were awarded, it is not appropriate to count Georgia wrongful death damages as compensatory damages in the ratio because, as the Georgia Supreme Court has explained, the measure of wrongful death damages is inherently punitive. *Bibbs v. Toyota Motor Corp.*, 815 S.E.2d 850, 859 (Ga. 2018) (stating that wrongful death damages are "punitive in nature" and "intended to make homicide expensive").[13] Treating wrongful death

---

[12] *See* Motion at 21. In response to this argument, Plaintiff relies exclusively on *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650 (E.D. Ky. 2009), an out-of-circuit, district court decision that decided otherwise. The greater weight of authority, however, supports Autoliv Japan's position on this question. *See* Motion at 21 n. 21. And in any event, *Fastenal* did not involve Georgia law, under which the measure of damages for wrongful death is inherently punitive. *See id.* at 22.

[13] In response to the Georgia Supreme Court's characterization of wrongful death damages as punitive, Plaintiff cites only *Bagley v. Shortt*, 410 S.E.2d 738 (Ga. 1991), claiming *Bagley* "categoriz[ed] wrongful death damages as compensatory." *See* Response at 24 n.17. *Bagley*, however, merely said that, "[i]n an action for bodily injury and wrongful death, the jury returned a verdict of $1,500,000 in compensatory damages and $14,000,000 in punitive damages." 410 S.E.2d at 738-39. It did not

damages as compensatory would both overstate the compensatory damages and understate the punitive damages.

In response, Plaintiff says that this Court should look not only to the actual compensatory damages awarded in this case, but also to hypothetical damages that could have been awarded for "potential" harm, citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). *See* Response at 23. But the Supreme Court and the Eleventh Circuit have only considered "potential" harm in connection with the ratio when the conduct at issue threatened great injury but (fortuitously) resulted in only negligible or minor harm.[14] That simply is not the case here; the seven-figure award of general damages does not suggest a negligible or minor harm.[15]

For ratio purposes, the relevant compensatory damages are the general and special damages for which Autoliv Japan is liable—roughly $1 million.[16]

---

specify which portions of the award were based on which claims, it did not characterize the nature of wrongful death damages, and in any event, it predates *Bibbs*.

[14] *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 (1993) (considering potential harm when the petitioner's conduct only resulted in $19,000 in actual damages); *SE Prop. Holdings, LLC v. Judkins*, 822 F. App'x 929, 936-37 (11th Cir. 2020) (considering potential harm when no compensatory damages were awarded).

[15] Potential harm is also irrelevant because Mr. Andrews died in the accident and was not "threatened with [] additional potential harm." *See BMW*, 517 U.S. at 582.

[16] *See Moseley*, 447 S.E.2d at 312 (describing ratio of punitive to compensatory damages as $101 million to $1, which excludes wrongful death damages awarded).

### b. The Ratio

With approximately $1 million (or $2 million without apportionment) in compensatory damages, the ratio of compensatory damages to punitive damages is approximately 100:1 (or 50:1) and shows that the punitive damages award is excessive—which Plaintiff does not dispute. *See* Motion at 23. But even if the relevant compensatory damages amount includes the wrongful death damages for which Autoliv is liable, the ratio still shows that the punitive damages award is unconstitutionally excessive, as the relevant compensatory damages amount would be $13.5 million (or $27 million without apportionment), and the ratio would be approximately 7.4:1 (or approximately 3.7:1). The former ratio is well in excess of the 4:1 ratio that, the Supreme Court has said, "might be close to the line of constitutional impropriety"—which Plaintiff does not dispute. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). And while the latter ratio is slightly below 4:1, the Supreme Court has stated that 4:1 may be excessive when compensatory damages are "substantial," which is the case here. *See id.*; Motion at 24-25.

For her part, Plaintiff emphasizes that, in *Cote v. Phillip Morris USA, Inc.*, 985 F.3d 840 (11th Cir. 2021)—a case in which there was a "substantial" compensatory damages award of $6.25 million—the Eleventh Circuit recently

upheld a ratio of 3.3:1, which is "similar" to the above-referenced 3.7:1 ratio in this case. *See* Response at 28. However, the degree of reprehensibility in *Cote* was extreme, as the defendant—tobacco company Phillip Morris USA—"for decades . . . engaged in a massive and effective disinformation campaign, aimed at instilling false doubt about scientific research linking cigarette smoking and deadly disease." See 985 F.3d at 844 (cleaned up). The degree of reprehensibility in this case does not come close to that in *Cote*. Accordingly, the ratio in this case should not be "similar" to the 3.3:1 ratio in *Cote*, much less exceed it.

### 3. Other Civil Penalties Authorized by Law

Plaintiff argues that the third guidepost—other civil penalties authorized by law—demonstrates that the $100 million punitive award is appropriate because, "today," the maximum amount of the closest comparable civil penalty is $105 million. *See* Response at 31. *Today's* maximum penalty, however, is irrelevant because Autoliv Japan could not have had notice of that when it supplied the subject seatbelt to Mazda.[17] Autoliv Japan was on notice of the $15 million maximum amount that existed at the time of the design and manufacture of the subject seatbelt,

---

[17] *See Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1210 (11th Cir. 2020) (stating that "available civil and criminal penalties" are considered "to determine whether [the defendants] had notice that they could be ordered to pay the amount awarded" (cleaned up)); *Clark v. Chrysler Corp.*, 436 F.3d 594, 608 (6th Cir. 2006) (analyzing the civil penalty as of "the time of the truck's design and manufacture").

and that amount is substantially less than the $100 million punitive damages award here, demonstrating the award's excessiveness.[18,19] *See id.*; Motion at 27.

