```
 1                    UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF GEORGIA
                           ATLANTA DIVISION
 3

 4
   JAMIE LEE ANDREWS, AS              )
 5 SURVIVING SPOUSE OF MICAH LEE      ) DOCKET NO. 1:14-CV-3432-SCJ
   ANDREWS, DECEASED, AND JAMIE       )
 6 LEE ANDREWS, AS ADMINISTRATOR      )
   OF THE ESTATE OF MICAH LEE         )
 7 ANDREWS, DECEASED,                 )
                                      )
 8                   PLAINTIFF,       )
                                      )
 9      -VS-                          )
                                      )
10 AUTOLIV JAPAN, LTD.,               )
                                      )
11                   DEFENDANT.       )
   _____
12                    TRANSCRIPT OF MOTIONS PROCEEDINGS
13               BEFORE THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT JUDGE
14                   WEDNESDAY, APRIL 6, 2022

15
   APPEARANCES:
16
   ON BEHALF OF THE PLAINTIFF:
17
    TEDRA L. CANNELLA, ESQ.
18  JAMES E. BUTLER, JR., ESQ.
    RORY A. WEEKS, ESQ.
19
   ON BEHALF OF THE DEFENDANT:
20
    DOUGLAS G. SCRIBNER, ESQ.
21  WILLIAM J. REPKO, III, ESQ.
    JENNY A. HERGENROTHER, ESQ.
22  JUSTICE KEITH BLACKWELL

23
               VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
24      OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT COURT
25                       ATLANTA, GEORGIA
                  VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1              (HELD IN OPEN COURT AT 10 A.M.)

 2         THE COURT:  Good morning, y'all.  Before we get started

 3    this morning, last week the judges for the Northern District of

 4    Georgia met and we decided that you no longer are required to wear

 5    masks while walking in the hallways of this building.  We've also

 6    decided each judge will decide on his or her own room how they

 7    will handle matters as far as their courtroom.  My position is if

 8    you want to wear a mask, please put a mask on.  If you don't want

 9    to wear a mask, you don't have to wear a mask.

10         With that stated, Ms. Wright, will you call the case for

11    today.

12         THE DEPUTY CLERK:  Yes, sir.  The Court calls the matter

13    of Jamie Lee Andrews v. Autoliv, Case No. 1:14-cv-03432-SCJ.

14         THE COURT:  Representing the plaintiff this morning?

15         MR. BUTLER:  James E. Butler, Jr., Tedra Cannella, and

16    Rory Weeks.

17         THE COURT:  Okay, thank you.  Representing the defense?

18         MR. SCRIBNER:  Yeah, Douglas Scribner, Jenny

19    Hergenrother and Justice Keith Blackwell.

20         THE COURT:  We have three motions to deal with today.

21    One shouldn't take too long.  The first motion is the plaintiffs'

22    motion for damages under O.C.G.A. 9-11-68(e).  This is a Document

23    535 on the docket.

24         The defendants asked for a summary response to

25    the -- frivolous claims for defense for the plaintiff.  On March
```

1   31st of this year, the plaintiffs filed what they claim frivolous

2   claim defenses.  You all asked for a schedule, Mr. Scribner.  I

3   first decided about having your schedule starting on March 31st to

4   respond to these defenses and claims, but to be fair, I'm going to

5   start -- I'll give you 14 days from today to respond to it, and

6   then you all, Mr. Butler, you have 14 days to reply.

7           MR. BUTLER:  I don't quite follow.  What are they

8   responding to, Your Honor?

9           THE COURT:  In defendant's Docket 535 filed on

10  January 8, 2022, defendants asked for -- they filed a summary

11  response, and they requested a briefing schedule once plaintiff

12  fully identified all privileged claims and defenses that

13  plaintiffs will be presenting.  Y'all filed that on March 31 of

14  this year.  On March 31 plaintiffs filed a bench brief and set

15  forth all the privileged claims and defenses.

16          MR. BUTLER:  Your Honor, 14 days from today for them to

17  respond to the bench brief?

18          THE COURT:  And then y'all will have 14 days then to

19  respond.

20          MR. SCRIBNER:  May I be heard on this, Your Honor?

21          THE COURT:  Yes.

22          MR. SCRIBNER:  You anticipated my first motion, which

23  was to continue this until we receive adequate information to

24  assess the claims specifically --

25          THE COURT:  Yes.

1          MR. SCRIBNER:  -- they claim are frivolous.  I don't

2  know if you saw this, but yesterday we received three affidavits

3  in the afternoon.

4          THE COURT:  Yes, sir.

5          MR. SCRIBNER:  This morning I received what I believe --

6  I'll let Ms. Cannella speak to this, a binder of information upon

7  which they have an expert who is going to testify about the

8  reasonableness of the fees.  I'm receiving this for the first

9  time.  I've just scanned it.  I haven't seen any of these

10  documents.

11          THE COURT:  You're ahead of me.  I haven't seen it at

12  all.

13          MR. SCRIBNER:  But my point to all this is -- and this

14  is what we wanted from the very beginning -- the law in Georgia

15  says that you can't just say "I claim fees," unless this court

16  says everything we did for seven years was frivolous, and I refuse

17  to believe that you are going to do that.

18          If they identify something specific, then they have to

19  allocate attorney's fees to that frivolous action.  We haven't

20  seen any of that.

21          So the way this is supposed to work is not only,

22  respectfully, Your Honor, should I have time to respond to that

23  brief, but if they had an expert who is going to opine and say, "I

24  allocate $2,433 to that affirmative defense that you filed," we

25  should have the opportunity to get our own expert to vet that.  So

1    we just aren't there yet.

2            THE COURT:  Let me say this, Mr. Scribner.  I don't know

3    anything about what you just said this morning, this expert.  I

4    didn't take a quick look at my docket this morning before I came

5    in.  So I will also give you time to get your own expert and be

6    prepared to respond to their experts.  Obviously, we're going from

7    a 14-day schedule to a longer schedule.  So while you're standing

8    there, what type of time period do you need?

9            MR. SCRIBNER:  Well, you know, I don't want to delay

10   this.  I know that when we filed our original motion, we knew you

11   were going to have a hearing, and we wanted this in advance of the

12   hearing so we could conduct our work and finish this case.  But I

13   think I have the right to get all documents upon which their

14   experts rely.  The affidavits you saw yesterday include -- I think

15   Mr. Weeks said he had time entries.  We don't have those.  E-mails

16   were reviewed.  I need to know what literature they're relying

17   upon.  It's an expert disclosure.  I would ask for expert

18   disclosures for anyone who is giving an expert opinion in this

19   case.

20           I don't know who this gentleman is who prepared this

21   binder, but I would like a disclosure for him, and I would like a

22   disclosure certainly from Ms. Cannella because she has said in her

23   affidavit she is opining as to the reasonableness of the fees.  I

24   just want to follow the Federal Rules.  If they get us a

25   disclosure, we have time to counter with our own expert, to the

1  extent we need one.  But what I'm looking for, Judge, is an

2  opinion that I can vet and examine, tie it to particular claims,

3  and then we can have a hearing on this.  How much time will that

4  take?  It sort of depends, right, on what I'm going to get.

5           THE COURT:  Well, I may have to do this.  I may just

6  give a schedule to the plaintiffs on getting this information to

7  you on the expert disclosures and disclosure from Ms. Cannella,

8  and then sort of work backwards.

9           MR. SCRIBNER:  Yes.

10          THE COURT:  So hold tight for a second, and you'll be

11  back up until I speak to Ms. Cannella and Mr. Butler.

12          MR. SCRIBNER:  Thank you.

13          THE COURT:  Mr. Butler.

14          MR. BUTLER:  Yes, sir.  One moment.

15          Yes, Your Honor.  Thank you.

16          We do have an expert witness here, his name is Mr. Alan

17  Hamilton, and we would respectfully request the opportunity to put

18  up his testimony with respect to the reasonableness of attorney

19  fees.  It will be factual testimony.

20          THE COURT:  How is Mr. Scribner going to cross-examine

21  him?  He said he didn't know anything about it until this morning?

22          MR. BUTLER:  Well, the problem with Mr. Scribner's

23  motion for continuance and the entirety of his argument is this:

24  Rule 68(e), which is what I'm going under here, is very clear.

25  This is an issue to be decided at the conclusion of the trial.

1              If we had a jury trial, we could have done this at the
2    conclusion of trial, but we didn't have a verdict.  So we had to
3    wait until we had a verdict.  But if it was a jury trial, the jury
4    would come out and give a verdict, and the judge would send them
5    back in, and then we would have a conference and then they would
6    come back out for this testimony, which is an expert witness.
7              THE COURT:  I agree with all that.  My question is,
8    Mr. Butler, why didn't you tell Mr. Scribner who this expert was
9    going to be as soon as you determined it?  In other words, there
10   is no way I can go forward with expert testimony this morning if
11   he just got it.  If you found out about this whenever, tell Mr.
12   Scribner.  Then I could say, Mr. Scribner, you knew you should
13   have been prepared.  But y'all are not denying you just told him
14   this morning.  So I can't make him cross-examine somebody when he
15   didn't even know who they are.  He just found out who they were.
16             When did y'all know about this expert?
17             MR. BUTLER:  Pardon?
18             THE COURT:  When did y'all know about you were going to
19   have this expert?  When did you hire this expert to testify in
20   this matter?
21             MR. BUTLER:  We didn't hire him.  He is testifying for
22   us.
23             THE COURT:  When did you decide you were going to use
24   him?
25             MR. BUTLER:  What's today?  Wednesday last week.  Last

1  week.

2       THE COURT:  Could you not have told Mr. Scribner

3  Wednesday of last week?

4       MR. BUTLER:  Perhaps, we should have.  We would have the

5  same objection we've got now.

6       THE COURT:  Yes.

7       MR. BUTLER:  We thought this was a proceeding that --

8  and I -- it's not what you would call complex.  Mr. Scribner has

9  practiced law -- I forget what his declaration filed years ago

10 said, 25 years or so.

11      THE COURT:  I don't deny Mr. Scribner is an excellent

12 attorney, but even great attorneys have to be prepared.

13      MR. BUTLER:  Well, my point is that Mr. Hamilton simply

14 is going to testify that the contingency fee agreement was

15 reasonable.  That's the thrust of his testimony.

16      THE COURT:  Mr. Butler, I understand your argument, but

17 I'm just going to tell you, I'm not going to go forward with this

18 expert this morning.  Mr. Scribner has a right to be prepared for

19 this expert.  I don't doubt Mr. Scribner is an excellent attorney.

20 I've seen that firsthand, but I'm not going to make him go

21 forward.

22      MR. BUTLER:  Yes, sir.  Let me respond for the record to

23 the balance of some things that Mr. Scribner just said.

24      First with respect to documents in the binder.  They're

25 all from the record or from Ms. Cannella's affidavit.

1          Second, the -- with respect to Mr. Scribner's position

2    that we have to identify time spent and expenses spent on the

3    particular conduct that we contend was frivolous.  We don't agree

4    with that at all.  That's a legal question.  The Court can decide

5    that.  Mr. Scribner can brief it in his 14 days, and we'll

6    respond.

7          This is not a Rule 68(b) offer of settlement, attorney's

8    fees proceeding.  It's a Rule 68(e) proceeding for general

9    damages, which under the statute may include attorney fees and

10   expenses.  But this is a proceeding to recover general damages for

11   what Ms. -- Autoliv has put Ms. Andrews through, plus attorneys

12   fees and expenses.  That's a crucial distinction.

13         The definitions that are applied to a Rule 68(e) statute

14   are those in the Georgia abusive litigation statute 51-7-80, et

15   seq., which has been on the books since 1988.  I'm very familiar

16   with that.  We also don't deny with the help of the then Mark

17   Groover (phonetic) who wrote that statute a long time ago.  The --

18   and that's all for my response.

19         Your Honor, if the Court is inclined to continue the

20   hearing, you want us to give expert disclosures for Mr. Hamilton;

21   is that correct?

22         THE COURT:  Correct.  And Mr. Scribner also requests a

23   disclosure of Ms. Cannella.

24         Let me say this, Mr. Butler.  I understand what you're

25   saying.  But here's what we're going to come down.  So I want to

1    prepare you, just based on hearing what Mr. Scribner said.  He's

2    probably going to challenge some of y'all's time on these time

3    records on which you spent.  He didn't say that, but I've learned

4    to read between the lines.  He might accept what y'all -- but he

5    wants to see time records; correct?

6           MR. SCRIBNER:  Yes.  Yes, of course.  They have not

7    produced any time records.  They are a contingency law firm.  And

8    so what we have is an affidavit from Ms. Cannella saying, I think,

9    e-mails in the case were produced; there were 4,000 of them.  I'm

10   going to give a .5 for each lawyer of the firm that received an

11   e-mail.  So, yeah, I believe that is under speculation and we're

12   going to challenge that.

13          But the more fundamental issue -- two things:

14   Mr. Butler said we had received this stuff.  Not true.  I just

15   received these this morning.  I have never seen these two

16   documents.  A depositions index, expenses incurred, I have not

17   seen these documents.  It's not true.  What he just said is not

18   true.

19          Number two, we still don't know what the claim is in

20   terms of what was frivolous.  Instead, what we have is an

21   affidavit and a brief that says everything is frivolous.

22          MR. BUTLER:  Your Honor, that's not true.

23          THE COURT:  Hold on.  One at a time.

24          MR. SCRIBNER:  Let me finish, please.

25          Everything was frivolous, which is why their fees --

```
 1  they don't limit them to any specific claim.  They just say I want
 2  all my fees, which are $11 million, according to them, and they
 3  have a contingency fee arrangement.  So it should be more than $11
 4  million, presumably.  And I'm hearing this from an affidavit the
 5  day before the hearing.
 6          Here is what I would respectfully request.  Ms. Cannella
 7  respectfully in her affidavit says, I am giving an opinion.  That
 8  makes her an expert.  I want an expert disclosure from
 9  Ms. Cannella and Mr. Hamilton, just like you would -- I may
10  counter designate an expert of my own; I may not.
11          But what I really want more than anything else, though,
12  Judge -- and we've said this from the very beginning -- if you're
13  going to take a position that a particular defense or a claim was
14  frivolous, identify it and tie it to legal fees.  Otherwise, we
15  are going to have a zany hearing where somebody just comes in and
16  says, I've got $11 million in damages, and, Judge, you figure out
17  which of these claims it's attributable to.  That's not fair.
18  That's not fair to the defense.
19          THE COURT:  I'm going to tell you, Mr. Scribner, that's
20  not going to happen.
21          MR. BUTLER:  May I respond, Judge?
22          THE COURT:  Yes, please.
23          MR. BUTLER:  All right, first with respect to use of
24  words like zany.  Mr. Scribner is wrong as a matter of law.
25          To recover Rule 68(e), that -- general damages which may
```

 1   include attorney fees, plaintiff is not required to provide time

 2   records for all of the time that plaintiffs' counsel spent on the

 3   case.  That's a matter of law.  Mr. Scribner is dead wrong.

