# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
404-881-7000 | Fax: 404-881-7777

Doug Scribner                           Direct Dial: 404-881-7752                    Email: doug.scribner@alston.com

May 12, 2020

**VIA EMAIL**

Tedra L. Cannella, Esq.
Butler Wooten & Peak LLP
2719 Buford Highway
Atlanta, Georgia 30334
tedra@butlerwooten.com



Plaintiff's Exhibit

PX 1142

Re: *Jamie Lee Andrews, et al. v. Autoliv Japan, Ltd., et al.*
Civil Action File No. 1:14-cv-03432-SCJ
United States District Court, Northern District of Georgia

Dear Ms. Cannella:

Below are Autoliv's responses to the stipulations proposed in your May 8, 2020 letter and your email from earlier today. Where a proposed stipulation has been modified with redlines, Autoliv will only agree to the stipulation as modified. For those responses with no redlines, Autoliv agrees to the proposed stipulation as written. Autoliv continues to consider Proposed Stipulations 39, 40, and 49, but will first need to confer with David Prentkowski, who is currently on furlough as a result of COVID-19.

As you will see below, Autoliv has rejected Proposed Stipulations 54 through 58. Those stipulations do not identify all potentially at-fault parties or the allocation of fault between them, and the stipulations inadequately describe all of the ways in which Chris Caruso opines that the EFS System was defective—from the testing performed by Mazda during product development to the selection of a Single EFS System (as opposed to a Dual EFS System) to the push tab connector that never should have been utilized in a vehicle safety system. In short, no Stipulation can adequately capture Mr. Caruso's numerous criticisms of the EFS System. Moreover, Proposed Stipulations 54 through 58 are not "facts"—they are opinions, and they need context. Therefore, we plan on playing Autoliv's designated portions of Mr. Caruso's deposition, which will last less than two hours.

Finally, while Autoliv has agreed to a number of stipulations below, Autoliv reserves the right to introduce evidence to place these stipulations in the proper context.

1. The defendant in this case, Autoliv, is a manufacturer of components used in cars made by many automakers.

Alston & Bird LLP                                                                                         www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Los Angeles | New York | Research Triangle | San Francisco | Silicon Valley | Washington, D.C.

May 12, 2020
Page 2

2. Autoliv makes seatbel~~s~~ components and airbag components.

3. On April 12, 2013, Mr. Andrews left work at the Georgia Aquarium in his 2005 Mazda3 and headed for home.

4. As Mr. Andrews drove north on I-575 in Cobb County, Georgia, Mr. Andrews drove his car off ~~left~~ the highway and hit a cluster of trees. Mr. Andrews' actions were the cause of the collision which resulted in his death.

5. Mr. Andrews was wearing his seatbelt properly at the time of the wreck.

6. ~~Mr. Andrews was not speeding just before the wreck.~~

7. The speed of Mr. Andrews' car when it hit the trees was about 35 mph.

8. The principle direction of force was 10-15 degrees from the left of straight ahead, which is roughly the 11:30 position on a clock.

9. Defendant Autoliv manufactured the drivers' seatbelt assembly in Mr. Andrews' Mazda3 in accordance with Mazda's design specifications.

10. Mr. Andrews' seatbelt paid ~~spooled~~ out approximately 20 inches in the April 12, 2013 wreck.

11. Mr. Andrews' head hit the steering wheel during the collision.

12. Mr. Andrews died from the injur~~ies~~y he received ~~as a result of his head hitting the steering wheel~~ in the collision—and more specifically from sequelae of generalized trauma.

13. ~~Mr. Andrews was unresponsive when EMS arrived at the scene.~~ Mr. Andrews died in the presence of Officer A.J. Porter prior to the arrival of EMS and the Fire Department.

14. ~~Mr. Andrews was pronounced dead after arriving at Kennestone Hospital in Marietta, Georgia.~~

15. Weather played no factor in the April 12, 2013 wreck.

16. ~~Mr. Andrews was not talking on his cellphone or texting at the time of the collision.~~

17. Mr. Andrews was not under the influence of ~~drugs or~~ alcohol at ~~of~~ the time of the collision.

18. ~~Mr. Andrews had no health problem or medical event that contributed to the collision.~~

May 12, 2020
Page 3

19. ~~The seatbelt in the 2005 Mazda3 spooled out 16.85 inches in the NCAP 35 mph frontal barrier test.~~ <ins>Pursuant to Plaintiff's and Autoliv's agreement that all documents produced in this case by current or former parties are authentic business records, the test results for the 2005 Mazda 3 are admissible.</ins>

20. A "seatbelt retractor" is a device that stores, <ins>pays</ins>~~lets~~ out, and retracts seatbelt webbing.

21. Inside the seatbelt retractor is a spindle, and the seatbelt webbing is wound around this spindle.

22. ~~Devices called~~ "<ins>L</ins>~~l~~oad limiters" are <ins>always</ins>~~often~~ added to seatbelt <ins>assemblie</ins>s, and they can decrease the risk of injuries that can be caused <ins>by a seatbelt assembly that does not allow the occupant to move forward after a significant impact</ins>~~from a locked seatbelt~~.

