**Andrews v Autoliv**

 **Kamei, Yuji (Vol. 01) - 12/20/2018**                    1 CLIP  (RUNNING 02:38:26.439)

 THE UNITED STATES DISTRICT COURT ...



YK01 EDITED                   42 SEGMENTS  (RUNNING 02:38:26.439)

**1. PAGE 10:03 TO 10:16  (RUNNING 00:00:49.140)**

```
03        Q    Mr. Kamei, my name is Jim Butler, and I
04   represent Jamie Andrews in this case whose husband
05   was killed.
06             Do you understand that about the case, that
07   Ms. Andrews' husband was killed?
08        A    I have heard that Mr. Andrews died in an
09   auto accident.
10        Q    Do you understand that the jury at the
11   trial of this case is going to watch this videotaped
12   deposition?
13        A    Yes.
14        Q    Do you understand that you are under oath
15   and you are required to tell the truth?
16        A    Yes, I understand.
```

**2. PAGE 12:09 TO 22:07  (RUNNING 00:17:24.123)**

```
09        Q    Where did you go to University?
10        A    I went to Tokai University, T-o-k-k-a-i,
11   University.  Tokai, T-o --
12             INTERPRETER TERESA SUMIYOSHI:  Sorry.
13   There's only one K.
14             CHECK INTERPRETER REITZ:  That's okay.
15   BY MR. BUTLER:
16        Q    Where is that located?
17        A    In Kanagawa Prefecture.  K-a-n-a-g-a-w-a.
18        Q    Did you study English while you were at the
19   university?
20        A    I studied a little.
21        Q    Did you study English while you were in
22   high school?
23        A    Yes.
24        Q    Have you ever traveled outside Japan, other
25   than to come to California for this deposition?
00013:01        A    Yes, I have.
02        Q    How many times?
03        A    Three or four times.
04        Q    How long have you worked for Autoliv?
05        A    I've worked for Autoliv 10 plus -- over --
06   between 10 and 20 years.
07        Q    Well, which is it?  Ten, 15 or 20?
08             THE INTERPRETER:  The interpreter will note
09   that the Japanese witness used a Japanese phrase
10   that means the first number is 1 and then any other
11   number could fill in for the second number, which is
12   why she interpreted it as 10 to 20.
13             MR. BUTLER:  Let me rephrase my question.
14        Q    For how many years have you worked for
15   Autoliv?
16        A    The department for which I worked was
17   acquired by Autoliv around 2006 and, therefore, I
18   have been working for Autoliv for 12, or is it 13
19   years?
20             And the company I was working for prior to
21   that, 2000 or 2001, was called NSK Autoliv, which
```



Plaintiff's Exhibit

**PX 1163**

**Andrews v Autoliv**

```
          22   was a joint venture between NSK and Autoliv.
          23       Q   Autoliv is a Swedish corporation; correct?
          24       A   That's correct.  The headquarters are in
          25   Sweden.
00014:01       Q   Autoliv has subsidiaries in Japan and in
          02   the United States and in Australia and in Mexico and
          03   in Thailand and in China; correct?
          04       A   I think they have companies worldwide.
          05       Q   Would you answer my question, please, sir.
          06       MR. SCRIBNER:  Object.  Form.
          07       You may answer.
          08       THE WITNESS:  I know that Autoliv has
          09   companies in the U.S., in Japan, in China and in
          10   Mexico.
          11   BY MR. BUTLER:
          12       Q   How many times before you came to
          13   California for this deposition have you traveled to
          14   the United States?
          15       A   One time.
          16       Q   In your job duties with Autoliv, and before
          17   that with NSK, have you ever talked to any employees
          18   of Autoliv who were Americans and who did not speak
          19   Japanese?
          20       A   Practically not at all, but occasionally, I
          21   did -- there was a need to have communications with
          22   a person or persons who came on board a business
          23   trip.
          24       THE INTERPRETER:  And the interpreter will
          25   note there's no singular plural in Japan -- in
00015:01   Japanese, so that's why she interpreted "person or
          02   persons."
          03   BY MR. BUTLER:
          04       Q   Do you know a man named David Prentkowski?
          05       A   Yes, I've seen the name in e-mail.
          06       Q   Isn't it true you have talked with David
          07   Prentkowski?
          08       A   I have not talked directly with him, no.
          09       Q   Isn't it true you participated in a
          10   conference call with David Prentkowski in this case
          11   where he was being prepared to testify as the
          12   corporate representative for Autoliv in this case?
          13       A   I don't recall.
          14       Q   Have you read Mr. Prentkowski's deposition
          15   he gave in this case?
          16       A   I think I've seen it.
          17       Q   Have you read it?
          18       A   Yes.
          19       Q   Did you read it in English?
          20       A   I read the English document.
          21       MR. SCRIBNER:  I'm going to object, Jim.  I
          22   think -- I don't believe he understands what
          23   "deposition" is, but you may continue.  I think he's
          24   confused by the word "deposition."
          25       MR. BUTLER:  Well, that's not an objection.
00016:01       MR. SCRIBNER:  Well ...
          02   BY MR. BUTLER:
          03       Q   Did you read the transcript of the
          04   testimony given in this case by David Prentkowski
          05   who works for Autoliv in the United States?
          06       MR. SCRIBNER:  Object to form.
          07       You may answer.
          08       THE WITNESS:  I did not read the contents
          09   in detail.
          10   BY MR. BUTLER:
          11       Q   Did you read it at all?
          12       MR. SCRIBNER:  Same objection.
```

**Andrews v Autoliv**

| | |
|---|---|
| 13 | You may answer. |
| 14 | THE WITNESS:  I read it a little. |
| 15 | MR. BUTLER:  Ms. Sumiyoshi, are you |
| 16 | interpreting the objections? |
| 17 | THE INTERPRETER:  I was.  Sorry.  That's -- |
| 18 | I'm sorry.  That's normal for me and I forgot.  You |
| 19 | asked that objections not be interpreted. |
| 20 | MR. BUTLER:  They're for the judge, not for |
| 21 | the witness or the jury.  So please don't. |
| 22 | THE INTERPRETER:  Okay. |
| 23 | MR. SCRIBNER:  That's fine with me. |
| 24 | BY MR. BUTLER: |
| 25 | Q   Did you -- was the transcript that you read |
| 00017:01 | in English? |
| 02 | A   I don't remember very well.  It may have |
| 03 | been that there were -- there was English and |
| 04 | Japanese in parallel. |
| 05 | Q   Isn't it true that on February 22, 2016, |
| 06 | you participated in a conference call with |
| 07 | Mr. Prentkowski to prepare him to give testimony in |
| 08 | this case as Autoliv's corporate representative, and |
| 09 | in the -- stop there. |
| 10 | A   I don't remember. |
| 11 | Q   Isn't it true that in that conference call |
| 12 | on February 22, 2016, with Mr. Prentkowski were also |
| 13 | Hirokazu Hirabayashi, Toshihiko Kumagai, and Masashi |
| 14 | Shigetoh? |
| 15 | THE REPORTER:  I'm sorry.  I don't have |
| 16 | those spellings for the interpreter. |
| 17 | MR. BUTLER:  Do you want to read those |
| 18 | names? |
| 19 | THE INTERPRETER:  Yes, please. |
| 20 | MR. BUTLER:  Give me that back because |
| 21 | that's my only copy. |
| 22 | THE INTERPRETER:  Excuse me, Counsel. |
| 23 | MR. BUTLER:  Up there at the top are the |
| 24 | names. |
| 25 | THE INTERPRETER:  Oh, okay. |
| 00018:01 | THE WITNESS:  I know the names of two of |
| 02 | those three people, but I don't remember if I was |
| 03 | present at that time or not. |
| 04 | BY MR. BUTLER: |
| 05 | Q   Do you remember whether there was an |
| 06 | interpreter on that conference call that you had |
| 07 | with Mr. Prentkowski? |
| 08 | A   It's not clear whether I attended that |
| 09 | conference or not, but there are no interpreters for |
| 10 | internal discussions within the company for that |
| 11 | conference. |
| 12 | Q   Does Mr. Prentkowski speak Japanese? |
| 13 | A   He -- I don't think he can. |
| 14 | Q   Were you aware that Mr. Prentkowski |
| 15 | testified under oath as the Autoliv witness on |
| 16 | March 8th, 2016, that he talked to you in that |
| 17 | conference call? |
| 18 | A   No, I'm not aware of that.  I cannot speak |
| 19 | English.  So I have not talked with Mr. David |
| 20 | directly. |
| 21 | Q   Well, you said you read parts of his |
| 22 | deposition.  I'll show you page 24 of his |
| 23 | deposition, lines 7 and 8. |
| 24 | Did you read that where Mr. Prentkowski -- |
| 25 | I've highlighted it for you -- where Mr. Prentkowski |
| 00019:01 | testified under oath that he talked to you? |
| 02 | MR. SCRIBNER:  Is the question, Jim, that |
| 03 | did he read that? |

**Andrews v Autoliv**

```
04          MR. BUTLER:  That's the question.
05      Q   Did you read that?
06          MR. SCRIBNER:  Okay.  Object to form.
07          You may answer.
08          THE WITNESS:  This is the first time that
09 I'm seeing this.
10 BY MR. BUTLER:
11      Q   Can you read that in English?
12      A   Yes, I can read this.  I can read line 8.
13 I can read line 7 and 8.
14      Q   So Mr. Prentkowski has testified for
15 Autoliv as its corporate representative under oath
16 that he talked to you to prepare for his testimony,
17 and you have told us today under oath that you did
18 not talk to him.
19          Can you help the jury decide who is telling
20 the truth?
21          MR. SCRIBNER:  Object to form.
22          He said he did not recall that subject of
23 that.
24          He may answer.
25          THE WITNESS:  Yes.  In that sense at that
00020:01 time what probably happened was that Mr. Hirabayashi
02 or Mr. Kumagai interpreted David's question or
03 questions to me into Japanese, and then I respond --
04 I answered in Japanese to Mr. Hirabayashi or
05 Mr. Kumagai and they interpreted that into English
06 to David.
07          MR. BUTLER:  Move to strike as
08 nonresponsive.
09      Q   Let me ask my question again, please, sir.
10          MR. BUTLER:  Tell him that.
11 BY MR. BUTLER:
12      Q   This is my question.
13          MR. BUTLER:  Tell him that.
14      Q   So Mr. Prentkowski has testified for
15 Autoliv as its corporate representative under oath
16 that he talked to you to prepare for his testimony,
17 and you have told us today under oath that you did
18 not talk to him.
19          Can you help the jury decide who is telling
20 the truth?
21          MR. SCRIBNER:  Object to form.
22          You may answer.
23          THE WITNESS:  Yes.
24          Yes.  At that time there was a group
25 discussion, but there was no conversation in the
00021:01 form directly between -- from David to me or from me
02 to David, but within the discussion that took place
03 amongst everyone present, I was present and David
04 was present.
05          And if David posed a question that called
06 for me to provide an answer, then I think that was
07 conveyed to me and I provided an answer.  That's
08 probably how it was.
09 BY MR. BUTLER:
10      Q   Is it now your testimony that you recall
11 being on a conference call with David Prentkowski on
12 February 22, 2016, to prepare him to testify on
13 behalf of Autoliv in this case?
14          MR. SCRIBNER:  Object to form.
15          You may answer.
16          THE WITNESS:  Yes.  Although the date is
17 not clear, but I do recall a sense of there having
18 been an internal group discussion -- a discussion
19 that took place together with David, although it's
```

