1

1
2                        UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF GEORGIA
3                               ATLANTA DIVISION

4
JAMIE LEE ANDREWS, AS                )
5   SURVIVING SPOUSE OF MICAH LEE     )  DOCKET NO. 1:14-CV-3432-SCJ
ANDREWS, DECEASED, AND JAMIE         )  VOLUME 4 - P.M.
6   LEE ANDREWS, AS ADMINISTRATOR    )
OF THE ESTATE OF MICAH LEE           )
7   ANDREWS, DECEASED,                )
                                      )
8                      PLAINTIFF,     )
                                      )
9        -VS-                         )
                                      )
10  AUTOLIV JAPAN, LTD.,              )
                                      )
11                     DEFENDANT.     )

12  _____

13                TRANSCRIPT OF NON-JURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE STEVE C. JONES
14                  UNITED STATES DISTRICT JUDGE
                   THURSDAY, OCTOBER 7, 2021

15

16  APPEARANCES:

17  ON BEHALF OF THE PLAINTIFF:

18   TEDRA L. CANNELLA, ESQ.
     JAMES E. BUTLER, JR., ESQ.
19   RORY A. WEEKS, ESQ.
     MICHAEL F. WILLIFORD, ESQ.

20

21  ON BEHALF OF THE DEFENDANT:

22   DOUGLAS G. SCRIBNER, ESQ.
     WILLIAM J. REPKO, III, ESQ.
23   JENNY A. HERGENROTHER, ESQ.

24                VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
                      OFFICIAL COURT REPORTER
25                  UNITED STATES DISTRICT COURT
                         ATLANTA, GEORGIA

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

Plaintiff's Exhibit

PX 1172

```
1
2                              INDEX
3
   WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS
4
   DAVID PRENTKOWSKI            4      35
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    (HELD IN OPEN COURT AT 1 P.M.)
 2             THE COURT:  I hope everybody had a good lunch.
 3   Mr. Butler, are you ready?
 4             MR. BUTLER:  Before we get started, I would like to
 5   tender an exhibit.  Exhibit 1161.  I tender it into evidence.
 6             This is a copy of the -- I know it's not a jury case,
 7   but pattern jury charges from the Eleventh Circuit and from
 8   Georgia courts.  It has to do with what is evidence and what is
 9   not evidence.  We believe the law is very relevant to the conduct
10   of the trial at this case.
11             THE COURT:  Any objection?
12             MR. SCRIBNER:  If it's the law, it's the law.  I don't
13   know if that is an exhibit, but I have no objection to it.
14             THE COURT:  1161 is admitted without objection.
15             MR. BUTLER:  It's 1164, Your Honor.
16             THE COURT:  1164 is admitted without objection.
17             (Plaintiff's Exhibit 1164 was received and marked into
18   evidence.)
19             THE COURT:  Okay.  Mr. Scribner, you can call your next
20   witness.
21             MR. SCRIBNER:  We call Mr. Prentkowski, Your Honor.
22             THE COURT:  Okay.
23             Mr. Prentkowski, you've already taken an oath so I'm not
24   going to give you another one.  I will remind you, you are still
25   under oath.  You heard the drill enough, so you know it.
```

```
 1                          ******

 2                  DAVID PRENTKOWSKI,

 3         having been previously sworn, resumes the

 4               stand and testified as follows:

 5                          ******

 6  DIRECT EXAMINATION

 7  BY MR. SCRIBNER:

 8  Q.  Mr. Prentkowski, how old are you?

 9  A.  I'm 64.

10  Q.  Have you ever testified at trial before?

11  A.  I have not.

12  Q.  How long have you worked in the automotive industry?

13  A.  A little over 38 years.

14  Q.  I understand from your previous testimony that you had been

15  involved in seat belt development; true?

16  A.  Yes, I have.

17  Q.  How long have you been doing that?

18  A.  Pretty much most of the 38 years.

19  Q.  Can you describe at a very high level what your role has been

20  in seat belt development?

21  A.  Well, it starts with listening to what the customer is looking

22  for in terms of products that they would like to use as part of

23  their occupant restraint system, and then as the supplier to help

24  explain what the capabilities of our components, our pieces, our

25  parts are that may help them decide which of those pieces and
```

1  parts they'd like to incorporate into a seat belt assembly and

2  then into their overall restraint system.

3  **Q.**   Have you worked with vehicle manufacturers to develop seat

4  belt assemblies?

5  **A.**   Yes, we do.

6  **Q.**   Which ones have you worked with?

7  **A.**   It's a very extensive list.  Certainly Ford, General Motors,

8  Chrysler, their various subdivisions, like, Dodge, Jeep, in terms

9  of Chrysler.  Mercedes Benz, Toyota, Honda, Nissan, Mazda, VW,

10  BMW.  A lot.

11  **Q.**   Okay.  There's been a lot of discussion at this trial about

12  occupant restraint systems and seat belt assemblies, you've heard

13  that?

14  **A.**   Yes, sir.

15  **Q.**   I want to focus for a moment on the differences between the

16  two.  Okay?

17  **A.**   Okay.

18  **Q.**   So let's start with the occupant restraint system.  You don't

19  have to name every single one, but just for Judge Jones' benefit,

20  identify some of the component parts that comprise the occupant

21  restraint system.

22  **A.**   Okay.  Starting with the actual vehicle body and the crash

23  pulse characteristics of that body, the anchorage locations for

24  the various components in that body, the seat, the seat belt

25  assembly, the airbag, the steering wheel, the steering column.

1   Those are the major components.

2   **Q.**   Okay.  And in your experience have you found that they are

3   designed to work together?

4   **A.**   Yes.  They have to be.

5   **Q.**   Why is that?

6   **A.**   Because you can't -- you can't look at or focus on any

7   individual component.  They all work together as a system.  And

8   that's -- that's the main word, is that they are a system working

9   together to achieve a final end goal of protecting the occupant.

10  **Q.**   In your 39 years of experience, who accounts for all of the

11  various component parts for the occupants -- strike that.

12      In your experience, who accounts for all of the components of

13  the vehicle's restraint system and determines which parts are

14  suited for them?

15  **A.**   Well, it's the vehicle manufacturer themselves, in this case

16  Mazda, and it varies from customer to customer.  But I'm going to

17  use the term "crash worthiness team."  It's that crash worthiness

18  team where they know what the body looks like and where the

19  anchorages are and how it's going to decelerate or absorb energy

20  during a crash, and how the seat belt will perform to control

21  occupant kinematics and those kinds of things.  But it's the

22  occupancy -- the vehicle manufacturer crash worthiness team.

23  **Q.**   Have you worked with the crash worthiness team -- I know -- I

24  think you testified they're not necessarily called the

25  crash worthiness team -- and you worked with the crash worthiness

1  teams for various automakers?

2  **A.**   Yes, I have.

3  **Q.**   When supplying a seat belt, does Autoliv know all of the

4  component parts of the occupant restraint system that is being

5  used by the automaker?

6  **A.**   Only in general terms as those components that I named.   But

7  detailed and specific information about each of them, no.

8  **Q.**   So when supplying a seat belt, does the Autoliv team know what

9  Mazda is planning to use for the airbag sensor system, for

10  example?

11  **A.**   No, they don't.

12  **Q.**   Do they know the details of the vehicle's body structure?

13  **A.**   Only where it's going to be mounted in the vehicle.   How the

14  body structure performs or manages energy, no, we don't.

15  **Q.**   The details of the steering wheel?

16  **A.**   No, we don't.

17  **Q.**   Details of the steering column?

18  **A.**   No, we don't.

19  **Q.**   The details of the seat?

20  **A.**   No, we don't.

21  **Q.**   If all of these parts have to work together, why doesn't the

22  seat belt team at Autoliv have knowledge of the specifications of

23  all these other various parts?

24  **A.**   Because it's the vehicle -- sorry, the vehicle manufacturer

25  crash worthiness team that has -- that has the knowledge to

1   understand how those other components are going to be designed to

2   work together.  They're the ones that are managing and

3   coordinating any changes to any of those parts, and they're the

4   ones that have set the -- I'll use the term, occupant protection

5   philosophy or strategy in defining what products they want in

6   their seat belt assembly to work as part of that overall restraint

7   system.

8   **Q.**   Does that automaker tell Autoliv about changes that they are

9   making to these various other parts of the occupant restraint

10  system when they're making them?

11  **A.**   No.

12  **Q.**   What is a seat belt assembly specification?

13  **A.**   In general, there are two specifications, and one is a set of

14  standard functional requirements, and another relates to the

15  actual performance level requirements that the vehicle

16  manufacturer expects the seat belt assembly to provide as part of

17  that overall restraint system.

18  **Q.**   Can we just call that the seat belt assembly specification

19  today?

20  **A.**   Yes.

21  **Q.**   And who determines in this industry what goes into that seat

22  belt assembly specification?

23  **A.**   The vehicle manufacturer and going back to that crash

24  worthiness team.

25  **Q.**   Now, you mentioned the crash worthiness team.  Do all

1  manufacturers have crash worthiness team?

2  **A.**  Yes, they do.

3  **Q.**  Does Mazda have a crash worthiness teams?

4  **A.**  Yes, they do.

5  **Q.**  Have you in the past interacted with crash worthiness teams?

6  **A.**  Yes, I have.

7  **Q.**  Are they sophisticated people?

8  **A.**  Yes, they are.

9  **Q.**  I'm going to shift gears.

10     On Monday during your cross-examination, Mr. Butler made

11  several references to a junk sensor; do you recall that?

12  **A.**  I do.

13  **Q.**  All right.  Does Autoliv have any involvement with the airbag

14  sensor system for the 2005 Mazda3?

15  **A.**  No, we do not.

16  **Q.**  What is your understanding of who provided the airbag sensor

17  system for the airbag in the 2005 Mazda3?

18  **A.**  Bosch.

19  **Q.**  And in your 39 years of experience developing seat belts, have

20  you ever communicated with the automakers' airbag sensor system

21  team?

22  **A.**  No, we have not.

23  **Q.**  Have you ever had interaction with them at all?

24  **A.**  No.

25  **Q.**  All right.  Shifting gears.  I'm done with the occupant

1    restraint.  I want to talk about the seat belt assembly.  Okay?

2       We talked earlier about the components that make up the

3    occupant restraint system.  Now I want to focus on -- well, strike

4    that.  Bad question.

5       Is the seat belt assembly one of the things that goes into the

6    occupant restraint system?

7    **A.**  Yes, it is.

8    **Q.**  Is the seat belt assembly itself that's set forth in that

9    specification, comprised of multiple component parts?

10   **A.**  It is.

11   **Q.**  And we talked about this last night.  There is a lot of them,

12   but can you just give Judge Jones an example of some of them?

13   **A.**  Sure.  Starting at the anchor end, there is an anchor that

14   attaches to the lower --

15       (The reporter asks for a clarification.)

16   **A.**  There's -- there's an anchor that is attached to the very end

17   of the seat belt assembly that helps --

18            THE COURT:  There is an exhibit the plaintiffs had of a

19   seat belt assembly.  That would help me as he goes through it, if

20   you don't mind.

21            MR. SCRIBNER:  Sure.  May I approach?

22            THE COURT:  Yes, sir.  Yes, sir.  I'm picturing this in

23   my mind, but I want to get it down.

24            THE WITNESS:  Yes, sir.  No problem.

25            THE COURT:  Yeah, that's it, Mr. Scribner.  Thank you.

1           THE WITNESS:  Okay.  So as you can see --

2           THE COURT:  Here.  Here.  I meant to give that to you

3  the other day, Ms. Cannella.  I had it when Ms. Cannella was up

4  here and I forgot to give it to her.  So Mr. Scribner gets to use

5  it first.

6           THE WITNESS:  I will do the best I can from the seat.

7           Okay.  The lower outboard anchor in green text here

8  where the end of the lap belt portion of the belt attaches to --

9  it can attach to either the vehicle body or part of the seat

10  structure.  Of course --

11          THE COURT:  So it could be on what y'all call the column

12  or tower of the car?

13          THE WITNESS:  Well, the lower -- if you don't mind, let

14  me continue, sir.