### B. The Court Improperly Considered Evidence of Non-Party Autoliv, Inc.'s Financial Condition.

In response to Autoliv Japan's argument that the financial condition of its parent company should not have been considered as part of the punitive damages calculation, Plaintiff does not distinguish the authority Autoliv Japan cites. Instead, Plaintiff calls the argument a "red herring," arguing that consideration of a parent's finances is an evidentiary question of "relevance and admissibility," not a question of Georgia law. *See* Response at 34 n.21. It is Plaintiff's response that is a "red herring." Whether particular evidence is admissible in federal court to prove a particular fact is a question of federal law. *See* Fed. R. Evid. 401. But whether a particular fact is material to a state law claim is governed by state law.[20] Here,

---

[18] Plaintiff also argues that *Moseley* put Autoliv Japan on notice that it could face a $100 million punitive award. *Moseley*, however, is insignificant in this regard as it is physical precedent only, was decided pre-*BMW*, and only discusses the constitutionality of the punitive damages award in dicta. *See* 447 S.E.2d at 311-12.
[19] In opposition to Autoliv Japan's Excessive Fines Clause argument, Plaintiff emphasizes that *Colonial Pipeline Co. v. Brown*, 365 S.E.2d 827, 831 (Ga. 1988) was a plurality decision (correct), but also argues that *Colonial Pipeline* has not been cited with approval (incorrect). The Georgia Supreme Court has cited the plurality opinion favorably for its constitutional interpretation. *See* Motion at 28 n.31.
[20] *See VTS Transp., Inc. v. Palm Beach Cnty.*, 239 F. Supp. 3d 1350, 1352 (S.D. Fla. 2017) ("The substance of the relevant law dictates whether a fact is material.").

14

Autoliv Japan does not dispute the *admissibility* of any particular evidence offered to establish its parent's financial condition; rather, it contends that the parent's financial condition is not *a fact that is material* to the determination of punitive damages (at least absent proper evidence of corporate "abuse") under Georgia law.

### III. The Compensatory Damages and Wrongful Death Damages Awards Should Be Reduced.

Plaintiff does not dispute that the evidence demonstrates that Bosch would have been liable under Georgia's products liability statute—the same statute under which the Court held Autoliv Japan liable—had Bosch been a defendant at trial. Moreover, Plaintiff concedes that Bosch was a joint tortfeasor. *See* Dkt. No. [541] at 13; Dkt. No. [545] at 14. Given these circumstances, holding Autoliv Japan liable, but not apportioning fault to Bosch, would be a manifest injustice.[21]

Respectfully submitted this 11th day of March, 2022.

/s/ William J. Repko III, Esq.

---

[21] Finally, Plaintiff suggests that Autoliv Japan has improperly withheld insurance documents. That is not true. *See* Response at 16 n.12. During discovery, Autoliv Japan produced information related to its primary insurance coverage ($25 million), including the relevant policy. However, Autoliv explicitly objected to the production of excess insurance coverage information, making Plaintiff fully aware, more than six years ago, that Autoliv Japan potentially had excess insurance coverage. But Plaintiff chose not to challenge Autoliv Japan's objection during discovery—an implicit concession that Plaintiff, like Autoliv Japan, did not believe that more than $25 million of coverage was relevant. To the extent Plaintiff believes that excess insurance coverage is now relevant to her post-judgment collection efforts, Autoliv Japan will provide that information in response to an appropriate discovery request.

| | |
|---|---|
| ALSTON & BIRD LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309-3424<br>(404) 881-7000 (telephone) | Doug Scribner, Esq.<br>Georgia Bar No. 632755<br>doug.scribner@alston.com<br>Keith R. Blackwell, Esq.<br>Georgia Bar No. 024493<br>keith.blackwell@alston.com<br>Jenny A. Hergenrother, Esq.<br>Georgia Bar No. 447183<br>jenny.hergenrother@alston.com<br>William J. Repko III, Esq.<br>Georgia Bar No. 301797 |
| *Attorneys for Autoliv Japan, Ltd.* | jay.repko@alston.com |

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in Times New Roman, 14 point font.

/s/ William J. Repko III, Esq.
Doug Scribner, Esq.
Georgia Bar No. 632755
doug.scribner@alston.com
Keith R. Blackwell, Esq.
Georgia Bar No. 024493
keith.blackwell@alston.com
Jenny A. Hergenrother, Esq.
Georgia Bar No. 447183
jenny.hergenrother@alston.com
William J. Repko III, Esq.
Georgia Bar No. 301797
jay.repko@alston.com

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 (telephone)
(404) 881-7777 (facsimile)

*Attorneys for Autoliv Japan, Ltd.*

# CERTIFICATE OF SERVICE

  This is to certify that on March 11, 2022, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

    James E. Butler, Jr.
    Michael F. Williford
    BUTLER PRATHER LLP
    2719 Buford Highway
    Atlanta, Georgia 30324

    Tedra Cannella
    Rory Weeks
    CANNELLA SNYDER LLC
    Post Office Box 1399
    Decatur, Georgia 30031

    William L. Ballard
    Gregory R. Feagle
    BALLARD & FEAGLE, LLP
    4200 Northside Parkway NW
    Atlanta, Georgia 30327

    ***Attorneys for Plaintiff***

      /s/ William J. Repko III
      William J. Repko III
      Georgia Bar No. 301797