 4           Plaintiff is not required to slice and dice the time and

 5   effort they spent on the case and allocate a certain portion of it

 6   to particular defenses that plaintiff claims were frivolous.

 7   We're not required to do that.  That would be an impossibility.

 8   We're not required to do the impossible.

 9           With respect to what claims the defense says are

10   frivolous, those were stated in the brief and they are stated

11   again in Ms. Cannella's affidavit.  Now, there are others that we

12   could claim are frivolous, but for purposes of Rule 68(e) we've

13   got enough.

14           For example, for seven years this defendant denied that

15   the airbag what was defective, which changed everything about the

16   case.  And not until the morning of October 4 in 2021, the first

17   day of trial, did this defendant come in and admit the airbag was

18   defective.  Had Autoliv, the world's largest supplier of airbags

19   and seat belts, admitted that from the beginning, as they should

20   have, Mazda would have had no defense, the settlement with Mazda

21   would have been for a lot more money, and Autoliv would have had

22   to defend.  Because as the Court recalls, you put it in their

23   judgment, Autoliv knew airbags failed.  Autoliv knew the

24   consequences of an airbag failing in this car with this seat belt

25   was going to be a catastrophic injury or death because the

1  seatbelt was useless if the airbag didn't work.

2          So with respect to Mr. Scribner's statement that we

3  claim everything is frivolous, again, I refer to the bench brief

4  and Ms. Cannella's affidavit.  That's simply not correct.

5          Now, if the Court directs a hearing be continued and

6  that we give expert disclosure, we will certainly do that.

7  Ms. Cannella's affidavit is her expert disclosure.  It's got -- I

8  forget how many paragraphs.  It's really long.

9          THE COURT:  Let me ask you this, Mr. Butler.  It is your

10  position that you already specified what your frivolous claims

11  are, and Mr. Hamilton is an expert and Ms. Cannella is an expert.

12          Here is what I plan on doing at the end of this hearing.

13  I'm going to draft an order, and the order is going to tell y'all

14  to make findings.  I'm going to tell you what schedule I want on

15  it.  But if y'all take the position that you have specific ones in

16  there, then I will make you file one, and I will go through and

17  look to see what they are.  If they're there, fine; and if they're

18  not there, fine.  And then this order is also going to give y'all

19  a schedule, when you're going to do disclosures.  It's almost

20  going to be like a discovery order, even though I don't like to

21  use the word "discovery," because we're not reopening rediscovery.

22  It's going to outline a time limit when things have to be filed

23  and responded to, and we're going to have a set hearing date.  So

24  I will probably have this case a little while longer.

25          So anything else y'all need to tell me?  Because you're

1   going to get an order probably next week outlining everything I

2   just talked about.  So now is the time to tell me.  Because after

3   that, that's how I'm going to proceed.

4          MR. BUTLER:  Yes, Your Honor.

5          And just for the record, because the hearing is going to

6   be continued, I do want to put in the record and proffer up and --

7   may I hand the Court an exhibits?

8          THE COURT:  Yes, sir.

9          MR. BUTLER:  And I also hand it to the defendants.  This

10  is plaintiffs' Exhibit 1184, which is a document filed by Autoliv,

11  Inc., on January 28, 2002, with the U.S. Securities and Exchange

12  Commission.  It's a Form 8K, and under the law, as I understand it

13  and as indicated in this document, Autoliv, Inc., has to file this

14  with the SEC.  This is an excerpt.  The whole thing is, I forget

15  how long, 48 pages, I think.  We have no objection to Autoliv

16  submitting the whole thing.

17         But if you look over here at page 5 -- let's see.  No,

18  page 6, this is -- and the reason I bring this up, one of the

19  frivolous defenses we're going to argue about is one mentioned in

20  Autoliv's motion to amend the Court's judgment.  And that is the

21  claim that the Court was wrong in considering the financial

22  situation, circumstances of Autoliv, Inc., rather than just as

23  well as Autoliv Japan, Ltd.  That's in their motion to amend that

24  the Court's got.  They also argued that at trial.  Here is

25  Autoliv, Inc., filing a required SEC document, Form 8K, and on

1    page 6 at the bottom it says that Autoliv -- that the State of

2    Georgia returned a verdict against Autoliv in a wrongful death

3    products liability lawsuit stemming from a fatal car accident in

4    2013.

5              If you read on, it says, entered an order requiring

6    Autoliv to pay about approximately $113.5 million.

7              The last paragraph on that page says the company,

8    supported by its legal counsel, believes the Court's verdict was

9    in error.  The company is defined in this document to be, quote,

10   Autoliv, Inc., close quote.

11             THE COURT:  Mr. Butler, I don't want to argue it right

12   now.

13             MR. BUTLER:  All right.

14             THE COURT:  You're going to have a hearing to argue it.

15             MR. BUTLER:  This document also reveals -- and this will

16   be another -- add it to our list.

17             THE COURT:  Mr. Butler, I'm giving y'all a hearing to

18   argue what the frivolous claims are.

19             MR. BUTLER:  Yes, sir.  I will pause, but I said the

20   frivolous things are included in the bench brief and

21   Ms. Cannella's affidavit.  I want to correct that by saying that

22   Autoliv, Inc.'s argument they've made, we also believe to be

23   frivolous.  And there is also proof in this document they

24   concealed documents.

25             Thank you, Your Honor.

```
 1                THE COURT:  All right.  Thank you.

 2                Any last words on this particular motion?

 3                MR. SCRIBNER:  One thing, Your Honor, and I will stick

 4    to these issues.  I think that's what we were originally talking

 5    about.  There is not a lot of case law on 9-11-68(e).  The case

 6    law that we reviewed said very clearly that to the extent -- and

 7    if a frivolous claim or defense is made, you get fees caused by

 8    that defense.

 9                If you look at 9-15-14, as a former state court judge,

10    I'm sure you're more familiar with that --

11                THE COURT:  Correct.

12                MR. SCRIBNER:  -- very similar standard, and what it

13    says as follows.  This is the Moore v. Hullander,

14    H-U-L-L-A-N-D-E-R, case, 345 Ga. App. 568.

15                THE COURT:  Give me that cite again.

16                MR. SCRIBNER:  Sure.  345 Ga. App. 568, it is a 2018

17    case.

18                I only reference this for the Court, Your Honor, because

19    of Mr. Butler's statement that he doesn't need to allocate and

20    apportion fees.  This is what Moore says:

21                "Moreover, when awarding attorney fees under O.C.G.A.

22    9-15-14(b), the trial court must limit the fees award to those

23    fees incurred because of the sanctionable conduct.  Thus, lump sum

24    or unapportioned attorney fees awards are not permitted in

25    Georgia, and we will vacate the remand for further fact finding
```

1   where the trial court's order on its face fails to show the

2   complex decision-making process necessarily involved in reaching a

3   particular dollar figure and fails to articulate why the Court

4   awarded one amount of fees rather than another," under

5   O.C.G.A. 9-15-14(b).

6           Here the trial court awarded a lump sum of $4,000 in

7   attorney fees without showing the complex decision-making process

8   necessarily involved in reaching that particular dollar figure,

9   and failed to articulate how the award was apportioned to include

10  only fees and expenses generated based on the sanctionable

11  conduct.

12          I say this -- and there are many, many cases like that,

13  Venta v. Mayton, 362 Ga. App. 264.  The point is this.  And you

14  see this, Your Honor, less in personal injury cases and more often

15  in commercial cases.  You may have three contract claims, and two

16  of which have a bona fide controversy; the third of which did not.

17  And the defendant moves for summary judgment and says just

18  asserting that claim was frivolous, and I had to spend time on my

19  summary judgment briefing, et cetera.  You can't say, like they

20  want to say here, they just said I have $11 million in fees.  I

21  want it all.  You can't do it.

22          What's going to happen, we all know this is going up to

23  the Eleventh Circuit, we're going to come right because you have

24  to apportion two of the claims that you claim are frivolous.

25          One last point, and that is, Mr. Butler said the

1   disclosure -- in the affidavit is the disclosure.  Well, the

2   affidavits reference documents.  If you're an expert, we all know

3   this, and you are relying on documents to opine, I get to see the

4   documents.  Thank you.

5          THE COURT:  Thank you.

6          The next motion we're talking about is the plaintiffs'

7   motion to amend and modify the Court's final order of judgment.

8   This is Document 536.  Plaintiffs' request amendment to judgment

9   in two ways:  Basically, they are talking about the Carmichael

10  case.  It is plaintiffs' argument that the Court was incorrect in

11  apportioning the amount, the whole amount -- the entire amount,

12  excuse me, should have been given over to Autoliv and not 50

13  percent to Mazda.

14         Plaintiffs' request the Court further modify the

15  judgment to include the amount of prejudgment interest that

16  Autoliv owes for failing to timely accept a settlement demand

17  under O.C.G.A. 51-12-14.  They're requesting $4,734,349.55.

18         Let me go back again to the apportionment aspect.

19  Plaintiffs' request the Court amend the judgment to include the

20  amount of compensatory damages omitted because of apportionment or

21  fault of Mazda of $13,509,671.70 was based on the case law issued

22  on November 1, 2021.  And it's the Carmichael case decided by the

23  Georgia Court of Appeals.

24         We are checking to see what the Georgia Court has or has

25  not done regarding this case, and I think as of yesterday they

 1  hadn't said anything.  But we have a former expert that is on that
 2  court that will kind of tell us what kind of time limit they're
 3  looking at to give us an answer on that.
 4        But both of y'all also indicated, you might as well
 5  forget about the Carmichael matter and look at it based on the
 6  amount of contributions Mazda and Bosch made to the plaintiffs.
 7        The plaintiffs indicated that they are willing to have
 8  the Court have a confidential agreement entered into between Bosch
 9  and Mazda.  And the plaintiffs' brief, as I understand it, y'all
10  will consider the Court having an in camera inspection to look at
11  the amounts privately.  Defense argued, I'm not quoting you
12  exactly, that y'all think the Carmichael case has been decided
13  incorrectly, and y'all will get something along with contributions
14  as well.
15        I will hear argument first from the plaintiffs, and then
16  response from the defense, and then the plaintiffs get last word
17  on this motion.
18        MR. BUTLER:  Your Honor, since the Court's not going to
19  take up the plaintiffs' Rule 68(e) motion today, may Mr. Hamilton
20  be excused?
21        THE COURT:  Yes, sir.
22        MR. BUTLER:  Thank you so much.  I think he's already
23  been excused.
24        THE COURT:  I think he read the tea leaves.
25        MS. CANNELLA:  Thank you, Your Honor.

1          Plaintiffs' motion to amend addresses two issues as you

2   stated, whether the interest should be added to the -- to the

3   judgment and in what amount.  And, two, whether apportionment

4   applies to this case or setoff.

5          On the first issue, Autoliv does not dispute the rate of

6   interest, the date of rejection or the number of days that

7   elapsed.  The verdict against Autoliv is over the demanded amount

8   of 9.5 million, so the interest is clearly owed.

9          And the only dispute left is whether the interest is

10  simple interest or whether it compounds annually.  Yes, Your

11  Honor.

12         On that issue, as our brief addresses, we have both the

13  statutory construction, the actual statute says that it is an

14  annual rate, and we also have the testimony of Mike Daniels, who

15  was the expert in this case, and who does economics all the time.

16  And he looked at the statute and said that that annual statement

17  means that it compounds annually.

18         So it seems like a pretty easy one, a pretty clear one.

19  If that's the case, then the total as of the time of judgment was

20  $4,734,349.55.  The letter was sent seven years ago today,

21  actually, is the -- is the -- is the anniversary of that.

22         The brief also points to O.C.G.A. 7-4-2, which states

23  that the legal rate of interest shall be seven percent per annum

24  simple interest, end quote.

25         Can I pass a copy of that up to the Court?

 1          THE COURT:  Yes.

 2          MS. CANNELLA:  Thank you.

 3          And so that's an example of the Georgia assembly saying

 4  this is how we explain you should do simple interest when you

 5  should do simple interest.  And that's actually really an

 6  interesting statute because it has that per annum statement, and

 7  then it clarifies simple interest.  Here we just have an annual

 8  rate.

 9          On the apportionment issue, the question is whether the

10  Court should apply binding precedent of Carmichael v. CVS, like

11  Judge Grimberg did in a recent case we cited in our brief and

12  which I have a copy here.

13          THE COURT:  I have it.

14          MS. CANNELLA:  Okay.  Thank you, Your Honor.

15          Autoliv argues that the Court should not follow that

16  binding precedent.  And as the Court is aware, the Georgia Supreme

17  Court decided a case called Alston & Bird v. Hatcher on August 10,

18  2021.  And that case said if there's one defendant when the case

19  was originally filed, then according to the plain language of the

20  apportionment statute, there is no apportionment.

21          On November 1, a couple weeks after trial ended, the

22  Georgia Court of Appeals decided CVS v. Carmichael, which says if

23  you get to trial and there is only one defendant left, then

24  Alston & Bird says there is no apportionment.  And as everybody

25  here knows, there is a petition for cert pending.  We don't know

1    if it is going to get granted.

2          THE COURT:  The word "brought" typically -- has a very

3    special meaning in this argument.  When this case was originally

4    brought, there was three defendants, and then through settlement,

5    by the time we got to trial, verdict, there was just one

6    defendant.  In looking at Carmichael, does Carmichael address

7    that?

8          MS. CANNELLA:  No.  Not explicitly, Your Honor, but

9    Carmichael does say we have to read the statute according to the

10   plain language and have a strict construction of that.  So -- oh,

11   I'm sorry.  Did you ask me about Alston & Bird or Carmichael?

12         THE COURT:  Carmichael.

13         MS. CANNELLA:  I am so sorry.  Yes, Carmichael did

14   address the situation that we have here.  There were multiple

15   defendants in the beginning when the case was filed, and then by

16   the time you got to trial, there was only one.

17         Now, in the case that Judge Grimberg had, the defendant

18   actually contacted the Court to say Carmichael controls and we

19   can't have apportionment.  We didn't have that in this case.  But

20   Austin -- Autoliv says that it is plaintiffs' fault that we didn't

21   tell the Court about this early.  We've waived it, or whatever

22   their argument is, and I think that's really interesting.  Because

23   if -- if everyone knew about this decision, according to what

24   Autoliv is saying, everyone should have known about this, did

25   Autoliv know about it?  And if they did, why didn't they do what

1  the defendant did in the case in front of Judge Grimberg and

2  contact the Court and let them know, because that means that their

3  apportionment defense was no longer valid.