23. A "torsion bar" is one kind of load limiter.

24. A "torsion bar" is ~~a special kind of seatbelt retractor spindle, the~~<ins>a</ins> metal bar around which the seatbelt webbing is wrapped.

25. In a collision the torsion bar twists to allow seatbelt webbing to come off the spindle.

26. How easily a torsion bar twists and allows seatbelts webbing to <ins>pay</ins>~~spool~~ out depends on the torsion bar's deployment threshold~~, which is to say the torsion bar's strength~~.

27. ~~A torsion bar with a higher deployment threshold will result in less spool out, all other things about a crash being equal.~~

28. At the time Autoliv sold Mazda the seatbelt in Mr. Andrews' car, Autoliv ~~already~~ had manufactured another seatbelt retractor with a load limit<ins>ing threshold higher</ins> ~~er several times stronger~~ than the one in Mr. Andrews' seatbelt.

29. A "stop" is a device added to the seatbelt retractor to limit the amount of seatbelt webbing ~~the torsion bar can allow to~~ <ins>that pays</ins>~~come~~ out of the retractor in a collision.

30. At the time Autoliv <ins>supplied</ins> ~~sold~~ Mazda <ins>with</ins> the seatbelt<ins> assembly</ins> ~~in~~ <ins>for</ins> Mr. Andrews' <ins>2005 Mazda 3 in accordance with Mazda's written design specifications</ins>~~car~~, Autoliv had manufactured another seatbelt retractor with a stop. <ins>At the time Mazda purchased the seatbelt assembly for the 2005 Mazda 3, Mazda had manufactured vehicles with a stop in their driver seatbelt assemblies, including the 1987 Mazda 626 and the 1991 Mazda Protégé.</ins>

May 12, 2020
Page 4

31. The seatbelt assembly that Autoliv supplied~~sold~~ to Mazda—in accordance with Mazda's written design specifications—for the next year model Mazda3—the 2006 model—ha~~d~~s a deployment threshold higher ~~torsion bar in the seatbelt retractor stronger~~ than the one in Mr. Andrews' 2005 Mazda3 ~~car~~. Before the 2005 Mazda 3 was manufactured by Mazda, Mazda had manufactured vehicles with seatbelts that had deployment thresholds higher than the one in the 2005 Mazda 3.

32. In a frontal collision, the seatbelt retractor may lock~~s~~ to provide controlled pay~~prevent uncontrolled spool~~ out of the seatbelt webbing, thus providing for controlled ~~limiting the~~ forward movement of the~~an~~ occupant.

33. During product development of the 2005 Mazda 3, Autoliv provided Mazda with "high," "medium," and "low" deployment threshold options for the front seat seatbelt assembly. Mazda made the final decision to utilize a deployment threshold of 2 ± .5 kilonewtons. Autoliv did not ~~tell~~ instruct Mazda to use ~~a torsion bar with~~ a higher deployment threshold ~~in the front seat positions in the 2005 Mazda3~~.

34. Mazda made the final decision not to utilize a retractor with a stop in the front seat position in the 2005 Mazda3. Autoliv did not ~~tell~~instruct Mazda to use a retractor with a stop. ~~in the 2005 Mazda3 in the front seat positions in the 2005 Mazda3.~~ However, Mazda had previously manufactured vehicles with a stop in the front seat seatbelt assembly, including the 1987 Mazda 626 and the 1991 Mazda Protégé.

35. The retractor used in Mr. Andrews' Mazda3 was Autoliv's "R27LL" retractor.

36. Autoliv has sold seatbelt assemblies that include the R27LL retractor to other automakers besides Mazda.

37. Autoliv sold seatbelt assemblies that include the R27LL retractor to other automakers before Autoliv sold it to Mazda for the Mazda3.