**Andrews v Autoliv**

```
20   not clear to me.
21   BY MR. BUTLER:
22        Q   You keep calling Mr. Prentkowski by his
23   given name David.
24            How long have you known him?
25        A   I've hardly spoken with him at all, but I
00022:01   have seen his name in e-mails a number of times.
02   That was probably about two years ago.
03        Q   How long have you known him?
04        A   I have seen his name in e-mails starting
05   from about two years ago.
06        Q   You keep mentioning e-mails.  Are these
07   e-mails that you are referring to in English?
```

**3. PAGE 22:10 TO 23:06  (RUNNING 00:01:18.457)**

```
10            THE WITNESS:  David would e-mail a question
11   or questions in English to Mr. Noda of the quality
12   assurance section, and for technical content
13   regarding that, Mr. Noda would turn that into
14   Japanese and forward the e-mail to me.
15            So Mr. Noda would pose the questions to me
16   having turned the English content into Japanese.
17            MR. BUTLER:  Move to strike as
18   nonresponsive.
19        Q   Can you read e-mails that are typed in the
20   English language?  Yes or no.
21            MR. SCRIBNER:  Object to form.
22            You may answer.
23            THE WITNESS:  Yes, I can read English.
24   BY MR. BUTLER:
25        Q   Did you study English in elementary school?
00023:01        A   Practically not at all.
02        Q   Have you ever given testimony in a lawsuit
03   like this -- like you're doing today, before today?
04        A   No, I have not.  This is the first time.
05        Q   Have you ever worked in the United States?
06        A   No, I have not.
```

**4. PAGE 23:20 TO 25:18  (RUNNING 00:02:36.070)**

```
20        Q   When did you come to California for
21   purposes of giving your testimony here today?
22        A   Monday.
23        Q   And today is Thursday; correct?
24        A   Yes, that's correct.
25        Q   Did you come to Los Angeles?
00024:01        A   Yes.
02        Q   Have you met with anyone about this case
03   since you came to Los Angeles on Monday?
04        A   Yes, on Tuesday and Wednesday.
05        Q   Who did you meet with?
06        A   Mr. Doug and Ms. Jenny.
07        Q   Anybody else?
08        A   Mr. John.  Joan.
09            MR. SCRIBNER:  It's John.
10   BY MR. BUTLER:
11        Q   John what?
12            MR. SCRIBNER:  Schultz.
13   BY MR. BUTLER:
14        Q   John Schultz.
15            Anybody else?
16        A   He was an attorney for our firm.
17        Q   Anybody else?
18        A   Mr. Kumagai was there.
19        Q   Mr. Who?
20            THE INTERPRETER:  K-u-m-a-g-a-i.
```

**Andrews v Autoliv**

```
        21   BY MR. BUTLER:
        22        Q    Does he work for Autoliv, Mr. Kumagai?
        23        A    Yes.
        24        Q    Anybody else in these meetings?
        25        A    There was an interpreter or interpreters.
00025:01        Q    The interpreter that Autoliv has here today
        02   interpreting your testimony Ms. Sumiyoshi was not
        03   there, was she?
        04        A    Correct, she was not.
        05        Q    What was the interpreter's name?
        06        A    I don't remember.
        07        Q    Where did you meet with these people?
        08        A    Here in this office.
        09        Q    In Alston Bird's Los Angeles office?
        10        A    That's correct, yes.
        11        Q    How many hours did you meet on Tuesday?
        12        A    Well, starting at nine o'clock and going
        13   until around 2:00 or 3:00 with lunch in the middle.
        14   So about five or six hours.
        15        Q    How long did you meet on Wednesday?
        16        A    I think it was about the same.
        17        Q    Did you meet with anybody --
        18        A    About that, I think.
```

**5. PAGE 25:20 TO 28:03  (RUNNING 00:04:26.450)**

```
        20             Did you read anything on the plane ride
        21   over to prepare for giving your testimony in this
        22   case?
        23        A    No, I didn't read anything at all.
        24        Q    Did you meet with anybody in Japan before
        25   you left for purposes of preparing for this case?
00026:01             MR. SCRIBNER:  Object to form.
        02             You may answer.
        03             THE WITNESS:  In Japan, you're asking?
        04   BY MR. BUTLER:
        05        Q    Yes.
        06        A    I don't really remember, but I don't think
        07   I met anyone in particular in regards to this case.
        08        Q    Did you do anything prior to flying from
        09   Japan to California on Monday to prepare to give
        10   testimony in this case?
        11        A    Mr. Noda looked for various documents for
        12   this case, and I helped him with that.
        13        Q    Who is Mr. Noda?
        14        A    Mr. Noda is the person who handles quality
        15   assurance at Autoliv Japan.
        16        Q    Is he a person that helps with lawsuits?
        17        A    No, I don't think it's just that.
        18   Basically, he's a quality assurance person.  And I
        19   don't really know beyond that.
        20        Q    When did you and Mr. Noda look for
        21   documents for this case?
        22        A    I think it was probably about two years
        23   ago.
        24        Q    What documents were you looking for?
        25        A    I think it was things, such as the Mazda
00027:01   seatbelt specifications and the seatbelt product
        02   specifications for the Mazda 3.
        03        Q    Did you then find the Statement of Work?
        04             MR. SCRIBNER:  Object to the form of that.
        05             Please don't translate --
        06             THE INTERPRETER:  I'm sorry.  It's so
        07   automatic in my other cases.
        08             MR. SCRIBNER:  That's all right.
        09             Object to the form.
        10             You may answer.
```

```
11            Mr. Kamei, you may answer.
12            THE WITNESS:  What was the question again?
13 BY MR. BUTLER:
14      Q    Did you then find the Statement of Work?
15            MR. SCRIBNER:  Object to form.
16            You may answer.
17            THE WITNESS:  I did not find it, but
18 perhaps somebody else found it.
19 BY MR. BUTLER:
20      Q    Who found it?
21            MR. SCRIBNER:  Object.
22            THE WITNESS:  I don't know.
23 BY MR. BUTLER:
24      Q    When did you first see the Statement of
25 Work?
00028:01      A    I think I probably saw the cover sheet for
02 the Mazda S.O.W. when doing development, but I have
03 not looked at the content in detail.
```

**6. PAGE 28:08 TO 28:13  (RUNNING 00:00:54.190)**

```
08            Back two years ago when you were helping
09 Mr. Noda look for documents for this case, why were
10 you and Mr. Noda doing that?
11      A    Just as I talked about earlier, David asked
12 Mr. Noda to look for various documents, and I worked
13 with Mr. Noda to look for technical documents.
```

**7. PAGE 30:09 TO 30:13  (RUNNING 00:00:07.915)**

```
09            Do you agree that the makers of automotive
10 products have a duty to make safe products?
11            MR. SCRIBNER:  Object to form.
12            You may answer.
13            THE WITNESS:  Yes.
```

**8. PAGE 30:15 TO 30:17  (RUNNING 00:00:09.052)**

```
15      Q    Do you agree that the makers of products
16 have a duty to make products that actually do the
17 job the product is supposed to do?
```

**9. PAGE 30:19 TO 30:22  (RUNNING 00:00:38.744)**

```
19            THE WITNESS:  Yes.  I agree that we at
20 Autoliv aim to make products that comply with the
21 laws and regulations of that country and that
22 operate correctly.
```

**10. PAGE 31:02 TO 31:04  (RUNNING 00:00:08.107)**

```
02            Do you agree that the makers of products
03 have a duty to make products that actually do the
04 job the product is supposed to do?
```

**11. PAGE 31:08 TO 33:07  (RUNNING 00:06:08.844)**

```
08            THE WITNESS:  Yes, I agree.
09 BY MR. BUTLER:
10      Q    Do you agree that the makers of automotive
11 products have a duty to warn people if a product
12 poses a danger that can kill someone or hurt them
13 very badly?
14            MR. SCRIBNER:  Same objection.
15            You may answer.
16            THE WITNESS:  Could I have the Japanese
17 question again, please.
18            THE INTERPRETER:  The interpreter will
19 reinterpret.
20            THE WITNESS:  A duty to warn?  Is that what
```

**Andrews v Autoliv**

```
21  you said?
22  BY MR. BUTLER:
23      Q   Yes.  "Hai."
24      A   I don't know.
25          We believe that basically the products that
00032:01  we ship to the world are safe and that there's no
02  need to indicate in particular any dangerous -- any
03  danger with the products because we work -- we aim
04  to -- in our work to ensure that all our products
05  are safe.
06      Q   Do you agree that if a driver is wearing
07  his seatbelt and there's a frontal collision and the
08  driver's head hits the steering wheel so hard it
09  kills him, then that means the occupant restraint
10  system has failed?
11          MR. SCRIBNER:  Object to form.
12          You may answer.
13          THE INTERPRETER:  The interpreter will
14  interpret up to this point.  She doesn't know if the
15  witness was finished or not.
16          THE WITNESS:  This accident -- in this
17  accident there was a very severe collision, and the
18  seatbelt locked as it is designed to do, but the
19  seatbelt pretension and airbag did not receive an on
20  signal; and, therefore, this time it's extremely
21  unfortunate, but the result was that the head hit.
22          The occupant device comprises the airbag,
23  the seatbelt, the steering wheel, and the electric
24  transmission system -- electronic system -- device.
25          THE INTERPRETER:  Pardon.  Interpreter will
00033:01  restate that part.
02          THE WITNESS:  The occupant restraint device
03  comprises the airbag, the seatbelt, the steering
04  wheel, and the electric transmission device, and
05  they work together to restrain the occupant, but
06  it's very unfortunate that the airbag and the
07  seatbelt pretension did not receive a signal.
```