15          THE COURT:  Go ahead.

16          THE WITNESS:  Sorry.  So, again, this is the lower

17  outboard anchor that comprises one end of the lap belt portion of

18  the seat belt assembly.  So that component is typically mounted

19  to, like, the lower sill or the side of the seat.

20          Then you have the webbing.  This is one continuous piece

21  of webbing that runs from the anchor through the tongue up through

22  the D-ring and then back down into the retractor.

23          You have the tongue, that is the component that you grab

24  when you're trying to put the seat belt on, and insert the tongue

25  into the buckle to complete that lower portion of the belt, the

1   pelvic area and then the upper torso portion.

2           The webbing coming out of the tongue goes up to the

3   D-ring, which is a redirecting device and it's a load management

4   device.  If you think about the seat belt assembly, it's one

5   continuous piece of webbing.  It's called a three-point seat belt

6   assembly.  Typically referred to this as the pelvic portion and

7   upper torso portion.  So between the tongue and the D-ring, you've

8   created the upper torso portion of the belt.

9           Now, the D-ring is typically attached to that B-pillar

10  portion in your vehicle.  Again, when you are sitting in a

11  driver's seat and look left, it's right there.  And sometimes it's

12  mounted on an adjuster that allows you to position that seat belt

13  relative to your shoulder for comfort or fit.  Then the webbing

14  comes down from the D-ring and is attached to the retractor.

15          So those are the basic elements of the seat belt system.

16          THE COURT:  Thank you.

17          MR. SCRIBNER:  Thank you, Your Honor.

18          THE WITNESS:  Seat belt assembly.

19  DIRECT EXAMINATION

20  BY MR. SCRIBNER:

21  **Q.**  Now, if we talk about each of those components that comprise

22  the seat belt assembly, does Autoliv design those?

23  **A.**  Yes, we do.

24  **Q.**  Now, we talked about buckles, latch plates, webbing,

25  retractors.  What I want you to explain to Judge Jones about is do

1  we have multiple options of each of these components available for

2  an automaker?

3  **A.**   Yes, we do.

4  **Q.**   So let's just go with buckles.

5  **A.**   Okay.

6  **Q.**   So when you are communicating with an automaker, I mean, how

7  many buckles do they get to choose from, or is that a bad example?

8  **A.**   Well, a buckle is a reasonable example.   We probably have five

9  different versions of our typical or normal buckles, but there are

10  then many options that you can put inside the buckle.

11      Like, for example, right now, buckles are being developed with

12  lighted push buttons or lighted rings, so if you get into the

13  vehicle in the dark, and you have an idea of where you want to put

14  the buckle tongue.   It kind of highlights where the tongue goes.

15      Sometimes they have, in driver seating positions, they have

16  what I'll refer to as a system use switch, that's the thing that

17  drives that warning light and chime on your dashboard.   When

18  you're not wearing a belt, the light goes off, chimes go off, but

19  as soon as you buckle up, the chimes go off.   So there is a switch

20  in there for that.

21  **Q.**   Okay.   We're not going to do this because there are -- how

22  many component parts are there, just a guesstimate in terms of how

23  many are there in a seat belt assembly?

24  **A.**   Well, if you go down to the individual component level,

25  there's anywhere from 75 to 100 individual components when you add

1    up all of the bits and pieces and parts that could show up in a

2    three-point belt assembly.

3    **Q.**   And multiple options of each of them?

4    **A.**   Yes, sir.

5    **Q.**   The focus thus far in this case has been on the 2.0 kilonewton

6    R27LL retractor; right?

7    **A.**   Correct.

8    **Q.**   Does Autoliv design that retractor?

9    **A.**   Yes, we do.

10   **Q.**   All right.  Now I want to talk about seat belt assembly.

11   Okay?  On Monday Mr. Butler asked you whether you could answer the

12   question, the seat belt assembly in this car was designed by

13   Mazda, and he said I want a yes or no and you struggled with that.

14   Do you recall that?

15   **A.**   I do, yes.

16   **Q.**   You said I can't give you a yes or no.  Why?  Why did you

17   struggle with his question?

18   **A.**   Because it goes back to the -- basically, the prior two

19   discussion points.  Autoliv designs and manufactures the

20   individual components and subassemblies that can be used to make

21   up the seat belt assembly, but then the vehicle manufacturer by

22   specification selects which function or feature for each component

23   in the belt assembly that they would like to use.

24        One example -- two examples, very quick, the retractor.  We

25   have multiple torsion bars available for that retractor.  If you

1  want a two, you put in a two.  If you want a three, you put in a

2  three -- I'm sorry, a three-and-a-half, a three-and-a-half.  If

3  you want a five, you ask for a five.  It's available.

4      Webbing.  Webbing, many people just look at webbing and say,

5  okay, it's a piece of fabric.  Webbing has different elongations,

6  and different customers want different elongations to help manage

7  energy as part of the overall restraint system.  So there are many

8  options for all of those component parts.

9  **Q.**   Thank you.  Before we get to the specification at issue in

10 this case, you talked about that crash worthiness team; right?

11 **A.**   Yes, sir.

12 **Q.**   When you first meet with the crash worthiness team -- now,

13 this is before any testing is performed, before the NCAP testing

14 which the Judge is aware of that is performed, the NHTSA, all of

15 the testing that the manufacturer does, before that all happens,

16 do you typically receive a specification from the automaker?

17 **A.**   Yes.

18 **Q.**   It's not the final?

19 **A.**   It's not the final specification.  We receive a preliminary

20 specification based on the simulation work that they've done,

21 where that crash worthiness team has looked at -- this is what we

22 think the body is going to look like and where we think the

23 anchorages are going to be and what kind of seat we think we're

24 going to use.  They perform a simulation to evaluate how -- how

25 the occupant restraint performance works with elements of a seat

1  belt assembly and other components in the overall restraint

2  system.

3  **Q.**  Sometimes the details of the specification change during

4  product development?

5  **A.**  Yes, they do.

6  **Q.**  Sometimes they don't; true?

7  **A.**  That's correct.

8  **Q.**  All right.

9       MR. SCRIBNER:  Mr. Repko, could you pull up Defendant's

10  Trial Exhibit No. 42.

11  DIRECT EXAMINATION

12  BY MR. SCRIBNER (continued):

13  **Q.**  This is just page 1, but what do you recognize that to be page

14  1 of?

15  **A.**  That is the Mazda engineering specification for the seat belt

16  assembly used in the Mazda3.

17       MR. SCRIBNER:  And, Mr. Repko, can you go to retractor

18  characteristics, please, and zoom in on that.  There you go.

19  DIRECT EXAMINATION

20  BY MR. SCRIBNER (continued):

21  **Q.**  All right.  So do you see the retractor characteristic portion

22  of the specification?

23  **A.**  I do.

24  **Q.**  And does it tell you the deployment threshold requested for

25  this particular retractor?

1  A.  Yes, it does.

2  Q.  And can you tell Judge Jones what that is?

3  A.  Yeah, it specifies two plus or minus 0.5 kilonewtons at 200

4  millimeters.

5  Q.  Okay.  In this industry that you work in, who develops seat

6  belt assembly specifications?

7  A.  Back to that customer crash worthiness team.  So it's -- it

8  would be the crash worthiness team at Mazda for this vehicle.

9  Q.  Once that specification is set, can Autoliv depart from that

10  specification when it supplies a seat belt assembly?

11  A.  No.

12  Q.  Why not?

13  A.  Because Autoliv is not aware of other changes that they may be

14  making in the rest of the system.  So if they make other changes

15  and they want us to make a change, then they have to authorize us

16  with an engineering change notice.

17      MR. SCRIBNER:  I believe, Your Honor, previously, two or

18  three pages of this document has been introduced as exhibits.  I

19  have no objection to that, but we would like to introduce this

20  whole document into evidence, please.

21      MR. BUTLER:  No objection.

22      THE COURT:  This document is admitted with no objection

23  into evidence, Defendant 42.

24      (Defendant's Exhibit 42 was received and marked into

25  evidence.)

 1          MR. SCRIBNER:  Mr. Repko, can you pull up Plaintiff's

 2  Exhibit 128?  The answer to that may be no.

 3          MS. HERGENROTHER:  He's got it.  I see it.

 4          MR. BUTLER:  Mr. Hendricks can pull it up real quick for

 5  you.  That's fine with us.  PX128 is what he's talking about.

 6          MR. SCRIBNER:  Thank you.  I appreciate that.  All

 7  right.

 8  DIRECT EXAMINATION

 9  BY MR. SCRIBNER (continued):

10  **Q.**  Do you recall Mr. Butler asking you a series of questions

11  about this document?

12  **A.**  Yes, I do.

13  **Q.**  And, first, can we go to the date of the document?

14  **A.**  January 8, 2002.

15  **Q.**  Would January 8, 2002, have been before or during the

16  production of the 2005 Mazda3?

17  **A.**  This is before production.

18  **Q.**  How long before, just give or take?

19  **A.**  A little over two years.

20  **Q.**  Two years before the actual vehicles are made by Mazda?

21  **A.**  For the 2005 model year, yes.

22  **Q.**  Okay.  In the third paragraph do you see a reference to

23  MADYMO?

24  **A.**  I do.

25  **Q.**  Can you describe to Judge Jones what MADYMO is?

**A.**   MADYMO is actually an acronym for mathematical dynamic
modeling, and basic -- I touched on it a little bit earlier.   It's
a tool that the crash worthiness team would use where they take
the electronic, the digital models and performance characteristics
of the various components of the overall restraint system, again,
body, seat, steering wheel, airbag, seat belt, and perform a
simulation of a crash test.   But it's a computer simulation, not
an actual vehicle test.

**Q.**   You anticipated my question.   The Judge heard about NCAP
testing and Rule 208 testing where they take an actual vehicle and
drive it into a rigid barrier at 30 to 35 miles per hour.   Is this
that test?

**A.**   It is not.

**Q.**   All right.   Now, Mr. Butler focused on the language in the
e-mail that says, "As expected the target was not obtained.
Bottoming of the head occurred -- bottoming of the head occurred
STG wheel," or words to that effect.   Do you see that?

**A.**   Yes.

**Q.**   And several times on Monday you said, you know, may I talk
about page 2 of this document.   Do you recall that?

**A.**   I do.

**Q.**   Okay.   Judge Jones said you can do that when your lawyer --

        MR. BUTLER:   Objection, your Honor.   It mischaracterizes
his testimony.

        MR. SCRIBNER:   It does not.

1              MR. BUTLER:  Oh, it does several times.  It certainly

2    does.

3              THE COURT:  Let's just move it on and get to your next

4    question.

5    DIRECT EXAMINATION

6    BY MR. SCRIBNER (continued):

7    Q.  Now is your chance.  Can we move to page 2, please.

8    A.  I'm there.

9    Q.  Okay.  Did Mr. Butler show you this page?

10   A.  He did not.

11   Q.  Okay.  What importance do you take from page 2 of this

12   exhibit?

13   A.  Well, the one thing -- the one thing that I see is I have an

14   Autoliv response back to Mazda.  It's, basically, the last two

15   sentences on this page.

16   Q.  And can you hear me?  I'll be loud.  I think it says -- they

17   start with saying, Thank you for your continued assistance,

18   et cetera.  The final amount of change in speed is 25M/S/90KM/H.

19       Do you think the data is incorrect?  Please confirm.  And that

20   is Autoliv --

21   A.  It is.

22   Q.  -- in that e-mail?

23   A.  That is Autoliv asking Mazda a question about the MADYMO model

24   that they asked us to review.

25   Q.  And what is the speed -- what is 90 kilometers per hour equate

1  to miles an hour?

2  **A.**   Ninety kilometers per hour is 56 miles per hour, which is not

3  any type of standard test protocol for 208 or NCAP.

4  **Q.**   We talked about 208, which is 30 miles per hour, NCAP which is

5  35 miles per hour.   This is 56 miles per hour according to this

6  e-mail?

7  **A.**   That's what it says.

8  **Q.**   Is there any test that anyone runs, to the best of your

9  knowledge, an actual crash test where the vehicle is traveling at

10  56 miles an hour?