4          So I bring that up just to address that timeliness

5  argument that the defendant made.

6          On the issue of statutory construction, Your Honor, two

7  things:  One, the context of the statute is at trial.  So we cited

8  in our brief a case that talks about how when you interpret a

9  statute, you have to look at the context in which the statute is

10 taking place.  And so in the statute we have here 51-12-33(b), the

11 language is that we are talking about the, quote, trier of fact.

12 So the trier of fact is identifying the actor -- is the actor who

13 must undertake the tasks of determining the total amount of

14 damages to award and apportioning those damages.  The trier of

15 fact can only take those actions at trial.  So the statute is

16 occurring in the context of trial.

17         The verb phrase in 33(b) is brought, we interpret that

18 phrase in the context of "at trial."

19         So if you're in front of a jury and you want to refer to

20 the case as it was when you filed, you would say, ladies and

21 gentlemen of the jury, this case was brought against Mazda, Bosch

22 and Autoliv.  You would use that past tense.

23         If you were referring to the case about how it was

24 brought in the beginning, you might say, ladies and gentlemen of

25 the jury, this case is a case brought against or was a case

 1  brought against Mazda, Autoliv and Bosch.  But the statute doesn't

 2  use the phrase "was brought".  It doesn't use the phrase

 3  "brought".  It uses the phrase "is brought".

 4          If you use that phrase in front of the jury, what would

 5  you say?  Ladies and gentlemen, this case is brought against

 6  Autoliv.  It wouldn't make any sense to say, this case is brought

 7  against Mazda, Autoliv and Bosch because it's not when we go to

 8  trial, it's not a case that is brought against all those parties.

 9          In order to read the statute as Autoliv argues the Court

10  should, the statute -- you have to remove the word "is" from the

11  statute.  And if it's helpful, Your Honor, I have a copy of the

12  statute with me.

13          THE COURT:  We've got it.

14          MS. CANNELLA:  You've got it.  Okay.

15          So that's why a strict construction requires that we

16  look at the parties who are present at the start of trial.  That

17  is what the Court of Appeals concluded in binding precedent, and

18  it's what -- it's what the Georgia Supreme Court will have to

19  conclude in order to read the statute strictly.  The entire bar

20  seems to agree with the Court of Appeals, because during this

21  legislative session, in less than eight months, we have a law that

22  has been passed by both the House and the Senate that undoes both

23  Carmichael and the Alston & Bird v. Hatcher decision.

24          THE COURT:  Here's my concern.  Let's say hypothetically

25  we get all these things done, which I doubt very seriously, in

1  time for this case to go to the Eleventh Circuit, if this issue

2  has not been resolved by the Georgia Supreme Court by that time,

3  what they are going to do is just certify the question to Georgia

4  Supreme Court.  So why not wait to see what the Georgia Supreme

5  Court does or does not do?  Now, I doubt very seriously this case

6  is going to be settled.  I think the Georgia Supreme Court

7  probably will write two or three opinions about this matter before

8  this case gets to the Eleventh Circuit, but is this not a matter

9  where I should just say, let's see what the Georgia Supreme Court

10  does?

11       MS. CANNELLA:  Your Honor, that is a great question.

12  That is what I was going to start off my argument with, but we got

13  off on a different direction.

14       But the point is, there is a really easy way to handle

15  this.  And is for Court to apply the binding precedent of the

16  Georgia Court of Appeals, and three things would have to happen

17  for the binding precedent to change:  The Georgia Supreme Court

18  would have to accept cert, it would have to accept cert on this

19  question, and it would have to overturn the Court of Appeals.

20       Those three things are unlikely to happen.  One,

21  primarily because the Supreme Court accepts cert on big issues

22  that are going to affect a lot of people.

23       THE COURT:  This is not a big issue?

24       MS. CANNELLA:  No, Your Honor, because the law has

25  changed.  As soon as the governor signs the bill, we have a new

 1  law.  So we're talking about a very short window of cases that

 2  would even be affected by this.  We have a Court of Appeals

 3  decision on it, and it's not a big issue anymore.

 4          So there's a good chance the Court won't accept cert,

 5  and if that's the case then we have binding precedent to apply.

 6  So --

 7          THE COURT:  And that's what I'm saying, if they don't

 8  accept cert, then they're giving me an answer that way.

 9          MS. CANNELLA:  I'm sorry, Your Honor?

10          THE COURT:  If they have not accepted cert, then they

11  have given me an order.

12          MS. CANNELLA:  Yes, Your Honor, because there is a Court

13  of Appeals decision.  If they want to overturn it, then they need

14  to accept cert.

15          So this Court is perfectly safe following the Georgia

16  Court of Appeals binding precedent.  Autoliv doesn't even argue

17  that it's not binding precedent.  Follow that law, if it changes

18  during the appeal, which Autoliv has already announced its

19  intention to appeal -- so anyway, to follow that law, to then

20  allow the Eleventh Circuit if something happens between now and

21  then and the Georgia Court of Appeals accept cert and overturns

22  the bidding precedent that is out there today, then the Eleventh

23  Circuit can conform the judgment to that.  And, obviously, if the

24  law changes, we're not going to object to that.

25          So -- the law is the law.  But the law right now is that

1  all of the verdict belongs and Autoliv is responsible for the

2  whole thing.

3       THE COURT:  I still don't see what's wrong with just

4  saying, wait until the Georgia Supreme Court either accepts cert

5  or denies it.  If they deny cert, Carmichael is the law.

6       MS. CANNELLA:  Your Honor, the reason not to wait is

7  because we're nine years since Mr. Andrews' death.  We are

8  seven-and-a-half years since this case was filed.  And so waiting

9  for the Court to accept cert, to have briefing scheduled and then

10  start our appeal in this case, we're just -- we're just building

11  in an extra year of time into --

12       THE COURT:  Based on what I heard this morning in the

13  first motion that's got to be argued -- listen, I understand

14  you're all going to move along, and don't take this personally,

15  any of y'all, but I want to move this case along, too, off my

16  docket.  However, when I send something to the Eleventh Circuit, I

17  would like to feel at least feel kind of confident of what I'm

18  sending them, and this case is not going to be resolved in the

19  next 90 days.

20       I'm going to send y'all a detailed order.  I'm just

21  running through my mind what the order is going to say when

22  Mr. Butler and Mr. Scribner was talking.  This case is not going

23  to resolve in the next 90 days.  I see a whole lot more litigation

24  going on in this case, and I'm not an expert on Georgia Supreme

25  Court, and I never claimed to, but I don't think they're going to

```
 1  tell me something on the next 90 or 120 days on this Carmichael
 2  case.
 3          MS. CANNELLA:  I'm not an expert either, but I would
 4  tell you that if they accept cert, we're in for another, at least,
 5  year.
 6          THE COURT:  Well, if they accept cert, they're telling
 7  me something there as well.
 8          MS. CANNELLA:  Yeah, but -- I mean, we don't know what
 9  it is.
10          THE COURT:  Well, that's even more reason for me to
11  wait.  If they accept cert -- again, if they accept cert, there's
12  on reason for me not to wait.  Again, if I send this case to the
13  Eleventh Circuit, they're going to say, let's see what the Georgia
14  Supreme Court says.  So either way, nothing is going to be decided
15  on this until the Georgia Supreme Court makes a decision.
16          MS. CANNELLA:  Yes, Your Honor, and I agree with that
17  completely.  And, of course, the Court can run its docket however
18  it wants.  My only request would be for the Court to at least
19  consider if we get -- obviously, if we get a no on cert, than the
20  bidding precedent is --
21          THE COURT:  They've giving me an answer.
22          MS. CANNELLA:  Then we have an answer.
23          So certainly if the Court wants to wait until cert is
24  decided, that's fine.  But the --
25          THE COURT:  I think -- excuse me for cutting you off.
```

```
 1  It's not prudent or wise on my part to make a decision on that
 2  issue until I get something from the Georgia Supreme Court.
 3  That's the way it is going to be.  The very issue that we're
 4  talking about now, the Couch case, the Red Roof case, that case
 5  started in my court.  I certified that question to the Georgia
 6  Supreme Court.  And the reason why, because I knew nothing was
 7  going to happen until they told me something one way or another.
 8  It's the same with this issue.  If they don't accept cert, they've
 9  given me an answer.  If they accept cert -- I know you want to
10  move this along, I want to move this along, but why would I make a
11  decision until they make a decision?
12           MS. CANNELLA:  I understand, Your Honor.  We were
13  pressed that the Court -- if they do accept cert, that the Court
14  would consider the fact that when we go -- when this case is
15  finally done here in the trial court, there will be an appeal.
16  There's a time delay associated with even getting on the docket.
17  Then there will be a briefing schedule.  Then there may be an oral
18  argument schedule after that.  That, in our experience, is a
19  two-year situation.
20           THE COURT:  I don't argue with you there.  It's a
21  time-consuming matter.  But how would you like to go 18 months and
22  then this case gets sent back here by the Eleventh Circuit and we
23  have to start -- start another -- not start over, but maybe start
24  certain aspects of this cases over again.
25           Let me make this simple for everybody.  Let me just make
```

1   this simple.  I'm not going to rule on this issue until I hear

2   from the Georgia Supreme Court.  If they don't accept cert,

3   they've given me an answer.  If they accept cert, I'm going to

4   wait until they tell me what the answer is.  I don't want to be

5   disrespectful to you or Mr. Scribner, but I'm going to sit here

6   and hear argument, but I'm not going to rule on this until the

7   Georgia Supreme Court tells me something.  Not to be offensive or

8   disrespectful, but that's just the way it's going to be.

9           MS. CANNELLA:  I understand, Your Honor.

10          THE COURT:  All right.

11          MS. CANNELLA:  Thank you.

12          THE COURT:  All right.  Mr. Scribner, I would love to

13  hear your argument.  There is no sense of me hearing your argument

14  on this, because I've already made my mind up.

15          MR. SCRIBNER:  Mr. Repko, who is the only person good at

16  math on our side, is going to talk about the interest.

17          THE COURT:  We're talking interest.  Yes, we're talking

18  interest.

19          MR. SCRIBNER:  And we'll go from there.

20          MR. REPKO:  Good morning, Your Honor.

21          THE COURT:  Good morning, Mr. Repko.

22          MR. REPKO:  Two issues to talk about on the prejudgment

23  interest front.

24          THE COURT:  All right.

25          MR. REPKO:  We can boil it down to two questions:  Is

1    plaintiff entitled to prejudgment interest?  That's the threshold

2    question.  And then question two, if so, should that interest be

3    calculated as simple interest or compound interest.

4          Ms. Cannella suggested that question one is signed,

5    sealed and delivered.  We say not so fast.  As the Court knows, we

6    filed, on behalf of Autoliv, a motion to amend the judgment to

7    apportion fault as to Bosch.  As we spelled it out there, we would

8    like and request that fault be apportioned to Bosch, fault be

9    reduced from Autoliv, and as a result the amount of compensatory

10   damages for which Autoliv is liable will be decreased.  And we

11   believe it will be decreased below the threshold for which

12   plaintiff can recover prejudgment interest.

13         So I know we're going to get into that today.  I simply

14   request that the Court reserve ruling on this motion for

15   prejudgment interest until the Court has heard our arguments as to

16   apportionment as to Bosch.

17         Turning now to question two.  Is plaintiff entitled to

18   simple or compound interest?  It really boils down to what does

19   the phrase "at an annual rate" mean.  Plaintiffs says that means

20   compound interest.  We say it means simple interest.

21         As support, plaintiff relies on the declaration of their

22   expert Dr. Daniels.  Dr. Daniels says, and I'm quoting here, based

23   on his experience -- or let me start it again.

24         "Based on my experience and training as an economist,

25   the reference to interest being calculated at an annual rate means

1  that interest is compounded yearly."

2         Your Honor, this is in the docket, but that is the

3  substance of what Dr. Daniels has to say.  It's that one

4  paragraph, paragraph six.

5         Notably, let's take a look at what's not in that opinion

6  from Dr. Daniels.  There's no mention of whether this phrase "at

7  an annual rate" is used commonly to refer to compound interest.

8  He doesn't mention whether he's actually seen it before and used

9  it.  He just says, based on his experience and training, I believe

10 that at an annual rate means that interest is compounded yearly.

11 There's no mention of, yes, I've seen that a dozen places.  I've

12 seen that in two dozen statutes.  There is no mention of that

13 whatsoever.

14         Furthermore, there is no reliance on any legislative

15 history, nor does Dr. Daniels hold himself out to be a past or

16 former member of Georgia General Assembly.  So he can't -- and

17 he's offered no evidence as to what the intent of the Legislature

18 was here.

19         So that moves nicely into what plaintiff would have the

20 Court look to for the intent of the -- the intent of the General

21 Assembly.

22         Ms. Cannella cited to O.C.G.A. 70-4-2.  Because in that

23 statute, the General Assembly expressly used the word "simple

24 interest".  And so plaintiff would tease it out as this:  The

25 General Assembly knows and has used in the past the explicit

1   phrase "simple interest".  So if the Legislature intended for this

2   statute to be simple interest, then they would have said so.

3   Well, Your Honor, we can make the exact same argument tying it to

4   the use of "compound interest".  So why don't I go ahead and

5   mention on the record the statutes that I'm referencing, and then

6   I'll hand them up.

7          There are quite a few, Judge, that make express

8   reference to "compound annually".  So we argue, well, if the

9   Legislature uses the phrase "compound annually" in statutes, then

10  if it intended in the statute that is at issue here to award

11  compound interest, they would have done so.  And so those

12  statutes -- and I've got ten of them here so I'm going to read

13  them off quickly -- O.C.G.A. 20-3-514, O.C.G.A. 33-5-33, O.C.G.A.

14  33-28-2, O.C.G.A. 47-2-204, O.C.G.A. 47-2-266.  And, Judge, I can

15  go on for about five more, but I won't.  I think the point is

16  clear here.

17         Plaintiffs' argument regarding the use of simple

18  interest in the statute O.C.G.A. 7-4-2 is at best a wash here.

19  Because they say, oh, this statute makes use of the word "simple

20  interest," while we pointed to other statutes, and a handful of

21  them, in which the word "compound interest" is used expressly.  So

22  that argument doesn't carry the day.