38. ~~Autoliv has a duty to manufacture non-defective seatbelts.~~

39. ~~The "platform" of a vehicle means its basic structure including most of the floor pan or undercarriage and engine compartment, which is often referred to as the vehicle's chassis.~~

40. ~~Vehicles can share the same common structure and thus be considered to have the same common platform even if they are not the same type, same make, or even sold by the same manufacturer.~~

41. The vehicle platform for the 2004 through 2009 model year Mazda3 cars and for the 2004 through 2009 model year Volvo S40 cars was jointly

May 12, 2020
Page 5

engineered by Mazda, Ford, and Volvo. <ins>However, Ford and Volvo did not have any role in the design or manufacture of the occupant restraint system of the 2004-2009 model year Mazda 3. Decisions regarding the design and manufacture of the occupant restraint system were made solely by Mazda.</ins>

42. The 2004 through 2009 model year Volvo S40 cars were built on the same platform as the 2004 through 2009 model year Mazda3 cars. <ins>However, Volvo did not have any role in the design or manufacture of the occupant restraint system of the 2004-2009 model year Mazda 3. Decisions regarding the design and manufacture of the occupant restraint system were made solely by Mazda.</ins>

43. Autoliv <ins>supplied</ins> ~~sold to~~ Volvo <ins>with</ins> the seatbelt <ins>assembly</ins> that Volvo used for the 2004 through 2009 model year Volvo S40 cars <ins>in accordance with Volvo's written design specifications</ins>.

44. ~~The seatbelt Autoliv sold to Volvo for the 2004 through 2009 model year S40 cars allowed much less spoolout than did the seatbelt Autoliv sold to Mazda for the 2005 Mazda3 car like the one Mr. Andrews was driving.~~ <ins>Pursuant to Plaintiff's and Autoliv's agreement that all documents produced by current or former parties in this case are authentic business records, the test results for the 2005 Mazda 3 are admissible. Autoliv will also stipulate to the admissibility of NCAP test results for the 2004 through 2009 Volvo S40 cars.</ins>

45. The seatbelt <ins>assembly that</ins> Autoliv <ins>supplied</ins>~~sold~~ to Volvo for the driver's seat of the 2004 through 2009 model year Volvo S40 cars had a <ins>torsion bar with a deployment threshold of</ins> 6.0 kilonewton<ins>s</ins> ~~digressive torsion bar~~.

46. The seatbelt <ins>assembly that</ins> Autoliv <ins>supplied</ins>~~sold~~ to Mazda <ins>in accordance with Mazda's written design specifications</ins> for the 2005 Mazda3 car had a <ins>deployment threshold of 2 ± .5</ins>~~.0~~ kilonewton<ins>s</ins> ~~torsion bar~~.

47. ~~The torsion bar for the seatbelt Autoliv sold to Volvo for the 2004 through 2009 model year Volvo S40 cars was stronger than the one Autoliv sold to Mazda for the 2005 Mazda3.~~

48. ~~At the time Autoliv sold the seatbelt in Mr. Andrews' car to Mazda, Autoliv did not tell Mazda it was selling a stronger seatbelt to Volvo for the Volvo S40 cars.~~

49. ~~The internal designation code for the 2007 through 2009 Mazda3 cars is J48L.~~

50. The 2004 and 2005 Mazda3 used the same seatbelt <ins>assembly</ins> in the driver's seat position.

May 12, 2020
Page 6

51. <u>In accordance with Mazda's written design specifications,</u> Autoliv supplied Mazda with the seatbelt <u>assemblies</u>~~s~~ and <u>the</u> airbag modules for the J48C ~~from 2003 to 2005~~.  <u>Bosch supplied Mazda with the airbag sensor system that ultimately resulted in the airbag in Mr. Andrews' 2005 Mazda 3 failing to deploy.</u>

52. Autoliv supplied seatbelt <u>assemblies</u> and airbag modules for the J48L.~~ from 2005 to 2008.~~

53. A seatbelt can comply with federal minimum standards and still be defective. <u>However, evidence that a seatbelt's design complies with federal minimum standards is evidence that the design is reasonably safe.</u>

54. ~~The reason the airbag did not deploy is because the airbag system was defective.~~

55. ~~Mazda is responsible for the defects that caused the airbag not to deploy.~~

56. ~~The airbag in Micah Andrews' Mazda3 was defective.~~

57. ~~The reason the airbag in Micah Andrews' Mazda3 didn't deploy is because the airbag system was defective.~~

58. ~~Mazda is responsible for the defects that caused the airbag not to deploy.~~

If you would like to discuss the reasoning behind any of our responses over the phone, please let us know.

Sincerely,

*[signature: DS]*

Doug Scribner

cc: James E. Butler Jr., Esq.
    Rory A. Weeks, Esq.
    Jenny A. Hergenrother, Esq.
    William J. Repko III, Esq.