**12.  PAGE 33:12 TO 39:08  (RUNNING 00:13:11.452)**

```
12      Q   Mr. Kamei, did you just correct the
13  interpreter's translation of the question by telling
14  her the word to use was, quote, device, close quote?
15      A   Yes.
16      Q   Back to my question:  Do you agree that if
17  a driver is wearing his seatbelt but the driver's
18  head hits the steering wheel so hard it kills him,
19  then that means the occupant restraint system
20  failed?
21          MR. SCRIBNER:  Object to form.
22          You may answer.
23          CHECK INTERPRETER REITZ:  So that it killed
24  him.  I think that didn't come into his question.
25          THE INTERPRETER:  I thought I said it, but
00034:01  I'll repeat it to be sure.
02          CHECK INTERPRETER REITZ:  Please.
03          THE WITNESS:  No.  No.  This collision was
04  very severe, and even so, the electronic -- the
05  electric transmission device did not transmit a
06  signal to the airbag and the pretension.  Therefore,
07  the seatbelt locked the webbing as it is designed to
08  do.
09          The pretensioner and the airbag did not
10  operate and, therefore, very unfortunately, there
11  was impact with the steering wheel.
12  BY MR. BUTLER:
13      Q   My question is very simple, Mr. Kamei.  I
```

**Andrews v Autoliv**

```
14  asked you to admit that in this wreck the occupant
15  restraint system failed.  And you said no.
16        Is it -- are you telling these jurors that
17  in this wreck the occupant restraint system worked?
18        MR. SCRIBNER:  Object to form.  Asked and
19  answered.  Twice now.
20        You may answer again.
21        THE WITNESS:  The occupant restraint system
22  does not consist of just our product alone, but
23  rather comprises the airbag, the seatbelt, the
24  electric device, the steering wheel, steering wheel
25  column, all of that together.
00035:01        And in regards to that, I believe that our
02  product operated properly, but I don't know as to
03  the signal not being received.
04        I don't understand why the signal was not
05  transmitted.  That's something I would want you to
06  ask Mazda.
07  BY MR. BUTLER:
08     Q   Whoever's fault it was, sir, isn't it true
09  that the occupant restraint system failed in this
10  wreck?
11        MR. SCRIBNER:  Same objection.  Asked and
12  answered.
13        You may answer.
14        THE WITNESS:  Within -- within the occupant
15  restraint system, the seatbelt locked as it is
16  designed to do in a collision, but the airbag and
17  pretensioner did not receive an electric signal.
18        THE INTERPRETER:  Interpreter will start
19  over.
20        THE WITNESS:  Within the occupant restraint
21  system, the seatbelt locked as it is designed to do
22  in a collision, but as to the airbag and
23  pretensioner not receiving an electronic signal, as
24  to the electronic signal or the electric device, I
25  don't know why that failed.
00036:01  BY MR. BUTLER:
02     Q   Mr. Kamei, I didn't ask you why the
03  electronic device failed.
04        My question was very simple, and I will
05  repeat it:  Whoever's fault it was, sir, isn't it
06  true that the occupant restraint system failed in
07  this wreck?
08        MR. SCRIBNER:  Same objection.
09        You may answer.
10        THE WITNESS:  That's a question that I
11  would want you to ask Mazda.
12  BY MR. BUTLER:
13     Q   Isn't it true, sir, that Autoliv made the
14  seatbelts for this -- for Jamie Andrews' Mazda M3?
15     A   Yes.  Autoliv is the one that made the
16  seatbelt product for -- that makes the seat --
17        THE INTERPRETER:  Interpreter will start
18  over.
19        THE WITNESS:  Autoliv is the one that made
20  the seatbelt products for the Mazda 3.
21  BY MR. BUTLER:
22     Q   Isn't it true that in this wreck the
23  seatbelt spooled out 20 inches?
24        MR. SCRIBNER:  Object to form.
25        You may answer.
00037:01        THE WITNESS:  This accident was a very
02  severe collision.  Despite that, the airbag and
03  pretensioner did not receive an electric signal and,
04  therefore, it did occur that there was a 20-inch
```

**Andrews v Autoliv**

```
05   spool-out.
06   BY MR. BUTLER:
07        Q    Will you agree, sir, that when the seatbelt
08   spools out 20 inches, that means the seatbelt
09   failed?
10             MR. SCRIBNER:  Object to form.
11             You may answer.
12             THE WITNESS:  No.  No.  Our seatbelt locked
13   as designed, but the airbag and pretensioner did not
14   receive an electronic signal.  And as a result,
15   there was a 20-inch spool-out.
16   BY MR. BUTLER:
17        Q    Is it -- are you telling the jurors, sir,
18   that Autoliv designed this seatbelt to spool out
19   20 inches?
20             MR. SCRIBNER:  Object to form.
21             You may answer.
22             THE WITNESS:  No.
23   BY MR. BUTLER:
24        Q    Well, did the seatbelt perform as Autoliv
25   designed it to perform or not?
00038:01             MR. SCRIBNER:  Object to form.
02             You may answer.
03             THE WITNESS:  Autoliv manufactures
04   seatbelts to Mazda's design, as designed by Mazda.
05             MR. BUTLER:  Move to strike as
06   nonresponsive.
07             And tell him this:  I'm going to ask him
08   about who designed the seatbelt in a few minutes.  I
09   didn't ask him that.
10             Tell him that.
11             MR. SCRIBNER:  Tell him I disagree.  I
12   think that's precisely what he asked.
13   BY MR. BUTLER:
14        Q    Did this seatbelt that spooled out
15   20 inches in this wreck perform as Autoliv intended
16   it to perform or not?
17             MR. SCRIBNER:  Object to form.
18             You may answer.
19             THE WITNESS:  Autoliv manufactured the
20   seatbelt exactly to the design specifications of
21   Mazda.
22   BY MR. BUTLER:
23        Q    Did Autoliv intend for this seatbelt to
24   spool out 20 inches in a wreck like this?
25             MR. SCRIBNER:  Same objection.
00039:01             You may answer.
02             THE WITNESS:  Autoliv manufactured the
03   seatbelt exactly to the design specifications of
04   Mazda.  And in a severe collision like this time,
05   whether it is the intention for there to be a
06   20-inch spool-out in a situation where no signal is
07   received or not is something that should be asked of
08   Mazda.  I don't know.
```

**13. PAGE 39:16 TO 40:08  (RUNNING 00:01:08.694)**

```
16        Q    Has any employee from Autoliv even gone to
17   inspect Mr. Andrews's Mazda M3?
18        A    I don't really know, but as to this
19   accident, after this accident I have seen a picture
20   or pictures of the product after the accident, so I
21   think somebody must have gone.
22             MR. BUTLER:  I'll show you Plaintiff's
23   Exhibit No. 209.
24             MR. SCRIBNER:  Thank you.
25   ///
```

**Andrews v Autoliv**

```
00040:01          (Exhibit 209 was previously marked
     02          for identification.)
     03  BY MR. BUTLER:
     04      Q   That's a picture of Micah Andrews's Mazda
     05  M3.
     06          Will you agree with me that the seatbelt
     07  should never spool out that much in a frontal
     08  collision?
```

**14. PAGE 40:17 TO 40:25  (RUNNING 00:00:34.292)**

```
     17          THE WITNESS:  No.  Looking at this picture,
     18  even though it was a very severe collision, you can
     19  see that the airbag did not open so the result was
     20  that the system, not just the seatbelt or the
     21  airbag, but the system itself did not function, and,
     22  therefore, the webbing was pulled out to this
     23  extent.  And that is something that is designed by
     24  Mazda, so it's something that you need to check with
     25  Mazda on.
```

**15. PAGE 41:02 TO 41:03  (RUNNING 00:00:05.865)**

```
     02      Q   The occupant restraint system did not
     03  function properly; isn't that true?
```

**16. PAGE 41:06 TO 41:09  (RUNNING 00:00:28.989)**

```
     06          THE WITNESS:  I can't understand this
     07  situation.  I can't understand why it did not open,
     08  but not opening would be -- would mean that it did
     09  not operate very well, but I can't understand why.
```

**17. PAGE 45:10 TO 46:22  (RUNNING 00:04:00.101)**

```
     10      Q   And my question is, again:  Mr. Kamei, did
     11  you not, yourself, say, quote, but the system itself
     12  did not function, close quote?
     13          Wasn't that your testimony?
     14          MR. SCRIBNER:  Object to form.
     15          You may answer.
     16          THE WITNESS:  I said that from what I see
     17  the result appears that despite there being a severe
     18  collision, the airbag did not receive a signal and
     19  the pretensioner did not receive a signal, and that
     20  result would mean that the occupant restraint system
     21  is in an abnormal state, is what I think.
     22          And, therefore, the occupant restraint
     23  system fell into an abnormal state and failed, is
     24  what I think.  But as to why and whether it actually
     25  failed or did not fail, that would be something that
00046:01  only Mazda, who oversees the entire system, could
     02  answer.
     03  BY MR. BUTLER:
     04      Q   Isn't it true, sir, that Micah Andrews's
     05  face hit the steering wheel of his Mazda 3 in this
     06  wreck?
     07      A   Yes.  In a severe -- in such a severe
     08  collision, the airbag did not open well -- the
     09  airbag could not receive a signal, the pretensioner
     10  could not receive a signal, and so the airbag could
     11  not open.  And the result being that the seatbelt
     12  spooled out and his head hit the steering wheel.
     13      Q   Has anybody shown you this photograph,
     14  which is Plaintiff's Exhibit No. 3?
     15          MR. SCRIBNER:  Thank you.
     16          (Exhibit 3 was previously marked
     17          for identification.)
     18  BY MR. BUTLER:
```

**Andrews v Autoliv**

```
19       Q   And that is a photograph of the steering
20  wheel of Micah Andrews's Mazda 3 after the wreck.
21       A   Today is the first time for me to see this
22  picture.
```

**18. PAGE 47:04 TO 48:06  (RUNNING 00:01:15.979)**

```
04       Q   Do you see what I'm going to call stippling
05  here on the steering wheel part of the Mazda 3 right
06  here on the side (indicating)?
07       A   What is stippling?
08       Q   Well, I don't -- any word will suit me.
09  It's these little indentations right here
10  (indicating).
11           Do you see that?
12       A   The after-impact indentation?
13       Q   No.  In the design of the steering wheel,
14  these little indentations right there (indicating).
15       A   Ah --
16           MR. BUTLER:  What's he calling them?
17           THE INTERPRETER:  Dekoboku,
18  D-e-k-o-b-o-k-u.
19           MR. BUTLER:  What's it mean in English?
20           THE INTERPRETER:  It means bumps and
21  valleys.
22           MR. BUTLER:  Bumps and valleys.
23       Q   Do you see the bumps and valleys on that
24  steering wheel, sir?
25       A   Yes.  On both sides, yes.
00048:01       Q   Did anybody tell you that Micah Andrews's
02  face hit that steering wheel so hard that those
03  bumps and valleys on the steering wheel grip were
04  imprinted on his face?
05       A   No, I had not heard that.  This is the
06  first time I'm hearing that.
```