11  **A.**   No, there is not.

12          MR. SCRIBNER:   Mr. Repko, can you pull up Plaintiff's

13  Trial Exhibit No. 126.   All right.   Can you zoom in?

14  DIRECT EXAMINATION

15  BY MR. SCRIBNER (continued):

16  **Q.**   There was another document you were asked about.   Before we

17  get into it, let's provide some context.

18      What's the date on this document?

19  **A.**   November 2002.

20  **Q.**   And is this a description of a meeting between Autoliv and

21  Mazda?

22  **A.**   Yes.

23  **Q.**   All right.   Now, you see there, it says, "Mazda had

24  difficulties to achieve their U.S. NCAP targets with the current

25  restraint system.   They intend to change to higher load level,

1   implement digressive load limiters or retractor pretensioners

2   instead of R27LL.  Timing and costs were submitted.  Mazda still

3   have not come to a decision."

4       All right.  Let's pause and talk about the timing of this

5   document.  Is this before, during or after production for the 2005

6   model?

7   **A.**   This is before.

8   **Q.**   How long before?

9   **A.**   Just under two years before start of production.

10  **Q.**   Okay.  Now, the R27LL has a 2-kilonewtons threshold; true?

11  **A.**   Correct.

12  **Q.**   And the "they," when they say they intend to change to a

13  higher load level, is the "they" Mazda?

14  **A.**   That's the way I read it to be, yes.

15  **Q.**   Okay.  Now, what is the importance of, when it says timing and

16  costs were submitted, Mazda still has not come to a decision,

17  what's the importance of that to you?

18  **A.**   Well, it means that Mazda has done a certain level of

19  evaluation and provided Autoliv enough information about the

20  proposed changes that they're considering.  So that we have enough

21  information to provide them a quote on cost and on timing of what

22  it would cost to do that from a seat belt component standpoint.

23  **Q.**   Okay.  So Mazda has done some work, still thinking about going

24  to a higher load limiter; right?

25  **A.**   Yes.

1  Q.   And we're waiting for a decision from Mazda; right?

2  A.   Correct.

3  Q.   Now, we know, because there's been testimony about it, that

4  the 2006 Mazda3 had a 3.5 kilonewtons threshold; correct?

5  A.   That's correct.

6  Q.   Okay.  Let's assume at this moment in time that Mazda wanted

7  to change.  Nothing else in those parts, in that seat belt

8  assembly, but the retractor.  And they said, I want Autoliv to

9  supply me with a 3.5 kilonewtons threshold instead of 2.0 for

10 production.  It's going to take several months down the road for

11 the 2005 Mazda3.  Are you with me?

12 A.   Yes.

13 Q.   Could Autoliv have done that?

14 A.   Yes.

15 Q.   How difficult would that have been?

16 A.   Not difficult at all.

17 Q.   In your experience, who makes the final decision as to what

18 retractor goes into that specification?

19 A.   The vehicle manufacturer, and part of that is the crash

20 worthiness team.

21          MR. SCRIBNER:  Pull up Plaintiff's Trial Exhibit 151,

22 please.

23 DIRECT EXAMINATION

24 BY MR. SCRIBNER (continued):

25 Q.   All right.  Do you recall seeing this document --

**A.**   Yes, I do.

**Q.**   -- during the course of this trial?

**A.**   Yes, I do.

**Q.**   All right.   So this is November 2004, and it's a business trip report; right?

**A.**   It is.

**Q.**   And at the bottom they're talking about performance of the entire occupant restraint system; right?

**A.**   They are.

**Q.**   And talking about the bottoming again; correct?

**A.**   Correct.

**Q.**   But can you explain to Judge Jones who this communication is with?   Which teams at Autoliv and Mazda are we talking about at this point?

**A.**   This is between Mazda and the Autoliv airbag module group.

**Q.**   Okay.   Did Autoliv supply the Autoliv airbag module for this vehicle?

**A.**   We did, yes.

**Q.**   Okay.   And there's a discussion in there about, perhaps, some changes --

            MR. BUTLER:   Objection, leading, Your Honor.

            MR. SCRIBNER:   I'll rephrase.   That's fair.

DIRECT EXAMINATION

BY MR. SCRIBNER:

**Q.**   What is the discussion in this document?   Why is it important

1  to you?

2  **A.**   In Section 3 where it describes future plan --

3  **Q.**   Hold still until Mr. Repko can blow it up, please.

4  **A.**   Okay.

5  **Q.**   All right.   There you go.   Go ahead.

6  **A.**   Section 3, line item one where it says, "Further sled testing

7  will be conducted on the module, airbag module, in which the

8  diameter of the vent hole has been reduced."   That is significant.

9  **Q.**   Why is that significant?   Can you explain it to Judge Jones,

10  why that is significant?

11  **A.**   Sure.   If you think of an airbag, it's a large fabric bag when

12  it's fully deployed, filled with a high-pressure gas from the

13  inflater.   You can change the stiffness or hardness of the airbag

14  as it's engaging with the occupant by changing the way the bag is

15  vented.   If you have a large vent in the bag, the pressure bleeds

16  out fairly quickly.   If you have a small hole vent in the bag, the

17  pressure leaks out more slowly.   So a crude example would be if

18  you think of a pillow, right, it's a pillow, a large vent hole

19  gives you a very soft pillow, and a small vent hole gives you a

20  much more firm pillow.   So if you're engaging the airbag with a

21  small vent hole, the airbag is more firm, it's stiffer.   Does that

22  help?   Okay.

23  **Q.**   Well, let me ask a follow-up.   The stiffer the airbag, how can

24  that impact occupant restraint?

25  **A.**   Well, it helps resist forward motion of the occupant.

1  Q.   And why is -- well, strike that.

2       Did you say -- I'm sorry.  Can you say that again?

3  A.   Sure.  As the occupant is moving forward, it's utilizing the

4  load limiting in the seat belt when it engages the airbag.  The

5  airbag helps resist the forward motion of the occupant.  So a

6  stiffer airbag helps resist the forward motion of the occupant.

7  Q.   Is this consistent or inconsistent with what you said earlier,

8  that all of these various parts can impact occupant safety?

9  A.   Yes.

10 Q.   Consistent?

11 A.   Yes, it is consistent.

12 Q.   Let's switch gears.

13      MR. SCRIBNER:  You can pull it out, Mr. Repko.

14 DIRECT EXAMINATION

15 BY MR. SCRIBNER (continued):

16 Q.   Now, do you recall Mr. Butler asking you if Autoliv intended

17 for the subject seat belt to pay out 20 inches?

18 A.   I do.

19 Q.   You recall there was back and forth about intended?  We had a

20 back and forth about the word "intended" means; right?

21 A.   Yes.

22 Q.   I'm going to give you a chance to explain.  But first, let me

23 make sure I set the stage.

24      When Autoliv sold the seat belt assembly to Mazda, was Autoliv

25 aware that if the airbag did not deploy, that seat belt was

1  capable of paying out 20 inches?

2  **A.**   Yes.

3  **Q.**   Was Autoliv aware that a seat belt assembly with a 4

4  kilonewtons threshold could pay out 20 inches?

5  **A.**   Yes.

6  **Q.**   Was Autoliv aware that a seat belt assembly with a 6

7  kilonewtons threshold in an impact like this could pay out 20

8  inches without an airbag?

9  **A.**   Yes.

10  **Q.**   Are all -- well, strike that.

11     To clear up the confusion, did Autoliv intend -- well, strike

12  that.   Strike that.

13     Did Autoliv intend for that to happen in this case?

14  **A.**   No.

15  **Q.**   What did Autoliv intend to happen in a 35-mile-per-hour

16  accident of this type?

17  **A.**   Autoliv intends that the vehicle level restraint system works

18  as the -- as the vehicle manufacturer has designed it.

19  **Q.**   Which includes what?

20  **A.**   Airbags, seat belts, steering wheels, steering columns, seats,

21  vehicle body structure, and the other components that make up the

22  overall restraint system.

23  **Q.**   Now, you're not suggesting that Autoliv is not aware that

24  sometimes airbags fail to deploy, that has happened; right?

25  **A.**   Yes.

1  **Q.**  And everyone knows that; right?

2  **A.**  Yes.

3  **Q.**  All right.  Let's switch gears.

4     There's been discussion at this trial about the primary form

5  of restraint.  Okay?

6     Now, in a fender bender, what's the primary form of restraint?

7  **A.**  That would be the seat belt.

8  **Q.**  Okay.  How about a high-speed accident like this one, do you

9  think the seat belt is the primary form of restraint in a

10  35-mile-per-hour impact?

11  **A.**  No, it's the -- it's the overall restraint system as designed

12  by the vehicle manufacturer.  All of those elements need to work

13  together to provide the best restraint possible.

14  **Q.**  Now, there are documents that say the seat belt is the primary

15  form of restraint; correct?

16  **A.**  Yes, there are.

17  **Q.**  All right.  And that is true in certain instances; true?

18  **A.**  It is.  It's -- it's always the below airbag deployment

19  threshold type event.

20  **Q.**  I'm going to switch gears.

21     Are you familiar with stops in seat belts?

22  **A.**  I am.

23  **Q.**  Within the industry is the availability of stops well-known?

24  **A.**  Yes, it is.

25  **Q.**  In your experience, are they commonly used?

1   **A.**  Not really.

2   **Q.**  Okay.  We've heard several engineers the plaintiffs have

3   called as witnesses talk about this engineering trade-off.  You've

4   heard that?

5   **A.**  Yes, I have.

6   **Q.**  Can you describe to Judge Jones what the trade-off is when

7   you're talking about a stop?

8   **A.**  The big trade-off is when you introduce a stop into the system

9   is you run the risk of increasing the forces on the chest.

10  **Q.**  All right.  Let's switch gears.

11       We heard in the cross-examination on Monday that part of your

12  duties at Autoliv is to provide assistance to the legal

13  department; true?

14  **A.**  Correct.

15  **Q.**  And how long have you been working with the legal department

16  in that way?

17  **A.**  Since about 2007.

18  **Q.**  2000, sorry?

19  **A.**  2007.

20  **Q.**  And at a high level what kind of assistance are you providing?

21  **A.**  Basically, any time the legal department receives a legal

22  claim, they ask me to help investigate that claim.

23  **Q.**  Are the types of claims that they have you look at, like seat

24  belt claims, are you talking about?

25  **A.**  Seat belt claims.  Only seat belt claims.

1  **Q.**   Okay.   And as part of your job duties and responsibilities

2  since 2004 -- I'm sorry, strike that.

3      As part of your job duties and responsibilities, do you

4  receive notice of claims of a defective seat belt or defective

5  seat belt retractor that Autoliv receives?

6  **A.**   Yes, I do.

7  **Q.**   Other than the claim made by Ms. Andrews, are you aware of any

8  other claims alleging that the driver side seat belt retractor in

9  the 2005 Mazda3 was defective?

10  **A.**   No, I have not.

11  **Q.**   Now, other than the lawsuit filed by Ms. Andrews, are you

12  aware of any other lawsuits alleging that the driver side's seat

13  belt retractor in the 2005 Mazda3 is defective?

14  **A.**   No, I have not.

15  **Q.**   Do you know how many 2005 Mazda3s have been sold by Mazda?

16  **A.**   I believe it's around 71,000.

17          MR. SCRIBNER:   Mr. Repko, could you please pull up

18  Exhibit 206.

19          MR. BUTLER:   Defendant's Exhibit 206?

20          MR. SCRIBNER:   That's a good question.

21          MR. REPKO:   It is.

22          MR. WEEKS:   Yes.

23          MR. BUTLER:   PX206.   Thank you.

24          MR. SCRIBNER:   If you will scroll down, Mr. Repko.

25  DIRECT EXAMINATION

1  BY MR. SCRIBNER (continued):

2  Q.  This is discovery that was served on Mazda in this case?

3        MR. BUTLER:  Objection, your Honor, hearsay.  This is

4  outside the field of this guy's expertise.  He's an engineer.