23         So what does carry the day?  Well, in our papers, Your

24  Honor, we reference the Wolf Camera case that's at 253 Georgia

25  Court of Appeals 254.  It's a 2002 case.  And the key language

1  there is, "As the prejudgment interest statute is in derogation of

2  the common law, it must be strictly construed."  In other words,

3  the Court should interpret the statute in a way as to have as

4  little effect as possible in altering the common law.

5        At common law there was no prejudgment interest for

6  unliquidated damages as was the case here.  So the question is,

7  and the question to the Court is, do I apply the statute in a way

8  that gives more prejudgment interest, which is plaintiffs'

9  interpretation with the compound interest, or do I interpret it in

10  a way that gives less interest?  That would be the simple

11  interest, and that's our position.

12        We submit that if the Court, as it must, strictly

13  construes this statute, that is the conclusion that it will reach,

14  that it is simple interest, not compound.

15        And, Your Honor, I won't get into detail any further,

16  but we did reference a treatise and a law review article in our

17  papers, and I will refer the Court to those.  Those state that

18  simple interest is the traditional and, in fact, the majority

19  rule.

20        THE COURT:  Thank you.  You get the last word.

21        MS. CANNELLA:  Thank you, Your Honor.

22        JUSTICE BLACKWELL:  Your Honor, can I be heard briefly

23  on the Carmichael issue?  I know the Court's inclination is to

24  wait to see what the Georgia Supreme Court does, but I would just

25  like to, if the Court will permit, make a couple of points on

 1  that.

 2          THE COURT:  Any objection to that.

 3          MS. CANNELLA:  No, Your Honor.

 4          JUSTICE BLACKWELL:  Good morning, Your Honor.

 5          THE COURT:  Good morning.

 6          JUSTICE BLACKWELL:  So in answer to the Court's question

 7  about how long we may be waiting to hear from the Georgia Supreme

 8  Court on the cert petition, I believe the cert petition was filed

 9  at the very end of December of last year.  And the Court has been

10  typically taking between four and six months to rule on cert

11  petitions.  So given that, I would anticipate that we probably

12  would get a decision on the cert petition most likely in the next

13  30 to 90 days.

14          Now, there is one thing that I wanted to caution the

15  Court with respect to, and that is, I heard the Court say a couple

16  of times, well, if the Court denies cert, if the Georgia Supreme

17  Court denies cert, we have our answer.  Maybe.

18          The Carmichael case presents some unusual vehicle issues

19  for that -- that particular issue.  And I can tell the Court that

20  the Georgia Supreme Court looks very carefully in deciding whether

21  to grant cert on a particular issue and whether that particular

22  case is the right vehicle for addressing that issue.  There have

23  been cases where there was an issue of gravity where the Supreme

24  Court had real uncertainty about whether the Court of Appeals had,

25  in fact, gotten it right, but the Supreme Court passed on that

1  particular case and decided to wait on another case to come along

2  that presented the same issue because of vehicle concerns, because

3  there were kind of threshold issues that might prevent them from

4  ever getting to the issue of gravity.

5          And in the Carmichael case, and this is described in the

6  briefing a little bit, the issue or the holding that the

7  plaintiffs are relying on in this case from Carmichael is an

8  alternative holding.  And so for the Supreme Court to really be

9  able to reverse the Court of Appeals on that, it would have to

10 take up both holdings, both of the two alternative holdings.

11 Because otherwise if they only take up one of two alternative

12 holdings, anything they say on that point would be dictum.

13         So for that reason, I do think if the Court does grant

14 cert, that this Court would -- it would be quite sensible, in my

15 view, for this Court to wait to see what the Georgia Supreme Court

16 says.

17         If the Supreme Court were to deny cert on this issue in

18 Carmichael, however, I just wouldn't want the Court to be left

19 with the impression that that amounts to the Georgia Supreme Court

20 endorsing the holding of the Court of Appeals on this point.

21 Because the ultimate decision for this Court is what -- under

22 Erie, which is what would the Georgia Supreme Court decide.

23         THE COURT:  Thank you.

24         JUSTICE BLACKWELL:  Thank you.

25         MR. BUTLER:  May I respond briefly, Your Honor?

```
 1              THE COURT:  Yes.
 2              MR. BUTLER:  If the Supreme Court denies cert,
 3    Carmichael is binding this Court.  That's it.  If the Supreme
 4    Court accepts cert, apparently Mr. Blackwell wants the Court to
 5    wait until a year or two for the Supreme Court to make a decision
 6    one way or the other before the Court decides the -- our motion to
 7    amend.  Now, what does that mean as a practical matter for
 8    Ms. Andrews?  Frankly, so the Court will have -- will be aware of
 9    this, if we're going to have to wait another year or two, it makes
10    also more sense for the plaintiff to just ask the Court to deny
11    the motion.  It's going up to the Eleventh Circuit.  By the time
12    the Eleventh Circuit gets around to it, the Supreme Court would
13    have ruled, and if the Supreme Court ruled contrary to the Court's
14    ruling, then the Eleventh Circuit can straighten it out.
15    This -- there's been too much delay and frivolous litigation in
16    this case.  Thank you, Your Honor.
17              THE COURT:  The only thing I will say to both of you all
18    is, I understand the timing -- I understand those things, but this
19    matter is not going to be resolved as far as the Eleventh Circuit
20    is concerned until certain things happen.  And I may have to make
21    a decision if they deny cert.  I may have to say, okay, here is
22    how I'm going to rule, but let's just deal with it there.
23              Thank you, Mr. Butler.  Thank you, Mr. Blackwell.
24              MS. CANNELLA:  Your Honor, just a couple of points on
25    this interest issue.
```

1          That whole response, Your Honor, is -- it could be

2     exhibit number three million and two to the evidence that

3     Autoliv's end game in this case is delay.  The defense complains

4     about Mike Daniels' expert affidavit.  He was not challenged by

5     Daubert in this case.  He was not -- there was no opposing expert

6     that Autoliv hired to counter his calculations or his expertise.

7     Autoliv stipulated to his numbers at trial.  And Autoliv has had

8     our brief and Mike Daniels' affidavit on this issue since February

9     7, 2021 -- 2022.  It never used that time to find its own expert.

10    It didn't do anything.  This whole idea that we've asked for

11    something so outrageous that they need more time, they always need

12    more time to counter it is false.

13         The statute says "annual rate".  An expert that

14    everybody agrees is qualified has said in his experience that

15    means "compounded annually".  His testimony is unrebutted.  The

16    issue should be decided in plaintiffs' favor.

17         And, Your Honor, I agree that -- well, let me tell a

18    little story.  When I was a clerk for Judge Lawson, he hated

19    getting reversed.  So whenever --

20         THE COURT:  Surprise, surprise.

21         MS. CANNELLA:  -- I helped him with an order, his

22    question was always:  Am I going to get reversed?  Nobody wants to

23    get reversed.  And I remember I helped him with an order that was

24    very complex and new, and after I left, it went up.  And when it

25    came back down affirmed, he called me to tell me because he was so

```
 1   excited.  So I understand the Court's concern completely.

 2         And plaintiffs had no objection to the Court waiting

 3   until cert is, you know, either accepted or denied.  But what I

 4   hear from Autoliv reading between the lines, like you said, is

 5   that if cert is denied, they're not done.  They're going to ask

 6   the Court to do something more to certify a question or to, you

 7   know, still ignore the Court of Appeals.  It's delay, delay,

 8   delay, and there is one way for the Court to help us with that.

 9         THE COURT:  I think if cert is denied, then what I'm

10   going to have to do is rule what I think the Georgia Supreme Court

11   would say or would have said.  I could be wrong, but let me tell

12   you a little story.

13         Probably three years after I started this job, I had a

14   case dealing with a matter of a particular issue, and the law

15   clerk and I looked at it, the Court of Appeals had two cases on

16   it.  But one panel of the Court of Appeals said this, and another

17   panel said something else.  Unique.  So I said, What do I do?

18   Well, the parties said, God, I really need to get this issue

19   decided, Judge.

20         Now, I knew in my mind that the Eleventh Circuit is

21   going to say what they eventually said, but I -- I want to make

22   everybody happy.  I'm going to rule.  I'm going to move it along.

23   I ruled.  It goes up to the Eleventh Circuit.  Judge Edmondson is

24   on the panel.  I never go to the arguments, obviously.  But

25   somebody else happened to be there.  He said, certify this
```

1    question, Georgia Supreme Court.  The question I should have done

2    myself.  I knew.  Well, make one mistake, that's human.  But to

3    make the same mistake twice, there's another word for that.

4         So believe me, I want to get this case over with;

5    believe me, I do.  But it's just -- I just don't see how -- I

6    can't fashion until I at least know something -- if they deny

7    cert, honestly, I hear Mr. Blackwell, Judge, you may have to make

8    a decision or you don't.  That's what you're saying.  I'm prepared

9    to do that, but there are some things in life you don't forget,

10   and I knew and the law clerk knew and we've both knew we should

11   have certified it, and we didn't.  I ruled.  It goes to the

12   Eleventh Circuit, and Judge Edmondson and Judge Dubina, and I

13   can't remember -- I think the third judge was a district judge.

14   Judge Edmondson, certified, Georgia Supreme Court.

15        So the time it took for them -- for me to go from me to

16   them or from my court, excuse me -- an English teacher would be

17   horrified -- from the District Court here to the Eleventh Circuit,

18   it was about nine months before they got to it, six to nine

19   months.  Okay?  It gets to them, they say, certify it, Georgia

20   Supreme Court.  So six to nine months that was wasted.  If I had

21   just dealt with it, I knew -- I had should have done in the

22   beginning.  It goes to the Georgia Supreme Court, Georgia Supreme

23   Court gets it.  Judge Blackwell was on the panel, so I won't say

24   how long it took them to do it, but they didn't do it fast enough.

25   Come back -- so, really, I didn't save anybody any time by not

1  certifying it myself.  That's what I'm saying to you, that's what

2  I'm saying to y'all.  I didn't save anybody anything.  I was

3  trying to do something that I was told when I got to be a Superior

4  Court Judge 28 years ago, you can't make everybody happy.

5          MS. CANNELLA:  No, Your Honor, you cannot.

6          THE COURT:  So that's been my motto, just rule, if they

7  like it, fine; if they don't, there is an appeal court here.

8          MS. CANNELLA:  Just in case it helps, you can blame it

9  on us.  It is fine with us if you deny our motion.  We prefer a

10 denial.

11         THE COURT:  Those people in the Eleventh Circuit, they

12 don't look at it that way.  You signed it, you did it.  I don't

13 get to say it was this person's fault or it was that person's

14 fault; it's me, and that's the way it should be.  I understand

15 what you're saying, but I told y'all what I'm going to do.

16         MS. CANNELLA:  Thank you, Your Honor.

17         THE COURT:  Let's move to the third motion.

18         The third motion, defendant's motion to amend the motion

19 or motion for a new trial.  According to the defendant, the $100

20 million in punitive damages award should be eliminated altogether,

21 because the evidence in this case does not authorize any award of

22 punitive damages as a matter of Georgia law.  If not eliminated

23 entirely, the award should, at a minimum, be reduced because it is

24 unconstitutionally excessive and improperly based on the financial

25 condition of non-party Autoliv, Inc.

1          Defendant further states, alternatively, the Court

2     should order a new trial so that compensatory damages and punitive

3     damages can be properly reconsidered.

4          Mr. Scribner, this is your motion, so you go first.

5          MR. SCRIBNER:  Your Honor, I think the way to deal with

6     this, I think the constitutional issue, the punitive damages, the

7     consideration of the economic wherewithal, those are new to you at

8     least in this case.  And so -- and Justice Blackwell was going to

9     argue that.

10         I'm going to argue Bosch first because you are familiar

11    with it, and I'm going to turn the baton over and give him the

12    time that he needs to do.

13         THE COURT:  That's fine.

14         And then you all have time for a response.

15         MR. SCRIBNER:  We have moved to amend the judgment to

16    apportion fault to Bosch.  It does not appear that there is any

17    dispute from the plaintiff that the elements of a product

18    liability claim are met as to Bosch.  The same product liability

19    claim under which the Court found Autoliv responsible.

20         Federal Rules of Civil Procedure 59 authorizes this

21    Court to revisit its earlier decision to correct clear error that

22    manifests injustice.

23         Now, I know that we spent a lot of time at trial, and

24    you paid very close attention.  And I know you have clerks who --

25    I don't know if you get discounts on the number of pads they use,

1   but they are furiously writing notes and following everything

2   that's happening in this case.  So I understand the burden upon me

3   today to get this Court to do something that no one wants to do,

4   which is to say, I made a mistake.  I think I got that one wrong.

5   That's a hard thing to do.  It's a really hard thing to do for

6   anyone at any time, and so I know.  I know what I'm up against.

7           But we believe and maintain that that ruling was

8   manifestly unjust, ultimately because the Court in this case

9   awarded plaintiff $113 million vis-a-vis Autoliv -- and we're

10  going to talk about that -- and apportioned nothing to Bosch.

11  Zero.

12          Under the Georgia law, three elements must be satisfied

13  in order to prove a claim for straight products liability, just

14  three.  One, the entity manufactured the product; two, the entity

15  knew when they sold the product it was defective; and three, that

16  it was the proximate cause of the injuries.

17          Here the plaintiff does not dispute that those three

18  elements were met as to Bosch.  The first element is met because

19  evidence demonstrates that Bosch manufactured the airbag censor

20  system.  There's the airbag module that Autoliv supplied, but as

21  you recall, there was nothing wrong with the module.  It was that

22  sensing system that failed.  It's judgment, Your Honor, at pages

23  20 and 71 you note on multiple occasions that it's Bosch's airbag

24  electronic front sensor system component that caused the

25  nondeployment of the airbag.  Plaintiffs' airbag expert, Mr. Chris

1  Caruso, said Bosch made available to Mazda the option to select

2  two sensors instead of one.  That is the trial transcript, Volume

3  3 a.m. at page 119.

4       Bosch also manufactured the electronic front sensor

5  system for purposes of strict liability under O.C.G.A. 51-1-1

6  because they were actively involved in the design specifications

7  or formulation of the system.

8       The Davenport decision, which is the decision upon which

9  your predecessor granted summary judgment to Autoliv, said:  You

10 have to have -- if you're not an actual manufacturer of a product,

11 you have to have a row in the design if it is a design claim.  So

12 our argument to your predecessor was, this is really a design

13 claim as it relates to the seat belt -- I'm talking about Autoliv

14 now -- and the ultimate designer is Mazda.  They make the final

15 decision, they sent the component parts.

16      So Davenport -- when it went up to the Court of Appeals,

17 what the Court of Appeals said, I'm not going to get into that,

18 but you did manufacture these parts, these component parts of the

19 seat belt.  So you, Autoliv, are a manufacturer.