**19. PAGE 48:16 TO 51:01  (RUNNING 00:04:43.873)**

```
16       Q   Has anybody shown you Plaintiff's Exhibit
17  No. 2, which is an autopsy photograph of
18  Mr. Andrews?
19           (Exhibit 2 was previously marked
20           for identification.)
21           THE WITNESS:  No.  This is the first time
22  I've seen it.
23  BY MR. BUTLER:
24       Q   Can't you see the impression of those bumps
25  and valleys, as you called them, from the steering
00049:01  wheel that are on Mr. Andrews's face?  Can't you see
02  them right there?
03       A   I can see that.
04       Q   When Mr. Andrews's face hit the steering
05  wheel so hard that the pattern on the steering wheel
06  became imprinted into his face, would you agree with
07  me that the seatbelt totally failed?
08           MR. SCRIBNER:  Object to form.
09           You may answer.
10           THE WITNESS:  No.  It's my understanding
11  that in this severe collision the seatbelt locked as
12  designed by Mazda, but the airbag and seatbelt
13  pretensioner did not receive an electric signal, and
14  the result of that was that his head hit the
15  steering wheel.
16  BY MR. BUTLER:
17       Q   Would you agree with me, sir, that the
18  seatbelt totally failed to protect Micah Andrews in
19  this wreck?
```

**Andrews v Autoliv**

```
20          MR. SCRIBNER:  Object to form.
21          You may answer.
22          THE WITNESS:  No.  The occupant restraint
23    system is made up of many components, including an
24    airbag, a seatbelt, a steering wheel, and a steering
25    column.  And in this wreck even though there was a
00050:01    severe collision, the airbag and seatbelt did not
02    receive a signal.  The seatbelt did lock as designed
03    by Mazda.
04    BY MR. BUTLER:
05          Q   All right.  Mr. Kamei, let's start chasing
06    some rabbits.
07          MR. BUTLER:  Tell him I said that.
08          Q   You have used the word "severe" now at
09    least ten times.  And I want to ask you about that.
10          MR. BUTLER:  Tell him that.
11          Q   When you were meeting with Autoliv's
12    lawyers on Tuesday and Wednesday, did anybody in
13    that meeting use the word "severe"?
14          MR. SCRIBNER:  I'm going to object to the
15    question and direct the witness not to disclose any
16    communications with counsel.  It's privileged.
17          THE INTERPRETER:  I assume you still want
18    the question interpreted and then your --
19          MR. BUTLER:  You need to interpret that.
20          MR. SCRIBNER:  Correct.
21          THE INTERPRETER:  Yes.
22          MR. SCRIBNER:  I'm directing him not to
23    answer.
24    BY MR. BUTLER:
25          Q   Are you going to answer the question?
00051:01          A   I don't remember.
```

**20.  PAGE 52:13 TO 56:15  (RUNNING 00:09:12.419)**

```
13          Q   Are you going to answer the question?
14          A   I will not answer.
15          Q   Has anybody told you to use the word
16    "severe" over and over again?
17          A   No, that's not the case.  No.  But what
18    I've heard about this collision is that he ran into
19    a tree when he was going over 35 miles per hour.
20    And it's my understanding that going over -- at
21    least 35 miles per hour would mean that it was a
22    significant collision.
23          Q   Sir, isn't it true that it's in, quote,
24    severe, close quote, wrecks that one needs a
25    seatbelt?
00053:01          A   Even if not severe, for example, even if
02    it's at 10 kilometers or 20 kilometers, a seatbelt
03    is necessary, but in such cases just having the
04    seatbelt lock will restrain the occupant.
05          Q   Mr. Kamei, I think I told you when we
06    started this deposition that the jury is going to
07    have to watch this deposition.
08          And I would like to make this deposition as
09    brief as possible.
10          MR. BUTLER:  Tell him that and then I'll
11    finish.
12          Q   I've spent a lot of time -- I've spent a
13    lot of time trying to craft questions that only
14    require short answers.
15          MR. BUTLER:  Tell him that.
16          Q   So I would ask you to just answer my
17    question and to give a short answer any time you
18    can.
19          MR. SCRIBNER:  Object to those statements.
```

**Andrews v Autoliv**

```
20          Go ahead.
21  BY MR. BUTLER:
22      Q   Are you familiar with the NCAP test,
23  N-C-A-P, NCAP tests?
24      A   I've heard of the NCAP test.
25      Q   Did you discuss the NCAP test with anybody
00054:01  in preparation for this deposition?
02          MR. SCRIBNER:  Hold on.  I'm going to
03  object to the question to the extent Mr. Butler is
04  seeking to get communications between this witness
05  and counsel.
06          MR. BUTLER:  I'm just asking him the
07  question.  I'm not seeking to get anything.  Answer
08  the question.
09          MR. SCRIBNER:  I understand.  To the extent
10  that the answer is going to reveal communications
11  with me, I object and direct him not to answer the
12  question.
13  BY MR. BUTLER:
14      Q   Are you going to answer the question?
15      A   There was no talk about the NCAP.
16      Q   The NCAP tests are done by United States
17  Government; correct?
18      A   I don't really know, but it's my
19  understanding that it's a test that is conducted by
20  a public agency or a regulatory agency.
21      Q   In the United States; correct?
22      A   Yes.
23      Q   And it's a test to test whether or not the
24  occupant restraint system is safe; correct?
25      A   Yes.  It's my understanding that these are
00055:01  tests in which sensors are placed on dummies in
02  collision testing that is performed, and the
03  capability and effect of an automotive occupant
04  restraint system is investigated by obtaining the
05  data that is indicated by those sensors.
06      Q   And the frontal collision NCAP tests are
07  run at 35 miles per hour; correct?
08      A   That's what I've heard.
09      Q   Does Autoliv still sell to anybody the
10  seatbelt that it sold to Mazda for the 2004 and 2005
11  Mazda 3, as shown in Plaintiff's Exhibit No. 209?
12      A   Could I have the Japanese once again,
13  please.
14          I think the same type of seatbelt is still
15  being sold to another OEM or other OEMs, but I think
16  the budget for the Mazda 3 seatbelt has ended for
17  this.
18      Q   I don't understand that answer.
19          Does Autoliv still sell this same seatbelt
20  that was in Micah Andrews's Mazda 3 or not?
21          MR. SCRIBNER:  Object to form.
22          You may answer.
23          THE WITNESS:  The 2005 model for Mazda 3
24  seatbelt is still -- what verb should I use -- it's
25  still around as a part for parts replacement.  So
00056:01  the seatbelt for the 2005 Mazda 3 could still --
02  could still be purchased as a part for parts
03  replacement, if necessary, as a service part.
04  BY MR. BUTLER:
05      Q   Does Autoliv still sell the same seatbelt
06  that was in Micah Andrews's Mazda 3 for
07  manufacturers of cars to put that seatbelt in new
08  cars?
09          MR. SCRIBNER:  Object to form.
10          You may answer.
```

CONFIDENTIAL

**Andrews v Autoliv**

```
11          THE WITNESS:  This type of seatbelt is from
12   over 10 years ago, and, of course, new products keep
13   coming out.  So the new products replace the older
14   products, but I don't know precisely whether this is
15   still being sold or not.
```

**21.  PAGE 57:06 TO 66:02  (RUNNING 00:16:45.298)**

```
06          Q    Mr. Kamei, you referred several times to
07   Mazda having designed the seatbelt that was in Micah
08   Andrews's Mazda 3.
09               I want to show you Plaintiff's Exhibit 20.
10               (Exhibit 20 was previously marked
11               for identification.)
12   BY MR. BUTLER:
13          Q    Are you familiar with that document?
14          A    Yes.
15               MR. SCRIBNER:  Jim, let me state for the
16   record that this is not the complete specification.
17   I don't mind you using it, but to be clear, it's not
18   the entire specification.
19               MR. BUTLER:  The question was simply is he
20   familiar with this document.  That's all.
21               THE WITNESS:  This document, Mazda --
22               Yes, I am familiar.
23               MR. BUTLER:  Tell him this:  As we go
24   through these documents, to save time, I'm going to
25   ask some very specific questions about them and all
00058:01   I really want is answers to my questions.
02               Autoliv's lawyer can ask more questions if
03   he or she wants to later on.
04          Q    This is an Autoliv Japan document produced
05   to us by Autoliv; correct?  Autoliv Japan, produced
06   by Autoliv; correct?
07               MR. SCRIBNER:  Object to form.
08               You may answer.
09          THE WITNESS:  This document was created
10   using a format originally provided by Mazda.  The
11   contents noted here were written after the
12   contents -- were written down after the contents had
13   been decided upon in discussions regarding the
14   product specification between Mazda and us.
15               And after noting those contents, the
16   document was provided from Autoliv to Mazda, and
17   then upon receiving the document, Mazda approved the
18   contents.
19               MR. BUTLER:  Tell him this:
20          Q    Mr. Kamei, I did not ask you to explain the
21   document.  I just asked you to agree that this was
22   an Autoliv Japan document which had been produced in
23   this case by Autoliv.
24               Please just answer my questions.
25               Isn't it true, sir, that it says right here
00059:01   designed, and then it has your name Kamei?
02               Isn't that what it says?
03          A    It's true that my name appears in the
04   "Designed" column.  This document notes the items
05   for confirmation in regards to what to do as to the
06   specifications for the Mazda 3 seatbelt, which was
07   discussed between Autoliv and Mazda.  It's the
08   confirmation items as to what the specifications are
09   to be.
10          Q    No.  No.  No.  No.  No.  Let me do this
11   again.
12               MR. SCRIBNER:  Let him finish his answer,
13   Mr. Butler.
14               MR. BUTLER:  No, he's not going to finish
```