5  He's not a lawyer.

6        MR. SCRIBNER:  First of all, they've already -- they

7  don't object to this.  They've agreed this would be admitted as an

8  exhibit.  We're going to talk about the number of vehicles sold.

9  I think what you may recall, Your Honor --

10        MR. BUTLER:  Excuse me.

11        THE COURT:  First of all, let him finish his

12  explanation, then you may respond.

13        MR. SCRIBNER:  So I think you may remember, we had a

14  motion in limine on this.  You said, well, if you're going to say

15  that there are no previous incidents or a small number of previous

16  incidents, we have to establish that, you know, somebody has

17  reason to know about the claims and we have to know how many were

18  sold.  They've already acknowledged that this is an admissible

19  document during this trial.

20        I don't think I objected to a single document, by the

21  way.

22        This just shows that 71,000 vehicles were sold, that's

23  all.

24        MR. BUTLER:  My objection was to asking this witness

25  about this document.  No foundation.  There can be no foundation

1   laid.

2          THE COURT:  Mr. Scribner said you all agreed to allow

3   this document in.

4          MR. SCRIBNER:  May I respond?

5          THE COURT:  Yes.

6          MR. SCRIBNER:  I have literally let them cross-examine

7   witnesses with stipulations.  So, I mean --

8          MR. BUTLER:  Can I have a moment, Your Honor?

9          THE COURT:  All right.

10          MR. BUTLER:  Let it go.

11          THE COURT:  All right.  Thank you.

12          MR. BUTLER:  We'll withdraw the objection.

13          THE COURT:  Go ahead, Mr. Scribner.

14          MR. SCRIBNER:  Thank you.

15   DIRECT EXAMINATION

16   BY MR. SCRIBNER (continued):

17   Q.  So the plaintiff's lawyers asked Mazda for the years 2002 to

18   present to state the number of Mazda3 vehicles sold, all models

19   and configurations in the United States and Georgia.

20          MR. SCRIBNER:  Can you pull up the response?

21   DIRECT EXAMINATION

22   BY MR. SCRIBNER:

23   Q.  There, the total response nationwide is 71,058.  Do you see

24   that?

25   A.  I do.

1  **Q.**  Is that consistent with your understanding in terms of how

2  many seat belt assemblies we were supplying for this program?

3  **A.**  Yes, it is.

4          MR. SCRIBNER:  All right.  We move to admit it, Your

5  Honor.

6          THE COURT:  I think Mr. Butler said we could allow it

7  in.  So it's allowed in.

8          MR. SCRIBNER:  Thank you.

9          THE COURT:  What number is this, Mr. Scribner?

10         MR. REPKO:  206.

11         THE COURT:  Defendant's 206.

12         THE DEPUTY CLERK:  Defendant's 206.  Thank you.

13         (Defendant's Exhibit 206 was received and marked into

14  evidence.)

15  DIRECT EXAMINATION

16  BY MR. SCRIBNER (continued):

17  **Q.**  All right.  One last area of inquiry for you, Mr. Prentkowski.

18     There has been a lot of discussions about VA/VE documents in

19  this trial.  Have you seen that?

20  **A.**  Yes, I have.

21  **Q.**  Well, I'm just going to ask you.  What is a VA/VE document?

22  **A.**  VA/VE stands for value analysis, value engineering, but in its

23  simplest form, it is a proposal for a cost reduction.

24         MR. BUTLER:  A proposal for what, I'm sorry?

25         THE WITNESS:  Cost reduction.

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

1 DIRECT EXAMINATION

2 BY MR. SCRIBNER (continued):

3 **Q.**  So if Autoliv is making a proposal for a cost reduction, it's

4 included within a VA/VE?

5 **A.**  Yeah.  Mazda has certain rules and procedures and

6 expectations, and any proposal for a cost reduction needs to be

7 submitted on a VA/VE form.

8 **Q.**  If it's not a cost reduction, would it be captured in one of

9 these documents?

10 **A.**  If it is not?  No, no, no.  Only cost reductions are part of

11 the VA/VE documentation.

12         MR. SCRIBNER:  That's all I have.  Thank you, Your

13 Honor.

14         THE COURT:  Thank you, Mr. Scribner.  Mr. Butler.

15         MR. BUTLER:  Yes, sir.

16         THE COURT:  Mr. Scribner.

17         MR. SCRIBNER:  Sorry.  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         MR. BUTLER:  I guess, Mr. Repko, would you pull 206 back

20 up?  Because we don't have it.

21         While he's doing that, Your Honor, under the old legal

22 principle of belts and suspenders, we want to tender into evidence

23 the official certified transcript of this witness'

24 cross-examination three days ago on Monday, October 4, 2021.

25         May I approach, Your Honor, and give him a copy?

1           THE COURT:  Yes, sir, you may approach.

2           MR. SCRIBNER:  No objection.

3           THE COURT:  No objection.

4           THE DEPUTY CLERK:  Can I have a number?

5           MR. BUTLER:  You need to put a sticker on it.

6           THE COURT:  What number, Mr. Butler?

7           MS. CANNELLA:  1165.

8           MR. BUTLER:  1165.

9           (Plaintiff's Exhibit 1165 was received and marked into

10    evidence.)

11          THE COURT:  Go ahead, Mr. Butler.  I'm sorry.

12    CROSS-EXAMINATION

13    BY MR. BUTLER:

14    Q.  Mr. Prentkowski, good afternoon.

15    A.  Hello.

16    Q.  Have you been here all week?

17    A.  Yes, I have.

18    Q.  I thought it was said Monday that you had to leave and go to

19    your hometown?

20    A.  Things happen.

21    Q.  You talked at some length to Mr. Scribner about explaining

22    things to customers.  Tell the Court when you last met with

23    Autoliv lawyers to discuss your testimony that you've given here

24    today.

25          THE COURT:  Just don't tell us what y'all talked about.

1    CROSS-EXAMINATION

2    BY MR. BUTLER (continued):

3    Q.   That's right.   When did you all last meet with all those

4    lawyers to discuss the testimony that you and they proposed for

5    you to give today?

6              MR. SCRIBNER:   I'm going to let him answer when he last

7    met with us.   In terms of a suggestion that we're telling him what

8    to say, that's totally improper.

9              MR. BUTLER:   That's argumentative, Your Honor.   That's

10   not a proper objection.

11             THE COURT:   Mr. Prentkowski, don't tell us anything you

12   all talked about.   Okay?

13             THE WITNESS:   Last night.

14   CROSS-EXAMINATION

15   BY MR. BUTLER (continued):

16   Q.   Last night.   When before that did you meet with all of the

17   lawyers about what testimony you might give?

18   A.   Well, as you indicated, I've been here all week, sir.

19   Q.   So all week?

20   A.   Before last night, it was the night before, yes, sir.

21   Q.   All right.   And have you reviewed the transcript of your

22   testimony on Monday?

23   A.   I have not.

24   Q.   Have you discussed the transcript of your testimony on Monday

25   with anybody?

1          MR. SCRIBNER:  Objection.  No communications with

2    lawyers.  I just want to make sure he understands.

3          THE COURT:  Don't tell one word what you or Mr. Scribner

4    or Mr. Repko talked about.

5    CROSS-EXAMINATION

6    BY MR. BUTLER (continued):

7    Q.  Let me make sure it's clear for the record.  Mr. Prentkowski,

8    I'm not going to ask you what Autoliv's lawyers told you or said

9    to you.  Okay?  Do you understand that?

10   A.  I'll listen for it, yes, sir.

11   Q.  Pardon me?

12   A.  I'll listen for it.  I'll listen to the question.

13   Q.  I'm not going to ask you what they said.  Do you understand

14   that?

15   A.  Okay.

16   Q.  All right.  What was my question?  Oh, have you

17   discussed -- they'll be asking, I guess.

18       Do you know what is in the transcript of what you testified to

19   on Monday?

20   A.  I don't remember the details.  I, obviously, gave the

21   testimony, but I couldn't read it back to you out of my head word

22   for word.

23   Q.  You've been working with the legal department at Autoliv for

24   14 years; right?

25   A.  Approximately, yes.

1  Q.   Okay.  And you've been sent by the legal department at Autoliv

2  to nine or ten 30(b)(6) depositions?

3  A.   Yes.

4  Q.   Now, that's what all automakers do, isn't it?  All automakers

5  do this.  The legal department finds an engineer who they think

6  would be a persuasive witness and they designate that person as

7  their witness to send to depositions and trials; right?

8         MR. SCRIBNER:  I object to the form of that.  Calls for

9  speculation as well, what other legal departments do for other

10  automakers.

11         THE COURT:  I don't know if he can answer what other

12  automakers do.  Mr. Prentkowski can answer as to his company, but

13  not what somebody does.

14  CROSS-EXAMINATION

15  BY MR. BUTLER (continued):

16  Q.   Why were you told that you had been picked out from all of the

17  hundreds of Autoliv seat belt engineers to be the official Autoliv

18  Incorporated spokesperson?

19  A.   Basically, years of experience.

20  Q.   Don't those other hundreds of Autoliv engineers also have

21  years of experience?

22  A.   I don't know the number of years of experience of other

23  engineers.

24  Q.   Now, when Mr. Scribner was asking you questions, you admitted

25  today that the seat belt is the primary restraint.  Do you recall

1   that just three days ago you refused to admit that?

2   **A.**   I believe I explained that earlier.

3   **Q.**   My question is:  Do you recall that just three days ago, on

4   Monday, you refused to admit that?  Do you recall that?

5   **A.**   I do.

6   **Q.**   Yes, sir.  Thank you.

7       You sat here and listened to Mr. Kamei's deposition, and you

8   had read his deposition.  He also refused to admit that the seat

9   belt was the primary restraint; correct?

10  **A.**   Correct.

11  **Q.**   Did someone tell you it was time for Autoliv to stop denying

12  that?

13  **A.**   No.

14  **Q.**   Mr. Scribner asked you about a bunch of Autoliv documents.  I

15  wrote down five, four of which were plaintiff's exhibits in this

16  case.  You had nothing to do with any of those documents, did you?

17  **A.**   As in personal involvement in the program?

18  **Q.**   Yes, sir.

19  **A.**   No, I did not.

20  **Q.**   You had nothing to do with this seat belt that was put in the

21  Mazda3, did you?

22  **A.**   I did not.

23  **Q.**   Autoliv has engineers who are employed by Autoliv with

24  firsthand knowledge of this seat belt and of those documents;

25  correct?

1   **A.** Correct.

2   **Q.** I want to follow-up with a question that the Court asked of

3   one of our expert witnesses, and I'm not remembering which one.

4           THE COURT:   I think it was Caruso, and Ms. Cannella was

5   directing.  I've been answering so many questions.  I apologize.

6   Judges aren't supposed to do that.

7           MR. BUTLER:  No, it's fine for the Judge to do that,

8   especially in this trial, we have no objection.  We appreciate it.

9   CROSS-EXAMINATION

10  BY MR. BUTLER (continued):

11  **Q.** But I ask you this question, Mr. Prentkowski.  Show us an

12  Autoliv document where Mazda told Autoliv, we don't want a

13  stronger seat belt that has been recommended by Autoliv.

14  **A.** I can't.

15  **Q.** There's not one, is there?

16  **A.** Not that I've seen.

17  **Q.** Yes, sir.  Show us an Autoliv document where Autoliv said to

18  Mazda, we won't sell you this seat belt without a legal waiver and

19  indemnification from Mazda.  Show us that document.

20  **A.** I don't believe one exists.

21  **Q.** I don't either.

22      You talked with Mr. Scribner about, quote, the overall

23  occupant restraint system as designed by the manufacturer.  Do you

24  remember that discussion?

25  **A.** I do.

1  Q.  Okay.  You talked about as part of that system, the steering

2  wheel and the collapsible steering column and a bunch of other

3  things.  Let me ask you this question.

4      Is Autoliv now trying to blame someone other than Mazda and

5  Bosch?

6  A.  I believe I'm just explaining what our working relationship

7  and normal practice is.

8  Q.  You're the corporate representative.  Is Autoliv contending

9  that some part of this, quote, overall occupant restraint system,

10  close quote, failed other than the airbag and the seat belt?