20      My point is in addition to manufacturing a component

21 part, like Bosch did here, the electronic front sensor system,

22 they were clearly involved, actively involved in the design of the

23 electronic front sensor.

24      Plaintiffs' airbag expert Mr. Chris Caruso testified,

25 and I quote,-Bosch designed electronic system -- strike that.

1          If -- the quote -- the Bosch-designed electronic system

2   had sent the signal to the Autoliv airbag, it would have deployed.

3   That's trial transcript Volume 3 a.m. at page 107.

4          Later on the same day on page 119, Mr. Caruso says,

5   quote, Bosch said to Mazda, the use of two electronic front

6   sensors enhances the performance of the sensing system, especially

7   for compliance.

8          So the point to all of that is whether you look at a

9   pure manufacturer or someone actively involved in the design,

10  which is what Davenport says, you can become a, quote,

11  manufacturer under the statute, under the circumstances.  Bosch is

12  a manufacturer of that front electronic sensor design.

13         Element number two was also met because that system was

14  defective.  Plaintiffs' airbag expert, Mr. Chris Caruso,

15  acknowledged his opinion that the airbag electronic front sensor

16  system was defectively designed.  That's trial transcript Volume 3

17  a.m. at page 96.

18         He also said had the system been designed with one of

19  his alternative proposals, including the use of dual sensors, the

20  system would not have been unsafe and unreasonably dangerous.

21  That's trial transcript Volume 3 a.m. at 107.

22         In other words, what Chris Caruso said was there are lot

23  of reasons why I find this electronic front sensor system

24  defective.  But one for sure, and his principal chief complaint,

25  having sat with him not only in this courtroom but at a

1  deposition, is that the electronic front sensor system only had

2  one sensor.  As you may recall, Judge, he said, When I was at GM

3  we had two sensors.  And what that does, it ensures that if one

4  gets knocked loose, like it did here, that other sensor performs.

5  And so it's defective to only include one sensor.  You need to

6  have two.

7          Also, I would mention, Your Honor, that your judgment,

8  at pages 20 and 71, you reference the fact that Bosch's electronic

9  front sensor system ultimately caused the nondeployment of the

10 airbag.  And Chris Caruso testified that the failure to deploy the

11 seat belt pretensioner and airbag in the subject collision

12 rendered the vehicle defective.

13         So we have two things:  Bosch is clearly a manufacturer

14 under the statute under which Autoliv was held responsible.  Bosch

15 supplied a defective component part, undisputed.  The only expert

16 in the case that talked about it was Chris Caruso and he said you

17 need two sensors, not one.

18         Finally -- finally, the third element is did it cause

19 Mr. Andrews' death.  Well, plaintiffs airbag expert Mr. Chris

20 Caruso at Volume 3, trial transcript Volume 3 a.m. at 107, said,

21 if the system would have been designed with any of his proposed

22 alternatives, including the dual sensor design, this would have

23 prevented the unsafe condition that ultimately led to Mr. Andrews'

24 death.

25         He also mentioned that morning at page 110, on

1  cross-examination, if Mazda had paid $5, they would have had two

2  sensors.  Right?  That extra sensor would have cost Mazda $5.

3       He also testified that morning at page 107, that if the

4  Bosch-designed electronic system had sent the signal to the

5  airbag, it would have deployed.  And we all know, Your Honor, that

6  Dr. Ziewjewski, plaintiffs' biomechanic expert, testified that if

7  the airbag deployed, Mr. Andrews would be alive today.

8       They manufactured or participated in the design of a

9  defective product that caused the injuries.  Plaintiff doesn't

10  dispute this.  What they say in response is, well, the Court was

11  correct in not assigning any fault to Bosch because the airbag

12  didn't deploy because the EFS, that's electronic front sensor

13  system, the connector got disconnected before it could send its

14  signal to deploy, and he testified that Mazda was responsible for

15  that failure, not Bosch.  True.  I don't know what to say.  I'm

16  not going to argue about it.  It's absolutely true, but it

17  highlights Chris Caruso's main criticism of this electronic front

18  sensor system which you need two.  Because, as you will recall,

19  Mr. Andrews, unfortunately, hit that tree right in the middle and

20  the tree knocked that sensor loose.  If you have two sensors, he's

21  alive today.  And the reason that vehicle has two sensors is Bosch

22  because -- strike that.  The reason it only had one sensor is

23  Bosch, although they recommended two sensors, delivered one.

24       Now, he testified clearly the dual electronic front

25  sensor design would have provided redundant crash protection.  So

1   that upfront sensor would not have come dislodged as it did here,

2   that single sensor, and you had two sensors and he would be alive

3   today, according to Dr. Ziejewski.  Two is always better than one.

4           And this is where I think, Your Honor, if I'm overly

5   passionate, forgive me, because I've lived this case for a long

6   time.  You have a situation where Autoliv supplies a seat belt

7   that this Court says was defective.  It is undisputed that Mazda

8   knew about stops and chose not to use one.  And it is undisputed

9   that Mazda knew about the threshold, the deployment threshold and

10  where it was, and they could have increased it.  But the Court

11  said, regardless, Autoliv is responsible.

12          The thrust of our argument as to why that seat belt was

13  not defective, as you will recall, Your Honor, because there is an

14  engineering trade-off.  The more forward excursion you allow, the

15  less chest injuries you have and allows somebody to ride up the

16  airbag.  The less forward excursion, more force you apply to that

17  chest, you risk injuries.  And so no doubt the plaintiffs' expert

18  said this design was improper.  They did.  But they acknowledge

19  that there is a tradeoff.  You have to make a hard decision.  How

20  much forward excursion do you want?  Mazda knew that; their

21  experts conceded that.  Nonetheless, the Court said, well, that

22  seat belt is defective, and you, Autoliv, are responsible for it.

23  Now, let's compare that with what Bosch did.

24          Bosch supplied a part to Mazda.  Bosch supplied a

25  defective part to Mazda.  That defect caused his death.  Period,

 1  full stop.  What makes our case better than Bosch's is that they

 2  don't have a tradeoff.  The seat belt is designed in such a way

 3  that we can have a debate as to how much forward excursion you

 4  should allow.

 5          Our expert came in and said, look, if he uses a six-inch

 6  stop, there's all sorts of bad things.  You could kill somebody in

 7  an accident like that.  And so we could debate should you have a

 8  stop, should you not.  Should you have a higher deployment

 9  threshold or lower.  It depends on the accident; it depends on the

10  size.  I have a young girl, a 14-year-old.  I would tell you, she

11  would want more forward excursion because she's small in stature.

12  She doesn't have fully-formed chest bones yet.  So we can all have

13  a debate.  It is the essence of reasonableness.

14          So against that backdrop, you issued an award against

15  Autoliv for over $100 million and gave Bosch nothing.  Bosch

16  doesn't have that tradeoff.  There's no trade-off.  There is no

17  case -- he said there is no case under which one sensor is better

18  than two.  Two is always better, always, and it was standard in

19  the industry.

20          So I say all of that, Your Honor, attempting to convince

21  you that you were wrong, and that's a hard thing to do.  But you

22  can see if you were Autoliv in this case, and you understand the

23  facts as I've just outlined them, that it feels unfair to

24  apportion $113 million to Autoliv and zero to Bosch.

25          And so that's the point of our motion.  We ask that the

1   Court revisit the facts and look at the testimony I've cited and

2   at least apportion Bosch as much fault as you did to Autoliv, from

3   our perspective, and recognizing it is just our perspective.  It's

4   not really a close call in terms of the conduct of the two

5   companies.  One had an engineering design decision that had a

6   tradeoff.

7           THE COURT:  Hold on.  Mr. Butler.  I can't --

8           MR. BUTLER:  Sorry, Your Honor.

9           MR. SCRIBNER:  In other words, that trade-off is you

10  give here and you take there.  You may save the life of someone in

11  a high-speed accident who is 200 pounds, but you could really

12  injure someone in a lower-speed accident with, you know, small

13  stature, a hundred pounds.  That is the tough tradeoff that you

14  make.  And so we feel like that is a reasonableness issue.  You

15  can't say that about Bosch.  There is no circumstance under which

16  one sensor is better than two.  And if two existed on this

17  vehicle, he would be alive today and it would have cost Mazda $5.

18          THE COURT:  So it's your argument that it was Bosch's

19  decision to just put one sensor rather than two?

20          MR. SCRIBNER:  No, it is Mazda's decision because they

21  are the OEM.  Just like it was Mazda's decision to use a seat belt

22  with no stop and a 2.5-kilometer threshold.  It is always Mazda's

23  decision.  So when you go back and think about this, there is no

24  doubt that Mazda should be apportioned fault there.  And you

25  did -- one thing we don't know, Judge, because we can't define

1    what you and your clerks were thinking, we don't know if that

2    apportionment related to the airbag or the seat belt.  Because

3    Mazda is responsible for both.  It is in their vehicle.  Mazda

4    makes the final decision on the airbag; Mazda makes the final

5    decision on the seat belt.  No doubt.  And so we can't tell

6    because it's not set out in your order whether you said, well, I

7    find fault with Mazda in the airbag section or do you find fault

8    with Mazda in the seat belt section.  Because they knew about the

9    stop and they knew about the high threshold and they chose not to

10   do that.

11         But for purposes of the Bosch/Autoliv dynamic, I

12   respectfully submit that if you look at what these companies did,

13   the main difference -- they both supplied a component part to the

14   OEM.  They both gave the OEM options.  We gave Mazda options for

15   low, immediate and high thresholds.  They chose low.  Mazda said

16   you could use one or two.  They chose one.  So they both did the

17   same thing in that respect.  The difference is in the Autoliv

18   situation, you have a trade-off, an engineering trade off.  You

19   can make an argument one way or the other.  You can't make an

20   argument on one v. two.

21         The final thing I'll leave you with, when I asked -- and

22   I will respectfully ask that you take a look at this.  When I

23   asked Mr. Caruso, How do you give Bosch a free pass?  And he said,

24   Well, here's a document.  And the document says, you know, there

25   are benefits to a two -- two sensors instead of one.  And I asked

1  him, Is there anything else in the file that you reviewed that

2  causes you to believe that they discharged their duty as a

3  reasonable supplier should?  And he said, Nope, it's all in that

4  one document.  It's really not even one document.  It is one

5  sentence, and it says two is better than one.  That discharged

6  their duty, according to him.

7          And so you can see why if you are in our position

8  representing Autoliv to the best of our ability, you look at that

9  situation and feel like that is unfair.

10          You worked hard, as did your entire staff.  You worked

11  very hard at this case, and reviewed the documents, and I'm not

12  suggesting otherwise.  But we all make mistakes.  And I would ask

13  the Court to give thought to -- to remedy what we think is a

14  mistake.

15          THE COURT:  Thank you, Mr. Scribner.  Justice Blackwell.

16  I'm going to let them make their whole argument, and then you all

17  come.

18          JUSTICE BLACKWELL:  Judge, this -- our motion to amend,

19  it's been well and pretty thoroughly briefed on the legal issues.

20  I'm not going to, unless the Court has questions about particular

21  things, go into all of the arguments we have made.  There are two

22  I would like to hit on briefly this morning.

23          The first is the Court's reliance on the financial

24  condition of Autoliv, Inc., the parent company in this case, as

25  opposed to the particular financial circumstances and condition of

1   the named defendant, Autoliv Japan.

2          The Court considered this, to some extent, on a motion

3   in limine that was filed before trial.  And the Court in denying

4   Autoliv's motion in limine to keep out evidence of the parent

5   company's finances, the Court drew significantly on a decision

6   from the Fourth Circuit called Daugherty.  And in the Daugherty

7   case we think that Daugherty probably would support the

8   admissibility as a matter of evidence of financial reports

9   concerning the parent, to the extent that they shed light on the

10  financial condition of a subsidiary of that parent.  That's what

11  was going on in Daugherty.  The Court pointed out that the SEC

12  filings of the parent, in fact, discuss the financial condition of

13  the subsidiary, and, therefore, that evidence did, in fact, shed

14  light on the financial condition of the subsidiary, which was the

15  defendant in Daugherty.

16          Here the evidence that was admitted at trial may well

17  shed light on the financial circumstances of Autoliv Japan.  But

18  as I read the Court's final order, the Court didn't look so much

19  to those SEC filings to make inferences and try to discern what

20  the financial circumstances of the subsidiary were.  Instead, the

21  Court went straight to what the financial circumstances of the

22  entire corporate family, from the parent and all of the

23  subsidiaries were.  We think for that to be a material fact with

24  respect to the amount of punitive damages would require a classic

25  Val Pearson under Georgia law.  And we just don't think -- the

1   Court identified a number of circumstances, a great deal of which

2   was frankly litigation conduct.  And conduct, Your Honor, that I

3   think is fairly unremarkable, like an employee of one company

4   testifying as a corporate representative on behalf of a different

5   subsidiary within the corporate family, particularly, an overseas

6   subsidiary.

7           We don't think that there was evidence in this case

8   sufficient in the classic corporate veil piercing sense to pierce

9   the corporate veil.  And, therefore, irrespective of what evidence

10  may have been admissible, the key fact is the financial

11  circumstances of Autoliv Japan, not the financial circumstances of

12  the parent company.  There was direct evidence before the Court,

13  there were stipulations as to the net profits of the subsidiary

14  Autoliv Japan over a period of years that the Court could have

15  drawn on in assessing punitive damages.  That, I think, would be

16  much more difficult for us to complain about had the Court looked

17  to there, but we do think it was improper to base the amount of

18  punitives on the fact of the financial condition of the parent

19  company.

20          The other issue I want to turn to, Your Honor, is

21  the -- whether the punitive damages award in this case is grossly

22  excessive in violation of the guarantee of due process.  We raise

23  that under both the Georgia due process clause and the federal due

24  process clause.  I'm not aware of any case law suggesting that for

25  due process that those standards differ between the state and

```
 1   federal constitutions, and so we argue this under the BMW v. Gore

 2   framework.

 3           Now, we do have a separate argument under Colonial

 4   Pipeline as to the excessive fines clause in the Georgia

 5   constitution, but I want to talk -- I want to talk to the Court

 6   about the due process analysis, because that's the analysis that I

 7   think should give the Court the greatest pause with the punitive

 8   damages award that was entered.

 9           There's a substantial body of case law.  The Court is

10   familiar with that substantial state case law, BMW v. Gore, State

11   Farm v. Campbell.  I won't go through that in detail.

12           I think the critical issue here is on the second of the

13   three guideposts.  The Court has explained in some sense the first

14   guidepost, reprehensibility, may be the most important in context,

15   but it's difficult to quantify because there has to be some degree

16   of reprehensibility to justify any punitive damages as a matter of

17   constitutional law.  The question is where on the spectrum do you

18   fall in the range of reprehensibility.  We would suggest that the

19   evidence in this case to the extent that it shows

20   reprehensibility -- and we don't dispute the couple -- that at

21   least a couple of factors might show some degree of

22   reprehensibility here, but this is far from, for instance, the

23   tobacco cases that are at the high, the extreme end of

24   reprehensibility.  And so we would ask the Court to take a look at

25   that.
```

1          But on the ratio because reprehensibility is not

2   quantifiable, courts frequently move to the second guidepost,

3   which is the ratio.