CONFIDENTIAL

**Andrews v Autoliv**

```
       15  his answer.
       16          Tell him once more --
       17          MR. SCRIBNER:  You should let him finish
       18  his answer.
       19  BY MR. BUTLER:
       20      Q   -- please --
       21          Tell him once more:  Please just answer my
       22  question.  He can explain this if Mr. Scribner asks
       23  him a question.
       24          My next question is:  Doesn't it say at the
       25  very top (as read and/or reflected:)
00060:01              Engineering Specification for
       02          Seatbelt?
       03          MR. SCRIBNER:  Tell him he can finish the
       04  answer he was giving that Mr. Butler interrupted.
       05          THE WITNESS:  And, therefore, the meaning
       06  of my name being written here is indicating that the
       07  confirmation of the contents for the seatbelt
       08  specifications was conducted between Mazda and
       09  Autoliv.
       10  BY MR. BUTLER:
       11      Q   It says at the top of the page --
       12          MR. BUTLER:  Soseh, zoom to this --
       13      Q   Engineering Specification for Seatbelt;
       14  correct?
       15      A   Yes.
       16      Q   It says (as read and/or reflected:)
       17              "Designed Kamei" --
       18          "Designed," and under the block for
       19  "Designed" it says "Kamei"; correct?
       20      A   Yes.
       21      Q   And it's got over here in the bottom, it's
       22  got blocks for four specification changes and one
       23  entry for "Released."  And it's got your name beside
       24  all of them; correct?
       25      A   Yes, that's correct.
00061:01          Yes.  There were a number of seatbelt
       02  specification changes pursuant to Mazda's
       03  instructions.  And my name is written here to
       04  indicate that pursuant to those instructions, the
       05  content change was as noted here, and there are no
       06  mistakes in that.
       07      Q   Mazda did not own Autoliv, did it?
       08      A   Mazda and Autoliv are separate companies.
       09      Q   Mazda has never owned Autoliv, has it?
       10      A   That has not occurred.
       11      Q   Mazda was not -- strike that.
       12          Autoliv was not forced to sell this
       13  seatbelt to Mazda, was it?
       14      A   Can I have the Japanese again, please.
       15          An order receipt contract was established
       16  between Mazda and Autoliv, and this product was
       17  supplied to Mazda pursuant to Mazda's instructions.
       18      Q   That doesn't answer my question.
       19          Isn't it true, sir, that Autoliv was not
       20  forced to sell this seatbelt to Mazda?
       21          MR. SCRIBNER:  Object to form.
       22          You may answer.
       23          THE WITNESS:  They were not forced to sell
       24  it.
       25  ///
00062:01  BY MR. BUTLER:
       02      Q   Autoliv sold this seatbelt to Mazda to make
       03  money, that is, for profit; correct?
       04      A   Autoliv is in the business of selling
       05  seatbelts and auto -- and airbags to OEMs.  And so
```

**Andrews v Autoliv**

06  it is correct that Autoliv makes a profit selling
07  seatbelts.
08      Q   Autoliv at the time it sold the seatbelts
09  that were in Micah's Mazda 3 to Mazda had other
10  seatbelts available to sell that were three times as
11  strong; correct?
12          MR. SCRIBNER:  Object to form.
13          You may answer.
14          THE WITNESS:  Three times as strong, you
15  said?
16  BY MR. BUTLER:
17      Q   Yes.
18      A   I don't know as to that.  I've never heard
19  that.
20      Q   Well, we'll return to that shortly.
21          Are you familiar with this document,
22  Plaintiff's Exhibit No. 35?
23          (Exhibit 35 was previously marked
24          for identification.)
25          THE WITNESS:  Yes.
00063:01         MR. SCRIBNER:  And note for the record,
02  again, Mr. Butler, this is not a complete copy of
03  the document, but I don't object to you using it.
04  BY MR. BUTLER:
05      Q   This is also an Autoliv Japan document
06  produced in this case by Autoliv; correct?
07      A   Yes.  The same as previously, the contents
08  here are in accordance with Mazda format.  And this
09  is a document for checking that there are no
10  mistakes in the seatbelt specifications that were
11  decided upon between Mazda and Autoliv.
12      Q   It is true that the seatbelt specifications
13  were decided upon between Mazda and Autoliv;
14  correct?
15      A   No, that's not true.  It was designed by
16  Mazda and this is a document to confirm between
17  Mazda and Autoliv that there are no mistakes in the
18  contents of the design specification.
19      Q   Well, let's see what this additional
20  document, itself, says.  Plaintiff's Exhibit 35.
21          In the block right down here under
22  "Designed," it's got your name, does it not?
23  "Kamei."
24      A   Yes.  The contents here are according to
25  Mazda's format.  And the notation design here means
00064:01  that -- with my name means that I checked the design
02  portion of the document to ensure that there were no
03  mistakes in the seatbelt for the Mazda 3 in the
04  contents noted here.
05      Q   Isn't it true that you were the
06  application -- strike that.
07          Let me start over.
08          I will show you Plaintiff's Exhibit No. 4.
09          (Exhibit 4 was previously marked
10          for identification.)
11  BY MR. BUTLER:
12      Q   Are you familiar with this document?
13          MR. SCRIBNER:  Thank you.
14          THE WITNESS:  Yes, I've seen it.
15  BY MR. BUTLER:
16      Q   Now, this is another Autoliv document
17  produced in this case by Autoliv; correct?
18      A   It states here that it is an Autoliv
19  document, so I think that is the case.
20      Q   And it is a document entitled "Team List,"
21  correct?

**Andrews v Autoliv**

```
     22      A    Yes.  Yes.  This is a list of the seatbelt
     23 team for -- our seatbelt team for making the
     24 seatbelt for the Mazda 3.
     25      Q    And you are listed as the manager for
00065:01 seatbelt technology; correct?
     02      A    Yes, I am listed as the manager for the
     03 seatbelt design project.
     04      Q    I will show you Plaintiff's Exhibit No. 5.
     05           (Exhibit 5 was previously marked
     06           for identification.)
     07 BY MR. BUTLER:
     08      Q    This is another Autoliv document produced
     09 to us in this case; correct?
     10      A    Yes.  This is one presentation document
     11 according to the Autoliv product development
     12 procedure.
     13           MR. SCRIBNER:  I will state for the record
     14 this is an incomplete document, but we don't mind
     15 you using it, Mr. Butler, in the deposition.
     16 BY MR. BUTLER:
     17      Q    This document, Plaintiff's Exhibit No. 5,
     18 is entitled "Mazda J48C"; correct?
     19      A    Yes.
     20      Q    And the Mazda J48C was the program name for
     21 the 2004 and 2005 Mazda 3; correct?
     22      A    Yes, that's correct.
     23      Q    And the second page of Plaintiff's Exhibit
     24 No. 5 shows that you were the, quote, application
     25 engineer, close quote, for that seatbelt project;
00066:01 correct?
     02      A    Yes, that's correct.
```

**22. PAGE 66:07 TO 66:19 (RUNNING 00:01:10.934)**

```
     07           It is true that the seatbelt that was in
     08 Micah Andrews's 2005 Mazda 3 was made by Autoliv?
     09      A    Yes.  It's true that the seatbelt used in
     10 the Mazda 3 that Micah Andrews was riding in was
     11 produced by Autoliv.
     12      Q    It was manufactured -- strike that.
     13           That seatbelt was manufactured in Japan;
     14 correct?
     15      A    The seatbelt was manufactured in Japan.
     16      Q    You talked a lot earlier today about
     17 various other components of the occupant restraint
     18 system.  So let me follow up about that.
     19      A    Okay.
```

**23. PAGE 67:08 TO 68:09 (RUNNING 00:02:58.090)**

```
     08      Q    Mr. Kamei, look at Plaintiff's Exhibit
     09 No. 3, which is the steering wheel in Micah
     10 Andrews's Mazda 3, and the steering wheel is turned
     11 around in this picture, but at the bottom of the
     12 steering wheel you see the letters, quote, SRS,
     13 close quote?
     14           Do you see that?
     15      A    Yes.
     16      Q    What does SRS mean?
     17      A    I think it's probably support --
     18 supplemental restraint system.
     19      Q    And it refers to the airbag as being the,
     20 quote, supplemental restraint system; correct?
     21      A    Yes.  The law prescribes that this is to be
     22 imprinted on the airbag.
     23      Q    What law?
     24      A    I don't know for certain what country's --
```

**Andrews v Autoliv**

```
        25  what law of what country requires that SRS, meaning
00068:01  supplemental restraint system, be imprinted.
        02       Q   Isn't it true that the seatbelt is the
        03  primary mode of protection for occupants?
        04       A   Yes.  Yes.  The seatbelt has been around
        05  for decades.  The seatbelt has been around for
        06  decades before airbags.  And so the seatbelt was the
        07  first occupant restraint system, and then later --
        08  it was later that airbags came along, as well as
        09  shock-absorbing steering column.
```

**24. PAGE 68:12 TO 72:03  (RUNNING 00:10:21.085)**

```
        12       Q   My question to you, Mr. Kamei, was simply
        13  this:  Isn't it true that the seatbelt is the
        14  primary mode of protection for occupants?
        15            MR. SCRIBNER:  Object to form.
        16            You may answer.
        17            THE WITNESS:  It is true that the seatbelt
        18  is one component of the restraint system, which
        19  responds to various collisions.  There are various
        20  types of collisions, such as low-speed collisions
        21  and high-speed collisions.
        22  BY MR. BUTLER:
        23       Q   Why don't you tell the ladies and gentlemen
        24  of the jury why you don't want to admit that
        25  seatbelts are the primary mode of protection.
00069:01            MR. SCRIBNER:  Object to form.  Asked and
        02  answered.
        03            You may answer again.
        04            THE WITNESS:  Currently, the occupant
        05  restraint system is made up of the collection of a
        06  number of components, namely the airbag, the
        07  steering wheel, the steering column, and the
        08  seatbelt.  So the seatbelt is included.  And it is
        09  true that the seatbelt is one of the devices amongst
        10  those.
        11  BY MR. BUTLER:
        12       Q   Isn't it true, sir, that the reason you
        13  don't want to say that seatbelts are the primary
        14  mode of protection is because Autoliv wants to blame
        15  everything on the airbag in an attempt to escape
        16  responsibility for a seatbelt that spooled out
        17  20 inches?
        18            MR. SCRIBNER:  Object to form.
        19            You may answer.
        20            THE WITNESS:  No, that's not true.
        21            The seatbelt was in accordance with the
        22  original Mazda design.  The design -- being designed
        23  to absorb impact according to the original Mazda
        24  design.
        25            The occupant restraint system is made up of
00070:01  the collection of the airbag, the steering wheel,
        02  and other components, and is designed to achieve a
        03  better effect when that collection of components
        04  operates.
        05            This time the airbag did not open and the
        06  seatbelt pretensioner did not operate.  That was not
        07  the situation that was intended to occur.
        08  BY MR. BUTLER:
        09       Q   Isn't it true, sir, that this Autoliv
        10  seatbelt that spooled out 20 inches was totally
        11  useless to protect Micah Andrews in this wreck?
        12       A   I don't know as to that.
        13       Q   Isn't it true, sir, that the Autoliv
        14  seatbelt was so totally useless that Micah Andrews's
        15  face hit the steering wheel so hard that it killed
```