11  A.  Can you repeat that question, please?

12          MR. BUTLER:  Can you read it back, please, ma'am.

13          (Whereupon, the record was read back by the reporter.)

14          THE WITNESS:  I'm sorry, I'm struggling with the

15  question.  I don't know that anybody has said the airbag has

16  failed.  The airbag did not deploy.  The pretensioner did not

17  deploy.  So, again, I'm struggling with the question.

18  CROSS-EXAMINATION

19  BY MR. BUTLER (continued):

20  Well, what parts of the, quote, overall occupant restraint system,

21  close quote, does Autoliv admit was defective?

22  A.  I guess whatever elements prevented the airbag and

23  pretensioner from deploying.

24  Q.  What do you mean, quote, whatever elements, close quote?  You

25  don't know what those elements are?

1   **A.**   I am -- I am not the Mazda crash worthiness team.   I don't

2   know what elements, what sensors, what functions, features they

3   use to make determinations or decisions for deploying component

4   parts of the restraint system.   So I would rather not speculate.

5   **Q.**   You're the corporate representative, you don't know what

6   caused the airbag to fail to deploy?

7   **A.**   No.

8            MR. BUTLER:   Mr. Hendricks, would you pull up

9   Plaintiff's Exhibit 151, and go to paragraph that is numbered

10   three.

11   CROSS-EXAMINATION

12   BY MR. BUTLER (continued):

13   **Q.**   Do you see that, Mr. Prentkowski?

14   **A.**   I do.

15   **Q.**   Autoliv'S lawyer just asked you about that; correct?

16   **A.**   Correct.

17   **Q.**   It says:   Further sled testing will be conducted.   Who is

18   going to do that sled testing?

19   **A.**   The system level sled testing is done by the vehicle

20   manufacturer.

21   **Q.**   Now, I didn't ask you about system level.   I asked you who was

22   going to do this, quote, further sled testing?

23   **A.**   Mazda.

24   **Q.**   Thank you, sir.   Very clear answer.

25       Autoliv has its own crash test facilities, doesn't it?

**A.**   Yes.

**Q.**   It has, as a matter of fact, in an annual report we saw that's in evidence that said Autoliv has, like, 16 full vehicle crash test courses, and I believe I recall six sled tests -- what's the word -- facilities or something like that.  Do you remember seeing that?

**A.**   Yes.

**Q.**   Okay.  Did Autoliv do any sled testing to test whether or not this seat belt was defective or not?

**A.**   Are you talking about this page?

**Q.**   No, no, no.  Separate question.

Did Autoliv do any of its own sled testing at these facilities Autoliv has to determine whether or not this seat belt was defective?

**A.**   There are two sled tests requirements in the Mazda engineering specification, and Autoliv did -- did do those tests.

**Q.**   How many tests did Autoliv do?

**A.**   I can't recall at the moment.

**Q.**   Look -- look, if you would, sir, at --

MR. BUTLER:  Under bullet point two, Mr. Hendricks.  Let me see if I can find it.  That's not right.  No, that's not it.  I can't remember what I saw a minute ago, Your Honor.  Just give me a second.  There we go, under two.  Blow up this paragraph, part two.  No, up here.  Test results.  That whole -- no, the whole thing where it says, "Two" in the left column.  My instructions

1 are deficient.

2 CROSS-EXAMINATION

3 BY MR. BUTLER (continued):

4 Q. Now, the reason that there had to be additional or further

5 sled testing is because bottoming occurred; isn't that right?

6 A. That's what the document says.

7 Q. Autoliv knew that bottoming out of the head on the steering

8 wheel had occurred in somebody's testing, but Autoliv itself

9 didn't do any further sled testing after Autoliv learned that;

10 isn't that true?

11 A. I believe that's probably correct.

12 Q. Pardon?

13 A. I believe that's probably correct.

14 Q. Thank you, sir.

15     Now, Mr. Scribner also asked you about this document, about

16 how -- something about how the -- the vent hole in the airbag was

17 reduced; right?

18 A. Correct.

19 Q. Now, the reason the vent size and diameter -- start over.

20     The reason that the diameter of the vent hole in the airbag

21 was reduced is so that the airbag would remain deployed for a

22 longer period of time; correct?

23 A. Longer period of time or higher pressure, yes.

24 Q. And the reason it was necessary to reduce the diameter of the

25 vent hole in the airbag is because Autoliv knew the seat belt was

1  spooling out so far that the dummy's head hit the steering wheel?

2  **A.**   Is that a question?

3  **Q.**   Yes.   Isn't that the reason?

4  **A.**   Well, it's what Mazda's engineering team is telling us.

5  **Q.**   Well, did -- when the Mazda crash worthiness engineering team

6  told Autoliv that, did Autoliv say you're wrong?

7  **A.**   No.

8  **Q.**   So the Mazda engineering crash worthiness team told Autoliv

9  that this seat belt is spooling out so bad, we've got to make

10  sure -- we've got to adjust the airbag so it stays inflated

11  longer; isn't that right?

12  **A.**   As a potential solution, yes.

13  **Q.**   Now, show us the document where any Autoliv engineer or

14  executive wrote or said, whoa, wait a minute.   We know that the

15  seat belt is spooling out so bad that we've got to do more sled

16  testing, and we know the seat belt is spooling out so bad that

17  we've got to change the airbag and let it deploy longer, and,

18  whoa, what happens if the airbag fails all together and does not

19  deploy?   Show us a document where somebody at Autoliv raised that

20  red flag.

21  **A.**   I can't.

22  **Q.**   There's not one, is there?

23  **A.**   Nope.

24  **Q.**   Show us a document where somebody at Autoliv told Mazda, guys,

25  we can't sell you this seat belt.   We have to go back to the

1   drawing board, because if you've got to solve the seat belt

2   spool-out problem by messing around with the airbag, we know

3   airbags sometimes don't deploy, we've got to fix the seat belt

4   itself.   Autoliv never told Mazda that either, did they?

5   **A.**   Not that I can see in any documents.

6   **Q.**   What happened was, that Autoliv totally outsourced its duty

7   under law and morality to make sure the seat belt was safe to

8   Mazda; isn't that right?

9   **A.**   I don't understand the question.

10  **Q.**   What about it don't you understand?

11  **A.**   I either didn't hear or didn't understand the last few words.

12  **Q.**   I thought it was clear.   I'll try it again.

13       Isn't it true that what happened is that Autoliv totally

14  outsourced its duty to make sure that this seat belt was safe to

15  Mazda?

16  **A.**   Again, I don't -- I don't agree with that.

17  **Q.**   You said when Autoliv's lawyer was asking questions, once the

18  manufacturer specifies -- provides the specifications and that is

19  set, Autoliv cannot depart from it.   Do you remember saying that?

20  **A.**   I do.

21  **Q.**   Do you remember hearing Mr. Kamei admit that Autoliv didn't

22  have to sell this seat belt to Mazda?

23  **A.**   I don't recall that statement.

24  **Q.**   Do you agree that Autoliv did not have to sell this seat belt

25  to Mazda?

1  **A.**  That's true.

2  **Q.**  Does Autoliv contend that it was Mazda that meant for this

3  seat belt to spool-out 20 inches and be useless if the airbag

4  failed?

5  **A.**  Well, Mazda has overall system responsibility for their own

6  vehicle.

7  **Q.**  Is that a yes?

8  **A.**  Yes.

9  **Q.**  All right.  Isn't Autoliv also responsible for that same

10  thing?

11  **A.**  No.

12  **Q.**  Autoliv is not responsible for the seat belt it manufactured

13  and sold?

14  **A.**  I thought the question was related to the overall system.

15  **Q.**  I didn't say a single word about overall system.

16         THE COURT:  Hold on, hold on.

17  CROSS-EXAMINATION

18  BY MR. BUTLER (continued):

19  **Q.**  I'm going to talk to you a lot about systems.

20         THE COURT:  Hold on.  Question, answer.  That's what

21  we're doing.

22         MR. BUTLER:  I can't remember the question.  Can you

23  read back?  Sorry.

24         (Whereupon, the record was read by the court reporter.)

25  CROSS-EXAMINATION

BY MR. BUTLER (continued):

**Q.**   Is that Autoliv's position?

**A.**   Autoliv is responsible for the seat belt it manufactured and sold.

**Q.**   Thank you, sir.

Do you know of anyone from Autoliv, employed by Autoliv as an executive or engineer or whatever, who has ever expressed to Micah Andrews' widow any condolence?

**A.**   I believe Mr. Scribner offered condolence in his opening statement.

**Q.**   I believe he did, too, but he doesn't work for Autoliv.  He's a lawyer.  Has anyone from Autoliv itself done that?

**A.**   I don't know.

**Q.**   All right.  Let me ask you about that.  Were you aware that Autoliv filed a motion with this Court to make Mrs. Andrews, Micah Andrews' widow, pay to Autoliv its fees and expenses?

**A.**   I don't know all the details of what transpired between the legal teams.  I'm sorry.

**Q.**   Do you know about that?

**A.**   If I knew it, I can't recall it at the moment.  I'm not involved in every aspect.

THE COURT:  Could you repeat that?  I heard the question, but I didn't get it all.  I'm sorry, Mr. Butler.

MR. BUTLER:  I can't repeat it, but I know Vi can.

(Whereupon, the record was read by the court reporter.)

1            THE COURT:  Okay.  As I was saying, I was apologizing to

2    Mr. Butler.  I was responding in a way to something you said

3    regarding Mr. Scribner not working for Autoliv.  So I apologize.

4    You sometimes have that effect on me, Mr. Butler.

5            MR. BUTLER:  No problem.

6            We're looking up the document number of that motion.  If

7    somebody will remind me, we'll put that in the record.

8            MS. CANNELLA:  276-1.

9            MR. BUTLER:  Page or Document 276-1, Your Honor.

10   CROSS-EXAMINATION

11   BY MR. BUTLER (continued):

12   Q.  Now, Mr. Prentkowski, I want to make sure that we have a clear

13   record of what happened.  Mr. Andrews' face hit the steering wheel

14   with a great deal of force.  You agree with that, don't you?

15   A.  I do.

16   Q.  And that was as a direct result of the seat belt spooling out

17   20 inches; correct?

18   A.  It was.

19   Q.  You've agreed and testified on Monday that the seat belt was

20   useless to Micah Andrews?

21   A.  The overall system didn't work as designed.

22   Q.  It was useless to him, wasn't it?

23   A.  For failure of the rest of the system, it was useless to him.

24   Q.  Well, there wasn't a single thing in the, quote, rest of the

25   system, close quote, that made that seat belt spool out 20 inches,

1  was there?

2  **A.**   Lack of an airbag.

3  **Q.**   That didn't make the seat belt spool out 20 inches.   If an

4  airbag had not failed, it might not have prevented some of that

5  spool-out, but the seat belt was spooling out 16.84 inches in the

6  NCAP test, wasn't it?

7  **A.**   It was.

8  **Q.**   The Court has seen this exhibit probably more than it wants to

9  see it.   It's going to see it again.

10    Plaintiff's Exhibit 1074 shows that, doesn't it?

11  **A.**   Yes, it does.

12  **Q.**   Now, tell the Court where Autoliv's version of Plaintiff's

13  1073 is.   We have a chart that shows all of the NCAP results for

14  all these compact cars.   Does Autoliv have such a chart that it is

15  willing to show to the Court?

16  **A.**   No.

17  **Q.**   What?

18  **A.**   No.

19  **Q.**   No.

20    Isn't it true that the seat belt did not prevent Mr. Andrews

21  from hitting the steering wheel so hard he was killed?

22  **A.**   I guess the same as the previous answer, for lack of airbag,

23  yes.

24  **Q.**   Isn't it true the steering wheel was collapsed?

25  **A.**   It appeared to be, yes.

1  Q.  Isn't it true the steering wheel was collapsed because Micah

2  Andrews' right cheek hit it so hard it broke the steering

3  column --

4  A.  Yes.

5  Q.  -- or collapsed the steering column?

6  A.  Yes.

7  Q.  Isn't it true that the one job of a driver side seat belt is

8  to keep the driver's head from hitting the steering wheel so hard

9  it kills him?