4          So how do we figure the ratio in a case like this?

5   Well, it all depends on what counts on the compensatory side of

6   the ledger.  And that is, I think, a difficult issue for the Court

7   to sort through.  Now, there are some cases, but I will concede

8   they have cited a case, a District Court decision going the other

9   way.  We don't have anything definitive from the Eleventh Circuit,

10  but there is a split on authority.  We think the greater weight of

11  the authority is on our side, but there is a split on authority on

12  whether in the ordinary course you look only at the claims on

13  which punitive damages were awarded, or you look at all of the

14  claims that kind of go to the -- arise out of the same injuries.

15         We think that just based on that case law alone, that

16  the greater weight of the authority is you limited it to the

17  claims for which punitive damages were authorized and were

18  awarded.  That would mean that in this case you would be talking

19  about $1 million as apportioned to Autoliv, or even if you

20  consider, depending on the outcome of the Carmichael issue, even

21  if you -- even if you brought in the amount of pain and suffering,

22  damages, general damages that were attributed to Mazda, that would

23  only be $2 million.

24         So if $2 million is the compensatory baseline and you

25  have $100 million punitive award, that is a 50-to-1 ratio.  I'm

1  not aware, Your Honor, of any Circuit Court decisions decided

2  since BMW v. Gore anywhere in the country, in the Eleventh Circuit

3  or otherwise, that approve such a high ratio when you have such a

4  substantial compensatory damages award.  There are cases that go

5  beyond single-digit multipliers when you have really

6  de minimis-type compensatory damages.

7       There was a case in the Eleventh Circuit, the AT&T count

8  case where AT&T was involved in some -- I believe it was

9  fraudulent misconduct in that case, but the individual

10  compensatory damages were in the four-figure range.  And so the

11  Court approved a pretty substantial -- the Eleventh Circuit

12  approved a ratio that was in excess of nine to one.  But, of

13  course, the Supreme Court has cautioned us that ordinarily and

14  generally speaking -- they have made clear they're not drawing

15  bright lines -- but generally speaking in the heartland of

16  punitive damages cases, four to one is probably approaching the

17  constitutional limit, and anything beyond nine to one is going to

18  be incredibly suspect and will rarely meet constitutional mustard.

19  That is the guidance that the Supreme Court has given.

20       Now, even if -- even if the Court looks at that split in

21  case law, or do you just look at the compensatory arising out of

22  the claims on which punitives were awarded, or can you look at all

23  of the claims that involve the same injury, that arise in some

24  sense out of the same injury?  Even if the Court looks at that and

25  decides that you don't necessarily have to limit it to just claims

1  on which punitive damages were awarded, we would submit that there
2  is a second and even more compelling reason in this case why you
3  still can't include the wrongful death damages, the full value of
4  life damages in on the compensatory side of that ledger.  And that
5  is because, first of all, Georgia law is very clear that you
6  cannot have punitive damages added onto a wrongful death claim in
7  addition to the full value of life, measure of damages.  Why is
8  that?

9          Well, the reason is because the full value of life
10  measure of damages is already itself punitive.  The Georgia
11  Supreme Court has explained that.  It's punitive in more than one
12  respect.  It's punitive in the sense that the damages are actually
13  awarded to somebody irrespective of the loss they sustained,
14  because you measure the full value of life from the perspective of
15  the decedent.  And so whoever is entitled under statute to make
16  that recovery as their survivor -- you know, it doesn't matter
17  what they lost.

18          Now, there is no doubt in most cases the people who are
19  entitled to recover have lost a great deal.  They have endured a
20  great deal of suffering in those circumstances.  But it's not
21  inevitably true, Your Honor.  You can imagine in strange
22  relationships where somebody recovers for the loss of a relative
23  when they are entitled under statute to recover, and it's really
24  not a loss that is felt to them.  We he don't suggest that's the
25  case with Ms. Andrews, but that is the reality.  The measure of

1  damages awards substantial damages to someone who did not

2  themselves sustain the injury and is not required to show that

3  they sustained any injury themselves.

4          The measure of damages is, also, punitive in the sense

5  that it allows for the full value of life, which the Georgia

6  Supreme Court has explained exceed the actual value of life.  The

7  economic component you don't back out necessarily, and the usual

8  expenses of life.  But the Georgia Supreme Court has made very

9  clear that the full value of life measure of damages is itself

10 punitive, and it is intended, the Court has said, to make homicide

11 expensive in Georgia.  It is intended to make civil defendants

12 who -- whether it is by negligence or intent have caused the death

13 of someone.  It is intended to make that very, very expensive for

14 them.  It is intended to make them feel pain.  Because it is

15 itself punitive, to count it as compensatory really distorts both

16 sides of the ratio.  Because if you include the wrongful death

17 damages and you include them on the compensatory side, you are

18 overstating in the ratio what the compensatory damages are and you

19 are understating what the punitive damages are.

20          So we think that when you look at this in light of the

21 unique nature of Georgia law, that to calculate the ratio you

22 really have to exclude the wrongful death damages.  And when you

23 do, I think it is very, very difficult under the decisions of the

24 U.S. Supreme Court, under the decisions of the Eleventh Circuit,

25 and under the persuasive decisions that we have from the other

1   circuit courts around the country, I think it is very, very

2   difficult to sustain.  In fact, I think it's impossible to sustain

3   a 50-to-1 ratio in this case.

4          So with that, if the Court has any questions about our

5   arguments, I would be happy to address those.

6          THE COURT:  I don't have any questions.  Thank you, sir.

7          JUSTICE BLACKWELL:  Thank you.

8          THE COURT:  Mr. Butler.

9          MR. BUTLER:  Can we take a break before we proceed, Your

10  Honor?

11         THE COURT:  Yes, we can take a 15-minute break and we

12  can start back at 11:50.

13         (Whereupon, a break was taken.)

14         THE COURT:  Let me just say this.  I think we will be

15  done by 12:45, but if not, we will have to stop and take a lunch

16  break.  I have a meeting at 1:15.  At 1:15 it will probably take

17  about 30 minutes to go from here to get to the meeting.  So I'm

18  not trying to rush anybody.  I decided last night I wasn't going

19  to put time limits on y'all.  If we're not done by 12:45, we will

20  stop and take a lunch break.

21         Mr. Butler, you can proceed.

22         MR. BUTLER:  Thank you, Your Honor.  From my part, we'll

23  be done well before 12:45.

24         THE COURT:  Well, I have to get a reply.

25         MR. BUTLER:  Well, the argument from Autoliv was fairly

1   brief.

2   I want to start by agreeing with Justice Blackwell that

3   the issue has been well-briefed.  Mr. Scribner started by talking

4   about Bosch, which was the last thing in their motion which was

5   completely dealt with at the trial.  And I would respectfully

6   submit that this motion is more proof about why punitive damages

7   were and are mandatory.  Remember, the motion says there should

8   have been no punitive damages at all.  So does the reply brief.

9   This defendant is unrepentant, has no contrition, still insists it

10  was blameless and pure seven-and-a-half years after this lawsuit

11  was filed, nine after Mr. Andrews was killed.  This defendant says

12  of the Court's final order of judgment that it was, quote,

13  counterintuitive, close quote, excessive, close quote, improper,

14  close quote, and represents, quote, a manifest injustice.

15  I don't think there is any doubt about the necessity

16  both in punitive damages and large punitive damages.  And this

17  defendant remains unrepentant with no contrition, despite the fact

18  that the seat belt that killed Mr. Andrews is still out there.

19  The Court will recall, I think it's in your judgment,

20  that Mr. Prentkowski, the corporate representative, basically said

21  that Autoliv does no field performance analysis at all.  Well, I

22  have been doing auto part cases since 1986 or '7.  The first one

23  was against Nissan for the family of a young law student who was

24  driving to watch me try a case when he got killed.  And Jeffrey

25  Willis (phonetic).  And I remember another one -- a defendant that

1   didn't at least have some field performance analysis function.

2   Now, sometimes they weren't very good, they weren't complete, but

3   the defendants don't get the documents, they didn't have them

4   produced.  But they all except Autoliv, at least, have something

5   that they can call field performance analysis.

6          The problem here is that there is still no warning of

7   the danger these seat belts pose.  This defendant can't give a

8   warning about a seat belt so defective that it is useless,

9   useless, if the airbag fails, which is foreseeable, and it

10  happens, as defendants had to admit finally.

11         Instead of warning people, as it should, especially

12  given this Court's judgment, Autoliv is paying lawyers to defend

13  the indefensible and attack all who disagree.

14         There's a reason for that.  Delaying payment makes money

15  for Autoliv.  I think we put this in our response brief.  Whatever

16  value you put on this case, Autoliv has held that money for

17  seven-and-a-half years.  Not warning people, not doing a recall

18  saves money for Autoliv.

19         The fundamental problem we have with Autoliv's motion is

20  this:  Except for the ratio argument, which is new, all the rest,

21  which is also humbug, I'll get to that in a moment, all of the

22  rest of it is nothing but a rehash of what was considered before

23  or during trial.  Every bit of it.  That means that the motion,

24  except for the ratio argument, is nothing but pure venting.  We

25  put this in our -- in our response, and I don't know what page it

1  is on, but we cited the Eleventh Circuit law about rule 59(e).

2  It's very clear.  Quote, the only grounds for granting a Rule

3  59(e) motion is newly-discovered evidence -- not here -- or

4  manifest errors of law or fact, close quote.

5          THE COURT:  Mr. Scribner is arguing the Court made a

6  manifest error of fact.

7          MR. BUTLER:  He says that.  I'm going to get to Bosch

8  last, because that's where they put it last.  It's a throwaway

9  argument, but I'll get to that, Judge.

10         A lawyer incanting the words -- I think this is clear

11 error, doesn't mean that it really is or that there is any grounds

12 for the lawyer to incant those words.  And in this case, there is

13 no grounds for that.

14         A Rule 59(e) motion is no substitute for appeal and thus

15 cannot be used to, quote, relitigate on matters or raise argument

16 or present evidence that could have been raised prior to the entry

17 of judgment, close quote.

18         Well, that touches the ratio argument, because if they

19 wanted to do this hairsplitting thing about -- upon what is

20 the -- I guess the comparator for ratio purposes is just pain and

21 suffering, or is it also death damages?  They could have done that

22 at trial.  I stood here to ask for not less than a hundred million

23 dollars in punitive damages.  They could have raised the ratio

24 argument then; they didn't do it.

25         We cited these cases, the Jacobs case, the In Re Kellogg

```
 1  case.  If you look at their reply brief, it is nothing but
 2  reargument.  The punitive damages award should be eliminated
 3  altogether.  That's page number one.  And then a bunch of others.
 4          Quote, the subject seat belt was not an outlier in any
 5  material way, close quote.  Well, the evidence it was an outlier
 6  was overwhelming and uncontradicted.  They didn't have an expert
 7  witness to testify to the contrary.  They couldn't get one.
 8  Nobody would testify to that for Autoliv.
 9          Here's another argument.  Autoliv Japan did not
10  consciously disregard Mazda's concerns.  The Court heard
11  Mr. Prentkowski.  Quote, Mazda wasn't concerned, so we weren't
12  concerned.
13          The Court improperly considered evidence of nonparty
14  Autoliv, Inc., financial conditions.  Well, now, Mr. Blackwell --
15  Justice Blackwell just got up here and said something different
16  than the argument heading.  The argument heading is, quote, the
17  Court improperly considered evidence of nonparty Autoliv, Inc.,
18  financial condition.  Mr. Blackwell said -- let me find it here.
19  Now, it's on here.  I can't find it.  I wrote it down.  But it
20  basically said, the Court based its punitive damages verdict upon
21  the financial condition of Autoliv, Inc.  That's not in the
22  judgment.  It's not true.
23          Now, I submitted to the Court earlier this astounding
24  document, Plaintiffs' Exhibit 1184, which is a January 28, 2022,
25  submission to the SEC by Autoliv, Inc., the parent corporation.
```

1  If you look at paragraph -- the second page, Item 202.  On January

2  28, 2022, Autoliv, Inc., paren, quote, the company, close quote,

3  close paren.  All right, that's who the company is, Autoliv, Inc.

4         Go over to page 6 of 26, at the bottom, rendered a

5  verdict against Autoliv.  That's what it says, not Autoliv Japan,

6  Ltd.  Entered an order requiring Autoliv to pay.  That's what it

7  says.  Because Autoliv manufactured the seat belt that was

8  involved in the accident.

9         Do you see the words Japan, comma, Limited there

10 anywhere?  No.  This Autoliv, Inc., functions as one integrated --

11 integral, integrated unit, as the Court observed in its judgment.

12 As a matter of fact, their corporate representative at trial

13 didn't even work at Autoliv Japan, Ltd., the nominal defendant in

14 this case.  There's more in this document that the Court needs to

15 see.

16        If you look at the next page, page 7, at the top of the

17 page, the company has determined that the loss with respect to

18 this litigation is probable.  Reading down, the third sentence, it

19 is reasonably possible that the company may have to pay the entire

20 amount of damages awarded by the Court.  Do you see that sentence?

21 Skip the next sentence.  We've submitted this in evidence.  I

22 don't mean to skip it.  The Court can consider it, but what I want

23 to highlight is the next sentence.  Quote, the company believes

24 that its insurance should cover all of the types of damages

25 awarded by the Court, close quote.

1          Well, awarded by the Court is $113.5 million.  Now, that

2   caught our attention.  Why?  Because we asked for all of the

3   insurance coverage, and all we got was an answer identifying a $25

4   million policy.  And Mr. Weeks put it in our response brief that

5   he complained about that, because it appeared that, once again,

6   that Autoliv had been guilty of concealing evidence, other

7   policies, because the Autoliv, Inc., report to the SEC says we've

8   got coverage for all $113.5 million.

9          And plaintiffs Exhibit 1185, I submit to the Court, is

10  an excerpt from Autoliv's reply brief, which again I think

11  demonstrates the nature of this defendant.  Unfortunately, the

12  pages as stapled by me are in the wrong order.  I'll ask you to

13  look at the last page.  Footnote 21.