**Andrews v Autoliv**

```
        16  him?
        17      A    This Mazda 3 occupant restraint system
        18  consisted of the collection of the airbag, the
        19  seatbelt, the steering wheel, the steering column,
        20  an electric device, and was designed by Mazda to
        21  work as an integrated system.
        22           In this collision a signal was not
        23  received, and due to that, there was spooling out.
        24  That is very unfortunate, but the seatbelt itself
        25  did properly lock, according to the design.  And the
00071:01  impact-absorption function did work.
        02      Q    Is it your testimony to these ladies and
        03  gentlemen of this jury, sir, that this seatbelt
        04  properly worked?
        05      A    Yes.  It is a fact that this seatbelt
        06  locked as designed by Mazda and the
        07  impact-absorption function operated as designed, but
        08  despite it being a major collision, the airbag did
        09  not operate and the pretensioner did not operate.
        10  And that was not intended.
        11      Q    Let's see if I can get you to admit that
        12  seatbelts are the primary mode of protection.
        13           I'll show you Plaintiff's Exhibit No. 57.
        14           (Exhibit 57 was previously marked
        15           for identification.)
        16  BY MR. BUTLER:
        17      Q    You recognize that as a document from
        18  Autoliv's own website, do you not?
        19           MR. SCRIBNER:  Thank you.
        20           THE WITNESS:  Yes.
        21  BY MR. BUTLER:
        22      Q    And this is some pages from the Autoliv's
        23  website about Autoliv's frontal airbags; correct?
        24      A    Yes.
        25           MR. BUTLER:  Soseh.
00072:01      Q    It says right here, "Autoliv's Frontal
        02  Airbag System"; correct?
        03      A    Yes.
```

**25. PAGE 73:01 TO 78:05  (RUNNING 00:10:25.232)**

```
00073:01      Q    Isn't it true, sir, that at the very top of
        02  the page it says "Frontal Airbags"?
        03      A    Yes, here it says "Frontal Airbags."
        04      Q    And isn't it true that under the cartoon,
        05  or whatever you want to call it, it says, quote (as
        06  read and/or reflected:)
        07           Note:  Seatbelts are the
        08           primary mode of protection.
        09           Isn't that what it says?
        10           MR. BUTLER:  Move to strike as
        11  nonresponsive.
        12           The witness answered my question before it
        13  was translated.
        14           But go ahead and tell us the translation,
        15  please, ma'am.
        16           THE INTERPRETER:  The interpreter will note
        17  that she translated the question.
        18           MR. BUTLER:  I know.  He had already
        19  answered the question, but you go ahead and tell us
        20  what he said in Japanese.
        21           THE WITNESS:  The seatbelt is the first
        22  means of restraint.  When a collision occurs, the
        23  seatbelt first -- well, assuming that the seatbelt
        24  is being worn.  The system is based on that
        25  assumption.  The seatbelt first locks and then
00074:01  spools out due to impact, which causes -- the impact
```

**Andrews v Autoliv**

```
02   causes the airbag to operate.  And the airbag
03   absorbs the impact as the head moves forward to
04   prevent the impact.
05   BY MR. BUTLER:
06        Q    Isn't it true, sir, that Autoliv's 2005
07   annual report even says that seatbelts are, quote,
08   the primary mode of protection, close quote?
09        A    Do you have the documents?
10        Q    Sure.
11             MR. BUTLER:  Plaintiff's Exhibit No. 58.
12             (Exhibit 58 was previously marked
13             for identification.)
14   BY MR. BUTLER:
15        Q    Isn't it true that on page 18 --
16             MR. BUTLER:  And I've got it highlighted
17   for everybody -- I think for everybody.  Where is
18   it?
19             Autoliv's 2005 Annual Report.
20             MR. SCRIBNER:  Thank you.
21   BY MR. BUTLER:
22        Q    Autoliv itself said to the public that
23   seatbelts are the primary mode of protection?
24        A    It comes to the meaning of primary.
25             THE INTERPRETER:  And the interpreter has
00075:01   to make a statement -- sorry.  The interpreter has
02   to make a statement because there is not a
03   one-to-one correspondence between English and
04   Japanese and the English word "primary" can be
05   translated into two different Japanese words.
06             One, which uses the word "first."  And the
07   other which uses the word "main."  And both of those
08   Japanese words are commonly translated into English
09   as the word "primary."
10             And I can put the words on the record just
11   if anybody ever wants to review this.
12             (Speaking in Japanese.)
13             MR. BUTLER:  No, that's all right.
14             THE INTERPRETER:  Okay.
15             MR. BUTLER:  Have you interpreted his
16   answer?  I can't remember.
17             THE INTERPRETER:  I stated that before.  He
18   hasn't given me the answer yet.
19             He said (as read and/or reflected:)
20                  I think it has to do with the
21             meaning of primary.
22             And I interpreted that, and then I asked
23   him to pause.
24             MR. BUTLER:  Let me ask him this.  I'll ask
25   it this way, then.
00076:01        Q    Isn't it true that the seatbelt is the
02   first and the main mode of protection in a wreck?
03        A    That is true.
04        Q    And isn't it true, sir, that the airbag is
05   only designed to provide supplemental protection?
06        A    I don't think that can be said to be true.
07        Q    I'll show you the owner's manual for
08   Mr. Andrews's 2005 Mazda 3, Plaintiff's Exhibit 61.
09             (Exhibit 61 was previously marked
10             for identification.)
11             THE WITNESS:  Yes.
12   BY MR. BUTLER:
13        Q    Doesn't it say on page 2-36, under the
14   heading "Supplemental Restraint Systems" down here,
15   and I've highlighted it for you (as read and/or
16   reflected:)
17                  The airbag supplemental
```

**Andrews v Autoliv**

```
     18          restraint systems are designed to
     19          provide supplemental protection.
     20          Isn't that what it says?
     21     A    Yes.  The airbag is designated as a
     22  supplemental restraint system according to the law.
     23  The law requires that airbags be designated as SRS,
     24  supplemental restraint system and, thus, it is
     25  indicated as that.
00077:01          But nowadays, the collision protection
     02  system is made up of the airbag, the seatbelt, and
     03  lots of restraint devices.  And it's made predicated
     04  on all of those operating in conjunction with each
     05  other.
     06     Q    Isn't it true, sir, that Autoliv knows that
     07  seatbelts are the No. 1 lifesaver?
     08     A    Of course, seatbelts are one restraint
     09  device that are effective in various collisions.  In
     10  a low-speed collision, the airbag will not open, but
     11  if a seatbelt is worn, then injury can be avoided.
     12     Q    I'll show you Plaintiff's Exhibit No. 1,
     13  sir.
     14          (Exhibit 1 was previously marked
     15          for identification.)
     16          MR. SCRIBNER:  Thank you.
     17  BY MR. BUTLER:
     18     Q    Isn't it true this is another document from
     19  the Autoliv.com website?
     20     A    I've never seen this before, but I think
     21  that is probably the case.
     22     Q    Well, doesn't it show at the top, doesn't
     23  it show the Autoliv.com website?
     24     A    Yes.
     25     Q    And didn't Autoliv put on its website,
00078:01  quote, Seatbelt-No. 1 lifesaver, close quote?
     02     A    Yes.  It's my understanding that seatbelts
     03  were the first to be created amongst the occupant
     04  restraint system, and that seatbelts were Autoliv's
     05  first product, and that that is what this indicates.
```

**26.  PAGE 78:22 TO 80:15  (RUNNING 00:04:36.365)**

```
     22     Q    Mr. Kamei, are you telling this jury that
     23  this is all Mazda's fault, that Mazda killed Micah
     24  Andrews?
     25     A    Unfortunately, in this accident, there was
00079:01  a severe collision and the seatbelt locked, but the
     02  electric device did not transmit a signal to the
     03  airbag or the seatbelts.  And I don't know the
     04  reason for that, so it's hard for me to say
     05  anything.
     06     Q    Let me ask my question again, sir.
     07          Are you telling this jury that this is all
     08  Mazda's fault, that Mazda is responsible for killing
     09  Micah Andrews?
     10          Yes or no?
     11          MR. SCRIBNER:  Objection.  Asked and
     12  answered.
     13          You may answer again.
     14          THE WITNESS:  I don't know why it did not
     15  turn on.  So I don't know whether it's Mazda's
     16  responsibility or not.  And so I would want you to
     17  ask Mazda why it did not turn on.
     18  BY MR. BUTLER:
     19     Q    Will you agree with me, sir, that Mazda is
     20  not at fault at all for the seatbelt spooling out
     21  20 inches?
     22          MR. SCRIBNER:  Object to form.
```

**Andrews v Autoliv**

```
     23          You may answer.
     24          THE WITNESS:  In this collision our
     25 seatbelt locked as it was designed to do by Mazda.
00080:01 Unfortunately, the airbag and the seatbelt
     02 pretensioner did not receive an electric signal.
     03 And I will agree that it spooled out 20 inches
     04 because it did not receive an electric signal.
     05 BY MR. BUTLER:
     06     Q  Sir, isn't it correct that last statement
     07 is simply not true, that it spooled out 20 inches
     08 because it was designed to spool out 20 inches by
     09 Autoliv?
     10          MR. SCRIBNER:  Object to form.
     11          You may answer.
     12          THE WITNESS:  No, that's not correct.
     13          No.  As to the design of the seatbelt, the
     14 torsion bar that handles the spooling out, that
     15 torsion bar was designed by Mazda.
```

**27.  PAGE 80:18 TO 82:12  (RUNNING 00:02:49.417)**

```
     18          Sir, haven't you already admitted that the
     19 seatbelt was manufactured by Autoliv in Japan and
     20 sold by Autoliv?
     21     A  Yes, that's correct.
     22     Q  Don't these documents prove that Autoliv
     23 was actively involved in the design of that
     24 seatbelt?
     25          MR. SCRIBNER:  Object to form.
00081:01          You may answer.
     02          THE WITNESS:  No.  These documents were
     03 created to check that the product to be sold to
     04 Mazda, as planned by Mazda, were according to
     05 Mazda's instructions.
     06 BY MR. BUTLER:
     07     Q  Haven't we gone over two or three Autoliv
     08 documents, sir, where under the word "Designed" is
     09 typed your name "Kamei"?
     10     A  Yes, we have seen those.
     11     Q  Yes.
     12     A  But the meaning of that is -- but the
     13 meaning of that is that there are no mistakes in the
     14 content of the design, which was following the
     15 instructions of Mazda.  It was confirming that there
     16 were no mistakes in the design.  That was the
     17 meaning.
     18     Q  Let's talk about this 20 inches of
     19 spool-out.
     20          Isn't it true that seatbelts are supposed
     21 to spool out only slightly?
     22     A  There are various collision forms.  So I
     23 think that's a case-by-case matter.
     24     Q  I'll show you Plaintiff's Exhibit 117, sir.
     25 ///
00082:01          (Exhibit 117 was previously marked
     02          for identification.)
     03 BY MR. BUTLER:
     04     Q  Do you recognize this as yet another page
     05 from Autoliv's own website?
     06     A  Yes.
     07     Q  And the title of the page is "Seatbelt
     08 Retractors"; correct?
     09     A  Yes.
     10     Q  And if you look down here, it's got a
     11 section about load limiter; correct?
     12     A  Yes.
```