10  A.  Well, driver seat belt assembly is part of the overall

11  restraint system.

12  Q.  No, sir, you're dodging my question.

13  A.  I'm not dodging your question.  That is the way that Mazda

14  designed the restraint system for that vehicle.

15          MR. BUTLER:  Vi, would you repeat my question, ma'am,

16  please.  I'm sorry to ask you again.  I didn't follow my notes

17  exactly.

18          (Whereupon, the record was read by the court reporter.)

19          THE WITNESS:  It's part of the overall restraint system,

20  yes.

21  CROSS-EXAMINATION

22  BY MR. BUTLER (continued):

23  Q.  When the driver's seat belt fails to keep the driver's head

24  from hitting the steering wheel so hard it kills him, doesn't that

25  mean the seat belt failed?

```
 1  A.   I can't separate the seat belt assembly from the system.

 2  Q.   Doesn't that mean, sir, the seat belt failed?

 3  A.   Lacking an airbag, yes.

 4  Q.   Isn't it true, sir, that Autoliv knew that this seat belt --

 5            MR. BUTLER:  Here.

 6            THE COURT:  Let him take mine.

 7            MR. BUTLER:  I have an extra one, Your Honor.  I

 8  realized my notes were on this unbound copy.

 9            THE COURT:  Thank you.

10  CROSS-EXAMINATION

11  BY MR. BUTLER (continued):

12  Q.   Isn't it true, sir, that Autoliv knew that this seat belt was

13  going to spool out 20 inches if that airbag did not stop it?

14  A.   Yes.

15  Q.   Isn't it true that it was foreseeable to Autoliv that this

16  airbag might not deploy?

17  A.   Yes.

18  Q.   Isn't it true that it is -- strike that.

19       Isn't it true that what is foreseeable can be avoided?

20  A.   Yes.

21  Q.   Isn't it true that 20 inches was something that could have

22  been avoided?

23  A.   Yes.

24  Q.   Would you agree that refusing to avoid the foreseeable when

25  you have an opportunity to avoid it, is the same thing as
```

1  intential?

2  **A.**  Yes.

3  MR. BUTLER:  That would be a major part of our response

4  to motion for directed verdict, Your Honor.

5  CROSS-EXAMINATION

6  BY MR. BUTLER (continued):

7  **Q.**  Tell the Court what Autoliv did to avoid 20 inches of

8  spool-out that killed Micah Andrews when the airbag foreseeably

9  failed to deploy?

10  **A.**  Well, at this point Autoliv followed the Mazda design

11  specification.  Mazda does the development and review of what is

12  and isn't possible for the overall restraint system.

13  **Q.**  Let me give you, as the Autoliv corporate representative at

14  this trial, another opportunity, Mr. Prentkowski.

15  Tell the Court what Autoliv did to avoid 20 inches of

16  spool-out that killed Micah Andrews when the airbag foreseeably

17  failed to deploy.

18  **A.**  We supplied the seat belt that Mazda required -- requested.

19  **Q.**  Is it Autoliv's position that it has absolutely no duty to

20  avoid such horrible results as a seat belt that spools out 20

21  inches and allows the driver's head to hit the steering wheel with

22  such force that it kills him?

23  **A.**  I'm sorry, can you repeat the question?

24  MR. BUTLER:  Vi, can you repeat it, because I ad-libbed

25  again.

1          (Whereupon, the record was read by the court reporter.)

2          THE WITNESS:  No, Autoliv's responsibility is to supply

3  the parts that the customer is looking for since they designed

4  this system and understand it best.

5  CROSS-EXAMINATION

6  BY MR. BUTLER (continued):

7  Q.  Who understands seat belt best, Autoliv or Mazda?

8  A.  Autoliv understands the components that made up the seat belt

9  assembly.  But the definition and combination of components to

10 make the seat belt assembly to work best in the system, resides

11 with the customer crash worthiness team.

12 Q.  We're going to get to this in a minute.  I did note that

13 Mr. Scribner used when he was describing the seat belt assembly

14 components, Plaintiff's Exhibit 1059.  Do you remember that?

15 A.  Yes.

16 Q.  We're going to get to that in a moment, but right now we're

17 going to talk about something else.

18     We're going to talk about Autoliv blaming Mr. Andrews.

19     You, the Autoliv corporate representative, admits that this

20 case starts when the car hit those trees because that's when the

21 question arises, who is at fault for the airbag not working and

22 the seat belt not working, you admit that, don't you?

23 A.  Yes, but I'm also the first to admit I don't understand the

24 legal aspects of the situation or question.  I'm not a lawyer.

25 I'm an engineer.

1  Q.  Look at 40 page of your deposition -- of your trial testimony

2  three days ago, line 21.

3          MR. SCRIBNER:  Your Honor, I thought his answer was yes.

4          MR. BUTLER:  His answer was not just, yes.  You know,

5  we've had this problem in his deposition.  I wouldn't

6  characterize.  We had this problem in his deposition.  We have

7  this problem now.  It's the one I addressed in the first five

8  minutes on the cross-examination on Monday.  You ask a yes or no

9  question, the Court instructed this witness and others, you have

10  the right to explain your answer, but first you answer.  This

11  witness instead of doing that, he gave some sort of -- I won't

12  characterize what it is -- a bunch of words, and then he says yes

13  or no.  Now it was very clear Monday, and I want to read into the

14  record what he said Monday.

15          THE COURT:  But he did say yes a minute ago.

16          MR. BUTLER:  He qualified his answer, Your Honor.

17          THE COURT:  I took it as a straight yes.

18          MR. BUTLER:  Well, then if you think it's a straight

19  yes, I'll take it.

20          THE COURT:  If it wasn't a straight yes, you tell me,

21  Doctor.  I took it as a straight yes.

22          MR. SCRIBNER:  He didn't say it was straight yes.

23          MR. BUTLER:  You didn't ask Mr. Scribner.  This is not

24  proper.  He is coaching his witness again.

25          THE COURT:  Listen, we can move on.  It was a yes.

1            MR. SCRIBNER:  Thank you, Your Honor.

2    CROSS-EXAMINATION

3    BY MR. BUTLER (continued):

4    Q.  Isn't it true that Mr. Andrews had nothing to do with

5    manufacturing and selling either the airbag or the seat belt?

6    A.  That's correct.

7    Q.  Isn't it true that Mr. Andrews had no warning that if the

8    airbag failed, the seat belt would be useless to him?

9    A.  I believe that's correct.

10   Q.  You know that if neither the seat belt nor the airbag worked,

11   a person could get killed, and that is what happened to

12   Mr. Andrews?

13   A.  If the seat belt and airbag do not work, a person can get

14   killed, yes.

15   Q.  That wasn't all my question.  And that is exactly what

16   happened to Mr. Andrews, wasn't it?

17   A.  Well, the airbag didn't work, yes.

18   Q.  No, sir.  Let's do it this way.  Look at your deposition page

19   45.  I mean, your trial testimony.

20       Line 14:  "QUESTION:  If neither one of them worked, you could

21   get killed; isn't that right?

22       "ANSWER:  Correct.

23       "QUESTION:  That's what happened to Mr. Andrews, isn't it?

24       "ANSWER:  It is."

25       Is that your testimony three days ago?

1   **A.**   It is.

2   **Q.**   Thank you, sir.

3      Now, there were some questions asked about Mr. -- by Autoliv's

4   lawyer just a little while ago about other similar incidents.   Do

5   you remember those questions, how often this has happened?

6   **A.**   I do.

7   **Q.**   Okay.   Do you know?

8   **A.**   For front seat driver seating position?

9   **Q.**   Um-hum.

10  **A.**   Just this one.

11  **Q.**   How do you know that?

12  **A.**   Just this one since I've been providing support to the Autoliv

13  legal team from about 2007.

14  **Q.**   How do you know that?

15  **A.**   Basically, any time that -- any legal claim that comes to the

16  legal department involving the seat belts, they ask me to help

17  investigate it.

18  **Q.**   How do you know that this -- you said the word "legal claim."

19  Now, that's different.

20     Mr. Scribner asked you how many times has there been an

21  incident where one of these seat belts failed and spooled out as

22  much as 20 inches and somebody got hurt or killed?

23          THE COURT:   There's an objection.

24          MR. SCRIBNER:   That is flat false.   I did not say

25  "incident."

MR. BUTLER: Well, he is talking about the --

THE COURT: Sustained.

MR. BUTLER: I'll rephrase. I don't know what word he used. I can't remember. I don't have the transcript.

CROSS-EXAMINATION

BY MR. BUTLER (continued):

**Q.** But he asked you something about how many times it has happened when this seat belt failed in spooling out this much or nearly this much and somebody got killed and injured. Do you remember that question generally?

**A.** Yes.

**Q.** Okay. So -- and you said just this once, and then you qualified it to be driver side only. I'm not asking you about driver side only. The same seat belt was driver side and passenger side, wasn't it?

MR. SCRIBNER: Objection, your Honor. I specifically asked about driver side. He's suggesting I didn't. This is about the third time he's suggesting my questions mean something that they don't, and everybody in this room knows it.

THE COURT: He did say driver side, Mr. Butler.

MR. BUTLER: I didn't mean to suggest anything to the contrary. That's my point. He said driver side only.

CROSS-EXAMINATION

BY MR. BUTLER (continued):

**Q.** My point to you, Mr. Prentkowski, is the driver side and the

1  passenger side had the same seat belt; right?

2  **A.**  Yes, they had the same seat belt, but it's not necessarily the

3  same system.

4  **Q.**  I didn't ask you that, did I?  They have different airbags;

5  right?  That's the point you're trying to make?

6  **A.**  Among other things, yes.

7  **Q.**  All right.  They had the same seat belt though; right?

8  **A.**  Well, a mirror image, yes.

9  **Q.**  Tell the Court how many times it has happened that this same

10  seat belt failed and it spooled out 20 inches or something close

11  to that and somebody got killed or injured?

12  **A.**  If you're including the passenger side, then there is a second

13  case.

14  **Q.**  That's the Stegall case?

15  **A.**  Yes, sir.

16          (The reporter asks for a clarification.)

17          MR. BUTLER:  Stegall, S-T-E-G-A-L-L.

18  CROSS-EXAMINATION

19  BY MR. BUTLER (continued):

20  **Q.**  So that's only two, Mr. Prentkowski; right?

21  **A.**  Under those qualifications or conditions, yes.

22  **Q.**  The seat belt spooled out this much or almost this much,

23  somebody was killed, those are the qualifications.

24      How do you know there was only two?

25  **A.**  The only two that I've been asked to assist with.

1  Q.  Well, that doesn't mean you know there's only two, does it?

2  A.  It's the only two that I am aware of.

3  Q.  Well, that wasn't the question.  My question was how many

4  times has it happened, and the answer is you don't know, do you?

5  A.  I do not know.

6  Q.  All right.  And the further answer is you don't know because

7  nobody's told you; isn't that right?

8  A.  I guess told me or asked me to help support, yeah, I only know

9  what I'm told.

10  Q.  Nobody's told you about any of the others; correct?

11  A.  Correct.

12  Q.  All right.  Now, you tell Judge Jones what it is that Autoliv

13  does to monitor the field performance of its seat belts to find

14  out how many times this has happened?

15  A.  What Autoliv does to monitor?

16  Q.  Do you want it read back?  Monitoring field performance is a

17  term of art in the automative industry.  All automakers and

18  component suppliers are supposed to do it.  You agree with that,

19  don't you?

20  A.  I agree it occurs.

21  Q.  Well, would you agree that all manufacturers of automatic

22  equipment should monitor the field performance of their products?

23  A.  I don't know what other manufacturers do.

24  Q.  I didn't ask you that.

25      Would you agree that all manufacturers of automative

1  components, should monitor the field performance of their

2  products?

3  **A.**  That's up to each individual manufacturer.

4  **Q.**  Well, if a manufacturer does not monitor the field performance

5  of its products, it can't find out if the things are failing, can

6  it, unless it gets sued?