14          I gave somebody my highlighted copy.  Who's got it?  Can

15  I have that so I can remember what I was supposed to say.  Thank

16  you, ma'am.

17          Look at the Footnote 21.  Finally, plaintiffs suggestion

18  that Autoliv Japan has improperly withheld insurance documents.

19  That is not true.  Now, that's a flat statement.

20          Look on down.  It says, during discovery Autoliv

21  revealed one policy for -- its primary policy for 25 million, but

22  it didn't produce anything else.  Plaintiff -- and then it blames

23  plaintiff for the fact that Autoliv didn't fully answer the

24  interrogatory.  But plaintiff chose not to challenge Autoliv

25  Japan's objection during discovery.  And then it said, what we

1   could do -- what plaintiff could do is, post judgment we could do

2   discovery to get the rest of the insurance coverage.  Well, we

3   asked years ago.  And there is a lot of Georgia cases on this, the

4   Court of Appeals and I think a Supreme Court case about not

5   disclosing insurance coverage.  The plaintiff is not required to

6   assume that the objection means that the defendant is concealing

7   evidence.  We're not required to do that.

8          And the point is, we ask the Court today to take into

9   consideration entering an order instructing this defendant to

10  identify all its insurance coverage pursuant to our interrogatory

11  that was posed years ago.

12         I'll tell you what, since Mr. -- Justice Blackwell only

13  covered two of their arguments, and I'll get to Bosch in a moment,

14  I'll be brief on that.  I want to cover, all of the arguments, all

15  of the bullet points for -- whatever they wrote.

16         THE COURT:  You do what you need to do.

17         MR. BUTLER:  All right.  Well, the brief that was

18  drafted by Mr. Weeks and Ms. Cannella is so good that I don't know

19  that I can add much to it.

20         I will say that this argument that there should have

21  been no punitive damages at all is truly frivolous and truly

22  outrageous.  Even making it ignores any evidence rule.  The

23  evidence rule applies to jury verdicts.  This is a bench verdict.

24  And to say that you were dead wrong is ridiculous, especially

25  when, as the Court's judgment recites, Autoliv's own corporate

1  representative admitted that the spool out was foreseeable and

2  foreseen and was avoidable, and that the consequences of that

3  foreseeable occurrence were foreseeably catastrophic, and that

4  that is the equivalent of intentional.

5         Now, I've been practicing law 45 years, and I've got a

6  lot of punitive damages verdicts.  I've never had a defendant's

7  own corporate representative admit that misconduct was the

8  equivalent of intentional until this case.

9         My former law partner tried a case in front of Judge

10 Duross Fitzpatrick many years ago.  The case arose in Americus and

11 tried in Macon, because that's where Judge Fitzpatrick lived, he

12 lived in Cochran, near there.  We went there and tried the case,

13 so we did.  And the jury came back with a question.  And normally

14 what judges do, they call the lawyers in and say this is the

15 question.  Do y'all have anything to say?  Judge Fitzpatrick

16 didn't do that.  He was a no-nonsense sort of judge.  He just

17 called the lawyers, he's standing at the bench with his question,

18 note paper in the hand, he called the jurors in and he said,

19 ladies and gentlemen, I have a note here that you want me to

20 recharge you on when it is appropriate to impose punitive damages.

21 I will now do that.  Ladies and gentlemen, you impose punitive

22 damages when after considering all of the evidence, you conclude

23 that the defendant just did not give a damn.  Is that clear?  They

24 all nodded their heads, got up and came back with a punitive

25 damages verdict.

1        That is the standard for punitive damages and it's aptly
2   admitted in this case.

3        We touched on the argument that the Court was wrong
4   considering the financial condition of Autoliv, and the Court's
5   judgment speaks to that.  I won't recite from it, but there is
6   more, and this is in our response brief.  Any time anybody from
7   Autoliv, any Autoliv speaks about this judgment, it's never
8   anybody from, quote, Autoliv Japan, Ltd., close quote.

9        There is a January 31 Law360 article quoting the senior
10  vice president of a communications firm, Autoliv, a lady named
11  Gabriella Echelon.  She works in Stockholm, Sweden.  She doesn't
12  work for Autoliv Japan, Ltd.  She works for Autoliv AB's
13  headquarters.  And her official statement on behalf of Autoliv was
14  this:  Autoliv believes, quote, final judgment should be modified
15  in several respects for the reasons set forth in, quote, our
16  motion, close quote.

17       Justice Blackwell said that this kind of conduct of
18  making no distinction itself -- making no distinction amongst
19  various corporate subsidiaries is fairly unremarkable.  Well, it's
20  remarkable to my experience.  I've never had this experience
21  before where there really is no distinction.  Justice Blackwell
22  said that the Court, to consider any evidence about Autoliv,
23  Inc's, financial condition, the Court first had to pierce the
24  corporate veil.  I listened very attentively.  Justice Blackwell
25  did not cite a single case from anywhere for that proposition.  I

 1  don't think there are any in the brief that he filed.

 2          Now, let me turn to this ratio argument.  First, first

 3  thing I want to say about it is this:  The issue in those cases,

 4  Gore and State Farm is notice, that's the due process issue.  Is

 5  the defendant put on notice that this could happen.  Well, what's

 6  the punitive verdict in this case?  Under $100 million.  28 years

 7  ago in Mosley v. General Motors, the Georgia Court of Appeals

 8  issued an opinion upholding or stating that $101 million punitive

 9  damages verdict was appropriate.  $101 million 28 years ago.  The

10  Court of Appeals held, quote, it was not unreasonable and rashly

11  served the purpose of punishing and deterring, close quote.

12          Given the fact that the award was supposed to achieve,

13  quote, the public nature of the harm in this case, the corporate

14  defendant involved and the protection afforded by the statute 101

15  provision, close quote.  That's 28 years ago.

16          There is a mention in the defendant's motion about how

17  they didn't have notice.  You're supposed to compare what sort of

18  non-civil litigation penalties might apply, and we covered this in

19  our brief.  They cite to the United States Code back in 2005.  But

20  in 2021, O.C.G.A. Section -- or excuse me, 49 U.S.C. § 30118(c)

21  provided penalties of up to $105 million.  I've got the wrong

22  section.  That's Section 301658.  $105 million, 28 years ago.

23  Notice, $101 million was approved based in theory by the Georgia

24  Court of Appeals.

25          The statute at issue for -- under the Federal Rule of

1   Vehicle Safety Act would allow penalties up to $105 million.

2            Justice Blackwell argued that, quote, it all depends on

3   what counts on the compensatory side of the ledger.  And to try to

4   get the punitive damages verdict down, they say only the pain and

5   suffering, $2 million count.  The death damages don't count.  With

6   all due respect to Justice Blackwell, that makes no sense at all.

7            The Court has to ask itself, does -- is the due process

8   clause of the United States Constitution different depending on

9   what state you're in?  Because that's their argument, that it is.

10           Why is that their argument?  In Alabama there is no

11  compensatory damages for wrongful death.  It's all punitive.

12  Well, what do you compare it to then?  I guess the due process

13  clause just doesn't exist for cases originating in South

14  Carolina -- in Alabama.  What about South Carolina?  Which, as I

15  recall, the death damages go to the estate.  The same place as

16  pain and suffering damages.  So in South Carolina if this case

17  were there, we would have $27 million worth of compensatories

18  undisputed, and the ratio would be 3.7, which it is under the

19  Court's judgment.  But because we're in Georgia and there is a

20  vagary of Georgia law that says the pain and suffering goes to

21  this lady, Ms. Andrews, as administrator of the estate, and the

22  wrongful death damages goes to this lady, Ms. Andrews, as personal

23  representative and surviving spouse, therefore, not all of that is

24  compensatory.  That's the argument.  Death damages are not

25  compensatory, so they don't count for ratio purposes.  That is

 1  hairsplitting nonsense.

 2          What about the states where -- unlike Georgia, where the

 3  measure of damages and the full value of the life to himself as

 4  though he had lived?  And under the law from 1991 and I've

 5  forgotten what it's called, it's a modified Lord Campbell's Act, I

 6  think, but don't trust me on that because that is a long time ago.

 7  There are states where the death damages are viewed from the

 8  perspective of the survivors.  What did they lose?

 9          Now, a wrongful death claim in Tennessee or in North

10  Carolina, where I've had them, is worth a lot less than a wrongful

11  death claim in Georgia because of the different viewpoints.

12  Because if viewed from the -- from under those states case law,

13  viewed from the standpoint of the survivor, that non-economic

14  damages are de minimis, especially in Tennessee, as I recall.

15          So what about in a state where the wrongful death case

16  is not as valuable as it is in Georgia?  Well, you change the

17  ratio according to Autoliv's argument.  Change the ratio.  That

18  means the due process clause means one thing in Georgia and

19  something entirely different in Tennessee.  Respectfully, by no

20  stretch of anybody's imagination, even the most brilliant lawyer

21  can it be said that parts of the United States' Constitution apply

22  or mean different things depending on which state you're in.  It's

23  nonsense.

24          Now, so what does count as damages?  Well, you know, the

25  whole argument is based upon BMW v. Gore.

1          So what did the U.S. Supreme Court say in BMW v. Gore?

2   First fact, I think, is reprehensibility, and defense lawyers

3   don't want to touch that too much because the Court's judgment

4   about reprehensibility is eloquent, and I'll just adopt it.

5          But the second factor is, quote, the ratio of the

6   punitive damages award to the actual or potential harm suffered by

7   the plaintiff, close quote.  All right, let's use that as

8   BMW v. Gore, 517 U.S. et seq., at page 574.  Let's look at the

9   actual or potential harm suffered by the plaintiff.  Here is the

10  plaintiff.  What was the actual harm suffered by the, quote,

11  plaintiff, close quote.  Her husband was killed.  And they say

12  that doesn't count.  It's nonsense.

13         But there's more.  What was the potential harm?  Micah

14  could have been -- could have survived.  He could have just been

15  brain-damaged in a coma like the plaintiff in the Bibbs case which

16  we to cited in our brief, Bibbs v. Toyota.  He could have lived 30

17  years with a life care plan of 4 to $7 million.  Gore says that

18  counts.  See, would not have even had this argument if they had

19  not killed Micah.  If he had been brain-damaged, then there would

20  have been a claim not by his estate but by his conservator for

21  pain and suffering, including life care plan.  What if his life

22  care plan was $47 million?  Let's put that in the ratio.  Then the

23  punitive damages the Court entered would be two to one.

24         There's no doubt that what the Supreme Court said was,

25  quote, the actual or potential harm suffered by the plaintiff.

1          Now, Autoliv discussion of ratios begs the question,

2   which I don't ask the Court to lay judgment until the U.S. Supreme

3   Court takes it up again, the future of viability of this entire

4   hairsplitting ratio argument.  Given the changes in the makeup of

5   the Court and the protestations by those recently entering the

6   Court that there are strict constructions.  If you look back at

7   some of the dissents from these ratio cases, a combination of

8   folks, Scalia, Thomas and Ginsburg.  That's kind of an academic

9   observation, and we're not supposed to deal in academics.

10          And so with respect to this hairsplitting ratio

11   argument, we respectfully submit that the actual damages include

12   death, the potential damages would have been much more in terms of

13   compensatory damages had he been brain-damaged in a coma for

14   decades.

15          The mere fact that under the venues of Georgia law, the

16   pain and suffering damages go to this lady as administrator, and

17   the wrongful death damages go to this lady as his personal

18   representative is meaningless for purposes of trying to calculate

19   the ratio.  Actual or potential is $27 million rendered in this

20   Court's judgment.

21          This ratio argument is not unlike Autoliv's, quote, not

22   actively involved in the design argument, which was frivolous at

23   all times.  And not unlike Autoliv's refusal for seven years to

24   admit that the airbag was defective, which was frivolous, which

25   Autoliv essentially admitted by finally admitting on the morning

1  on the first day of trial that the airbag was defective.  Really

2  incredible, seven years.

3        We respectfully submit that the argument is, according

4  to the words of a defense lawyer who is close to me, at a minimum,

5  unquote, intellectually dishonest.

6        I will talk about -- just to hit on the excessive fines

7  argument that remains in their motion, no Georgia court has ever

8  held that punitive damage verdict should be reversed because of

9  excessive fines.  The cases cited in our response about that

10  Hospital Authority of Qwinnett County v. Jones, that was my case.

11  And Mack Trucks, Inc. V. Conkle, I filed an amicus curiae brief in

12  that case.

13        Autoliv even makes an argument about capping the

14  punitive damages in -- in an amount -- at the amount of

15  compensatory damages, which would be $27 million here.  And we, as

16  we've noted in our response brief, in the Cote case just last

17  year, the Eleventh Circuit flatly rejected that very argument, but

18  they still make it, they still make it in their motion to amend,

19  an argument that they know that the Eleventh Circuit just rejected

20  last June.

21        Now, let's turn to Bosch.  Your Honor, I will be brief.

22  And I will go back to the first point I made, and that is, Rule 59

23  does not allow you to rehash things already litigated in a motion

24  to amend a judgment.  This is already litigated.  The Court

25  decided this.  And the Court's order stated, judgment stated,

1  Document 534, page 64, quote, Autoliv has not established a
2  rational basis for apportionment as to Mr. Andrews and Bosch, but
3  has established a rational basis for apportionment as to Mazda,
4  close quote.

5       Well, you can't have apportionment without a rational
6  basis.  That's the law.  Mr. Scribner can't change that law.
7  There was no error at all.  There was certainly nothing anyone
8  could reasonably call, quote, clear error, close quote.

9       As the Court noted, Chris Caruso's testimony about this
10 was, quote, credible, close quote, and unrebutted, close quote.
11 And remember this, whose expert was Chris Caruso?  Ours and
12 theirs.  They identified him as an expert.  We had a big
13 kerfuffle, I guess is the way you pronounce it, about that.

14      What this is all about is it is undisputed and
15 indisputable that Mazda was responsible for the airbag sensoring
16 system.  That is what Mr. Caruso testified to without rebuttal,
17 without contradiction.  And he was their expert witness.  What
18 Mr. Scribner wants is two bites of that delicious apportionment
19 apple.  You've already apportioned to Mazda, and he wants to take
20 another bite of the compensatory damages and apportion some to
21 Bosch.  That argument is purely frivolous.