CONFIDENTIAL

**Andrews v Autoliv**

28. **PAGE 82:17 TO 86:03  (RUNNING 00:06:51.428)**

```
17              In the second paragraph under that it says,
18  quote (as read and/or reflected:)
19              Load limiters keep the belt
20              force at a controlled and
21              predefined level.  This is
22              accomplished by a mechanism in the
23              retractor that allows webbing to
24              pull out -- to be pulled out
25              slightly and in a controlled way.
00083:01         Close quote.
02               Did I read that correctly?
03               THE INTERPRETER:  Counsel, I have to ask,
04  since the question is:  Did I read that correctly,
05  the interpreter normally just refers to the English.
06               MR. BUTLER:  Do it however you think best.
07               MR. SCRIBNER:  Yeah, I agree.  I agree.
08               THE WITNESS:  Yes.
09  BY MR. BUTLER:
10       Q   Would you agree with me, sir, that
11  20 inches of spool-out in a seatbelt is not, quote,
12  slightly, close quote?
13       A   My understanding is that this is referring
14  to spooling out in accordance with a preset load and
15  that it could spool out more if the load was greater
16  than that preset load.  It's written here.  It says,
17  "predefined level."
18               And a load larger than that was applied to
19  the webbing, and, therefore, it was stretched out
20  more than had been anticipated.
21       Q   Look at the bottom right corner of
22  Plaintiff's Exhibit 117, sir.  Do you see the date
23  that this document was printed off from Autoliv's
24  website?
25       A   Yes, it's here.
00084:01         Q   It was printed out March 7, 2016, at
02  11:07 a.m.; correct?
03       A   I can see that that's what's printed here.
04       Q   Yes, sir.
05               And did you know that this page from
06  Autoliv's website, Plaintiff's Exhibit 117, that
07  talks about the webbing is to be pulled out slightly
08  was removed from Autoliv's website after that date?
09       A   No, I don't know that.
10       Q   Did you know that this page was removed
11  from Autoliv's website after Mrs. Andrews's lawyers
12  asked about this page in a deposition in this case?
13       A   No, I don't know that.
14       Q   Do you know who was behind removing this
15  page from Autoliv's website?
16       A   Not at all.
17       Q   Now, let's -- we talked about -- we
18  mentioned Volvo earlier.
19               Isn't it true that Autoliv supplied the
20  seatbelt for the 2005 Volvo S40?
21       A   I don't know if this is correct or not, but
22  I have a recollection that when the -- when there
23  was development for the Mazda 3, there was also
24  Volvo and Ford on the same platform, and S40 might
25  be one of those.
00085:01         Q   Yes, sir.  The Volvo S40 and the Mazda 3
02  for model year 2005 were on the same platform;
03  correct?
04       A   I'm not sure.  I don't know if the
05  platforms for the Mazda 3 and the Volvo were
```

**Andrews v Autoliv**

```
      06   identical.  That's something that would need to be
      07   confirmed with Mazda.
      08        Q    Or Volvo or Ford?
      09        A    Yes.
      10        Q    All right.  Were you aware that
      11   Mr. Prentkowski, whom -- who you helped prepare for
      12   his testimony in this case, has confirmed that
      13   Autoliv supplied the seatbelt for the Volvo S40?
      14        A    No.  I -- no, I don't know.  That's
      15   something that David may have looked into, but I
      16   didn't hear that.
      17        Q    Well, let's read it together, then, on
      18   Plaintiff's Exhibit 21, which includes page 98 of
      19   Mr. Prentkowski's deposition.
      20             (Exhibit 21 was previously marked
      21             for identification.)
      22   BY MR. BUTLER:
      23        Q    I've got it highlighted for you.
      24             Didn't Mr. Prentkowski, who has testified
      25   as the corporate representative for Autoliv,
00086:01   testify that Autoliv supplied the seatbelt for the
      02   Volvo S40?
      03        A    It's written that way here.
```

**29.  PAGE 87:05 TO 87:16  (RUNNING 00:01:26.850)**

```
      05        Q    Isn't it true that the seatbelt Autoliv
      06   sold to Volvo for the 2005 S40 had a torsion bar
      07   that was three times as strong as the torsion bar in
      08   the seatbelt that Autoliv sold to Mazda for the 2005
      09   Mazda 3?
      10             MR. SCRIBNER:  Object to form.
      11             You may answer.
      12             THE WITNESS:  There are various types of
      13   torsion bars, and we provide Mazda with low, mid,
      14   and high types of torsion bars.  And I know that
      15   Mazda selected the low type.  I don't know which
      16   type of torsion bar Volvo selected.
```

**30.  PAGE 87:25 TO 89:14  (RUNNING 00:02:55.510)**

```
      25             Let's look at Autoliv document Plaintiff's
00088:01   Exhibit 141, sir.
      02             Doesn't that show that Autoliv sold to
      03   Volvo a torsion bar that was high streaming,
      04   6.0 kilonewtons?
      05        A    Kilonewton.
      06        Q    Kilonewton.
      07        A    That's what's indicated.
      08        Q    And isn't it true, sir, that the torsion
      09   bar in the seatbelt that Autoliv sold to Volvo was
      10   300 percent stronger than the torsion bar in the
      11   seatbelt that Autoliv sold to Mazda?
      12             MR. SCRIBNER:  Object to form.
      13             You may answer.
      14             THE WITNESS:  Autoliv provided Mazda with
      15   low, mid, and high torsion bars.  And amongst those
      16   three, Mazda selected low.  And I think then that
      17   Volvo would have selected a different one, but I
      18   don't know what the reason for that is.  That's
      19   something that I would like you to ask Mazda.
      20   BY MR. BUTLER:
      21        Q    I'm going to ask you like Ms. Cannella
      22   asked Mr. Prentkowski, Autoliv's corporate
      23   representative, isn't it -- you said earlier today
      24   that you had read parts of his deposition.
      25             MR. BUTLER:  Look at Plaintiff's Exhibit
```

**Andrews v Autoliv**

```
00089:01  No. 43 on pages 100 and 101.
      02          (Exhibit 43 was previously marked
      03          for identification.)
      04  BY MR. BUTLER:
      05      Q   Didn't Mr. Prentkowski answer that same
      06  question whether or not the torsion bar sold by
      07  Autoliv to Volvo for the 2005 car was 300 percent
      08  stronger than the torsion bar Autoliv sold to Mazda
      09  for its 2005 car, and Mr. Prentkowski's answer was,
      10  quote, yes, close quote?
      11          Did I read that correctly?
      12          MR. SCRIBNER:  Object to form.
      13          You may answer.
      14          THE WITNESS:  Yes.
```

**31. PAGE 89:14 TO 89:14 (RUNNING 00:00:00.655)**

```
      14          THE WITNESS:  Yes.
```

**32. PAGE 90:13 TO 90:18 (RUNNING 00:00:15.225)**

```
      13      Q   Mr. Kamei, I want to ask you again about
      14  Plaintiff's Exhibit 35 we talked about before.  This
      15  is an Autoliv document, which in the block below
      16  "Designed" it's got your name "Kamei."
      17          Do you remember talking about that before?
      18      A   Yes, I remember that.
```

**33. PAGE 90:19 TO 91:05 (RUNNING 00:01:43.480)**

```
      19      Q   That's all I'm --
      20      A   This document was according to a format
      21  provided by Mazda and was for checking the Mazda 3
      22  seatbelt specifications.  And according to the
      23  format provided by Mazda and was an agreement
      24  between Mazda and Autoliv in --
      25          And was a checklist that Autoliv provided
00091:01  to Mazda to confirm that there were no mistakes in
      02  which Mazda then received and approved.  It was a
      03  document for the purpose of checking that there were
      04  no mistakes in the content of the design performed
      05  by Mazda.
```

**34. PAGE 91:22 TO 92:05 (RUNNING 00:01:03.240)**

```
      22          Isn't it true that the torsion bar on the
      23  seatbelt Autoliv provided to Mazda for the 2005
      24  Mazda 3 had a strength of 2.0 kilonewtons?
      25          MR. SCRIBNER:  Object to form.
00092:01          You may answer.
      02          THE WITNESS:  Yes.  It is true that the
      03  torsion bar selected according to the Mazda design
      04  for the Mazda 3 seatbelt, which was provided from
      05  Autoliv to Mazda, was 2.0 kilonewtons.
```

**35. PAGE 92:08 TO 93:06 (RUNNING 00:03:10.496)**

```
      08          Did Autoliv tell Mazda that a torsion bar
      09  with a strength of 2.0 kilonewtons was lower than
      10  low strength?
      11          MR. SCRIBNER:  Object to form.
      12          You may answer.
      13          THE WITNESS:  Autoliv provided low, mid,
      14  and high torsion bars to Mazda.  And from amongst
      15  those, Mazda selected the low torsion bar.  It's my
      16  understanding that the low torsion bar is
      17  2.0 kilonewtons.
      18  BY MR. BUTLER:
      19      Q   Look at page Plaintiff's Exhibit No. 35,
```

```
20  please, sir, under "Retractor Characteristic."
21        And doesn't this Autoliv document say right
22  here -- say right here that 3.5 kilonewtons is mid
23  strength and 3.0 is low strength?
24        A   Within this table, there are descriptions
25  of two different retractors.  The first line -- and
00093:01  the 2.0 kilonewtons is the torsion bar for the type
02  of retractor that was used in the seatbelt for
03  Mazda's 3s manufactured between 2003 and 2005.
04        And the torsion bars described in lines 2
05  and 3 are torsion bars used in a different retractor
06  so the conditions were different.
```

**36. PAGE 93:09 TO 93:22 (RUNNING 00:01:09.081)**

```
09        Q   Sir, isn't 2.0 less than 3.0?
10        A   That's true.
11        Q   So if 3.0 is low, 2.0 is lower than low;
12  isn't that true?
13        MR. SCRIBNER:  Object to form.
14        You may answer.
15        THE WITNESS:  These are talking about
16  different retractors.  There were three types --
17  there were three names for three types of torsion
18  bars in the retractor that was first used in the
19  Mazda 3 originally.  So this is a matter of the
20  names that were used.
21        MR. BUTLER:  Thank you, Mr. Kamei.  That's
22  all of our questions.
```

**37. PAGE 94:09 TO 96:06 (RUNNING 00:03:34.088)**

```
09  BY MR. SCRIBNER:
10        Q   Good afternoon, Mr. Kamei.
11        A   Good afternoon.
12        Q   My name is Doug Scribner, and I represent
13  Autoliv and I'm going to ask you some questions.
14  Okay?
15        A   Okay.
16        Q   Have you obtained a college degree?
17        A   Yes.
18        Q   When?
19        A   I graduated from college in March of 1987.
20        Q   In what area did you obtain your college
21  degree?
22        A   I graduated from the precision instruments
23  engineering department of the engineering faculty.
24        Q   Is that mechanical engineering?
25        A   Yes.
00095:01        Q   After you obtained your mechanical
02  engineering degree in 1987, where did you go to
03  work?
04        A   In April of 1987, I joined a company called
05  NSK Warner, which was a joint venture between NSK,
06  which is Nihon Seiko Company, Limited, N-I-H-O-N
07  S-E-I-K-O, and Borg Warner.
08        It's a company that makes transmissions.
09        THE INTERPRETER:  The interpreter does not
10  know how to spell it.
11  BY MR. SCRIBNER:
12        Q   Did you begin working with seatbelts in
13  1987?
14        A   Yes.  Yes.  I joined in April of 1987, and
15  soon after that, I was assigned to the seatbelt
16  engineering department.
17        Q   For whom do you work now in 2018?
18        A   I now work at a company called Autoliv
```

**Andrews v Autoliv**

```
      19    Japan.
      20         Q   Do you work with seatbelts currently?
      21         A   Yes.  I now do work involving airbag and
      22    seatbelt patents.
      23         Q   Have you worked continuously since 1987 in
      24    the area of occupant safety?
      25         A   Yes, I have.
00096:01         Q   Mr. Butler asked you questions about
      02    Exhibit 20.
      03              Do you have that in front of you?
      04         A   Yes.
      05         Q   Is that the seatbelt assembly
      06    specification?
```

**38.  PAGE 96:11 TO 98:17  (RUNNING 00:05:29.540)**

```
      11              THE WITNESS:  This is a design
      12    specification for Autoliv based on the Mazda designs
      13    according to the format provided by Mazda.
      14    BY MR. SCRIBNER:
      15         Q   If you could turn the page, there's a
      16    reference to a 2 kilonewton torsion bar deployment
      17    threshold.
      18              Do you see that?
      19         A   Yes.
      20         Q   Other than Mazda, are you aware of other
      21    Autoliv customers that incorporate seatbelts with
      22    2 kilonewton torsion bar deployment thresholds?
      23         A   Yes.  I know that there are many customers
      24    that have used the seatbelt which uses the 2.0
      25    kilonewton torsion bar.
00097:01         Q   Can you name some.
      02         A   There are many of them, but, for example, I
      03    believe that the Mitsubishi Outlander and the Honda
      04    CRV used the same 2.0 torsion bar.
      05         Q   Are you aware of automobile manufacturers
      06    that incorporate a torsion bar deployment threshold
      07    of less than 2 kilonewtons?
      08         A   Yes.  I'm aware that there is or are an
      09    Isuzu car or cars that uses seatbelt which
      10    incorporates a torsion bar that is below
      11    2.0 kilonewtons.
      12              I've recalled the name of the car.
      13    The Trooper.
      14         Q   With respect to the 2005 Mazda 3, who
      15    selected the 2 kilonewton torsion bar deployment
      16    threshold?
      17         A   We provided three types of torsion bars to
      18    Mazda, low, mid, and high.  And based on various
      19    tests that Mazda did, Mazda selected the low one.
      20         Q   If Mazda had requested that Autoliv
      21    supply a torsion bar with a deployment threshold of
      22    6 kilonewtons, would Autoliv have done that?
      23         A   Yes.  I think Autoliv would follow Mazda's
      24    instructions and provide a 6.0 kilonewton torsion
      25    bar.
00098:01         Q   Do you know what a stopper is?
      02         A   Yes.
      03         Q   Have some of Autoliv's customers required
      04    that Autoliv supply a seatbelt assembly with a
      05    stopper in the specification?
      06         A   Yes.  Yes.  The stopper is something that
      07    prevents the torsion bar from having more torsion,
      08    from winding more than a certain amount.  And Honda
      09    demands such a stopper.
      10    BY MR. SCRIBNER:
      11         Q   If Mazda had requested a stopper in the
```

```
      12   2005 Mazda 3 assembly, would Autoliv have provided
      13   one?
      14        A    At that time there was a retractor that
      15   came with a stopper.  And Mazda was aware of the
      16   stopper mechanism.  So if they had requested that,
      17   we would have acceded to their request.
```

**39.  PAGE 98:22 TO 98:24  (RUNNING 00:00:07.391)**

```
      22             Was it commonly known in the automotive
      23   industry that you could use a stopper in a seatbelt
      24   assembly in 2002?
```

**40.  PAGE 99:04 TO 99:08  (RUNNING 00:00:21.862)**

```
      04        A    Yes, it was.
      05        Q    Has Mazda ever complained to you that the
      06   seatbelt assembly that Autoliv supplied was wrong?
      07        A    We have not received a complaint from
      08   Mazda.
```

**41.  PAGE 100:02 TO 104:07  (RUNNING 00:11:31.132)**

```
      02        Q    Mr. Kamei, I just have a few follow-up
      03   questions.
      04             The first thing that Mr. Scribner,
      05   Autoliv's lawyer here today, said to you was that my
      06   name is Doug Scribner.
      07             Didn't you tell us that you spent most of
      08   Tuesday and Wednesday with Mr. Scribner and others?
      09        A    Yes, that's correct.
      10        Q    Mr. Scribner also asked you questions and
      11   you testified that some automakers have used torsion
      12   bars provided to them by Autoliv that had the same
      13   lower than low strength of 2.0 kilonewtons, and that
      14   at least one automaker has used torsion bars even
      15   weaker than that.
      16             Do you remember that testimony?
      17             MR. SCRIBNER:  Object to form.
      18             You may answer.
      19             THE WITNESS:  Yes.  I said that there were
      20   lots of manufacturers that used a seatbelt with the
      21   same type of torsion bar as the 2.0 kilonewton
      22   torsion bar used for the Mazda 3.  And that amongst
      23   those seatbelts I named the Mitsubishi Outlander and
      24   the Honda CRV.
      25             And I also named Isuzu as a company that's
00101:01   using a seatbelt which uses an even lower torsion
      02   bar.
      03   BY MR. BUTLER:
      04        Q    Well, my question to you about that is:
      05   Are any of those carmakers using torsion bars that
      06   weak today, now, in 2018?
      07        A    I don't know what types of torsion bars are
      08   currently used in mass production.
      09        Q    Would you agree with me, sir, that people
      10   that are driving in cars in America or riding in
      11   cars in America do not know that if the airbag
      12   fails, for whatever reason, the seatbelt can spool
      13   out 20 inches and the driver's face can then hit the
      14   steering wheel with such force that it kills the
      15   driver?
      16        A    Basically, the occupant restraint system is
      17   premised on the airbag, the seatbelt, the seatbelt
      18   pretensioner all working together in combination.
      19   And the occupant restraint system is designed to
      20   work that way.
      21             If the airbag, which is one part of the
```

**Andrews v Autoliv**

```
         22  occupant restraint system, does not work, that would
         23  be an abnormal situation.
         24       Q    Would you agree with me, sir, that people
         25  don't know that the airbag doesn't work in their --
00102:01  one of these cars with an Autoliv seatbelt like this
         02  that the driver's head can hit the steering wheel
         03  with so much force that it kills him?
         04       A    I don't know -- I don't know what the
         05  general public knows or does not know in regards to
         06  such circumstances.
         07       Q    Isn't it true that Autoliv has given no
         08  warning to the general public?
         09            MR. SCRIBNER:  Object to form.
         10            You may answer.
         11            THE WITNESS:  Autoliv is one manufacturer
         12  among many for occupant restraint systems.  And the
         13  occupant restraint systems comprise airbags,
         14  seatbelts, steering wheels, steering columns, the
         15  electric device.  I don't know if there is a need
         16  for Autoliv to issue a warning about airbags not
         17  opening or not.
         18  BY MR. BUTLER:
         19       Q    Is Autoliv still selling seatbelts like the
         20  one that was in Micah Andrews's 2005 Mazda 3?
         21            MR. SCRIBNER:  Object to form.
         22            You may answer.
         23            THE WITNESS:  The seatbelt used in the
         24  Mazda 3 used a low torsion bar pursuant to Mazda's
         25  instructions.  And a seatbelt using that torsion bar
00103:01  is still being purchased -- is still being shipped
         02  from Autoliv.  In other words, can still be
         03  purchased from Autoliv as service parts.
         04  BY MR. BUTLER:
         05       Q    Are seatbelts like the one Autoliv sold for
         06  the 2005 Mazda 3 still being shipped to the United
         07  States of America?
         08       A    The same sort of seatbelts might being --
         09  be being shipped or might not be being shipped.  I
         10  don't know the details right now.
         11       Q    Will you agree that there are still a lot
         12  of cars on the roads in America with seatbelts made
         13  by Autoliv like the seatbelt Autoliv sold for the
         14  2005 Mazda 3?
         15       A    I know that there are still Mazda 3s from
         16  that time period on the road.
         17       Q    Will you agree that if the jury decides
         18  that the seatbelt in Micah Andrews's car was
         19  defective, since there are still cars like that on
         20  the road, then there's a real problem?
         21            MR. SCRIBNER:  Object to form.
         22            You may answer.
         23            THE WITNESS:  No.  We at Autoliv
         24  manufactured the seatbelt decided upon according to
         25  Mazda's design.  And it was -- the specifications
00104:01  for the torsion bar of the seatbelt were decided
         02  upon by Mazda in combination, in conjunction with
         03  the airbag and such.  And as to why that combination
         04  was decided upon is something that should be
         05  asked -- that I would like you to ask Mazda.
         06            MR. BUTLER:  Thank you, Mr. Kamei.  That's
         07  all my questions.
```

**42. PAGE 104:12 TO 104:16 (RUNNING 00:00:17.284)**

```
         12       Q    To the best of your knowledge, has Mazda or
         13  the National Highway Traffic Safety Administration
         14  issued a recall notice for the 2005 Mazda 3?
```

CONFIDENTIAL

**Andrews v Autoliv**

```
15      A   I don't know, but I don't believe they have
16  issued such.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 02:38:26.439)