7  **A.**  They can get direct customer feedback, vehicle manufacturer

8  customer feedback.

9  **Q.**  All right.  You don't know anything about that either, do you?

10  **A.**  I do not.

11  **Q.**  Yes, sir.  So back to my original question.

12  Tell Judge Jones what Autoliv has done to monitor the field

13  performance of its seat belts to find out if there are other

14  incidents of failure like this?

15  **A.**  In general, it's -- it's information supplied through lawsuits

16  or direct customer feedback from the vehicle manufacturers.

17  **Q.**  Do you know of anything other than that that Autoliv has done?

18  **A.**  Not that I'm aware of.

19  **Q.**  Nobody has told you that Autoliv is doing anything other than

20  that to monitor the field performance of these seat belts;

21  correct?

22  **A.**  Well, nobody -- nobody has told me or not told me.  It's just

23  that -- that's the only answer I can give at that point.  I'm

24  unaware of it.

25  **Q.**  Tell Judge Jones who that is employed by Autoliv would know

1    the answer to my question which again is:  What has Autoliv done

2    to monitor the field performance of its seat belts so that we

3    would know if this has happened in the real world more than just

4    two times?

5    **A.**   Again, I don't know the answer other than from a legal

6    standpoint, if there is a legal claim that goes through the -- the

7    legal department at Autoliv.

8    **Q.**   Not only do you not know what Autoliv does to monitor the

9    field performance of its seat belts, you don't know who at Autoliv

10   does know; correct?

11   **A.**   Correct.

12   **Q.**   Thank you, sir.

13       You said when Autoliv's lawyer was asking questions that

14   automakers have, quote, an occupant restraint strategy or

15   philosophy, close quote.  Do you remember saying that?

16   **A.**   I do.

17   **Q.**   Does any automaker have a strategy or philosophy to let

18   someone's head slam into the steering wheel with fatal force?

19   **A.**   Probably not.

20   **Q.**   If an automaker had that strategy and philosophy, would

21   Autoliv refuse to provide products that allowed that to happen, or

22   do you know?

23   **A.**   I don't know.  But I would say that if -- if Autoliv was aware

24   of a system that they knew by design as explained through

25   specification or documentation at the customer that wasn't going

1    to protect the occupant, we wouldn't participate.

2    **Q.**   Mr. Prentkowski, that's exactly what Autoliv did do, isn't it?

3    **A.**   It is not.

4    **Q.**   Look at the Plaintiff's Exhibit 1074 again, the results of the

5    NCAP test.   Autoliv knew from the NCAP test that the driver side

6    seat belt was spooling out 16.8 inches, 16.84 I think it is, which

7    was twice as much as the next worse performer; isn't that right?

8    **A.**   That's what that chart shows.

9    **Q.**   Well, have you looked at the NCAP test?

10   **A.**   I have.

11   **Q.**   I haven't heard a single person speaking for Autoliv in this

12   courtroom this week say that chart, Plaintiff's Exhibit 1074, was

13   not accurate; have you?

14   **A.**   It is accurate.

15   **Q.**   Thank you, sir.

16   **A.**   Can I complete my answer?

17            THE COURT:  Yes.

18            THE WITNESS:  Yes.  NCAP generates a star rating.  The

19   star rating consists of multiple measures and evaluations.

20            MR. BUTLER:  Your Honor, I object.  I didn't ask him

21   about star ratings.  That has nothing to do with my question.

22   He's making a speech.

23            THE COURT:  Hold on.  Hold on.  Wait.  Why are you going

24   into star ratings?  The question was:  Has anyone contested

25   Plaintiff's 1074?

1          MR. BUTLER:  He said no.  He said it is accurate.

2          MR. SCRIBNER:  Well, my recollection is a little bit

3     different.  I think he's talking about -- I don't want to do that.

4     I don't want to be accused --

5          THE COURT:  Let me hear part of what he's going to say,

6     Mr. Butler.  If he's not going to respond, then I'll stop him.  Go

7     ahead.

8          THE WITNESS:  The focus of this chart is in webbing

9     payout.  But the NCAP evaluates head injury criteria, neck injury

10    criteria, chest acceleration, chest deflection, and femur loads.

11    All those things put together create the star rating.  The star

12    rating for this vehicle was four.  NHTSA doesn't publish and

13    doesn't require webbing payout to be published anywhere.  They do

14    require the final star rating for the overall evaluation of the

15    vehicle to be put on a new car window sticker.

16         MR. BUTLER:  Move to strike as not responsive.

17         THE COURT:  I think that was responsive to the question.

18    I'm going -- go ahead and explain -- just go ahead.  Say what

19    you're going to say.

20         MR. SCRIBNER:  Well, I think that the question was, you

21    know, wasn't this accurate?  And I believe Mr. Prentkowski was

22    saying you're looking at one value, but there are chest -- you

23    know, force measures, there are lots of different measures and

24    it's evaluated on all of these things, not just one thing.

25         MR. BUTLER:  That was not the question.  My question

1  was:  Has anybody speaking for Autoliv, speaking in this

2  courtroom, said at any time during this week that this chart,

3  Plaintiff's 1974, was not accurate.  And he said, no, sir, it is

4  accurate.  That was my question, and he's trained to go off on a

5  star rating tangent.

6         THE COURT:  I heard the answer that he said, no.  He

7  explained parts of it.  As the finder of fact, I get to determine

8  what part I want to balance in my findings and what part I don't.

9         MR. BUTLER:  And I know when I've been told to shut up.

10  I concur with the Court's directive.

11         THE COURT:  Thank you.

12         MR. BUTLER:  I'm a slow learner.

13  CROSS-EXAMINATION

14  BY MR. BUTLER (continued):

15  Q.  Isn't it true that in NCAP results, the passenger side seat

16  belt spooled out 22.4 inches?

17  A.  I believe that's correct.

18  Q.  Isn't it true that from the passenger's chest in a seated

19  upright position to the dashboard, there is not 22.4 inches of

20  room before the passenger's head hits the dash?

21  A.  I believe that was testimony earlier in the week, but I

22  haven't independently verified it.

23  Q.  Well, do you dispute it?

24  A.  No.  I said based on testimony earlier this week, that's what

25  was reported.

1  **Q.**  It's undisputed.  That's the point.

2       When Autoliv's lawyer was asking you questions you said

3  something, and I wrote it down as follows:  Quote, right now

4  buckles are being developed with ellipses.  I missed the last of

5  you said.  But the point now, you're talking about right now

6  buckles are being developed.  I want to ask you a question to

7  follow-up on that.

8       Right now is any automaker selling any cars with a seat belt

9  that can spool out 20 inches when the airbag fails?  Do you know?

10  **A.**  Well, I also believe I answered -- yes.

11  **Q.**  You do know?

12  **A.**  Sorry.  A load limiter with the right load and duration

13  lacking an airbag, there are load limiters that will spool out 20

14  inches.

15  **Q.**  And sold today?

16  **A.**  Yes.

17  **Q.**  By whom?

18  **A.**  Pretty much every seat belt manufacturer on the planet.

19  **Q.**  So seat belt manufacturers are still doing this?

20  **A.**  It's what the customers and their crash worthiness teams ask

21  for in terms of overall performance of the seat belt assembly.

22  **Q.**  It's your testimony that car makers like Volvo and Mercedes

23  and BMW and GM and Ford are still selling cars with seat belts

24  that will perform just like this one did if the airbag fails?

25  **A.**  I don't know from an overall systems standpoint how those

1   other vehicles perform.  The load limiters can pay out that much

2   webbing with the right load and duration of load.

3   Q.  I haven't asked you about overall systems.  I haven't asked

4   you about load limiters.  I have not asked you about can pay out.

5   My question is very, very specific.

6           MR. BUTLER:  Would you repeat it, Vi, please.

7           (The record was read.)

8           THE WITNESS:  Again, not knowing the exact details, it's

9   possible.

10  CROSS-EXAMINATION

11  BY MR. BUTLER (continued):

12  Q.  You don't know, do you?

13  A.  I don't know.  There's thousands of vehicles.  I don't know

14  the details of every restraint system.

15  Q.  It is true that Mazda3s with this seat belt are still out

16  there on the road; right?

17  A.  Correct.

18  Q.  And since the last Mazda3 with the seat belt was sold as a

19  2005 model, that means they are 16 years old or older?

20  A.  Yes.

21  Q.  That means that mostly in the hands of people who buy used

22  cars probably?

23  A.  It's possible, yes.

24  Q.  Now, you said in your testimony Monday, a statement, quote, I

25  can't separate system from component, close quote.  And I want to

1  talk to you about that.

2      Do you remember talking a lot about system and systems in your

3  30(b)(6) deposition?

4  **A.**   I do.

5  **Q.**   Thank you.  We made a chart of how many times those words

6  appear, and in your deposition it was 173 times.  Does that

7  surprise you?

8  **A.**   If you did the count, that's what it was.

9  **Q.**   Well, I didn't.  Ms. Glenn did.  She's usually pretty good.

10  So it ought to be about right.

11      Mr. Kamei used those words 33 times in his deposition.

12  Dr. Van Arsdell used those words 71 times in his deposition.  So I

13  want to ask you about that.  If I can remember what I wanted to

14  ask you about.  I've got my notes in disarray.

15      Isn't it true that the only part of this system that Autoliv

16  is willing to admit was defective, is the EFS system, that's the

17  system that sends the signal to the black box?

18  **A.**   Yes.

19  **Q.**   Now, when the EFS is defective and fails to send the signal to

20  the black box, that means the airbag does not deploy; correct?

21  **A.**   Correct.

22  **Q.**   Now, doesn't that mean that the -- what you have and these

23  other witnesses, Mr. Kamei, Dr. Van Arsdell, have repeatedly

24  called the, quote, occupant system, doesn't that mean the, quote,

25  occupant restraint system was defective?

**A.** If it fails?  I mean, the original design by design says that it's going to work under the conditions that crash worthiness team established for it.  If one component doesn't do its job, then, yes, the overall system is not working as designed.

**Q.** It failed; right?

**A.** The overall system failed.

**Q.** Yes.  And Mr. Andrews would be alive today had the system not failed; correct?

**A.** Yes.

**Q.** Now, isn't it true that the manufacturer of components of that system when the system fails catastrophically, have a duty to report that defective system to the National Highway Traffic Safety Administration?

**A.** Well, since the system is owned by Mazda, Mazda would have to file a report of some kind if they believe it was a failure, yes.

**Q.** Well, you believe it was a failure, don't you?

**A.** I don't know.  And Autoliv doesn't have responsibility for the overall system, the vehicle manufacturer does.

**Q.** Autoliv knows the document restraint system failed; correct?

**A.** But, again, Autoliv is not intimately familiar with all of the components of the system.

**Q.** Autoliv is the world's leading manufacturer of safety restraint systems; correct?

**A.** Of seat belt components and seat belt assemblies.

**Q.** And airbags?

1  **A.**   And airbags.

2  **Q.**   44 percent market share worldwide for seat belts, 42 market

3  share worldwide for airbags; right?

4  **A.**   If that's what the data shows, yes.

5  **Q.**   We went over that Monday.  I won't waste time doing it again.

6  From Autoliv's website or annual report, I forget which ones,

7  that's pretty big.  Autoliv has assets of $8.5 billion.  We went

8  over that Monday, too.  Do you remember that?

9  **A.**   Yes.

10 **Q.**   This ain't no small time mom and pop operation that is riding

11 on big data Mazda to report a defect to NHTSA.

12     Does Autoliv have its own independent duty to report that

13 defect to NHTSA, yes or no?

14 **A.**   If the supplier has -- if the supplier has knowledge of a

15 defect of a component, it should report to NHTSA, yes.

16 **Q.**   Well, it ain't no doubt about the supplier Autoliv having

17 knowledge of a defect.  On Monday morning, very early, in Document

18 522, Autoliv admitted knowledge of defect.  Are you familiar with

19 that?

20 **A.**   I don't remember everybody's testimony.

21 **Q.**   It wasn't testimony.  It was called -- it was Defendant

22 Autoliv --

23     (Whereupon, the reporter asks for a clarification.)

24 **Q.**   Defendants' proposed findings of fact and conclusions of law,

25 Document 522, filed Monday morning, page 17, number 12.  Would you

1  read number 12 into the record for the Court?

2  **A.**  "The airbag did not deploy because of the EFS system, which

3  was supplied by Bosch in accordance with Mazda design

4  specifications was defective."

5  **Q.**  Isn't it true that Autoliv knew that the seat belt was

6  defective long before, 11 years before Micah Andrews was killed?

7  **A.**  I don't agree Autoliv knew the seat belt assembly was

8  defective.

9  **Q.**  Isn't it true that on January 8, 2002, Mazda sent an e-mail to

10  Autoliv telling Autoliv that the dummy was bottoming out on the

11  steering wheel when it's tested with this seat belt?

12  **A.**  That is what that document said, but there is a big question

13  mark on the second page.

14  **Q.**  There's a question mark raised by Autoliv; right?

15  **A.**  Correct.

16  **Q.**  Did Autoliv insist on an answer to that question?

17  **A.**  I don't know.

18  **Q.**  Well, Mr. Scribner asked you all about page 2 just a while

19  ago.  He accused me of not letting you talk about page 2, quote,

20  several times, close quote, which is not accurate.

21      Tell us about page 2.  Show the Court the document where

22  Autoliv insisted on an answer from Mazda about that question mark.

23  Show it to us.

24  **A.**  I cannot show you a document.

25  **Q.**  It does not exist, does it, sir?

1  **A.**   The document does not exist. It doesn't mean there wasn't a

2 telephone call or face-to-face meeting.

3  **Q.**   Show us a document that records memorializing the fact of a

4 telephone call or a face-to-face meeting, sir?

5  **A.**   There is not.

6  **Q.**   There's not any because Autoliv didn't do anything, did it?

7  **A.**   I don't know what Autoliv did or didn't do at that time.

8  **Q.**   The people who were involved with the seat belt and who

9 interacted with Mazda, they know, don't they?

10  **A.**   They might, yup.

11  **Q.**   They're not here, are they?

12  **A.**   They are not.

13  **Q.**   Now, Mr. Scribner asked you questions about this design by

14 Mazda thing. He brought up the fact that on Monday you said when

15 you were asked this question, is it true the seat belt assembly

16 was, quote, designed by Mazda, close quote; you said three days

17 ago, I cannot answer yes or no. Do you remember that?

18  **A.**   I do.

19  **Q.**   You also admitted Monday, did you not, that the design of this

20 retractor was completed at least five months before Mazda even

21 asked Autoliv to do any work for the Mazda3?

22  **A.**   Yes.

23  **Q.**   Isn't it true then that to say this seat belt was, quote,

24 designed by Mazda, close quote, is a bald face falsehood?

25  **A.**   No, sir.

1   Q.   All right.  Let's talk about the components of a seat belt.

2   I'm going to put back up Plaintiff's Exhibit 1059.  Plaintiff's

3   exhibit, our exhibit.  And you said it's accurate; right?

4   A.   What's shown on that document example, yes, it is.

5   Q.   Yes, sir.

6      Now, those are the components.  You've got an outboard anchor.

7   That's just a static piece of metal, isn't it, an anchor bolted to

8   the floor?

9   A.   Well, as shown on this document it's very generic.  But there

10  are lots of different types of outboard anchors.

11  Q.   The outboard anchor doesn't do anything but hold the seat

12  belt; right?

13  A.   If you put a lap belt pretensioner on that position, it does

14  more than just hold pieces.

15  Q.   Mr. Prentkowski, you know where I'm going.  Please answer the

16  questions.  Look at the document right in front of you.  I'll give

17  you a small copy, if that makes it easier for you.

18  A.   I can see it.

19  Q.   And I'll give a copy to the Court, because I made plenty of

20  copies.

21     These were components of a seat belt system.  There are no

22  moving parts in that outboard anchor, are this?

23  A.   In a standard outboard anchor, no, there are not.

24  Q.   We are talking about this seat belt.  Okay?  There are no

25  moving parts in the seat belt anchor?

1  **A.**   As described on this sheet.

2  **Q.**   Are there any moving parts in the D-ring?

3  **A.**   No.  Other than it pivots on the bolt, on the pillar.

4  **Q.**   All right.  And the other components of the seat belt assembly

5  are the latch plate and the buckle; right?

6  **A.**   Correct.

7  **Q.**   Everybody knows what the latch plate and the buckle do; right?

8  Isn't that right?

9  **A.**   Correct.

10  **Q.**   Isn't it true that the heart of a seat belt assembly, the

11  thing that's mostly charged with the responsibility of keeping the

12  driver's head from hitting the steering wheel so hard it kills

13  them, is the retractor?

14  **A.**   That in conjunction with the other elements of the system,

15  yes.

16  **Q.**   The retractor is the mechanical device that controls

17  spool-out; correct?

18  **A.**   It controls the webbing payout from load limiting, yes.

19  **Q.**   You talked with Autoliv's lawyer a bunch earlier this

20  afternoon about, quote, what parts the customer wants, close

21  quote.  Do you remember that?

22  **A.**   I do.

23  **Q.**   The customer being Mazda.  Show the Court the document from

24  Mazda to Autoliv where Mazda said we want this R27LL retractor,

25  that's all we want?

1  **A.**   I don't -- it would have been in the original request for

2  quote and quote response between Mazda and Autoliv.

3         MR. BUTLER:   Now, can we have a blowup of PX74.   Put up

4  PX74, if you would, please, Mr. Hendricks.   And go down here to

5  the middle where it has special remarks.

6  CROSS-EXAMINATION

7  BY MR. BUTLER (continued):

8  **Q.**   This is an Autoliv document; correct?

9  **A.**   It is.

10 **Q.**   And it shows the three levels of load limiters offered by

11 Autoliv; right?

12 **A.**   It does.

13 **Q.**   And describes the low-level load limiter as providing 2.5

14 kilonewtons; correct?

15 **A.**   That is what this document says.

16 **Q.**   The load limiter in this seat belt, the subject seat belt, was

17 2.0 kilonewtons; right?

18 **A.**   Right.

19 **Q.**   That's lower than low; right?

20 **A.**   It's lower than what is shown on this drawing, yes.

21 **Q.**   Now, yesterday Autoliv's lawyer suggested that two comma five

22 as shown on this document, does not mean 2.5 or two-and-a-half

23 kilonewtons.   You heard that, didn't you?

24 **A.**   I did.

25 **Q.**   Isn't it true that everybody knows who works in this business

1  that, in your opinion, in Japan oftentimes they use a comma where

2  we use a period?

3  **A.**  Correct.

4  **Q.**  Isn't it true that everybody knows this means 2.5, 3.35 and

5  4.5; isn't that true?

6  **A.**  That's correct.

7  **Q.**  And would you agree with me, sir, that to suggest that this

8  does not mean 2.5, would be misleading?

9  **A.**  It's not 2.0.

10  **Q.**  Pardon?

11  **A.**  It's not 2.0.

12  **Q.**  Let me ask the question again.

13     Would you agree with me then, sir, to suggest to anybody that

14  this document when it has two comma five, does not mean 2.5?  To

15  suggest that, that would be misleading?

16  **A.**  Incorrect, yes.

17  **Q.**  Thank you, sir.

18     Now, would Autoliv sell a torsion bar that was only 1.5

19  kilonewtons if that's what the customer asked for?

20  **A.**  It goes back to the question of system.  The answer is yes,

21  but it goes back to the question of system.  If the system is

22  designed, developed, properly tested, evaluated, certified to

23  meeting the regulatory and customer and other requirements, yes,

24  we would.

25  **Q.**  Autoliv has got no idea about all of that stuff; isn't that

1   true?  No clue about all the stuff that you just qualified your

2   answer with.

3   **A.**  Well, if a customer is talking to us specifically about a load

4   limiter, and they're asking a question specific to a torsion bar,

5   we do have an idea of what they're looking for.

6   **Q.**  No, no.  But you don't know about all that other stuff about

7   the system you just talked about, you don't know anything about

8   that stuff?  Autoliv doesn't know anything about any of that

9   stuff; isn't that right?

10  **A.**  Well, in general terms, yes, but again, the crash worthiness

11  team has done that evaluation.  They've done the system analysis.

12  I don't need to know how the airbag is going to perform to be able

13  to address a question on a torsion bar if they've done the

14  analysis and they've done the simulation and they've done the

15  testing and say it's okay for our system, we want it.

16  **Q.**  For example, for the 2005 Mazda3, Autoliv had no clue what

17  kind of sensor, what kind of sensor connector, what kind of wires

18  were going to be put into the car?  And even though Autoliv's own

19  airbag is totally dependent upon those components; correct?

20  **A.**  That's correct.

21  **Q.**  Would Autoliv sell a customer a 1 kilonewton torsion bar just

22  because that's what the customer asked for?

23  **A.**  Well, now we're getting into the problem that it's very

24  difficult to match and manufacture that part.  So I think the

25  answer is, no, because I don't think we can create it and control

1    it.

2    **Q.** Has Mazda sold a 1.5 kilonewton torsion bar to anybody?

3    Strike that.

4        Has Autoliv sold a 1.5 kilonewtons torsion bar to anybody?

5    **A.** I believe the answer is yes.

6    **Q.** So -- strike that.

7        Now, I asked you a question Monday and you agreed that Autoliv

8    warned no one about what Autoliv -- well, strike that.

9            THE COURT:  Are you ready, Mr. Butler?

10           MR. BUTLER:  I'm trying to wrap up, Your Honor.  Just

11    give me one second.  I want to make sure I don't need to cover any

12    of this stuff that I've already covered.

13           Thank you, Your Honor.  Thank you, Mr. Prentkowski.

14           THE COURT:  Redirect, Mr. Scribner?

15           MR. SCRIBNER:  I have nothing, Your Honor.

16           THE COURT:  Thank you, sir.  You can step down.

17           My understanding, Mr. Scribner, you have two witnesses

18    on Tuesday?

19           MR. SCRIBNER:  I apologize.  We just anticipated

20    differently the trial -- and to everybody, counsel, Ms. Andrews,

21    the staff.  So that's my decision and I was wrong about that.

22           THE COURT:  No apology needed.  We'll close the evidence

23    out on Tuesday.  Let me ask y'all this kind of schedule-wise.

24           Do you think the two witnesses on Tuesday -- I'm trying

25    to figure out how much time do you want to do your closing

1  arguments on Wednesday, or do you want to try to do them on

2  Tuesday?

3          MR. SCRIBNER:  Whatever Mr. Butler would like to do is

4  fine with me.

5          MR. BUTLER:  I don't know how long these witnesses are

6  going to last.  I would prefer Tuesday, but I'm also cognizant of

7  my age and weakening constitution.  So if the witnesses last until

8  mid-afternoon, I would like to go Wednesday morning.

9          MR. SCRIBNER:  In fairness to Mr. Butler, I think these

10 two witnesses are going to get into the afternoon.  Sure.

11         THE COURT:  Let's do the witnesses on Tuesday and

12 closing arguments on Wednesday morning at nine.

13         MR. BUTLER:  Thank you, Your Honor.

14         THE COURT:  Now, let me say this to you.  I have a

15 preliminary injunction that I can push to Wednesday afternoon.  Is

16 that safe?

17         MR. SCRIBNER:  Oh, yeah.

18         MR. BUTLER:  I didn't hear you?

19         THE COURT:  I have a preliminary injunction hearing that

20 we're going to push -- not involved in this case -- to Wednesday

21 afternoon.  Is that safe?

22         MR. BUTLER:  My argument is going to last three hours.

23 I'm kidding, Judge.  Yes, sir.  That's safe.

24         THE COURT:  Listen, if I don't see you all tomorrow,

25 everybody have a great weekend.

—UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT—

1          MR. BUTLER:   Thank you, Your Honor.

2          MR. SCRIBNER:   Thank you, Your Honor.

3          (Whereupon, the trial concluded for the day at 3 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 7th day of October, 2021.

10

11

12

13

14             /s/Viola S. Zborowski
               VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15             OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25
```