22      Mr. Scribner said plaintiffs agree that the elements of
23 a product liability claim is met as to Bosch.  That is not true.
24 It's not true.  It's not true that we agree, it's not true that
25 they are met.  And the reason is one of the elements of a products

1  liability claim is that the component was defective when it was

2  sold.  There is no proof of that; not by us, not by Bosch.  Bosch

3  sold a single sensor.  There is no evidence that single sensor was

4  defective.  Mr. Scribner tries to alleve (sic) that distinction by

5  talking about how there should have been two sensors.  Well, we

6  agree, there should have been two sensors.  That wasn't Bosch's

7  decision, that was Mazda's decision.

8         The single sensor was not defective when Bosch shipped

9  it.  End of products liability claim.  That's why we dismissed it,

10 unless we determine that.  It was defective because of the way

11 Mazda implemented it.  That's undisputed.

12        Now, Mr. Scribner wanted to cite to Mr. Caruso's

13 testimony.  Here is what Mr. Caruso said.  This is Exhibit 2 to

14 our response document, 545-2, trial testimony on Wednesday,

15 October 6, page 88.

16        Question -- who is asking the question?  Do you

17 remember?  Is that you?  Ms. Cannella was asking these questions.

18        Did you determine whether it was Bosch's fault that the

19 wire got cut or the sensor came apart?

20        Answer:  It was a combination of Mazda's decision on how

21 to route this wire and the decision to use the substandard

22 connector.  Not sensor, connector.

23        Question:  And using the connector was Mazda's decision

24 or Bosch's decision?

25        Answer:  From what I gathered from all of the

1  documentation that I read, it was Mazda's decision.

2        Question:  You didn't have a document that you could

3  hold up and show this is Bosch's fault, at least in part?

4        Answer:  Correct, I did not.

5        Why are we arguing about Bosch?  They put it at the end

6  of their motion, because it was a throwaway that we spent all this

7  time on.

8        Mr. Scribner said, quote, it is undisputed that Bosch

9  sold a defective part, close quote.  Not only is that not correct,

10 not only is it not undisputed that Bosch sold a defective part,

11 there is no evidence that Bosch did that.  That's why they were

12 dismissed.

13       Mr. Scribner quoted -- he said that if Mr. Caruso said

14 if you had two sensors, there would be no defect.  He didn't

15 say -- Mr. Caruso didn't say that the sensor that Bosch sold was

16 defective, period.

17       Now, why do we know that for Mr. Scribner to make that

18 argument, he first had to say there was evidence that -- it would

19 have to be unrebutted evidence -- that the Bosch sensor that it

20 sold was fake.  How did we know he has to do that?  Well, we have

21 an opinion by the Eleventh Circuit.  Well, this case.  It's just a

22 two-page opinion.

23       THE COURT:  Okay.

24       MR. BUTLER:  The names of the judges and the word per

25 curiam is on page 1.  The second page has three lines.  In the two

1   pages of the Eleventh Circuit opinion in this case, the Eleventh

2   Circuit held that under Georgia law, the main factor of any

3   personal property sold as new property directly or through a

4   dealer or any other person shall be liable in tort for personal

5   injury resulting because the property when sold by the

6   manufacturer was, brackets, defective, close brackets, and its

7   condition when sold was the proximate cause of the injuries

8   sustained.

9           No evidence that the product that Bosch sold was

10  defective, none whatsoever.

11          We will conclude by saying this Court has invested an

12  enormous amount of time and effort in trying the case and pretrial

13  proceedings and its judgments, finding of facts and conclusions of

14  law.  There is no plain error of law or of fact.  Indeed, there is

15  nothing new argued by Autoliv except for this ratio argument.

16  There is no newly-discovered evidence.  Autoliv doesn't even

17  contend that there is.

18          Plaintiff Jamie Andrews respectfully requests -- makes

19  this request of the Court, given what Mr. Scribner said today,

20  which was not unexpected, let's get on to the Eleventh Circuit.

21  Let's review this Court's judgment de novo and reverse only if it

22  finds, quote, clear error, close quote, which it cannot.  Thank

23  you very much, Your Honor.

24          THE COURT:  Thank you, Mr. Butler.

25          Before Mr. Butler sits down, Mr. Butler gave us,

 1  Mr. Scribner, Plaintiffs' Exhibit 1184, and Plaintiffs' Exhibit

 2  1185.  Any objection to the Court considering these?

 3            MR. SCRIBNER:  No, sir.

 4            I'll be brief.

 5            Four things:  First, the quote that there was no

 6  rational basis to apportion fault to Bosch sounds familiar because

 7  they drafted it.  That was in their proposed order, and they led

 8  you astray.  It was wrong.

 9            Two, wires cut.  I covered that.  It doesn't matter.  It

10  doesn't matter if it gets dislodged when you have two; he's alive

11  today.  I don't know why we are even talking amount at this point.

12            Three, he said there was no evidence that the electronic

13  sensor system caused this failure.  It's your judgment, page 20

14  and 71.  You say, quote, Bosch's airbag electronic front sensor

15  system component ultimately caused the nondeployment of the

16  airbag.  Their expert agrees.  Here's the rub.  This is the -- all

17  of that -- I'm not going to use "frivolous."  I'm not going to use

18  "wasteful."  You know, I've heard so much of it.  I've heard so

19  much of it.  I heard the name calling.  I'm not going to do it.

20  But everything that you just heard up to this point is not the

21  rub.  This is the rub.  Manifest injustice.  It's a high standard,

22  no doubt about it.  But it doesn't suggest evil, intent to harm.

23  You know, I think some lawyers look at that language and they

24  think that I have to prove that you tried to hurt us or you

25  intentionally did something.  That's not what I'm suggesting at

 1   all.  I'm suggesting that you made a mistake.  I've made mistakes.

 2   Everybody makes mistake.  And I would like to see you remedy that

 3   mistake, and I'm going to leave you with this.  Because the last

 4   thing you said was, there is no evidence that one sensor is

 5   defective.  I'm going to leave you with that, because here is

 6   where I didn't make a mistake and here is where their expert, the

 7   one that they paid to get up and testify, here's what he said.

 8   And I'm citing Chris Caruso trial transcript Volume 3 a.m. at page

 9   110.

10        Question:  So $5, if Mazda pays that and adds the

11   sensor, this airbag would have deployed from this accident; right?

12        Answer:  That would be my belief.  A properly developed

13   system, yes, it would deploy.

14        That's it.  Of course he said several times that two is

15   better than one.  One rendered it defective, if two were there, he

16   would be alive today, and Bosch supplied that part.  Those are the

17   facts.  I'm going to leave the rest for Justice Blackwell, unless

18   you have any questions.

19        THE COURT:  Thank you, Mr. Scribner.

20        MR. BUTLER:  May I respond very briefly?

21        THE COURT:  No, they get the last word.  Justice

22   Blackwell.

23        JUSTICE BLACKWELL:  Judge, I'll be very brief.  I do

24   want to -- I do want to hit on a few points that Mr. Butler made

25   in connection with the ratio argument.

1          And kind of working backwards through his argument, he

2    talked near the end of his discussion of the ratio about the Cote

3    case from the Eleventh Circuit, and that was a Phillip Morris

4    case, it one of the Engle tobacco cases that came out of Florida.

5    In that case Phillip Morris took the position that where you had a

6    $6 million compensatory award in that case, you absolutely were

7    required to go no further than a one-to-one ratio.  So you

8    couldn't have a punitive award in excess of that amount.

9          The Eleventh Circuit rejected that and probably

10   correctly in the sense that there is no bright lines.

11         I mean, even in BMW v. Gore and State Farm v. Campbell,

12   U.S. Supreme Court makes very clear that they're not interested in

13   drawing bright lines.  It doesn't change the fact that as the

14   Eleventh Circuit recognized only about a year before the Cote case

15   in Williams v. First Advantage, which is 947 F.3d 735, in that

16   case they recognized the principle that the Supreme Court did

17   allude to in Gore and Campbell, which is there is an inverse

18   relationship between the acceptability of a particular ratio and

19   the size of the compensatory award.  When you have a really

20   substantial compensatory award, a higher ratio is less justifiable

21   generally speaking.

22         And, also, as a general proposition, when you have

23   de minimis compensatory damages, a case where this could have been

24   really bad but it turned out not to be just by fortuity, that

25   can -- that can justify a much higher ratio.  That's -- that's

1   where the Courts have looked to, as Gore and Campbell suggest,

2   potential harm in lieu of actual harm.  They tend to go to

3   potential harm in cases where you have a very de minimis sort of

4   harm actually proved for conduct that threatened very serious

5   harm.  That is just not the case in a case like this one.

6          Now, Mr. Butler said Autoliv seems to be arguing that

7   due process means something different in Georgia than it does in

8   Alabama, than it does in South Carolina.  That is not what we are

9   arguing.  Due process means the same thing in all 50 states of

10  these United States.  Due process means that there has to be a

11  reasonable relationship and proportionality between compensatory

12  damages and punitive damages.

13         Now, what a particular state's legislature decides they

14  will compensate for, what they decide they will punish for, that

15  may very from state to state.  And so you might have cases that

16  involve similar fact patterns that come out very differently under

17  the due process ratio, but that's simply because of legislative

18  choices made state to state about what conduct leads to punitive

19  damages and what conduct leads to compensatory damages.  Due

20  process requiring a proportionality, requiring a reasonable

21  relationship between the two in any particular case, that is the

22  same across the nation.

23         Mr. Butler referred to the civil penalty, and the course

24  of civil penalty we could find, Your Honor, was the one that is in

25  the Federal Motor Vehicle Safety Act for violations of those

1   standards.  Of course, this seat belt did not violate those

2   federal standards.  But we think that was the closest

3   legislatively authorized penalty.  And it is true that Congress

4   has raised the aggregate penalty substantially since the time that

5   it was involved in this case in the early 2000s, but we think it's

6   appropriate for the Court to look at what the penalty was then.

7   Because the entire purpose, and Gore and Campbell make this clear,

8   the entire purpose of looking at what legislature had authorized,

9   is to see whether a defendant had fair notice.  And so you would

10  have fair notice at the point in time when you take the action

11  that is complained of.  And here the action complained of is the

12  desire and provision of a seat belt for a 2005 Mazda 3.  In fact,

13  in the Clark case out of the Sixth Circuit, which is cited in our

14  briefs, the Clark case that's what they do.  It was actually a

15  case decided around 2005, but they actually look back to

16  the -- what the penalty was in the mid-'90s when the relevant

17  conduct in that case occurred.  And they said that is the civil

18  penalty we look to on the third guidepost.

19          The last point I want to make is this.  Mr. Butler

20  alluded to the great success he's had over the years in getting

21  punitive damages awards, and there is -- I'm quite familiar with

22  his record.  You are quite familiar with his record, Your Honor.

23  He has a very impressive record.  And he knows the Mobley case

24  better than I ever could.  That was -- that was his case, and he

25  mentioned the decision of the Court of Appeals in 1994.

1          Now, for several reasons we don't think it's really

2     authority for much of anything on punitive damages.  First of all,

3     Judge Banke especially concurred on rehearing did not join the --

4     Judge Blackburn's discussion of punitive damages.  Even in the

5     original opinion, they were reversing on liability issues for a

6     new trial.  So the punitive damages award went out the window

7     anyway.  So really anything the Court said about punitive damages

8     was dicta.  Judge Banke recognized that.  That's why his

9     disagreement with the majority about punitive damages was a

10    concurrence and not a dissent.  If it had been a dissent, if there

11    actually was any holding in Moseley on punitive damages, I believe

12    at that point in time the rules of the Court of Appeals would have

13    required it to go to seven judges, instead of just the three.  So

14    we know there was not a holding about upholding punitive damages.

15          But nonetheless, there is one very interesting aspect of

16    Judge Blackburn's discussion of punitive damages.  And the Moseley

17    case is 213 Ga. App. 875, and this is over on page 885.  And this

18    is what's so interesting.  He is addressing an argument about

19    ratio.  Now, this is before BMW v. Gore.  The Court may recall

20    there were a couple of cases from the U.S. Supreme Court that kind

21    of hinted what the BMW v. Gore ultimate analysis would be.  There

22    was the Haslip case, I think in the late '80s.  There was the TXO

23    case.  The Court didn't firmly lay down the due process framework

24    until BMW v. Gore, but nonetheless they kind of hinted at some of

25    these things, and some of the principles were starting to take

 1   shape by the early '90s when Moseley was decided.  So GM in that

 2   case in challenging the punitive damages was talking about the

 3   ratio.

 4            Now, what were the awards in Moseley?  It was a wrongful

 5   death case, but there were also damages awarded for pain and

 6   suffering.  So what were those damages?  A little more than

 7   $4 million on the wrongful death claim, $1 on pain and suffering,

 8   and $101 million in punitive damages.

 9            Judge Blackburn writes this:  In this case GM concedes

10   that the proportion of punitive damages to compensatory damages is

11   not dispositive, but nevertheless contends that the proportion in

12   the instant case, i.e., 100 million to one, demonstrates the

13   excessiveness of the award.

14            So Judge Blackburn thought in a case that involved $1 in

15   pain and suffering damages, $4.2 million in wrongful death damages

16   and $101 million in punitives, he thought -- at least his opinion

17   suggested, he thought that the ratio was 100 million to one.  Not

18   a $101 million to $4 million.

19            MR. BUTLER:  Do you have a copy of the Moseley opinion

20   that you're reading, by any chance?

21            JUSTICE BLACKWELL:  We do.

22            MR. BUTLER:  Did you say Judge Blackburn said that or GM

23   contended that?

24            JUSTICE BLACKWELL:  Judge Blackburn was writing about

25   what GM contentions were, Your Honor, but in doing so he points

1   out that the proportion in the instant case, i.e., 101 million to

2   1.  Like I said, everything in Moseley on punitive damages is in

3   some sense dicta, but what we are proposing, that wrongful death

4   damages should be excluded, is nothing new.  It was acknowledged

5   by Judge Blackburn in the Moseley decision.

6          So with that, Your Honor, we will ask the Court to give

7   full consideration, I'm sure the Court will, to our motion.  We

8   would ask the Court to grant the motion and revise the award

9   accordingly.

10         THE COURT:  Thank you.  Thank you, Judge Blackwell.

11         Thank y'all for being here today, for your time, for

12  your preparation.  Y'all were really prepared, and I like to

13  acknowledge when the lawyers come in prepared.  Don't worry about

14  sending anything more today.  Wait until you get my order and

15  scheduling and everything.  I will keep y'all posted.  I like to

16  get all the orders out at one time, so I may not rule on the third

17  motion until I hear everything and just issue one big order.

18  Thank y'all.  Have a good day.

19         MR. SCRIBNER:  Thank you, Your Honor.

20         (Whereupon, the hearing concluded at 12:42 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 6th day of April, 2022.

10

11

12

13

14                       /s/Viola S. Zborowski_____
                         VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                       OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25

—UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT—